**IN THE UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT**

|  |  |  |
|---|---|---|
| MOTOROLA SOLUTIONS, INC., and MOTOROLA SOLUTIONS MALAYSIA SDN. BHD. | ) ) ) | APPEAL NO. 24-1531 |
| | ) | CASE NO. 1:17-cv-01973 |
| Plaintiffs-Appellees, | ) ) | |
| v. | ) ) | |
| HYTERA COMMUNICATIONS CORPORATION LTD., HYTERA AMERICA, INC., AND HYTERA COMMUNICATIONS AMERICA (WEST), INC. | ) ) ) ) ) ) | |
| Defendant-Appellant. | ) ) | |

## PLAINTIFFS' MOTION FOR LEAVE TO FILE CORRECTED APPENDIX TO MOTOROLA'S RESPONSIVE BRIEF

Pursuant to Federal Rule of Appellate Procedure 27, Plaintiffs Motorola Solutions, Inc. and Motorola Solutions Malaysia SDN. BHD respectfully move this Court for leave to file a corrected version of Dkt. 35, their Appendix to Motorola's Responsive Brief. When the Volume III of the Appendix was filed, pages MSA0805 to MSA0923 were inadvertently omitted from "Appendix for Plaintiffs-Appellees Volume III of III." We have conferred with counsel for the Appellant, Alice Loughran, and Appellant does not oppose this motion.

1

DATED: June 26, 2024                Respectfully submitted,


*/s/ John C. O'Quinn, P.C.*
John C. O'Quinn, P.C.
  *Counsel of Record*
Jason M. Wilcox
Joseph C. Schroeder
KIRKLAND & ELLIS LLP
1301 Pennsylvania Avenue N.W.
Washington, DC 20004
(202) 389-5000
john.oquinn@kirkland.com

Michael W. De Vries
KIRKLAND & ELLIS LLP
555 South Flower Street
Suite 3700
Los Angeles, CA 90071
(213) 680-8400

Adam R. Alper
KIRKLAND & ELLIS LLP
555 California Street
27th Floor
San Francisco, CA 94104
(415) 439-1400

Leslie Schmidt
Kirkland & Ellis LLP
601 Lexington Ave.
New York, NY 10022
(212) 446-4763

Counsel for Appellees.

## <u>CERTIFICATE OF SERVICE</u>

I, hereby certify that on June 26, 2024, a copy of the foregoing was filed electronically. Service to this filing will be made on all ECF-registered counsel by operation of the court's electronic filing system. Parties may access this filing through the court's system.

DATED: June 26, 2024

*/s/ John C. O'Quinn*
John C. O'Quinn, P.C.

No. 24-1531

# In The United States Court of Appeals for The Seventh Circuit

MOTOROLA SOLUTIONS, INC. AND
MOTOROLA SOLUTIONS MALAYSIA SDN. BHD.,
*Plaintiffs-Appellees*

v.

HYTERA COMMUNICATIONS CORPORATION LTD.,
*Defendant-Appellant.*

On Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division
Case No. 1:17-cv-01973
Honorable Martha M. Pacold

**APPENDIX FOR PLAINTIFFS-APPELLEES
VOLUME I OF III**

Michael W. De Vries
Kirkland & Ellis LLP
555 South Flower Street, 3700
Los Angeles, CA 90071

Adam R. Alper
Kirkland & Ellis LLP
555 California Street, 27th Floor
San Francisco, CA 94104

Leslie Schmidt
Kirkland & Ellis LLP
601 Lexington Ave.
New York, NY 10022

John C. O'Quinn, P.C.
*Counsel of Record*
Jason M. Wilcox
KIRKLAND & ELLIS LLP
1301 Pennsylvania Avenue NW
Washington, DC 20004

*Counsel for Plaintiffs-Appellees*

June 11, 2024

# MOTOROLA'S SEPARATE APPENDIX
# TABLE OF CONTENTS

## VOLUME I OF III

**DOCUMENT**                                                    **PAGE**

Complaint, dated March 14, 2017 (R.1) ................................................. MSA0001-34

Amended Complaint, dated August 2, 2018 (R.266) ................................MSA0035-73

Trial Transcript Excerpts Volume 2A (pgs. 19-24)
November 7, 2019 (R.783)..................................................................MSA0074-82
    Opening Statement by A. Alper (Motorola)

Trial Transcript Excerpts Volume 2B (pgs. 203-206)
November 7, 2019 (R.783)............................................................. MSA0083-89-
    Direct Examination of Russ Lund (Motorola Witness)

Trial Transcript Excerpts Volume 3B (pgs. 395-401)
November 12, 2019 (R.784)..............................................................MSA0090-99
    Direct Examination of Scott Shepard (Motorola Witness)

Trial Transcript Excerpts Volume 5B (pgs. 722-725)
November 14, 2019 (R.786)...............................................................MSA0100-106
    Direct Examination of Jesus Corretjer (Motorola Witness)

Trial Transcript Excerpts Volume 8B (pgs. 1153-1160, 1203-1208, 1233-1240)
November 20, 2019 (R.789)..............................................................MSA0107-0131
    Direct Examination of Stephen Wicker (Motorola Witness)

Trial Transcript Excerpts Volume 9A (pgs. 1297-1299, 1330-1332)
November 21, 2019 (R.790)..............................................................MSA0132-140
    Direct Examination of Stephen Wicker (Motorola Witness)

Trial Transcript Excerpts Volume 9B (pgs. 1480-1486)
November 21, 2019 (R.790)..............................................................MSA0141-150
    Cross Examination of Stephen Wicker (Motorola Witness)

Trial Transcript Excerpts Volume 10A (pgs. 1548-1550)
November 25, 2019 (R.791)..............................................................MSA0151-156
    Cross Examination of Stephen Wicker (Motorola Witness)

Trial Transcript Excerpts Volume 11B (pgs. 1838-1842, 1884-1894, 1907-1910, 1924-1927)
November 27, 2019 (R.792)........................................................................MSA0157-183
    Direct Examination of Sandeep Rangan (Motorola Witness)

Trial Transcript Excerpts Volume 13B (pgs. 2158-2161)
December 2, 2019 (R.794) ........................................................................MSA0184-190
    Direct Examination of James Malackowski (Motorola Witness)

Trial Transcript Excerpts Volume 22A (pgs. 3258-3262)
December 17, 2019 (R.803) ......................................................................MSA0191-198
    Re-Cross Examination of Luo Junping (Hytera Witness)

Trial Transcript Excerpts Volume 30A (pgs. 4405-4407)
January 28, 2020 (R.924)..........................................................................MSA0199-204
    Direct Examination of Andy Grimmett (Hytera Witness)

Trial Transcript Excerpts Volume 30B (pgs. 4591-4594, 4624-4626)
January 28, 2020 (R.924)..........................................................................MSA0205-214
    Direct Examination of Andy Grimmett (Hytera Witness)
    Cross Examination of Andy Grimmett (Hytera Witness)

Trial Transcript Excerpts Volume 33B (pgs. 5093-5098, 5131-5137)
February 4, 2020 (R.927) .........................................................................MSA0215-230
    Direct Examination of Stephen Wicker [Rebuttal] (Motorola Witness)

Trial Transcript Excerpts Volume 34A (pgs. 5220-5223)
February 5, 2020 (R.928) .........................................................................MSA0231-236
    Cross Examination of Stephen Wicker [Rebuttal] (Motorola Witness)

Trial Transcript Excerpts Volume 34B (pgs. 5279-5283)
February 5, 2020 (R.928) .........................................................................MSA0237-244
    Re-Direct Examination of Stephen Wicker [Rebuttal] (Motorola Witness)

Trial Transcript Excerpts Volume 35A (pgs. 5355-5362)
February 10, 2020 (R.929) .......................................................................MSA0245-254
    Direct Examination of James Malackowski [Rebuttal] (Motorola Witness)

Trial Transcript Excerpts Volume 35B (pgs. 5409-5412, 5466-5469)
February 10, 2020 (R.929) .......................................................................MSA0255-264
    Cross Examination of James Malackowski [Rebuttal] (Motorola Witness)

Trial Transcript Excerpts Volume 37A (pgs. 5557-5560) February 12, 2020 (R.931) ...................................................................MSA0265-271

    Cross Examination of James Malackowski [Rebuttal] (Motorola Witness)

Final Jury Instructions, dated February 14, 2020 (R. 895) ...................MSA0272-326

Plaintiffs' Motion For Permanent Injunction, dated April 2, 2020 (R.961) ..................
.............................................................................................................MSA0327-355

Opposition to Plaintiffs' Motion For a Permanent Injunction, dated June 9, 2020 (R.987)..........................................................................................MSA0356-388

## VOLUME II OF III

Motorola's Reply in Support of its Motion for a Permanent Injunction, dated June 23, 2020 (R.996)...........................................................................MSA0389-423

Order re Pending Motions, dated December 17, 2020 (R.1097)............MSA0424-0430

Findings of Fact and Conclusion of Law in Relation to the Court's October 19 and November 10, 2020 Orders, dated January 8, 2021 (R.1100) ...............MSA0431-0469

Motorola's Submission Regarding and Ongoing Royalty, dated January 28, 2021 (R.1118)......................................................................................MSA0470-0491

Hytera's Submission Regarding a Reasonable Royalty, dated February 17, 2021 (R.1130)........................................................................................MSA0492-511

Order re Motion for Instructions and Supplemental Motion For Attorneys' Fees, dated October 15, 2021 (R.1250)..................................................MSA0512-524

Order re Embedded Motion to Reconsider in its Submission on the Parties' Disputes as to the Court-Ordered Royalties, dated April 12, 2022 (R.1338) .........MSA0525-548

Motorola's Motion that Hytera be Held in Contempt for Violating Court Orders and Request For Hearing, dated August 3, 2022 (R.1359)............................MSA0549-552

Memorandum Opinion and Order (*Motorola v. Hytera*, Case No. 17-cv-1972, N.D. Ill.), dated January 5, 2023(R.275).........................................................MSA0553-566

Minute Entry Regarding Joint Status Report on Discovery (*Motorola v. Hytera*, Case No. 17-cv-1972, N.D. Ill.), Dated March 29, 2023(R.291)...............................MSA0567

Hearing Transcript, dated August 17, 2023 .............................................MSA0568-804

## VOLUME III OF III

Memorandum Opinion and Order (R.1461), dated August 26,2023)......MSA0805-823

Joint Status Report Regarding Royalty Order (R.1463), dated September 1, 2023) ....
............................................................................................................MSA824-828

Memorandum Opinion and Order (*Motorola v. Hytera*, Case No. 17-cv-1972, N.D. Ill.), (R.324) dated September 12, 2023 .................................................MSA0829-845

Motorola's Memorandum in Support of Motion to Hold Hytera in Contempt for Violating Order to Produce Source Code (*Motorola v. Hytera*, Case No. 17-cv-1972, N.D. Ill.), (R.352-1) dated January 16, 2024 ...........................................MSA0846-866

Plaintiffs' Memorandum in Support of Their Motion to Open Contempt Proceedings and Enter an Anti-Suit Injunction to Protect this Court's Jurisdiction (R1482-1) dated February 20, 2024...................................................................MSA0867-893

Defendant Hytera Communications Corporation Ltd.'s Opposition to Motorola's Motion to Open Contempt Proceedings and Enter and Anti-Suit Injunction, (R.1486) dated March 6, 2024....................................................................MSA0894-923

Plaintiffs' Emergency Motion for a Temporary Restraining Order, (R1491) dated March 11, 2024..................................................................................MSA0924-939

Plaintiffs' Memorandum in Support of their Motion to Open Contempt Proceedings and Enter and Anti-Suit Injunction to Protect this Court's Jurisdiction (R.1500) dated March 22, 2024..................................................................................MSA0940-966

Defendant Hytera Communications Ltd.'s Notice Regarding Shenzhen Litigation, (R.1507) dated March 28, 2024............................................................MSA0967-969

Spreadsheet - Diff. of H-end and L-end, Apportionment, Business Terminal, Item Attribute, (Not Dated)
**Trial Ex. DTX-5502** (Admitted February 3, 2020, Tr. pg. 4843) ........MSA0970-1004

Email from S. Chia Han Siong to G. Zhang re FPGA Analysis, (dated June 25, 2008)
**Trial Ex. PTX-19** (Admitted November 20, 2019, Tr. pg. 1195)..........MSA1005-1008

Spreadsheet Task Tracking, (Not Dated)

**Trial Ex. PTX-263**
(Admitted November 20, 2019, Tr. pg. 1204).........................................MSA1009-1032

Email from Guoyxiang to Chanqingzhou et al. re Weekly Updates, (dated February 26, 2008)
**Trial Ex. PTX-421**
(Admitted November 26, 2019, Tr. pg. 1885).........................................MSA1033-1034

Email from zhangjun 02973 to tangjiyue 04081, et al., re Notice about welcome Penang Visitors on March 3, 9:00 a.m., (dated February 29, 2008)
**Trial Ex. PTX-422**
(Admitted December 5, 2019, Tr. pg. 2542) .........................................MSA1035-1041

Presentation: HYT DMR Protocol Introduction, (Not Dated)
**Trial Ex. PTX-1129**
(Admitted November 13, 2019, Tr. pgs. 569) .........................................MSA1042-1089

Spreadsheet, Summary, Sharing Calculation Table, Commercial Terminal Codes, DRM item code-Product type, (Not Dated)
**Trial Ex. PTX-2352**
(Admitted February 10, 2019, Tr. pgs. 5357) .........................................MSA1090-1122

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| MOTOROLA SOLUTIONS, INC., and MOTOROLA SOLUTIONS MALAYSIA SDN. BHD. | ) ) ) ) | CASE NO. 1:17-cv-1973 |
| Plaintiffs | ) ) | **COMPLAINT** |
| v. | ) ) | |
| HYTERA COMMUNICATIONS CORPORATION LTD., HYTERA AMERICA, INC., and HYTERA COMMUNICATIONS AMERICA (WEST), INC. | ) ) ) ) ) ) | **DEMAND FOR A JURY TRIAL** |
| Defendants | ) ) | |

<u>**COMPLAINT**</u>

Plaintiffs Motorola Solutions, Inc. ("Motorola US") and Motorola Solutions Malaysia Sdn. Bhd. ("Motorola Malaysia") (collectively "Motorola," or "Plaintiffs") allege as follows against Defendant Hytera America, Inc., Hytera Communications Corporation Ltd., and Hytera Communications America (West), Inc. (collectively "Hytera" or "Defendants"). The allegations herein are made based on personal knowledge as to Motorola with respect to its own actions, and upon information and belief as to all other matters.

<u>**INTRODUCTION**</u>

1.      Motorola has been building its radios and its reputation for almost a century, and Hytera tried to hijack both in just a few months—and continues to do so to this day. Founded in 1928 in Chicago, Motorola has built and maintained its position as the innovation leader, at home and abroad, in radio equipment and infrastructure technologies. In particular, Motorola has invested its considerable expertise and creativity in developing cutting-edge digital two-way radio communication systems, which it supplies to thousands of public safety organizations, emergency response teams, transportation and logistics organizations, and

numerous other customers involved in hospitality, manufacturing, education, utilities, oil and gas, and retail throughout the United States and around the world.

2. Motorola's global leadership in this sophisticated technical field does not come cheap. For many years, Motorola has employed thousands of engineers in Illinois, other parts of the United States, and various countries throughout the world, and spends hundreds of millions of dollars annually to research new technologies and to develop a wide range of digital radio products and solutions for feature-rich, seamless communication in rapid response networks across many industries and mission-critical applications. Motorola's substantial investments in research and other forms of innovation require protection, and Motorola relies on its trade secrets, in addition to its copyrights, patents, and trademarks, to guard the intellectual property created by the ingenuity and industry of its employees.

3. Hytera's story is the opposite. Hytera's story is not one of innovation, but rather about misappropriation, misuse, copying, and intentional efforts to hide its misconduct from detection. Unlike Motorola, Hytera has not invested the human effort and financial capital in the substantial time-consuming research required to produce truly innovative technologies and products. Founded in 1993 in Shenzhen, China, Hytera served as a distributor for Motorola products until 2001, and since then has operated as a supplier of mostly analog radio products, although many customers require the sophisticated digital products of the kind that Motorola designs and produces. Significantly, by the time Hytera began developing its digital two-way radio technologies, Motorola had already pioneered the field, and had established its digital two-way radio technologies as the leading communications solution for public works, industry, government, non-profit, and commercial applications. In fact, Motorola's success in the digital two-way radio field had rendered Hytera's outdated analog systems obsolete, providing Hytera a motive to take steps to compete through any

means available. Complicating matters further for Hytera during this same time period, the United States Federal Communications Commission set a deadline that effectively required suppliers of radio products to use digital technology.

4. Knowing that its analog radio products faced extinction, and that it could not hope to develop its own digital two-way radios in time to save its ailing business, Hytera embarked on an unlawful plot to surreptitiously take Motorola's confidential and proprietary trade secrets, and use those trade secrets to build a competing product. Indeed, as its executive team acknowledged, Hytera's main product line—analog radios—was quickly becoming "obsolete," and its digital radios had to be developed at a "very quick pace."[1] Thus, Hytera was faced with a choice: engage in time-consuming and resource-intensive development of its own digital product line, or simply take Motorola's technology, without permission, in order to get a product out to market (in Hytera's words) "at a very quick pace." Hytera chose the latter: rather than design its own digital two-way radio products to compete fairly in the marketplace, Hytera instead built its current digital two-way radio business by misappropriating Motorola's proprietary technologies and critical business strategies. This included copying Motorola's innovations—from replicating key technologies in Motorola's products, right down to copying the Motorola technical documentation describing them.

5. Hytera's plan to steal Motorola's technologies was a multi-faceted one, but included as a central pillar a plot to target Motorola from the inside, through its personnel— namely, by recruiting Motorola personnel who had substantial access to Motorola's proprietary technologies, and who downloaded thousands of confidential technical documents in the weeks prior to their departures. Specifically, in order to break into the digital two-way radio market, beginning as early as 2008, Hytera lured away several Motorola senior radio engineers who

---

[1] *See* https://www.youtube.com/watch?v=twxZXiWeNZQ.

were extensively familiar with Motorola's technologies and intellectual property. Three Motorola senior engineers were hired by Hytera and currently hold senior positions at Hytera: Gee Siong Kok ("G.S. Kok"), who formerly served as Senior Engineering Manager at Motorola, and now serves as Senior Vice President and Terminal Chief at Hytera; Samuel Chia ("Chia"), who formerly served as Senior Engineer and Engineering Section Manager at Motorola, and now serves as the Director of Software Engineering at Hytera; and Yih Tzye Kok ("Y.T. Kok"), who formerly served as a Senior Engineer at Motorola, now serving as Sales Director at Hytera (collectively the "Hytera Employees").

6. During their years of employment at Motorola, Motorola trusted these Hytera Employees to work extensively with Motorola's confidential information on highly sensitive and proprietary products and technology. While at Motorola, they were privy to proprietary technical documents and design ideas; they were aware of Motorola's product planning, research and development efforts; and they were intimately familiar with Motorola's digital radio development efforts, including those related to the technologies at issue in this case. And while that knowledge alone presented incalculable value to Hytera, in the weeks prior to their resignations from Motorola (and unbeknownst to Motorola), the Hytera Employees surreptitiously downloaded and misappropriated more than 7,000 technical, marketing, sales, and legal documents related to Motorola's digital radio and infrastructure products. Critically, many of these unlawfully-downloaded documents provided Motorola's specific technology implementations, and other highly detailed technical information relating to critical technologies at issue in this case, providing an unlawfully obtained roadmap to Hytera about how to implement key features developed by Motorola over the course of many years. Hytera relied on, and continues to rely on, Motorola's trade secret information collected from sources including the Hytera Employees, to develop and supply its digital two-way radio products, and

4

the ongoing sales of those products in the United States continue to perpetrate the misappropriation of Motorola's trade secrets. Egregiously, and notwithstanding its unlawful conduct, Hytera publicly touts the very innovations it took from Motorola as *its* own "innovation[s],"[2] evidencing a degree of wanton misappropriation rarely seen even in cases like these.

7. Hytera and the newly employed Hytera Employees knew that the information they downloaded without permission was confidential, and knew that those documents were replete with Motorola's trade secrets. Despite this knowledge, Hytera simply copied and used these critical trade secrets in its own competing products—products that bear the hallmarks of Motorola's innovation, product development, and technical and business strategies. Hytera's misappropriation was deliberate, wholesale, and systematic—not only did Hytera take and then copy Motorola's technical trade secrets, it even copied the marketing, configurations, and product manuals related to the misappropriated features as well, leaving no doubt about its unlawful scheme.

8. The Hytera Employees—and by extension, Hytera itself—intentionally hid their wrongful conduct from Motorola, to ensure it would not be discovered until years later. Motorola undertakes substantial precautions to ensure that its highly confidential information is not misused, including by restricting access to only its trusted employees that have a need for such access. Motorola also requires those employees not only to execute confidentiality agreements upon commencement of their employment, but also to confirm their understanding of their obligations at the time of their departure, and affirmatively represent to Motorola upon their termination that they had not retained any Motorola confidential information.

---

[2] *See, e.g.,* Hytera DMR Introduction presentation, at 40 (available at: http://www.w4cll.com/Digital/TDMA/HyteraIntro.pdf).

9.     Motorola also employs robust technical protections in its systems to detect and thwart unauthorized downloads and access to its confidential and sensitive information, and that technology has improved substantially in recent years over what was available in 2008. Due at least in part to their elevated positions with Motorola, the Hytera Employees were able to evade Motorola's then-existing measures through a series of serious misrepresentations and carefully planned illegal acts, all of which took advantage of Motorola's trust in its senior product staff and the Hytera Employees' intimate knowledge of Motorola's systems.  As a result of their illegal conduct and misrepresentations, the Hytera Employees ensured Motorola would not become aware of the Hytera Employees' conduct, and by extension, Hytera's misappropriation, until years after the Hytera Employees left their employment at Motorola to go to work (unbeknownst to Motorola) at Hytera.

10.     Hytera's brazen misappropriation and theft of trade secrets leave Motorola no choice but to file this lawsuit seeking injunctive relief and recovery of damages for the harm that has been caused by Hytera's illegal conduct.  Hytera did not even attempt to compete fairly with Motorola; rather than develop its own digital two-way radio products, it instead took a short-cut to the marketplace by stealing Motorola's trade secrets and copying Motorola's proprietary innovations.  Such conduct makes investments in technology pointless and costly, and harms American companies and the economy in critical ways.  Unless halted, Hytera's illegal actions will serve as a roadmap for other companies who have not invested in research and development themselves to steal the trade secrets of their competitors, and violate the intellectual property rights of true innovators.  Simply put, Hytera's conduct must be stopped.

MSA0006

## THE PARTIES

11.   Motorola Solutions, Inc. is a company organized and existing under the laws of Delaware having a principal place of business at 500 W Monroe St, Chicago, IL 60661.

12.   Motorola Solutions Malaysia Sdn. Bhd. is a Malaysian corporation having its principal place of business at Level 18, The Gardens North Tower, Mid Valley City, Linkaran Syed Putra, Kuala Lumpur, Labuan 59200, Malaysia.

13.   Defendant Hytera Communications Corporation Ltd. is a company organized and existing under the laws of the People's Republic of China, with its principal place of business at Hytera Tower, Hi-Tech Industrial Park North, #9108 Beihuan Road, Nanshan District, Shenzhen, People's Republic of China.

14.   Defendant Hytera America, Inc. is a company organized and existing under the laws of Florida with its principal place of business at 3315 Commerce Pkwy, Miramar, FL 33025.

15.   Defendant Hytera Communications America (West), Inc. is a company organized and existing under the laws of California with its principal place of business at 300 Spectrum Center Dr., Suite 1120, Irvine, California 92618.

## JURISDICTION AND VENUE

16.   This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 2201, 2202, and the trade secret laws of the United States, 18 U.S.C. §§ 1836 and 1839.  This Court also has supplemental jurisdiction over the asserted state law claims pursuant to 28 U.S.C. § 1367(a) because the federal and state law claims derive from a common nucleus of operative facts.  This Court further has jurisdiction over the asserted state law claims pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship among the parties and an amount in controversy in excess of $75,000.

MSA0007

17. This Court has personal jurisdiction over all of the Defendants. Personal jurisdiction exists generally and specifically over all of the Defendants because they (directly and/or through their subsidiaries, divisions, groups or distributors) have sufficient minimum contacts with the Northern District of Illinois as a result of substantial business conducted within the State of Illinois. For example, Defendants distribute their products that contain the misappropriated technology through a number of District- and Illinois-based distributors, including Lakeland Communication Service, Ragan Communications, A Beep, and Concept Wireless Communications, Inc. Defendants have also distributed their products containing the misappropriated technology to customers in this District and the State of Illinois, including the University of Illinois.[3] As such, Defendants have demonstrated that they are ready and willing to conduct business with residents of this District and the State of Illinois, and actively do so.

18. Defendants also employ individuals in this District and the State of Illinois, including in Chicago[4] and claim that their "Global Presence" is based, in part, in Chicago, IL.[5] Defendants have further availed themselves of contacts and business in this District and the State of Illinois by actively advertising and promoting the products that contain the misappropriated technology. For example, on November 2, 2016, G.S. Kok, Hytera's Senior Vice President delivered the keynote of Hytera's future plans in the digital radio market (which

---

[3] *See* http://wiki.radioreference.com/index.php/University_of_Illinois_at_Urbana-Champaign; *see also* https://www.slideshare.net/rosebrown156/hytera-introductionfor-customers at slide 7.

[4] *See* https://lautanjobs.com/logistics-coordinator-jobs-hytera-communications-america-west.b0c61a8d02aa0acb; *see also* https://www.indeed.com/cmp/Hytera-America/jobs/Logistic-Coordinator-b0c61a8d02aa0acb?q=Transport+West.

[5] *See* https://tandcca.com/fm_file/tetrainchile2015hytera-pdf/ at slide 11 (titled "Hytera Global Presence", and specifically naming and pointing at Chicago as a location that is part of its "Global Presence").

MSA0008

include Hytera's use of Motorola's trade secrets) at a conference held in Chicago, IL.[6] Seven executives of Hytera attended this conference in Chicago, including Hytera America's president, Mr. Andy Zhao, in order to, among other things, increase sales in this District and the State of Illinois of products that contain Motorola's misappropriated technology.[7]

19.     Personal jurisdiction also exists specifically over all the Defendants because they have each committed acts of misappropriation in this District and the State of Illinois, because they each directly and/or through their subsidiaries, divisions, groups, or distributors, advertise, market, use, offer for sale, import for sale and/or sell the products at issue in this case containing the misappropriated technology in this District and the State of Illinois, and place those products in the stream of commerce with the expectation and knowledge that they will be purchased by consumers in this district.  Further, Hytera's misappropriations involved certain trade secrets that were invented in, stored in, or accessed from this District and the State of Illinois.  As such, Defendants have committed tortious acts in this District and the State of Illinois; have expressly aimed their actions at this District and the State of Illinois with the knowledge that they would cause harm and substantial injury to Motorola in the District and the State of Illinois; and Motorola's claims relate to Defendants' products containing technology misappropriated from Motorola and advertised, marketed, used, offered for sale, imported, and/or sold in this District and in the State of Illinois.

20.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because Hytera transacts business in this district, has misappropriated trade secrets in this district, and is subject to personal jurisdiction in this district.  In addition, venue is proper because Motorola is

---

[6]     *See* http://www.hytera.us/Catalogs/Contents.aspx?id=213;
http://www.criticalltecommunications.net/program-day-one/.

[7]     *See* http://urgentcomm.com/hytera/hytera-andy-zhao-outlines-companys-technology-roadmap-lte-other-next-generation-products.

MSA0009

headquartered in this District; has made significant investments of both equipment and engineering talent in this District; stores in or invented in this District certain of the trade secrets at issue in this case; and has suffered harm in this District.

## ADDITIONAL FACTUAL ALLEGATIONS

### A. Motorola Pioneers Digital Two-Way Radio Technology

21. In the United States and around the world, Motorola leads the industry in two-way digital radio products, technologies, and supporting infrastructure and systems. Ever since the company's founding in 1928, Motorola's engineers and technicians have focused on developing the hardware, software, and systems necessary to create innovative and durable products that enable rapid and seamless communications in a variety of different organizations and environments, from construction sites to emergency dispatch systems to school bus networks.

22. Such commitment to cutting-edge innovation in the service of customers—whether they are enterprises, public safety organizations like police and fire departments, or emergency medical providers—does not come cheaply. Motorola has always invested heavily in research and development, spending more than $3.5 billion in the last five years alone, along with the time, dedication, and creativity of hundreds of Motorola engineers, technicians, and other staff.

23. Motorola's innovation and market leadership were praised by many in the industry who recognized that Motorola "is creating a new era in data-rich public safety communications…. Its core business is unrivaled in the United States and around the world with a broad and loyal customer base, an outstanding record of reliability and growing reach

and scale driven by technology innovation."[8] Others have noted that "Motorola Solutions is a leading provider of mission-critical communication solutions and services for enterprise and government customers. Through leading-edge innovation and communications technology, it is a global leader that enables its customers to be their best in the moments that matter."[9]

24. As an industry leader in two-way radio products, Motorola has expended considerable resources to research, design, develop, and bring to market new and innovative technologies that have revolutionized the radio and telecommunications industries. One such innovation is the digital two-way radio technology which Motorola pioneered.

25. Motorola provides its proprietary digital two-way radio technology and features under the brand name MotoTRBO. Motorola's digital two-way radio technology and features are carefully tailored—based on Motorola's extensive research and testing—to meet the requirements of public safety and professional organizations that need a customizable, mission-critical, private communication solution using licensed spectrum.

26. Motorola's MotoTRBO technology is a full product platform that includes portable and mobile radio devices, repeaters and controllers, accessories, data applications, and services that provide a comprehensive two-way digital radio solution.



---

8   *See* Law360, "Silver Lake Backs Motorola Solutions With $1B Investment," (August 5, 2015) (available at: https://www.law360.com/articles/687546/silver-lake-backs-motorola-solutions-with-1b-investment).

9   *See* http://markies.eloqua.com/entrant/motorola-solutions.

**Exemplary MotoTRBO system**

27.     In operation, the MotoTRBO system converts an analog signal that represents an acoustic waveform into a digital signal.  The system then performs voice encoding (vocoding) that compresses the signal to fit into a radio channel.  The encoded audio and accompanying data are then organized into frames for transmission.  The signal is then sent on a single time-slot over a two-slot TDMA 12.5 kHz channel.



**MotoTRBO Digital Radio System**

28.     As part of its industry-leading MotoTRBO digital radio technology, Motorola has developed proprietary digital voice and data innovations that offer great benefits to digital two-way radio users.  These proprietary innovations include features that can provide efficiency together with enhanced digital capabilities and provide exceptional voice quality, integrated data applications, increased capacity, and extended battery performance, among other improvements—and have made Motorola's current MotoTRBO technology the most advanced in the industry.  Motorola's feature-rich MotoTRBO technology integrates proprietary innovations, implemented both in hardware and software, that relate to every aspect of Motorola's digital two-way radio systems, such as emergency features, telephony support, integrated GPS and location services, digital data applications, and enhanced voice features to allow ease of migration from analog to digital systems.  The design, development, and implementation of these features in Motorola's MotoTRBO hardware and software include Motorola's confidential and proprietary technology and trade secrets.

MSA0012

29.    One example of Motorola's proprietary MotoTRBO feature is **Voice Operated Transmission ("VOX")**, which provides invaluable benefits to end users by enabling hands-free communication, *i.e.*, without any push-to-talk action. Motorola's enhanced VOX uses specialized hardware and software to monitor the device microphone for voice activity and begins transmission upon detection, allowing users to communicate while still having full use of their hands, thereby enhancing safety and efficiency.

Voice Operated Transmission (VOX) monitors the accessory microphone for voice activity. When voice is detected, the radio is keyed-up and the voice is transmitted. When voice is no longer detected at the accessory microphone, the radio is de-keyed.

**MotoTRBO System Planner at 131.**

30.    Another proprietary feature developed and implemented by Motorola in its MotoTRBO line of products is **Telemetry** functionality that enables a radio to remotely control and monitor the GPIO (General Purpose I/O) pins of a target radio. This functionality enables remote controlling and monitoring of equipment, for example in industrial or agricultural environments.

13

MSA0013



*Figure 3-25  MOTOTRBO Radios in Digital Two-Slot Digital Repeater Mode with Telemetry Functions*

**MotoTRBO System Planner at 205.**

31.    As another example, Motorola developed a **Dynamic Mixed Mode Priority Scan** feature that enables a user's radio to dynamically switch between analog and digital modes depending on the type of call received.

When operating in **Dynamic Mixed Mode (DMM)**, MOTOTRBO uses a pair of physical channels configured for 12.5 kHz channel bandwidth for digital operation and 25 kHz and/or 12.5 kHz channel bandwidth for analog operation. The repeater dynamically switches between analog and digital modes based on the call it receives from radios. If an analog radio transmits, the repeater switches to analog mode to repeat the analog call. However, the repeater only repeats analog calls that are qualified by PL (DPL/TPL). If a digital radio transmits, then the repeater switches to digital mode to repeat the digital call if the call uses the right color code. While the repeater repeats one analog call at a time, it can repeat 2 digital calls at a time, one on each logical channel.

**MotoTRBO System Planner at 15.**

32.    Motorola has also developed **location based services** that rely on integrated GPS functionality in its MotoTRBO devices.  Motorola's location services enable, for

example, a dispatcher to determine the current location of a radio on a display map, along with

other information such as speed and direction.



Figure 2-9 Location Services

**MotoTRBO System Planner at 51.**

33.     One specific proprietary feature within MotoTRBO's location services

innovations is the **GPS Revert Channel** feature, which removes location data from a selected

channel into a dedicated channel, thus freeing the selected channel to accommodate increased

voice traffic.

## GPS Revert Channel

The GPS Revert Channel feature allows system operators a configurable option to off load radio transmitted location updates onto a programmed digital channel that differs from the digital Selected Channel. This feature effectively removes Location Update traffic from the Selected Channel in order to free up that channel to accommodate increased voice loads and/or to enhance the user experience by reducing the number of channel busies during voice call requests. This feature also allows a large group to communicate on a single voice channel while sending location updates on multiple GPS Revert Channels to accommodate larger Location Update loads. This increases the Location Update throughput associated with radios belonging to a single group.

**MotoTRBO System Planner at 54.**

34.     Motorola's MotoTRBO technology also includes a **Digital Telephone Patch (DTP)** feature that enables direct communication between radio devices and telephone devices, in both an individual call mode and talkgroup mode that enables communication between a phone user and a group of radio users through a half-duplex voice communication.

## Digital Telephone Patch (DTP)

The MOTOTRBO Digital Telephone Patch is a Motorola proprietary feature introduced in software version R01.08.00 supporting two types of phone patch calls:

- **Individual Phone Patch Call** – This allows a half-duplex voice communication between a radio user and a phone user. This communication can be initiated from either party.
- **Talkgroup Phone Patch Call** – This allows a half-duplex voice communication between a phone user and a group of radio users. This type of communication can be initiated only by the phone user.

**MotoTRBO System Planner at 138.**

35.     Another set of proprietary features supported in Motorola's MotoTRBO technology are emergency features that enable a user in distress to send an emergency alarm message that contains the individual radio identification of the user.  Such emergency features include, for example, a proprietary implementation of the **emergency "Lone Worker"** feature to enhance safety for users who work remotely from others, including those operating machinery and on security patrols.  The Lone Worker feature is able to detect when a user's activity has stopped and, based on a pre-determined activity timer, initiate an emergency signal.  Another example is the **emergency "Man-Down"** feature which detects when the radio, and by extension its user, is in a horizontal orientation and initiates an emergency signal.

## 2.3.4     Digital Emergency

MOTOTRBO offers a variety of emergency handling strategies that will fit the customer's organizational needs. In its basic form, MOTOTRBO provides the ability for a radio user in distress to send a confirmed emergency alarm message, and emergency voice to a user on a supervisory radio. The emergency alarm message contains the individual radio ID of the initiator. Upon reception of an emergency alarm, the supervisor receives audible and visual indications of the emergency and the initiating radio ID is displayed. Depending on configuration, emergency voice may follow between the initiator and the supervisor. Once the supervisor handles the emergency situation (i.e. solves the problem), he clears the emergency on the supervisor radio. Once the initiator clears his emergency on the initiator radio, the emergency is considered over.

16

## 2.12    Lone Worker

For a radio user who is operating machinery, carrying out a security patrol or working in a plant alone, the Lone Worker feature provides a way to remotely monitor, if a user has stopped activity.

The Lone Worker feature is a predefined timer reset with user activity. For example, if the activity timer is set for 10 minutes and the user has no interaction with the radio during this time, the inactivity timer expires and a pre-warning tone sounds immediately after 10 minutes. If the user fails to reset the timer by an interaction with the radio (such as a button press, PTT, volume knob turn, etc.), the radio initiates Emergency. For more information, see section 2.3.4 "Digital Emergency".

The Lone Worker feature is available for both the portable and mobile radios, and in analog and digital modes.

**MotoTRBO System Planner at 34, 132.**

36.    These exemplary proprietary features demonstrate just some of Motorola's substantial and sustained investment in its MotoTRBO technology.  Underlying these technologies are significant technical know-how and other carefully guarded trade secrets that Motorola has developed over the course of many years.  These efforts resulted in substantial trade secrets that, together with other Motorola intellectual property, have made Motorola's current MotoTRBO technology the most advanced in the industry.  For these reasons and others, Motorola's MotoTRBO technology and the secret implementation details of its proprietary features and processes are some of Motorola's most valuable assets.

### B.    Motorola Protects Its Trade Secrets

37.    As a leader in the digital radio industry, Motorola has expended considerable resources in R&D, which resulted in volumes of confidential trade secrets.  For example, in 2015, Motorola invested $620 million in R&D, which represents 10.9% of its sales during the same year.  Between 2011 and 2014, Motorola invested R&D amounts that range between $681-790 million annually.  As a result of its substantial investments and decades-long dedication to innovation, Motorola has been awarded thousands of patents covering, among other things, its digital two-way radio technology.  In addition, significant aspects of Motorola's products are highly confidential, and are maintained by Motorola in strict

MSA0017

confidence as trade secrets to protect their value and the substantial investments Motorola has made to develop them. Indeed, this confidential information derives considerable value from not being publicly known outside of Motorola.

38. Motorola protects its trade secrets in numerous ways, including by restricting access to confidential information only to select individuals, and even then, only subject to strict confidentiality and non-disclosure agreements. For example, as a condition of their employment and as part of their employment agreement, Motorola's employees—including the Hytera Employees—sign confidentiality agreements pursuant to which they agree, among other things, to not make improper use of any of Motorola's confidential information or trade secrets.

> "In consideration of my employment, or continued employment by Motorola, Inc. or its subsidiaries (referred to separately or jointly as "Motorola") and the salary or wages paid to me, I understand and agree to the following provisions for the protection of Motorola property rights:
>
> …
>
> 2. Not to use, or to publish, *or to otherwise disclose to others, either during or subsequent to my employment by Motorola, any confidential information of Motorola* or its customers, except as my Motorola duties may require.
>
> 3. Upon termination of my employment by Motorola, to *promptly deliver to a designated Motorola representative all documents and other records which relate to the business activities of Motorola*, or any other materials which belong to Motorola."

**Motorola Employment Agreement (emphasis added).**

39. Consistent with this practice, the Hytera Employees also entered into employment agreements with Motorola in which they "agree[d] to [certain] provisions for the protection of Motorola's property rights." For example, on or around May 15, 1997, Y.T. Kok and Motorola entered into an Employment Agreement in which Y.T. Kok acknowledged that

MSA0018

he had read and understood the requirements of Motorola's Standard Operating Procedure (SOP) E-62 form regarding the "Appropriate Use of Computer Resources," which states that "[i]t is the policy of Motorola to protect confidential, sensitive or critical information owned by Motorola or in Motorola custody, and also to protect specific information as required by applicable law." Motorola's Standard Operating Procedures expressly forbid "[d]isclosing confidential or sensitive information which is owned by or entrusted to Motorola to unauthorized recipients." Motorola's Standard Operating Procedures further prohibited "[a]ccessing confidential or sensitive information on computer resources without authorization."

40. Chia entered into a similar employment agreement with Motorola on August 23, 1999, in which Chia acknowledged that he had read and understood the requirements of Motorola's Standard Operating Procedure (SOP) E-62 form regarding the "Appropriate Use of Computer Resources," which states, *inter alia*, that "[i]t is the policy of Motorola to protect confidential, sensitive or critical information owned by Motorola or in Motorola custody."

41. In their respective Employment Agreements, each Hytera Employee expressly agreed "[n]ot to use, or to publish, or to otherwise disclose to others, either during or subsequent to [his] employment by Motorola, any confidential information of Motorola or its customers, except as [his] Motorola duties may require." The Hytera Employees further agreed that "[u]pon termination of [their] employment by Motorola, [they would] promptly deliver to a designated Motorola representative all documents and other records which relate to the business activities of Motorola, or any other materials which belong to Motorola."

42. In their respective Employment Agreements, each Hytera Employee further expressly agreed "[t]o assign and [] [t]hereby assign[ed] to Motorola as its exclusive property, the entire right, title and interest in all [his] inventions, innovations, or ideas developed or

19

conceived by [him] solely, or jointly with others, at any time during the term of [his] employment and which inventions, innovations, or ideas relate to the actual or anticipated business activities of Motorola, or result from, or are suggested by, work which [he] do[es] for Motorola."

43. On or around January 8, 2008, in connection with his resignation from Motorola, G.S. Kok executed an agreement entitled "Non-Disclosure of Motorola Proprietary and Confidential Information." Chia and Y.T. Kok signed similar Non-Disclosure agreements in connection with their resignation from Motorola, on or around May 20, 2008 and October 3, 2008, respectively (collectively the "Resignation NDAs").

44. In the Resignation NDAs, each Hytera Employee acknowledged that he had access to Motorola's confidential information, and further acknowledged his continuing obligations under the terms of his Employment Agreement. By the Resignation NDAs, each Hytera Employee agreed that he had been "informed that Motorola felt that any assignment relating to Portable and Paging Radio products and the information listed above might by nature of the assignment require the disclosure of Motorola proprietary and confidential information, and that [he] should also advise [his] new employer or others." Upon resigning, each Hytera Employee was asked: "What orgnisation [sic] will you be working for after Motorola?" None of the Hytera Employees informed Motorola that he was taking on an assignment relating to Portable and Paging Radio products at Hytera.

45. In the Resignation NDAs, each Hytera Employee acknowledged that he was "to collect all Motorola property and confidential information including documents, drawings, reports, specifications, samples, etc., which [he had] in his possession from all Motorola and non-Motorola locations and to have them reviewed by Motorola management." Each Hytera

20

Employee further "[a]cknowledge[d] that all such property and confidential information has been returned from [his] possession to Motorola."

46. Motorola reasonably relied on the Hytera Employees' representations and agreements as contained in their Resignation NDAs, as well as otherwise described herein. Through subsequent investigation, however, Motorola later learned that the Hytera Employees' statements and representations were false, and that they hid their unauthorized downloading of massive amounts of Motorola's confidential trade secrets in the weeks leading up to their departures to Hytera (a fact that was also hidden).

47. Each of the Hytera Employees acknowledged and agreed to protect and treat as confidential all Motorola's trade secrets and/or confidential information.

### C.  Hytera Is Late To Enter The Digital Two-Way Radio Market

48. Whereas Motorola introduced its MotoTRBO technology in 2006, Hytera did not begin developing digital two-way radio products until years later, and did not introduce a digital two-way radio product until 2010. By the time Hytera began developing its digital two-way radio products, Motorola had already pioneered the field, and had established its digital two-way radio products as the leading communications solution for public works and numerous private commercial applications. Moreover, Motorola's success had rendered Hytera's outdated analog systems obsolete.

49. Complicating matters further for Hytera, during this same time period, the United States Federal Communications Commission (FCC) set a deadline that required licensees that had traditionally employed systems that operate on channel bandwidths of 25 kHz to implement equipment designed to operate on channel bandwidths of 12.5 kHz or less to meet specific efficiency standards (hereinafter the "Mandatory Narrowbanding"). The Mandatory Narrowbanding effectively urged providers of radio products toward the use of

digital technology. Both the Hytera Employees and Hytera were acutely aware of these regulations requiring the rapid move to digital two-way radio technology like DMR (Digital Mobile Radio).

50. For example, in a presentation prepared on or around April 8, 2009, for Hytera, Chia recognized a decline in the analog market and a need to move towards digital due to the impending FCC deadline:



51. Hytera knew that its analog radio products faced extinction, and that it could not hope to develop its own digital two-way radios in time to save its ailing business. Indeed, G.S. Kok, in his new role as an executive at Hytera, publicly acknowledged that Hytera's main product line—analog radios—were quickly becoming "obsolete" and that its digital DMR radios had to be developed at a "very quick pace":

> "[Hytera's] recently launched DMR radios . . . were ***developed at a very quick pace*** … ***it had to be fast*** because 2016 is coming up around the bend. And, this is the time where China already announced in 2010 that they're going to obsolete all [ ] analog radio so ***we have only this small amount of time to make it happen***." (emphasis added)



**May 29, 2014 "Interview with Gee Siong Kok, Senior VP of Hytera"** [10]

52.     Thus, Hytera was faced with a choice:  engage in time-consuming and resource-intensive development of its own digital product line, or simply take Motorola's technology, illegally and without permission, in order to get a product out to market "at a very quick pace." Hytera chose the latter.

### D.     Hytera Misappropriates Motorola's Trade Secrets

53.     By the time Hytera began working on a digital two-way radio line of products, Motorola already had fully developed proprietary digital two-way radio technologies and products.  In an unlawful attempt to overcome its late entry to the market, Hytera recruited senior Motorola engineers to initiate and boost its digital two-way radio product line.  Three of those former Motorola engineers, Samuel Chia, Y.T. Kok, and G.S. Kok, were directly

---

[10]    *Available at* https://www.youtube.com/watch?v=twxZXiWeNZQ.

involved in developing Motorola's MotoTRBO technology, and were intimately knowledgeable about the implementation of Motorola's proprietary features.

54.     For example, Samuel Chia served as an Engineering Section Manager for Motorola.  During the time of his employment at Motorola, he held several other key engineering positions, including Senior Software Engineer.  His responsibilities at Motorola included coding, documentation, testing, and release of software used to run Motorola's MotoTRBO technology.  In 2008, Chia was hired by Hytera and he currently serves as a Director of Software Engineering at Hytera.

55.     Similarly, Y.T. Kok served as a Senior Software Engineer at Motorola.  His responsibilities at Motorola included design, development, and release of software used to run Motorola's MotoTRBO technology.  Subsequently, Y.T. Kok was hired by Hytera and he currently serves as a Sales Director at Hytera.

56.     G.S. Kok served as a Senior Engineering Manager for Motorola.  His responsibilities at Motorola included design, development, and release of software used to run Motorola's MotoTRBO and related technology.  In 2008, G.S. Kok was hired by Hytera and he currently serves as Senior Vice President and Terminal Chief at Hytera.

57.     Each of the Hytera Employees were lured to Hytera and accepted employment at Hytera as part of Hytera's unlawful scheme to take Motorola's confidential trade secrets.  In their new positions at Hytera, the Hytera Employees work on the same technologies as they did at Motorola.  For example, G.S. Kok is a Senior Vice President responsible for migrating Hytera's analog technology to digital, including without limitation, the same digital two-way radio technology that comprises Motorola's trade secrets.  Similarly, Y.T. Kok is a Sales Director at Hytera where he oversees sales strategies and product marketing.  Given these overlapping technical fields and responsibilities together with their surreptitious theft of

MSA0024

Motorola's trade secrets (which they went on to hide), it was and is likely that G.S. Kok and Y.T. Kok would use or disclose Motorola's trade secrets in the performance of their job duties for Hytera.

58.     Further, Chia is Software Engineering Director at Hytera and is involved with Hytera's development of two-way digital radio technology that directly misappropriates Motorola's trade secrets.  For instance, Chia is the named inventor on U.S. Pat. No. 8,982,736 (the "'736 Patent") entitled "Method for implementing radiophone based conference call and dynamic grouping," which is assigned to Hytera Communications Corp. Ltd.  The '736 Patent is directed to "[a] method for implementing radiophone based conference call and dynamic grouping," and according to the '736 patent, it could be "based upon a specific protocol, e.g., a protocol stack of a radiophone based *Digital Mobile Radio (DMR)*." (emphasis added).  '736 Patent at Title, 7:50-53.  The international application that led to the '736 Patent was filed on December 12, 2008, approximately seven months after Chia resigned from Motorola.  Thus, Chia was engaged in development of two-way digital radio technology at Hytera shortly after he was hired from Motorola, and even purported to patent technologies he was exposed to as a Motorola employee.  Chia had and still has similar responsibilities with Hytera which, together with his surreptitious theft of Motorola's trade secrets (which he went on to hide), have made it likely that he would use or disclose Motorola's trade secrets in the performance of his job duties for Hytera, and will continue to do so.

59.     In 2008, unbeknownst to Motorola at the time due to their surreptitious activities and misrepresentations, just weeks before leaving Motorola, the Hytera Employees downloaded over 7,000 technical, marketing, sales, and legal documents, related to at least Motorola's MotoTRBO proprietary technology.

60.     These highly confidential and sensitive documents, some of which include very detailed technical specifications and schematics related to Motorola's proprietary MotoTRBO technology, include highly sensitive and proprietary Motorola trade secrets.  These documents include highly confidential information about the implementation, marketing, legal protection, and other confidential details regarding the proprietary MotoTRBO related features discussed above.

61.     For example, through its investigation, and despite the Hytera Employees' affirmative attempts to deceive and mislead Motorola, Motorola recently learned that the Hytera Employees accessed and downloaded the MotoTRBO "System Technical Requirements Specification (TRS)," which specifies the detailed technical requirements for Motorola's MotoTRBO technology.  Further, the Hytera Employees accessed and downloaded the MotoTRBO "Marketing Requirements Document (MRD)," which specifies the marketing requirements for Motorola's MotoTRBO technology.  Similarly, the Hytera Employees accessed and downloaded MotoTRBO "Integrated Business Plan" as well as other sensitive documents containing Motorola's confidential information and trade secrets, including marketing, packaging and pricing strategies, and a list of deliverables.  These documents all contain detailed disclosures of Motorola's sensitive trade secrets.

62.     Additionally, some of the MotoTRBO related confidential documents that were accessed and downloaded by the Hytera Employees include:

- MotoTRBO Marketing Requirements Document;
- MotoTRBO Digital Growth Strategies Presentation;
- MotoTRBO Software Strategy Overview;
- MotoTRBO Technology Roadmap;
- MotoTRBO Technical Requirements Document;

MSA0026

- MotoTRBO Technical Requirements Specification;

- MotoTRBO Technical Requirements Integrated Business Plan;

- MotoTRBO Feature Prioritization;

- MotoTRBO Digital Presentation;

- MotoTRBO System White Paper;

- Portable Receiver Architectures for MotoTRBO System;

- MotoTRBO LoneWorker Technical Scope Document;

- MotoTRBO Emergency Operation;

- MotoTRBO Emergency Clarifications Document;

- MotoTRBO Software GPS White Paper;

- MotoTRBO Revert Architecture Document;

- MotoTRBO GPS Revert Operational Scenarios;

- MotoTRBO Digital Telephone Interconnect Document;

- MotoTRBO Performance Analysis For Mixed-Mode Scan;

- MotoTRBO Scan - Software Architecture and Design Challenges;

- MotoTRBO Scanning Architecture;

- MotoTRBO Telemetry Technical Requirement Specification;

- MotoTRBO Telemetry User Requirements;

- MotoTRBO Enhanced VOX White Paper;

- MotoTRBO VOX Feature Impact Analysis; and

- MotoTRBO VOX Technical Scope.

63. Moreover, Motorola's investigation revealed that the Hytera Employees improperly accessed and retained files containing highly confidential information about Motorola's Intellectual Property, including sensitive (and in some cases privileged) information regarding patent submissions and licensing and legal strategy. For example, the

27

MSA0027

Hytera Employees downloaded sensitive documents that list many of the patent submissions and unpublished patent applications related to Motorola's MotoTRBO technology. Further, the Hytera Employees downloaded documents that include legal analysis and strategy with respect to technology standardization efforts and licensing operations.

64. Since its employees acquired these documents, Hytera has perfected the misappropriation by incorporating Motorola's digital two-way radio technologies and related features into its products that are currently sold in the United States, which are in whole or part derived from Motorola's trade secrets. For example, Hytera implemented Motorola's digital two-way radio features as implemented in Motorola's proprietary MotoTRBO products, often using the exact same feature names. For instance, Hytera has incorporated the "VOX," "Telemetry," "Lone Worker," "Man Down," Mixed Mode Scanning," "Phone Feature," and "GPS Revert Channel" features, that are in whole or part derived from and/or comprise Motorola's trade secrets.

65. Further, the Hytera Employees were actively familiar with Motorola's proprietary information regarding the MotoTRBO features while at Motorola. By way of example, Chia authored an "Enhanced VOX White Paper" on or around February 6, 2004, while at Motorola. The Enhanced VOX White Paper, which was unlawfully downloaded and retrieved by the Hytera Employees, describes the operation of Motorola's VOX feature and includes detailed information such as algorithms and simulations required for implementing and operating Motorola's confidential and proprietary technology.

66. Further, by way of example, Y.T. Kok served as the Feature Manager for Motorola's VOX technology implementation. Y.T. Kok had access to confidential details regarding the implementation of Motorola's VOX technology including major development

28

MSA0028

milestones, development timelines, risk analyses, product and feature analyses, and issues with development and how they were being addressed.

67. At all relevant times, Hytera knew that the Hytera Employees had previously been employed by Motorola as well as the nature of their work and responsibilities as Motorola employees. Hytera knew or should have known that the Hytera Employees had access to Motorola's trade secrets and confidential information. Yet Hytera acquired, used, and/or disclosed Motorola's trade secrets by instructing and allowing the Hytera Employees to incorporate Motorola's trade secrets and confidential information into, among other things, Hytera's products and business strategies. Indeed, upon their termination at Motorola, each Hytera Employee acknowledged in his respective Resignation NDA that he would "advise [his] new employer" that "any assignment relating to Portable and Paging Radio products . . . might by nature of the assignment require the disclosure of Motorola proprietary and confidential information."

## COUNT I

### Trade Secret Misappropriation Under the Defend Trade Secrets Act
### (18 U.S.C. §§ 1836(b), 1839 *et seq.*)

68. Motorola incorporates and re-alleges each and every allegation above as if fully set forth herein.

69. Motorola is the owner of certain valuable trade secrets contained in and relating to digital mobile radio, including as described herein. These trade secrets are related to Motorola's products and services that are used in or intended for use in interstate and foreign commerce. These confidential and proprietary trade secrets are of substantial economic value and have conferred a competitive advantage on Motorola.

MSA0029

70.     As stated above, Motorola sells its products throughout the United States.  For example, Motorola's digital two-way radio technology and solutions are sold and used throughout the United States.

71.     The Hytera Employees gained access to Motorola's trade secrets in the course of an employee-employer relationship between Motorola and the Hytera Employees.  The Hytera Employees improperly acquired and retained Motorola's trade secrets upon termination of their employment.

72.     The Hytera Employees subsequently used and disclosed to Hytera Motorola's trade secrets.  Accordingly, Hytera is in possession of the foregoing Motorola trade secrets, which are subject to confidentiality agreements in which the Hytera Employees expressly acknowledged and confirmed the confidential nature of these secrets.

73.     Hytera improperly acquired Motorola's trade secrets from the Hytera Employees and has since improperly used and disclosed those Motorola trade secrets, including by incorporating them into products Hytera markets and sells as its own.

74.     Hytera has misappropriated Motorola's trade secrets by acquiring, using, and/or disclosing the information described above, including by manufacturing, marketing, offering, and/or selling in the United States products that comprise, embody, and/or incorporate the trade secrets described herein.

75.     Hytera willfully and maliciously misappropriated Motorola's trade secrets in order to gain economic value from that information.

76.     Motorola has taken reasonable steps to maintain the secrecy of its trade secrets, including by requiring confidentiality and/or nondisclosure agreements to be signed by any party granted access to Motorola's trade secrets.

MSA0030

77.     As a direct and proximate result of Defendants' current and continued misappropriation of Motorola's trade secrets, Motorola will suffer imminent and irreparable harm.

78.     Unless enjoined by this Court, Defendants' acts of misappropriation will continue and Motorola will continue to suffer irreparable harm.

79.     Motorola has no adequate remedy at law.

## COUNT II

**Trade Secret Misappropriation Under Illinois Trade Secret Act**

**(765 ILCS 1065 *et seq.*)**

80.     Motorola incorporates and re-alleges each and every allegation above as if fully set forth herein.

81.     Motorola is the owner of certain valuable trade secrets contained in and relating to digital mobile radio and as described herein.  These confidential and proprietary trade secrets are of substantial economic value and have conferred a competitive advantage on Motorola.

82.     The Hytera Employees gained access to Motorola's trade secrets in the course of an employee-employer relationship between Motorola and the Hytera Employees.  The Hytera Employees improperly acquired and retained Motorola's trade secrets upon termination of their employment.

83.     The Hytera Employees subsequently used and disclosed to Hytera Motorola's trade secrets.  Accordingly, Hytera is in possession of the foregoing Motorola trade secrets, which are subject to confidentiality agreements in which the Hytera Employees expressly acknowledged and confirmed the confidential nature of these secrets.

MSA0031

84.     Hytera improperly acquired Motorola's trade secrets from the Hytera Employees and has since improperly used and disclosed those Motorola trade secrets, including by incorporating them into products Hytera markets and sells as its own.

85.     Hytera willfully and maliciously misappropriated Motorola's trade secrets in order to gain economic value from that information.

86.     Motorola has taken reasonable steps to maintain the secrecy of its trade secrets, including by requiring confidentiality and/or nondisclosure agreements to be signed by any party granted access to Motorola's trade secrets.

87.     As a direct and proximate result of Defendants' current and continued misappropriation of Motorola's trade secrets, Motorola will suffer imminent and irreparable harm.

88.     Unless enjoined by this Court, Defendants' acts of misappropriation will continue and Motorola will continue to suffer irreparable harm.

89.     Motorola has no adequate remedy at law.

## JURY DEMAND

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Motorola demands a trial by jury on all issues raised by the Complaint.

## PRAYER FOR RELIEF

WHEREFORE, Motorola prays for relief as follows:

1.     Award a temporary restraining order, preliminary injunction, and/or permanent injunction prohibiting Hytera and all affiliates, employees, agents, officers, directors, attorneys, successors, and assigns, and all those acting on behalf of or in active concert or participation with any of them, from unfairly competing with Motorola by using Motorola's trade secrets.

32

MSA0032

2.      Award a temporary restraining order, preliminary injunction, and/or a permanent injunction restraining and enjoining Hytera from altering, destroying, or disposing of any evidence, in any form, relating to this action, including without limitation emails and paper and electronic documents, including current or archived electronic logs, metadata, and directories.

3.      Order Hytera to return all Motorola confidential and proprietary information in its possession and to cease and desist from its efforts to encourage employees and others, including the Hytera Employees, from violating Motorola's Employment Agreements and Resignation NDAs.

4.      Declare that Hytera has no rights or privileges to use Motorola's trade secrets.

5.      Award Motorola restitution in an amount to be determined at trial.

6.      Award Motorola damages in an amount to be determined at trial, including without limitation, Motorola's lost revenues and profits.

7.      Award Motorola punitive damages in an amount to be determined at trial.

8.      For an award of pre-judgment and post-judgment interest.

9.      Award Motorola attorneys' fees and costs.

10.     Award Motorola any such other relief as the Court deems appropriate.

DATED: March 14, 2017          Respectfully submitted,

*/s/ Brandon H. Brown*

Adam R. Alper (*pro hac vice forthcoming*)
adam.alper@kirkland.com
Brandon H. Brown (IL Bar No. 266347 CA)
bhbrown@kirkland.com
KIRKLAND & ELLIS LLP
555 California Street
San Francisco, California 94104
Telephone: (415) 439-1400
Facsimile: (415) 439-1500

Michael W. De Vries (*pro hac vice forthcoming*)
michael.devries@kirkland.com
Ali-Reza Boloori (*pro hac vice forthcoming*)
ali-reza.boloori@kirkland.com
KIRKLAND & ELLIS LLP
333 South Hope Street
Los Angeles, California 90071
Telephone: (213) 680-8400
Facsimile: (213) 680-8500

David Rokach  (IL SBN: 6279703)
david.rokach@kirkland.com
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, IL 60654
Telephone: (312)862-2000
Facsimile: (312)862-2200

Katharine M. Burke (*pro hac vice forthcoming*)
katharine.burke@kirkland.com
KIRKLAND & ELLIS LLP
655 Fifteenth Street, N.W.
Washington, DC 20005
Telephone: (202) 879-5000
Facsimile: (202) 879-5200

Attorneys for Plaintiffs
MOTOROLA SOLUTIONS, INC. and
MOTOROLA SOLUTIONS MALAYSIA
SDN. BHD.

MSA0034

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| MOTOROLA SOLUTIONS, INC., and MOTOROLA SOLUTIONS MALAYSIA SDN. BHD. <br><br> Plaintiffs <br><br> v. <br><br> HYTERA COMMUNICATIONS CORPORATION LTD., HYTERA AMERICA, INC., and HYTERA COMMUNICATIONS AMERICA (WEST), INC. <br><br> Defendants | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | Case No. 1:17-CV-01973 <br><br> Honorable Charles R. Norgle, Sr. <br><br> Magistrate Judge Jeffrey Cole <br><br> **AMENDED COMPLAINT** <br><br> **JURY TRIAL DEMAND** |

<u>**AMENDED COMPLAINT**</u>

Plaintiffs Motorola Solutions, Inc. ("Motorola US") and Motorola Solutions Malaysia Sdn. Bhd. ("Motorola Malaysia") (collectively "Motorola," or "Plaintiffs") allege as follows against Defendant Hytera America, Inc., Hytera Communications Corporation Ltd., and Hytera Communications America (West), Inc. (collectively "Hytera" or "Defendants"). The allegations herein are made based on personal knowledge as to Motorola with respect to its own actions, and upon information and belief as to all other matters.

**INTRODUCTION**

1. Motorola has been building its radios and its reputation for almost a century, and Hytera tried to hijack both in just a few months—and continues to do so to this day. Founded in 1928 in Chicago, Motorola has built and maintained its position as the innovation leader, at home and abroad, in radio equipment and infrastructure technologies. In particular, Motorola has invested its considerable expertise and creativity in developing cutting-edge digital two-way radio communication systems and computer programs, which it supplies to

MSA0035

thousands of public safety organizations, emergency response teams, transportation and logistics organizations, and numerous other customers involved in hospitality, manufacturing, education, utilities, oil and gas, and retail throughout the United States and around the world.

2. Motorola's global leadership in this sophisticated technical field does not come cheap. For many years, Motorola has employed thousands of engineers and software developers in Illinois, other parts of the United States, and various countries throughout the world, and spends hundreds of millions of dollars annually to research new technologies and to develop a wide range of digital radio products and solutions for feature-rich, seamless communication in rapid response networks across many industries and mission-critical applications. Motorola's substantial investments in research and other forms of innovation require protection, and Motorola relies on its trade secrets, in addition to its copyrights, patents, and trademarks, to guard the intellectual property created by the ingenuity and industry of its employees.

3. Hytera's story is the opposite. Hytera's story is not one of innovation, but rather about misappropriation, misuse, copying, and intentional efforts to hide its misconduct from detection. Unlike Motorola, Hytera has not invested the human effort and financial capital in the substantial time-consuming research required to produce truly innovative technologies and products. Founded in 1993 in Shenzhen, China, Hytera served as a distributor for Motorola products until 2001, and since then has operated as a supplier of mostly analog radio products, although many customers require the sophisticated digital products of the kind that Motorola designs and produces. Significantly, by the time Hytera began developing its digital two-way radio technologies, Motorola had already pioneered the field, and had established its digital two-way radio technologies as the leading communications solution for public works, industry, government, non-profit, and commercial applications. In

MSA0036

fact, Motorola's success in the digital two-way radio field had rendered Hytera's outdated analog systems obsolete, providing Hytera a motive to take steps to compete through any means available. Complicating matters further for Hytera during this same time period, the United States Federal Communications Commission set a deadline that effectively required suppliers of radio products to use digital technology.

4. Knowing that its analog radio products faced extinction, and that it could not hope to develop its own digital two-way radios in time to save its ailing business, Hytera embarked on an unlawful plot to surreptitiously take and copy Motorola's confidential and proprietary trade secrets and copyrighted material, and use those trade secrets and copyrighted material to build a competing product. Indeed, as its executive team acknowledged, Hytera's main product line—analog radios—was quickly becoming "obsolete," and its digital radios had to be developed at a "very quick pace."[1] Thus, Hytera was faced with a choice: engage in time-consuming and resource-intensive development of its own digital product line, or simply take Motorola's technology, without permission, in order to get a product out to market (in Hytera's words) "at a very quick pace." Hytera chose the latter: rather than design its own digital two-way radio products to compete fairly in the marketplace, Hytera instead built its current digital two-way radio business by misappropriating Motorola's proprietary technologies and critical business strategies. This included copying Motorola's innovations—from replicating key technologies in Motorola's products, right down to copying the Motorola technical documentation describing them and even the Motorola computer programs at the heart of Motorola's products.

---

[1] *See* https://www.youtube.com/watch?v=twxZXiWeNZQ.

3

5. Hytera's plan to steal Motorola's technologies was a multi-faceted one, but included as a central pillar a plot to target Motorola from the inside, through its personnel—namely, by recruiting Motorola personnel who had substantial access to Motorola's proprietary technologies, and who downloaded thousands of confidential technical documents in the weeks prior to their departures. Specifically, in order to break into the digital two-way radio market, beginning as early as 2008, Hytera lured away several Motorola senior radio engineers who were extensively familiar with Motorola's technologies and intellectual property. Three Motorola senior engineers were hired by Hytera and held senior positions at Hytera: Gee Siong Kok ("G.S. Kok"), who formerly served as Senior Engineering Manager at Motorola, and at Hytera served as Senior Vice President and Terminal Chief at Hytera; Samuel Chia ("Chia"), who formerly served as Senior Engineer and Engineering Section Manager at Motorola, and now serves as the Director of Software Engineering at Hytera; and Yih Tzye Kok ("Y.T. Kok"), who formerly served as a Senior Engineer at Motorola, now serving as Sales Director at Hytera (collectively the "Hytera Employees").

6. During their years of employment at Motorola, Motorola trusted these Hytera Employees to work extensively with Motorola's confidential information on highly sensitive and proprietary products and technology. While at Motorola, they were privy to proprietary technical documents, design ideas, and computer programs, including software source code; they were aware of Motorola's product planning, research and development efforts; and they were intimately familiar with Motorola's digital radio development efforts, including those related to the technologies at issue in this case. And while that knowledge alone presented incalculable value to Hytera, in the weeks prior to their resignations from Motorola (and unbeknownst to Motorola), the Hytera Employees surreptitiously downloaded and misappropriated more than 7,000 technical, marketing, sales, and legal documents related to Motorola's digital radio and

MSA0038

infrastructure products. Critically, many of these unlawfully-downloaded documents provided Motorola's specific technology implementations and copyrighted material, and other highly detailed technical information relating to critical technologies at issue in this case, providing an unlawfully obtained roadmap to Hytera about how to implement key features developed by Motorola over the course of many years. Hytera relied on, and continues to rely on, Motorola's trade secret and copyrighted information collected from sources including the Hytera Employees, to develop and supply its digital two-way radio products, and the ongoing sales of those products in the United States continue to perpetrate the misappropriation of Motorola's trade secrets and Hytera's infringement of Motorola's copyrighted computer programs. Egregiously, and notwithstanding its unlawful conduct, Hytera publicly touts the very innovations it took from Motorola as *its* own "innovation[s],"[2] evidencing a degree of wanton misappropriation rarely seen even in cases like these.

7. Hytera and the newly employed Hytera Employees knew that the information they downloaded without permission was confidential, and knew that those documents were replete with Motorola trade secrets and copyrighted material. Despite this knowledge, Hytera simply copied and used these critical trade secrets and copyrighted material in its own competing products—products that bear the hallmarks of Motorola's innovation, product development, and technical and business strategies. Hytera's misappropriation was deliberate, wholesale, and systematic—not only did Hytera take and then copy Motorola's technical trade secrets, it even copied the marketing, configurations, and product manuals related to the misappropriated features as well, and copied Motorola's computer programs, including source

---

[2]  *See, e.g.,* Hytera DMR Introduction presentation, at 40 (available at: http://www.w4cll.com/Digital/TDMA/HyteraIntro.pdf).

MSA0039

code, ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ leaving no doubt about its unlawful scheme.

8. The Hytera Employees—and by extension, Hytera itself—intentionally hid their wrongful conduct from Motorola, to ensure it would not be discovered until years later. Motorola undertakes substantial precautions to ensure that its highly confidential information is not misused, including by restricting access to only its trusted employees that have a need for such access. Motorola also requires those employees not only to execute confidentiality agreements upon commencement of their employment, but also to confirm their understanding of their obligations at the time of their departure, and affirmatively represent to Motorola upon their termination that they had not retained any Motorola confidential information.

9. Motorola also employs robust technical protections in its systems to detect and thwart unauthorized downloads and access to its confidential and sensitive information, and that technology has improved substantially in recent years over what was available in 2008. Due at least in part to their elevated positions with Motorola, the Hytera Employees were able to evade Motorola's then-existing measures through a series of serious misrepresentations and carefully planned illegal acts, all of which took advantage of Motorola's trust in its senior product staff and the Hytera Employees' intimate knowledge of Motorola's systems. As a result of their illegal conduct and misrepresentations, the Hytera Employees ensured Motorola would not become aware of the Hytera Employees' conduct, and by extension, Hytera's misappropriation, until years after the Hytera Employees left their employment at Motorola to go to work (unbeknownst to Motorola) at Hytera.

10. Hytera's brazen misappropriation, theft of trade secrets, and infringement of Motorola's copyrights leave Motorola no choice but to file this lawsuit seeking injunctive relief and recovery of damages for the harm that has been caused by Hytera's illegal conduct. Hytera

MSA0040

did not even attempt to compete fairly with Motorola; rather than develop its own digital two-way radio products, it instead took a short-cut to the marketplace by stealing Motorola's trade secrets and copying Motorola's proprietary innovations and computer programs. Such conduct makes investments in technology pointless and costly, and harms American companies and the economy in critical ways. Unless halted, Hytera's illegal actions will serve as a roadmap for other companies who have not invested in research and development themselves to steal the trade secrets of their competitors, and violate the intellectual property rights of true innovators. Simply put, Hytera's conduct must be stopped.

## THE PARTIES

11.     Motorola Solutions, Inc. is a company organized and existing under the laws of Delaware having a principal place of business at 500 W Monroe St, Chicago, IL 60661.

12.     Motorola Solutions Malaysia Sdn. Bhd. is a Malaysian corporation having its principal place of business at Level 18, The Gardens North Tower, Mid Valley City, Linkaran Syed Putra, Kuala Lumpur, Labuan 59200, Malaysia.

13.     Defendant Hytera Communications Corporation Ltd. is a company organized and existing under the laws of the People's Republic of China, with its principal place of business at Hytera Tower, Hi-Tech Industrial Park North, #9108 Beihuan Road, Nanshan District, Shenzhen, People's Republic of China.

14.     Defendant Hytera America, Inc. is a company organized and existing under the laws of Florida with its principal place of business at 3315 Commerce Pkwy, Miramar, FL 33025.

15.     Defendant Hytera Communications America (West), Inc. is a company organized and existing under the laws of California with its principal place of business at 300 Spectrum Center Dr., Suite 1120, Irvine, California 92618.

MSA0041

**JURISDICTION AND VENUE**

16.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 2201, 2202, the trade secret laws of the United States (18 U.S.C. §§ 1836 and 1839), and the copyright laws of the United States (17 U.S.C. § 101 *et seq.*).  This Court also has supplemental jurisdiction over the asserted state law claims pursuant to 28 U.S.C. § 1367(a) because the federal and state law claims derive from a common nucleus of operative facts. This Court further has jurisdiction over the asserted state law claims pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship among the parties and an amount in controversy in excess of $75,000.

17.     This Court has personal jurisdiction over all of the Defendants.  Personal jurisdiction exists generally and specifically over all of the Defendants because they (directly and/or through their subsidiaries, divisions, groups or distributors) have sufficient minimum contacts with the Northern District of Illinois as a result of substantial business conducted within the State of Illinois.  For example, Defendants distribute their products ███████████ ██████████████████████████████████████████████████████████████████ ████████████████ through a number of District- and Illinois-based distributors, including Lakeland Communication Service, Ragan Communications, A Beep, and Concept Wireless Communications, Inc.   Defendants have also distributed their products ██████████ ██████████████████████ to customers in this District and the State of Illinois, including the University of Illinois.[3]  As such, Defendants have demonstrated that they are ready and willing to conduct business with residents of this District and the State of Illinois, and actively do so.

---

[3]   *See* http://wiki.radioreference.com/index.php/University_of_Illinois_at_Urbana-Champaign; *see also* https://www.slideshare.net/rosebrown156/hytera-introductionfor-customers at slide 7.

MSA0042

18.     Defendants also employ individuals in this District and the State of Illinois, including in Chicago[4] and claim that their "Global Presence" is based, in part, in Chicago, IL.[5] Defendants have further availed themselves of contacts and business in this District and the State of Illinois by actively advertising and promoting the products ████████

████████████████     For example, on November 2, 2016, G.S. Kok, Hytera's Senior Vice President delivered the keynote of Hytera's future plans in the digital radio market (which include Hytera's use of Motorola's trade secrets) at a conference held in Chicago, IL.[6]  Seven executives of Hytera attended this conference in Chicago, including Hytera America's president, Mr. Andy Zhao, in order to, among other things, increase sales in this District and the State of Illinois of products that contain Motorola's misappropriated technology.[7]

19.     Personal jurisdiction also exists specifically over all the Defendants because they have each committed acts of misappropriation and copyright infringement in this District and the State of Illinois, because they each directly and/or through their subsidiaries, divisions, groups, or distributors, advertise, market, use, offer for sale, import for sale and/or sell the products at issue in this case containing the misappropriated technology in this District and the State of Illinois, and place those products in the stream of commerce with the expectation and knowledge that they will be purchased by consumers in this district.  Further, Hytera's

---

[4]     *See* https://lautanjobs.com/logistics-coordinator-jobs-hytera-communications-america-west.b0c61a8d02aa0acb; *see also* https://www.indeed.com/cmp/Hytera-America/jobs/Logistic-Coordinator-b0c61a8d02aa0acb?q=Transport+West.

[5]     *See* https://tandcca.com/fm_file/tetrainchile2015hytera-pdf/ at slide 11 (titled "Hytera Global Presence", and specifically naming and pointing at Chicago as a location that is part of its "Global Presence").

[6]     *See* http://www.hytera.us/Catalogs/Contents.aspx?id=213; http://www.criticalltecommunications.net/program-day-one/.

[7]     *See*   http://urgentcomm.com/hytera/hytera-andy-zhao-outlines-companys-technology-roadmap-lte-other-next-generation-products.

misappropriations involved certain trade secrets that were invented in, stored in, or accessed from this District and the State of Illinois and computer programs likewise developed there. As such, Defendants have committed tortious acts in this District and the State of Illinois; have expressly aimed their actions at this District and the State of Illinois with the knowledge that they would cause harm and substantial injury to Motorola in the District and the State of Illinois; and Motorola's claims relate to Defendants' products containing technology misappropriated from Motorola and advertised, marketed, used, offered for sale, imported, and/or sold in this District and in the State of Illinois.

20. Venue is proper in this Court pursuant to 28 U.S.C. §§ 1391(b), 1400(a) because Hytera transacts business in this District, has misappropriated trade secrets in this District, has engaged in copyright infringement in this District, and is subject to personal jurisdiction in this district. In addition, venue is proper because Motorola is headquartered in this District; has made significant investments of both equipment and engineering talent in this District; stores in or invented in this District certain of the trade secrets and copyrighted material at issue in this case; and has suffered harm in this District.

## ADDITIONAL FACTUAL ALLEGATIONS

### A. Motorola Pioneers The Digital Two-Way Radio Technology

21. In the United States and around the world, Motorola leads the industry in two-way digital radio products, technologies, and supporting infrastructure and systems. Ever since the company's founding in 1928, Motorola's engineers and technicians have focused on developing the hardware, software, and systems necessary to create innovative and durable products that enable rapid and seamless communications in a variety of different organizations and environments, from construction sites to emergency dispatch systems to school bus networks.

MSA0044

22.     Such commitment to cutting-edge innovation in the service of customers—whether they are enterprises, public safety organizations like police and fire departments, or emergency medical providers—does not come cheaply.  Motorola has always invested heavily in research and development, spending more than $3.5 billion in the last five years alone, along with the time, dedication, and creativity of hundreds of Motorola engineers, technicians, and other staff.

23.     Motorola's innovation and market leadership were praised by many in the industry who recognized that Motorola "is creating a new era in data-rich public safety communications …. Its core business is unrivaled in the United States and around the world with a broad and loyal customer base, an outstanding record of reliability and growing reach and scale driven by technology innovation."[8]  Others have noted that "Motorola Solutions is a leading provider of mission-critical communication solutions and services for enterprise and government customers.  Through leading-edge innovation and communications technology, it is a global leader that enables its customers to be their best in the moments that matter."[9]

24.     As an industry leader in two-way radio products, Motorola has expended considerable resources to research, design, develop, and bring to market new and innovative technologies that have revolutionized the radio and telecommunications industries.  One such innovation is the digital two-way radio technology which Motorola pioneered.

25.     Motorola provides its proprietary digital two-way radio technology and features under the brand name MotoTRBO.  Motorola's digital two-way radio technology and features are carefully tailored—based on Motorola's extensive research and testing—to meet the

---

[8]     *See* Law360, "Silver Lake Backs Motorola Solutions With $1B Investment," (August 5, 2015) (available at: https://www.law360.com/articles/687546/silver-lake-backs-motorola-solutions-with-1b-investment).

[9]     *See* http://markies.eloqua.com/entrant/motorola-solutions.

MSA0045

requirements of public safety and professional organizations that need a customizable, mission-critical, private communication solution using licensed spectrum.

26. Motorola's MotoTRBO technology is a full product platform that includes portable and mobile radio devices, repeaters and controllers, accessories, data applications, and services that provide a comprehensive two-way digital radio solution.



**Exemplary MotoTRBO system**

27. In operation, the MotoTRBO system converts an analog signal that represents an acoustic waveform into a digital signal. The system then performs voice encoding (vocoding) that compresses the signal to fit into a radio channel. The encoded audio and accompanying data are then organized into frames for transmission. The signal is then sent on a single time-slot over a two-slot TDMA 12.5 kHz channel.



**MotoTRBO Digital Radio System**

28. As part of its industry-leading MotoTRBO digital radio technology, Motorola has developed proprietary digital voice and data innovations that offer great benefits to digital two-way radios. These proprietary innovations include features that can provide efficiency

MSA0046

together with enhanced digital capabilities and provide exceptional voice quality, integrated data applications, increased capacity, and extended battery performance, among other improvements—and have made Motorola's current MotoTRBO technology the most advanced in the industry. Motorola's feature-rich MotoTRBO technology integrates proprietary innovations, implemented both in hardware and software, that relate to every aspect of Motorola's digital two-way radio systems, such as emergency features, telephony support, integrated GPS and location services, digital data applications, and enhanced voice features to allow ease of migration from analog to digital systems. The design, development, and implementation of these features in Motorola's MotoTRBO hardware and software include Motorola's confidential, proprietary, and copyrighted technology and trade secrets.

29. One example of Motorola's proprietary MotoTRBO feature is **Voice Operated Transmission ("VOX")**, which provides invaluable benefits to end users by enabling hands-free communication, *i.e.*, without any push-to-talk action. Motorola's enhanced VOX uses specialized hardware and software to monitor the device microphone for voice activity and begins transmission upon detection, allowing users to communicate while still having full use of their hands, thereby enhancing safety and efficiency.

> Voice Operated Transmission (VOX) monitors the accessory microphone for voice activity. When voice is detected, the radio is keyed-up and the voice is transmitted. When voice is no longer detected at the accessory microphone, the radio is de-keyed.

**MotoTRBO System Planner at 131.**

30. Another proprietary feature developed and implemented by Motorola in its MotoTRBO line of products is **Telemetry** functionality that enables a radio to remotely control and monitor the GPIO (General Purpose I/O) pins of a target radio. This functionality enables remote controlling and monitoring of equipment, for example in industrial or agricultural environments.

13



*Figure 3-25 MOTOTRBO Radios in Digital Two-Slot Digital Repeater Mode with Telemetry Functions*

**MotoTRBO System Planner at 205.**

31.     As another example, Motorola developed a **Dynamic Mixed Mode Priority**

**Scan** feature that enables a user's radio to dynamically switch between analog and digital

modes depending on the type of call received.

When operating in **Dynamic Mixed Mode (DMM)**, MOTOTRBO uses a pair of physical channels configured for 12.5 kHz channel bandwidth for digital operation and 25 kHz and/or 12.5 kHz channel bandwidth for analog operation. The repeater dynamically switches between analog and digital modes based on the call it receives from radios. If an analog radio transmits, the repeater switches to analog mode to repeat the analog call. However, the repeater only repeats analog calls that are qualified by PL (DPL/TPL). If a digital radio transmits, then the repeater switches to digital mode to repeat the digital call if the call uses the right color code. While the repeater repeats one analog call at a time, it can repeat 2 digital calls at a time, one on each logical channel.

**MotoTRBO System Planner at 15.**

32.     Motorola has also developed **location based services** that rely on integrated

GPS functionality in its MotoTRBO devices.  Motorola's location services enable, for

example, a dispatcher to determine the current location of a radio on a display map, along with other information such as speed and direction.



*Figure 2-9  Location Services*

**MotoTRBO System Planner at 51.**

33.    One specific proprietary feature within MotoTRBO's location services innovations is the **GPS Revert Channel** feature, which removes location data from a selected channel into a dedicated channel, thus freeing the selected channel to accommodate increased voice traffic.

## GPS Revert Channel

The GPS Revert Channel feature allows system operators a configurable option to off load radio transmitted location updates onto a programmed digital channel that differs from the digital Selected Channel. This feature effectively removes Location Update traffic from the Selected Channel in order to free up that channel to accommodate increased voice loads and/or to enhance the user experience by reducing the number of channel busies during voice call requests. This feature also allows a large group to communicate on a single voice channel while sending location updates on multiple GPS Revert Channels to accommodate larger Location Update loads. This increases the Location Update throughput associated with radios belonging to a single group.

**MotoTRBO System Planner at 54.**

MSA0049

34.     Motorola's MotoTRBO technology also includes a **Digital Telephone Patch (DTP)** feature that enables direct communication between radio devices and telephone devices, in both an individual call mode and talkgroup mode that enables communication between a phone user and a group of radio users through a half-duplex voice communication.

## Digital Telephone Patch (DTP)

The MOTOTRBO Digital Telephone Patch is a Motorola proprietary feature introduced in software version R01.08.00 supporting two types of phone patch calls:

- **Individual Phone Patch Call** – This allows a half-duplex voice communication between a radio user and a phone user. This communication can be initiated from either party.
- **Talkgroup Phone Patch Call** – This allows a half-duplex voice communication between a phone user and a group of radio users. This type of communication can be initiated only by the phone user.

**MotoTRBO System Planner at 138.**

35.     Another set of proprietary features supported in Motorola's MotoTRBO technology are emergency features that enable a user in distress to send an emergency alarm message that contains the individual radio identification of the user.  Such emergency features include, for example, a proprietary implementation of the **emergency "Lone Worker"** feature to enhance safety for users who work remotely from others, including those operating machinery and on security patrols.  The Lone Worker feature is able to detect when a user's activity has stopped and, based on a pre-determined activity timer, initiate an emergency signal.  Another example is the **emergency "Man-Down"** feature which detects when the radio, and by extension its user, is in a horizontal orientation and initiates an emergency signal.

### 2.3.4     Digital Emergency

MOTOTRBO offers a variety of emergency handling strategies that will fit the customer's organizational needs. In its basic form, MOTOTRBO provides the ability for a radio user in distress to send a confirmed emergency alarm message, and emergency voice to a user on a supervisory radio. The emergency alarm message contains the individual radio ID of the initiator. Upon reception of an emergency alarm, the supervisor receives audible and visual indications of the emergency and the initiating radio ID is displayed. Depending on configuration, emergency voice may follow between the initiator and the supervisor. Once the supervisor handles the emergency situation (i.e. solves the problem), he clears the emergency on the supervisor radio. Once the initiator clears his emergency on the initiator radio, the emergency is considered over.

MSA0050

## 2.12 Lone Worker

For a radio user who is operating machinery, carrying out a security patrol or working in a plant alone, the Lone Worker feature provides a way to remotely monitor, if a user has stopped activity.

The Lone Worker feature is a predefined timer reset with user activity. For example, if the activity timer is set for 10 minutes and the user has no interaction with the radio during this time, the inactivity timer expires and a pre-warning tone sounds immediately after 10 minutes. If the user fails to reset the timer by an interaction with the radio (such as a button press, PTT, volume knob turn, etc.), the radio initiates Emergency. For more information, see section 2.3.4 "Digital Emergency".

The Lone Worker feature is available for both the portable and mobile radios, and in analog and digital modes.

**MotoTRBO System Planner at 34, 132.**

36. These exemplary proprietary features demonstrate just some of Motorola's substantial and sustained investment in its MotoTRBO technology. Underlying these technologies are significant technical know-how and other carefully guarded trade secrets that Motorola has developed over the course of many years. These efforts resulted in substantial trade secrets that, together with other Motorola intellectual property, have made Motorola's current MotoTRBO technology the most advanced in the industry. For these reasons and others, Motorola's MotoTRBO technology and the secret implementation details of its proprietary features and processes are some of Motorola's most valuable assets.

### B. Motorola Protects Its Trade Secret and Copyrighted Material

37. As a leader in the digital radio industry, Motorola has expended considerable resources in R&D, which resulted in volumes of confidential trade secrets and copyrighted material. For example, in 2015, Motorola invested $620 million in R&D, which represents 10.9% of its sales during the same year. Between 2011 and 2014, Motorola invested R&D amounts that range between $681-790 million annually. As a result of its substantial investments and decades-long dedication to innovation, Motorola has been awarded approximately 5,000 patents covering, among other things, its digital two-way radio technology. In addition, significant aspects of Motorola's products are highly confidential, and

MSA0051

are maintained by Motorola in strict confidence as trade secrets to protect their value and the substantial investments Motorola has made to develop them. Indeed, this confidential information derives considerable value from not being publicly known outside of Motorola.

38. Motorola protects its trade secrets in numerous ways, including by restricting access to confidential information only to select individuals, and even then, only subject to strict confidentiality and non-disclosure agreements. For example, as a condition of their employment and as part of their employment agreement, Motorola's employees—including the Hytera Employees—sign confidentiality agreements pursuant to which they agree, among other things, to not make improper use of any of Motorola's confidential information or trade secrets.

> "In consideration of my employment, or continued employment by Motorola, Inc. or its subsidiaries (referred to separately or jointly as "Motorola") and the salary or wages paid to me, I understand and agree to the following provisions for the protection of Motorola property rights:
>
> …
>
> 2. Not to use, or to publish, ***or to otherwise disclose to others, either during or subsequent to my employment by Motorola, any confidential information of Motorola*** or its customers, except as my Motorola duties may require.
>
> 3. Upon termination of my employment by Motorola, to ***promptly deliver to a designated Motorola representative all documents and other records which relate to the business activities of Motorola***, or any other materials which belong to Motorola."

**Motorola Employment Agreement (emphasis added).**

39. Consistent with this practice, the Hytera Employees also entered into employment agreements with Motorola in which they "agree[d] to [certain] provisions for the protection of Motorola's property rights." For example, on or around May 15, 1997, Y.T. Kok and Motorola entered into an Employment Agreement in which Y.T. Kok acknowledged that

MSA0052

he had read and understood the requirements of Motorola's Standard Operating Procedure (SOP) E-62 form regarding the "Appropriate Use of Computer Resources," which states that "[i]t is the policy of Motorola to protect confidential, sensitive or critical information owned by Motorola or in Motorola custody, and also to protect specific information as required by applicable law." Motorola's Standard Operating Procedures expressly forbid "[d]isclosing confidential or sensitive information which is owned by or entrusted to Motorola to unauthorized recipients." Motorola's Standard Operating Procedures further prohibited "[a]ccessing confidential or sensitive information on computer resources without authorization."

40. Chia entered into a similar employment agreement with Motorola on August 23, 1999, in which Chia acknowledged that he had read and understood the requirements of Motorola's Standard Operating Procedure (SOP) E-62 form regarding the "Appropriate Use of Computer Resources," which states, *inter alia*, that "[i]t is the policy of Motorola to protect confidential, sensitive or critical information owned by Motorola or in Motorola custody."

41. In their respective Employment Agreements, each Hytera Employee expressly agreed "[n]ot to use, or to publish, or to otherwise disclose to others, either during or subsequent to [his] employment by Motorola, any confidential information of Motorola or its customers, except as [his] Motorola duties may require." The Hytera Employees further agreed that "[u]pon termination of [their] employment by Motorola, [they would] promptly deliver to a designated Motorola representative all documents and other records which relate to the business activities of Motorola, or any other materials which belong to Motorola."

42. In their respective Employment Agreements, each Hytera Employee further expressly agreed "[t]o assign and [] [t]hereby assign[ed] to Motorola as its exclusive property, the entire right, title and interest in all [his] inventions, innovations, or ideas developed or

19

MSA0053

conceived by [him] solely, or jointly with others, at any time during the term of [his] employment and which inventions, innovations, or ideas relate to the actual or anticipated business activities of Motorola, or result from, or are suggested by, work which [he] do[es] for Motorola."

43.     On or around January 8, 2008, in connection with his resignation from Motorola, G.S. Kok executed an agreement entitled "Non-Disclosure of Motorola Proprietary and Confidential Information."  Chia and Y.T. Kok signed similar Non-Disclosure agreements in connection with their resignation from Motorola, on or around May 20, 2008 and October 3, 2008, respectively (collectively the "Resignation NDAs").

44.     In the Resignation NDAs, each Hytera Employee acknowledged that he had access to Motorola's confidential information, and further acknowledged his continuing obligations under the terms of his Employment Agreement.  By the Resignation NDAs, each Hytera Employee agreed that he had been "informed that Motorola felt that any assignment relating to Portable and Paging Radio products and the information listed above might by nature of the assignment require the disclosure of Motorola proprietary and confidential information, and that [he] should also advise [his] new employer or others."  Upon resigning, each Hytera Employee was asked: "What orgnisation [sic] will you be working for after Motorola?"  None of the Hytera Employees informed Motorola that he was taking on an assignment relating to Portable and Paging Radio products at Hytera.

45.     In the Resignation NDAs, each Hytera Employee acknowledged that he was "to collect all Motorola property and confidential information including documents, drawings, reports, specifications, samples, etc., which [he had] in his possession from all Motorola and non-Motorola locations and to have them reviewed by Motorola management."  Each Hytera

MSA0054

Employee further "[a]cknowledge[d] that all such property and confidential information has been returned from [his] possession to Motorola."

46. Motorola reasonably relied on the Hytera Employees' representations and agreements as contained in their Resignation NDAs, as well as otherwise described herein. Through subsequent investigation, however, Motorola later learned that the Hytera Employees' statements and representations were false, and that they hid their unauthorized downloading of massive amounts of Motorola's confidential trade secrets in the weeks leading up to (and in some cases after) their departures to Hytera (a fact that was also hidden).

47. Each of the Hytera Employees acknowledged and agreed to protect and treat as confidential all Motorola trade secrets and/or confidential information.

48. Motorola also protects its intellectual property through copyright. For example, the Digital Mobile Radio ("DMR") computer program in Motorola's MotoTrbo product lines ("DMR Program") was duly registered with the U.S. Copyright Office, including, for example, Registration Nos. TXu 1-578-438 and TXu 1-578-439. True and correct copies of Motorola's Certificates of Registration, issued by the U.S. Copyright Office, for the DMR Program are attached hereto as Exhibit A. As discussed in more detail below, Hytera copied the code from the DMR Program ███████████████████████████ Motorola's DMR Program includes creative expression, including, for example, proprietary source code, command expressions, organization and command hierarchies, comments, definitions, and corresponding user interfaces.

49. The DMR Program is an original, creative work and copyrightable subject matter under the laws of the United States. Motorola's DMR Program, including its unique source code and structure, has required many years of creative development efforts by Motorola. For example, when developing software for DMR radios, a software developer may implement any

21

of a wide range of options for structuring the organization and appearance of the user interface, the names, structures, and purposes of libraries, commands, and prompts, and the algorithms facilitating the program's functionality. Motorola's DMR Program represents the culmination of numerous creative choices made by Motorola and Motorola's original expression of a particular way to create such a program, and has required Motorola to invest tens of thousands of employee-hours to develop its unique DMR Program. In sum, the uniquely expressed structure, architecture, modules, algorithms, data structures, control instructions, and source code contained in the DMR Program are the product of Motorola's engineering discretion and substantial skills, resources, and creative energies.

### C. Hytera Is Late To Enter The Digital Two-Way Radio Market

50. Whereas Motorola introduced its MotoTRBO technology in 2006, Hytera did not begin developing digital two-way radio products until years later, and did not introduce a digital two-way radio product until 2010. By the time Hytera began developing its digital two-way radio products, Motorola had already pioneered the field, and had established its digital two-way radio products as the leading communications solution for public works and numerous private commercial applications. Moreover, Motorola's success had rendered Hytera's outdated analog systems obsolete.

51. Complicating matters further for Hytera, during this same time period, the United States Federal Communications Commission (FCC) set a deadline that required licensees that had traditionally employed systems that operate on channel bandwidths of 25 kHz to implement equipment designed to operate on channel bandwidths of 12.5 kHz or less to meet specific efficiency standards (hereinafter the "Mandatory Narrowbanding"). The Mandatory Narrowbanding effectively urged providers of radio products toward the use of digital technology. Both the Hytera Employees and Hytera were acutely aware of these

22

regulations requiring the rapid move to digital two-way radio technology like DMR (Digital Mobile Radio).

52. For example, in a presentation prepared on or around April 8, 2009, for Hytera, Chia recognized a decline in the analog market and a need to move towards digital due to the impending FCC deadline:



53. Hytera knew that its analog radio products faced extinction, and that it could not hope to develop its own digital two-way radios in time to save its ailing business. Indeed, G.S. Kok, in his new role as an executive at Hytera, publicly acknowledged that Hytera's main product line—analog radios—were quickly becoming "obsolete" and that its digital DMR radios had to be developed at a "very quick pace":

> "[Hytera's] recently launched DMR radios . . . were *developed at a very quick pace* … *it had to be fast* because 2016 is coming up around the bend. And, this is the time where China already announced in 2010 that they're going to obsolete all [ ] analog radio so *we have only this small amount of time to make it happen*." (emphasis added)



**May 29, 2014 "Interview with Gee Siong Kok, Senior VP of Hytera"** [10]

54. Thus, Hytera was faced with a choice: engage in time-consuming and resource-intensive development of its own digital product line, or simply take Motorola's technology, illegally and without permission, in order to get a product out to market "at a very quick pace." Hytera chose the latter.

**D.** **Hytera Misappropriates Motorola's Trade Secrets and Copies Motorola's Copyrighted Material**

55. By the time Hytera began working on a digital two-way radio line of products, Motorola already had fully developed proprietary digital two-way radio technologies and products. In an unlawful attempt to overcome its late entry to the market, Hytera recruited senior Motorola engineers to initiate and boost its digital two-way radio product line. Three of those former Motorola engineers, Samuel Chia, Y.T. Kok, and G.S. Kok, were directly

---

[10]   *Available at* https://www.youtube.com/watch?v=twxZXiWeNZQ.

MSA0058

involved in developing Motorola's MotoTRBO technology, and were intimately knowledgeable about the implementation of Motorola's proprietary features.

56. For example, Samuel Chia served as an Engineering Section Manager for Motorola. During the time of his employment at Motorola, he held several other key engineering positions, including Senior Software Engineer. His responsibilities at Motorola included coding, documentation, testing, and release of software used to run Motorola's MotoTRBO technology. In 2008, Chia was hired by Hytera and he currently serves as a Director of Software Engineering at Hytera.

57. Similarly, Y.T. Kok served as a Senior Software Engineer at Motorola. His responsibilities at Motorola included design, development, and release of software used to run Motorola's MotoTRBO technology. In 2008, Y.T. Kok was hired by Hytera and he currently serves as Sales Director at Hytera.

58. G.S. Kok served as a Senior Engineering Manager for Motorola. His responsibilities at Motorola included design, development, and release of software used to run Motorola's MotoTRBO and related technology. In 2008, G.S. Kok was hired by Hytera and he served as Senior Vice President and Terminal Chief at Hytera.

59. Each of the Hytera Employees were lured to Hytera and accepted employment at Hytera as part of Hytera's unlawful scheme to take Motorola's confidential trade secrets and copy Motorola's copyrighted code. In their new positions at Hytera, the Hytera Employees work on the same technologies as they did at Motorola. For example, G.S. Kok was a Senior Vice President responsible for migrating Hytera's analog technology to digital, including without limitation, the same digital two-way radio technology that comprises Motorola's trade secrets. Similarly, Y.T. Kok is a Sales Director at Hytera where he oversees sales strategies and product marketing. Given these overlapping technical fields and responsibilities together

MSA0059

with their surreptitious theft of Motorola's trade secrets and copyrighted material (which they went on to hide), G.S. Kok and Y.T. Kok used and disclosed Motorola's trade secrets and copyrighted material in the performance of their job duties for Hytera.

60. Further, Chia is Software Engineering Director at Hytera and is involved with Hytera's development of two-way digital radio technology that directly misappropriates Motorola's trade secrets and copies Motorola's code. For instance, Chia is the named inventor on U.S. Pat. No. 8,982,736 (the "'736 Patent") entitled "Method for implementing radiophone based conference call and dynamic grouping," which is assigned to Hytera Communications Corp. Ltd. The '736 Patent is directed to "[a] method for implementing radiophone based conference call and dynamic grouping," and according to the '736 patent, it could be "based upon a specific protocol, e.g., a protocol stack of a radiophone based *Digital Mobile Radio (DMR)*." (emphasis added). '736 Patent at Title, 7:50-53. The international application that led to the '736 Patent was filed on December 12, 2008, approximately seven months after Chia resigned from Motorola. Thus, Chia was engaged in development of two-way digital radio technology at Hytera shortly after he was hired from Motorola, and even purported to patent technologies he was exposed to as a Motorola employee. Chia had and still has similar responsibilities with Hytera which, together with his surreptitious theft of Motorola's trade secrets and copyrighted material (which he went on to hide), has involved using and disclosing Motorola's trade secrets and copyrighted code in the performance of his job duties for Hytera, and will continue to do so.

61. In 2008, unbeknownst to Motorola at the time due to their surreptitious activities and misrepresentations, just weeks before leaving Motorola for Hytera, the Hytera Employees downloaded over 7,000 technical, marketing, sales, and legal documents, related to at least Motorola's MotoTRBO proprietary technology.

62. These highly confidential and sensitive documents, some of which include very detailed technical specifications and schematics related to Motorola's proprietary MotoTRBO technology, include highly sensitive and proprietary Motorola trade secrets. These documents include highly confidential information about the implementation, marketing, legal protection, and other confidential details regarding the proprietary MotoTRBO related features discussed above.

63. For example, through its investigation, and despite the Hytera Employees' affirmative attempts to deceive and mislead Motorola, Motorola learned that the Hytera Employees accessed and downloaded the MotoTRBO "System Technical Requirements Specification (TRS)," which specifies the detailed technical requirements for Motorola's MotoTRBO technology. Further, the Hytera Employees accessed and downloaded the MotoTRBO "Marketing Requirements Document (MRD)," which specifies the marketing requirements for Motorola's MotoTRBO technology. Similarly, the Hytera Employees accessed and downloaded MotoTRBO "Integrated Business Plan" as well as other sensitive documents containing Motorola's confidential information and trade secrets, including marketing, packaging and pricing strategies, and a list of deliverables. These documents all contain detailed disclosures of Motorola's sensitive trade secrets.

64. Additionally, some of the MotoTRBO related confidential documents that were accessed and downloaded by the Hytera Employees include:

- MotoTRBO Marketing Requirements Document;

- MotoTRBO Digital Growth Strategies Presentation;

- MotoTRBO Software Strategy Overview;

- MotoTRBO Technology Roadmap;

- MotoTRBO Technical Requirements Document;

27

- MotoTRBO Technical Requirements Specification;

- MotoTRBO Technical Requirements Integrated Business Plan;

- MotoTRBO Feature Prioritization;

- MotoTRBO Digital Presentation;

- MotoTRBO System White Paper;

- Portable Receiver Architectures for MotoTRBO System;

- MotoTRBO LoneWorker Technical Scope Document;

- MotoTRBO Emergency Operation;

- MotoTRBO Emergency Clarifications Document;

- MotoTRBO Software GPS White Paper;

- MotoTRBO Revert Architecture Document;

- MotoTRBO GPS Revert Operational Scenarios;

- MotoTRBO Digital Telephone Interconnect Document;

- MotoTRBO Performance Analysis For Mixed-Mode Scan;

- MotoTRBO Scan - Software Architecture and Design Challenges;

- MotoTRBO Scanning Architecture;

- MotoTRBO Telemetry Technical Requirement Specification;

- MotoTRBO Telemetry User Requirements;

- MotoTRBO Enhanced VOX White Paper;

- MotoTRBO VOX Feature Impact Analysis; and

- MotoTRBO VOX Technical Scope.

65.     Moreover, Motorola's investigation revealed that the Hytera Employees improperly accessed and retained files containing highly confidential information about Motorola's Intellectual Property, including sensitive (and in some cases privileged) information regarding patent submissions and licensing and legal strategy.  For example, the

28

Hytera Employees downloaded sensitive documents that list many of the patent submissions and unpublished patent applications related to Motorola's MotoTRBO technology. Further, the Hytera Employees downloaded documents that include legal analysis and strategy with respect to technology standardization efforts and licensing operations.

66. Since its employees acquired these documents, Hytera has perfected the misappropriation and copyright infringement by incorporating Motorola's digital two-way radio technologies and related features ███████████████████████████, which are in whole or part derived from Motorola's trade secrets and copyrighted material. For example, Hytera implemented Motorola's digital two-way radio features as implemented in Motorola's proprietary MotoTRBO products, often using the exact same feature names. For instance, Hytera has incorporated the "VOX," "Telemetry," "Lone Worker," "Man Down," Mixed Mode Scanning," "Phone Feature," and "GPS Revert Channel" features, that are in whole or part derived from and/or comprise Motorola's trade secrets.

67. Additionally, Hytera has infringed Motorola's DMR Program by unlawfully copying Motorola's DMR Program, including source code, ████████████████ ████████████ In doing so, Hytera has ████████████████████████ ████████████████████████████████████████████ ████████ Of particular note is the ███████████████████████ ████████████████████████████████████████████ ████████████████████████████████

68. Further, the Hytera Employees were actively familiar with Motorola's proprietary information regarding the MotoTRBO features while at Motorola, and had access to Motorola's copyrighted material. By way of example, Chia authored an "Enhanced VOX White Paper" on or around February 6, 2004, while at Motorola. The Enhanced VOX White

MSA0063

Paper, which was unlawfully downloaded and retrieved by the Hytera Employees, describes the operation of Motorola's VOX feature and includes detailed information such as algorithms and simulations required for implementing and operating Motorola's confidential and proprietary technology.

69. Further, by way of example, Y.T. Kok served as the Feature Manager for Motorola's VOX technology implementation. Y.T. Kok had access to confidential details regarding the implementation of Motorola's VOX technology including major development milestones, development timelines, risk analyses, product and feature analyses, and issues with development and how they were being addressed. Y.T. Kok also worked on DMR software development at Motorola, and through this work had access to Motorola's DMR Program, including its source code, for example.

70. At all relevant times, Hytera knew that the Hytera Employees had previously been employed by Motorola as well as the nature of their work and responsibilities as Motorola employees. Hytera knew that the Hytera Employees had access to Motorola's trade secrets, confidential information, and copyrighted information. Yet Hytera acquired, used, and/or disclosed Motorola's trade secrets and copyrighted information by instructing and allowing the Hytera Employees to incorporate Motorola's trade secrets, confidential information, and copyrighted information into, among other things, ███████████ and business strategies. Indeed, upon their termination at Motorola, each Hytera Employee acknowledged in his respective Resignation NDA that he would "advise [his] new employer" that "any assignment relating to Portable and Paging Radio products . . . might by nature of the assignment require the disclosure of Motorola proprietary and confidential information."

MSA0064

## COUNT I

**Trade Secret Misappropriation Under the Defend Trade Secrets Act**

**(18 U.S.C. §§ 1836(b), 1839 *et seq.*)**

71.     Motorola incorporates and re-alleges each and every allegation above as if fully set forth herein.

72.     Motorola is the owner of certain valuable trade secrets contained in and relating to digital mobile radio, including as described herein.  These trade secrets are related to Motorola's products and services that are used in or intended for use in interstate and foreign commerce.  These confidential and proprietary trade secrets are of substantial economic value and have conferred a competitive advantage on Motorola.

73.     As stated above, Motorola sells its products throughout the United States.  For example, Motorola's digital two way radio technology and solutions are sold and used throughout the United States.

74.     The Hytera Employees gained access to Motorola's trade secrets in the course of an employee-employer relationship between Motorola and the Hytera Employees.  The Hytera Employees improperly acquired and retained Motorola's trade secrets upon termination of their employment.

75.     The Hytera Employees subsequently used and disclosed to Hytera Motorola's trade secrets.  Accordingly, Hytera is in possession of the foregoing Motorola trade secrets, which are subject to confidentiality agreements in which the Hytera Employees expressly acknowledged and confirmed the confidential nature of these secrets.

76.     Hytera improperly acquired Motorola's trade secrets from the Hytera Employees and has since improperly used and disclosed those Motorola trade secrets, including by incorporating them into products Hytera markets and sells as its own.

MSA0065

77.     Hytera has misappropriated Motorola's trade secrets by acquiring, using, and/or disclosing the information described above, including by manufacturing, marketing, offering, and/or selling in the United States products that comprise, embody, and/or incorporate the trade secrets described herein.

78.     Hytera willfully and maliciously misappropriated Motorola's trade secrets in order to gain economic value from that information.

79.     Motorola has taken reasonable steps to maintain the secrecy of its trade secrets, including by requiring confidentiality and/or nondisclosure agreements to be signed by any party granted access to Motorola's trade secrets.

80.     As a direct and proximate result of Defendants' current and continued misappropriation of Motorola's trade secrets, Motorola will suffer imminent and irreparable harm.

81.     Unless enjoined by this Court, Defendants' acts of misappropriation will continue and Motorola will continue to suffer irreparable harm.

82.     Motorola has no adequate remedy at law.

## COUNT II

### Trade Secret Misappropriation Under Illinois Trade Secret Act
### (765 ILCS 1065 *et seq.*)

83.     Motorola incorporates and re-alleges each and every allegation above as if fully set forth herein.

84.     Motorola is the owner of certain valuable trade secrets contained in and relating to digital mobile radio and as described herein.  These confidential and proprietary trade secrets are of substantial economic value and have conferred a competitive advantage on Motorola.

MSA0066

85. The Hytera Employees gained access to Motorola's trade secrets in the course of an employee-employer relationship between Motorola and the Hytera Employees. The Hytera Employees improperly acquired and retained Motorola's trade secrets upon termination of their employment.

86. The Hytera Employees subsequently used and disclosed to Hytera Motorola's trade secrets. Accordingly, Hytera is in possession of the foregoing Motorola trade secrets, which are subject to confidentiality agreements in which the Hytera Employees expressly acknowledged and confirmed the confidential nature of these secrets.

87. Hytera improperly acquired Motorola's trade secrets from the Hytera Employees and has since improperly used and disclosed those Motorola trade secrets, including by incorporating them into products Hytera markets and sells as its own.

88. Hytera willfully and maliciously misappropriated Motorola's trade secrets in order to gain economic value from that information.

89. Motorola has taken reasonable steps to maintain the secrecy of its trade secrets, including by requiring confidentiality and/or nondisclosure agreements to be signed by any party granted access to Motorola's trade secrets.

90. As a direct and proximate result of Defendants' current and continued misappropriation of Motorola's trade secrets, Motorola will suffer imminent and irreparable harm.

91. Unless enjoined by this Court, Defendants' acts of misappropriation will continue and Motorola will continue to suffer irreparable harm.

92. Motorola has no adequate remedy at law.

MSA0067

## COUNT III

### Copyright Infringement

### (17 U.S.C. §§ 106, 501 *et seq.*)

93. Motorola incorporates and re-alleges each and every allegation above as if fully set forth herein.

94. Motorola's DMR Program is an original, creative work and copyrightable subject matter under the copyright laws of the United States.

95. Motorola is the owner of valid copyrights in the DMR Program, and the Register of Copyrights has issued valid Certificates of Registration as indicated in Exhibit A.

96. Motorola has complied in all respects with 17 U.S.C. §§ 101 *et seq.*, and has the exclusive rights and privileges in and to the copyrights in its DMR Program.

97. By its actions, alleged above, Hytera has infringed and will continue to infringe Motorola's DMR Program by reproducing and distributing Motorola's code, as well as creating derivative works of the DMR Program for Hytera's two-way digital radios. As explained above, Hytera's source code contains ███████████████████████████████ ████ In other instances, Hytera's source code contains ████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ Hytera's copying included ██████████████████████████ ██████████ despite the availability of other ways to achieve the same functionality without using ███████████████████████████ ████████████████ ████████████████████████████████████████████████

MSA0068

██████████████████████████████████████████████████████████

████████████████████████████

98.     As also averred above, the Hytera Employees had access to and, upon information and belief, copied Motorola's DMR Program.  For example, while the Hytera Employees worked for Motorola, they were privy to copyrighted material including, for example, Motorola's DMR Program, including source code.  Further, in the weeks and months prior to their resignations from Motorola (and unbeknownst to Motorola), the Hytera Employees surreptitiously downloaded thousands of confidential Motorola documents.  Hytera also surreptitiously obtained a copy of Motorola's DMR Program, including source code.  The Hytera Employees then brought that material to Hytera, and ████████████████████████████████████

99.     Knowing the illegality of their conduct, the Hytera Employees ████████████

████████████████████████████████████████████████████████████

████████████████████████—both before and after Motorola's original Complaint was filed—████████████████████████████████████████████████████

████████████████████████████████████.  For example, in June 2008, Hytera employees ███

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████ *See, e.g.*, Exs. B (HYT1973-00061160 at 161) and C (HYT1973-02180813) at row 38.

100.     Through its conduct as averred herein, Hytera has infringed Motorola's copyrights in its works without authorization in violation of Sections 106 *et seq.* and Section 501

35

of the Copyright Act. 17 U.S.C. §§ 106 *et seq.*, and 501. For example, as averred above, Hytera has copied Motorola's code into at least Hytera's DMR subscriber and repeater products.

101. Each infringement, including each use, reproduction, distribution, and sale, by Hytera of Motorola's copyrighted works constitutes a separate and distinct act of infringement.

102. Hytera's acts of infringement were and are willful, in disregard of and with indifference to the rights of Motorola.

103. As a direct and proximate result of Hytera's current and continued infringement of Motorola's DMR Program, including source code, Motorola will suffer imminent and irreparable harm.

104. Unless enjoined by this Court, Hytera's acts of infringement will continue and Motorola will continue to suffer irreparable harm.

105. As a direct and proximate result of the infringements by Hytera, Motorola is entitled to damages and Hytera's profits in amounts to be proven at trial which are not currently ascertainable.

106. Alternatively, Motorola is entitled to the maximum statutory damages in the amount of $150,000 with respect to each work infringed, or for such other amounts as may be proper under 17 U.S.C. § 504.

## JURY DEMAND

Motorola requests trial by jury.

## PRAYER FOR RELIEF

WHEREFORE, Motorola demands judgment against Hytera as follows:

1. Award a temporary restraining order, preliminary injunction, and/or permanent injunction prohibiting Hytera from unfairly competing with Motorola by using Motorola's trade secrets and directly or indirectly infringing Motorola's copyrights, including without

MSA0070

limitation reproducing, distributing, or creating derivative works based upon Motorola's computer programs.

2. Award a temporary restraining order, preliminary injunction, and/or a permanent injunction restraining and enjoining Hytera from altering, destroying, or disposing of any evidence, in any form, relating to this action, including without limitation emails and paper and electronic documents, including current or archived electronic logs, metadata, and directories.

3. Declare valid and enforceable the provisions of Motorola's Employment Agreements and Resignation NDAs with the Hytera Employees requiring them not to use or disclose Motorola's trade secrets and other confidential information to Hytera or to anyone else and to return all Motorola confidential and proprietary information retained after their respective period(s) of employment ended.

4. Declare that Hytera has no rights or privileges to use Motorola's trade secrets or copyrighted works.

5. Award Motorola restitution in an amount to be determined at trial.

6. Award Motorola compensatory damages in an amount to be determined at trial, including without limitation, Motorola's lost revenues and profits.

7. Award Motorola actual damages in an amount to be determined at trial.

8. Award Motorola disgorgement of Hytera's profits in an amount to be determined at trial.

9. Award Motorola punitive damages in an amount to be determined at trial, including those pursuant to 18 U.S.C. § 1836 *et seq.* and 765 ILCS 1065/1 *et seq.*

10. Award Motorola attorneys' fees and costs, including those pursuant to 18 U.S.C. § 1836 *et seq.*, 765 ILCS 1065/1 *et seq.*, and 17 U.S.C. § 501 *et seq.*

MSA0071

11.     Award Motorola statutory damages, pursuant to 17 U.S.C. § 501 *et seq*.

12.     Award Motorola any such other relief as the Court deems appropriate.

DATED: August 2, 2018                              Respectfully submitted,


                                                  */s/ Adam Alper*
                                                  Adam Alper (*admitted pro hac vice*)
                                                  adam.alper@kirkland.com
                                                  Brandon H. Brown (IL Bar No. 266347 CA)
                                                  brandon.brown@kirkland.com
                                                  KIRKLAND & ELLIS LLP
                                                  555 California Street
                                                  San Francisco, CA 94104
                                                  Telephone: (415) 439-1400
                                                  Facsimile: (415) 439-1500

                                                  Michael W. De Vries (*admitted pro hac vice*)
                                                  michael.devries@kirkland.com
                                                  Justin Singh (*admitted pro hac vice*)
                                                  justin.singh@kirkland.com
                                                  Christopher Lawless (*admitted pro hac vice*)
                                                  christopher.lawless@kirkland.com
                                                  Ali-Reza Boloori (*admitted pro hac vice*)
                                                  ali-reza.boloori@kirkland.com
                                                  KIRKLAND & ELLIS LLP
                                                  333 South Hope Street
                                                  Los Angeles, California 90071
                                                  Telephone: (213) 680-8400
                                                  Facsimile: (213) 680-8500

                                                  David Rokach (IL SBN: 6279703)
                                                  david.rokach@kirkland.com
                                                  KIRKLAND & ELLIS LLP
                                                  300 North LaSalle
                                                  Chicago, IL 60654
                                                  Telephone: (312) 862-2000
                                                  Facsimile: (312) 862-2200


                                                  *Attorneys for Plaintiffs*
                                                  *Motorola Solutions, Inc. and Motorola*
                                                  *Solutions Malaysia SDN. BHD.*

MSA0072

CERTIFICATE OF SERVICE

The undersigned hereby certifies that on August 2, 2018, a true and correct copy of the foregoing:

AMENDED COMPLAINT

was served as follows:

☒      **[E-Mail]** By causing the above documents to be sent via electronic mail to the parties at the email addresses listed below.  I am aware that service is presumed invalid if the email transmission is returned as undeliverable.

| | |
|---|---|
| Erik R. Puknys<br>(admitted *pro hac vice*)<br>Finnegan, Henderson, Farabow,<br>   Garrett & Dunner, L.L.P.<br>3300 Hillview Avenue<br>Palo Alto, CA  94304-1203<br>Telephone:  650 849 6600<br>E-mail:  erik.puknys@finnegan.com | Of Counsel:<br><br>John T. Schriver<br>Duane Morris LLP<br>190 S. LaSalle St. – Suite 3700<br>Chicago, IL  60603<br>Telephone:  312-499-6785<br>E-mail:  jtschriver@duanemorris.com |
| E. Robert Yoches<br>(admitted *pro hac vice*)<br>Finnegan Henderson Farabow<br>   Garret & Dunner LLP<br>901 New York Ave., N.W.<br>Washington, D.C.  20001-4413<br>Telephone:  202-408-4000<br>E-mail:  bob.yoches@finnegan.com | Todd R. Tucker<br>Joshua M. Ryland (pro hac vice)<br>Calfee, Halter & Griswold LLP<br>The Calfee Building<br>1405 East Sixth Street<br>Cleveland, OH 44114<br>Telephone: (216) 622-8200<br>E-mail:  ttucker@calfee.com<br>E-mail: jryland@calfee.com |

DATED:  August 2, 2018

*/s/ Adam Alper*
Adam Alper

**1**

MSA0073

15

MOTOROLA SOLUTIONS, INC., and MOTOROLA ) No. 17 CV 1973
SOLUTIONS MALAYSIA SDN. BHD, )
                                    )
         Plaintiffs, )
vs. ) Chicago, Illinois
                                    )
HYTERA COMMUNICATIONS CORPORATION, LTD., ) November 7, 2019
HYTERA AMERICA, INC., and HYTERA )
COMMUNICATIONS AMERICA (WEST), INC., )
                                    )
         Defendants. ) 10:00 o'clock a.m.

TRIAL - VOLUME 2 A
TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE  CHARLES R. NORGLE, SR.
and a jury

For the Plaintiffs:    KIRKLAND & ELLIS LLP
                        BY:  Mr. Adam R. Alper
                            Mr. Brandon Hugh Brown
                        555 California Street
                        27th Floor
                        San Francisco, California 94104
                        (415) 439-1400

                        KIRKLAND & ELLIS LLP
                        BY:  Mr. Michael W. De Vries
                        333 South Hope Street
                        Los Angeles, California 90071
                        (213) 680-8400

Court reporter:            BLANCA I. LARA
                        Official Court Reporter
                      219 South Dearborn Street
                        Room 2342
                      Chicago, Illinois 60604
                      (312) 435-5895
                      blanca_lara@ilnd.uscourts.gov

MSA0074

Appearances:  (Continued:)

For the Plaintiffs:    KIRKLAND & ELLIS LLP
BY: Ms. Megan Margaret New
300 North LaSalle Street
Chicago, Illinois 60654
(312) 862-7439

KIRKLAND & ELLIS LLP
BY:  Ms. Leslie M. Schmidt
601 Lexington Avenue
New York, New York 10022
(212) 446-4763

Motorola Corporate Representative:   Mr. Russ Lund

For the Defendants:    STEPTOE & JOHNSON LLP
BY: Mr. Boyd T Cloern
Mr. Michael J. Allan
Ms. Jessica Ilana Rothschild
Ms. Kassandra Michele Officer
1330 Connecticut Avenue., Nw
Washington, DC 20036
(202) 429-6230

Hytera Corporate Representative:  Michele Ning

MSA0075

MR. ALPER:  Thank you, Your Honor.

OPENING STATEMENT ON BEHALF OF THE PLAINTIFFS.

MR. ALPER:  Good morning, ladies and gentlemen.  My name again is Adam Alper and I represent Motorola in this case. And I wanted to start by thanking you very much for your time and service yesterday and over the course of the remainder of this trial.  We know that you have may things in your lives, and on behalf of myself, my colleagues, and really both sides, we want to say that we greatly appreciate you time and attention over the course of this very important matter.

All right.  As His Honor noted yesterday, this case involves Motorola's claims against Hytera for trade secret misappropriation and copyright infringement in connection with Motorola's two-way digital mobile radio technologies.

And over the course of my opening statement, I'm going to tell you about Motorola's development of those technologies, but first I'd like to show you something that Hytera said when they first launched their version of the two-way digital mobile radio technologies in 2010, which are the products that are accused and at issue in this case.  I'm going to show you some demonstratives that will come up on the screen as I walk through my presentation.

And what we're seeing here is a Hytera brochure --

THE COURT:  Counsel, just a minute.

Are all of your units working in the jury box?

(Jurors all answered yes.)

THE COURT:  Okay.  Please procedure.

MR. ALPER:  Yes, Your Honor.

And what we're seeing here is a Hytera product brochure that it released in 2010 when it launched its version of the technology at issue, the two-way digital mobile radio technologies.

And you can see what Hytera said about its radios.  It called them "innovative."  It called them "leading digital technologies" and it said they were the most valuable solution on the market.  But what Hytera didn't say is the technology that made those Hytera radios work came from Motorola.

And, in fact, in order to make its products, as the evidence will show, Hytera stole thousands upon thousands of confidential and proprietary Motorola technical documents and millions of lines of source code, put it right in their products, and it is still selling its products with Motorola's technologies to this very day, and that is why Motorola has brought this lawsuit, and at the end of this, Motorola will be asking you to find that that is wrong.

Okay.  Well, let's now start with -- go back to where the story really starts, and that's with Motorola.  Many of you know who Motorola is.  Motorola has been around for nearly 100 years.  Headquartered in the Chicago area over that time, and as some of you are familiar, has been responsible over that

period of time for some of the world's most critical technologies used my consumers, businesses, and governments all around the world.

And one of the focal points of Motorola's research and development over those years has been in the field of wireless technologies and radios, and that's the type of technology that we're going to be talking about over the course of this trial.

And in particular, we're going to be talking about a type of technology that is referred to as a two-way digital mobile radio or digital mobile radio technology, and that's abbreviated as DMR. You're going to hear that term quite frequently over the course of this trial. I'm going to refer to DMR radios over the course of the remainder of my opening statement, digital mobile radio.

And that is, as some of you know, basically sophisticated walkie-talkies, and that is equipment -- I have one right here, actually -- it's essentially a very sophisticated two-way radio. You'll be seeing these quite frequently over the course of the trial. You essentially press the button on the side here, talk into it, and that instantaneously broadcasts your message, whether it's voice or data, to any recipient who is on your network.

And as some of you know, this is very important equipment that's used in a very wide variety of settings.

And so let me go to my next slide. Just showing a few

of those settings here. So in some applications these radios are used by police, by fire departments, by emergency services, but it's also widely used in businesses, like construction, in warehousing, all around the world, and security. Security is a major application for this. Schools, hotels, theme parks, airlines, basically any place where you need instantaneous communications that are highly reliable without the need to place a cell phone call.

And it's Motorola's technologies that have made its two-way DMR, digital mobile radio technologies, the most popular in the world. And I'm showing you just a few logos from some of the household names who have chosen Motorola to be the radios that they rely on in their businesses all over the world. And these are, you know, obviously very large companies: United, General Motors, Disney, Amazon, Ford, and so forth.

Now, this is a technology case. And so let's talk about that a little bit. And where I want to begin is with this: There's a lot of technology that's built into every one of these radios. And so we're going to talk a little bit about that.

The technologies in these radios really, at a very high-level, divide up into two categories. The first is what they refer to as standardized technologies. And those are technologies that are public and ever can share them. But most

of the technologies in each of these radios is confidential and proprietary Motorola technology. And what that means is that Motorola owns it, it's secret to Motorola, and it's the stuff that makes Motorola's radios so special and better than all the other ones on the market because it's Motorola's technology. And, in fact, it's those parts of the technology that are essentially the lifeblood of the company. And it's those confidential and proprietary technologies that Hytera stole.

All right. I'd like to tell you a little bit about the development process at Motorola for the confidential and proprietary technologies. And at Motorola, when it comes to development, it all starts with the personnel, and in particular the engineers. So let me go to my next slide.

We're going to bring for you over the course of this trial a number of the engineers who were responsible for developing and overseeing the research and development of Motorola's two-way digital mobile radio products. And these are the senior-most engineers of the company. And as you can see from my slide, they've been at Motorola for decades, and that is when they began their work on these technologies really decades ago.

And the gentleman on the left, Mr. Russ Lund, you saw him during jury selection yesterday. He will be back with us after opening statements and he will be our first witness and then he will be followed by these other additional engineers at

Motorola who will explain to you the technologies at issue.

All right. So now we have our engineers. What happens next in the development process? Well, after scoping the project in the various different ways that Mr. Lund will explain, Motorola then begins architecting and designing the technology and they do that using what is referred to as a technical specification. You're going to see a lot of these types of documents over the course of the case, so I want to introduce you to what they are at this point.

So I've got one here. This is an example. This one is from December 1996. This has to do with the two-way digital mobile technology. As I mentioned, Motorola has been developing this technology for a very long time.

And there's a couple of things that I want to point out about this. I'm just showing the cover page, by the way, about this technical specification. I have a wireless pointer, I'm going to try to use it and see how it works, if it pops up on your screen.

So the first thing is the title: Radio Operating System, or ROS. That refers to a particular part of the software that goes on each of these radios in order to run certain features, critical features on the radio. And we'll talk more over the course of the case about that particular technology, but my point for now is that each of these technical specifications regards a particular aspect of the

of this as part of your deliberations at the end of the case.

So we will pick it up Tuesday morning at 10 o'clock, the last couple of questions you might have, followed by the extensive cross-examination of Hytera. That's the understanding.

When you leave, you are not to discuss this case amongst yourselves. Do not do any kind of an examination or research directly or indirectly. As I have said, your decision must be based upon the evidence that you see and hear in this courtroom.

Please be here on time at 10 o'clock, and we will try to move this case forward.

We are adjourned.

(Jury out at 4:42 p.m.)

(An adjournment was taken at 4:45 p.m.)F

* * * * *

We certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

/s/ Judy Walsh, CSR, RMR, RDR, F/CRR, CCP  November 8, 2019.
Official Court Reporter

/s/ Frances Ward CSR, RPR, FCRR_____November 8, 2019.
Official Court Reporter

                    IN THE UNITED STATES DISTRICT COURT
                      NORTHERN DISTRICT OF ILLINOIS
                            EASTERN DIVISION

MOTOROLA SOLUTIONS, INC., and MOTOROLA      ) No. 17 CV 1973
SOLUTIONS MALAYSIA SDN. BHD,                )
                                            )
                Plaintiffs,                 )
vs.                                         ) Chicago, Illinois
                                            )
HYTERA COMMUNICATIONS CORPORATION, LTD.,    ) November 7, 2019
HYTERA AMERICA, INC., and HYTERA            )
COMMUNICATIONS AMERICA (WEST), INC.,        )
                                            )
                Defendants.                 ) 12:30 o'clock p.m.

                        TRIAL - VOLUME 2-B
                      TRANSCRIPT OF PROCEEDINGS

            BEFORE THE HONORABLE CHARLES R. NORGLE, SR.,
                            and a jury

APPEARANCES:

For the Plaintiffs:     KIRKLAND & ELLIS, LLP
                        BY:  MR. ADAM R. ALPER
                             MR. BRANDON HUGH BROWN
                        555 California Street
                        27th Floor
                        San Francisco, California 94104
                        (415) 439-1400

                        KIRKLAND & ELLIS, LLP
                        BY:  MR. MICHAEL W. DE VRIES
                        333 South Hope Street
                        Los Angeles, California 90071
                        (213) 680-8400


Court Reporter:         JUDITH A. WALSH, CSR, RDR, F/CRR
                        Official Court Reporter
                        219 South Dearborn Street, Room 2342
                        Chicago, Illinois 60604
                        (312) 435-5895
                        blanca_lara@ilnd.uscourts.gov

APPEARANCES (Continued:)

For the Plaintiffs:  KIRKLAND & ELLIS, LLP
BY:  MS. MEGAN MARGARET NEW
300 North LaSalle Street
Chicago, Illinois 60654
(312) 862-7439

KIRKLAND & ELLIS, LLP
BY:  MS. LESLIE M. SCHMIDT
601 Lexington Avenue
New York, New York 10022
(212) 446-4763

For the Defendants:  STEPTOE & JOHNSON, LLP
BY:   MR. BOYD T. CLOERN
MR. MICHAEL J. ALLAN
MS. JESSICA ILANA ROTHSCHILD
MS. KASSANDRA MICHELE OFFICER

STEPTOE & JOHNSON, LLP
BY:  MR. DANIEL S. STRINGFIELD
227 West Monroe Street, Suite 4700
Chicago, Illinois 60606
(312) 577-1300

ALSO PRESENT:  MR. RUSS LUND and
MS. MICHELE NING

MSA0084

THE COURT: Anyone in the public can send in a check and get a copy of that?

THE WITNESS: You can get a copy of these certificates.

THE COURT: Do you have to pay for it?

THE WITNESS: There might be a small fee.

THE COURT: How much would that be?

THE WITNESS: $75.

THE COURT: Thank you.

You may proceed.

MR. De VRIES: Your Honor, plaintiff moves the admission of PTX 1645, PTX 1527, and PTX 1659.

THE COURT: Are you offering them as public records?

MR. De VRIES: Yes, your Honor.

THE COURT: They are received on that basis and may be published.

(Said exhibits were received in evidence.)

BY MR. De VRIES:

Q. Mr. Lund, who owns the copyrights that are covered by these registrations?

A. Motorola Solutions.

Q. And in general, what do these registrations relate to, these copyright registrations?

A. They relate to the firmware and hardware that we developed at Motorola Solutions for the MOTOTRBO platforms -- the

portables, the mobiles, and the repeaters, and the software, too.

Q. You can put that away.

I would like to shift gears again.

THE COURT: Excuse me. Can you give the jury a perspective on what dates do they bear?

THE WITNESS: Three of them were, roughly, in the 2007 time frame, and the fourth one was in the 2018 time frame for the Release 3 of MOTOTRBO.

THE COURT: You may proceed.

BY MR. De VRIES:

Q. Are you familiar with a company named Hytera?

A. Yes, I am.

Q. What is Hytera?

A. Hytera is a manufacturer of two-way radio systems. They are located in China.

Q. Does Hytera sell DMR products, to your knowledge?

A. Yes, they do.

Q. Do you know when Hytera started selling DMR products?

A. Yes. They started in 2010.

Q. Mr. Lund, when is the first time that you recall hearing about Hytera?

A. The first time I recall hearing about them, when I was living in Malaysia in the 2008 time frame.

Q. Now, in connection with your current job, are you familiar

with whether Hytera was ever a distributor of Motorola products?

A. Yes, I do understand that they were a distributor at one point in time.

Q. Okay. And do you know approximately when that was?

A. It was in the 1990s.

Q. Now, before Hytera released its DMR products in 2010, do you know whether Hytera was selling other types of products?

A. Yes, I do.

Q. Okay. And what's an example of a type of product that you understand they were selling before then?

A. Like many other manufacturers at the time -- as I explained earlier, analog radios were the popular radio for our commercial users, and Hytera was selling analog radios along with many other manufacturers at that time.

Q. Was Motorola surprised to see Hytera release a digital DMR radio product?

A. Yes, we were.

Q. Why do you say that?

A. As I said, there was a lot of manufacturers of analog radios at the time. A lot. And we were surprised to see them come out as a digital provider.

Q. Now, by the time Hytera released its DMR products in 2010, how were Motorola's DMR MOTOTRBO products doing in the market?

A. We were doing very well in North America and all the

different regions, Asia, Europe.

Q. Does Hytera compete with Motorola in the DMR market today?

A. Yes, they do.

Q. Now, Mr. Lund, are you aware of any Motorola engineers who worked on developing MOTOTRBO products who later went to work for Hytera?

A. Yes, I am.

Q. And who are you referring to?

A. I'm referring to G.S. Kok, Sam Chia, and Y.T. Kok.

Q. And where did they work for Motorola?

A. They worked in the Penang Design Center in Malaysia.

Q. And approximately when did they work there?

A. They worked in the early 2000 through 2008.

Q. And what was your position, if any, at the time that G.S. Kok, Sam Chia, and Y.T. Kok worked at Motorola's Penang Design Center?

A. I was the engineering leader.

Q. Do you know whether Hytera released its first DMR product before or after those individuals went to work for Hytera?

A. I'm sorry. Can you repeat the question.

Q. Sure.

Do you know whether Hytera released its first DMR product before or after G.S. Kok, Sam Chia, and Y.T. Kok left Motorola and joined Hytera?

A. They released their first product after they left

of this as part of your deliberations at the end of the case.

So we will pick it up Tuesday morning at 10 o'clock, the last couple of questions you might have, followed by the extensive cross-examination of Hytera. That's the understanding.

When you leave, you are not to discuss this case amongst yourselves. Do not do any kind of an examination or research directly or indirectly. As I have said, your decision must be based upon the evidence that you see and hear in this courtroom.

Please be here on time at 10 o'clock, and we will try to move this case forward.

We are adjourned.

(Jury out at 4:42 p.m.)

(An adjournment was taken at 4:45 p.m.)F

* * * * *

We certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.


/s/ Judy Walsh, CSR, RMR, RDR, F/CRR, CCP  November 8, 2019.
Official Court Reporter


/s/ Frances Ward CSR, RPR, FCRR_____November 8, 2019.
Official Court Reporter

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

MOTOROLA SOLUTIONS, INC., and MOTOROLA ) No. 17 CV 1973
SOLUTIONS MALAYSIA SDN. BHD, )
)
        Plaintiffs, )
vs. ) Chicago, Illinois
)
HYTERA COMMUNICATIONS CORPORATION, LTD., ) November 12, 2019
HYTERA AMERICA, INC., and HYTERA )
COMMUNICATIONS AMERICA (WEST), INC., )
)
        Defendants. ) 1:00 o'clock p.m.

TRIAL - VOLUME 3-B
TRANSCRIPT OF PROCEEDINGS

BEFORE THE HONORABLE CHARLES R. NORGLE, SR.,
and a jury

APPEARANCES:

For the Plaintiffs:    KIRKLAND & ELLIS, LLP
                    BY:  MR. ADAM R. ALPER
                        MR. BRANDON HUGH BROWN
                    555 California Street
                    27th Floor
                    San Francisco, California 94104
                    (415) 439-1400

                    KIRKLAND & ELLIS, LLP
                    BY:  MR. MICHAEL W. DE VRIES
                        MR. CHRISTOPHER M. LAWLESS
                    333 South Hope Street
                    Los Angeles, California 90071
                    (213) 680-8400

Court Reporter:      JUDITH A. WALSH, CSR, RDR, F/CRR
                    Official Court Reporter
                    219 South Dearborn Street, Room 2342
                    Chicago, Illinois 60604
                    (312) 435-5895
                    blanca_lara@ilnd.uscourts.gov

MSA0090

325

APPEARANCES (Continued:)

For the Plaintiffs:    KIRKLAND & ELLIS, LLP
                       BY:  MS. MEGAN MARGARET NEW
                       300 North LaSalle Street
                       Chicago, Illinois 60654
                       (312) 862-7439

                       KIRKLAND & ELLIS, LLP
                       BY:  MS. LESLIE M. SCHMIDT
                       601 Lexington Avenue
                       New York, New York 10022
                       (212) 446-4763

For the Defendants:    STEPTOE & JOHNSON, LLP
                       BY:   MR. BOYD T. CLOERN
                             MR. MICHAEL J. ALLAN
                             MS. JESSICA ILANA ROTHSCHILD
                             MS. KASSANDRA MICHELE OFFICER
                       1330 Connecticut Avenue NW
                       Washington, DC 20036
                       (202) 429-6230

                       STEPTOE & JOHNSON, LLP
                       BY:  MR. DANIEL S. STRINGFIELD
                       227 West Monroe Street, Suite 4700
                       Chicago, Illinois 60606
                       (312) 577-1300

ALSO PRESENT:          MR. RUSS LUND and
                       MS. MICHELE NING

MSA0091

Q. And approximately -- I'm not going to ask you to count them all, but approximately how many files was that on May 5th, 2008?

A. It looks to be about 600 files on the one day.

Q. Okay. Let's go to the next day, May 6th. How many pages of this log does it take to show Mr. Chia's activity on that day?

A. There are seven files -- or seven pages.

Q. And approximately how many files?

A. It looks to me just over 500 files.

Q. Okay. And one last time, go to the next day, May 7th, 2008. How many pages of the log does it take to capture Mr. Chia's downloading?

A. There are seven pages as well.

Q. And approximately how many files?

A. It looks to be 500 files.

Q. Okay. As Motorola's chief information security officer, is it your observation that this is normal downloading activity?

A. This is not normal downloading activity.

Q. Okay. So we just looked at May 5th, 6th, and 7th, 2008. What did Mr. Chia do the next day, Mr. Shepard?

A. On May 8th, he submitted his resignation.

Q. Is there a reason from an information security standpoint that someone would commit mass downloading and then turn in

their resignation?

A.   The only -- the only reason we have through other --
assisting with other investigations is Samuel Chia wanted to
collect this information to take it on to his next career.

Q.   All right.  One last point on this log, Mr. Shepard.  I'd
like to compare Mr. Chia's downloading in his last month at
work to earlier when he was at Motorola, so if you could turn
to Page 156.

A.   Okay.

Q.   What is the date that is -- what is the earliest date in
Mr. Chia's Compass log?

A.   The last line is August 12th of 2003.

Q.   Okay.  And on this single page in Mr. Chia's Compass
report, what length of time of activity is captured?

A.   Let me look at the top one, if you could pull that,
Mr. Schlaifer.

        So what that covers in one single page is basically
four years of downloading.

Q.   Thank you, Mr. Schlaifer.  We can take that down.

        So Mr. Shepard, high-level observations, what did you
observe from reviewing Mr. Chia's Compass report?

A.   I observed that toward the end of his career at Motorola
while an employee and having access to this data, he
downloaded 1600-plus files and then turned his resignation in
the day afterwards.

Q. And how did that compare to his download activity at the beginning of his career?

A. Compared to the one page over four years, I would say that he was not mass downloading when he started but at the end of his career at Motorola Solutions.

Q. Is that a serious matter from an information protection perspective?

A. Absolutely.

Q. Why?

A. Because all of this is our innovative work and our intellectual property, and he was simply collecting it to take it with him.

Q. Okay. So let's be very clear about something. Can you tell from the Compass log whether Mr. Chia ever took those files off of his Motorola computer?

A. I cannot. These logs show that he accessed the system and pulled them down to his local machine.

Q. All right. Is there anything that would show you that extra step of whether files were transferred off of Mr. Chia's computer?

A. No, there's not in 2008.

Q. Okay. And can you explain that?

A. Yeah. We have technology that's been implemented after then that allows us to look at USB writes as well as other movement of data. That technology didn't exist in the version

of Symantec that we were running, our antivirus software.  So we didn't have the technology to know what happened with the data after it was downloaded to his machine.

Q.   Okay.  Let's pick up some steam here, Mr. Shepard.  I'd ask you to flip to PTX 1417 in your binder.

A.   Sure.

Q.   Do you recognize that document?

A.   I do.

Q.   What is it?

A.   It is -- I'm sorry.

Q.   I'm sorry.  What is it?

A.   This is the Compass access report for Y.T. Kok.

Q.   And how do you know that?

A.   His core ID or user ID is FJD476.

Q.   Is this the report that your team generated and provided back to the legal department?

A.   Yes, it is.

MR. LAWLESS:  Your Honor, Motorola moves admission of PTX 1417.

THE COURT:  The exhibit received and may be published.

(Plaintiff's Exhibit 1417 received in evidence.)

BY MR. LAWLESS:

Q.   All right.  Mr. Shepard, where is Y.T. Kok's user ID?

A.   If you look at the top of the Compass access report, you

will see the title of the document, and it says, "FJD476."
That is Y.T. Kok's user ID.

Q. Okay. Does this Compass report for Y.T. Kok have the same column headings as the report we just saw for Mr. Sam Chia?

A. Yes, it does.

Q. What time period does this Compass report cover?

A. I have to look at the back. This covers -- this report runs from 8/29 of 2007 until August 5th of 2008, which is his employment at Motorola Solutions.

Q. Okay. Let's look at June 28th, 2008. And Mr. Schlaifer, could you please blow up rows 29 through 68?

Okay. Mr. Shepard, same exercise as the last time. Looking at the last access column combined with the count column, can you tell us what you see?

A. Yes. Y.T. Kok downloaded four documents -- sorry, three documents on -- at 11:08 p.m. on June 28th only once.

Q. And the next minute?

A. The next minute, he downloaded four documents only once.

Q. The next minute?

A. He downloaded five documents, four of those only once. The other document, he did download three times.

Q. Okay. And if we repeated this minute after minute after minute, what would you observe?

A. I would observe that except for the two documents listed in this set here, he downloaded all these documents only once

over a seven-minute period.

Q. And what do you call that?

A. I call that mass downloading.

Q. How sensitive are these documents?

A. The POPI labels both say "internal use only" and "Motorola Solutions confidential restricted," which means they are very sensitive for us.

Q. Okay. If you page through Mr. Y.T. Kok's Compass report, do you see other instances of mass download?

A. I do.

Q. All right. Let's just do one more day. Let's do June 23rd, 2008, if you could turn to Page 4, please.

And Mr. Schlaifer, if I could have you blow up rows 201 through row 248.

And then Mr. Shepard, do you see that?

A. I do.

Q. And just going very quickly again, could you go minute by minute and tell us what you observe?

A. So the first minute there at 7:17, he downloaded three documents. Then the next two minutes, he downloaded one each minute. And then the next, at 7:22 he downloaded three documents. At 7:24, he downloaded two documents. At 7:25, he downloaded three documents. At 7:27, he downloaded two documents.

Q. Okay. Mr. Shepard, and if you look at Y.T. Kok's Compass

MSA0097

report as a whole, what is your overall observation?

A. My overall observation is that he is downloading information. Unlike Samuel Chia that used an application, I believe he's actually clicking on documents and pulling these down. So he's kind of searching and looking for the documents to pull down.

Q. Okay. And is that a typical practice at Motorola of mass downloading?

A. It is.

Q. I'm sorry. I just want to be clear about that. Maybe I asked a poorly phrased question. Is -- the download activity that you observed in Y.T. Kok's Compass log, is that normal, acceptable activity at Motorola?

A. That is not normal acceptable activity.

Q. Okay. Thank you, Mr. Schlaifer. We can take that down.

Let's change topics, Mr. Shepard. I'd like to ask you about some policies and rules at Motorola. First of all, does Motorola use rules or have rules that tell employees how they have to treat confidential material?

A. Yes, we do.

Q. And at a high level, what are those rules called?

A. The -- they're basically our policies. And they are the rules that kind of govern what we need to do with the protection of intellectual property.

Q. When you joined Motorola in 1994, did Motorola have those

MR. CLOERN:  Yes, your Honor.

THE COURT:  Okay.  Did you get that?  Okay.

Please be seated.

The reason for the 10:15 start tomorrow is I have four matters here set for 10:00 o'clock.  And also, there is an issue involving supervised release and a sentencing set for 11:30, so it's a full day.  So counsel, please come in at 10:15.

And I will attempt to do the supervised release and the sentencing during the lunch hour.  And so we will then work our way into the afternoon.  So once again, 10:15. 10:15.  Thank you, counsel.

(Proceedings adjourned from 3:15 p.m. to 10:15 a.m.)

\* \* \* \* \* \* \*

C E R T I F I C A T E

I, Judith A. Walsh, do hereby certify that the foregoing is a complete, true, and accurate transcript of the proceedings had in the above-entitled case before the Honorable CHARLES R. NORGLE, SR., one of the judges of said Court, at Chicago, Illinois, on November 12, 2019.

/s/ *Judith A. Walsh, CSR, RDR, F/CRR*\_\_\_\_\_November 13, 2019

Official Court Reporter

United States District Court

Northern District of Illinois

Eastern Division

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

MOTOROLA SOLUTIONS, INC.,              )
and MOTOROLA SOLUTIONS                 )
MALAYSIA SDN. BHD,                     )        Docket No. 17 CV 1973
                                       )
                 Plaintiffs,           )
                                       )
            vs.                        )
                                       )
HYTERA COMMUNICATIONS                  )
CORPORATION, LTD.; HYTERA              )
AMERICA, INC.; and HYTERA              )
COMMUNICATIONS AMERICA                 )
(WEST), INC.,                          )        Chicago, Illinois
                                       )        November 14, 2019
                 Defendants.           )        12:30 p.m.

TRIAL - VOLUME 5-B
TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE CHARLES R. NORGLE, SR., and a jury

APPEARANCES:

For the Plaintiff:        KIRKLAND & ELLIS LLP
                          BY:  MR. ADAM R. ALPER
                               MR. BRANDON H. BROWN
                               MR. AKSHAY S. DEORAS
                          555 California Street, 27th Floor
                          San Francisco, California  94104

                          KIRKLAND & ELLIS LLP
                          BY:  MR. MICHAEL W. De VRIES
                          333 South Hope Street
                          Los Angeles, California  90071


Court Reporter:


                          BLANCA I. LARA
                     Official Court Reporter
            219 South Dearborn Street, Room 2342
                     Chicago, Illinois  60604
                          (312)435-5895
                  blanca_lara@ilnd.uscourts.gov

MSA0100

APPEARANCES (Continued:)

KIRKLAND & ELLIS LLP
BY:  MS. MEGAN M. NEW
300 North LaSalle
Chicago, Illinois  60654

KIRKLAND & ELLIS LLP
BY:  MS. LESLIE M. SCHMIDT
601 Lexington Avenue
New York, New York  10022

Motorola Corporate Representative:  Mr. Russ Lund

For the Defendants:          STEPTOE & JOHNSON LLP
                             BY:   MR. BOYD T. CLOERN
                                   MR. MICHAEL J. ALLAN
                                   MS. JESSICA I. ROTHSCHILD
                                   MS. KASSANDRA M. OFFICER
                                   MR. SCOTT M. RICHEY
                             1330 Connecticut Avenue, NW
                             Washington, DC  20036

                             STEPTOE & JOHNSON LLP
                             BY:  MR. DANIEL S. STRINGFIELD
                             227 W. Monroe Street, Suite 4700
                             Chicago, Illinois  60606

Hytera Corporate Representative:    Ms. Michele Ning

Q.   Would it be acceptable for a competitor to have these confidential documents and source code?

A.   It would not be acceptable.

Q.   Are the documents that we listed all of Motorola's technical documentation regarding its DSP trade secret technologies?

A.   No, no.  We have more documents, way more.

Q.   Okay.  You referred to source code.

Did you prepare a demonstrative on DSP source code?

A.   I have, yes.

Q.   All right.  Okay.  I'm showing you PTX 5.5.

What are we seeing here?  I'll try to zoom in a little bit.

A.   Yeah, these are the different directories where we store the DSP code that we're talking about.

Q.   Okay.  When you say "directories," just taking one as an example, what is a source code directory?

A.   What is a source code directory?

Q.   Yes.

A.   It's like a repository in a computer or a server where we put the code.

Q.   Who architected the DSP source code?

A.   I did.

Q.   Did you write any of the DSP source code?

A.   I did, yes.

Q.   How many files do the directories reflecting the DSP source code represent?

A.   I think there's over a thousand files here.

Q.   How does Motorola label its source code?

A.   We label it with a tag, you know, and we -- we put it as confidential proprietary, "Motorola Confidential Proprietary."

Q.   Okay.  In your 26 years at Motorola, can you recall ever seeing any source code file labeled as -- with the words "Trade Secret" or "Registered Trade Secret"?

A.   I have not, no.

Q.   In your 26 years at Motorola, can you recall any document that you worked on or your colleagues worked on that had technical trade secret information labeled as "Trade Secret" or "Registered Trade Secret"?

A.   I personally don't -- haven't seen that.

Q.   Is it important for those materials, the source code and the confidential documents, to stay confidential and not be disclosed to competitors?

A.   Yes, it is.

Q.   And why is that?

A.   Well, if a competitor were to get our source code and technical documents, that's like getting our playbook, you know, for how we do things.

And that's -- you know, they can literally take that and understand and learn how we do -- you know, develop our

code.

Not only that. I mean, they can get our source code and save years of development that it took us, and they could work on other stuff to basically leapfrog us and potentially get ahead of us. And that would be very harmful to Motorola.

Q. As the source code relates to other technical materials at Motorola, how detailed is the source code? In other words, how much information can you get from the source code itself as compared to other materials?

A. Yeah. The documents are -- you know, tell you a lot of good information. Details that are not covered in the document are in the source code, so pretty much if you have the source code, you have everything.

Q. If the source code and the technical documents are so important to keep as a secret, why hasn't Motorola labeled them as trade secret or registered secret?

A. It's not necessary to label them as a registered secret or -- you know, essentially anything -- the labels that we use are perfectly appropriate. You know, "Motorola Confidential Proprietary" is one of the labels that we use to indicate that something is secret.

Q. When you put a label on the document, does that, at Motorola, turn it into a trade secret?

A. It does not. We're actually taught that even on marked documents, maybe you start working on something and you

haven't labeled it yet, if the -- if the information is confidential, it's still a trade secret from day one. It doesn't matter that it hasn't been labeled yet.

Q. If that's the case, what are the labels for at Motorola?

A. The labels are to ensure that the documents and the source code, they get handled properly inside the company by people -- you know, there's people that, you know, don't necessarily have a need to know -- they don't need to know every single thing.

So that's what the labels are for: to tell people within Motorola how to handle those documents accordingly.

Q. All right. I'm going to very briefly put on the ELMO what has already been admitted PTX 1865. This is -- that's the entire source code. This is an excerpt from it.

This is a document that starts with the number -- the page number down at the bottom Moto-1973-S C-13958, and I'll zoom in on the file name.

What file are we seeing here?

A. It's file called "squelch.cpp."

Q. Okay. And what -- remind us generally, what does this file -- what is this file responsible for?

A. This file is the implementation of the squelch trade secret that I described earlier. This is the source code implementation for it.

Q. And do we see -- you had testified a bit about

* * * * * * *

C E R T I F I C A T E

We, Fran Ward and Amy Spee, do hereby certify that the foregoing is a complete, true, and accurate transcript of the proceedings had in the above-entitled case before the Honorable CHARLES R. NORGLE, SR., one of the judges of said court, at Chicago, Illinois, on November 14, 2019.

/s/*Fran Ward, Official Court Reporter*        November 15, 2019

/s/*Amy Spee, Official Court Reporter*        November 15, 2019

Official Court Reporters

United States District Court

Northern District of Illinois

Eastern Division

MSA0106

1129

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

MOTOROLA SOLUTIONS, INC., and MOTOROLA ) No. 17 CV 1973
SOLUTIONS MALAYSIA SDN. BHD, )
)
          Plaintiffs,                  )
vs.                                    ) Chicago, Illinois
                                       )
HYTERA COMMUNICATIONS CORPORATION, LTD., ) November 20, 2019
HYTERA AMERICA, INC., and HYTERA       )
COMMUNICATIONS AMERICA (WEST), INC.,   )
                                       )
          Defendants.                  ) 12:32 o'clock p.m.

TRIAL - VOLUME 8-B
TRANSCRIPT OF PROCEEDINGS

BEFORE THE HONORABLE CHARLES R. NORGLE, SR.,
and a jury

APPEARANCES:

For the Plaintiffs:    KIRKLAND & ELLIS, LLP
                       BY:  MR. ADAM R. ALPER
                            MR. BRANDON HUGH BROWN
                       555 California Street
                       Suite 2700
                       San Francisco, California 94104
                       (415) 439-1400

                       KIRKLAND & ELLIS, LLP
                       BY:  MR. MICHAEL W. DE VRIES
                            MR. CHRISTOPHER M. LAWLESS
                       333 South Hope Street
                       Suite 2900
                       Los Angeles, California 90071
                       (213) 680-8400


Court Reporter:        AMY M. SPEE, CSR, RPR, CRR
                       Official Court Reporter
                       United States District Court
                       219 South Dearborn Street, Room 1728
                       Chicago, Illinois  60604
                       Telephone:  (312) 818-6531
                       amy_spee@ilnd.uscourts.gov

MSA0107

1130

APPEARANCES (Continued:)

For the Plaintiffs:    KIRKLAND & ELLIS, LLP
                       BY:  MS. MEGAN MARGARET NEW
                       300 North LaSalle Street
                       Chicago, Illinois 60654
                       (312) 862-7439

                       KIRKLAND & ELLIS, LLP
                       BY:  MS. LESLIE M. SCHMIDT
                       601 Lexington Avenue
                       New York, New York 10022
                       (212) 446-4763

For the Defendants:    STEPTOE & JOHNSON, LLP
                       BY:   MR. BOYD T. CLOERN
                             MR. MICHAEL J. ALLAN
                             MS. JESSICA ILANA ROTHSCHILD
                             MS. KASSANDRA MICHELE OFFICER
                       1330 Connecticut Avenue NW
                       Washington, DC 20036
                       (202) 429-6230

                       STEPTOE & JOHNSON, LLP
                       BY:  MR. DANIEL S. STRINGFIELD
                       227 West Monroe Street
                       Suite 4700
                       Chicago, Illinois 60606
                       (312) 577-1300

ALSO PRESENT:          MR. RUSS LUND and
                       MS. MICHELE NING

MSA0108

there's a function called climate control.  Yeah, it was up here.  There's a variable called temperature.  It was over here.

Q.  And so then what's next?  Can the computer read the library code -- the processor -- can the processor read the library code you've got there?

A.  No, it still can't read that.  There's more work to be done.

So the last stage is called the linking.  And what we're going to do is take all the code that we've compiled, Steve's temperature control and whatever else I've got and combine it so that we get one big executable file.  And now it's just zeros and ones.

Q.  Why is it that the processor needs or the radio needs zeros and ones to operate?

A.  That's all it understands.

So over here there is one -- actually, there's two processors and a Motorola radio, but the processors get their instructions.  Do this.  Do that.  But the only thing they're actually seeing are sequences of zeros and ones.  32 zeros and ones in a row tell it to do a particular thing.

And so we have to get all the way from up here down to sequences of zeros and ones that that processor can understand or those processors.

Q.  Okay.  So if you'll retake the stand, Professor.

Why don't we get into your actual investigation here.

MR. BROWN: Mr. Schlaifer, if we could move to Slide 25 of Professor Wicker's presentation.

BY MR. BROWN:

Q. Can you resummarize, just explain to the jury, what your actual work here is. What work did you do?

A. Certainly. I looked at a great deal of evidence, which we will summarize, and I came to the conclusions that I've already noted, namely that Hytera took and used Motorola's trade secrets and copyrights, they concealed their theft and its use. And I'll show how that was done.

And furthermore and finally, Motorola's trade secrets are valuable and they are confidential. That's been discussed already, and we'll discuss it some more.

Q. Okay. And you said that you've worked on this case for several years now.

A. Yes.

Q. Why did it take so long?

A. Well, there was a huge amount of material to consider. I had to consider the entire volume of everything that had been taken and to interpret it and see how it was used. So that took a long time.

Q. Okay. So can you summarize some of the materials that you found at Hytera that helped you come to your conclusions that Hytera possessed and used Motorola's trade secrets?

A.   Certainly.

We'll start with the upper left, something called Compass logs.  They've been discussed already in court.  It is a log of accesses of Motorola's database.  And we see Sam Chia and Y.T. Kok in the pictures.

There's also Motorola's confidential documents that were found in Hytera's files.  As part of this case, it's my understanding that Hytera produced a number of things that were in their files, and they included Motorola's confidential documents.

There's also Motorola code found on Hytera's computers.

I can't see that.  There we go.

There was Motorola code found in Hytera's products.  There were Motorola documents that had been rebranded as Hytera.  They had literally changed the cover page.

I also had the opportunity to review forensic analyses of Hytera's laptops.

For example, there was one laptop where there had been an attempt to erase things, but that was recovered through a forensic analysis.  You can actually look at a hard drive and even though someone has erased things, you can tell what was there previously.

And then finally, I considered the fact that a number of laptops had gone missing.

Q. Okay. And how did you have the opportunity to look at all this material? This wasn't available publicly, right?

A. No. In fact, I'm thinking the vast majority of this was not available publicly. It was produced in this case. And I had to sign something where I promised I wouldn't disclose any of it.

Q. Okay. So when you had a chance to look into Hytera's files, what was the result of how many of Motorola's confidential documents you found there?

A. Okay. I was able to identify over 1200 confidential documents, Motorola documents that were labeled confidential.

Q. Okay. And we'll talk about some of those a little later in your examination.

What about source code? Did you find any of Motorola's confidential source code like you showed on the board in Hytera's files?

A. Yes, I did. There were over 1,000 source code files, Motorola's source code files that were found in Hytera.

Q. Okay. And you also mentioned that you investigated Hytera's radios. How did you find Motorola source code in Hytera's radios?

A. Okay. We will talk about that more in a bit, but I was able to look at source code that was actually put into Hytera's products. There were nine releases, if I remember correctly, of their software. And I was able to look at that

software and identify Motorola's source code.

Q.   Okay.  And you also mentioned that there was some aspect of rebranding that had happened.

MR. BROWN:  Mr. Schlaifer, if we'll go to slide 32 of Dr. Wicker's presentation.

BY MR. BROWN:

Q.   What do you mean by rebranding of Motorola information?

A.   Okay.  That's where a document such as this one -- this is a testing document, by the way.  I believe it was discussed yesterday.  Conformance testing for radio hardware, portable and mobile.  It's Motorola confidential proprietary.

What's happened is that Motorola has been rebranded as Hytera.  The name has changed slightly.  It says DMR instead of LTD F2.  And it now says Hytera confidential proprietary.  But if you look into this document on the right, you'll see that it essentially contains the document on the left.

Q.   Okay.  And we also heard some evidence about how Hytera's engineers might not have known that this was a Motorola document, that there was no evidence to let them know that.  Did you see anything that contradicted that?

A.   Yes.  There was a lot of evidence that contradicted that, evidence that showed that there was sharing of the Motorola documents.

Q.   Okay.  So on the screen is PTX 100.  And it's an e-mail

from Mr. Jue Liang, Hytera engineer, to another Hytera engineer, Mr. Sam Chia.

What are you showing in this slide?

A.   Okay.   So Mr. Liang is a Hytera hardware product manager. He spoke by videotape yesterday.   What you see is that we have an e-mail from Mr. Liang to Sam Chia.   That is Sam Chia's e-mail address, and it's his Chinese name.

And basically this is a request.   It says, "Please review the DMR tuning and testing plan again."   And what I saw when I looked at this e-mail was that they had cut-and-pasted -- or Mr. Liang had cut-and-pasted from a Motorola document.

This piece right here, this square comes right out of the document on the left that I showed in the previous slide.

Q.   And how did Mr. Liang identify what he was copying in this e-mail?

A.   He referred to it as the MOTO DMR conformance testing of radio hardware.

Q.   And how -- have you seen evidence of where that name came from on Mr. Liang's actual computer?

A.   Yes.   When this document was produced, there was associated metadata with it.   That told me a number of things. First off, it told me the file name.

And so if we look at the file name, we can see it is MOTO DMR conformance testing for radio hardware.   And that's

the version. And furthermore, it was found on Mr. Liang's computer.

Q. Okay. And so when you open the Motorola DMR conformance testing document, what do you see?

A. When you open the document, what you see -- if you can go to the particular page, you will see that piece that was excerpted in the e-mail. So I was able to tell where the excerpted e-mail had come from by comparing it to the document.

Q. And so when you open the document, it actually has the Hytera logo on it, right?

A. It does.

Q. But it's still called the Motorola DMR conformance testing document?

A. That's right. Because the document with the Hytera logo is simply a Motorola document that's been rebranded.

Q. And so if Mr. Liang wanted to open this file on his computer, how would he do that?

A. If Mr. Liang went to his computer to open this document, he would have to find a file, a Microsoft Word file in this case, that says "MOTO DMR conformance testing."

Q. Okay. We also heard testimony from one of the read transcripts today about a document with a red line, stuff that had been erased, but we didn't get to see the document.

So I'm showing on the slide PTX 0861.

Was this the document we heard during that testimony?

A. Yes.

Q. Okay. So can you explain what you're showing with this particular document.

A. Okay. This is a Microsoft Word document that has been edited using track changes. You may have used Microsoft Word like this. Track changes basically shows the changes that had been made. So if you type something in, it often comes in in a different color. If you delete something, it crosses it out, but it remains there so you can see it.

Q. Okay. And so is -- what's happening here?

And we see that there's a bunch of red line here, and what does that indicate happened?

A. That indicates that the Motorola logo, more additional information about it, a confidentiality note, they've been deleted.

Q. And so what in this document was erased and what was kept at Hytera?

A. Okay. What was erased were the things that identified it as a Motorola confidential document. What was kept you can see over here. This is the actual technical content. And so they erased the Motorola material, the stuff that said this is Motorola's document, it's confidential, and they kept the technical detail of the testing.

Q. And we'll talk more about that technical detail when we

refer to reusing code that Hytera already had?

A. Well, then it wouldn't make sense because then we'd be saying, "This is a new algorithm. This is something we've never done before, so let's reuse our code." It doesn't work.

Q. Okay. And what about the noise suppressor algorithm? What did -- what was the proposal for how to implement the noise suppressing algorithm at Hytera?

A. Okay. So once again, it's a new algorithm, so it's going to be a reuse of Motorola's algorithm.

Q. And then going down to common items, what does Mr. Chia say about the common items here in the second blowout?

A. Okay. So this first one relates to carrier detector, the first one I've highlighted. And he says that this is missing from the lineup. It's something we don't have. It needs to be created, possibly reuse.

Q. And what does it mean to be missing from the lineup? What does that mean?

A. Okay. So in DSP, the way Motorola talks about DSP is in terms of lineups. It has little -- it has several smaller algorithms that are linked together in a big chain that Motorola calls a lineup. So when we look a little bit later at transmitters and receivers, we'll see there's a chain of things that have to be done, and that's what they call the lineup.

Q. Okay. And have you actually -- well, let me ask it

differently. Is this -- this is just Mr. Chia's proposal. Have you seen evidence that this is actually what Mr. Chia did?

A. Yes.

Q. Okay. And if you'll go to your next slide, slide 76, please, Professor.

A. Okay.

Q. And I'm going to ask you, what is PTX 263?

A. This is a spreadsheet that provides information about what Hytera was doing in the development of their radios.

Q. And how do you know that that's what this spreadsheet is?

A. First up, that's what its content indicates. Secondly, it's got a Hytera Bates number that indicates it was produced by Hytera in this case.

Q. Okay. And did you rely on this spreadsheet in forming your opinions in this case?

A. I did.

MR. CLOERN: Could we have the number? I can't seem to find the document.

MR. BROWN: 263. It's on slide 76.

MR. CLOERN: Thank you.

MR. BROWN: You're welcome.

All right. Plaintiff moves to admit Exhibit 263, please.

THE COURT: Is that what's being shown to the jury?

MR. BROWN: No. It's on the next slide.

THE COURT: The next one?

MR. BROWN: Yes.

THE COURT: It is received and then may be published.

MR. BROWN: Thank you, your Honor.

(Plaintiff's Exhibit 263 received in evidence.)

BY MR. BROWN:

Q. All right. So what did this task tracking spreadsheet say in terms of how Hytera was going to implement its DSP functionality?

A. Okay. So a piece of it has been blown up. What you see here is down here. It says, "Determine how to create libraries." So that's a task. And what that task is showing is that the question arises, how to create libraries of functions that various pieces of the radio can call on. And it says there's a number of approaches. We could reuse the entire GCISS subscriber library.

Q. Can you pause that for a second? What is the GCISS subscriber library?

A. Well, first off, I think this is a typo. It should be CGISS, which is commercial government industrial solutions sector.

Q. What does that refer to?

A. It is an entity at Motorola.

Q. Okay. And so what is it -- what does it mean technically

that to reuse an entire Motorola subscriber library?

A.   In other words, they're going to reuse a large chunk of code that provides services, provides functionality -- in this case, DSP, as we'll see -- to lots of other functions.  So it's basically saying, we're going to create this library of DSP functionality using Motorola's code.

Q.   And it looks like there's two other proposals there.  The second is to extract only the required components and change the interface to own interface.  Does that mean anything from a technical perspective?

A.   Yes, it does.  This is telling me two things.  First, it says, "extract only required component."  As we'll see, the libraries are complicated, and they have lots of pieces of code in them.  And so this is saying, "Let's just take the stuff we need from Motorola's library and then change the interface to own interface."

So this is an act to conceal the fact that the library code came from Motorola.  So you can think of it, changing the interface means changing the way that we get into the library.

In other words, if you want to go to the library and find a particular function, for example, for carrier detect, there's a particular phrase you will look for.  What they're saying here is, we're going to keep the code the same but the way you look it up in the library is going to be changed.  And

that's the part that might be detectable the way it's looked up, and so we're going to change that.

Q. Okay. And then it says the third option is to convert the required library to C. What does that mean?

A. Okay. So that will mean changing the code from C++, one programming language as it turns out, to C so that it runs in Hytera's environment.

Q. And so then Hytera writes here, "Out of the selection, option two is the best one due to the fact that the effort to migrate is the lowest among the three." What does "the effort to migrate" refer to?

A. In other words, what it requires those engineers to do to reuse Motorola's code. 2 requires the least effort.

Q. Okay. And then the next sentence says, "It has a low chance of detection if the code was disassembled by Mot," or Motorola. What is that talking about technically?

A. Okay. So basically, what it's saying is that since we have changed the interface to our own interface, if Motorola breaks open the radio and looks at the zeros and ones, they won't be able to see their own interface. All they're going to see is our interface, our own entry into the library, and they won't recognize it as Motorola's.

Q. Now, we heard a little bit about -- from Mr. Zetzl earlier in the trial about a fingerprinting test that was done. How does that relate to disassembly?

A.   Okay.  So that is basically looking at the code, the zeros and ones, to see if certain parameters could be found.  So it's looking for particular numbers that would turn up in Motorola's code to see if it turns up in the zeros and ones that are contained in Hytera's radios.

Q.   And so how does what Hytera is describing here as this reusing Motorola's code has a low chance of detection if the code was disassembled by Motorola, how does that relate to what Motorola did to try to determine if there was code copying here?

A.   Okay.  So Motorola took a look.  It opened up the radios.  It looked at the zeros and ones.  It looked for numbers in this case, parameters or coefficients, that would have been found in Motorola's software but because Hytera had concealed what they were doing by changing interfaces and changing performance, Motorola didn't find those coefficients, and so Motorola assumed that there was no code copying.

Q.   Okay.  And is it -- is what Hytera is describing here as what they're trying to evade, is that exactly what Motorola did or is it different in technology?

A.   What Hytera is talking about doing here is avoiding detection based on exactly what Motorola did.  Motorola disassembled the code.  Motorola went and looked for certain parameters as well as looking for certain performance.  They didn't see it, and so Motorola assumed that no code copying

This is not a coincidence.

Q. Okay. Wouldn't it have been easier to just look at Hytera's source code, you know, the source code you have on the left? Why didn't you just look at Hytera's source code for its DSP functionality and compare those?

A. That would have been easier, but that source code is no longer available.

Q. What do you mean, it's no longer available?

A. Hytera didn't produce it. It's my understanding they say they don't have it.

Q. I'm sorry. Hytera doesn't have its source code?

A. That's correct.

Q. What does that mean from the context of running a software company?

A. That's extremely unusual. What we have is a situation where Hytera used code, compiled it into their libraries, and now no longer has the code that they started with. So I couldn't look at the code that they actually compiled because they don't have it. This means that they will find it extraordinarily difficult to update that software because they don't have it anymore.

Q. So how can they run -- how can they have all this DSP functionality on their radios if they don't have the source code?

A. They had the source code at one point in time.

Q.   And did you see evidence in this case that engineers at Hytera deleted materials that were relevant to Motorola's trade secrets?

A.   Yes.

Q.   Okay.   And what did you see?

A.   I saw, for example, information regarding a laptop where there had been a forensic analysis, and various files in various places in the laptop were identified.   A large number of Motorola-related files were found in the recycling bin. Someone had tried to delete them and hadn't emptied the trash.

Q.   Okay.   Let me -- you said you reviewed a forensic log of that?

A.   Yes.

Q.   Okay.   Let me take you back to your slide 31.   And I'm going to ask you if PTX 2 -- excuse me, PTX 1019 is one of those logs that you reviewed.

A.   Yes, it is.

Q.   Okay.   And how did you know that PTX 1019 was a forensic log?

A.   It was actually produced by Hytera.   They had the forensic analysis done on their side, and they produced the results.

THE COURT:   Just for clarification, when you say "produced by Hytera," you mean an exchange of exhibits between the parties in this litigation?   That's what you mean when you say "produced by Hytera"?

THE WITNESS: Yes, your Honor.

THE COURT: Okay.

THE WITNESS: Hytera produced it earlier in the case.

THE COURT: I'm saying, the production in terms of an exchange of documentation between the parties in the litigation. Proceed.

BY MR. BROWN:

Q. And so just to put a little bit more on that so that it's clear, when we -- the material that you had access to, was this stuff that you could have gotten if you weren't involved in this case and signed a protective order?

A. No. I would never have seen all this material.

MR. BROWN: Okay. Plaintiff moves to admit PTX 1019.

THE COURT: It is received and may be published.

(Plaintiff's Exhibit 1019 received in evidence.)

MR. BROWN: Mr. Schlaifer, can we go to slide PDX 8.31?

BY MR. BROWN:

Q. So what are you showing on this slide, 8.31, with regard to what you just explained was in the forensic log?

A. So again, this is a forensic log. And what we see is that there's a number of different kinds of documents. Here we have an ErgoGuidebook doc. So that would be a Microsoft Word file. Here we have an app presentation. That's a PowerPoint. There are a number of other PowerPoints and documents.

Down here we have actual code, a particular code development system that creates these RT log packages. And what we're seeing here is code that's related to specific trade secrets. For example, XCMP and XNL are related to a trade secret referred to as the extended control and management protocol.

Q. Okay. So let's -- to set the context for this, what we're looking at, is this a directory listing of something that was on a Hytera computer?

A. Yes, that was recovered from a Hytera computer.

Q. Okay. And you pointed out a couple of the file names. Does Hytera have a functionality called ergo platform?

A. No. That's actually a Motorola term for their ergonomic architecture.

Q. And does Hytera have a functionality called XCMP?

A. Again, no. That's actually a Motorola term for their extended control protocol.

Q. Okay. And you said that these files were found in the recycle bin of somebody at Hytera. How do you know that from the forensic logs?

A. Well, what the forensics logs show me is the path name for these particular files. And as you can see, they all start in the recycler, okay, the trash bin.

Q. And so how does this relate to why --

THE COURT: When you say "recycler," the trash bin,

do you mean that literally, or is that a technical term?

THE WITNESS:  It's a technical term, your Honor.

THE COURT:  Can you explain it?

THE WITNESS:  Yes, sir.  It's the trash bin on the computer.  So it wasn't literally in the trash in someone's office.  It's the little trash icon that you've got on your computer when you throw files away so --

THE COURT:  So there's no allegation that somebody had a hammer and broke it up, right?

THE WITNESS:  No, your Honor.

THE COURT:  Proceed.

BY MR. BROWN:

Q.  So the -- how does this relate to why you had to do this analysis that we just walked through of looking at the library code at Hytera instead of the source code?

A.  Well, what this showed me was that there was other Motorola source code and other Motorola documents at Hytera, but they had been deleted.  This shows me this is an actual act of deletion that's caught through forensic analysis.

Q.  So if we go back to the DSP functionality, we talked about the source code.  If we can go to 8.90, please.

So what is your conclusion as to whether or not Hytera's DSP functionality they have on all of their radios came from using Motorola's source code?

A.  It's clear to me that it did.  In other words, Hytera's

DSP capability is based on the library on the right, and that library was created by compiling Motorola's source code into it. And "the library on the right," I'm referring to PDX 109.

Q. And you were able to figure that out despite the fact that source code was deleted at Hytera?

A. That's correct.

Q. What other documents? When Mr. Corretjer was on the stand, he talked about a number of confidential Motorola documents. Did you also find Motorola confidential documents about the DSP functionality in Hytera's radios -- or sorry, in Hytera's possession?

A. Yes. These documents that we see on the screen describe various aspects of the DSP trade secret. We have the framework introduction, the LTD DSP architecture document, the software requirement specification, and the software architecture document, all of which were found in Hytera's possession.

MR. BROWN: For the record, that's PTX 789, 727, 766, and 839.

BY MR. BROWN:

Q. Did you also find evidence that some of these files had additionally been downloaded by Mr. Chia?

A. There were additional files that Mr. Chia had downloaded. Here's an example. This is the DSP design handbook that is a Microsoft Word document that he downloaded while at Motorola.

Q. And were you able to find this document at Hytera?

A. No, I don't believe I did.

Q. Okay. And so why is it that you were only able to find some of the documents that were downloaded by Mr. Chia at Hytera?

A. It appears that documents had been deleted.

Q. In addition to the engineering -- sorry, the Hytera engineer computer that we just looked at a forensic analysis of, were there other places in which you learned that material had gone missing at Hytera?

A. Yes. There were laptops that had been lost. In fact, Mr. Chia's laptop was lost.

Q. Okay. And when you say "lost," how does one lose -- what do you mean by that?

A. He reported it as having been lost. It was not available.

Q. Okay. And then additional files for the DSP functionality, did you find evidence of the carrier detection, noise suppression, and squelch documents in Hytera's possession?

A. Yes. There are two examples on the screen. The one on the left has to do with noise suppression, and this has to do with squelch. It's an unmute logic task design.

Q. Now, we'll switch gears now and talk about the ergonomic layer which Motorola also calls the Darwin layer. What is that?

A.   That was -- there was actually a demonstrative in court, not yesterday, the day -- the previous day of court.  It was referred to as the traffic cop.  So what the ergonomic layer does is it controls the way applications interact on these radios.  It passes message applications.  It turns them on and off as needed.  It provides a lot of functionality.

Q.   Okay.  And so what functionality is it that you need the ergo layer or the application layer to do to make a radio work?

A.   Okay.  So these radios have applications a lot like a cell phone would, but these particular applications have to behave in a unique way.  In other words, they have to interact in a certain way one would not find on a cell phone.

Q.   What is it that this ergonomic layer helps with?  How does that help with the interactions?

A.   Well, for example, let's suppose that someone is using a texting application on a radio, a DMR radio, and there's an emergency.  One would want that activity, the texting, to be interrupted so rather than, you know, have it be waiting in background.

That's not something you would necessarily see on a cell phone but in a radio for an emergency medical technician, for example, the ability to stop one application and start another, for example, in the case of an emergency is important.

1278

you no longer.

(Proceedings adjourned from 4:05 p.m. to 10:15 a.m.)

* * * * * *

C E R T I F I C A T E

We, Amy Spee and Judith A. Walsh, do hereby certify that the foregoing is a complete, true, and accurate transcript of the proceedings had in the above-entitled case before the Honorable CHARLES R. NORGLE, SR., one of the judges of said court, and a jury, at Chicago, Illinois, on November 20, 2019.

/s/ *Amy Spee, CSR, RMR, CRR*_____            November 21, 2019

/s/ *Judith A. Walsh, CSR, RDR, F/CRR*_____  November 21, 2019

Official Court Reporters

United States District Court

Northern District of Illinois

Eastern Division

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

MOTOROLA SOLUTIONS, INC., and MOTOROLA ) No. 17 CV 1973
SOLUTIONS MALAYSIA SDN. BHD, )
)
Plaintiffs, )
vs. ) Chicago, Illinois
)
HYTERA COMMUNICATIONS CORPORATION, LTD., ) November 21, 2019
HYTERA AMERICA, INC., and HYTERA )
COMMUNICATIONS AMERICA (WEST), INC., )
)
Defendants. ) 10:15 o'clock a.m.

TRIAL - VOLUME 9 A
TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE  CHARLES R. NORGLE, SR.
and a jury

For the Plaintiffs:      KIRKLAND & ELLIS LLP
                         BY:  Mr. Adam R. Alper
                              Mr. Brandon Hugh Brown
                              Mr. Reza Dokhanchy
                              Ms. Barbara Nora Barath
                              Mr. Kyle Calhoun
                         555 California Street
                         27th Floor
                         San Francisco, California 94104
                         (415) 439-1400

                         KIRKLAND & ELLIS LLP
                         BY:  Mr. Michael W. De Vries
                         333 South Hope Street
                         Los Angeles, California 90071
                         (213) 680-8400

Court reporter:              BLANCA I. LARA
                         Official Court Reporter
                         219 South Dearborn Street
                         Room 2342
                         Chicago, Illinois 60604
                         (312) 435-5895
                         blanca_lara@ilnd.uscourts.gov

1280

Appearances: (Continued:)

For the Plaintiffs:   KIRKLAND & ELLIS LLP
                      BY: Ms. Megan Margaret New
                      300 North LaSalle Street
                      Chicago, Illinois 60654
                      (312) 862-7439

                      KIRKLAND & ELLIS LLP
                      BY:  Ms. Leslie M. Schmidt
                      601 Lexington Avenue
                      New York, New York 10022
                      (212) 446-4763

Motorola Corporate Representative:   Mr. Russ Lund


For the Defendants:   STEPTOE & JOHNSON LLP
                       BY: Mr. Boyd T Cloern
                        Mr. Michael J. Allan
                        Ms. Jessica Ilana Rothschild
                        Ms. Kassandra Michele Officer
                      1330 Connecticut Avenue., Nw
                      Washington, DC 20036
                      (202) 429-6230



Hytera Corporate Representative:  Michele Ning

MSA0133

that was attached to an e-mail that you pointed to in the previous slide?

A.  That's correct.

Q.  And so what does it tell you here that the code file that is being sent to a number of Hytera engineers includes a Motorola term for its source code?

A.  Okay.  This tells me that "raf_app.h" was clearly taken from Motorola.  We can see it through the copying, but also that copying is acknowledged by using Motorola's term, "EMT," that only has meaning within Motorola's constellation of development.  And so this document is using a Motorola term which shows that it is a Motorola development.

Q.  And as somebody with expertise in software programming, have you used header files and libraries and interfaced with them before?

A.  Yes.

Q.  And when you have run into a term that doesn't have any meaning to you in the environment you're working in, what do you normally do?

A.  I would ask somebody.  This actually happens a fair amount. If I'm working with my students and they've written code, if we're going to be sure that it works, I have to know what it means.  And so if I ran into a term that I didn't recognize, I would get in touch with the student who wrote it or the person who wrote it.

Q.  Did you see other indications in just this header file that the term "EMT" showed up?

A.  Yes, I did.

Q.  So what are you showing on this slide?

A.  Here we see "EMT" turning up here, but over -- we also see changes, in other words, where "EMT" is used in Motorola's code, there has been an attempt to conceal.  They have changed those to "RAF" while using the same functions.

Q.  And you said there was an attempt to conceal.  Can you remind us why that's an attempt to conceal.

A.  Okay.  So these could possibly be visible.  Anyone searching for "SvcEMT --" -- I covered it up there. "SvcEmtDSGetAdb", which makes sense in an EMT context, if they're searching for that they won't find it because it's been renamed "Raf_GetAdb."  SvcEmtDSFreeAdb" becomes "Raf_freeAdb", and so on.  So the names are changed slightly, so anyone doing the search wouldn't find it.

Q.  But they've only been changed slightly, as you said, Professor.  Why would a search not find the code here on the right that's pretty similar?  It still says "GetAdb" and Motorola code says "GetAdb," why would that not come up in a search if Motorola was attempting to disassemble or reverse engineer the code?

A.  Okay.  Well, remember that the disassembly from Motorola would start with all those zeros and ones.  And so basically

what one can search for would be numbers, and so forth. If one actually reversed compiled those zeros and ones, one would not get code that looked like this. So they would not be able to search for and find, for example, "GetAdb."

Q. And if we look at just those two lines, the "GetAdb" line on line 95 on the left side and the "RAF_GetAdb" line on Hytera's code on the right side, which of the terms in Motorola's code is sort of the Motorola proprietary term, the term that would make sense to search for?

A. Okay. So that would be the EMT part. In other words, when I was doing searches initially through Hytera's code, I looked for EMT, that's what I was looking for. It took me a while to realized that they systematically changed it to RAF.

Q. So let's talk about the design work of the applications at Hytera. You've shown a lot of code copying so far, which is direct code copying. Did Hytera write their own applications or did they wholesale copy those from Motorola?

A. They did write some applications.

Q. And in your analysis, why would Hytera have written their own applications, from a technical perspective?

A. From a technical perspective, they may have had other objectives; in other words, they may have wanted to emphasize different types of applications, but furthermore, they would want a different application, because if they used the exact same applications, then the behavior and what you saw on the

BY MR. BROWN:

Q. And so relative to the specific operating system abstraction layer trade secret that we were talking about, what do you see here that shows that Hytera had possession of the source code?

A. Basically that they were able to print out directory listings. They were able to compile the code, apparently successfully, and link it.

Q. Okay. We'll go to the next slide.

Did you see other examples that Motorola's source code was in Hytera's possession?

A. Yes, these are actual -- let's see, on the left we have "ros_bufs.h", that's a particular radio operating system abstraction layer file for Motorola that was found at Hytera, as you can see by the Bates number.

Here we have "ros_dirs.h", it's a header file with directives, that was found at Hytera as well.

And just to note, there's the "Motorola confidential" that's blown up here.

Q. Let's go to your slide 166, please, Professor. If you'll switch in your deck.

And it lists PTX 1019, is this another document that you relied on?

A. What was the number again?

Q. PTX 166.

A. 166. I'm sorry.

Okay, yes, this is something that I relied on.

Q. And where did it come from?

A. It was produced by Hytera in the course of this case.

MR. BROWN: Plaintiff moves to admit PTX 1019.

THE COURT: It is received and may be published.

(Said exhibit received in evidence.)

BY MR. BROWN:

Q. What is PTX 1019, Professor?

A. Okay. This is a list of material found on a laptop, you can see here. And what it shows is, there was an attempt to recycle or trash OSAL files.

Q. So PTX 1019, is it one of those forensic logs we were talking about earlier?

A. Exactly.

Q. And I think you've written here a list of non-recovered files from x-Ways, what does that mean?

A. That's right. So though the list was recovered, the forensic attempt was not able to actually reproduce the files. So there was a listing of what was in the recycled bucket, but the forensic analysis wasn't able to actually pull the real files out.

Q. We've talked about the high-level of the operating system. Did you see evidence that the way in which Motorola developed its ROS was also copied by Hytera?

A.   Yes.

Q.   What are you showing here?

A.   This is information from that document we've been talking about, a long document that describes the ROS operating system.

     And what this is showing is that there are a number of functions being declared with descriptions of what they do, and I see this copied into Hytera's version.  Basically, they prefaced it with "ROSAL," but, otherwise, they're copying it essentially word for word.

Q.   And on the next slide, this is PTX 798, a Motorola document on page 84, and PTX 1072, a Hytera document on page 31, what are you showing here?

A.   It's another example.  Again, we're dealing with the ROS operating system, ROS 32.  Here's the name, a function or directive, and a description.  In the ROSAL document, what we're seeing is that ROSAL has been placed in front of the name and otherwise the text has been copied.

Q.   Now, is the fact that you haven't shown any literal source code copying for this particular trade secret, how does that affect your opinion as to whether or not Hytera has possessed and used Motorola's ROS trade secret?

A.   Well, it doesn't affect it, because the use comes from having this available, being able to look at what Motorola has done and design, for example, applications in operating system

THE WITNESS:  Thank you, Your Honor.

(The following proceedings were had out of the presence of the jury in open court:)

THE COURT:  All right.  The Court is in session.

(Brief pause.)

THE COURT:  It is a criminal matter with a detained subject and certainly he should be given prompt attention.

Thank you, counsel.

MR. BROWN:  Thank you, Your Honor.

THE CLERK:  All rise.  The Court is adjourned.

        *     *     *     *     *     *     *     *

I CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT FROM THE RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED MATTER

        /s/Blanca I. Lara          November 21, 2019

1335

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

MOTOROLA SOLUTIONS, INC., and MOTOROLA ) No. 17 CV 1973
SOLUTIONS MALAYSIA SDN. BHD, )
)
     Plaintiffs, )
vs. ) Chicago, Illinois
)
HYTERA COMMUNICATIONS CORPORATION, LTD., ) November 21, 2019
HYTERA AMERICA, INC., and HYTERA )
COMMUNICATIONS AMERICA (WEST), INC., )
)
     Defendants. ) 12:54 o'clock p.m.

TRIAL - VOLUME 9-B
TRANSCRIPT OF PROCEEDINGS

BEFORE THE HONORABLE CHARLES R. NORGLE, SR.,
and a jury

APPEARANCES:

For the Plaintiffs:    KIRKLAND & ELLIS, LLP
      BY:  MR. ADAM R. ALPER
          MR. BRANDON HUGH BROWN
      555 California Street
      Suite 2700
      San Francisco, California 94104
      (415) 439-1400

      KIRKLAND & ELLIS, LLP
      BY:  MR. MICHAEL W. DE VRIES
          MR. CHRISTOPHER M. LAWLESS
      333 South Hope Street
      Suite 2900
      Los Angeles, California 90071
      (213) 680-8400

Court Reporter:    AMY M. SPEE, CSR, RPR, CRR
      Official Court Reporter
      United States District Court
      219 South Dearborn Street, Room 1728
      Chicago, Illinois  60604
      Telephone:  (312) 818-6531
      amy_spee@ilnd.uscourts.gov

MSA0141

1336

APPEARANCES (Continued:)

For the Plaintiffs:  KIRKLAND & ELLIS, LLP
                     BY:  MS. MEGAN MARGARET NEW
                     300 North LaSalle Street
                     Chicago, Illinois 60654
                     (312) 862-7439

                     KIRKLAND & ELLIS, LLP
                     BY:  MS. LESLIE M. SCHMIDT
                     601 Lexington Avenue
                     New York, New York 10022
                     (212) 446-4763

For the Defendants:  STEPTOE & JOHNSON, LLP
                     BY:  MR. BOYD T. CLOERN
                          MR. MICHAEL J. ALLAN
                          MS. JESSICA ILANA ROTHSCHILD
                          MS. KASSANDRA MICHELE OFFICER
                     1330 Connecticut Avenue NW
                     Washington, DC 20036
                     (202) 429-6230

                     STEPTOE & JOHNSON, LLP
                     BY:  MR. DANIEL S. STRINGFIELD
                     227 West Monroe Street
                     Suite 4700
                     Chicago, Illinois 60606
                     (312) 577-1300


ALSO PRESENT:        MR. RUSS LUND and
                     MS. MICHELE NING

MSA0142

is.

You never -- I think we just agreed.  The only way -- because the "Motorola code" part is cut off of what says "Hytera" on the right, the only way to know if this is Hytera's official code versus code only on P.E.'s laptop is if you look down at the PTX and all the information describing the PTX there, right?  That's the only way one would know, correct?

A.   Well, one can also tell from this kind of wrapping that's going on.  But from your standpoint, without getting into the details, yes, one would look right here and see that there is no release number.  There is no path name.  So that would tell us that this did not come from Hytera's official release software.

Q.   So if you are not a software expert -- and the first part, you pointed out, wouldn't tell you -- and you are not one of the lawyers on the case familiar with this PTX numbering, then you wouldn't know the difference unless you were expressly told, right?

A.   No, I don't agree with that.  If this was from a particular release of Hytera's code, it would say so.  And there are many examples.

This is a Motorola example.  But this is what I'm talking about, a path name that says R, release.  In this case it's 1.00.01 of Motorola's software, but there is

comparable path names for Hytera's software, and it identifies the release. And that indicates that it's from the SVN.

Q. Okay. You didn't tell that -- you didn't testify to that in your direct, did you?

A. I think I pointed it out several times.

Q. You pointed out how to tell the difference between whether -- what's shown on the right that says "Hytera" on it, right -- you have written the word "Hytera" above this snippet of code, right?

A. That's right.

Q. And your testimony now on cross is that you pointed out how to tell the difference between P.E. code versus Hytera code in your direct. That's your testimony right now?

A. My testimony is that many times I pointed out that a given chunk of Hytera code was an official release that it was on the SVN, and there were other times I pointed out that it came from Peiyi Huang's laptop. In fact, there are many cases where I actually wrote out, obtained from Peiyi's laptop by a particular organization doing a study of the laptop.

Q. P.E. deleted all that Motorola code off her laptop years before this case was filed, right?

A. She certainly tried. It was in the recycling bin. And I believe the date was 2013.

Q. Right. Well, it actually had to be forensically restored, correct?

A. That's right.

Q. So you have talked a lot about rebranding of documents, right?

A. Yes.

Q. You have shown a number of examples of rebranding of documents, correct?

A. Yes, I have.

Q. Okay. And those are documents that were in the files of the former Motorola employees originally, correct? That's where they were brought over?

A. Yes. They were initially downloaded by a then-Motorola employee who brought them over to Hytera.

Q. Okay. And then they were changed and circulated to other folks at Hytera, correct?

A. That's correct.

Q. So the former Motorola employees were concealing their actions from other engineers at Hytera?

A. That I don't agree with.

Q. You don't agree with that.

So you understand that there are currently -- let me back up a minute.

Were you in the courtroom -- I think I saw you -- for the testimony of the Motorola engineers about the trade

secrets?

A.   Yes, I was.

Q.   And each of them identified -- I don't know -- four to six or seven documents for each trade secret, right?

A.   That's right.

Q.   And some of those documents were identified for more than one trade secret, correct?

A.   That's true as well.

Q.   So in total, I believe there are 78 documents that have been cited as support for the 21 trade secrets, correct?

A.   I don't know the exact number, but it's in that neighborhood.

Q.   Okay.

A.   Certainly the folks who testified before me talked about or identified, roughly, 70 or 80 documents.

Q.   70 or 80 documents.  We can agree it's in that number, right?

A.   Roughly.

Q.   Okay.  And not all of those documents were found in the files at Hytera, correct, as you pointed out in your direct presentation?  Most were, but a few weren't, correct?

A.   So all of those documents were downloaded and taken to Hytera.

Q.   I understand.

A.   They weren't all found on Hytera's --

Q.   I am going to give you a chance to answer that.  I just want to take it in pieces, if that's okay.

So let's start there.

There is Compass logs, and all 78 of those documents were on the Compass logs of either Sam or Y.T., correct?

A.   That's my recollection.

Q.   Sam Chia, a former Motorolan; and Y.T. Kok, a former Motorolan?

A.   That's right.

Q.   Okay.  And then Sam and Y.T. bring the docs to Hytera, right?

A.   That's right.

Q.   Okay.  And there were some of those documents that weren't found in the files of anyone at Hytera, correct?

A.   That's right.  When production was done, not everything that had been taken from the Compass database was found at Hytera.

Q.   Right.  And there was no -- you didn't find any direct evidence that they were deleted.  For example, none were -- in fact, some of them -- some of the documents that were found in Hytera's files were recovered from the deletion process, right?

A.   That's right.

Q.   Okay.  So there were documents that were found through

the deletion process, correct?

A.   That is correct.

Q.   And I believe you looked at some logs of the forensic recovery from P.E.'s laptop, right?

A.   That's correct.

Q.   And that showed where there was documents that existed but weren't able to be recovered, correct?

A.   That's right.

          With regard to the forensic examination of that laptop, some things were recovered, some things weren't recovered, but they were listed.

Q.   Exactly.

          And you didn't see any evidence where there was one of the trade secret documents that weren't found in Hytera's files -- you didn't see any evidence that they had been deleted but not recovered, right?

A.   Let me make sure I understand.

          So a particular trade secret document -- you are asking whether a particular trade secret document was listed but not found --

Q.   Correct.

A.   -- not recovered.

          I don't recall that happening.

Q.   Okay.  All right.  Good.

          So let's talk about the trade secret -- the other

trade secret documents, the trade secret documents of that list of 70 or 80, the trade secret documents that were found in Hytera's files. Okay?

Now, they were all found in the files of one of the former Motorolans, correct?

A. No.

Q. No?

A. No. There were examples -- for example, I showed you where testing the documents had turned up in a number of different places. There were examples of other documents being shared -- having been rebranded but shared, and they were essentially the original documents.

Q. So I'm not asking about the rebranded documents.

A. Sorry.

Q. Okay. I understand that there was some information that was copied from a Motorola badge document into a Hytera badge document --

THE COURT: Hang on just a minute.

Is that a question? What I am saying is, your understanding is not a question put to the witness. So rephrase the question.

BY MR. CLOERN:

Q. So setting aside Hytera branded documents, the specific Motorola branded documents that are identified as support for one of the trade secrets --

o'clock Monday.  Do not come in tomorrow.  Do not come in tomorrow.

Counsel, 10:00 o'clock Monday.

(An adjournment was taken at 4:36 p.m.)

*   *   *   *   *

We certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

/s/ Frances Ward_____November 22, 2019.
Official Court Reporter

/s/ Amy Spee                            November 22, 2019.
Official Court Reporter
F

1489

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

MOTOROLA SOLUTIONS, INC., and MOTOROLA    ) No. 17 CV 1973
SOLUTIONS MALAYSIA SDN. BHD,              )
                                          )
            Plaintiffs,                   )
vs.                                       ) Chicago, Illinois
                                          )
HYTERA COMMUNICATIONS CORPORATION, LTD.,  ) November 25, 2019
HYTERA AMERICA, INC., and HYTERA          )
COMMUNICATIONS AMERICA (WEST), INC.,      )
                                          )
            Defendants.                   ) 10:00 o'clock a.m.

TRIAL - VOLUME 10 A
TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE  CHARLES R. NORGLE, SR.
and a jury

For the Plaintiffs:    KIRKLAND & ELLIS LLP
                       BY:  Mr. Adam R. Alper
                            Mr. Brandon Hugh Brown
                            Mr. Reza Dokhanchy
                            Ms. Barbara Nora Barath
                            Mr. Kyle Calhoun
                       555 California Street
                       27th Floor
                       San Francisco, California 94104
                       (415) 439-1400

                       KIRKLAND & ELLIS LLP
                       BY:  Mr. Michael W. De Vries
                       333 South Hope Street
                       Los Angeles, California 90071
                       (213) 680-8400

Court reporter:             BLANCA I. LARA
                       Official Court Reporter
                       219 South Dearborn Street
                            Room 2342
                       Chicago, Illinois 60604
                          (312) 435-5895
                       blanca_lara@ilnd.uscourts.gov

MSA0151

1490

Appearances: (Continued:)

For the Plaintiffs:     KIRKLAND & ELLIS LLP
                        BY: Ms. Megan Margaret New
                        300 North LaSalle Street
                        Chicago, Illinois 60654
                        (312) 862-7439

                        KIRKLAND & ELLIS LLP
                        BY:  Ms. Leslie M. Schmidt
                        601 Lexington Avenue
                        New York, New York 10022
                        (212) 446-4763

Motorola Corporate Representative:   Mr. Russ Lund


For the Defendants:     STEPTOE & JOHNSON LLP
                         BY: Mr. Boyd T Cloern
                             Mr. Michael J. Allan
                             Ms. Jessica Ilana Rothschild
                             Ms. Kassandra Michele Officer
                        1330 Connecticut Avenue., Nw
                        Washington, DC 20036
                        (202) 429-6230



Hytera Corporate Representative:  Michele Ning

A. That's correct.

Q. But if you didn't have Motorola code, you wouldn't know that those object names are from Motorola code, right? You'd have to have the Motorola code to compare it like you did?

A. That's correct. The only reason I knew this was pointing to Motorola code was, I recognized names like that. If I had not ever seen the Motorola code, I wouldn't have known that.

Q. So you talked a little bit in your direct testimony about Motorola rebranded documents at Hytera?

A. That's correct.

Q. Let's take a look at PDX 8.354.

And that's one of the rebranded documents, correct?

A. That's right.

Q. And the documents on the left, those are the Motorola documents, and they were only in the files of Sam Chia, right?

A. I'd have to check the metadata, but these numbers tell me that they were produced by Hytera during this litigation.

MR. CLOERN: Can we call up the metadata, Jim, please.

BY MR. CLOERN:

Q. And we see that these documents were in the files of Peiyi Huang and Sam Chia, both former Motorlans, right?

A. That's correct.

Q. Okay. And then these documents were rebanded and then sent out to a broader audience within Hytera, correct?

A. That's correct as well.

Q. And the same with PDX 8.158. Can we bring that up.

Is that correct?

A. That is correct as well. This is an example of rebranding.

Q. And the Motorola document on the left, that was only in the files of Peiyi Huang, correct?

A. As a Motorola titled document, that's correct.

Q. Dr. Wicker, if everyone at Hytera knew that the former Motorlans had taken documents from Motorola and everybody at higher was complicit in their use, why would former Motorlans go through so much trouble to rebrand them all?

A. Well, they were trying to conceal what they were doing by, for example, changing the names of documents to limit the extent to which the documents that said "Motorola" would be available to the outside world.

Q. Well, don't you think in the 20 million pages of documents and the 30 laptops that were all forensically restored, don't you think that somewhere at least one of these Motorola documents would've wound up in one of the Motorola trade secret documents, would've wound up in non-Motorlans files?

A. Well, to begin with, I'm not aware that there were some 20 to 30 laptops forensically stored. What I am aware of is that some laptops were lost and never recovered, and certainly never forensically analyzed.

And furthermore, Motorola documents did turn up; though I agree that the vast majority had been rebranded.

Q. Dr. Wicker, there's no document from a compass log of G.S. Sam or Y.T., not a single Motorola branded document that's listed on a Compass log that was found in a single Hytera employees' files, was there?

A. I don't agree.

Q. Which one wasn't?

A. Peiyi Huang's computer had a large number of Motorola documents.

Q. Peiyi Huang was a former Motorlan. And maybe I wasn't clear in my question, so I'll ask it again.

There is not a single document listed on a Compass log at issue in this case that was found in the files of a Hytera employee who isn't one of the former Motorlans, correct?

A. I believe that's correct.

Q. Okay. I'd like to just switch over, switch gears a little bit.

MR. CLOERN: Jim, can you please pull up 8.342.

BY MR. CLOERN:

Q. So here's another example of rebranding, correct, Dr. Wicker?

A. That's right.

Q. All right. Now, can we pull up slide PDX 8.343.

And we see the metadata for the Hytera branded version of this document, correct?

A. That's right.

Q. And Peiyi Huang sent this file by mistake, right?

A. That appears to be the case.

Q. And it's Huang Ni's view and it's Huang Ni's position that she looked at the functional code, saw it was the wrong file, and informed Peiyi of that, correct?

A. That appears to be the case, yes.

MR. CLOERN: Jim, can you pull up PTX 630.

THE COURT: Counsel, would this be a good stopping point for lunch?

MR. CLOERN: Perfect, Your Honor.

THE COURT: All right. Members of the jury, please come back at 1:15.

The witness may leave the stand.

(Luncheon recess taken from 12:13 o'clock p.m. to 1:15 o'clock p.m.)

*    *    *    *    *    *    *    *

I CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT FROM THE RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED MATTER

/s/Blanca I. Lara                    November 25, 2019

                    IN THE UNITED STATES DISTRICT COURT
                       NORTHERN DISTRICT OF ILLINOIS
                            EASTERN DIVISION

MOTOROLA SOLUTIONS, INC., and MOTOROLA      ) No. 17 CV 1973
SOLUTIONS MALAYSIA SDN. BHD,                )
                                            )
              Plaintiffs,                    )
vs.                                         ) Chicago, Illinois
                                            )
HYTERA COMMUNICATIONS CORPORATION, LTD.,     ) November 27, 2019
HYTERA AMERICA, INC., and HYTERA            )
COMMUNICATIONS AMERICA (WEST), INC.,        )
                                            )
              Defendants.                    ) 1:12 o'clock p.m.

                        TRIAL - VOLUME 11-B
                      TRANSCRIPT OF PROCEEDINGS

           BEFORE THE HONORABLE CHARLES R. NORGLE, SR.,
                            and a jury

APPEARANCES:

For the Plaintiffs:    KIRKLAND & ELLIS, LLP
                       BY:  MR. ADAM R. ALPER
                            MR. BRANDON HUGH BROWN
                       555 California Street
                       Suite 2700
                       San Francisco, California 94104
                       (415) 439-1400

                       KIRKLAND & ELLIS, LLP
                       BY:  MR. MICHAEL W. DE VRIES
                            MR. CHRISTOPHER M. LAWLESS
                       333 South Hope Street
                       Suite 2900
                       Los Angeles, California 90071
                       (213) 680-8400


Court Reporter:        AMY M. SPEE, CSR, RPR, CRR
                       Official Court Reporter
                       United States District Court
                       219 South Dearborn Street, Room 1728
                       Chicago, Illinois  60604
                       Telephone:  (312) 818-6531
                       amy_spee@ilnd.uscourts.gov

MSA0157

APPEARANCES (Continued:)

For the Plaintiffs:  KIRKLAND & ELLIS, LLP
BY:  MS. MEGAN MARGARET NEW
300 North LaSalle Street
Chicago, Illinois 60654
(312) 862-7439

KIRKLAND & ELLIS, LLP
BY:  MS. LESLIE M. SCHMIDT
601 Lexington Avenue
New York, New York 10022
(212) 446-4763

For the Defendants:  STEPTOE & JOHNSON, LLP
BY:   MR. BOYD T. CLOERN
MR. MICHAEL J. ALLAN
MS. JESSICA ILANA ROTHSCHILD
MS. KASSANDRA MICHELE OFFICER
1330 Connecticut Avenue NW
Washington, DC 20036
(202) 429-6230

STEPTOE & JOHNSON, LLP
BY:  MR. DANIEL S. STRINGFIELD
227 West Monroe Street
Suite 4700
Chicago, Illinois 60606
(312) 577-1300

ALSO PRESENT:     MR. RUSS LUND and
MS. MICHELE NING

MSA0158

I'll try to circle. Oops, not as good as Mr. -- Dr. Wicker. Okay. Sorry.

Okay. Here we go.

You also see stacks similarly here on the bottom task in 141 to explicitly look up a number of features in that stack.

Q. And so does Row 141 also indicate to you that Hytera engineers are being told in this task list to study Motorola's implementation of DMR features?

A. Exactly. Exactly.

Q. Okay. Let's go back up to Row 92. And if you look over on the right-hand side under "Comments," you've underlined "There is a NEO ramp profile in the Mot folder."

So I want to ask you two questions about that.

First of all, what do you understand a Neo ramp profile to be?

A. So this is explicitly -- it's one of the components in that Neo document. It's the ramping profile, one of the ways the power ramps up. So that's exactly what it's talking about here.

Q. And then there's the second reference to "in the Mot folder."

A. Yeah.

Q. What does that indicate to you?

A. Sorry.

What that indicates is that this is particularly egregious here, to suggest that there's a folder which will be a repository, if you like, for Motorola confidential information.

And it's important to recall -- recognize this is a task list. And so the task list that is generally shared to the engineers explicitly calls out of having a folder where these engineers can obtain this confidential information.

Q. In Row 33, I want to look at both the "Task" and the "Comments" section.

So in the "Task" side, in the "Task" column, you've underlined "Determine DSP Library risk and where to store the files."

What does that mean to you, Dr. Rangan?

A. This is also quite egregious here. First of all, the "Determine DSP Library risk," the risk that is being talked about here is the risk for a detection by another party, such as Motorola. So that is just one of the tasks on -- for the engineers here at Hytera.

Q. And if we go to the "Comments" field on the far right-hand side, it looks like there's been a resolution to how to do that.

Can you explain to the jury what it says there.

A. Yeah. So in the task part on the left of 133, part of that way to determine the risk is where to store the files,

where to hide the files.

And then one engineer, Yu Yang, is explicitly tasked out to talk to the software configuration manager to find a folder.

Q.   And who is -- what is your understanding of You Yang's role within the software engineering group at Hytera?

A.   Actually, Yu Yang was at the -- at -- at the project from a -- from the beginning, back prior to the arrival -- I think since 2006 at least -- prior to the arrival of G.S. Kok, Y.T. Kok, and Sam Chia, and I believe at this point he is still a group leader within the software -- or the DSP team.

Q.   What does PTX 263 tell you about the sharing of Motorola's confidential information outside of G.S. Kok, Y.T. Kok, and Sam Chia?

A.   That's a good question.

I think to put that in context, you have to think this is a task spreadsheet.  I've written many of these tasks spreadsheets myself.  And this really walks step by step of what a DSP team is to do.

And many items on this task spreadsheet are explicitly calling out instructions for use and concealment of Motorola confidential information.  I've simply never seen anything like this.

Using -- for example, the task here is to reuse the entire CGISS library.  Not only does it mean that the

possessor of this spreadsheet would be part of this plan; the whole execution of the task involved explicitly the DSP team to conduct this. There is no way to reuse the CGISS library or any of these other options without the cooperation of the DSP team.

Q. And so, Dr. Rangan, we've just reviewed a handful of documents. And based on those documents, at least how many people at Hytera besides G.S. Kok, Y.T. Kok, and Sam Chia had access to or saw Motorola confidential information within Hytera?

A. That would be just in a few examples, we can identify explicitly the names of at least 28 Hytera engineers beyond G.S. Kok, Y.T. Kok, and Sam Chia.

Those names would include the few examples I've presented. Plus, due to time, we skipped a couple of others, the LTD conformance and the welcome e-mail that you'll talk about later. But just those two examples, it's already 28 engineers.

Q. And now let's look at PTX 1018, which has already been admitted. Did you consider this document in reaching your opinions?

A. Yes, I did.

Q. Okay. And can you just remind everyone what this document is.

A. If I recall, this is the spreadsheet of the recovered

files from Ms. Peiyi Huang's laptop.

Q.  So Mr. Schlaifer is just going to run a search within this Excel sheet.

MS. NEW:  Mr. Schlaifer, can you just run a search for the phrase "team training."

Just make that a little bigger so everyone can read it.

BY MS. NEW:

Q.  Okay.  So, Dr. Rangan, if you look down on the far left-hand corner of that window that Mr. Schlaifer just opened, how many files do we find if we just searched "team training"?

A.  I tried to circle it for you if you can't see, but that's 2544, more than 2500 such files.

Q.  And in your experience working at software companies and leading teams of engineers, what does "team training" mean to you?

A.  So team training is very important.  In any software team, you have team training material.  And this is a folder explicitly for team training material that would be used.

Q.  And just on the screen we see here, do you see any files here in the team training folder that relate to Motorola confidential information or source code?

A.  Yes.  I'll just give you a few examples.

For example, you can see here the release 1.4 Matrix.

2008?

A. It's my understanding that they believed they had what they call, characterized as a 75 percent complete prototype.

Q. Okay. And have you seen this alleged prototype?

A. No, I have not.

Q. Do you -- we've heard a little bit about Hytera's expert, Mr. Grimmett. Are you aware of whether Mr. Grimmett has seen this prototype?

A. He has not either.

Q. Have you seen pictures of this prototype?

A. No, I have not seen physical or -- versions or pictures of the prototype.

Q. Were you able to go to Hytera and inspect the prototype?

A. No, I was not either able to go to Hytera or its counsel's office to actually inspect one.

Q. And were you ever able to do any tests on any prototype?

A. Since it didn't physically exist, I could not do any test.

Q. And given that the prototype was allegedly 75 percent complete, would you expect Hytera to be able to produce and -- to find it and produce it in this case?

A. Absolutely.

Q. What is your understanding of what companies typically do with a prototype that is -- would be that far along?

A. Given -- had they actually completed a prototype that was 75 percent complete, that's quite a significant

accomplishment, and you would expect the company to keep it at least as a souvenir of that accomplishment because it would have been so significant.

Q. Now, it's been 11, almost 12 years since 2008. Would you expect Hytera to have kept the prototype for that long?

A. Yes. For example, at Flarion, we had developed prototypes dating back even to 2002, and they're still in the display case at Qualcomm that ended up acquiring us.

Q. All right. Let's take a look at PTX 421 on your next slide. Did you rely on this document in reaching your opinion, Dr. Rangan?

A. Yes, I did.

Q. Okay. And what is PTX 421?

A. This is an email in February 2008 sent to Mr. Chen, a Hytera email.

Q. Okay. And is there any indication that PTX 421 is a Hytera document produced from Hytera's files?

A. Yes. It has -- it has Hytera email recipients as well it has a Hytera Bates number.

MS. NEW: Plaintiff moves to admit PTX 421 into evidence.

THE COURT: It is received and may be published.

(Plaintiff's Exhibit 421 received in evidence.)

BY MS. NEW:

Q. Let's go to this next slide. Thank you.

Dr. Rangan, what does G.S. Kok say to Mr. Chen in this email?

A.  So this is about, to put it in context, about two weeks prior to Mr. -- after Mr. Kok has arrived at Hytera.  And at that time, he would have had an opportunity to look at the work that had been done prior to his arrival, and this email was discussing that.

He says here, I'll first go to the red highlighted part:  "I'm surprised also to find out that we do not have a prototype after three years.  In addition, that each circuit block needs to be merged and a new board layout."

He also states here that, "In my first review, the radio part count was greater than 1100 parts."  That's the radio part count of a board that they are planning on building.

Finally, at the end here, he instructs the team a number of instructions.  And I want to highlight the sixth one here, which is that the team will need an injection of subject matter experts, and he suggests getting them here from Motorola.

Q.  Based on your review of this email, Dr. Rangan, is there any indication that G.S. Kok did not understand how Hytera had developed its alleged prototype?

A.  No.  In fact, there's some technical details in the email and further emails that confirm that he did understand it.

Q.  Do you see any mention from Mr. Kok about any problems communicating with the team due to language barriers?

A.  No.  In fact, you see that he's, in fact, communicating with the team.

Q.  And did you see any indication in this email that G.S. Kok does not understand the hardware that Hytera was using at the time?

A.  No, I do not.

Q.  And there's a -- the reference here to the part count being greater than 1100, what, if anything, does that reference indicate to you about whether Hytera had a prototype in February 2008?

A.  This case, based on my other analysis, this is related to a part count for a board that they're potentially planning on building, not for one that's in existence right now.

Q.  Do you under -- do you have an understanding of why Hytera decided not to commercialize the prototype that was allegedly 75 percent complete in February of 2008?

A.  My understanding was that Mr. G.S. Kok and then later Mr. Chia's suggestion to abandon that work and then basically start from scratch.

Q.  Now, based on your engineering management and overall business experience, if a company invested three years developing a prototype and it was 75 percent complete, is it typical or is it atypical for all of that work to be

abandoned?

A.   That would be extremely atypical.  Had they actually achieved 75 percent functionality, that would be an enormous amount of development time and cost that would have been sunk into this that would be basically thrown out.  You just simply cannot undertake that decision easily.

In addition, you would expect there to be significant discussion amongst the engineering management as well as the business management maybe up to the Board given the importance of this company before you would discard such an amount of progress.

Q.   Now, given that you haven't seen the prototype that Hytera says it had, what evidence did Hytera -- excuse me, what documents did Hytera actually provide to support its contention that it had a prototype?

A.   So since there was no physical prototype to actually inspect or test, all of my analysis is based on the documents, the paper versions of what was actually available.

Q.   And based on your review of those documents, would Hytera have been able to independently develop a DMR product without using or accessing Motorola's trade secrets?

A.   No.   That's my conclusion.

Q.   Okay.  And what are the reasons for that?

A.   Sure.  So there's really -- I've tried to categorize it into four high-level reasons.  The first is that there's no

architecture or framework for this. That's the overall way that the whole product would have been architected.

The protocol stack was not complete. In fact, it was extremely limited. There was no demonstration of interoperability. And the source code, the way it was structured, was fundamentally flawed and would prevent any further progress.

Q. All right. So let's go to that first reason which is that there was no architecture or framework. Can you explain what you mean by "no architecture or framework"?

A. Yes. So you may recall Mr. Lund's presentation where he describes architecture or framework in the context of a large commercial office building. And when you build a large building, of course, you would have blueprints. You would lay a foundation and then put all the structural framework as well as plumbing, electrical, and so on.

Large pieces of complex software like a DMR radio are similar. They need that framework to basically assemble all the complex modules that will go into that software.

Q. Let's look at PTX 1261 on the next slide. And this document has already been admitted. And we're looking at Page 9. What are the components of architecture or framework that we can see here in this document?

A. This is a high-level block diagram of one of the components of the DMR system. Each block in this represents

in itself a large complex software module.  And the framework is a part that structures this all together.

I wanted to point out that several of the trade secrets at issue in this case are these structural framework aspects; for example, the HAL, the hardware abstraction layer; the operating system; Darwin; the DSP framework; and that virtual radio interface standard.

Q.  And just to be clear, I'm not sure I caught that you said this.  This is a Motorola document, correct?

A.  Oh, I'm sorry.  Yes, this is Motorola's architecture.

Q.  Okay.  And would you -- if Hytera had a prototype that was 75 percent complete, would you or would you not have expected to see some of these components present in the documents provided by Hytera?

A.  Absolutely.  Different designers can choose different types of architecture, but some architecture with at least some of these types of components you would expect in any product that's going towards commercialization.

Q.  And did you see any evidence of any of these components, any components of framework or architecture in the documents or materials related to Hytera's development efforts before February 2008?

A.  Remarkably, no.  That was really one of the shocking things to find when I first started looking at this material, that complete absence of that -- of those architectural

framework components.

Q. Now, one of the components you mentioned is an operating system. Can you just explain why an operating system would be necessary to any product that would be commercialized?

A. Sure. You heard several of the other witnesses testify about an operating system. Your smartphone, for example, has an operating system on it. It manages multiple applications. So, for example, you can surf the web while getting a call.

And on a DMR system, similarly you could be, for example, communicating on the radio while getting an emergency alarm. Any time you need to manage multiple tasks or applications, the operating system is essential.

Q. And if a prototype for a DMR radio was 75 percent complete, would you expect to see an operating system?

A. Absolutely. You can't -- you would have to come in very early in the development before continuing.

Q. Okay. And can you explain how you know that Hytera's pre-2008 DMR development did not include an operating system?

A. So my understanding is the only evidence they produced of an operating system were a number of files, but those files were just third party files that were downloaded for an operating system but they had never actually been integrated into the code or at least the code that I saw.

Q. And so to your knowledge, what was done with those files?

A. So you can think of them just as sitting in a separate

location and not really being used.

Q.   And without an architecture framework or operating system, would any company be able to develop a DMR radio?

A.   Absolutely not.  That's just inconceivable to develop any complex piece of software without that.

Q.   All right.  So the second reason you said that Hytera could not independently develop a DMR product without accessing or using Motorola's trade secrets is that Hytera did not have a complete protocol stack.  Can you just remind the jury what a protocol stack is?

A.   Sure.  The protocol, among other things, really defines the sequence of operations that the transmitter or receiver would have to do to communicate.  There's a protocol stack on each end of the communication.  Typically, the protocol stack is defined -- divided into layers.  For example, in the DMR, there's a physical layer, a data link layer, and a control layer.  And it's called a protocol stack because these layers are stacked, if you like, one on top of the other.

Q.   And if we go to the next slide, can you -- you put together this demonstrative to explain how communications between two radios would work if they have a complete protocol stack.  Can you walk the jury through that process?

A.   Sure.  Suppose you want to send a -- something like a short message saying, "Meet us on the 23rd floor," where we are right now.  Between two DMR radios, if you were to do

this, you would have a number of steps. The first is that you might have to try to access the channel before you can even communicate. You might have to exchange some other information, identifying information, to initiate the call. Sometimes that's called handshaking. That's what I've illustrated in step one.

At that point, you would have to have some interface with your keypad, convert that into digital information, and then that information would then need to be transmitted, typically divided into a number of small frames, and each of these frames being modulated over the air.

The receiver side would reverse this process, would demodulate it, reassemble the frames, and then display the message on your phone -- sorry, on your -- on the other radio. So there's a lot of steps even for something apparently simple like a short message.

Q. Have you seen any documents or materials in this case showing that Hytera could perform these steps prior to February 2008?

A. Not at all.

Q. Okay. If you could turn to DTX 32'9 on your next slide, do you recognize this document?

A. Yes, I do.

Q. What is the document?

A. This is an internal Hytera document dated in 2006 titled

"DMR data service program testing."

Q. Did you consider this document in reaching your opinions?

A. Yes, I did.

Q. Is there any indication on the document that it comes from -- it came from Hytera's files?

A. Yes. It's a Hytera branded document, and it also has a Hytera Bates number.

MS. NEW: Your Honor, plaintiff moves to admit DTX 3219 into evidence.

THE COURT: It is received and may be published.

(Defendant's Exhibit 3219 received in evidence.)

BY MS. NEW:

Q. So Dr. Rangan, based on your understanding, what does Hytera claim that this document shows?

A. This, they claim that it shows certain types of basic data service.

Q. And can you explain what data service is?

A. So usually, they -- one distinguishes data service from voice service. Data service is, say, sending a short message and voice, of course, is a voice conversation.

Q. Is a text message an easy way to think about data service?

A. Yes, that's a good one.

Q. Does sending a data service message represent full DMR capability?

A. No, because, of course, DMR would need voice on top of

able to communicate or send messages between two radios. They were unable to develop the basic functionality that you'd expect in a DMR protocol stack. And the requirements that they had set out to meet were not being met.

Q. Dr. Rangan, let's move on to the third reason you identified to support your conclusion that Hytera could not independently develop a DMR radio. Can you remind us what that third reason is?

A. That is that they did not demonstrate interoperability.

Q. Now, we're heard the term "interoperability" here and there over the last couple weeks. Can you remind us what interoperability means?

A. Sure. Interoperability simply means the ability of a device from one manufacturer to communicate to the device of another manufacturer. It's generally a formal process where manufacturers, for example, in DMR would go to, say, the DMR Association which will then, they will meet together and certify that they can produce -- perform or interoperate.

Q. Is interoperability important in a wireless communication system like a DMR radio?

A. Sure. It's absolutely essential. So, for example, in a cellular system, you want your Samsung or maybe Apple smartphone to be able to communicate to the radio equipment of your provider which could be purchased from another manufacturer, or you also might want your Apple phone to be

able to talk to other devices that are not Apple phones.

Similarly, in DMR, you may have, say, a scenario where the -- a person on, say, a construction site might need to communicate to another person on the construction site that maybe has a radio from a different manufacturer.

Q. All right. Let's look at PTX 1988, which is already admitted. Do you recognize this document, Dr. Rangan?

A. Yes, I do.

Q. Okay. And what is this document?

A. This is a Hytera document dated around September of 2007 entitled, "The summary report on interoperability between DMR and MOTO."

Q. Did you consider this document in reaching your opinions in this case?

A. Yes, I did.

Q. And why did you consider this one specifically?

A. This is really the sole document that Hytera relies on to demonstrate interoperability.

Q. And what does Hytera contend that this document shows?

A. They contend that it shows a group call from Motorola device to a Hytera device.

Q. What is a group call?

A. Sure. A group call is just simply a call that will go out to multiple users, say, for example, multiple people on a construction site.

Q. Does PTX 1988 show that Hytera had the ability to create -- or to complete a group call?

A. No, it does not.

Q. Let's look at Page 12 of PTX 1988. What does this document -- what does this page of this document show about Hytera's inability to perform a group call?

A. Yes. Before we go on, it's first important to recognize that this document itself does not describe what's being tested as a prototype. Instead, it refers to it as a debugging hardware platform.

Q. And just so everyone understands, what would be the difference between a prototype and a debugging hardware platform?

A. A debugging hardware platform would be a version of the system that's in a much earlier stage of development where you're still trying to build up basic features.

Q. And what is represented here on Page 12 of PTX 1988?

A. So you can see here the figure of what they're trying to do in the test, which is a communication between a Motorola device and this debugging hardware platform. Now, the Motorola device is that radio shown here on the left. And that is what a final commercial product is like, something like a handheld like this.

What it's communicating to, though, is this debugging hardware platform which I've outlined in here in red. That

debugging hardware platform in this case is not something like this but rather has these four boards connected by wires. There's a board for the radio, a board with the DSP for the baseband. There's the protocol -- sorry, a board with the radio, a board with the baseband with the FPGA, the DSP board, and then a final board for that voice coding.

Q. And is there anything missing from this debugging hardware platform that you would also expect to see if this was a true prototype?

A. Yes. You can see here on the right, this is outside that platform because this debugging platform doesn't have that man/machine interface, the interface between the keypad and the screen. So that's being simulated here on this PC computer which connects into the debugging hardware platform.

Q. Let's go to Page 13 of this document. Can you explain why the debugging hardware platform that we just looked at had limited functionality?

A. Yes. So there's -- in this interop test, there's actually two parts. There's a transmit part and a receive part. I will talk about the transmit part, but the other part is similar.

So in the transmit part, they give the technical description of what happened up here in the highlighted region. Let me read it out into the record: "According to the received control information" -- that's the received

do not use an FPGA processor?

A.   Yes, it's -- absolutely.   In fact, the Motorola's product as well as what Hytera finally did commercialize, neither of those use an FPGA.

Q.   Now, the product that Hytera did ultimately commercialize, what did they use instead of an FPGA processor?

A.   They put all the functionality that was on the FPGA into the DSP.

Q.   Does Hytera's decision -- so we just kind of talked about all your criticisms of Hytera's independent development efforts.   Does the decision to remove the FPGA processor affect those opinions at all?

A.   No.   It's really a nonissue whether they kept the FPGA or not kept the FPGA.   Both paths were not possible simply because the starting point with whatever chip selection they had was still so far behind in this case.

Q.   Let's look at PTX 22 which is already in evidence.   And if we go to Page 8, Dr. Rangan, what does this slide show about Hytera's ability to independently develop a DMR product using either the FPGA or the DSP processor?

A.   This really demonstrates my point and shows the difficulties in either path.   On the one hand, if they did continue with the FPGA development, they would have been lacking the expertise to get a high quality FPGA development. So recruiting and talent is one of other issues that they

would be facing.

On the other hand, if they were to use the DSP by itself as they indicate here, that will result in a lot of Moto code, that's reuse of Moto code, and this would be a concern.

Q. Did Hytera ever release a DMR product based on its pre-February 2008 development efforts?

A. No, it did not.

Q. What did Hytera do instead?

A. It abandoned those efforts and ended up following a development path based on Motorola misappropriated code.

Q. And when did Motorola file this lawsuit, Dr. Rangan?

A. In March of 2017.

Q. How much time has passed between then and your testimony today?

A. 2' -- two and a half years. Sorry.

Q. And in those two and a half years, have you seen any documents or materials indicating that Hytera has sold any products based on its pre-February 2008 development efforts?

A. No. Two and a half years since this lawsuit has began, they have -- sorry, Hytera continues to use Motorola confidential and proprietary information for its development.

Q. What does this indicate to you about Hytera's ability to independently develop a DMR product?

A. This indicates that Hytera is still not possible to

independently develop DMR product without Motorola confidential and proprietary information.

Q. All right. Let's talk about your third and final opinion, which is that Hytera could not conceive of or develop the trade secrets in a commercially reasonable time. Can you explain to the jury the analysis that you did to determine the development times for Motorola's trade secrets as a starting point?

A. Sure. So you've heard from these four Motorola engineers. These engineers are engineers with over 20 years of experience that were deeply involved in the DMR development. They first produced estimates that you've heard both in terms of the head count and staff months for each asserted trade secrets. My first part was to discuss those with those engineers, their methodology and how they arrived at this -- at these estimates.

Q. And did you -- do you understand whether the engineers were also deposed in this case?

A. Oh, sorry. They were also -- I also looked at their depositions as well.

Q. And after you did that, did you also consider Motorola's confidential technical documents and source code?

A. Yes. To provide an independent analysis, I also looked at the source code and all the design documents as well for the asserted trade secrets to try to assess the development effort

for each one of them.

Q.   And did you also rely on your experience in reaching this opinion?

A.   Yes.  I've also led software and hardware teams that are very closely related to these trade secrets, so I applied my own experience in trying to assess the development time.

Q.   And after going through that methodology, what is your conclusion about the amount of time that it took Motorola to develop the trade secrets?

A.   It's my belief that even for Motorola, the estimates they gave would be conservative, meaning that it would take more time than they had actually represented.

Q.   And those engineers provided the development times during their testimony.  Do you recall that?

A.   Yes, I do.

Q.   And are you simply, through this opinion, simply rubberstamping those estimates?

A.   Absolutely not.  I really tried to give an independent analysis based on my review of -- discussing with them but also review of all the source code, the design documents, and my own experience.

Q.   What measure of time was used to estimate Motorola's development efforts for the asserted trade secrets?

A.   You've seen this before, but the time was quantified in staff months.  One staff month is really one midlevel engineer

* * * * * * *

C E R T I F I C A T E

We, Amy Spee and Judith A. Walsh, do hereby certify that the foregoing is a complete, true, and accurate transcript of the proceedings had in the above-entitled case before the Honorable CHARLES R. NORGLE, SR., one of the judges of said court, at Chicago, Illinois, on November 26, 2019.

/s/ *Amy Spee, CSR, RPR, CRR*_____          November 27, 2019

/s/ *Judith A. Walsh, CSR, RDR, F/CRR*_____          November 27, 2019

Official Court Reporters

United States District Court

Northern District of Illinois, Eastern Division

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

MOTOROLA SOLUTIONS, INC., and MOTOROLA ) No. 17 CV 1973
SOLUTIONS MALAYSIA SDN. BHD, )
                                        )
          Plaintiffs,                   )
vs.                                     ) Chicago, Illinois
                                        )
HYTERA COMMUNICATIONS CORPORATION, LTD., ) December 2nd, 2019
HYTERA AMERICA, INC., and HYTERA        )
COMMUNICATIONS AMERICA (WEST), INC.,    )
                                        )
          Defendants.                   ) 1:22 o'clock p.m.

TRIAL - VOLUME 13-B
TRANSCRIPT OF PROCEEDINGS

BEFORE THE HONORABLE CHARLES R. NORGLE, SR.,
and a jury

APPEARANCES:

For the Plaintiffs:   KIRKLAND & ELLIS, LLP
                      BY:  MR. ADAM R. ALPER
                           MR. BRANDON HUGH BROWN
                      555 California Street
                      Suite 2700
                      San Francisco, California 94104
                      (415) 439-1400

                      KIRKLAND & ELLIS, LLP
                      BY:  MR. MICHAEL W. DE VRIES
                           MR. CHRISTOPHER M. LAWLESS
                      333 South Hope Street
                      Suite 2900
                      Los Angeles, California 90071
                      (213) 680-8400


Court Reporter:       AMY M. SPEE, CSR, RPR, CRR
                      Official Court Reporter
                      United States District Court
                      219 South Dearborn Street, Room 1728
                      Chicago, Illinois  60604
                      Telephone:  (312) 818-6531
                      amy_spee@ilnd.uscourts.gov

2133

APPEARANCES (Continued:)

For the Plaintiffs:    KIRKLAND & ELLIS, LLP
                       BY:  MS. MEGAN MARGARET NEW
                       300 North LaSalle Street
                       Chicago, Illinois 60654
                       (312) 862-7439

                       KIRKLAND & ELLIS, LLP
                       BY:  MS. LESLIE M. SCHMIDT
                       601 Lexington Avenue
                       New York, New York 10022
                       (212) 446-4763

For the Defendants:    STEPTOE & JOHNSON, LLP
                       BY:   MR. BOYD T. CLOERN
                             MR. MICHAEL J. ALLAN
                             MS. JESSICA ILANA ROTHSCHILD
                             MS. KASSANDRA MICHELE OFFICER
                       1330 Connecticut Avenue NW
                       Washington, DC 20036
                       (202) 429-6230

                       STEPTOE & JOHNSON, LLP
                       BY:  MR. DANIEL S. STRINGFIELD
                       227 West Monroe Street
                       Suite 4700
                       Chicago, Illinois 60606
                       (312) 577-1300

ALSO PRESENT:          MR. RUSS LUND and
                       MS. MICHELE NING

MSA0185

A    Yes, I have it.

Q    All right.  And, Mr. Malackowski, do you recognize this document?

A    I do.

Q    And what is it?

A    This is a Hytera email from 2008 that is an email that starts to Mr. Chen, Chairman Chen.

Q    And does this email come from Hytera's files?

A    It did.

MS. SCHMIDT:  Your Honor, we move the admission of PTX 421.

THE COURT:  You've heard me ask this question before, was it produced by Hytera?

THE WITNESS:  It was, Your Honor.  It bears a Hytera Bates number.

THE COURT:  It is received and may be published.

(Said exhibit was received in evidence.)

MS. SCHMIDT:  Thank you, Mr. Schlaifer.  If we could, anywhere on PTX 421.1, and if you could please, Mr. Schlaifer, blow up the text number next to the number 6 towards the bottom.

BY MS. SCHMIDT:

Q    Now, Mr. Malackowski, is this portion of PTX 426 that we're looking at, is this what you were referring to?

A    Yes.  Specifically this is an email from Mr. G.S. Kok to Mr. Chen.  And he talks in point six that the team, the Hytera

team, will need an injection of subject matter expert from Motorola Penang and Motorola Chengdu.  That's the Malaysia and Chinese plants.  This will be most important if we want to leapfrog onto the DMR business.  So this is exactly the point that I was talking about a moment ago.

MS. SCHMIDT:  Thank you, Mr. Schlaifer.  We can take that down.

BY MS. SCHMIDT:

Q   Now, Mr. Malackowski, we've been talking a lot about DMR products.  Did you consider the DMR market as part of your analysis?

A   Yes, ma'am.

MS. SCHMIDT:  Mr. Schlaifer, could we please get PDX 10.9.

BY MS. SCHMIDT:

Q   And, Mr. Malackowski, could you explain to us how you looked at the DMR market?

A   Yes.  So it's common in my work, once I get a chance to review the business records, the first thing I do is arrange them chronologically to understand how this market developed.

And so what this chart shows is the period of 2004 starting with the FCC announcement regarding DMR all the way through 2011, which is the implementation of the FCC announcement and the Hytera IPO.

Q   All right.  So starting in 2004, what FCC regulations are you

referring to?

A   Specifically the regulation that announced that companies or users are going to have to move away from analog products to digital only products.  And we heard testimony that that occurred in the United States.  But that also occurred in many countries around the world, that there was this transition to digital radios.  You could only sell digital radios.

Q   And how did that impact your analysis?

A   So that obviously provided a business incentive for everyone to get into the market and to get into the market quickly so they could develop a radio before that regulation actually took effect or they would be left out.

Q   Now, did you review any information regarding whether or not Hytera recognized that opportunity?

A   Yes, I did.

Q   All right.

        MS. SCHMIDT:  And could we please go to PDX 10.10.  And this includes admitted exhibit PTX 1129.

BY MS. SCHMIDT:

Q   Mr. Malackowski, can you please explain to us how this relates to your analysis?

A   Yes.  This is a Hytera presentation, and it explains in their own reasoning why they pursued the digital mobile radio market.  And point one talks about that, basically to create new business, to churn analog-based systems, meaning as the analog radios were

being replaced, they needed to have something to substitute for it, very much in line with the FCC mandate.

Q   Now, if we could go back to PDX 10.9, back to your timeline, when did Hytera enter the DMR market compared to Motorola?

A   So Motorola actually entered or began development before the FCC announcement, so in anticipation of the new technology.

Hytera responded shortly after the announcement in 2004, they began their work on DMR.

Q   And then what year did Hytera enter the DMR market?

A   So Hytera actually did not enter the market until 2010, so four years after Motorola entered the market in 2006, 2007.

Q   And now did the timing of Hytera's entry into the DMR market provide any information about the value of Motorola's trade secrets and copyrights to Hytera?

A   It did.  In my opinion, my work showed that the access to the copyrights and the trade secrets allowed Hytera to accelerate their entry into the market, to get there sooner than they otherwise would have.

THE COURT:  Just a minute.  Can you explain to the jury your use of the term "enter the market"?  What does that mean?

THE WITNESS:  Your Honor, specifically that means allowing Hytera to sell a DMR product globally.

THE COURT:  Proceed.

BY MS. SCHMIDT:

Q   And now, Mr. Malackowski, you mentioned a few times about

* * * * * * *

C E R T I F I C A T E

We, Amy Spee and Jennifer Costales, do hereby certify that the foregoing is a complete, true, and accurate transcript of the proceedings had in the above-entitled case before the Honorable CHARLES R. NORGLE, SR., one of the judges of said court, at Chicago, Illinois, on December 2nd, 2019.

*/s/Amy Spee, Official Court Reporter__*      December 3rd, 2019

*/s/Jennifer Costales, Contract Court Reporter* December 3rd, 2019

United States District Court

Northern District of Illinois

Eastern Division

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

MOTOROLA SOLUTIONS, INC., and MOTOROLA  ) No. 17 CV 1973
SOLUTIONS MALAYSIA SDN. BHD,            )
                                        )
          Plaintiffs,                   )
vs.                                     ) Chicago, Illinois
                                        )
HYTERA COMMUNICATIONS CORPORATION, LTD., ) December 17, 2019
HYTERA AMERICA, INC., and HYTERA        )
COMMUNICATIONS AMERICA (WEST), INC.,    )
                                        )
          Defendants.                   ) 10:00 o'clock a.m.

TRIAL - VOLUME 22 A
TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE  CHARLES R. NORGLE, SR.
and a jury

For the Plaintiffs:    KIRKLAND & ELLIS LLP
                       BY:  Mr. Adam R. Alper
                            Mr. Brandon Hugh Brown
                            Mr. Reza Dokhanchy
                            Ms. Barbara Nora Barath
                            Mr. Kyle Calhoun
                       555 California Street
                       27th Floor
                       San Francisco, California 94104
                       (415) 439-1400

                       KIRKLAND & ELLIS LLP
                       BY:  Mr. Michael W. De Vries
                       333 South Hope Street
                       Los Angeles, California 90071
                       (213) 680-8400

Court reporter:             BLANCA I. LARA
                       Official Court Reporter
                       219 South Dearborn Street
                       Room 2342
                       Chicago, Illinois 60604
                       (312) 435-5895
                       blanca_lara@ilnd.uscourts.gov

3236

Appearances: (Continued:)

For the Plaintiffs:    KIRKLAND & ELLIS LLP
                       BY: Ms. Megan Margaret New
                       300 North LaSalle Street
                       Chicago, Illinois 60654
                       (312) 862-7439

                       KIRKLAND & ELLIS LLP
                       BY:  Ms. Leslie M. Schmidt
                       601 Lexington Avenue
                       New York, New York 10022
                       (212) 446-4763

Motorola Corporate Representative:   Mr. Russ Lund


For the Defendants:    STEPTOE & JOHNSON LLP
                        BY: Mr. Boyd T Cloern
                            Mr. Michael J. Allan
                            Ms. Jessica Ilana Rothschild
                            Ms. Kassandra Michele Officer
                       1330 Connecticut Avenue., Nw
                       Washington, DC 20036
                       (202) 429-6230

                       STEPTOE & JOHNSON LLP
                       BY:  Mr. Daniel Steven Stringfield
                       227 West Monroe Street
                       Suite 4700
                       Chicago, Illinois 60606
                       (312) 577-1267

Hytera Corporate Representative:  Michele Ning

MSA0192

that time, correct?

A. That's correct. Like what I said yesterday, when I asked Huang Peiyi to hand over all her computers, she gave us only one computer, and she told us that she had only one computer.

MR. DE VRIES: Your Honor, may I approach?

THE COURT: Yes.

MR. DE VRIES: Mr. Schlaifer, would you please display previously admitted PTX 92.

BY MR. DE VRIES:

Q. Mr. Luo, PTX 92 is an e-mail, from January of 2013, from some Hytera engineers, is that right?

A. Yes.

Q. And you're familiar with this e-mail?

A. Yes, we saw this e-mail yesterday.

MR. DE VRIES: Mr. Schlaifer, let's please turn to page 9 of the exhibit. This is the English version.

BY MR. DE VRIES:

At the top, Mr. Luo, you'll see that the date is January 14th, 2013, right?

A. Yes.

Q. And the subject is "The Laptop List of Terminal PL," right?

A. Yes.

Q. And this contains a list of engineers in the DMR department in 2014 and what computers they had, correct?

A. Yes.

MR. DE VRIES: And if we go to page 14, and if we can blow up, Mr. Schlaifer, row 55 and row 62.

BY MR. DE VRIES:

Q. Those are the two computers that belonged to Huang Peiyi that she did not turn over to you in November of 2017, right?

A. Correct.

Q. And the one on the atop is the one that contained the Motorola source code and documents?

A. Yes. But I would like to emphasize again, we did find some source codes and documents in that computer which contained Motorola confidential identifier. However, whether or not they are truly Motorola's trade secrets, we would rely on our counsel and experts to do the investigation.

MR. DE VRIES: And if we go to the next page, page 16. Mr. Schlaifer, if you could please blow up row 71.

BY MR. DE VRIES:

Q. That's a laptop that belonged to Mr. Chia, right?

A. Correct.

Q. And that's the laptop that Mr. Chia said was lost, right?

A. Yes.

Q. Mr. Chia did not tell Hytera how it was lost, right?

A. He told us that he had lost that computer when he was on a business trip overseas.

THE COURT: Where was the trip?

THE WITNESS (THROUGH INTERPRETER): He did not tell

us.

BY MR. DE VRIES:

Q. You were deposed earlier this year, right?

A. Yes.

Q. At that time Mr. Chia had left the company, right?

A. Correct.

Q. You have not spoken to Mr. Chia since your deposition, right?

A. That's correct.

MR. DE VRIES: Mr. Schlaifer, please turn to the April 2019 deposition at page 145, lines 11 to 12.

BY MR. DE VRIES:

Q. You were asked:

"Question: How did Mr. Chia loss his laptop?

"Answer: I didn't know. He didn't tell us."

Was that the truth?

THE COURT: Are you saying was the answer the truth?

MR. DE VRIES: That's my question, yes.

THE COURT: The answer the witness gave at his deposition?

MR. DE VRIES: Yes, Your Honor.

THE COURT: All right.

BY THE WITNESS (THROUGH INTERPRETER):

A. Yes. However, later on -- yes, what I said in my deposition at that time was the truth. And later on we

conducted further investigation. And we saw from the records that were kept by the administration department that it was Mr. Chia's secretary who had reported that this computer was lost.

So I went to ask his secretary how this computer was lost. His secretary said that she had asked Mr. Chia. Sam Chia had told her that he had lost that computer on a business trip he took in 2013. I asked the secretary further questions, but she told me that that was all she knew. That was all the information she provided in that record for the administration department.

Q. Hytera did not learn that the computer was lost until Sam Chia left the company in October of 2018, correct?

A. Correct.

THE COURT: Let me ask a question. Was that a desktop computer or a portable computer?

THE WITNESS (THROUGH INTERPRETER): It was a laptop computer. Portable.

THE COURT: Proceed.

BY MR. DE VRIES:

Q. And Hytera never asked Sam Chia what was on that computer before he left the company, right?

A. That's correct. We were not aware of such information back then.

Q. Now, with Peiyi's Huang's computers, Ms. Huang turned in one computer in November of 2017, right?

A. Correct.

Q. But she did not turn in the two computers that we looked at on that spreadsheet, right?

A. That's correct.

Q. And you didn't pay attention at that time to see if she had more computers, right?

A. At that time, correct. First of all, we did a lot of work back then. We told her that she needed to turn over all of her computers. Our counsel also conducted interviews with her, and they informed her of the obligation and the work she needed to do in preserving evidence. At that time I had no reason to doubt that she would not follow our requirements of her.

Q. Hytera did not check the log -- the logs of assigned computers at that time to figure out if Ms. Huang had additional computers, right?

A. That's correct. At that time when I was assigned to do the work of collecting computers and as a coordinator between the company and counsel, that was the first time I ever did such work. I also believe that I already did everything I could to tell them to follow what our requirements were. At that time I had no authorization to see other records held by the administration department.

Q. You do admit, however, that had you called over to the administration department in November of 2017, they could've told you that Peiyi Huang had multiple computers, right?

(Luncheon recess taken from 12:01 o'clock p.m.

to 1:00 o'clock p.m.)

* * * * * * * *

I CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT FROM THE

RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED MATTER

/s/Blanca I. Lara                    December 17, 2019

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

MOTOROLA SOLUTIONS, INC., and MOTOROLA ) No. 17 CV 1973
SOLUTIONS MALAYSIA SDN. BHD, )
)
        Plaintiffs, )
vs. ) Chicago, Illinois
)
HYTERA COMMUNICATIONS CORPORATION, LTD., ) January 28, 2020
HYTERA AMERICA, INC., and HYTERA )
COMMUNICATIONS AMERICA (WEST), INC., )
)
        Defendants. ) 10:00 o'clock a.m.

TRIAL - VOLUME 30
TRANSCRIPT OF PROCEEDINGS

BEFORE THE HONORABLE CHARLES R. NORGLE, SR.
and a jury

APPEARANCES:

For the Plaintiffs:    KIRKLAND & ELLIS, LLP
                  BY:  MR. ADAM R. ALPER
                      MR. AKSHAY DEORAS
                      MR. BRANDON HUGH BROWN
                  555 California Street
                  Suite 2700
                  San Francisco, California 94104
                  (415) 439-1400

                  KIRKLAND & ELLIS, LLP
                  BY:  MR. MICHAEL W. DE VRIES
                      MR. CHRISTOPHER M. LAWLESS
                  333 South Hope Street
                  Suite 2900
                  Los Angeles, California 90071
                  (213) 680-8400

Court Reporter:      JENNIFER COSTALES, CRR, RMR
                  Official Court Reporter
                  219 South Dearborn Street, Room 2342
                  Chicago, Illinois 60604
                  (312) 435-5895
                  jenny.uscra@yahoo.com

MSA0199

4397

APPEARANCES: (Continued)

For the Plaintiffs:    KIRKLAND & ELLIS, LLP
                       BY:  MS. MEGAN MARGARET NEW
                       300 North LaSalle Street
                       Chicago, Illinois 60654
                       (312) 862-7439

                       KIRKLAND & ELLIS, LLP
                       BY:  MS. LESLIE M. SCHMIDT
                       601 Lexington Avenue
                       New York, New York 10022
                       (212) 446-4763

For the Defendants:    STEPTOE & JOHNSON, LLP
                       BY:   MR. BOYD T. CLOERN
                             MR. SCOTT M. RICHEY

                             MR. MICHAEL J. ALLAN
                             MS. JESSICA ILANA ROTHSCHILD
                             MS. KASSANDRA MICHELE OFFICER
                       1330 Connecticut Avenue NW
                       Washington, DC 20036
                       (202) 429-6230

                       STEPTOE & JOHNSON, LLP
                       BY:  MR. DANIEL S. STRINGFIELD
                       227 West Monroe Street
                       Suite 4700
                       Chicago, Illinois 60606
                       (312) 577-1300


ALSO PRESENT:          MR. RUSS LUND and
                       MS. MICHELE NING

MSA0200

Hytera could have developed in the world where it did not use any Motorola information?

A.   That's correct.

MR. CLOERN:   May I proceed?

THE COURT:   Yes.  Go ahead.

MR. CLOERN:   Okay.  Can we, Mr. Montgomery, go to DDX-21.44.

BY MR. CLOERN:

Q.   I'd like to ask you questions now about your third opinion.

You understand that Motorola contends that its confidential information and trade secrets were shared with the Hytera Chinese engineers and widely disseminated at Hytera?

A.   Yes, I understand that.

Q.   Do you agree?

A.   No, I don't.

Q.   Can you explain?

A.   Yeah.  So I guess in summary, Hytera produced I think in excess of 20 million pages of documents and source code in the case and --

THE COURT:   Just a minute.  20 million?

THE WITNESS:   Pages, yes.  That includes software source code as well.

THE COURT:   When you say "pages," do you mean

physical pages like paper?

THE WITNESS: Yeah. If you printed out the source code then --

THE COURT: It would be 20 million?

THE WITNESS: Yes.

THE COURT: Proceed.

THE WITNESS: Yeah. We've only seen a few examples pointed to where information has, Motorola information has appeared in those documents or source code.

BY MR. CLOERN:

Q. Now, did you see evidence that G.S. Kok, Sam Chia, Y.T. Kok, Peiyi Huang concealed their conduct?

A. Yes. As we discussed yesterday, there is lots of examples of what we've termed rebranding, so taking Motorola designations off documents and source code and putting the Hytera designations on them.

So there is many, many examples of that where that rebranding has been done by the former Motorolans in an attempt to hide what they've done.

I don't think given the volume of Hytera documents, if they hadn't actively hidden stuff, we would be seeing a lot of Motorola designations around the Hytera production.

Q. Does Motorola claim that thousands of documents and millions of lines of source code were taken by Sam Chia, Y.T. Kok or G.S. Kok?

A.   Yes, taken, yeah.

Q.   Yes.   And then those materials from Motorola, according to Motorola's claims in this case, were widely used by the entire DMR department at Hytera over the course of the last 10 years; is that your understanding?

A.   That's the accusation, but that's not the evidence that I've seen.

Q.   Have you seen in your investigation any Motorola branded source code in the files of anyone other than Sam Chia, Y.T. Kok -- I'm sorry, let me back up.

Have you seen in your investigation any Motorola branded source code in the files of anyone other than Peiyi Huang?

A.   No.

Q.   Have you seen any indications that Motorola source code was directly used by anyone other than Sam Chia, Y.T. Kok and Peiyi Huang?

A.   No.

Q.   Have you seen any evidence that any of the documents that are on the Compass logs of Y.T. Kok and Sam Chia, that any of those, those specific documents branded as Motorola documents were in the files of anyone other than Peiyi Huang, Sam Chia, Y.T. Kok and G.S. Kok, with the exception of the so-called VOX doc?

A.   No.   Apart from the VOX, that's the only one I've seen in

been a homemade methodology.

There is little reference in what he has been saying as to what other experts within his field, how they would approach matters or that his views would gain widespread acceptance.

I certainly have permitted him to say a great deal in this case. I have not denied him the opportunity to express his opinions, some of which may be speculations. But that would be a matter of weight the jury would give to his testimony when determining his credibility.

But I'm not going to extend that into the area of copyright and patent testimony.

MR. CLOERN: Thank you.

THE COURT: You've made the record. The Court has made the ruling.

MR. CLOERN: Thank you, Your Honor.

THE COURT: All right. Come back in an hour.

(Recess 11:30 a.m. to 12:30 p.m.)

C E R T I F I C A T E

I, Jennifer S. Costales, do hereby certify that the foregoing is a complete, true, and accurate transcript of the proceedings had in the above-entitled case before the Honorable CHARLES R. NORGLE, one of the judges of said Court, at Chicago, Illinois, on January 28, 2020.

*/s/ Jennifer Costales, CRR, RMR*
Official Court Reporter
United States District Court
Northern District of Illinois
Eastern Division

MSA0204

4462

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

MOTOROLA SOLUTIONS, INC., and MOTOROLA ) No. 17 CV 1973
SOLUTIONS MALAYSIA SDN. BHD,                )
                                            )
            Plaintiffs,                     )
vs.                                         ) Chicago, Illinois
                                            )
HYTERA COMMUNICATIONS CORPORATION, LTD.,    ) January 28, 2020
HYTERA AMERICA, INC., and HYTERA            )
COMMUNICATIONS AMERICA (WEST), INC.,        )
                                            )
            Defendants.                     ) 12:34 o'clock p.m.

TRIAL - VOLUME 30-B
TRANSCRIPT OF PROCEEDINGS

BEFORE THE HONORABLE CHARLES R. NORGLE, SR.,
and a jury

APPEARANCES:

For the Plaintiffs:    KIRKLAND & ELLIS, LLP
                       BY:  MR. ADAM R. ALPER
                            MR. AKSHAY DEORAS
                            MR. BRANDON HUGH BROWN
                       555 California Street
                       Suite 2700
                       San Francisco, California 94104
                       (415) 439-1400

                       KIRKLAND & ELLIS, LLP
                       BY:  MR. MICHAEL W. DE VRIES
                            MR. CHRISTOPHER M. LAWLESS
                       333 South Hope Street
                       Suite 2900
                       Los Angeles, California 90071
                       (213) 680-8400

Court Reporter:        AMY M. SPEE, CSR, RPR, CRR
                       Official Court Reporter
                       United States District Court
                       219 South Dearborn Street, Room 2318A
                       Chicago, Illinois  60604
                       Telephone:  (312) 818-6531
                       amy_spee@ilnd.uscourts.gov

4463

APPEARANCES (Continued):

For the Plaintiffs:  KIRKLAND & ELLIS, LLP
                     BY:  MS. MEGAN MARGARET NEW
                     300 North LaSalle Street
                     Chicago, Illinois 60654
                     (312) 862-7439

                     KIRKLAND & ELLIS, LLP
                     BY:  MS. LESLIE M. SCHMIDT
                     601 Lexington Avenue
                     New York, New York 10022
                     (212) 446-4763

For the Defendants:  STEPTOE & JOHNSON, LLP
                     BY:   MR. BOYD T. CLOERN
                           MR. MICHAEL J. ALLAN
                           MS. JESSICA ILANA ROTHSCHILD
                           MS. KASSANDRA MICHELE OFFICER
                           MR. SCOTT M. RICHEY
                     1330 Connecticut Avenue NW
                     Washington, DC 20036
                     (202) 429-6230

                     STEPTOE & JOHNSON, LLP
                     BY:  MR. DANIEL S. STRINGFIELD
                     227 West Monroe Street
                     Suite 4700
                     Chicago, Illinois 60606
                     (312) 577-1300


ALSO PRESENT:        MR. RUSS LUND and
                     MS. MICHELE NING

MSA0206

Q. What are those?

A. So firstly, they could have taken action straight away to stop the removal process of the offending code from the product. Secondly, they were having discussions with Motorola over this period, the legal department, so they could have negotiated a license or a royalty for the use of the information.

And finally, I think it was Andrew Yuan who testified that in parallel with this that he had already been developing a dPMR prototype radio. So they would have had the option to actually stop their DMR development and move to dPMR instead.

Q. So Hytera at this time also had a dPMR prototype?

A. They did, yes.

Q. And so Hytera could have commercialized the dPMR prototype instead of the DMR?

A. It would have been one option.

Q. And you mentioned a red team document earlier. Do you recall that?

A. Yes.

Q. And that was around 2009, that document?

A. Yes.

Q. Was Motorola concerned that more manufacturers would join dPMR and that dPMR would become the de facto standard?

A. Correct. That's why they were trying to recruit people to the DMR Association and propose this OEM agreement.

Q.   And that was an option?  If Hytera found out its DMR program was infected, it could have moved to dPMR?

A.   Correct.  That's one of the options they could have taken.

Q.   Did Hytera ultimately decide not to commercialize its dPMR product?

A.   Yes.  They've still not launched one today.

MR. CLOERN:  Your Honor, I pass the witness.

THE COURT:  Is it your position that based upon what you have called suspicion, you also define as beliefs, that that was enough for a major corporation such as Motorola to sue a major corporation, Hytera, in the federal court?

THE WITNESS:  No.  What I contend is they should have checked the Compass logs to determine whether their beliefs had some basis.

THE COURT:  So you're not saying then --

THE WITNESS:  Correct.

THE COURT:  -- that there was enough based upon your view of the evidence to file a major lawsuit in this court, right?

THE WITNESS:  I'm -- correct.  I'm saying they should have investigated by checking the Compass logs.

THE COURT:  But there was not enough, in your opinion, to file a lawsuit at that point?

THE WITNESS:  Not enough suspicion, but had they checked the Compass logs, they would be in the same position

as they are today.

THE COURT: And they would have learned what?

THE WITNESS: They would have learned that their IP had been stolen, and they could have brought this lawsuit in 2008.

THE COURT: They would have learned that it was stolen?

THE WITNESS: Yes.

THE COURT: What was your basis for -- what was your basis for that?

THE WITNESS: They simply would have had to check the Compass logs and they --

THE COURT: Which would reveal what?

THE WITNESS: They would seen that G.S. Kok, Y.T. Kok, and Sam Chia had stolen a huge amount of documents.

THE COURT: When you say "stolen," what do you mean?

THE WITNESS: Taken from Motorola and taken with them to Hytera.

THE COURT: Taken how?

THE WITNESS: I presume on an external hard drive.

THE COURT: That's what they would have done?

THE WITNESS: Yes.

THE COURT: That's what they would have learned?

THE WITNESS: Yes.

THE COURT: Proceed.

BY MR. CLOERN:

Q.   The Compass logs in 2008 -- for example, for Sam Chia, the Compass log would have shown Sam Chia downloaded thousands of documents in the days and weeks before he left Motorola to go to Hytera?

A.   Correct.

Q.   So Motorola -- if Motorola would have checked the Compass logs, they would have known that Sam and Y.T. downloaded thousands and thousands of documents just before they walked out the door to Hytera?

A.   That's right.

Q.   Now, with that information, would that have been -- if you were CTO and somebody came to you and said, "Two people just left our company to go to a competitor, and we checked their logs, and they downloaded 10,000 documents in the days before they left" --

A.   Yeah.

Q.   -- would that have been enough for you to take legal action?

A.   Absolutely.

        THE COURT:  Based upon your legal experience?

        THE WITNESS:  Based upon my technical experience.

        THE COURT:  All right.

        MR. CLOERN:  Pass the witness, your Honor.

        THE COURT:  You may cross-examine.

to market.

Q. Okay. Let's talk -- let me ask you some questions about one of your opinions. It's who at Hytera knew about the theft, and we -- I asked you a moment ago -- withdrawn.

In connection with your opinions on this issue, you displayed this slide, DDX 21.56, right?

A. Yes.

Q. Where you crossed out all of the circles that Dr. Rangan had drawn with the people that he testified there was evidence that they knew that there was use of Motorola's confidential information, right?

A. That's what he contended, yes.

Q. And you crossed them all out; you walked through and crossed them all out?

A. Yes. I disagreed that those people knew about the use of Hytera information -- Motorola information.

Q. And you then showed this slide, DDX 21.56, and that left these four Hytera employees who had come from Motorola, right?

A. Correct.

Q. And actually, over the course of your testimony, I believe that you added a couple of boxes. You testified that Eunice Chua, and I think it's Ken Wong, were also in possession of Motorola confidential information, and they were also from Motorola, right?

A. I've seen their email addresses on a couple of emails.

Q. And then I think just a couple hours ago, you added another one to this group, Yu Kok Hoong?

A. Yes.

Q. I'll throw him on there. So I put Yu Kok Hoong on there. And is it correct that through your testimony, you identified seven people who were at Motorola who came over to Hytera who knew about the theft, right?

A. I don't think that's what I testified to.

Q. You identified seven people who were at Motorola who came over to Hytera who were in possession of Motorola confidential information?

A. I'm not sure that's even what I said either.

Q. Okay.

A. I think I contended that there were seven people that came over from Motorola around this time period, four of which who were in possession of Hytera confidential information, three of which who were copied on some emails with some discussion that may have suggested there was some misappropriation.

Q. All right. And the four people who are in possession of Motorola confidential information were G.S. Kok, Y.T. Kok, Sam Chia, and Huang Peiyi?

A. Correct.

Q. And G.S. Kok, Y.T. Kok, Sam Chia, and Huang Peiyi were the senior officers and managers at Hytera who were responsible for developing the DMR products there, right?

A.   Yes.

Q.   And that was the job that they were hired to do, was to -- G.S. Kok, Sam Chia, Y.T. Kok, and Peiyi Huang, they were hired to develop Hytera's DMR products, right?

A.   Yes.

Q.   And when they were -- those individuals, G.S. Kok, Y.T. Kok, Sam Chia, and Huang Peiyi, were using Motorola source code and looking at Motorola confidential documents, they were doing that in connection with developing Hytera's DMR products, right?

A.   Yes.

Q.   And their goal was to make and sell the best product that they could, right?

A.   Yes.

Q.   For Hytera?

A.   Yes.

Q.   And when the -- when G.S. Kok, Y.T. Kok, Sam Chia, and Huang Peiyi made a decision about the development of Hytera's DMR products, that's what Hytera did, right?

A.   Yes, that's correct.

Q.   And when G.S. Kok, Y.T. Kok, Sam Chia, and Huang Peiyi made a decision to use Motorola confidential source code in Hytera's products, that's what Hytera did, right?

A.   Yes.

Q.   Now, Hytera promoted G.S. Kok, Mr. Chia, and Huang Peiyi

4633

They liked his work?

A. Yes, I don't know if he was recruited into that role or whether he was promoted after he joined but, yes, he was a senior officer in 2011.

Q. All right. I'm just going to go back --

THE COURT: Counsel, this may be a good stopping point for the evening.

Members of the jury, return tomorrow at 10:00 o'clock. The witness will return at 10:00.

(Adjournment 4:30 p.m. to 10:00 a.m., January 29, 2020)

C E R T I F I C A T E

We, Judy Walsh and Amy Spee, do hereby certify that the foregoing is a complete, true, and accurate transcript of the proceedings had in the above-entitled case before the Honorable CHARLES R. NORGLE, one of the judges of said Court, at Chicago, Illinois, on January 29, 2020.

*/s/ Judy Walsh, CRR, RMR*

*/s/ Amy Spee, RPR, CRR*

Official Court Reporter

United States District Court

Northern District of Illinois

Eastern Division

MSA0214

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

MOTOROLA SOLUTIONS, INC., and MOTOROLA ) No. 17 CV 1973
SOLUTIONS MALAYSIA SDN. BHD, )
 )
   Plaintiffs, )
vs. ) Chicago, Illinois
 )
HYTERA COMMUNICATIONS CORPORATION, LTD., ) February 4, 2020
HYTERA AMERICA, INC., and HYTERA )
COMMUNICATIONS AMERICA (WEST), INC., )
 )
   Defendants. ) 1:03 p.m.

TRIAL - VOLUME 33-B
TRANSCRIPT OF PROCEEDINGS

BEFORE THE HONORABLE CHARLES R. NORGLE, SR.
and a jury

APPEARANCES:

For the Plaintiffs: KIRKLAND & ELLIS, LLP
   BY: MR. ADAM R. ALPER
    MR. AKSHAY DEORAS
    MR. BRANDON HUGH BROWN
   555 California Street
   Suite 2700
   San Francisco, California 94104
   (415) 439-1400

   KIRKLAND & ELLIS, LLP
   BY: MR. MICHAEL W. DE VRIES
    MR. CHRISTOPHER M. LAWLESS
   333 South Hope Street
   Suite 2900
   Los Angeles, California 90071
   (213) 680-8400

Court Reporter: JENNIFER COSTALES, CRR, RMR
   Official Court Reporter
   219 South Dearborn Street, Room 2342
   Chicago, Illinois 60604
   (312) 435-5895
   jenny.uscra@yahoo.com

MSA0215

5070

APPEARANCES: (Continued)

For the Plaintiffs:   KIRKLAND & ELLIS, LLP
                      BY:  MS. MEGAN MARGARET NEW
                      300 North LaSalle Street
                      Chicago, Illinois 60654
                      (312) 862-7439

                      KIRKLAND & ELLIS, LLP
                      BY:  MS. LESLIE M. SCHMIDT
                      601 Lexington Avenue
                      New York, New York 10022
                      (212) 446-4763

For the Defendants:   STEPTOE & JOHNSON, LLP
                      BY:  MR. BOYD T. CLOERN
                           MR. SCOTT M. RICHEY

                           MR. MICHAEL J. ALLAN
                           MS. JESSICA ILANA ROTHSCHILD
                           MS. KASSANDRA MICHELE OFFICER
                      1330 Connecticut Avenue NW
                      Washington, DC 20036
                      (202) 429-6230

                      STEPTOE & JOHNSON, LLP
                      BY:  MR. DANIEL S. STRINGFIELD
                      227 West Monroe Street
                      Suite 4700
                      Chicago, Illinois 60606
                      (312) 577-1300


ALSO PRESENT:         MR. RUSS LUND and
                      MS. MICHELE NING

MSA0216

Q. I'm going to show you already admitted PTX-1863 at HYT-00736446.

Is this -- this is the RAF_display.cpp file. What do you see here that shows you that Mr. Yang Shuang Feng actually received Motorola code and was editing it at Hytera?

A. Okay. As I noted on that previous email, in places where he made changes, he put his initials "YSF" there. So he's saying I've changed this.

And you can tell that it's changed because it's now referring to RAF, which is the Hytera designation as opposed to the Motorola designation.

We can see other changes as well. Here he's deleted out an error log. As he changes the files, what he's doing is he's trying to make sure it still works, and so he runs an error log to basically debug as he goes along.

And so here we see that he is actively editing the file. I think those are the two examples I see here.

MR. CLOERN: Your Honor, we would just ask for a copy of this file. I'm not sure it was identified. I may have just missed it.

MR. BROWN: Sure. It's in your binder.

THE COURT: All right. What is the number of the exhibit if you have it?

MR. BROWN: It's 1863. It might be listed under HYT 1973-SC-00021309.

MR. CLOERN: Which binder? Your Honor, 1863 is an exhibit of about 74 million pages. So it's kind of hard to find.

THE COURT: I'm tempted to drop in a little humor, but I won't.

The objection is overruled. Try to provide the information to counsel.

MR. BROWN: Yes. Binder 2.

MR. CLOERN: The Bates number is?

(Discussion off the record)

BY MR. BROWN:

Q. So let's set the stage a little bit just to make this all clear. The file we're looking at is RAF_display.cpp, right?

A. That's correct.

Q. Now, how do you know that this file is Motorola or was originally from Motorola?

A. Okay. So I can see references to Motorola material in looking at this file. Just the first one I'll note is in the first line. It's a reference to the user interface task. That again was on that board that I had over here sometime back and was talking about how applications deal with messages.

That's a Motorola term. It's not a Hytera term. So that tells me we're looking at something that originated from Motorola.

Q. And what about the SVC function reference, what does that indicate to?

A. That's another example. SVC is a Motorola name. It is not a Hytera term.

Q. And does this code match code that you looked at from Motorola originally?

A. Yes.

Q. So you mentioned that Mr. Yang Shuang Feng is initialing things and you pointed here (indicating), right?

A. Let's see. I think I pointed -- well, that's an example. I'm not sure that's the one I pointed to. But that is a good example. And what he's done is he's commented out the SVC, which would indicate that it's a Motorola function call and put in something else.

Q. So let's unpack that. You are saying he's commenting out the SVC?

A. That's right.

Q. So it says here "IndReqBuf equals" and then there is a Motorola function in there?

A. That's right.

Q. And what does it mean that there is these comments here, the slash slash?

A. Okay. So we talked about how code is compiled, how it's reduced to the 0s and 1s that are actually fed into a microprocessor.

We write code in a source code form so that relatively normal human beings can read it and write it and make things happen.

Now, one of the things that's important to the coding process is putting in comments.  So if I read one of my student's pieces of code, for example, I want comments so I can know what the student was thinking and what their design process was.

Well, comments don't make it down to the 0s and 1s that are put in the radio.  They are deleted.

So a comment is something that is not going to be compiled.

We talk about commenting out code by putting this slash slash.  What this does is it means the compiler is not going to look at that.  This is no longer part of what will be reduced to the 0s and 1s that go in the radio.

Q.  And so what happens on line 1159 is it's commented out.

And then what happens on line 1160?  Is this a line that he added?

A.  Yes.  So what we see is actual editing, the kind of thing that went on to transplant Motorola code into the Hytera environment.  We see the deletion through commenting of Motorola code and the insertion of Hytera code.

Q.  And so, for instance, there is the function in here, this is a Motorola function GetIndicatorRequestBuff, right?

A.   That's right.

Q.   And then he changes it to what?

A.   RAF_GetIndicatorRequestBuff.

So the SVC becomes RAF.

Q.   And so that's changing from the Motorola name to the Hytera name in Motorola's original code?

A.   Exactly.

Q.   And then what does he do here?

A.   Once again, he says I made a change here, so he puts his initials there so that folks reviewing this code will know where he's made the change.

Q.   So he's signing his work here?

A.   Essentially, yes.

Q.   What is it that he's being tasked to do if he's going into this code that came from -- well, let me ask first.  Do you know where this code came from?

A.   Motorola.

Q.   And do you know who at Hytera had it?

A.   I believe this code was actually in the possession of Y.T. Kok.

Q.   So can you explain what situation he was put in?  He was given code from Y.T. Kok --

A.   Right.

Q.   -- that has calls to a function that didn't exist in Hytera.  Then what is he told to do?

A.   He is being told -- he's been told to transplant it, basically to translate it from the Motorola code into a Hytera version so it's not as obvious that it's Motorola code.

Q.   And what does that indicate to you about your demonstrative PDX-20.23 about what Hytera engineers are doing with all of the Motorola code that Y.T. Kok and Sam and Peiyi Huang brought over to Hytera?

A.   They're literally using it by studying it, learning from it and then writing their own code based on what they've learned.

Q.   And what does that tell you about Mr. Grimmett's testimony that we saw earlier about whether or not Mr. Yang Shuang Feng had ever been given more than just mere screenshots?

A.   Well, it's clearly not the case.  He's been given a lot more than screenshots because he's actively editing the file and putting his initials in there as he goes along.  You can't do that with screenshots, at least not in the way he's done it.

Q.   And if we look through this entire file, just this one example, was that the only example of YSF screenshots or YSF fingerprints or did you see it in more places?

A.   They're here in a number of places.  You can see them, yeah.

Q.   And what are these?

A.   There is even more.  These are places where he's modified

THE WITNESS: Yes, Your Honor.

BY MR. BROWN:

Q. My question was -- I'll repeat it again -- what does it tell you or how does it affect your opinion that so many of the Motorola confidential documents that embody these trade secrets were in Hytera's files over ten years?

A. That implies to me that they were in use, in substantial use over that period of time. No one threw them away.

Q. Now, PDX-20.36 and 20.37, some of these numbers are a little low, Professor. Hardware is only 40 percent that were found in Hytera's files. The repeater, only 50 percent.

Why is it -- how can you say that all these trade secrets were used at Hytera if some of the documents at least are not there right now?

A. Okay. So for example, with regard to the hardware, there's evidence that some of the hardware documents were actually deleted because one of them was recovered over time.

The bottom line, though, is that all of these documents were at Hytera at one point because Sam Chia downloaded them all.

Q. So let me show you PDX-48.

You said that Sam Chia downloaded them. There were -- how many documents are missing from your list of embodying trade secrets that aren't currently at Hytera?

A. 11.

Q.   Okay.  And how do you know that Mr. Chia downloaded those documents and brought them with him to Hytera?

A.   Okay.  So these are the Compass logs that have been discussed.  They show what Mr. Chia downloaded on particular dates just before he left for Hytera.  And what I'm showing here is that each one of the documents on the right, which were not still at Hytera, were downloaded by Mr. Chia before he went to Hytera.

Q.   And how does it -- when you -- what does it mean to download something from Motorola's Compass system?

A.   Okay.  You obtain a copy of it on your computer.

Q.   And where are the Compass servers located?

A.   They're in Illinois.

Q.   Now, how many files -- there's 11 files missing here.  How many files were ultimately found at Hytera of Motorola's confidential documents?

A.   Oh, there were thousands of them.

Q.   But I'm showing you your PDX-8.40.  How many documents did Mr. Chia actually download from Motorola?

A.   He downloaded even more.

Q.   How many?

A.   Tens of thousands.  At least the number, I believe, was over 10,000.

Q.   And is it disputed in this case now that these were downloads of material that Mr. Chia brought to Hytera?

A. No.

Q. So there were 10,000 files that were downloaded -- or tens of thousands of files that were downloaded, but only a couple thousand are at Hytera. What happened?

A. They've been deleted over time.

Q. And how do you know that?

A. There are records of deletions. For example, forensic evidence was obtained from one of Peiyi Huang's computers that showed that she had actually moved Motorola documents into the recycling. In other words, it was her intent that they be eliminated from her computer.

Q. I'll show you PDX-20.55.

What else happened that has caused materials to go missing from Hytera?

A. Okay. So what this shows is a number of different issues that have been risen, have been discussed here in court. For example, missing documents and e-mails. There's evidence of e-mails that were deleted by one party but not the other party to the e-mail. And that's how we know about it. In fact, one of them involved Chairman Chen.

There is missing source code. There's an SVN repository that's been discussed that we have no record of. Nothing has been produced regarding that other SVN. There are files -- there are thousands and thousands of files that could not be recovered from, for example, Peiyi Huang's laptop. And

then there are laptops that have simply gone missing.  Sam Chia's laptop disappeared, and it has not been seen.

Q.   And that's the laptop that Mr. Chia had from 2008 till 2013?

A.   That's right.

Q.   Okay.  Now, you said that some stuff is missing.  Let's just talk about a few examples of how you know that.  I'm showing PTX- -- PDX-20.56, which shows a clip of PTX-100 and 107.

Now, without going into too much detail, will you remind the jury what this document is and why it's relevant here.

A.   Okay.  So this is an e-mail from Jue Liang to -- I believe it's to Y.T. Kok.  I'm sorry, this is to Sam Chia.

And what he's done is he has excerpted material from a Motorola document and he's asking questions about it.

Q.   So we've gone through all of that before in other testimony.  Why is it relevant to whether things were deleted here?

A.   Okay.  So when I looked to see what documents were actually available on Mr. Liang's documents storage, I found something interesting, namely that at the time he sent this e-mail, he apparently did not have a copy of this file, which doesn't make sense.

Q.   Was it that he didn't have a copy of the file or he hadn't

received -- there's no evidence of receiving it?

A.   No evidence of having received it by e-mail.

Q.   What does that mean?  So he's copying a file -- copying from a file into an e-mail.  But what do you mean there's no evidence he ever received it?  Of course he had it.

A.   Okay.  So what this evidence shows is that Mr. Liang at this date -- actually it's a little hard to see the date, but I believe it's 2008.

At this point in time --

Q.   You're correct.

A.   Okay.  Good.  It's 2008.

At this point in time, he had a copy of this document because he took an excerpt from the document, pasted it into his e-mail and sent Sam Chia a question about it, but there's no evidence -- no record of him ever receiving this document.

According to the evidence, he received the document three years later, which, you know, clearly he had a copy before that.

Q.   Where -- what are the ways in which you looked to see how he got this document?  What did you look at?

A.   Okay.  I looked at e-mails.  I --

Q.   We'll pause there for a second.

So are there any e-mails that sent him the document in -- any time before he sent this e-mail?

A.   No.

Q. Okay. Where else could you have looked?

A. He could have downloaded it from the SVN server.

Q. Was it on the SVN server?

A. No evidence that it was. He could have actually had someone walk over to him with a thumb drive and say, "Here's a document you might like to have."

Q. Has any thumb drives or forensic analysis been produced to allow you to discern that?

A. No.

Q. Anywhere else?

A. Those are the ones that come to mind. In other words, someone could have e-mailed it to him, he could have downloaded it, or someone could have brought it on a thumb drive or some other kind of drive.

Q. So what does that tell you about the materials that are available to us here in terms of figuring out how everybody got each document that they had?

A. Well, what it tells us is there is a lot of information in this.

Q. And we also heard testimony about a missing SVN repository. Now, you gave testimony during your direct testimony about an SVN log. Can you --

A. Yes.

Q. -- explain what that is.

A. Okay. So an SVN is a repository of files of various

kinds.  The log denotes when people have downloaded or uploaded material.  SVN is a subversion tracking system.

So what it does is it keeps track of the activity with the documents as they're downloaded and uploaded.  And as we learned over the course of the testimony of the last couple weeks, I think it was, there may have been another SVN that we have no record of and we have no logs from.

Q.  And so what -- how do you know that there's at least another SVN or there's a gap in the logs that we have?

A.  Okay.  So the SVN that we're aware of, logs were provided.  These logs show no record of activity that is documented in e-mails.  In other words, we've got e-mails that say such and such documents were uploaded to the SVN, but it's not in the logs.

Q.  And so whether or not there's a gap in the logs that were produced or there's just a completely different server, what does that mean about the state of materials that have been brought in by Hytera here?

A.  It's incomplete.  In other words, either way there has been an effort to conceal activity, and we don't have a complete record of what happened.

Q.  And if we include in the charts you showed earlier -- I'm showing new charts at PDX-20.49 and 20.50.  If we include the files that were either present in Hytera's systems at the time the litigation began or were downloaded from -- by Mr. Chia,

0

C E R T I F I C A T E

We do hereby certify that the foregoing is a complete, true, and accurate transcript of the proceedings had in the above-entitled case before the Honorable CHARLES R. NORGLE, one of the judges of said Court, at Chicago, Illinois, on February 4, 2020.


/s/ *Amy Spee*                                        2/5/2020
_____            _____
Amy Spee, CSR, RPR, CRR                     Date
Official Court Reporter


/s/ *Jennifer Costales*                              2/5/2020
_____    _____
Jennifer Costales, RMR, CRR                 Date
Official Court Reporter

MSA0230

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

MOTOROLA SOLUTIONS, INC., and MOTOROLA      ) No. 17 CV 1973
SOLUTIONS MALAYSIA SDN. BHD,                )
                                            )
              Plaintiffs,                   )
vs.                                         ) Chicago, Illinois
                                            )
HYTERA COMMUNICATIONS CORPORATION, LTD.,    ) February 5, 2020
HYTERA AMERICA, INC., and HYTERA            )
COMMUNICATIONS AMERICA (WEST), INC.,        )
                                            )
              Defendants.                   ) 10:08 a.m.

TRIAL - VOLUME 34-A
TRANSCRIPT OF PROCEEDINGS

BEFORE THE HONORABLE CHARLES R. NORGLE, SR.
and a jury

APPEARANCES:

For the Plaintiffs:    KIRKLAND & ELLIS, LLP
                       BY:  MR. ADAM R. ALPER
                            MR. AKSHAY DEORAS
                            MR. BRANDON HUGH BROWN
                       555 California Street
                       Suite 2700
                       San Francisco, California 94104
                       (415) 439-1400

                       KIRKLAND & ELLIS, LLP
                       BY:  MR. MICHAEL W. DE VRIES
                            MR. CHRISTOPHER M. LAWLESS
                       333 South Hope Street
                       Suite 2900
                       Los Angeles, California 90071
                       (213) 680-8400


Court Reporter:        JENNIFER COSTALES, CRR, RMR
                       Official Court Reporter
                       219 South Dearborn Street, Room 2342
                       Chicago, Illinois 60604
                       (312) 435-5895
                       jenny.uscra@yahoo.com

MSA0231

5205

APPEARANCES: (Continued)

For the Plaintiffs:    KIRKLAND & ELLIS, LLP
                       BY:  MS. MEGAN MARGARET NEW
                       300 North LaSalle Street
                       Chicago, Illinois 60654
                       (312) 862-7439

                       KIRKLAND & ELLIS, LLP
                       BY:  MS. LESLIE M. SCHMIDT
                       601 Lexington Avenue
                       New York, New York 10022
                       (212) 446-4763

For the Defendants:    STEPTOE & JOHNSON, LLP
                       BY:   MR. BOYD T. CLOERN
                             MR. SCOTT M. RICHEY
                             MR. MICHAEL J. ALLAN
                             MS. JESSICA ILANA ROTHSCHILD
                             MS. KASSANDRA MICHELE OFFICER
                             MR. BILL TOTH
                       1330 Connecticut Avenue NW
                       Washington, DC 20036
                       (202) 429-6230

                       STEPTOE & JOHNSON, LLP
                       BY:  MR. DANIEL S. STRINGFIELD
                       227 West Monroe Street
                       Suite 4700
                       Chicago, Illinois 60606
                       (312) 577-1300

ALSO PRESENT:          MR. RUSS LUND and
                       MS. MICHELE NING

A.   That's what it says.

Q.   So that's what Dr. Rangan put in his report, no DMR product at all?

A.   That was that particular heading.

It's still my understanding that it is Motorola's position that they could not have come up with a comparable radio.  Clearly they can come up with a radio that's not comparable, because they did it.

Q.   Well, Professor Rangan testified consistent with that title in his report here in trial, didn't he?

A.   He certainly testified consistently with his expert report, yes, that's true.

MR. CLOERN:  Can we bring up, please, trial transcript page 1888, lines 19 to 22.

BY MR. CLOERN:

Q.   Here Dr. Rangan is asked in his November 26, 2019 testimony:

"And based on your review of those documents, would Hytera have been able to independently develop a DMR product without using or accessing Motorola's trade secrets?

"No.  That's my conclusion."

A.   That's what it says.

Q.   So in your view, Mr. Malackowski's testimony doesn't mention comparable products.  Dr. Rangan's testimony doesn't mention comparable products.  Two of Motorola's experts.

But it's your position that Motorola's view is that Motorola's position is only comparable. They're just saying that Hytera couldn't develop a comparable product, not any DMR product at all?

A. Again, it's not my view that these other experts testified as you have just summarized.

Furthermore, it's clear that Hytera could develop a low-level product, because they did it. That's not, that's not a debate. So I think you're misinterpreting their testimony.

Q. Well, what am I misinterpreting about what's on the screen?

A. What's on the screen taken out of context could be interpreted as you are interpreting it. But I don't believe that's their actual conclusion.

Q. Well, Dr. Rangan took the position that it would take 23 and a half years to develop the trade secrets, correct?

A. Actually, he separated out the trade secrets and applied a certain number of years to each. If you add them all together, you do get that, that's true.

Q. Actually if you add them all together you get almost 90 years.

A. He said there was overlap. So that wouldn't be the appropriate way to do it.

Q. If you take -- he put them in two columns and he said you

would have to take the longest from each of the two columns. One was 10 years, that was the DSP code, and then the repeater in the other column was 13 years, right? So it was a total, it was a total of 23 and a half years.

A. I agree with that, yes.

Q. So I have a question, I think I just have one more question. I want to try to get at what Motorola's position is, whether it could never -- Hytera was simply not capable of ever producing a DMR radio, as Mr. Malackowski and Dr. Rangan have testified, or whether it's that, as you have testified, Hytera couldn't produce a comparable DMR radio.

So I want to try to understand, so I think just one more question on that.

A. Okay.

Q. So we're showing you previously admitted DTX-4135. I think you were in the court when this was discussed yesterday. Do you recall?

A. Yes, I do recall this.

Q. And so this is a Motorola presentation, right?

A. Yes, it is.

Q. And Motorola is identifying when the competitors came into the market, correct?

A. They're identifying when companies offering DMR compatible equipment entered the market.

Q. So you don't agree they're competitors?

A.   I don't agree that all of these companies produced radios that would compete directly with Motorola.

Q.   Well, these are all DMR radios?

A.   That's certainly true.

Q.   So it's your position that not all DMR radios compete with one another?

A.   Again, as we talked about yesterday, there are different kinds of cars on the road.  There are different kinds of radios that are available, some are the lowest level, and that's not what Motorola makes.

Motorola is competing with those who are in the second level and higher.

Q.   DMR standard came out when?

A.   Early, mid-2000.

Q.   How about 2005, does that work for you?

A.   2005, yes, that sounds right.  The first version, yes. There have been several versions.

Q.   When did the second version come out?

A.   I believe it was 2008 or 2007.

Q.   Is it called DMR version 2?

A.   Yes, it is.

Q.   Do you believe there is a DMR version 2?

A.   There are other versions of DMR.  I don't remember the exact numbering.

Q.   Literally you think there is something that's called DMR

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

MOTOROLA SOLUTIONS, INC., and MOTOROLA ) No. 17 CV 1973
SOLUTIONS MALAYSIA SDN. BHD, )
)
        Plaintiffs, )
vs. ) Chicago, Illinois
)
HYTERA COMMUNICATIONS CORPORATION, LTD., ) February 5, 2020
HYTERA AMERICA, INC., and HYTERA )
COMMUNICATIONS AMERICA (WEST), INC., )
)
        Defendants. ) 12:30 p.m.

TRIAL - VOLUME 34-B
TRANSCRIPT OF PROCEEDINGS

BEFORE THE HONORABLE CHARLES R. NORGLE, SR.
and a jury

APPEARANCES:

For the Plaintiffs:   KIRKLAND & ELLIS, LLP
                BY:  MR. ADAM R. ALPER
                     MR. AKSHAY DEORAS
                     MR. BRANDON HUGH BROWN
                555 California Street
                Suite 2700
                San Francisco, California 94104
                (415) 439-1400

                KIRKLAND & ELLIS, LLP
                BY:  MR. MICHAEL W. DE VRIES
                     MR. CHRISTOPHER M. LAWLESS
                333 South Hope Street
                Suite 2900
                Los Angeles, California 90071
                (213) 680-8400

Court Reporter:      JENNIFER COSTALES, CRR, RMR
                Official Court Reporter
                219 South Dearborn Street, Room 2342
                Chicago, Illinois 60604
                (312) 435-5895
                jenny.uscra@yahoo.com

MSA0237

APPEARANCES:  (Continued)

For the Plaintiffs:     KIRKLAND & ELLIS, LLP
                        BY:  MS. MEGAN MARGARET NEW
                        300 North LaSalle Street
                        Chicago, Illinois 60654
                        (312) 862-7439

                        KIRKLAND & ELLIS, LLP
                        BY:  MS. LESLIE M. SCHMIDT
                        601 Lexington Avenue
                        New York, New York 10022
                        (212) 446-4763

For the Defendants:     STEPTOE & JOHNSON, LLP
                        BY:   MR. BOYD T. CLOERN
                              MR. SCOTT M. RICHEY
                              MR. MICHAEL J. ALLAN
                              MS. JESSICA ILANA ROTHSCHILD
                              MS. KASSANDRA MICHELE OFFICER
                              MR. BILL TOTH
                        1330 Connecticut Avenue NW
                        Washington, DC 20036
                        (202) 429-6230

                        STEPTOE & JOHNSON, LLP
                        BY:  MR. DANIEL S. STRINGFIELD
                        227 West Monroe Street
                        Suite 4700
                        Chicago, Illinois 60606
                        (312) 577-1300

ALSO PRESENT:           MR. RUSS LUND and
                        MS. MICHELE NING

MSA0238

architecture framework, "and the file system."

Q. What does that tell you about what Gabriel learned from Motorola's trade secrets as he was writing the code that counsel showed you?

A. He learned about the overall architecture of the system. He learned how to write applications to interact with the architectural framework. He learned about general file systems.

Q. And what did he say down here was his reason for leaving?

A. Okay. So he said "I've learned a lot. The biggest reason is I hope that we have an opening view not only in technic, also in customer and marketing."

He wanted the bigger picture of how to build schemes, how build these systems, how to market the system, et cetera. He went on to say, "As we know, Hytera cannot give this. All requirements come from Motorola, not a real customer."

Q. What does that tell you about what he was commenting on there with regard to Motorola and its trade secrets?

A. He's basically saying everything that I've been learning how to do is coming from Motorola. I'm not getting this from a real customer who is going to buy our radios.

MR. CLOERN: Your Honor, we object to that. It was just speculation, Gabriel --

THE COURT: Well, considering that the witness has been permitted to proceed under 402, the objection is

overruled. And you may return to that issue on cross-examination if you choose to do so.

BY MR. BROWN:

Q. Now, switching gears to questions you were asked about Mr. Chia and Mr. Y.T. Kok and their downloads from the Compass and ClearCase system. Do you remember those questions?

A. Yes, I do.

Q. And there were questions about whether or not Mr. Chia and Mr. Kok were employees of Motorola or Hytera at the time that they were doing the downloads. Do you remember that?

A. Yes, I do.

Q. And do you remember how you answered?

A. Yes. I pointed out that G.S. Kok -- excuse me. You asked about Sam Chia and Y.T. Kok.

Sam Chia was a Motorola employee. Y.T. Kok was a Motorola employee and a Hytera employee. He had already signed on with Hytera, but was still carrying on as a Motorola employee.

Q. Now, in your PDX-8.40, which is a slide from your opening direct, when did Mr. Chia start downloading massively from Compass? Was it when he was still just working as a Motorola engineer from 2006 and 2007 or did something else happen?

A. Well, he was still employed with Motorola when he started his massive downloads. But he had visited the Hytera headquarters. We see that date right there in early 2008. So

the massive downloads occurred after he had been to Hytera.

Q.   I'm going to show you PTX-422, which is already admitted. Do you remember this?

A.   Yes.   This is the visit schedule for the interview process when several Motorola employees visited Hytera.

Q.   And Mr. Chia was among those employees in March of 2008 who visited Hytera?

A.   That's right.

Q.   How long did Mr. Chia spend talking about DMR products with the Hytera engineers in March of 2008?

A.   Well, let's see, he spent the entire day of March 3rd. Actual discussions, we have an interview here, an interview here (indicating).   It looks like 3 hours right there.   "Free and easy" I presume was a break.   Organization and schematic review, if we include that, it's roughly 4 and a half hours it looks like.

Q.   So after meeting with the Hytera engineers in March of 2008, then what happened?

A.   Then he began his massive downloads.   As we can see here, for several months he downloaded literally thousands and thousands of documents.

Q.   And from a technical perspective, given that Mr. Chia had virtually no mass downloads up until that point, what does that tell you about why Mr. Chia or from whom Mr. Chia was downloading these files?

A.   He was doing it for Hytera.  He intended to leave based on what I see here and go to Hytera.

Q.   Now, switching gears, you were asked questions about a testing and tuning document.  Do you remember that document?

A.   Yes, I do.

Q.   What is that document?

A.   Okay.  So the testing and tuning document was a document we looked at in a little bit of detail.  It talks about how you go about testing a piece of equipment so you can see whether or not it meets the requirements of the standard.

So the document includes material like how to organize the test equipment, what to plug in where, and basically how to test to see if the standard is being met, among other things.

Q.   I'm showing you PTX-531.  Is this that document?

A.   Yes, it is.

Q.   Now, counsel represented to you that Mr. Grimmett agreed that other documents that Hytera had received from other suppliers matched this document.  Do you remember that?

A.   Yes, I do.

Q.   And you said you agreed with Mr. Grimmett's testimony about that.  But you were not shown the testimony, right?

A.   That's correct.

Q.   I'm showing you Mr. Grimmett's trial testimony from page 4809 at page 22 to 23.

Mr. Grimmett was shown DTX-3031, which was a completely different specification that doesn't relate to this case at all and was asked by his counsel, "Is this substantially the same document as DTX-431," which is the document which is a trade secret document?

And what was Mr. Grimmett's testimony?

A.   Okay.  So actually if I may it's DTX-531.

Q.   Thank you.

A.   He responded "No."  It's not substantially the same.

Q.   And so is it correct that the Motorola confidential document that Hytera received was something that it received just sort of on the open market?

A.   No, no.

Q.   Did you see any evidence of that?

A.   No, there is no evidence of that.

Q.   In fact, would you turn to PTX-571 and 572 in your binder.

A.   Okay.  I'm there.

Q.   Do you recognize these as documents produced by Hytera in this litigation?

A.   Yes, I do.

        MR. BROWN:  Plaintiff moves to admit PTX-571 and 572.

        MR. CLOERN:  No objection.

        THE COURT:  Both are received and may be published.

   (PTX-571 and PTX-572 were received in evidence.)

BY MR. BROWN:

A. That's true.

MR. CLOERN: I have no further questions.

MR. BROWN: Nothing further, Your Honor.

THE COURT: Not even two?

MR. BROWN: Well, I can come up with something, Your Honor. But I think we're good.

THE COURT: All right. You may step down.

THE WITNESS: Thank you, Your Honor.

(Witness excused)

THE COURT: Members of the jury, you may recall that you are not required to be here Thursday, tomorrow. You must return on Monday at 10:00 a.m. And you are excused.

By the way, you are not to be here Friday as well.

(Jury out)

THE COURT: If there is nothing further, we'll adjourn for the day. Thank you, counsel.

MR. BROWN: Thank you.

(Adjournment 2:03 p.m. until 10 a.m., February 10, 2018)

C E R T I F I C A T E

I, Jennifer S. Costales, do hereby certify that the foregoing is a complete, true, and accurate transcript of the proceedings had in the above-entitled case before the Honorable CHARLES R. NORGLE, one of the judges of said Court, at Chicago, Illinois, on February 5, 2020.

/s/ Jennifer Costales, CRR, RMR
Official Court Reporter
United States District Court

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

MOTOROLA SOLUTIONS, INC., and MOTOROLA ) No. 17 CV 1973
SOLUTIONS MALAYSIA SDN. BHD, )
 )
            Plaintiffs, )
vs. ) Chicago, Illinois
 )
HYTERA COMMUNICATIONS CORPORATION, LTD., ) February 10, 2020
HYTERA AMERICA, INC., and HYTERA )
COMMUNICATIONS AMERICA (WEST), INC., )
 )
            Defendants. ) 9:57 a.m.

TRIAL - VOLUME 35-A
TRANSCRIPT OF PROCEEDINGS

BEFORE THE HONORABLE CHARLES R. NORGLE, SR.
and a jury

APPEARANCES:

For the Plaintiffs:    KIRKLAND & ELLIS, LLP
                       BY:  MR. ADAM R. ALPER
                            MR. AKSHAY DEORAS
                            MR. BRANDON HUGH BROWN
                       555 California Street
                       Suite 2700
                       San Francisco, California 94104
                       (415) 439-1400

                       KIRKLAND & ELLIS, LLP
                       BY:  MR. MICHAEL W. DE VRIES
                            MR. CHRISTOPHER M. LAWLESS
                       333 South Hope Street
                       Suite 2900
                       Los Angeles, California 90071
                       (213) 680-8400


Court Reporter:        JENNIFER COSTALES, CRR, RMR
                       Official Court Reporter
                       219 South Dearborn Street, Room 2342
                       Chicago, Illinois 60604
                       (312) 435-5895
                       jenny.uscra@yahoo.com

5334

APPEARANCES: (Continued)

For the Plaintiffs: KIRKLAND & ELLIS, LLP
BY:  MS. MEGAN MARGARET NEW
300 North LaSalle Street
Chicago, Illinois 60654
(312) 862-7439

KIRKLAND & ELLIS, LLP
BY:  MS. LESLIE M. SCHMIDT
601 Lexington Avenue
New York, New York 10022
(212) 446-4763

For the Defendants: STEPTOE & JOHNSON, LLP
BY:   MR. BOYD T. CLOERN
MR. SCOTT M. RICHEY
MR. MICHAEL J. ALLAN
MS. JESSICA ILANA ROTHSCHILD
MS. KASSANDRA MICHELE OFFICER
1330 Connecticut Avenue NW
Washington, DC 20036
(202) 429-6230

STEPTOE & JOHNSON, LLP
BY:  MR. DANIEL S. STRINGFIELD
227 West Monroe Street
Suite 4700
Chicago, Illinois 60606
(312) 577-1300

ALSO PRESENT:        MR. RUSS LUND and
MS. MICHELE NING

MSA0246

costs go up significantly in the last 3 years of this analysis.

But the radios that were introduced and supposedly relate to this R&D came substantially long before the last three years.

And so even from a common sense perspective, if you are talking about research expenses, they come before you launch the product, not 5 to 10 years later. There is something that clearly is not right about this data.

Q. Now, the data that we're looking at on this slide, when did Hytera provide it?

A. This data was provided prior to the trial in the summer of last year.

Q. And are you aware that Hytera produced revised R&D data during this trial?

A. More than once, yes.

Q. When did Hytera produce that data?

A. I believe the first revised data was in November, right before I testified, and then again in December.

Q. And have you reviewed that data?

A. I have.

Q. All right. And in your 20-plus years of experience, are you ever aware of a party revising its R&D data multiple times during trial?

A. No. That's extremely unusual. And I don't think I've

ever seen it happen, because you are simply pulling data from an accounting system, so it would make no sense that you have to do it multiple times and somehow the numbers would change.

Q. Now, how, if at all, did that impact your opinion on the reliability of Hytera's R&D data?

A. Well, it raised even further questions and then it caused me to go back and review the data one more time in detail to try to understand why that would happen.

Q. Did Dr. Aron rely on the new R&D data that Hytera produced?

A. She did. Her analysis was based upon the final and most recent set of data.

MS. SCHMIDT: Mr. Schlaifer, could we please get the trial transcript at page 5012, lines 6 through 12, please.

BY MS. SCHMIDT:

Q. What did Dr. Aron say about the new R&D data?

A. Dr. Aron was asked about the new data. And her explanation as shown in the last two lines here was that "It was a filtering down of the data that was originally produced. It's the same data, but it's a subset of the data."

Q. And do you agree with that?

A. No, not after analyzing the data. If it's a subset of the data, it should be less than what was originally produced. It's filtered away and you're just looking at part of it. That's not what happened.

Q. And do you have examples to explain what you are talking about?

A. I do.

Q. So, Mr. Malackowski, could you please turn to PTX-2352 in your binder.

A. Yes.

Q. What is this document?

A. This is the R&D data that was provided in the summer of last year, the detailed spreadsheet showing all of the information.

Q. And was this document produced by Hytera to Motorola in this case?

A. It was.

MS. SCHMIDT: Your Honor, we move PTX-2352 into evidence.

THE COURT: It is received over objection.

(PTX-2352 was received in evidence.)

BY MS. SCHMIDT:

Q. Mr. Malackowski, what information is in PTX-2352?

A. So this is a massive data spreadsheet that shows product codes for various R&D efforts at Hytera. And then next to the product code there is a written description of what that R&D was actually spent on.

MS. SCHMIDT: Mr. Schlaifer, can we please go to PTX-2352.24 and pull up rows 1 through 20. And then you've

got 70 through 75, too.  Thank you.

BY MS. SCHMIDT:

Q.  Mr. Malackowski, can you please describe what's on the screen?

A.  So this is as I just mentioned.  In the first second column, the column labeled A, you can see the item code.  So that's the accounting code to help Hytera keep track of what the engineers are doing.

And then column B, you can see the product type, where they are keeping track of exactly what they are working on.  And there are many of these codes throughout their data.

Q.  And did you compare these codes to the later data that Hytera produced?

A.  In detail, I did, yes.

Q.  Okay.

MS. SCHMIDT:  So, Mr. Schlaifer, could we keep PTX-2325 -- excuse me, 2352 up on the left and then pull up DTX-5502 on the right, page 27, and maybe the first 20 or so rows, please.

This is already admitted.

BY MS. SCHMIDT:

Q.  And so, Mr. Malackowski, now what are we showing or now what are you showing on the screen?

A.  So on the left side of the screen is the chart that we just talked about, what I was given in the summer of last

year.

And what is shown on the right side of the screen is the new updated information.

Q.  And are there any differences between the data in the 2019, June 2019 data and the Hytera, the data Hytera produced during this trial?

A.  There are.

Q.  Okay.  Could you point those out for us?

A.  Well, let me give you a couple of examples.  If you go on the left side of the screen to the first row, it's not a high-end industry model, row 6.  You've got a code 400029.  It's described as a public item.  And that's what the record was in the summer of last year.

Now if you go to the R&D data, that's been changed and it's now considered to be a mid or high-end radio, which is at issue in this product -- in this case.

An even more telling example is if you go to 400084.  Here it's listed as a public item and public accessory.  If you go further into that database, it's actually classified as a low-end radio in the summer of last year.  But if you look at where it is today, it's been changed from being a low-end radio development, which is not relevant to this case, to middle and high-end models, which are relevant to this case.

Q.  Thank you.

And, Mr. Malackowski, do we have that on the screen

now?

A.    We do.  So you can see row 72, 400084.  Last summer it was reported as being a low-end commercial model.  During the trial that was changed and now it's a high-end commercial model, mid to high end.

Q.    And what impact did these changes have on the data?

A.    Well, if you just relied on the data without considering it, it would cause you to want to make more deductions in R&D expense and lower damages in this case.

        MS. SCHMIDT:  Could we go to PDX-26.4, please.

BY MS. SCHMIDT:

Q.    What is this, Mr. Malackowski?

A.    This is one of Dr. Aron's charts based upon the data that was produced in the summer of last year.  So this was her first analysis of that data.

        And what you can see is it has the same problem that I originally pointed out to you, that in the last three years, the R&D data jumps significantly for the products in this case, which doesn't make any sense because essentially all the products were in the market long before that happened.

        MS. SCHMIDT:  And could we go to PDX-26.5.

BY MS. SCHMIDT:

Q.    And so what happened with the new data?

A.    So this is Dr. Aron's analysis using the new data.  And you can see there is a substantial change or a smoothing.

And so you might say, well, in the last three years the numbers went down because we were filtering. We were taking a subset.

Okay. That doesn't explain what happened in every other year where the numbers actually went up. You can't take a database, take a subset of it and have the total be larger than the original. That's just wrong.

Q. Are the changes to those project descriptions that we looked at just data filtering?

A. It's not just data filtering. Somebody went in and changed the codes to attribute more R&D expense to the products to this litigation, and that change was made during the litigation.

Q. Now, what, if anything, did Dr. Aron say about where these documents came from?

A. They came from Hytera.

MS. SCHMIDT: Mr. Schlaifer, could we please get the trial transcript, 4842, at lines 2 through 5, please?

BY MS. SCHMIDT:

Q. And, Mr. Malackowski, here Dr. Aron is referencing DTX-5502. Is that the document that we just looked at?

A. It is.

MS. SCHMIDT: Mr. Schlaifer, if we go down to trial transcript at 4843, lines 1 through 3.

BY MS. SCHMIDT:

Q. What does Dr. Aron say about where the spreadsheets came from?

A. Well, she says they came from Hytera's business records. They were given to her by Hytera. But then she adds that they were kept in the normal course of business at Hytera.

But that we know can't be right, because the normal course documents were 5 to 10 years ago. It would have been the original numbers, not the changed numbers.

Q. Did anyone at Hytera provide testimony about how Hytera maintains its R&D data?

A. Yes. Their vice-president, Mr. Yuan, described that in more detail.

MS. SCHMIDT: Mr. Schlaifer, could we please go to 3422, lines 13 through 21 of the trial transcript.

BY MS. SCHMIDT:

Q. What does Mr. Yuan say about how Hytera maintains its R&D data?

A. So he was asked specifically:

"Focusing on the research and development data and specifically the product, project codes and product names that you mentioned," that's what we were just looking at, "how do Hytera engineers doing research and development record their time at Hytera?

"Answer: Most of them, they belong to a project, so they have the project codes. And they are working hour, it's

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

MOTOROLA SOLUTIONS, INC., and MOTOROLA ) No. 17 CV 1973
SOLUTIONS MALAYSIA SDN. BHD, )
                                        )
          Plaintiffs,                   )
vs.                                     ) Chicago, Illinois
                                        )
HYTERA COMMUNICATIONS CORPORATION, LTD., ) February 10, 2020
HYTERA AMERICA, INC., and HYTERA        )
COMMUNICATIONS AMERICA (WEST), INC.,    )
                                        )
          Defendants.                   ) 12:49 p.m.

                 TRIAL - VOLUME 35-B
              TRANSCRIPT OF PROCEEDINGS

       BEFORE THE HONORABLE CHARLES R. NORGLE, SR.
                      and a jury

APPEARANCES:

For the Plaintiffs:    KIRKLAND & ELLIS, LLP
                       BY:  MR. ADAM R. ALPER
                            MR. AKSHAY DEORAS
                            MR. BRANDON HUGH BROWN
                       555 California Street
                       Suite 2700
                       San Francisco, California 94104
                       (415) 439-1400

                       KIRKLAND & ELLIS, LLP
                       BY:  MR. MICHAEL W. DE VRIES
                            MR. CHRISTOPHER M. LAWLESS
                       333 South Hope Street
                       Suite 2900
                       Los Angeles, California 90071
                       (213) 680-8400


Court Reporter:        JENNIFER COSTALES, CRR, RMR
                       Official Court Reporter
                       219 South Dearborn Street, Room 2342
                       Chicago, Illinois 60604
                       (312) 435-5895
                       jenny.uscra@yahoo.com

APPEARANCES: (Continued)

For the Plaintiffs:     KIRKLAND & ELLIS, LLP
                        BY:  MS. MEGAN MARGARET NEW
                        300 North LaSalle Street
                        Chicago, Illinois 60654
                        (312) 862-7439

                        KIRKLAND & ELLIS, LLP
                        BY:  MS. LESLIE M. SCHMIDT
                        601 Lexington Avenue
                        New York, New York 10022
                        (212) 446-4763

For the Defendants:     STEPTOE & JOHNSON, LLP
                        BY:   MR. BOYD T. CLOERN
                              MR. SCOTT M. RICHEY
                              MR. MICHAEL J. ALLAN
                              MS. JESSICA ILANA ROTHSCHILD
                              MS. KASSANDRA MICHELE OFFICER
                        1330 Connecticut Avenue NW
                        Washington, DC 20036
                        (202) 429-6230

                        STEPTOE & JOHNSON, LLP
                        BY:  MR. DANIEL S. STRINGFIELD
                        227 West Monroe Street
                        Suite 4700
                        Chicago, Illinois 60606
                        (312) 577-1300

ALSO PRESENT:           MR. RUSS LUND and
                        MS. MICHELE NING

remember that from his testimony?

A. I honestly don't particularly remember that, no. But I'll accept it.

Q. And two of the products he removed were the mobile device 6500 series and the mobile 7800 series?

A. Well, if your chart is accurate, then that would be true.

Q. And nobody on cross-examination stood up and said: "Wait a minute. Those are accused. Those do contain Motorola source code," did they?

A. Well, people don't just get to stand up and say that. But that was raised as a follow-up issue with Ms. Frederiksen-Cross.

Q. I'm not talking about Ms. Frederiksen-Cross. I'm talking about Mr. Yuan.

A. Right. People can't just stand up and say what they want to say. It has to happen in order. And the order was when it got to the technical experts, it was raised.

Q. I'm asking a very simple question. When Mr. -- after Mr. Yuan presented this testimony, his direct examination, Motorola's lawyer did not get up and say: "Wait a minute. You took out two products you shouldn't have taken out because we think they contain Motorola source code," right?

A. I don't believe they stood up and said that. I believe they did say that with Ms. Frederiksen-Cross.

Q. But not with the fact witness, who testified in part about

all of the R&D data that was being subtracted to make the R&D as accurate as possible to account for the products that Motorola was accusing, correct?

A.   Not for the R&D data, only for the infringement, misappropriation.

Q.   In any event, Mr. Malackowski, you are here today on the last day of trial and adding $35 million to your opinion, right?

A.   Yes.   And so if the jury finds that Ms. Frederiksen-Cross said the code is included, then they should add that number. If they find that I got that wrong somehow, then they put 311.

Q.   Now, you don't contend -- well, strike that.

You understand that Hytera's commercial level radios are not accused in this case?

A.   The low-end radios, true.

Q.   Right here, right?

A.   Yeah.

Q.   Commercial low end?

A.   Correct.

Q.   None of these are accused?

A.   Correct.

Q.   And these radios -- let me clean this screen for a sec.

These radios, the commercial low-end radios, your view, they're not comparable to the mid-tier or high-tier?

A.   For purposes of damages, that's true.   Customers who

bought mid-tier or high-tier products at about $1,000 a piece would not alternatively have bought low-end products which are 90 to $300 a piece.

Q. And Motorola also has three levels of DMR radios, right? They have a commercial level, a mid-tier and a high-tier?

A. Yes. Generally speaking, the Hytera products mirror the Motorola offerings.

Q. So the high-tier compete, Hytera's high-tier competes with Motorola's high-tier; Hytera's mid-tier competes with Motorola's mid-tier; and Hytera's commercial competes with Motorola's commercial; fair?

A. That's generally fair. Except as I described in my other testimony, the mid-tier products do compete against the high-tier products. It's depending upon whether or not trunking was offered at a particular point in time.

Q. Fair enough. But the commercial Hytera competes with the Motorola commercial?

A. Yeah. They're generally in a different market segment.

Q. All right. You offered some testimony at the beginning of your direct --

MR. ALLAN: You can take that down, Mr. Montgomery.

BY MR. ALLAN:

Q. -- about, I think you criticized Dr. Aron's calculation of $265 million for Hytera's profits from the last 9 or 10 years, right?

A.   Yes.  I said that was not a comparable measure.

Q.   And you showed a Hytera annual report?

A.   I did.

Q.   And you pointed out several numbers that were in Chinese RMB, right?

A.   True.

Q.   You didn't convert any of them to U.S. dollars as I recall?

A.   I did not.  I explained the conversion was about 6.78 to 1, but I didn't show the math.

Q.   And you understand that the information in the documentation that is provided in a public company's annual report, it's important to be accurate?

A.   I explained that directly, yes.

Q.   Right.  And, in fact, it's a crime to misrepresent that information?

A.   I believe that's true.

Q.   And you pointed out bits and pieces about Hytera making investments in certain companies, Sepura was one and there was another company, right?

A.   Yes, sir.

Q.   And that happens all the time with big companies.  They invest money back into buying new companies?

A.   In a general sense, sure.

Q.   Right.

A.   At the time, yeah.  Obviously you raised it and I investigated it.

Q.   All right.  At the time you just took the 55,000 without doing -- without figuring out who Randy was or investigating it?

A.   I don't think the comment "per Randy" is related.  But at the time I looked at the first row and took the figures -- first column, rather.  But it's a fair question, and I went back to confirm.

Q.   And you'd agree that having the R&D head count or head figure of between 48,000 and 55,000 would make a pretty substantial difference?

A.   I believe you want to get it right, for sure.

Q.   Now, you offered some testimony about copyright apportionment in this morning, right?

A.   Sure.

Q.   And --

        THE COURT:  This might be a good break time.  It's 2:30 in the afternoon.  Members of the jury, we'll take a short break.

     (Recess.  Jury in)

        THE COURT:  Please proceed.

BY MR. ALLAN:

Q.   A couple questions about copyright apportionment.

        You think it's appropriate to apportion copyright

damages based on the value of the copied portion, is that fair?

A. It is potential, sure. That can be done.

Q. And you understand Professor Wicker in this case testified that all of the coding and software is equally important?

A. I can accept that.

Q. And we can agree that he indicated that 10 percent of the code he thought was copied, Barbara Frederiksen-Cross testified it was at most 4 percent?

A. No. I think he said 10 percent was copied. But all of the code benefited from the misappropriated intellectual property.

Q. But misappropriation and benefiting from code has nothing to do with copyright. You understand that, right?

A. Well, it does when you introduce the notion of apportionment.

Q. The amount of code that's copied is relevant to the issue of apportionment, is that your understanding or not?

A. The extent of the code, the importance of the code, how it was used, all of that would be relevant.

Q. So your view is that the fact that the actual amount that was copied doesn't make it -- you can't apportion that because you think it's just the whole thing was used or touched in some way, so apportionment goes out the window?

A. I don't think you can apportion by lines of code

generally, especially when there are multiple software platforms within the product. And I think you do need to take into account not just quantity but quality.

Q. And that's not a legal opinion. That's your --

A. That's my experience.

Q. -- punting opinion?

A. That's my experience as a valuation expert on intellectual property.

Q. You testified that Dr. Aron, I think you testified that Dr. Aron thought the FCC -- I'm switching gears now, I'm sorry -- that the FCC rulings and issues related to digital analog was irrelevant?

A. Correct.

Q. But she doesn't think they're irrelevant. She thinks you're wrong about the impact of them, right?

A. Well, we should pull up her testimony. My recollection is she thinks they're not relevant.

Q. Well, you offered some testimony.

MR. ALLAN: Actually, let's pull up 1129.5. This is a document you just showed to the jury, which is admitted.

BY MR. ALLAN:

Q. You showed this document just a few moments ago, right, Mr. Malackowski?

A. I did.

Q. And this is a 2009 document?

A.   It is.

Q.   And it's actually authored by Sam Chia?

A.   I don't recall.

MR. ALLAN:  We can pull up maybe the first page of that.  The second maybe.  There we go.  We've got his name.

BY MR. ALLAN:

Q.   All right.  Do you see, that Mr. Malackowski?

A.   I do.

MR. ALLAN:  All right.  If we go back, Mr. Montgomery, to page 5.

BY MR. ALLAN:

Q.   You cited this issue about "The mandate by the FCC that non-frequency efficient 12.5 kilohertz equipment will not be approved after 2005 due to congestion," right?

A.   Yes, sir.

Q.   Okay.  And --

THE COURT:  You might as well read the last sentence as well.

MR. ALLAN:  Certainly.

BY MR. ALLAN:

Q.   "However, we know now that it has -- we now know that it has been postponed to 2011 and all public safety equipment has to be migrated by 2013."  Right?

A.   Yes, sir.

Q.   And that's what everyone thought in 2009?

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

MOTOROLA SOLUTIONS, INC., and MOTOROLA     ) No. 17 CV 1973
SOLUTIONS MALAYSIA SDN. BHD,               )
                                           )
          Plaintiffs,                      )
vs.                                        ) Chicago, Illinois
                                           )
HYTERA COMMUNICATIONS CORPORATION, LTD.,   ) February 12, 2020
HYTERA AMERICA, INC., and HYTERA           )
COMMUNICATIONS AMERICA (WEST), INC.,       )
                                           )
          Defendants.                      ) 9:15 a.m.

TRIAL - VOLUME 37-A
TRANSCRIPT OF PROCEEDINGS

BEFORE THE HONORABLE CHARLES R. NORGLE, SR.
and a jury

APPEARANCES:

For the Plaintiffs:    KIRKLAND & ELLIS, LLP
                       BY:  MR. ADAM R. ALPER
                            MR. AKSHAY DEORAS
                            MR. BRANDON HUGH BROWN
                       555 California Street
                       Suite 2700
                       San Francisco, California 94104
                       (415) 439-1400

                       KIRKLAND & ELLIS, LLP
                       BY:  MR. MICHAEL W. DE VRIES
                            MR. CHRISTOPHER M. LAWLESS
                       333 South Hope Street
                       Suite 2900
                       Los Angeles, California 90071
                       (213) 680-8400


Court Reporter:        JENNIFER COSTALES, CRR, RMR
                       Official Court Reporter
                       219 South Dearborn Street, Room 2342
                       Chicago, Illinois 60604
                       (312) 435-5895
                       jenny.uscra@yahoo.com

MSA0265

APPEARANCES: (Continued)

For the Plaintiffs:    KIRKLAND & ELLIS, LLP
                       BY:  MS. MEGAN MARGARET NEW
                       300 North LaSalle Street
                       Chicago, Illinois 60654
                       (312) 862-7439

                       KIRKLAND & ELLIS, LLP
                       BY:  MS. LESLIE M. SCHMIDT
                       601 Lexington Avenue
                       New York, New York 10022
                       (212) 446-4763

For the Defendants:    STEPTOE & JOHNSON, LLP
                       BY:   MR. BOYD T. CLOERN
                             MR. SCOTT M. RICHEY
                             MR. MICHAEL J. ALLAN
                             MS. JESSICA ILANA ROTHSCHILD
                             MS. KASSANDRA MICHELE OFFICER
                             MR. BILL TOTH
                       1330 Connecticut Avenue NW
                       Washington, DC 20036
                       (202) 429-6230

                       STEPTOE & JOHNSON, LLP
                       BY:  MR. DANIEL S. STRINGFIELD
                       227 West Monroe Street
                       Suite 4700
                       Chicago, Illinois 60606
                       (312) 577-1300

ALSO PRESENT:          MR. RUSS LUND and
                       MS. MICHELE NING

(Proceedings in open court.  Jury in)

THE CLERK:  17 C 1973, Motorola versus Hytera.

THE COURT:  Hytera has submitted an amended verdict form.  I was looking at Motorola's proposed verdict form.  One thing I want to make sure we do is to have every juror would sign the verdict, including the foreperson.

There is a motion to limit closing argument brought by Hytera.  You may argue that motion, counsel.

MR. ALLAN:  Yes, Your Honor.  The motion is fairly straightforward.  There are damages issues that are now in play because of the Court's ruling about the pre-May 2016 limit based on Your Honor's extraterritorial order.

We had that order obviously in advance of Dr. Aron's testimony and anticipated that there would be a break in terms of damages, and we had her present evidence as to what she thought the damages numbers would be in that scenario.

And we conferred with counsel in advance to determine whether Mr. Malackowski would be doing that, and they advised us that he wouldn't.  In fact, he did not.

So he has not broken out any of the damages calculations for pre of May of 2016.  And there are numbers they have submitted in their Rule 50(a) proposal, motion, rather, that we never heard of, we don't know the origin, the genesis of them, and we don't think they should be in a position to present new damages numbers that were not advanced

by any experts in this case.

THE COURT: That sounds more like your closing argument.

MR. ALLAN: That's our position, Your Honor.

THE COURT: You may respond.

MR. DE VRIES: Your Honor, we agree that's a closing argument. It is no basis for exclusion. The evidence that we --

THE COURT: Don't be too quick to agree with the Court.

MR. DE VRIES: Your Honor, we intend to do two things to the jury. One is, as I said to Your Honor yesterday, we intend to fully abide by Your Honor's order and only present trade secret damages on sales of products that occurred after May 11th of 2016.

That damages number is supported by substantial evidence in the record, including the detailed financial data that Hytera produced broken down by time period in DTX-4057, and there is a translated version at PTX-2226.

In addition, Mr. Malackowski presented analyses including in Exhibit PTX-27 -- 2071.2 --

Do you mind if I use this for a moment?

MR. ALLAN: No, not at all.

MR. DE VRIES: -- where he breaks down profits by accused product over the time period. And so, for example, in

2017, he concludes that there are $32 million approximately in sales in the accused devices and repeaters --

THE COURT: All right. It seems like you're making your closing argument now.

What it gets down to, if Mr. Malackowski's testimony doesn't satisfy one party or the other, certainly in your closing argument you can make that clear to the jury and state the reasons for doing so.

But there is not enough before the Court to restrict your closing arguments with respect to how you view Mr. Malackowski's testimony in rebuttal and his earlier testimony, especially in light of all of the evidence in the case.

And so the motion to limit is denied. And if ever there was a case where closing arguments should not be limited, it is this case.

The Court's view, the better view would be to provide a very reasonable time and opportunity for counsel to address the jury to make the closing arguments. This has been an extended trial on complicated issues, numerous issues, countless documents and exhibits, and so closing arguments should not be restricted. On the other hand, it should be expanded.

And you have agreed to complete your closing arguments in one day. If earlier you had said you needed more

5560

than one day, the Court would likely have granted your motion and permitted as much as two days.  But by your own agreement you have agreed to one day.

And so any motion to restrict closing argument is denied.

But at appropriate times, when there is some basis to object, certainly counsel may object and the Court will rule accordingly, if necessary at a sidebar, or even to ask the jury to step out of the room for a few minutes.

But I'm sure the jury is eager to get this case for deliberations.

And so that takes us now to the verdict form submitted by Motorola and the original verdict form as supplemented by the second verdict form submitted by Hytera.

And so Hytera objects to Motorola's verdict form.  Would you state the grounds for your objection.

MR. ALLAN:  Yes, Your Honor.

MR. DE VRIES:  I'm sorry, Your Honor, I do not mean to interrupt, and I apologize.  I just wanted to note for Your Honor that we have exchanged an updated version of the verdict form for Motorola that adopts the agreements that were reached yesterday as part of the jury instructions.

I'm happy to hand it up to you now if it would be helpful.  But what it does --

THE COURT:  Okay.  It would not be helpful, I haven't

In any event, can we go back to the six months.

I'm good with that. Let's drop it. Let's take out the line of code analysis, because the line of code analysis as Andy Grimmett testified is the only reason that's 15 months. It uniformly causes longer delays.

This backs up to about there, and there is no real market delay if you don't use the line of code analysis. Either way, the six-month delay is very conservative. And taking out the line of code analysis actually just means even fewer damages for Motorola for criticizing something that they even do. They publish papers on. Six-month delay.

All right. Let's talk about Hytera's knowledge for a minute. Why does it matter? Motorola has to show that Hytera knew or should have known about the alleged misappropriation. That's right in the statute.

THE COURT: All right. This might be a good stopping point for today. It's roughly 4:30.

You can pick that up tomorrow morning, counsel.

Jurors, you are excused until tomorrow at 10:00 a.m.

(Adjournment 4:27 p.m. until 10:00 a.m., February 13, 2020)

                    C E R T I F I C A T E
     I, Jennifer S. Costales, do hereby certify that the
foregoing is a complete, true, and accurate transcript of the
proceedings had in the above-entitled case before the
Honorable CHARLES R. NORGLE, one of the judges of said Court,
at Chicago, Illinois, on February 12, 2020.

                         /s/ Jennifer Costales, CRR, RMR

PK

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS

Before the Honorable Judge Charles R. Norgle, Sr.

MOTOROLA SOLUTIONS, INC., ET AL.,

  Plaintiffs,

  v.

HYTERA COMMUNICATIONS CORPORATION LTD., ET AL.,

  Defendants.

Case No. 1:17-cv-01973

# JURY INSTRUCTIONS

# FILED

FEB 1 4 2020

JUDGE CHARLES R. NORGLE
U.S. District Court Judge

MSA0272

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

|  |  |
|---|---|
| MOTOROLA SOLUTIONS, INC., and MOTOROLA SOLUTIONS MALAYSIA SDN. BHD. | Case No. 1:17-CV-01973 |
| Plaintiffs, | |
| v. | Honorable Charles R. Norgle Sr. |
| HYTERA COMMUNICATIONS CORPORATION LTD., HYTERA AMERICA, INC., and HYTERA COMMUNICATIONS AMERICA (WEST), INC. | |
| Defendants. | |

## <u>FINAL JURY INSTRUCTIONS</u>

MSA0273

**Instruction No. 1 - Functions of the Court and Jury**

Members of the jury, you have seen and heard all the evidence and arguments of the attorneys. Now I will instruct you on the law.

You have two duties as a jury. Your first duty is to decide the facts from the evidence in the case. This is your job, and yours alone.

Your second duty is to apply the law that I give you to the facts. You must follow these instructions, even if you disagree with them. Each of the instructions is important, and you must follow all of them.

Perform these duties fairly and impartially. Do not allow sympathy, prejudice, fear, or public opinion to influence you. You should not be influenced by any person's race, color, religion, national ancestry, or sex.

Nothing I say now, and nothing I said or did during the trial, is meant to indicate any opinion on my part, about what the facts are or about what your verdict should be.

1

**Instruction No. 2 - No Inference from Judge's Questions**

During this trial, I have asked witnesses questions myself. Do not assume that because I asked questions I hold any opinion on the matters I asked about, or on what the outcome of the case should be.

2

MSA0275

**Instruction No. 3 - What is Evidence**

The evidence consists of the testimony of the witnesses, the exhibits admitted in evidence, and stipulations. A stipulation is an agreement between both sides that certain facts are true. The following are stipulated facts:

1. Motorola Solutions, Inc. is a Delaware corporation with its principal place of business in Chicago, Illinois. Motorola Solutions, Inc. provides radio equipment and infrastructure technologies to thousands of customers in manufacturing, education, utility, transport and logistics, oil and gas, hospitality, and retail throughout the United States and around the world.

2. Motorola Solutions Malaysia SDN. BHD. is a subsidiary of Motorola Solutions, Inc. It was founded in 1974, and its principal place of business is in Kuala Lumpur, Malaysia. It offers communication devices and systems including analog and digital radios, accessories, and communication infrastructure.

3. Motorola Solutions, Inc. and Motorola Solutions Malaysia SDN. BHD. (collectively, "Motorola") provides two-way digital radio communications for business and government customers.

4. Motorola's digital two-way radio technology and solutions are sold and used throughout the United States.

5. Hytera Communications Corporation Ltd. (previously known as HYT) was founded in Shenzhen, China, in 1993. The company started as a dealer/distributor for two-way radios

3

MSA0276

and began manufacturing its own two-way radio products in 1995.

6. Hytera America, Inc. is a Florida company with its principal place of business in Miramar, Florida. Hytera America, Inc. sells two-way radio products and provides customer service for those products.

7. Hytera Communications America (West), Inc. is a California company with its principal place of business in Irvine, California. Hytera Communications America (West), Inc. sells two-way radio products and provides customer service for those products.

8. Motorola launched its MotoTRBO professional digital radios in 2006 and first sold them in early 2007.

9. The U.S. Copyright Office issued registration certificates relating to certain software associated with Motorola's DMR radio products at issue in this case.

10. Hytera launched its DMR professional radios in early 2010.

11. Motorola Malaysia hired G.S. Kok in February 1987 as a hardware engineer. When G.S. Kok left Motorola Malaysia in 2008, he was a Senior Engineering Manager.

12. Motorola Malaysia hired Y.T. Kok in May 1997 as a software engineer. When Y.T. Kok left Motorola Malaysia in 2008, he was a Senior Software Engineer.

13. Motorola Malaysia hired Samuel Chia in August 1999 as a software engineer. When he left Motorola Malaysia in 2008, he was an Engineering Section Manager for Motorola.

14. G.S. Kok joined Hytera on February 18, 2008 as a Director, Shenzhen R&D Center, Government and Industry Terminal Product Department. When G.S. Kok left Hytera in

4

November 2018, he was a Deputy General Manager, Hytera UK.

15. Y.T. Kok joined Hytera on June 10, 2008 as a Section Head, Shenzhen R&D Center, Government and Industry Terminal Product Department. When Y.T. Kok left Hytera in October 2018, he was a Senior Sales Manager in the Overseas Sales Department Headquarters.

16. Samuel Chia joined Hytera on June 16, 2008 as a Section Head, Shenzhen R&D Center, Government and Industry Terminal Product Department. When Samuel Chia left Hytera in October 2018, he was Senior Technical Consultant, Terminal Platform Center Line.

17. Motorola filed this lawsuit on March 14, 2017.

MSA0278

## Instruction No. 4 - Deposition Testimony

During the trial, certain testimony was presented to you by the reading of the depositions and video. You should give this testimony the same consideration you would give it had the witnesses appeared and testified here in court.

6

## Instruction No. 5 - What is Not Evidence

Certain things are not to be considered as evidence. I will list them for you:

First, if I told you to disregard any testimony or exhibits or struck any testimony or exhibits from the record, such testimony or exhibits are not evidence and must not be considered.

Second, anything that you may have seen or heard outside the courtroom is not evidence and must be entirely disregarded. This includes any press, radio, Internet or television reports you may have seen or heard. Such reports are not evidence and your verdict must not be influenced in any way by such publicity.

Third, questions and objections or comments by the lawyers are not evidence. Lawyers have a duty to object when they believe a question is improper. You should not be influenced by any objection, and you should not infer from my rulings that I have any view as to how you should decide the case.

Fourth, the lawyers' opening statements and closing arguments to you are not evidence. Their purpose is to discuss the issues and the

7

evidence. If the evidence as you remember it differs from what the

lawyers said, your memory is what counts.

8

**Instruction No. 6 - Consideration of All Evidence Regardless of Who Produced It**

In determining whether any fact has been proved, you should consider all of the evidence bearing on the question regardless of who introduced it.

9

**Instruction No. 7 - Weighing the Evidence**

You should use common sense in weighing the evidence and consider the evidence in light of your own observations in life.

In our lives, we often look at one fact and conclude from it that another fact exists. In law we call this "inference." A jury is allowed to make reasonable inferences. Any inference you make must be reasonable and must be based on the evidence in the case.

10

MSA0283

**Instruction No. 8 - Direct vs. Circumstantial Evidence**

You may have heard the phrases "direct evidence" and "circumstantial evidence." Direct evidence is proof that does not require an inference, such as the testimony of someone who claims to have personal knowledge of a fact. Circumstantial evidence is proof of a fact, or a series of facts, that tends to show that some other fact is true.

As an example, direct evidence that it is raining is testimony from a witness who says, "I was outside a minute ago and I saw it raining." Circumstantial evidence that it is raining is the observation of someone entering a room carrying a wet umbrella.

The law makes no distinction between the weight to be given to either direct or circumstantial evidence. You should decide how much weight to give to any evidence. In reaching your verdict, you should consider all the evidence in the case, including the circumstantial evidence.

11

**Instruction No. 9 - Testimony of Witnesses**

You must decide whether the testimony of each of the witnesses is truthful and accurate, in part, in whole, or not at all. You also must decide what weight, if any, you give to the testimony of each witness.

In evaluating the testimony of any witness, including any party to the case, you may consider, among other things:

- the ability and opportunity the witness had to see, hear, or know the things that the witness testified about;

- the witness's memory;

- any interest, bias, or prejudice the witness may have;

- the witness's intelligence;

- the manner of the witness while testifying;

- and the reasonableness of the witness's testimony in light of all the evidence in the case.

12

**Instruction No. 10 - Prior Inconsistent Statements**

You may consider statements given by one of the parties or a witness under oath before trial as evidence of the truth of what he or she said in the earlier statements, as well as in deciding what weight to give his or her testimony.

With respect to other witnesses, the law is different. If you decide that, before the trial, one of these witnesses made a statement not under oath or acted in a manner that is inconsistent with his or her testimony here in court, you may consider the earlier statement or conduct only in deciding whether his or her testimony here in court was true and what weight to give to his or her testimony here in court.

In considering a prior inconsistent statement, you should consider whether it was simply an innocent error or an intentional falsehood and whether it concerns an important fact or an unimportant detail.

13

## Instruction No. 11 - Absence of Evidence

The law does not require any party to call as a witness every person who might have knowledge of the facts related to this trial. Similarly, the law does not require any party to present as exhibits all papers and things mentioned during this trial.

14

MSA0287

**Instruction No. 12 - Expert Witnesses**

You have heard witnesses give opinions about matters requiring special knowledge or skill. You should judge this testimony in the same way that you judge the testimony of any other witness. The fact that such person has given an opinion does not mean that you are required to accept it. Give the testimony whatever weight you think it deserves, considering the reasons given for the opinion, the witness's qualifications, and all of the other evidence in the case.

15

MSA0288

## Instruction No. 13 - Translated Language

You have heard testimony of witnesses who testified in the Chinese language, and seen documents written in Chinese. Witnesses who do not speak English, or are more proficient in another language, testify through an official Court certified interpreter. In addition to the witnesses' interpreter, a check interpreter was also present. Although some of you may know Chinese, it is important that all jurors consider the same evidence. You should consider only the evidence provided through the official interpreter. Therefore, you must base your decision on the evidence presented in the English translation. Therefore, you must accept the interpreter's translation of the witnesses' testimony, or of Chinese text in documents.

You must not make any assumptions about a witness or a party based solely on the use of an interpreter to assist that witness or a party.

16

**Instruction No. 14 - Demonstrative Exhibits**

Certain slides, diagrams, and illustrations prepared by attorneys have been shown to you. Generally, those demonstratives are used for convenience and to help explain the facts of the case. They are not themselves evidence or proof of any facts. Certain demonstratives, however, have been admitted as evidence in the case and will be provided as exhibits.

17

MSA0290

**Instruction No. 15 - Destruction of Evidence**

You have heard evidence that certain computers and files may have been lost, destroyed, and/or altered, and that those computers and files may have contained information that is relevant to this case. You may assume that such information would have been unfavorable to Hytera only if you find by a preponderance of the evidence that:

1.  The information should have been preserved by Hytera in anticipation of or during the conduct of litigation;

2.  Hytera destroyed the information with the intent to deprive Motorola of the information's use in this litigation; and

3.  Hytera destroyed the information or caused the evidence to be destroyed in bad faith.

"Bad faith" in this context means destruction for the purpose of hiding adverse information, and requires a showing of more than negligence or even gross negligence on Hytera's part. You cannot infer that Hytera engaged in intentional, bad faith destruction of evidence simply because a subordinate employee acted in violation of Hytera's document retention policies and procedures, or simply because a party was unable to locate or produce certain documents.

18

MSA0291

## Instruction No. 16 - Fifth Amendment

During the depositions of G.S. Kok, Y.T. Kok, and Samuel Chia, which were presented at our trial, they invoked their right not to incriminate themselves under the Fifth Amendment in our Bill of Rights. This was their right to do so. You may, but you need not, infer by such refusal that the answers would have been adverse to those individuals or Hytera. However, you can only draw reasonable inferences to the extent they are justified by independent corroborating evidence in this case, and you cannot speculate based on the witnesses' invocation of the Fifth Amendment alone.

To the extent that you draw any inferences adverse to G.S. Kok's, Y.T. Kok's, or Samuel Chia's respective positions from their decisions to invoke the Fifth Amendment right, those inferences would not necessarily be the same as an inference that is adverse to the position of Hytera. You are not required to find that any answer to a particular question by one of those witnesses would have been adverse to that witness or to any party in this case.

19

**Instruction No. 17 - Burden of Proof**

When I say a particular party must prove something by "a preponderance of the evidence," this is what I mean: When you have considered all the evidence in the case, you must be persuaded that it is more probably true than not true.

When I say a particular party must prove something by "clear and convincing evidence," this is what I mean: When you have considered all of the evidence, you are convinced that it is highly probable that it is true.

20

MSA0293

**Instruction No. 18 - Multiple Claims; Multiple Defendants**

You will be instructed as to each element of each claim and defense. You must give separate consideration to each claim and defense in this case and each party in this case. Although there are three defendants—Hytera Communications Corporation Ltd., Hytera America, Inc. and Hytera Communications America (West), Inc.—it does not follow that if one is liable that any of the others is also liable. Unless otherwise stated, when I refer to "Hytera" in an instruction, that instruction applies to all three defendants, but you must apply the instruction separately as to each defendant.

21

**Instruction No. 19 - Motorola's Claims for Misappropriation of Trade Secrets**

Now I will instruct you on the elements of Motorola's claims for trade secret misappropriation under the Illinois Trade Secrets Act and the federal Defend Trade Secrets Act.

Under the Illinois Trade Secrets Act, in order to establish a claim for misappropriation of trade secrets, Motorola has the burden of proving the following propositions by a preponderance of the evidence:

1. That Motorola owned the information at issue;

2. That the information at issue is a trade secret;

3. That the information at issue was misappropriated by Hytera in Illinois; and

4. That the information was used by Hytera in its business.

Under the federal Defend Trade Secrets Act, in order to establish a claim for misappropriation of a trade secret, Motorola has the burden of proving the following propositions by a preponderance of the evidence:

1. That Motorola owned the information at issue;

2. That the information at issue is a trade secret;

3. That the information at issue was misappropriated by Hytera; and

22

MSA0295

4. That the trade secret is related to a product used in, or intended for use in, interstate or foreign commerce.

23

MSA0296

**Instruction No. 20 - Respondeat Superior**

You have heard testimony about whether certain individuals were employed by Motorola or Hytera throughout the course of this trial. Hytera can be held liable for harm resulting to Motorola from the conduct of another if Hytera knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other.

In addition, a corporation can be liable, that is, responsible, for its employees' conduct whenever the employee is acting within the scope of his or her employment. An employee is acting within the scope of his or her employment if:

- The employee's conduct is of a kind he or she is employed to perform or reasonably could be said to have been contemplated as part of his or her employment; and

- The employee's conduct occurs substantially within the authorized time and space limits of his or her employment; and

- The employee's conduct is motivated, at least in part, by a purpose to serve the employer.

Conduct is within the scope of employment when actuated, at least in part, by a purpose to serve the employer. A corporation knows what its

24

employees know about subjects that are within the scope of the employees' duties and responsibilities.

An illegal act may still be within the scope of employment, so as to impose liability on the corporation.

A different rule applies with regard to punitive damages.

25

MSA0298

**Instruction No. 21 - Trade Secret Definition Generally**

A trade secret is information, including but not limited to, technical or non-technical data, a formula, pattern, compilation, program, device, method, technique, drawing, process, financial data, or list of actual or potential customers or suppliers that (1) is sufficiently secret to derive independent economic value, actual or potential, from not being generally known to other persons who can obtain economic value from its disclosure or use; and (2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy or confidentiality.

I will explain what these terms mean.

MSA0299

## Instruction No. 22 - Trade Secret Concreteness

In articulating a trade secret, it is not enough for Motorola to point to broad areas of technology. Instead, it is Motorola's burden to identify concrete information that it contends to constitute its trade secrets.

27

## Instruction No. 23 - Independent Economic Value

To derive independent economic value from not being generally known means that the information gives a business a competitive advantage over other businesses that do not know the information. Information that is generally known or understood within an industry, even if not known to the public at large, does not qualify as a trade secret. But information that requires considerable time, effort, and expense to duplicate, even if it is derived from public sources, can still qualify as a trade secret. Absolute secrecy, in the sense that no one else in the world possesses the information, is not required.

28

## Instruction No. 24 - Definition of Misappropriation

If you find that Motorola has proven by a preponderance of the evidence that a trade secret existed, then you must decide whether that trade secret information was misappropriated by Hytera.

To prove that a misappropriation occurred, Motorola must prove by a preponderance of the evidence that:

1. Hytera acquired Motorola's trade secret knowing or having reason to know that the trade secret was acquired by improper means; or

2. Hytera disclosed or used Motorola's trade secret without Motorola's express or implied consent, and Hytera:

   a) Used improper means to acquire knowledge of the trade secret; or

   b) At the time of the disclosure or use of the trade secret, knew or had reason to know that knowledge of the trade secret was:

      (i) Derived from or through a person who used improper means to acquire it; or

      (ii) Acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or

      (iii) Derived from or through a person who owed a duty to Motorola to maintain its secrecy or limit its use.

29

**Instruction No. 25 - Improper Means**

The phrase "improper means" includes theft, bribery, misrepresentation, breach or inducement of a breach of a confidential relationship or other duty to maintain secrecy or limit use, or espionage through electronic or other means.

On the other hand, the phrase "improper means" does not include acquiring information through reverse engineering or independent development.

30

**Instruction No. 26 - Modifications or Improvements**

You may find that a person used another's trade secret even if he uses it with modifications or improvements, so long as the substance of the resulting product is substantially derived from the other's trade secret.

31

MSA0304

**Instruction No. 27 - Trade Secret / Statute of Limitations**

Hytera contends that Motorola's trade secret misappropriation claims are barred by the statute of limitations. The statute of limitations is called an "affirmative defense." That means Hytera bears the burden of proof by a preponderance of the evidence.

The Defend Trade Secrets Act requires Motorola to bring its trade secret claim within three years after the alleged misappropriation was discovered or should have been discovered by the exercise of reasonable diligence. The Illinois Trade Secrets Act requires Motorola to bring its trade secret claim within five years after the alleged misappropriation was discovered or should have been discovered by the exercise of reasonable diligence. Concerns and suspicions do not start the clock of the statute of limitations.

Motorola filed suit on its federal and state law trade secret claims on March 14, 2017.

32

MSA0305

**Instruction No. 28 - Fraudulent Concealment**

The statute of limitations can be tolled if Motorola can prove by clear and convincing evidence that:

1.  Hytera intentionally took affirmative acts or made affirmative representations designed to prevent Motorola from discovering its trade secret misappropriation claims; and

2.  Hytera's affirmative acts or representations prevented Motorola from discovering its claims.

Mere silence by Hytera and failure by Motorola to learn of its cause of action do not amount to fraudulent concealment. If you find that Motorola learned of information that would have led to the discovery of its trade secret claims through diligence, you must find that the statute of limitations began to run at that time, regardless of concealment.

33

## Instruction No. 29 - Trade Secret / Damages Generally

I will now instruct you on the law you must follow in determining compensatory damages. The purpose of compensatory damages is to award, as far as possible, just and fair compensation for the loss, if any, which resulted from a defendant's violation of a plaintiff's rights. Compensatory damages are not intended to punish the defendant. Motorola is also seeking exemplary damages. I will instruct you on that later.

You should not interpret the fact that I am giving instructions about Motorola's potential damages as an indication in any way that I believe that Motorola should, or should not, prevail on any claim. It is your task to decide first whether Hytera is liable. I am instructing you on damages only so that you will have guidance in the event that you decide that Hytera is liable and that Motorola is entitled to recover money from Hytera. You will be asked to determine Motorola's damages through June 30, 2019, if any.

If you find that Motorola proved that Hytera misappropriated Motorola's trade secrets and that Hytera has not proved its statute of

34

limitations defense, then you must decide whether Motorola is entitled to damages on its claim for misappropriation of trade secrets.

Motorola has the burden of proving whether Hytera caused the damage that Motorola is claiming by a preponderance of the evidence. Motorola must prove the amount of damages with reasonable certainty, but need not prove the amount of damages with mathematical precision. However, Motorola is not entitled to damages that are remote or speculative.

MSA0308

**Instruction No. 30 - Trade Secret / Actual Loss**

In determining Motorola's actual loss, you should determine what profits Motorola proves that it would have made, if any, had Hytera not misappropriated Motorola's trade secret. To recover its actual loss, Motorola must prove:

1. A reasonable probability that, if Hytera had not misappropriated trade secrets, Motorola would have made additional sales of DMR products that Hytera made; and

2. The amount of profit Motorola would have made on those sales.

36

**Instruction No. 31 - Trade Secret / Unjust Enrichment**

Unjust enrichment is the amount Hytera benefited as a result of any misappropriation to the extent it exceeds Motorola's actual loss.

If you find that Motorola has proven by a preponderance of the evidence the amount that it is entitled to unjust enrichment damages in excess of its actual loss, you must deduct the costs and expenses that Hytera proves by a preponderance of the evidence that it incurred related to that benefit.

MSA0310

**Instruction No. 32 - Geographic and Temporal Scope of Trade Secret Damages**

You will be asked to determine Motorola's damages under the ITSA and the DTSA, if any. Under the ITSA, Motorola is seeking damages from 2010 through June 30, 2019. For Motorola's ITSA claim, if you find that Hytera misappropriated Motorola's trade secrets in or from Illinois, Motorola is entitled to recover all damages that occurred in Illinois that are a proximate and foreseeable result of that misappropriation.

Under the DTSA, Motorola is seeking damages from May 11, 2016 through June 30, 2019. For Motorola's DTSA claim, if you find that Hytera misappropriated Motorola's trade secrets anywhere in the world and an act in furtherance of the misappropriation was committed in the United States, Motorola is entitled to recover all damages that Motorola proved are a proximate and foreseeable result of that misappropriation, including any unjust enrichment that Hytera received anywhere in the world or profits Motorola lost anywhere in the world as a result of misappropriation on or after May 11, 2016.

38

MSA0311

## Instruction No. 33 - Trade Secret / Exemplary Damages

If you find for Motorola on its trade secret claims, you may, but are not required to, assess exemplary damages against Hytera. The purposes of exemplary damages are to punish Hytera for its conduct and to deter Hytera and others from engaging in similar conduct in the future.

In order for Motorola to recover exemplary damages, you must find that Motorola has proved by a preponderance of the evidence that Hytera's acts were willful and malicious. That is, you may assess exemplary damages only if you find Hytera's conduct was malicious or in reckless disregard of Motorola's rights. Conduct is malicious if it is accompanied by ill will or spite, or it is done for the purpose of injuring Motorola. Conduct is in reckless disregard of Motorola's rights if, under the circumstances, it reflects complete indifference to Motorola's rights, and not simply that Hytera was aware that the information was a trade secret.

Exemplary damages may be awarded against an employer because of an act by its employee if, but only if you find:

39

1. The employer authorized the doing and the manner of the act; or

2. The employee was unfit and the employer was reckless in employing him or her; or

3. The employee was employed in a managerial capacity and was acting in the scope of his or her employment; or

4. The employer or a manager of the employer ratified or approved the act.

In determining whether an employee is acting in a managerial capacity, you should consider the employee's authority and discretion to make decisions and not only the employee's title.

If you find that exemplary damages are appropriate, then you must use sound reason in setting the amount of those damages. Exemplary damages, if any, should be in an amount sufficient to fulfill the purposes that I have described to you, but should not reflect bias, prejudice, or sympathy toward either party. In determining the amount of any exemplary damages, you should consider the following factors:

1. The reprehensibility of the conduct;

2. The impact of the conduct on Motorola;

3. The relationship between Motorola and Hytera;

4. Hytera's financial condition;

40

5. The likelihood that such conduct would be repeated by Hytera or others if an award of exemplary damages is not made; and

6. The relationship of any award of exemplary damages to the amount of actual harm Motorola suffered.

If you find that Hytera acted willfully and maliciously, you may award Motorola an amount of exemplary damages up to two times the amount of the compensatory damages you award Motorola for trade secret misappropriation for the time during which it acted willfully and maliciously.

41

MSA0314

**Instruction No. 34 - Copyright Allegation Generally**

Motorola claims that Hytera has infringed Motorola's copyright in four works, respectively titled, MOTOTRBO Mobile Subscriber FW Package R01.00.01, MOTOTRBO Portable Subscriber FW Package R01.00.01, MOTOTRBO CYPHER R01.00.01, and MOTOTRBO Portable R01.03 by copying original elements of those works into Hytera's own DMR program.

MSA0315

**Instruction No. 35 - Copyright Infringement**

To succeed on its claim as to each of the asserted works, Motorola must prove the following things by a preponderance of the evidence:

1.    Motorola owns a valid copyright in the asserted work; and

2.    Hytera copied protected expression from the work in the United States.

I will explain what these words mean.

If you find that Motorola has proved each of these things, then you must find for Motorola. However, if you find that Motorola did not prove each of these things, then you must find for Hytera.

43

MSA0316

**Instruction No. 36 - Copyright Ownership**

Motorola owns a copyright in an asserted work if it was prepared by Motorola employees within the scope of their employment; or specially commissioned as a contribution to a collective work and there was a prior agreement, signed by Motorola, and if those that prepared it agreed that the work would be a work made for hire.

44

MSA0317

**Instruction No. 37 - Copying**

As I stated, Motorola must prove that Hytera copied protected expression in its work. You may infer that Hytera copied Motorola's work if Hytera had the opportunity to view or read the original before creating its own work and the two works are so similar that a reasonable person would conclude Hytera took protected expression from Motorola's work. You may also infer that Hytera copied Motorola's work if the similarities between the two works can be explained only by copying, rather than by coincidence.

In making that determination, the focus is on similarities between the works. Hytera cannot excuse its infringement by pointing to portions of its work that it did not copy from Motorola. The test is whether Hytera's work is so similar to Motorola's work that an ordinary reasonable person would conclude that Hytera unlawfully appropriated Motorola's protectible expression by taking material of substance and value.

45

MSA0318

**Instruction No. 38 - Protected and Non-Protected Expression**

I will now give you some examples of what constitutes protected expression and what does not, in order to aid you in this process.

"Protected expression" means expression in Motorola's work that was created independently, involving some creativity.

Copyright law protects only original expression in the work. This includes the way that facts; ideas; procedures; processes; systems; methods of operation; concepts; principles; discoveries; devices are expressed in the work. It does not include the facts; ideas; procedures; processes; systems; methods of operation; concepts; principles; discoveries; devices themselves.

46

**Instruction No. 39 - Copyright Damages Generally**

If you find that Motorola has proved that Hytera has infringed Motorola's copyright by a preponderance of the evidence, then you must determine the amount of damages, if any, Motorola is entitled to recover. You will be asked to determine Motorola's damages resulting from copyright infringement, if any. If you find that Motorola has failed to prove the claim, then you will not consider the question of damages.

Motorola must prove damages by a preponderance of evidence.

MSA0320

## Instruction No. 40 - Copyright / Defendants' Profits

Motorola is entitled to recover the profits that Hytera made through June 30, 2019, because of Hytera's copyright infringement. Hytera's profits are revenues that Hytera made because of the infringement, minus Hytera's expenses in producing and selling the infringing DMR radios. Motorola must prove Hytera's revenues and a causal relationship between the infringement and those revenues. Hytera must prove its own expenses and any portion of its profits that resulted from factors other than infringement of Motorola's copyright.

48

MSA0321

**Instruction No. 41 - Limitations of Copyright**

You may award Motorola damages under the Copyright Act for infringement by Hytera that occurred in the United States. You may also award copyright damages for infringing acts outside the United States that were a consequence or a result of an initial infringing act by Hytera that occurred inside the United States.

49

MSA0322

**Instruction No. 42 - No Double Recovery**

If you award Motorola damages for both its trade secret misappropriation claims and its copyright claims, you must not award damages in a manner that results in double recovery for the same injury.

50

**Instruction No. 43 - Selection of Presiding Juror; General Verdict**

Upon retiring to the jury room, you must select a presiding juror. The presiding juror will preside over your deliberations and will be your representative here in court.

Forms of verdict have been prepared for you.

[Forms of verdict read.]

Take these forms to the jury room, and when you have reached unanimous agreement on the verdict, your presiding juror will fill in and date the appropriate form, and all of you will sign it.

51

**Instruction No. 44 - Communication with the Court**

I do not anticipate that you will need to communicate with me. If you do need to communicate with me, the only proper way is in writing. The writing must be signed by the presiding juror, or, if he or she is unwilling to do so, by some other juror. The writing should be given to the marshal, who will give it to me. I will respond either in writing or by having you return to the courtroom so that I can respond orally.

If you do communicate with me, you should not indicate in your note what your numerical division is, if any.

52

MSA0325

## Instruction No. 45 - Disagreement among Jurors

The verdict must represent the considered judgment of each juror. Your verdict, whether for or against the parties, must be unanimous.

You should make every reasonable effort to reach a verdict. In doing so, you should consult with one another, express your own views, and listen to the opinions of your fellow jurors. Discuss your differences with an open mind. Do not hesitate to reexamine your own views and change your opinion if you come to believe it is wrong. But you should not surrender your honest beliefs about the weight or effect of evidence solely because of the opinions of other jurors or for the purpose of returning a unanimous verdict.

All of you should give fair and equal consideration to all the evidence and deliberate with the goal of reaching an agreement that is consistent with the individual judgment of each juror. You are impartial judges of the facts.

MSA0326

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| MOTOROLA SOLUTIONS, INC., and MOTOROLA SOLUTIONS MALAYSIA SDN. BHD., | ) ) ) | |
| | ) | Civil Action No.: 1:17-cv-01973 |
| Plaintiffs | ) ) | |
| v. | ) ) | Honorable Charles R. Norgle Sr. |
| | ) | |
| HYTERA COMMUNICATIONS CORPORATION LTD., HYTERA AMERICA, INC., AND HYTERA COMMUNICATIONS AMERICA (WEST), INC., | ) ) ) ) ) ) | |
| | ) | |
| Defendants | ) ) | |

**PLAINTIFFS' MOTION FOR PERMANENT INJUNCTION**

Plaintiffs Motorola Solutions, Inc. and Motorola Solutions Malaysia Sdn. Bhd. ("Plaintiffs" or "Motorola") hereby move this Court for a permanent injunction to stop further irreparable harm caused by the unlawful conduct of Defendants Hytera Communications Corporation Ltd., Hytera America, Inc., and Hytera Communications America (West), Inc. ("Defendants" or "Hytera"). Specifically, Motorola respectfully requests that the Court issue a permanent injunction enjoining Hytera, its officers, agents, servants, employees, distributors and resellers of any type, and all those persons in active concert or participation with any of them who receive actual notice of the order by personal service or otherwise, from performing any of the following actions:

> (1)    possessing, accessing, reviewing, using, disclosing, or otherwise misappropriating Motorola's Trade Secret Information[1], including any confidential Motorola

---

[1]    Motorola Trade Secret Information is any confidential information copied or derived from, in whole or in part, Motorola's confidential technical documentation, source code, and source code libraries. This also includes information found in Hytera technical documentation, source code, and source code

documents, source code, and source code libraries, in whole or in part, anywhere in the world[2];

(2)    making, offering to sell, selling, or otherwise distributing anywhere in the world (i) the Accused Products (defined in Exhibit A to the proposed order), or (ii) any other product developed or sold, based in whole or in part, on any of the Accused Products or Motorola's Trade Secret Information; and

(3)    reproducing, distributing, making available, or creating derivative works based on, in whole or in part, from Motorola's Copyrighted Works[3] anywhere in the world.

In addition, Hytera shall notify its distributors and resellers of Products described in Sections I(2) and I(3) of the entry of the permanent injunction, as well as the requirement to comply with the permanent injunction, within three (3) days of entry of the injunction.

Motorola further requests that the permanent injunction also order the following:

(1)    Hytera will engage an e-discovery vendor to assist with the identification, collection, and removal of any Motorola Trade Secret Information and Copyrighted Works, while also preserving all data in connection with Hytera's obligations in pending litigations in the U.S. and other countries.

(2)    Hytera will inspect the following data sources in its possession:

a.    Hytera's Subversion ("SVN") system, and any other database or document management systems in use at Hytera;

b.    The mailboxes contained in Hytera's corporate email servers for all current custodians in this litigation, as well as each Hytera engineer who is currently

---

libraries that are copied or derived from Motorola confidential documentation, source code, and source code libraries.

[2] This includes without limitation "Hytera badged" documents that contain Motorola confidential information, examples of which are attached to the proposed order as Ex. B (PTX-1072), Ex. C (PTX-586), Ex. D (PTX-628), and Ex. E (PTX-560).

[3] Motorola Copyrighted Works is any computer program created by Motorola for use in its MotoTRBO products, in whole or in part.

MSA0328

working on, or has worked on, the Accused Products or any alleged redesign of the Accused Products;[4]

c. Hytera computers, laptops, hard drives, and other storage media (including USB drives, network-based storage drives) belonging to all current custodians in this litigation, as well as each Hytera engineer who is currently working on, or has worked on, the Accused Products or any other alleged redesign of the Accused Products; and

d. Paper files belonging to all current custodians in this litigation, as well as each Hytera engineer who is currently working on, or has worked on, the Accused Products, or any other alleged redesign of the Accused Products.

(3) Prior to inspection and removal of any Motorola Trade Secret Information and Copyrighted Works, and in order to satisfy Hytera's discovery obligations and the litigation holds in place in this and other litigations, the e-discovery vendor will create and preserve a copy of each of the data sources listed above (hereinafter "Preserved Files"). The Preserved Files shall be maintained by the e-discovery vendor, and any Motorola Trade Secret Information and Copyrighted Works contained therein shall only be accessible by Hytera's outside counsel (including experts, vendors, etc.) in connection with pending or future litigation between Motorola and Hytera without express written permission by the Court, obtained after providing notice to Motorola. In addition, notwithstanding any other aspect of this Order, Hytera's outside counsel (including experts, vendors, and other permitted entities or individuals retained thereby solely for purpose of litigation) in any pending litigation may retain the files they have until those litigations are concluded, consistent with the protective orders and other law and regulations applicable in those cases.

(4) Hytera will remove from its possession and quarantine the following:

a. All Motorola-branded documents and source code (including source code libraries) that Motorola contends were improperly acquired by Hytera. Hytera will provide to Motorola a copy of all such documents and source code. Hytera may retain any Motorola-branded documents properly in its possession, such as its DMR patent license with Motorola and documents related to that license, provided those documents are specifically identified in writing to Motorola.

b. All other documents or source code (including source code libraries) in Hytera's possession that contain, in whole or in part, information copied from the materials covered by Section II(4)(a) above, or that Hytera's counsel, in connection with Hytera's technical experts, can reasonably

---

[4] For any such employees who left Hytera before Motorola filed its Complaint (March 14, 2017), Hytera will inspect his or her files to the extent that they were preserved.

determine, based on the evidence submitted at trial, was derived from materials covered by Section II(4)(a) above.

(5)     The documents and source code identified and removed pursuant to Section II(4) above shall be quarantined by the e-discovery vendor, consistent with Section II(3) above.

(6)     Hytera shall complete the identification, collection, and quarantine of Motorola Trade Secret Information and Copyrighted Works within sixty (60) days of the date of this Order.  In the event Hytera is unable to comply in that time frame, Hytera may make application to the Court for a modification of this Order, or for other relief.  The Court acknowledges that the circumstances of the coronavirus epidemic may require additional time, including because counsel may not be able to travel to China during the prescribed time frame, and will accommodate reasonable requests for additional time for reasons related to the epidemic or otherwise.

(7)     Any other relief that the Court deems just or proper.


DATED:  April 2, 2020                          Respectfully submitted,


                                               */s/ Michael W. De Vries*
                                               Adam Alper (*admitted pro hac vice*)
                                               adam.alper@kirkland.com
                                               Brandon H. Brown (IL Bar No. 266347 CA)
                                               brandon.brown@kirkland.com
                                               Reza Dokhanchy (*admitted pro hac vice*)
                                               reza.dokhanchy@kirkland.com
                                               KIRKLAND & ELLIS LLP
                                               555 California Street
                                               San Francisco, CA 94104
                                               Telephone: (415) 439-1400
                                               Facsimile: (415) 439-1500

                                               Michael De Vries (*admitted pro hac vice*)
                                               michael.devries@kirkland.com
                                               Christopher Lawless (*admitted pro hac vice*)
                                               christopher.lawless@kirkland.com
                                               Justin Singh (*admitted pro hac vice*)
                                               justin.singh@kirkland.com
                                               Ali-Reza Boloori (*admitted pro hac vice*)
                                               ali-reza.boloori@kirkland.com
                                               Benjamin A. Herbert (*admitted pro hac vice*)
                                               benjamin.herbert@kirkland.com
                                               KIRKLAND & ELLIS LLP
                                               555 South Flower Street
                                               Los Angeles, CA 90071
                                               Telephone: (213) 680-8400

MSA0330

Facsimile: (213) 680 8500

David Rokach (IL SBN: 6279703)
david.rokach@kirkland.com
Megan M. New (IL SBN 6300422)
megan.new@kirkland.com
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, IL 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200

Attorneys for Plaintiffs
*Motorola Solutions, Inc. and Motorola
Solutions Malaysia SDN. BHD.*

MSA0331

**CERTIFICATE OF SERVICE**

I, Michael W. De Vries, an attorney, hereby certify that on April 2, 2020, I caused a true and correct copy of the foregoing document to be served via the Court's ECF system upon all counsel of record.

DATED: April 2, 2020        */s/ Michael W. De Vries*
                                             Michael W. De Vries

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| MOTOROLA SOLUTIONS, INC., and MOTOROLA SOLUTIONS MALAYSIA SDN. BHD. | ) ) ) | Civil Action No.: 1:17-cv-01973 |
| | ) | |
| Plaintiffs, | ) | Honorable Charles R. Norgle Sr. |
| | ) | |
| v. | ) | **REDACTED – PUBLIC VERSION** |
| | ) | |
| HYTERA COMMUNICATIONS CORPORATION LTD., HYTERA AMERICA, INC., AND HYTERA COMMUNICATIONS AMERICA (WEST), INC. | ) ) ) ) ) | |
| | ) | |
| Defendants. | ) | |
| | ) ) | |

**MOTOROLA'S MEMORANDUM OF LAW IN SUPPORT OF
ITS MOTION FOR A PERMANENT INJUNCTION**

MSA0333

**TABLE OF CONTENTS**

**Page**

I.    INTRODUCTION ................................................................................................................ 1

II.    ARGUMENT ...................................................................................................................... 2

    A.    Motorola Has Succeeded on the Merits ................................................................. 2

    B.    Hytera's Ongoing Use of Motorola's Trade Secrets and Code Will Cause Motorola Irreparable Harm That Monetary Damages Cannot Remedy ................. 3

        1.    Hytera Caused Motorola to Lose Market Share and Reduce Prices ........... 4

        2.    Motorola Will Continue to Suffer Irreparable Reputational Harm ............. 8

    C.    The Balance of Harm Weighs Decidedly In Favor Of Enjoining Hytera ............. 10

    D.    The Public Interest Strongly Favors Enjoining Hytera's Unlawful Conduct ....... 10

    E.    A Worldwide Injunction Is Appropriate and Necessary ...................................... 13

    F.    If a Permanent Injunction Is Not Entered, Motorola Should Be Awarded an Ongoing Royalty for Hytera's Continued Misappropriation ........................... 14

III.    CONCLUSION ................................................................................................................. 15

MSA0334

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Family Mut. Ins. Co. v. Roth*,
    No. 05-3839, 2005 WL 3700232 (N.D. Ill. Aug. 5, 2005), *report and
    recommendation adopted*, 2006 WL 2192004 (N.D. Ill. July 27, 2006)..........................3, 4, 7

*Apple Inc. v. Psystar Corp.*,
    673 F. Supp. 2d 943 (N.D. Cal. 2009), *aff'd*, 658 F.3d 1150 (9th Cir. 2011) ..........................3

*Atari, Inc. v. JS & A Grp., Inc.*,
    597 F. Supp. 5 (N.D. Ill. 1983) ......................................................................................12

*Automed Techs., Inc. v. Microfil, LLC*,
    No. 04 C 5596, 2006 WL 1647505 (N.D. Ill. June 7, 2006), *aff'd in relevant
    part*, 244 F. App'x 354 (Fed. Cir. 2007)......................................................................2

*Bianco v. Globus Med., Inc.*,
    53 F. Supp. 3d 929 (E.D. Tex. 2014).........................................................................15

*Bianco v. Globus Med., Inc.*,
    No. 12-CV-00147, 2014 WL 1049067 (E.D. Tex. Mar. 17, 2014) .........................................15

*Comput. Assocs. Int'l v. Quest Software, Inc.*,
    333 F. Supp. 2d 688 (N.D. Ill. 2004) ........................................................................9

*Douglas Dynamics, LLC v. Buyers Prod. Co.*,
    717 F.3d 1336 (Fed. Cir. 2013).........................................................................9, 10, 14

*Dulisse v. Park Int'l Corp.*,
    No. 97 C 8018, 1998 WL 25158 (N.D. Ill. Jan. 9, 1998) ...........................................8

*Eagle View Techs., Inc. v. Xactware Sol'ns, Inc.*,
    No. 1:15-cv-07025, Dkt. 841 (D.N.J. Oct. 18, 2019) .............................................5, 6

*IDS Life Ins. Co. v. SunAm., Inc.*,
    958 F. Supp. 1258 (N.D. Ill. 1997), *vacated in part on other grounds*, 136
    F.3d 537 (7th Cir. 1998) ...............................................................................6, 11

*Imperium IP Holdings (Cayman), Ltd. v. Samsung Elecs. Co.*,
    No. 4:14-CV-371, 2017 WL 4038884 (E.D. Tex. Sept. 13, 2017).........................................15

*Intertek USA, Inc. v. AmSpec, LLC*,
    No. 14-CV-6160, 2014 WL 4477933 (N.D. Ill. Sept. 11, 2014) ...............................................3

MSA0335

*ISC-Bunker Ramo Corp. v. Altech, Inc.*,
  765 F. Supp. 1310 (N.D. Ill. 1990) .......................................................................10

*Mazak Optonics Corp. v. Marlette*,
  No. 17 C 1023, 2017 WL 3394727 (N.D. Ill. Aug. 8, 2017)...................................11

*Molex, Inc. v. Nolen*,
  759 F.2d 474 (5th Cir. 1985) ..................................................................................10

*Mondis Tech. Ltd. v. Chimei InnoLux Corp.*,
  822 F. Supp. 2d 639 (E.D. Tex. 2011), *aff'd* 530 F. App'x 959 (Fed. Cir.
  2013) .......................................................................................................................15

*Monroe v. United Air Lines, Inc.*,
  No. 79 C 360, 1983 WL 434 (N.D. Ill. Jan. 24, 1983) ..........................................2, 3

*OmniGen Research, LLC v. Yongqiang Wang*,
  No. 6:16-CV-268-MC, 2017 WL 5505041 (D. Or. Nov. 16, 2017)........................14

*PepsiCo Inc. v. Redmond*,
  54 F.3d 1262 (7th Cir. 1995) ..................................................................................11

*Petrella v. Metro-Goldwyn-Mayer, Inc.*,
  572 U.S. 663 (2014).................................................................................................15

*Plummer v. Am. Inst. of Certified Pub Accountants*,
  97 F.3d 220 (7th Cir. 1996) ......................................................................................2

*Richard Feiner & Co. v. Turner Entm't Co.*,
  No. 96 CIV 1472, 1998 WL 78180 (S.D.N.Y. Feb. 24, 1998)................................14

*RMH Tech LLC v. PMC Indus., Inc.*,
  352 F. Supp. 3d 164 (D. Conn. 2018)......................................................................10

*Rockwell Graphic Sys., Inc. v. DEV Indus., Inc.*,
  No. 84 C 6746, 1993 WL 286484 (N.D. Ill July 29, 1993) .....................................12

*Span–Deck, Inc. v. Fab–Con, Inc.*,
  677 F.2d 1237 (8th Cir. 1982) ...................................................................................3

*StrikePoint Trading, LLC v. Sabolyk*,
  No. SACV071073, 2009 WL 10659684 (C.D. Cal. Aug. 18, 2009) ........................9

*Telcordia Techs., Inc. v. Cisco Sys., Inc.*,
  No. CV 04-876, 2014 WL 1457797 (D. Del. Apr. 14, 2014)..................................15

iii
MSA0336

*Trading Techs. Int'l, Inc. v. eSpeed, Inc.*,
    No. 04 C 5312, 2008 WL 4531371 (N.D. Ill. May 22, 2008), *aff'd,* 595 F.3d
    1340 (Fed. Cir. 2010)....................................................................................................5

*Vendavo, Inc. v. Long*,
    397 F. Supp. 3d 1115 (N.D. Ill. 2019) ..................................................................3, 10

*Wal-Mart Stores, Inc. v. Cuker Interactive, LLC*,
    No. 5:14-CV-5262, 2017 WL 3206942 (W.D. Ark. July 28, 2017)......................4, 10

**Statutes**

765 ILCS 1065/3.......................................................................................................15

18 U.S.C. § 1836...............................................................................................1, 14, 15

18 U.S.C. § 1837.......................................................................................................14

132 Stat. 1917, §§ 889(a), (f)(3)(B) .........................................................................13

**Rules**

Fed. R. Evid. 702 ........................................................................................................4

MSA0337

I.      INTRODUCTION

Plaintiffs Motorola Solutions, Inc., and Motorola Solutions Malaysia SDN. BHD. ("Motorola") respectfully request that the Court enter a permanent injunction enjoining defendants Hytera Communications Corporation Ltd., Hytera America, Inc., and Hytera Communications America (West), Inc. and all those acting together with any of them ("Hytera") from continuing to misappropriate Motorola's trade secrets and infringe Motorola's copyrights, including any further sales of the portable, mobile, and repeater Digital Mobile Radio ("DMR") products at issue in this case, anywhere in the world.[1] Despite the jury's resounding verdict over six weeks ago—rejecting every one of Hytera's purported defenses and excuses for its illegal conduct—Hytera continues to sell products using Motorola's stolen technology throughout the world, undaunted by the verdict or by the irreparable harms its conduct continues to cause to Motorola.  In fact, Hytera has not only failed to stop its illegal conduct, but it has gone so far as to argue it should be ***allowed*** to continue knowingly using and selling technologies it stole from Motorola. Dkt. 908 at 15; Dkt. 914 at 12.  And Hytera has made clear that "***[u]nless the court orders Hytera out of the marketplace, Hytera will continue to compete in the DMR market***."[2]

As explained in Motorola's briefing on preliminary injunctive relief, every factor favors entry of an injunction, and there are no "exceptional circumstances that render an injunction inequitable[.]"  18 U.S.C. § 1836(b)(3)(A)(iii).  Indeed, Motorola remains ready, willing, and able to meet customer demand from the exclusion of Hytera's stolen products worldwide. Motorola has

---

[1] Motorola's request for entry of a TRO/preliminary injunction (Dkt. 901, 936) remains pending, and Motorola respectfully requests that the Court grant that request to stop the ongoing harm to Motorola caused by Hytera's illegal conduct while this motion for a permanent injunction is briefed and decided.  In the event preliminary injunctive relief is not entered pending further briefing on this motion, Motorola respectfully requests an accelerated briefing schedule be set for this motion.

[2] Dkt. 766-8 at 215:19-217:6; *see also* Trial Tr. at 3539:10-13.

substantial experience ensuring business continuity and customer service during widespread emergencies and has implemented business continuity plans to ensure that its customers can receive the support that they need. Motorola has also worked closely with its suppliers to minimize any disruptions to its supply chain, and Motorola is presently able to supply DMR radios and repeaters at ███████████████████████████. Accordingly, entry of a worldwide permanent injunction is necessary to stop Hytera's flagrant disregard of the laws protecting Motorola's trade secrets and copyrights, and the continued irreparable harm to Motorola caused by Hytera's theft. No public interest overrides the public's overwhelming interest in protecting intellectual property and the technological innovations it protects.

## II.     ARGUMENT

To decide whether to enter a permanent injunction, courts "first consider whether the plaintiff has actually succeeded on the merits," followed by the traditional equitable factors:

> (A) whether the plaintiff will have an adequate remedy at law or will be irreparably harmed if the injunction does not issue; (B) whether the threatened injury to the plaintiff outweighs the threatened harm the injunction may inflict on the defendant; and (C) whether the granting of the injunction will harm the public interest.

*Automed Techs., Inc. v. Microfil, LLC*, No. 04 C 5596, 2006 WL 1647505, at *1 (N.D. Ill. June 7, 2006), *aff'd in relevant part*, 244 F. App'x 354 (Fed. Cir. 2007) (quoting *Plummer v. Am. Inst. of Certified Pub Accountants*, 97 F.3d 220, 229 (7th Cir. 1996)). Each of these factors weighs heavily in favor of granting a permanent injunction.

### A.     Motorola Has Succeeded on the Merits

On February 14, 2020, after a three-month trial, the jury returned a verdict entirely in Motorola's favor in less than three hours. Trial Tr. at 5979:14-5982:3. Motorola therefore has unquestionably prevailed on the merits. *Monroe v. United Air Lines, Inc.*, No. 79 C 360, 1983 WL 434, at *4 (N.D. Ill. Jan. 24, 1983) (jury verdict show[s] "more than a reasonable likelihood" that

movant will ultimately prevail). In addition, as explained in Motorola's TRO briefing, the jury's general verdict is no impediment to entry of a permanent injunction. Dkt. 936 at 1–2 & n.2. The jury awarded the full amount of compensatory damages Motorola sought, meaning the jury necessarily found Hytera misappropriated all of Motorola's trade secrets. *Id.* n.2; *see Span–Deck, Inc. v. Fab–Con, Inc.*, 677 F.2d 1237, 1241 n. 5 (8th Cir. 1982) (general verdict "give[s] rise to the presumption that material fact issues have been resolved in favor of the prevailing party").

### B. Hytera's Ongoing Use of Motorola's Trade Secrets and Code Will Cause Motorola Irreparable Harm That Monetary Damages Cannot Remedy

"[T]here is a presumption of irreparable harm to the plaintiff in cases of trade secret misappropriation." *Vendavo, Inc. v. Long,* 397 F. Supp. 3d 1115, 1143 (N.D. Ill. 2019); *Intertek USA, Inc. v. AmSpec, LLC*, No. 14-CV-6160, 2014 WL 4477933, at *6 (N.D. Ill. Sept. 11, 2014) ("It is appropriate [in trade secret cases] to award equitable relief to eliminate the unfair advantage that defendants' gained by using plaintiff's trade secret information."). There is also an urgent need for court action where the defendant continues to unlawfully use the copyrighted works. *Apple Inc. v. Psystar Corp.*, 673 F. Supp. 2d 943, 949 (N.D. Cal. 2009) (granting permanent injunction and finding continued copyright infringement "would irreparably harm the competitive position and market share of Mac OS X"), *aff'd*, 658 F.3d 1150 (9th Cir. 2011). Indeed, nowhere in its two oppositions to Motorola's motion for a TRO or preliminary injunction, did Hytera dispute that (i) Motorola has lost and will continue to lose sales and market share if Hytera continues selling products with Motorola's stolen trade secrets and source code; (ii) Motorola has been forced to lower its prices to compete with Hytera; and (iii) Hytera has continued, unfettered access to Motorola's trade secrets and can continue using them to develop products. *See generally* Dkts. 908, 912. These undisputed facts establish irreparable harm. *Am. Family Mut. Ins. Co. v. Roth*, No. 05-3839, 2005 WL 3700232, at *26-27 (N.D. Ill. Aug. 5, 2005), *report and*

*recommendation adopted*, 2006 WL 2192004 (N.D. Ill. July 27, 2006).

### 1.    **Hytera Caused Motorola to Lose Market Share and Reduce Prices**

To be the first to market with its high-quality and cutting edge DMR product, Motorola invested over $117 million and the work of dozens of engineers to develop the 21 asserted trade secrets and write its copyrighted source code.[3]  Hytera's own expert, Andy Grimmett, conceded that it was "very important to Motorola, to have those secret technologies in order to . . . give it competitive advantages in the marketplace."[4]  Taking an illegal shortcut by stealing the trade secrets and copyrighted code that Motorola developed with its "blood, sweat, and tears", Hytera then created a "copycat product" that directly competes with Motorola's DMR products.[5, 6] Hytera's own witnesses admit that, as a result of Hytera's theft, Motorola has to compete "against products from Hytera that have Motorola source code in [them]" to this day.[7]

Hytera's ongoing sale of the Accused Products, using and based on Motorola's trade secrets and copyrighted source code, is alone sufficient for the Court to enter a permanent injunction because it is impossible to determine "the damage to [Motorola's] sales that could be caused by allowing [Hytera] to use its own secrets against it."  *Wal-Mart Stores, Inc. v. Cuker*

---

[3] Trial Tr. at 2156:2-9; *id.* at 594:14-23 (Boerger: 87 engineers and 9,500 staff months to develop the DMR source code); *see also id.* at 707:13-708:3 (Corretjer: 25 engineers 3,000 staff months to develop DSP code); *id.* at 999:3-5 (Karpoor: 20 engineers and 3,248 staff months to develop repeater).

[4] Trial Tr. at 4771:10-13; *see also id.* at 165:14-21, 3445:15-20, 3447:6-9; Dkt. 900-16 (Ex. 9).

[5] Trial Tr. at 609:6-14 (Boerger testifying, consistent with Fed. R. Evid. 702); *see also id.* at 3684:21-25, 3686:25-3687:6 (Rublaitus: Hytera had "a tremendous advantage" because "the material that was taken represents thousands and thousands of engineering hours").

[6] Trial Tr. at 1950:21-1951:7, 2189:6-15, *id.* at 2161:12-18 (Malackowski testimony).

[7] Trial Tr. at 3541:18-23; *id.* at 3409:17-22 (Yuan: confirming that Hytera competes with Motorola for DMR sales); *id.* at 3169:9-13 (Luo: some of Hytera's current DMR source code includes some Motorola source code); *id.* at 2830:15-17 (Yang: "Hytera's products have Motorola source code in them"); Trial Tr. at 2480:10-15 (Sun: he "kn[e]w it as a fact" that Hytera "is currently using … Motorola source code").

MSA0341

*Interactive, LLC*, No. 5:14-CV-5262, 2017 WL 3206942, at *2 n.1 (W.D. Ark. July 28, 2017). A permanent injunction is even more necessary and appropriate here because Hytera's ongoing sale and use of Motorola's trade secrets and code causes Motorola multiple forms of irreparable harm.

First, Hytera's ongoing sale of the Accused Products will irreparably harm Motorola by causing it to continue to lose market share in the DMR market in a way it may never be able to recover from. Hytera now "sells the second most DMR radios globally" and "has the second most dealers globally."[8] Those gains have come at the price of Motorola's market share, which steadily declined due to Hytera in the years leading up to this lawsuit. Ex. 1 (Dkt. 902, "Lund Decl.") ¶ 13.[9] Motorola's loss of market share was further confirmed by Hytera's Mr. Yuan, who testified that Hytera was "going to be the number one in DMR market,"[10] which would come at Motorola's expense.[11] And because the DMR products at issue have a life span of seven to ten years, every sale and customer that Motorola loses to Hytera is one that it will take Motorola at least that many years to get back, if ever. Ex. 1 ¶ 12. The ongoing harm to Motorola's competitive position in the market that will be caused if Hytera's illegal conduct is not enjoined is not quantifiable and cannot be adequately remedied by a money judgment. *Trading Techs. Int'l, Inc. v. eSpeed, Inc.*, No. 04 C 5312, 2008 WL 4531371, at *2 (N.D. Ill. May 22, 2008) (entering permanent injunction where plaintiff's market share was "one of its most important assets" and "[e]rosion of this intangible asset would cause incalculable extraneous injury"), *aff'd*, 595 F.3d 1340 (Fed. Cir. 2010); *Eagle View Techs., Inc. v. Xactware Sol'ns, Inc.*, No. 1:15-cv-07025, Dkt. 841 at 18, 25 (D.N.J. Oct. 18,

---

[8] Trial Tr. at 3393:5-10; *id.* at 205:23-206:3.

[9] For the Court's convenience, the 2/18/2020 Declaration of Russell Lund (without exhibits, which are available as Dkt. 902-1 to 902-6), originally filed as Dkt. 902, is reattached to the instant motion as Ex. 1.

[10] Trial Tr. 3539:4-17; *see also* Dkt. 766-8 at 81:9-17 (Yuan testimony).

[11] Dkt. 766-9 at 16:9-13 (Cragg testimony); *see also* Dkt. 766-8 at 205:18-206:10 (Yuan testimony).

MSA0342

2019) (loss of market share relevant to showing irreparable harm).

Second, Hytera's lower prices have irreparably harmed Motorola's ability to price its products. Hytera offers the Accused Products at approximately 8-15% lower than the price of Motorola's DMR products,[12] due in part to the savings on research and development that it realized from its theft of Motorola's trade secrets and source code.[13] As a result of those lower prices, customers have purchased Hytera's Accused Products over Motorola's competing products on the basis of price.[14] *See also* Ex. 1 ¶ 11. Motorola has been forced to lower its prices or offer price exceptions in every region to compete with Hytera, and if Hytera is not enjoined, Motorola will have to continue to lower its prices in order to compete with the Accused Products. *Id.* ¶¶ 3-10. This pervasive and global price erosion cannot be remedied by a money judgment.[15]

Third, if not enjoined, Hytera will have continued access to and use of Motorola's trade secrets and copyrighted code to modify its current products and create future products.[16] This

---

[12] Dkt. 766-8 at 156:25-157:12 (Yuan testimony) Trial Tr. at 2451:11-16 (Sun: "Of course, the cheaper products will sell better."); *see* Ex. 2 (PTX-2296) at 2-3 (explaining in letter to IRS that ███████████████████████████████████████████████████).

[13] Trial Tr. at 2156:15-2157:19, 5364:9-19; Dkt. 766-8 at 156:11-157:13; *see also* Trial Tr. at 5364:22-5365:6 (Malackowski: Hytera avoids R&D costs "with each and every [accused] product. … So it relates to each and every product at the time that product is introduced," including "products released in February 2017 and January 2019.").

[14] Dkt. 766-9 at 91:16-21, 93:20-23, 96:3-10 (Cragg testimony); *see also* Trial Tr. at 2451:11-16 (Sun: "Of course, the cheaper products will sell better.").

[15] *See also IDS Life Ins. Co. v. SunAm., Inc.*, 958 F. Supp. 1258, 1281 (N.D. Ill. 1997) (finding "[n]o remedy at law will make plaintiffs whole"), *vacated in part on other grounds*, 136 F.3d 537 (7th Cir. 1998); *Eagle View*, Case No. 1:15-cv-07025, Dkt. 841 at 22-23 (price erosion not compensable with money damages).

[16] Trial Tr. at 4596:8-20, 4593:13-15 (Grimmett testimony); *id.* at 2830:12-22 (Yang testimony); PTX-966 (Hytera's SVN log showing that Motorola's source code files still exist in Hytera's repository) (because this exhibit is more than 49,000 kilobytes in size, it was not filed but will be made available upon request); Trial Tr. at 1219:15-1222:10 (Dr. Wicker identifying portions of Motorola's source code on Hytera's SVN); *id.* at 1259:7-25 (Dr. Wicker comparing Motorola code to source code on Hytera's SVN); Dkt. 900-17 (Ex. 10) (PTX-531) and Dkt. 900-18 (Ex. 11) (PTX-571) (Motorola "Neo" document sent to Hytera engineers in 2008); Dkt. 900-19 (Ex. 12) (PTX-843) (2013 email sending same document to Hytera engineers); Dkt. 900-20 (Ex. 13) (PTX-530) (same document sent to Hytera engineers in 2016).

ongoing use of Motorola's trade secrets and copyrighted source code leaves open the possibility that Motorola will never be able to truly know of, let alone quantify, the full extent of Hytera's theft of its trade secrets and copyrighted code.[17]

Hytera does not dispute these facts, but nonetheless contends that monetary damages are adequate compensation for its theft. For example, Hytera contends the jury's award of damages through June 30, 2019, should be interpreted as a "perpetual license" that precludes an injunction. Dkt. 908 at 2–4. The jury was not instructed on a reasonable royalty by agreement of the parties, and with no evidence and no instruction, the jury could not, and did not, award a fully-paid up license. Dkt. 936 at 4-7. Hytera also claims that Motorola has been fully compensated because the time Hytera needs to independently develop Motorola's trade secrets has supposedly elapsed. Dkt. 908 at 3–4. Motorola, however, presented evidence that Hytera could not develop a comparable DMR radio in any commercially reasonable time; indeed, to this day, Hytera *still* has not been able to develop a "comparable" DMR radio on its own.[18] As a result, even if Hytera could develop a comparable DMR radio in a certain period of time, that would be years from now, with lower levels of sales than it has today.[19]

---

[17] *Am. Family Mut. Ins. Co. v. Roth*, No. 05 C 3839, 2005 WL 3700232, at *26-27 (N.D. Ill. Aug. 5, 2005) (issuing injunction where defendants "have already used the [trade secrets] in attempt to take business away from plaintiff" and "the genie is not only out of the bottle, . . . but in the employ of the wrongdoers"), *report and recommendation adopted*, No. 05 C 3839, 2006 WL 2192004 (N.D. Ill. July 27, 2006).

[18] Dkt. 935-3 (Ex. 36) (summary slide of Dr. Rangan's opinions, including that "Hytera Could Not Conceive Of Or Develop The Trade Secrets In A Commercially Reasonable Time") and Trial Tr. at 1823:10-13 (testimony re same); Trial Tr. at 1950:21-1951:7 (Dr. Rangan: because Hytera is still using Motorola's trade secrets "almost ten years" after Hytera's first DMR product release, "it would take at least ten years of time for them to develop these asserted trade secrets.").

[19] Trial Tr. at 2016:22–2017:3 (Dr. Rangan: to develop the DSP source code trade secret and repeater, it would take 23.5 years); *id.* at 5375:2-5377:9 (Malackowski: in the DMR market, "you build sales over time because you work with your customers to ramp up their need across their entire business. So you can't come in years later and pick up where you otherwise would have been."); *id.* at 5375:2-5377:9 (Malackowski: had Hytera "entered the market in 2014, there are a lot of other companies who are now in the business. [I]t would make no sense they could have obtained all the sales they actually did with the benefit of having started several years earlier."), 4880:19-4881:9 (Dr. Aron: a late entrant to the market

##### 2. **Motorola Will Continue to Suffer Irreparable Reputational Harm**

Allowing Hytera to continue using Motorola's trade secrets and source code will also irreparably harm Motorola's reputation as an innovator. When Hytera launched the Accused Products that were built using stolen source code and technical information, it was ***Hytera*** that touted itself and its Accused Products as "innovative."[20] But as Motorola's expert Mr. Malackowski explained, Hytera is "not competing that they're just as good at or comparable to. They're actually saying they're better [than Motorola]."[21] This is another type of irreparable harm that injunctive relief protects against. *See, e.g., Dulisse v. Park Int'l Corp.*, No. 97 C 8018, 1998 WL 25158, at *4 (N.D. Ill. Jan. 9, 1998) (finding plaintiff "will suffer irreparable harm to its reputation and good will if K & M is allowed to pass off Park products as its own"). Moreover, Hytera can, and has, used the money it saved by stealing Motorola's trade secrets "not to catch up, but to actually try to get ahead," such that Motorola will "have to confront something that they didn't have the resources to develop themselves," including on products beyond Hytera's mid- and high-tier radios.[22] Thus, Motorola is not only competing against its own technology, but against the advancements Hytera has been able to make through its ill-gotten gains from selling the Accused Products, resulting in Motorola losing its reputation as a market leader for innovation of two-way digital radios. A permanent injunction is the only way to ensure no further harm of that nature. *StrikePoint Trading, LLC v. Sabolyk*, No. SACV071073, 2009 WL 10659684, at *5 (C.D.

---

"may lose more sales if the late or delayed entry would have affected its ability to build its demand up.").

[20] Dkt. 900-21 (Ex. 14) (PTX-0005) at 1-2.

[21] Trial Tr. at 2170:22-2171:5, Dkt. 900-21 (Ex. 14) (PTX-0005) at 5.1.

[22] Trial Tr. 2157:12019; *id.* at 723:21-724:5 (Corretjer: competitor with access to source code and technical documents would have Motorola's "playbook … for how we do things," and that "they could work on other stuff to basically leapfrog us[.] And that would be very harmful to Motorola"); *id.* at 4852:13-4854:6 (Dr. Aron: "once Hytera introduced its DMR products in March of 2010, research and development didn't stop. [T]hey kept customizing the[ir] products … for their customer base."); *id.* at 3328:15–3332:4; Ex. 11.

Cal. Aug. 18, 2009) (granting permanent injunction because "loss of business and customer goodwill … is difficult to quantify"); *Douglas Dynamics, LLC v. Buyers Prod. Co.,* 717 F.3d 1336, 1344-45 (Fed. Cir. 2013) (entering permanent injunction and holding that "[plaintiff's] reputation as an innovator will certainly be damaged if customers found the same 'innovations' appearing in competitors' snowplows"); *cf. Comput. Assocs. Int'l v. Quest Software, Inc.*, 333 F. Supp. 2d 688, 701 (N.D. Ill. 2004) (finding irreparable harm where CA "expended significant resources" in developing software, and it "would be nearly impossible to determine the dollar value" of the "head start" received by stealing CA's intellectual property).

Hytera has further harmed Motorola's reputation by repeatedly misrepresenting this lawsuit to its DMR customers and trying to use it to cast a shadow over the innovative nature of Motorola and its MotoTRBO products. Hytera has told customers that "MSI has resorted to the tactic of trying to fight Hytera through litigation …to unfairly maintain high prices and margins to the detriment of radio users and dealers in the US."[23] Over a year after this case was filed, Hytera also issued a press release—which it sent to Motorola's dealers—alleging Motorola was "***trying to strangle competition with series of sham litigations***."[24] These press releases misrepresent Motorola's litigations against Hytera. Motorola has succeeded in every forum in which it has challenged Hytera's infringement or theft of its intellectual property, whether in this Court, the U.S. International Trade Commission (which issued an exclusion order), or Germany (which issued an injunction, exclusion order, and recalled infringing products) (Ex. 3). It is impossible to quantify the harm that such statements have caused to Motorola's reputation among those

---

[23] Dkt. 900-22 (Ex. 15) (2017 Hytera press releases); Dkt. 900-23 (Ex. 16) (PTX-2101) (Hytera form letter to dealers); *see also* Trial Tr. 3534:7-15.

[24] *See, e.g.*, Dkt. 900-24 (Ex. 17) (MetroCom-1973-00000067); *see also* Trial Tr. at 3532:9-3534:15; Dkt. 900-25 (Ex. 18) (PTX-2277).

MSA0346

customers, and how it will impact Motorola's reputation as an innovator if Hytera is permitted to continue its willful and malicious conduct going forward. *Douglas Dynamics,* 717 F.3d at 1344-45 (entering permanent injunction based on damage to plaintiff's reputation); *RMH Tech LLC v. PMC Indus., Inc.*, 352 F. Supp. 3d 164, 201 (D. Conn. 2018) (same); *Molex, Inc. v. Nolen*, 759 F.2d 474, 478 (5th Cir. 1985) ("irreparable harm may be shown in customer theft situations").

## C. The Balance of Harm Weighs Decidedly In Favor Of Enjoining Hytera

As explained above, Motorola will be severely and irreparably harmed if Hytera is not permanently enjoined from continuing to use Motorola's trade secrets and copyrighted source code. In contrast, Hytera has not identified, and will not suffer, any legally-cognizable harm from being prohibited from using the source code and other trade secrets that it maliciously stole. Hytera has argued in opposing Motorola's motion for a TRO or preliminary injunction that its business, or that of its customers, may be undermined as a result of that relief. *See* Dkt. 908 at 6-9; Dkt. 912 at 1-3, 8-12. This argument fares no better in the context of a permanent injunction because Hytera has "no equitable standing to complain of being deprived of the use of information … it had no right to use and appropriate in the first instance." *ISC-Bunker Ramo Corp. v. Altech, Inc.*, 765 F. Supp. 1310, 1335 (N.D. Ill. 1990); *see also Wal-Mart*, 2017 WL 3206942, at *2 ("[P]er the jury's verdict, [the defendant] has only itself to blame for whatever hardships an injunction may cause it."); "Where[, as here,] the injunctive relief sought primarily focuses on prohibiting a defendant from using information he should not have taken in the first place, the balance of harms weighs heavily in favor of granting an injunction." *Vendavo,* 397 F. Supp. 3d at 1145.

## D. The Public Interest Strongly Favors Enjoining Hytera's Unlawful Conduct

The public interest also provides no basis for allowing Hytera to continue to profit off of selling Motorola's stolen technology, at the expense of Motorola's business and employees. Now, perhaps more than ever, the public has no interest in "rewarding theft, and encouraging unethical

business behavior." *IDS*, 958 F. Supp. at 1282. Trade secrets law serves to protect "standards of commercial morality" and "encourage [ ] invention and innovation" while maintaining "the public interest in having free and open competition in the manufacture and sale of unpatented goods." *PepsiCo Inc. v. Redmond*, 54 F.3d 1262, 1268 (7th Cir. 1995); *see also Mazak Optonics Corp. v. Marlette*, No. 17 C 1023, 2017 WL 3394727, at *3 (N.D. Ill. Aug. 8, 2017) ("The public interest is supported by upholding the sanctity of confidential information such as trade secrets."). Hytera's own executives have recognized the economic harm the public will suffer if companies are allowed to misappropriate others' trade secrets and infringe their copyrights.[25]

Hytera, however, claims that an injunction would result in a "one-player market" (Dkt. 908 at 6), and that exclusion of its stolen products from the market may raise prices.[26] Hytera's "one-player market" scenario contradicts Hytera's position at trial and public statements, which tout the existence and benefits of other DMR manufacturers.[27] *See, e.g.*, Trial Tr. at 4935:24-4936:1 (Dr. Aron: "the MOTOTRBO radios do not compete in fact in a two-supplier market"); Dkt. 935-4 (Ex. 37). Moreover, Hytera's contention that prices "may" go up is premised on a 1% increase in Motorola's market share. Ex. 4 (Dr. Aron's calculation showing hypothetical increase of Motorola's market share from ▮▮▮▮▮▮▮). This speculative "what if" not close to sufficient to deny injunctive relief and to allow Hytera to continue selling stolen technology. The far greater risk to the public interest is that if thieves are permitted to continue profiting from their theft,

---

[25] *See* Dkt. 766-8 at 71:15-19, 74:10-14.

[26] Trial Tr. at 4919:17-4920:22.

[27] Trial Tr. at 2024:1-11 (Hytera's counsel: other than Motorola and Hytera, "there are a number of DMR manufacturers on the market today," including Kenwood, ICOM, Tait, and Simoco); *id.* at 672:18-673:14 (similar); *id.* at 5741:4-18 (similar); *id.* at 3409:17-22 (similar); *id.* at 5047:15-5048:16, 5053:18-25, and Dkt. 936-11 (Ex. 39) at 9 (Dr. Aron: there were "many more entrants" to the DMR market by 2014, and showing a slide with 20 DMR manufacturers as of 2014).

MSA0348

companies will be discouraged from investing in innovations that benefit consumers and the world generally—like Motorola did when developing its DMR technology.[28] *Rockwell Graphic Sys., Inc. v. DEV Indus., Inc.*, No. 84 C 6746, 1993 WL 286484, at *2–3 (N.D. Ill July 29, 1993) ("[i]f no injunctive relief is granted, the … wrongdoing competitor would be unpunished and would retain the benefit of a head start advantage over legitimate competitors."); *see also Atari, Inc. v. JS & A Grp., Inc.*, 597 F. Supp. 5, 10 (N.D. Ill. 1983) ("public interest in … protection of … copyrights is the reward and encouragement of creative expression").

Moreover, Motorola is capable of satisfying demand for new Motorola DMR products and systems caused by entry of a permanent injunction, such that nothing about enjoining Hytera's stolen products or the current global pandemic provides any reasonable basis for allowing Hytera to continue to profit off of selling stolen technologies. First, Motorola's and Hytera's DMR products are interoperable (as are those of other DMR manufacturers), and Motorola's products are more-than-adequate substitutes for any of Hytera's customers' needs, including any public safety, health care, or similar customers.[29]  In fact, Hytera admits its radios are interoperable with Motorola's, but points to a handful of purportedly Hytera-specific features to argue that customers should have these "attractive features" available to them. Dkt. 914 at 2–3. Hytera built these features using technology it stole from Motorola, Motorola's radios include comparable (if not superior) features, and Hytera does not identify any customer that "critically" requires these "attractive features" to meet critical needs. Dkt. 936 at 10–11

---

[28] *See, e.g.*, Dkt. 900-28 (Ex. 21) (PTX-2416 at 11 (positive correlation between "increased stringency of [trade secrets] protection to indicators of economic performance"); *see also* Dkt. 900-29 (Ex. 22) (PTX-2412 at 10 ("Investment and innovation are the engines that fuel a country's economic growth and productivity performance")); Dkt. 900-30 (Ex. 23); Dkt. 900-31 (Ex. 24).

[29] Trial Tr. at 154:25-155:20 (Lund: "standards are put in place usually to help the end customers," including public safety customers like police, by providing the ability to use interoperable radios where "the base common denominator is they can interoperate with each other").

Second, Motorola is an essential business that remains open during the COVID-19 pandemic. Ex. 5 (Lund Decl.) ¶ 4. Motorola has implemented companywide strategies to ensure that it can continue to supports its customers, such as providing round-the-clock support for operational, troubleshooting, and other support. *Id.* ¶ 5. Motorola has also taken steps to ensure that its supply chain and manufacturing remains intact. For example, Motorola is working with ██ ████████████████████ so that it maintains operations and Motorola can meet demand for MotoTRBO products. *Id.* ¶ 6. Many of Motorola's suppliers are also designated or are in the process of being designated as essential, and Motorola currently has the inventory necessary to meet customer demand for MotoTRBO. *Id.* Motorola would be able to ████████████████ ████████████████████████████████████████ ████████████████████████████████████████ *Id.* ¶ 7; Ex. 6 (Dkt. 936-1) ¶ 4. And, as Hytera repeatedly asserted during trial, there are many other DMR radio suppliers; like Motorola, these suppliers continue to serve their customers and have implemented strategies to do so in light of the current pandemic. Exs. 7-8.

Third, Hytera's argument that an injunction would harm the public safety industry is unsupported. Dkt. 908 at 6–7; *see also* Dkt. 914 at 2, 11, 12. Indeed, the U.S. government concluded the opposite: it banned government agencies from contracting to procure Hytera's telecommunications equipment, including two-way radios, "***[f]or the purpose of public safety***[.]" 132 Stat. 1917, §§ 889(a), (f)(3)(B). While customers may be inconvenienced any time a product is removed from the market, that does not come close to outweighing the significant detrimental effects on the public of inhibiting innovation by allowing those who disregard intellectual property laws to go on profiting from their thefts. *See Douglas Dynamics*, 717 F.3d at 1346.

### E. A Worldwide Injunction Is Appropriate and Necessary

Based on the above, Motorola respectfully requests that the Court enter a worldwide

MSA0350

injunction enjoining Hytera's conduct. A worldwide injunction is appropriate in this case. Courts routinely granted worldwide injunctions in trade secret and other intellectual property cases. *See, e.g., OmniGen Research, LLC v. Yongqiang Wang*, No. 6:16-CV-268-MC, 2017 WL 5505041, at *24 (D. Or. Nov. 16, 2017) (worldwide injunction "appropriate and necessary" where "Defendants' wrongful actions have included conduct occurring in China"); *Richard Feiner & Co. v. Turner Entm't Co.*, No. 96 CIV 1472, 1998 WL 78180, at *1–3 (S.D.N.Y. Feb. 24, 1998) (issuing worldwide injunction in copyright infringement case); *see also* Dkt. 901 at 3 n.7 (collecting cases). The activities in those cases are no different than here, where Hytera stole Motorola's trade secrets and copyrighted code and used them to enrich itself from sales of products using that stolen intellectual property around the world. Second, the DTSA applies "outside the United States" if any "act in furtherance of the offense was committed in the United States" (18 U.S.C. § 1837; Dkt. 834), and the Copyright Act's predicate act doctrine supports application of that statute to infringing conduct outside the United States. Dkt. 834 at 21–23; Dkt. 936 at 14. Because Hytera's illegal conduct has continued unabated around the world—and will continue absent an injunction reaching its sales abroad—a worldwide injunction should issue.

**F.      If a Permanent Injunction Is Not Entered, Motorola Should Be Awarded an Ongoing Royalty for Hytera's Continued Misappropriation**

No "exceptional circumstances that render an injunction inequitable" exist here, and, for the reasons explained above, a permanent injunction should enter. 18 U.S.C. § 1836(b)(3)(A)(iii). If, however, the Court disagrees, Motorola respectfully requests that Hytera's "future use of the trade secret" be "condition[ed] … upon payment of a reasonable royalty[.]"[30]  Hytera should not

---

[30] 18 U.S.C. § 1836(b)(3)(A)(iii); 765 ILCS 1065/3 (similar).  The Copyright Act similarly permits courts to award post-verdict relief other than an injunction. *See Petrella v. Metro-Goldwyn-Mayer, Inc.*, 572 U.S. 663, 687 (2014) (explaining section 502(a) on injunctive relief allows court to consider whether "injunctive relief or profits" should be adjusted, including whether to award ongoing royalty for continued use).

be permitted to continue selling products it made based on, and/or that contain or are otherwise derived from, Motorola's trade secrets and copyrighted source code in the first place, but in no circumstance should Hytera be permitted to do so freely. *Bianco v. Globus Med., Inc.*, No. 12-CV-00147, 2014 WL 1049067, at *12 (E.D. Tex. Mar. 17, 2014) (awarding ongoing royalty for continued trade-secret misappropriation) (Bryson, J., sitting by designation). In patent cases where infringement is willful and an injunction is not awarded, courts typically award an ongoing royalty that accounts for continued, willful infringement.[31] Here, the jury found that Hytera's misappropriation was not only willful, but willful and malicious, awarding the maximum amount of punitive damages permitted. Ex. 9. Hytera therefore knows the price of its misappropriation but has nevertheless decided to continue with its willful and malicious actions.[32] Thus, consistent with Hytera's actions and the jury's verdict, if an injunction is not entered, an ongoing royalty in the amount of ▮▮▮▮ per device should be awarded, which accounts for (i) the ▮▮▮▮ average profit made by Hytera selling the Accused Products, and (ii) a ▮▮▮▮ component to account for the willful and malicious nature of ongoing sales despite the jury's verdict. Ex. 10, Table E.

## III.    CONCLUSION

For the foregoing reasons, Motorola requests that the Court enter a permanent injunction, the terms of which are set forth in the accompanying [Proposed] Permanent Injunction Order.

---

[31] *See, e.g.*, *Imperium IP Holdings (Cayman), Ltd. v. Samsung Elecs. Co.*, No. 4:14-CV-371, 2017 WL 4038884, at *3 (E.D. Tex. Sept. 13, 2017) (enhancing damages where "[d]efendants' continued infringement [is] unreasonable, deliberate and willful in nature"); *Telcordia Techs., Inc. v. Cisco Sys., Inc.*, No. CV 04-876, 2014 WL 1457797, at *4 (D. Del. Apr. 14, 2014) ("courts frequently impose a post-verdict ongoing royalty rate that is higher than [damages for] past infringement."); *Mondis Tech. Ltd. v. Chimei InnoLux Corp.*, 822 F. Supp. 2d 639, 653 (E.D. Tex. 2011) ("the [] reasonable royalty rate … should be doubled … due to willfulness"), *aff'd* 530 F. App'x 959 (Fed. Cir. 2013).

[32] In this way, the circumstances of *Bianco* are different. The court declined to enhance the ongoing royalty because the Court granted judgment as a matter of law that the misappropriation was not willful or malicious. *Bianco v. Globus Med., Inc.*, 53 F. Supp. 3d 929, 937 (E.D. Tex. 2014).

MSA0352

DATED: April 2, 2020

Respectfully submitted,

*/s/ Michael W. De Vries*

Adam Alper (*admitted pro hac vice*)
adam.alper@kirkland.com
Akshay S. Deoras (*admitted pro hac vice)*
akshay.deoras@kirkland.com
Brandon H. Brown (IL Bar No. 266347 CA)
brandon.brown@kirkland.com
Barbara Barath (*admitted pro hac vice*)
barbara.barath@kirkland.com
Reza Dokhanchy (*admitted pro hac vice*)
reza.dokhanchy@kirkland.com
KIRKLAND & ELLIS LLP
555 California Street
San Francisco, CA 94104
Telephone: (415) 439-1400
Facsimile: (415) 439-1500

Michael W. De Vries (*admitted pro hac vice*)
michael.devries@kirkland.com
Christopher Lawless (*admitted pro hac vice*)
christopher.lawless@kirkland.com
Justin Singh (*admitted pro hac vice*)
justin.singh@kirkland.com
Ali-Reza Boloori (*admitted pro hac vice)*
ali-reza.boloori@kirkland.com
Benjamin A. Herbert *(admitted pro hac vice)*
benjamin.herbert@kirkland.com
KIRKLAND & ELLIS LLP
555 South Flower Street
Los Angeles, CA 90071
Telephone: (213) 680-8400
Facsimile: (213) 680-8500

David Rokach (IL SBN: 6279703)
david.rokach@kirkland.com
Megan M. New (IL SBN 6300422)
megan.new@kirkland.com
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, IL 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200

16

Leslie M. Schmidt (*admitted pro hac vice*)
leslie.schmidt@kirkland.com
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900

Attorneys for Plaintiffs
*Motorola Solutions, Inc. and Motorola
Solutions Malaysia SDN. BHD.*

17

**CERTIFICATE OF SERVICE**

I, Michael W. De Vries, an attorney, hereby certify that on April 2, 2020, I caused a true and correct copy of the foregoing document to be served via the Court's ECF system upon all counsel of record.


DATED: April 2, 2020

/s/ *Michael W. De Vries*
Michael W. De Vries

MSA0355

**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| MOTOROLA SOLUTIONS, INC., and MOTOROLA SOLUTIONS MALAYSIA SDN. BHD. | ) ) ) | |
| | ) | Case No. 1:17-CV-01973 |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Honorable Charles R. Norgle Sr. |
| | ) | |
| HYTERA COMMUNICATIONS CORPORATION LTD., HYTERA AMERICA, INC., and HYTERA COMMUNICATIONS AMERICA (WEST), INC. | ) ) ) ) ) | |
| | ) | |
| Defendants. | ) | |
| | ) ) | |

**OPPOSITION TO PLAINTIFFS' MOTION
FOR A PERMANENT INJUNCTION**

MSA0356

# Table of Contents

INTRODUCTION ..................................................................................................................1

ARGUMENT .......................................................................................................................2

I.      Motorola has not shown actual success on the 21 trade secrets and 4 copyrights...............2

II.     An injunction is inequitable on this record .........................................................................5

        A.      Motorola has not shown that it will suffer irreparable harm .................................. 5

        B.      The balance of hardships favors Hytera................................................................ 10

        C.      An injunction is contrary to the public interest...................................................... 11

III.    Motorola's proposed injunction is inconsistent with Rule 65(d)......................................16

IV.    A reasonable royalty would be more equitable than an injunction....................................21

V.     Any injunction should be limited to the United States .......................................................22

VI.    The issuance of a permanent injunction is foreclosed by laches ......................................24

CONCLUSION .....................................................................................................................25

MSA0357

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Abbott Labs. v. Andrx Pharm., Inc.*,
    452 F.3d 1331 (Fed. Cir. 2006)....................................................................................6

*Allied Erecting & Dismantling Co. v. Genesis & Mfg*,
    No. 4:06CV114, 2010 WL 3370286 (N.D. Ohio Aug. 26, 2010), *aff'd in*
    *relevant part*, 511 F. App'x 398 (6th Cir. 2013) ......................................................2

*Am. Can Co. v. Mansukhani*,
    742 F.2d 314 (7th Cir. 1984) ..............................................................3, 4, 17, 19, 20

*Apple Inc. v. Samsung Electronics Co*,
    695 F.3d 1370 (Fed. Cir. 2012)..........................................................................8, 9, 10

*Apple Inc. v. Samsung Electronics Co.*,
    735 F.3d 1352 (Fed. Cir. 2013)....................................................................................8, 11

*Apple, Inc. v. Samsung Electronics Co.*,
    678 F.3d 1314 (Fed. Cir. 2012)....................................................................................8

*Avery Dennison Corp. v. Four Pillars Enter. Co.*,
    45 F. App'x 479 (6th Cir. 2002) ..................................................................................2

*Binney & Smith v. Rose Art Indus., Inc.*,
    No. 94 C 6882, 1995 WL 103532 (N.D. Ill. Mar. 3, 1995) ......................................6

*CardiAQ Valve Techs., Inc. v. Neovasc Inc.*,
    Civ. A. No. 14-cv-12405-ADB, 2016 WL 6465411 (D. Mass. Oct. 31, 2016),
    *aff'd*, 708 F. App'x 654 (Fed. Cir. 2017)...................................................................11

*Chi. Bd. of Educ. v. Substance*,
    345 F.3d 624 (7th Cir. 2003) ......................................................................................3

*E.W. Bliss Co. v. Struthers-Dunn*,
    408 F.2d 1108 (8th Cir. 1969) ..................................................................................17

*eBay Inc. v. MercExchange, L.L.C.*,
    547 U.S. 388 (2006)...................................................................................1, 2, 5, 10, 11

*Faiveley Transp. Malmo AB v. Wabtec Corp.*,
    559 F.3d 110 (2d Cir. 2009)........................................................................................5

i

MSA0358

*First W. Capital Mgmt. Co. v. Malamed*,
874 F.3d 1136 (10th Cir. 2017) ......................................................................6, 25

*Flava Works, Inc. v. Gunter*,
689 F.3d 754 (7th Cir. 2012) ...............................................................................5

*H.K. Porter Co. v. Nat'l Friction Prods. Corp.*,
568 F.2d 24 (7th Cir. 1977) ............................................................................1, 16

*Hot Wax, Inc. v. Turtle Wax, Inc.*,
191 F.3d 813 (7th Cir. 1999) .........................................................................24, 25

*I-Flow Corp. v. Apex Medical Techs., Inc.*,
No. 07cv1200 DMS (NLS), 2010 WL 141402 (S.D. Cal. Jan. 8, 2010) .................................3

*IDX Sys. Corp. v. Epic Sys. Corp.*,
285 F.3d 581 (7th Cir. 2002) .............................................................................18

*LAJIM, LLC v. Gen. Elec. Co.*,
917 F.3d 933 (7th Cir. 2019) ...............................................................................5

*Machlett Labs., Inc. v. Techny Indus., Inc.*,
665 F.2d 795 (7th Cir. 1981) ..............................................................................15

*McDavid Knee Guard, Inc. v. Nike USA, Inc.*,
2 No. 08 CV 6584, 010 WL 151999 (N.D. Ill. Jan. 14, 2010).....................................6

*Minn. Mining & Mfg. Co. v. Pribyl*,
259 F.3d 587 (7th Cir. 2001) .........................................................................11, 20

*New Era Pubs. Int'l v. Henry Holt & Co.*,
873 F.2d 576 (2d Cir. 1989)...............................................................................24

*Nichia Corp. v. Eberlight Ams. Ins.*,
855 F.3d 1328 (Fed. Cir. 2017)............................................................................5

*Okaw Drainage Dist. of Champaign & Douglas Cty., Ill. v. Nat'l Distillers & Chem. Corp.*,
882 F.2d 1241 (7th Cir. 1989) ...........................................................................11

*Pampered Chef v. Alexanian*,
804 F. Supp. 2d 765 (N.D. Ill. 2011) ....................................................................6

*Petrella v. Metro-Goldwyn-Mayer, Inc.*,
572 U.S. 663 (2014)....................................................................................24, 25

*PMC, Inc. v. Sherwin-Williams Co.*,
151 F.3d 610 (7th Cir. 1998) ...........................................................................4, 16

ii

*Pruitt v. Chicago*,
   472 F.3d 925 (7th Cir. 2006) ............................................................................25

*Republic Aviation Corp. v. Schenk*,
   152 U.S.P.Q. 830 (N.Y. Sup. Ct. 1967)............................................................12

*Robertson Transformer Co. v. Gen. Electric Co.*,
   191 F. Supp. 3d 826 (N.D. Ill. 2016) ................................................................25

*Roton Barrier, Inc. v. Stanley Works*,
   79 F.3d 1112 (Fed. Cir. 1996)...........................................................................18

*Saban v. Caremark Rx, LLC*,
   780 F. Supp. 2d 700 (N.D. Ill. 2011) (Chang, J.) .............................................11

*SAS Inst., Inc. v. World Programming Ltd.*,
   874 F.3d 370 (4th Cir. 2017) ............................................................................11

*Schmidt v. Lessard*,
   414 U.S. 473 (1974)...........................................................................................17

*Sheldon v. Metro-Goldwyn*,
   106 F.2d 45 (2d Cir. 1939).................................................................................23

**Statutes**

11 U.S.C. § 362(a) ......................................................................................................1

18 U.S.C. § 1836(b)(3)(A)(iii)..................................................................................21

18 U.S.C. § 1837........................................................................................................23

**Federal Rules**

Fed. R. Civ. P. 65(d) ...............................................................................16, 17, 18, 19, 20

**Other Authorities**

4 Neville B. Nimmer & David Nimmer, *Nimmer on Copyright* § 14.06[C][2][a][i]
   (2019)..................................................................................................................24

iii

## INTRODUCTION

Motorola seeks a permanent injunction under Rule 65 to take Hytera's digital mobile radio products off the worldwide market.[1]  The proposed injunction goes beyond the jury's liability finding and seeks to enjoin conduct not even at issue (much less adjudicated) in this case.  "Rule 65(d) is no mere extract from a manual of procedural practice.  It is a page from the book of liberty."  *H.K. Porter Co. v. Nat'l Friction Prods. Corp.*, 568 F.2d 24, 27 (7th Cir. 1977).  The motion should be denied.

First, Motorola has not shown actual success on its asserted 21 trade secrets and 4 copyright claims.  Motorola made a tactical decision to push for a general verdict form, which allowed a jury liability finding without specifying which trade secrets were misappropriated or how many.  As a result, the court and parties are unable to determine which trade secrets the jury had relied on in making their liability finding.  The same is true for the copyright claims.  Because a permanent injunction must track adjudicated wrongdoing only, and the jury did not identify which alleged secrets or copyright claims formed the basis for their adjudication, no injunction is proper here.

Second, Motorola has not established the prerequisites for injunctive relief reiterated in *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 393-94 (2006).  Motorola has not shown irreparable harm and, as Dr. Aron explains, its own data undermines such a claim.  (Ex. 1 ¶¶ 35-52.)  The public interest is also disserved by an injunction.  As detailed in the attached declarations, such an injunction would have a devastating impact on innocent third parties including a number of foreign governmental agencies, public-safety entities, and public utilities around the world.  (Exs. 1, 3, 4, 5, 6, 7, 8, 9, 10, 11.)  These third parties have not only purchased individual Hytera

---

[1] Unless otherwise indicated, all references herein to "Hytera" are to defendant Hytera Communications Corporation Ltd.  The other two defendants—Hytera Communications America (West), Inc. and Hytera America, Inc.—filed for Chapter 11 bankruptcy and thus are subject to the automatic stay.  *See* 11 U.S.C. § 362(a).

1

radios but have also invested in entire infrastructure systems. These systems have Hytera-proprietary features and Hytera-customized functions that are not interoperable with Motorola DMR radios. Motorola's shutdown injunction would force existing Hytera DMR users to replace their entire infrastructure systems—an expensive and lengthy process. The remaining *eBay* factors also preclude an injunction.

Third, Motorola's injunction is inconsistent with Rule 65. It defines trade secret information as any confidential information derived in part from Motorola confidential technical documentation, going beyond the alleged 21 secrets at issue and encompassing information that does not even meet the definition of a trade secret. In addition, it would enjoin Hytera products that are not substantially derived from any of the alleged trade secrets at issue here. The Seventh Circuit has vacated intellectual property injunctions similar to that proposed by Motorola. For these and other reasons explained below, the injunction request should be denied.

**ARGUMENT**

## I.    Motorola has not shown actual success on the 21 trade secrets and 4 copyrights

There is no basis on this record for an injunction—much less the sweeping injunction sought by Motorola. As Motorola acknowledges (Br. 2), in deciding whether to enter a permanent injunction, courts first consider whether the plaintiff has actually succeeded on the merits of the specific claim for which injunctive relief is sought. While the jury returned a verdict in Motorola's favor, the jury entered a general verdict. The verdict form—adopted at Motorola's insistence—shows only that the jury found at least one trade secret had been misappropriated and one copyright infringed; the jury did not say how many or specify which one. Dkts. 898, 948.

Courts deny permanent injunction requests where, as here, they are "unable to determine which trade secrets the jury had relied on in making their findings." *Avery Dennison Corp. v. Four Pillars Enter. Co.*, 45 F. App'x 479, 487 n.2 (6th Cir. 2002); *Allied Erecting & Dismantling Co.*

2

MSA0362

*v. Genesis & Mfg,* No. 4:06CV114, 2010 WL 3370286, at *1 (N.D. Ohio Aug. 26, 2010), *aff'd in relevant part*, 511 F. App'x 398 (6th Cir. 2013); *I-Flow Corp. v. Apex Medical Techs., Inc.,* No. 07cv1200 DMS (NLS), 2010 WL 141402, at *3 (S.D. Cal. Jan. 8, 2010). An injunction must track adjudicated wrongdoing only. *See Am. Can Co. v. Mansukhani*, 742 F.2d 314, 329 (7th Cir. 1984) ("The primary purpose of trade secret law is to encourage innovation and development, and the law should not be used to suppress legitimate competition.").

Motorola incorrectly argues (Br. 3) that the Court can infer from the size of the damages award that the jury found misappropriation on all 21 trade secrets. At trial, Motorola presented its damages figures based on development periods, with the longest development period being capped at 108 months, or nine years. *See* Tr. 2199:19-21 (describing PDX 10.30 and PDX-10.31). Because the jury awarded Motorola nine years of disgorged profits, the most that can be inferred from the damages award is that the jury found Hytera had misappropriated one of these nine-years-to-develop trade secrets. *See* Dkt. 907-5, PDX 10.30 (identifying DMR Source Code, DSP Source Code, and Repeaters as trade secrets that would take 9 years to develop). Thus, for example, the jury may have concluded that Hytera misappropriated the DSP Source Code (TS 137) but that the other alleged secrets at issue were not trade secrets at all. The only permissible reading of the general verdict is that the jury found Hytera had misappropriated one of three trade secrets that would have taken nine years for Hytera to develop. Beyond this, the jury did not identify, and the Court cannot determine, which trade secrets formed the basis for the damages award.[2]

Motorola cannot obtain a permanent injunction that reaches lawful conduct or conduct not adjudicated. *See Chi. Bd. of Educ. v. Substance*, 345 F.3d 624, 632 (7th Cir. 2003); *Am. Can*, 742

---

[2] By pressing for the general verdict form, this is a problem of Motorola's own doing. Hytera's proposed verdict form would have required the jury to specifically identify the basis for its verdict as to each trade secret and copyright claim. (Tr. 5563-65.)

3

F.2d at 329-32. Because the jury's verdict is not specific, the Court cannot grant an injunction covering all 21 supposed trade secrets. The Court would need to make findings that each one of the 21 claimed trade secrets is, in fact, a valid trade secret and that it has been misappropriated and used in Hytera's accused products. Motorola, which bears the burden of establishing its entitlement to the injunction it seeks, does not ask this Court to make these findings now. Nor does Motorola provide support for such findings. It would be too late for Motorola to try to meet this burden in its reply.

Moreover, as we explain below in our objections to the scope of the proposed injunction (Section III), Hytera is entitled to receive explicit notice of what conduct is being enjoined. That requires precisely defining the metes and bounds of any alleged trade secrets that Hytera is to be enjoined from using. *Am. Can*, 742 F.2d at 332-33. That was not done at trial. Instead, Motorola's witnesses testified that the asserted trade secrets are directed to Motorola's specific implementation of well-known radio features (e.g., VOX, Squelch) and well-known software architecture techniques (e.g., abstraction layers).[3] They pointed to technical documentation and source code as evidence of Motorola's implementations, but conceded those materials also contain non-secret information (e.g., third-party code and patented information).[4] The wheat was never separate from the chafe.[5] To issue an injunction, the Court would need to do that work. *See PMC,*

---

[3] *E.g.*, Tr. 879:18–23 ("What we are asserting is our unique approach [to VOX]."); Tr. 885:15–17 (referencing a "high- and low-level design of" the DMR protocol stack); Tr. 1316:1–7 (claiming Motorola's "own particular approach"); *cf* Tr. 657:12–19 ("I described VRIS today in a high level for the jury in this courtroom to understand. We didn't go into the actual details of the VRIS trade secret . . . .").

[4] *E.g.*, Tr. 648:10–14, 650:1–4; Tr. 659:14–21; Tr. 920:25–921:20; Tr. 1642:10–1643:12. Motorola was similarly vague in identifying what in Hytera's code had been influenced by the aspects of Motorola's information that conferred the requisite competitive advantage, as distinct from the aspects that reflected generic, well-known, and easily replicated information.

[5] When asked to identify the "secret sauce" (*i.e.,* what specifically about its implementations confers a competitive advantage due to its secrecy), Motorola witnesses offered hollow puffery:

*Inc. v. Sherwin-Williams Co.*, 151 F.3d 610, 619 (7th Cir. 1998) ("an injunction [must] be precise and self-contained, so that a person subject to it who reads it and nothing else has a sufficiently clear and exact knowledge of the duties it imposes on him that if he violates it he can be adjudged guilty of criminal contempt."). Because the jury's verdict does not support Motorola's broad injunction and Motorola makes no effort to meet its burden for independent findings by the Court, the injunction request should be denied on this basis alone.

## II. An injunction is inequitable on this record

Even if Motorola had established success on the 21 trade secrets and 4 copyright claims, its motion fails under *eBay*. As Motorola acknowledges (Br. 2), it must also satisfy the traditional federal-law test for injunctive relief. *eBay v*, 547 U.S. at 393-94; *LAJIM, LLC v. Gen. Elec. Co.*, 917 F.3d 933, 945 (7th Cir. 2019) ("We reiterate . . . that a permanent injunction does not automatically follow from success on the merits."). If a plaintiff fails to meet just *one* factor of the test, the court must deny the motion. *Nichia Corp. v. Eberlight Ams. Ins.*, 855 F.3d 1328, 1341 (Fed. Cir. 2017). Motorola has not met its heavy burden here.

### A. Motorola has not shown that it will suffer irreparable harm

Motorola wrongly asserts that irreparable harm is *presumed* in trade secret cases. The Supreme Court has rejected any such presumption, explaining that the "plaintiff must demonstrate" all four factors. *eBay*, 547 U.S. at 391; *see also Flava Works, Inc. v. Gunter,* 689 F.3d 754, 755 (7th Cir. 2012) ("the Supreme Court's subsequent opinion in [*eBay*] made clear that there is no such presumption"); *Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir.

---

the technology is "very complicated" (Tr. 1181-82), it is designed "in a unique and innovative way" (*id.*), it "works really well" (Tr. 1187), it is "a high-performance technology" (Tr. 1188). As Professor Wicker acknowledged, "A person who wasn't familiar with communications technology" would not have been able to separate the non-trade secret information embedded in Motorola's materials from the purportedly proprietary information. (Tr. 1652:11–16.).

2009) (district court rulings applying a "presumption of irreparable harm" in trade secret cases are "not correct"). Applying this well-established equity jurisprudence, the Tenth Circuit has squarely held that "DTSA … do[es] not allow a presumption of irreparable harm." *First W. Capital Mgmt. Co. v. Malamed*, 874 F.3d 1136, 1142-44 (10th Cir. 2017).

Motorola thus bears the burden of showing that it will suffer irreparable harm. Motorola's principal argument (Br. 5-7) is that Hytera's sales of the accused products harmed Motorola *financially* by reducing its sales (reduced "market share") and, relatedly, forcing it to lower its prices to compete with Hytera's less costly products. Motorola also asserts (Br. 6-7) potential harm to its reputation. These arguments fail for three independent reasons.

***Lack of irreparability***. These alleged harms can be remedied by monetary damages—and routinely are. *See McDavid Knee Guard, Inc. v. Nike USA, Inc.*, 2 No. 08 CV 6584, 010 WL 151999, at *7-8 (N.D. Ill. Jan. 14, 2010) (loss of market share did not support finding of irreparable harm, because "any such losses could be recovered as money damages"); *Binney & Smith v. Rose Art Indus., Inc.*, No. 94 C 6882, 1995 WL 103532, at *13 (N.D. Ill. Mar. 3, 1995) ("Loss of sales, profits, and market share is traditionally not irreparable harm.").[6] Indeed, economists routinely quantify such harms, as Dr. Aron explains in her declaration. *See* Ex. 1, ¶¶ 11, 18, 23-25, 33. Motorola filed this suit in 2017, yet it waited years before first seeking an injunction in *2020*. It cannot credibly claim that it suffered irreparable harm throughout those three intervening years in light of its decision to pursue *only* monetary relief during that period.

Motorola flatly asserts that it cannot put a dollar amount on Hytera's "ongoing use of Motorola's trade secrets" (Br. 7), but that is the precise purpose of a reasonable royalty or license

---

[6] *See also Abbott Labs. v. Andrx Pharm., Inc.*, 452 F.3d 1331, 1347-48 (Fed. Cir. 2006) ("[W]e do not doubt that generic competition will impact Abbott's sales . . . but that alone does not establish that Abbott's harm will be irreparable."); *Pampered Chef v. Alexanian*, 804 F. Supp. 2d 765, 805-07 (N.D. Ill. 2011) (reputational harm not irreparable).

fee, and Motorola's own expert had no difficulty quantifying the amount of money that Motorola would need to compensate it for Hytera's perpetual use of its product. *See* Dkt. 908 at 2 & n.2. Motorola asked the jury for that very amount, and the jury awarded it. *See id.* Any use of Motorola's alleged intellectual property *can* be quantified in dollar terms and therefore does not constitute irreparable harm.

*Lack of support*. Motorola fails to support the alleged harms. In her declaration, Dr. Aron provides a detailed analysis of Motorola's irreparable harm claim and its multiple flaws. Ex. 1, Aron Decl. ¶¶ 17-20 (loss of market share is not irreparable); *id.* ¶¶ 21-32, 25-53 (price erosion is not irreparable or proven); *id.* ¶¶ 21-29 (reputational harm not shown).

For instance, as Dr. Aron explains, Motorola claims that it will suffer global price erosion but it only cites a small number of anecdotes. *See id.* ¶¶ 35-40. Even the anecdotes offered by Motorola do not demonstrate price erosion due to Hytera's accused products as opposed to other market forces because Motorola fails to disclose or acknowledge other relevant factors—*i.e.*, who else is competing, what the competitive products are, whether the customer had a pre-existing relationship with the competing dealer. *See id.* ¶¶ 40-52, 90. As Dr. Aron explains, Motorola wants to have it both ways: assert price erosion if Hytera stays in the market but denied any claim that Motorola will increase prices if Hytera's products are forced out of the market by an injunction. *See id.* ¶ 89.

Motorola claims irreparable harm in the form of lost market share, yet presents no evidence of its own market share, nor that of its competitors. *See* Lund Decl. ¶ 38 (Dkt. 962, Ex. 1.) Motorola does not acknowledge other relevant factors that contribute to market share, such as competition from other DMR providers and the size of the dealer network in a specific territory. Ex. 1, Aron Decl. ¶ 18, 37, 53, 91. And even though the relevant factors will vary by geographic market, Motorola has not conducted a market analysis for each country or region. *Id.* ¶¶ 95-114;

*see id*. ¶ 114 (summarizing Dr. Aron's market analysis). Motorola's argument on reputational injury (Br. 8-10) is limited to speculative attorney argument, without a shred of actual evidence (such as customer declarations speaking to Hytera's effect on Motorola's reputation). It should be disregarded. Motorola has failed to satisfy its burden of proof.

*Lack of requisite casual nexus*. Even if Motorola could prove that it is losing sales to Hytera, Motorola has still failed to establish the requisite causal nexus between those sales and its alleged intellectual property. "Sales lost to an infringing product cannot be irreparable harm … if customers buy that product for reasons other" than the intellectual property at issue in the litigation. *Apple, Inc. v.napier Samsung Electronics Co.*, 678 F.3d 1314, 1324 (Fed. Cir. 2012); *see also Apple Inc. v. Samsung Electronics Co.*, 735 F.3d 1352, 1363 (Fed. Cir. 2013). Motorola must therefore prove that "the infringing feature drives consumer demand for the accused product." *Apple Inc. v. Samsung Electronics Co*, 695 F.3d 1370, 1374 (Fed. Cir. 2012). Motorola must make this causal showing—which it fails to even acknowledge—separately for each item of intellectual property at issue. *See Apple*, *Inc. v. Samsung Electronics Co.*, 678 F.3d 1314, 1323-28 (Fed. Cir. 2012) (considering separately whether Apple had proved a causal nexus for '381 and D'677 patents).

Here, Motorola seeks an injunction covering 21 trade secrets and the 4 copyrights, but fails to show that the intellectual property drives consumer demand. Motorola opts instead for a blunderbuss approach, making no attempt to distinguish among the asserted intellectual properties or explain how any of them could drive consumer demand. This is insufficient to satisfy Motorola's burden. *Apple*, 735 F.3d at 1363.

In fact, substantial evidence *disproves* a causal nexus. Every DMR system has innumerable features.[7] As explained in the attached declarations, customer demand is driven by Hytera's unique, customized features.[8] Hytera's Simulcast and XPT, for example, expand radio coverage over large areas and maximize capacity across user groups.[9] Hytera has also launched Direct Mode, Repeater Mode, IP Connection, Trunking Lite, and Trunking Pro.[10] Hytera has released approximately ▮ customized DMR software features and also provided a number of unique frequency bands for the DMR products.[11] Hytera has designed many other customized features to respond to specific customer scenarios.[12] Hytera was also first to launch a DMR radio with a color screen, an ultra-thin DMR radio, and a single-frequency DMR radio.[13]

None of the claimed trade secrets at issue here are drivers of consumer demand.[14] At most, the alleged secrets at issue here are generic software features that make updates more efficient and generic features of a DMR radio that all manufacturers have.[15] The presence of these features is insufficient to satisfy Motorola's burden as a matter of law.[16] Just as customers do not buy

---

[7] *See* Ex. 10, Camelo Decl. ¶ 7; Ex. 1, Aron Decl. ¶¶ 124-30.

[8] *See* Ex. 4, Chen Chunsong Decl. ¶ 6; Ex. 7, Wilson Hu Decl. ¶¶ 7, 10, 27, 34, 47; Ex. 10, Camelo Decl. ¶¶ 4, 8, 19, 25; Ex. 3, Grimmett Decl. ¶¶ 7, 126-135.

[9] *See* Ex. 4, Chunsong Decl. ¶¶ 7-8; Grimmett Decl. ¶ 132.

[10] *See* Ex. 4, Chunsong Decl. ¶ 5.

[11] *See* Ex. 4, Chunsong Decl. ¶ 14.

[12] Ex. 4, Chunsong Decl. ¶¶ 12-16; Wilson Hu Decl. ¶¶ 11, 27, 34, 44; Ex. 10, Camelo Decl. ¶¶ 6-13; Ex. 11, Napier Decl. ¶ 14; Ex. 3, Grimmett Decl. ¶¶ 130-31; Ex. 1, Aron Decl. ¶¶ 126-29.

[13] Ex. 4, Chunsong Decl. ¶¶ 24.

[14] *See* Ex. 1, Aron Decl. ¶¶ 122-38; Ex. 3, Grimmett Decl. ¶¶ 15-114 (explaining the lack of a consumer demand drive as to each one of the 21 alleged trade secrets here); Ex. 4, Chungsong Decl. ¶ 26.

[15] *E.g.*, Tr. 3905:20-3906:17, 4333:25-4334:10, 4446:2-4447:12, 4464:7-4465:3, 4470:1-4471:3.

[16] *See Apple*, 695 F.3d at 1376 (explaining that the causal nexus is not satisfied simply because removing the infringing feature will make the device inoperable or less valued, such as a battery or cooling fan in a laptop; rather, plaintiff must show that consumers buy the product because it is

9

Cadillacs because of the type of spark plugs or steering wheel, customers do not purchase Hytera's DMR products because of generic features included in all radios.[17]

Because Motorola has failed to show irreparable harm, the Court need not address the other e*Bay* factors. The injunction request should be denied.

### B. The balance of hardships favors Hytera

The next factor—balance of hardships—tilts sharply in Hytera's favor. Since 2003, Hytera has made significant investments to build a distributor network. Tr. 3393-94. Hytera sells virtually all of its DMR products (99.9%) through dealers and distributors, and Hytera's network today consists of over 2,000 dealers worldwide. Tr. 3389:21-3390:15, Tr. 3392:10-23. In addition, Hytera has made massive R&D investments to develop a full range of DMR features that can meet the needs of customers in various industries and various countries. Ex. 4, Chungson Decl. ¶¶ 5-23. Hundreds of Hytera engineers have been working on DMR products since 2007. Tr. 3468. Motorola's proposed injunction will significantly disrupt these relationships and investments, and could put Hytera out of the DMR market altogether.

Motorola, by contrast, will not lose investments in distributor networks. It has not created the Hytera-proprietary features driving consumer demands in the radios. It has already received a massive damages award that is wildly disproportionate to the alleged harm. Dkt. 954 at 1-21. The jury's award swept beyond disgorgement of profits but also includes $73.6 million in avoided R&D—the same amount that Motorola's expert pronounced was reasonable price for a perpetual license to use Motorola's intellectual property. Dkt. 955 at 221:8-222:19. Without regard for whether *the jury* intended it to be a license fee, Motorola has been awarded what its own expert

---

equipped with the infringing feature); *see* id. (vacating injunction where plaintiff merely showed that the intellectual property at issue made the product easier to use).

[17] *See, e.g.,* Ex. 10, Camelo Decl. ¶¶ 6-12; Ex. 4, Chungsong Decl. ¶¶ 26-27.

deemed a reasonable fee for a perpetual license. The equitable course at this stage is for *the Court* to deem Motorola to have received all the remedy to which it could be entitled as a matter of law and equity. *See, e.g.*, *CardiAQ Valve Techs., Inc. v. Neovasc Inc.*, Civ. A. No. 14-cv-12405-ADB, 2016 WL 6465411, at \*7-8 (D. Mass. Oct. 31, 2016) (denying injunction where the damages award "approximated the amount [the defendant] would have been willing to pay to use [the plaintiff's] trade secrets indefinitely"), *aff'd*, 708 F. App'x 654, 668-69 (Fed. Cir. 2017).

Motorola argues (Br. 10) that the misappropriation was willful, but this is not a cognizable factor in the balance of harms. *See Apple*, 735 F.3d at 1371; *see also Saban v. Caremark Rx, LLC*, 780 F. Supp. 2d 700, 715 (N.D. Ill. 2011) (Chang, J.) (finding the balance of harms to weigh in the defendant's favor despite plaintiff's argument that defendant "brought on the harm"). The Seventh Circuit has admonished that an injunction may not be used for punishment or reparations for past violations. *See Minn. Mining & Mfg. Co. v. Pribyl*, 259 F.3d 587, 609 (7th Cir. 2001). Accordingly, the harm that Hytera would suffer from the broad injunction far outweighs any potential irreparable harm to Motorola.

## C. An injunction is contrary to the public interest

The last factor—the public interest—powerfully supports denial of an injunction. *See eBay*, 547 U.S. at 391 (plaintiff must show that "the public interest would not be disserved by a permanent injunction"). On this prong, the Court must evaluate "the costs that the injunction is likely to impose on third parties." *Okaw Drainage Dist. of Champaign & Douglas Cty., Ill. v. Nat'l Distillers & Chem. Corp.*, 882 F.2d 1241, 1248 (7th Cir. 1989). "Direct effects on innocent third parties have frequently grounded courts' denials of injunctions." *SAS Inst., Inc. v. World Programming Ltd.*, 874 F.3d 370, 388 (4th Cir. 2017) (citing, e.g., *Machlett Labs., Inc. v. Techny Indus., Inc.*, 665 F.2d 795, 798 (7th Cir. 1981)).

11

As explained in the attached declarations, Hytera provides DMR solutions around the world for foreign governmental entities, militaries, first responders, hospitals, airlines, utilities, sports teams, security firms, schools, security firms and other entities around the world.  Hytera's end users in these countries will face significant and irreparable hardship if the injunction is entered.  *See* Ex. 7, Hu Decl. (explaining hardship to Hytera DMR users in the Asia and Africa regions); Ex. 8, Breitner Decl. (hardship to Hytera DMR users in Eastern Europe); Dec. 9, Kuang Decl. (hardship to Hytera DMR users in Mexico); Ex. 10, Camelo Decl. (explaining hardship to Hytera DMR users in Central America); Ex. 11, Napier Decl. (Hytera's DMR business in United Kingdom); Ex. 6, Li Decl. (attaching letters from distributors and end users in numerous foreign countries).

Dkt. 916, Qi Yin Decl. ¶¶ 7, 10.  These third party interests are weighty enough to support denial of the injunction, but their interests apply with even more force in the midst of a global pandemic.  *See* Ex. 1, Aron Decl. ¶¶ 81-86; Ex. 11, Napier Decl. ¶¶ 7, 16; *see also Republic Aviation Corp. v. Schenk*, 152 U.S.P.Q. 830, 834 (N.Y. Sup. Ct. 1967) (refusing to grant injunctive relief where defendant's products were valuable to national interests).

Typically, customers do not buy a single DMR radio but rather invest in a complete, customized Hytera system.  *See* Dkt. 916, Qi Yin Decl. ¶¶ 6-18.  The system often includes a base station, a transmitter, a repeater, handheld radios and mobile radios (mounted inside vehicles).  The number of radios included in the system can range from a dozen to thousands.  *See* Dkt. 916 ¶ 14.  Similarly, the number of repeaters for each system can run into the hundreds or even

thousands. After selecting the system, the customer then pays to have the system tailored to its specific needs. *See* Ex. 10, Camelo Decl. ¶¶ 26.

For example, Hytera developed a unique, customized software tool to help public safety entities in Central American countries (*Id.* ¶¶ 15-22), in Turkey (Ex. 7, Hu Decl. ¶¶ 5-14), in the Phillipines (*id.* ¶¶ 15-28); in Hong Kong (*id.* ¶¶ 29-37); in the United Kingdom (Ex. 11, napier Decl. ¶¶ 8-18), and in Eastern Europe (Ex. 8, Breitner Decl. ¶¶ 3-48). In Colombia, a large utility company selected Hytera digital radios, and Hytera developed a customized life-saving function for this company. *See id.* ¶ 33. In Norway, a public safety customer purchased ▮▮ Hytera DMR radios, and Hytera developed for this entity a unique positioning format to show GPS coordinates on the subscriber's display. Dkt. 916, Qi Yin Decl. ¶ 14. In Mexico, the largest air carrier purchased approximately ▮▮ DMR tier 3 terminals and approximately ▮▮ repeaters from Hytera. *See* Ex. 9, Kuang Decl. ¶ 17. Another customer in Mexico purchased ▮▮ terminals. *Id.* ¶ 20.

Once a customer has purchased a Hytera system, it would be extremely difficult and costly, if not impossible, for the customer to add radios or repeaters from a different manufacturer. *See* Ex. 3, Grimmett Decl. ¶¶ 128-35. While Motorola claims that its radios are compatible with Hytera systems (Br. 12), DMR interoperability is generally limited to basic radio features and functionality. Dkt. 916, Qi Yin Decl. ¶ 11. ▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

*Id.* ¶ 13. ▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮ Ex. 3, Grimmett Decl. ¶ 134. For each of the country examples listed in the paragraph above, the unique Hytera features were necessary to meet the customer's critical needs, and those features are not interoperable with Motorola's radios. *See* Ex. 10, Camelo Decl. ¶¶ 26,

27, 33, 34; Dkt. 916, Qi Yin Decl. ¶ 14. Those are far from the only only examples. *See* Ex. 10, Camelo Decl. ¶ 26-27 (explaining that Hytera offers a unique encryption technology that cannot be operated with other manufacturers' DMR products, without significant time and expense). If the injunction were entered, these existing Hytera ███████████████████████████ ██████████ (Ex. 3, Grimmett Decl. ¶ 135)—an expensive task in terms of both time and money.

The inability to add Hytera radios to existing systems or replace broken radios could endanger public safety. Dkt. 916, Qi Yin Decl. ¶¶ 6, 9-10. For example, Hytera's proprietary features include the ability to track the location of the user in an emergency. *Id.* ¶ 14. If a police officer or firefighter is in distress, a Hytera radio automatically triggers an emergency alarm and notifies dispatch of the distressed individual's precise location. *Id.* This feature will not work with non-Hytera equipment. *Id.* Other proprietary features include call priority features that, as the name indicates, interrupt and prioritize emergency calls over ongoing, lower priority calls, assuring seamless communication in a crisis. *Id.* ¶ 15. Were a Hytera customer forced to integrate a non-Hytera device into a Hytera system, this functionality would no longer work. *Id.*; see id. at ¶¶ 7, 16 (explaining other unique Hytera features used to enable communication in life and death situations). Any shortage of radios can have a real impact on daily customer operations, limiting the effectiveness of the DMR system and increasing risk to public safety. *See* Ex. 10, Camelo Decl. ¶ 21; Ex. 1, Aron Decl. ¶¶ 77-87.

Indeed, a number of Hytera distributors, dealers, and end users around the globe have expressed concerns about the impact of Motorola's proposed injunction on their ability to protect the public. *See* Ex. 6, Xin Li Decl (attaching customer letters). One such customer, ██████████ utilizes Hytera radio and security infrastructure to protect passenger and freight rail between terminals in the United Kingdom and France. ██████████ connects the UK and France. It is concerned about ████████████████████████████████████

MSA0374

███████████████ Ex. 6-A at 1. Hytera has received a number of similar letters from Hytera distributors and end users in Japan, France, Japan, Thailand, El Salvador, Canada, South Africa, Hong Kong, Macau, Taiwan, Croatia, Hungary, and South Korea. *See id.* (attaching true and correct copies of such letters).

Apart from the harm to existing Hytera users, there are other public interests weighing against the proposed injunction. The public interest is disserved by reduced competition particularly in the midst of a once-in-a-century pandemic. *Machlett Labs., Inc. v. Techny Indus., Inc.*, 665 F.2d 795, 798 (7th Cir. 1981) (denying injunction against manufacturer of x-ray equipment because the public interest in the low cost of health care is disserved by reduced competition). As Dr. Aron explains, the proposed injunction will result in less consumer choice and have anti-competitive effects in at least several countries. *See* Ex. 1, Aron Decl. ¶¶ 88-120.[18] Without a rigorous analysis of the impacts the proposed injunction will have in each country, the Court should not disrupt market competition in foreign countries and deprive those customers of choice in DMR products.

Motorola's inability to meet customer demands in the different markets where Hytera competes strongly weighs against the broad injunction it seeks. While Motorola claims that it has the capacity to increase production by ███ (Dkt. 962, Ex. 5 ¶ 7), even if true, this does not translate into its ability to meet immediate customer demands in all regions of the world. *See* Ex. 1, Dr. Aron, ¶¶ 87 n.115. Furthermore, as Hytera has explained, it offers unique, proprietary features

---

[18] Indeed, the Italian Competition Authority recently issued a formal Request for Information into ████████████████████████████████████████████ including the impact on customers and on any tenders in progress or in the future. Ex. 6-B, Li Decl. (attaching copy of request and translation). Italy like other countries, has its own laws concerning intellectual property and concerns with competition, and actively regulates these matters.

15

that Motorola's products do not have.  Ex. 4, Chungsong Decl. ¶¶ 5-27; Ex. 1, Aron Decl. ¶¶ 121-138.  In short, the public interest factor weighs heavily in Hytera's favor.

Motorola's proposed worldwide injunction raises serious comity concerns.  As explained above, Hytera sells DMR products to foreign governmental entities, foreign militaries, foreign public safety entities, and foreign utilities around the world.   An injunction would leave these entities without their preferred supplier and would force them to invest significant time and money in an entirely new DMR infrastructure.  It is difficult to imagine a court order that gives less respect to international comity concerns.

**III.     Motorola's proposed injunction is inconsistent with Rule 65(d)**

Motorola's proposed injunction is overbroad and improper.  Federal Rule of Civil Procedure 65(d) states that "[e]very order granting an injunction … must … state its terms specifically and … describe in reasonable detail—and not by referring to the complaint or other document—the act or acts restrained or required."  Fed. R. Civ. P. 65(d)(1).  "Rule 65(d) is no mere extract from a manual of procedural practice.  It is a page from the book of liberty."  *H.K. Porter*, 568 F.2d at 27.  It demands "that an injunction be precise and self-contained, so that a person subject to it who reads it and nothing else has a sufficiently clear and exact knowledge of the duties it imposes on him that if he violates it he can be adjudged guilty of criminal contempt."  *PMC*, 151 F.3d at 619.

Motorola's proposed injunction does not come close to providing "a person subject to it who reads it and nothing else [with] a sufficiently clear and exact knowledge of the duties it imposes on him that if he violates it he can be adjudged guilty of criminal contempt."  *Id.*  To the contrary, it appears to have been drafted to be as vague and sweeping as possible, and to ensure future litigation to define its scope.  It is similar to trade secret injunctions vacated by the circuit

16

courts. *See, e.g., Am. Can*, 742 F.2d at 332-33; *E.W. Bliss Co. v. Struthers-Dunn*, 408 F.2d 1108, 1113-17 (8th Cir. 1969). As those cases reflect, any injunction must be limited to the specifically articulated and defined scope of the trade secrets. "[T]he specificity provisions of Rule 65(d) are not mere technical requirements"; they were "designed to prevent uncertainty and confusion on the part of those faced with injunctive orders . . . ." *Schmidt v. Lessard*, 414 U.S. 473, 476 (1974).

The proposed injunction's principal provision would broadly prohibit Hytera and all "persons in active concert" with it from "possessing, accessing, reviewing, using, disclosing, or otherwise misappropriating Motorola's Trade Secret Information." Proposed Order, p. 2. The term "Motorola's Trade Secret Information" is defined vaguely as "any confidential information copied or derived from, in whole or in part, Motorola's confidential technical documentation, source code, and source code libraries" and to "also include[] information found in Hytera technical documentation, source code, and source code libraries that are copied or derived from Motorola confidential documentation, source code, and source code libraries." *Id*. at n.1.

Motorola's proposed language is an invitation to endless litigation. For instance, the reference to "information … derived … in part [from] Motorola's confidential technical documentation" or "source code" is exceptionally broad and amorphous. It is not clear what it means for information to be "derived … in part" from other information. And "Motorola's confidential documentation" is itself incredibly vague and sweeping. Indeed, it was established at trial that Hytera lawfully has documents marked "Motorola Confidential" or "Motorola Proprietary" in its files, such as the DMR License between the parties, as Motorola witnesses acknowledged. Tr. 3694:6-3695:8, 3695:11-23, 3699:10-3702:24, 3703:12-17; PTX-1427; DTX-4675. And Motorola does not dispute (*see* Dkt. 968 at 25) that its supposedly "confidential materials" include information that has been publicly disclosed, materials created by third parties, and information that is generally known in the industry (including information that has been

17

incorporated into industry standards).  Motorola plainly is not entitled to an injunction over such materials, yet its proposed injunction would cover everything that is to be found in its "confidential documentation."

There has been a great deal of dispute in this case over the extent to which Motorola's materials were truly confidential, which the jury verdict did nothing to resolve—the jury verdict merely indicates that the jury found that one or more of the 21 asserted trade secrets was misappropriated, and it does not say which ones.  Such a verdict cannot support the sweeping injunction that Motorola seeks.  In short, Motorola's proposed definition of its confidential information is "both too vague and too inclusive, effectively asserting that all information in or about its software is a trade secret."  *IDX Sys. Corp. v. Epic Sys. Corp.*, 285 F.3d 581, 583 (7th Cir. 2002).  Such vagueness is entirely unacceptable in a document that could form the basis for a finding of criminal contempt.

Nor is the phrase "Motorola's confidential technical documentation" limited to the supposed trade secrets that Motorola asserted at trial.  On its face, it could include practically any Motorola materials that Motorola sees fit to deem "confidential" for purposes of wielding the injunction it seeks to hamstring Hytera's legitimate efforts to compete with it.  Courts applying Rule 65(d) in the trade secret context hold that an injunction "does not use specific terms or describe in reasonable detail the acts sought to be restrained" if it "does not set forth what the trade secret business and technical information is that cannot be disseminated" or used by the defendants. *Roton Barrier, Inc. v. Stanley Works*, 79 F.3d 1112, 1122 (Fed. Cir. 1996).  Motorola's proposed definition of "Motorola Trade Secret Information" to mean any information derived in any way from "Motorola confidential documentation" plainly does not cut it.

The next provision of Motorola's proposed injunction sweeps even more broadly.  It would enjoin Hytera from manufacturing or distributing not only "the Accused Products" but also "any

18
MSA0378

other product developed or sold, based in whole or in part, on any of the Accused Products or Motorola's Trade Secret Information." Proposed Order at p. 2. Again, the crucial term "Motorola's Trade Secret Information" is not defined with nearly the degree of clarity and specificity that Rule 65(d) demands. Additionally, this provision would, on its face, prohibit Hytera even from making radios that make no use of any of Motorola's information, so long as they were "based," even "in part" on "any of the Accused Products." *Id.* The provision would thus sweep far beyond anything that Motorola could conceivably lay claim to, to preclude Hytera from designing new products based on indisputably non-infringing and non-misappropriating aspects of the accused Hytera products. It would thus run afoul of the Seventh Circuit's pronouncement that trade secret injunctions must respect the "very narrow limits" imposed on an asserted trade secret by "public information" and the defendant's "own knowledge and experience," neither of which can be claimed as the plaintiff's trade secret. *Am. Can*, 742 F.2d at 326 (rejecting injunction under Rule 65(d) because it went beyond products that were "in fact *substantially* derived from plaintiff's trade secrets and not from the public information and [defendant's] own skill, knowledge and experience" (emphasis added)).

The clumsy phrasing of the proposed provision also creates subtler problems. For example: What would it mean for a product to be "sold, based in whole or in part, on any of the Accused Products"? *See* Proposed Order at p. 2. This language could be read to cover sales of entirely independent products so long as the *sale* of the product was somehow "based … in part" on Accused Products, perhaps because the purchaser chose to buy from Hytera based on its satisfaction with Hytera products that were accused in this litigation. Indeed, it is not clear what else it *could* mean for a product to be "sold, based … on … the Accused Products." The phrase is yet a further invitation to endless litigation over the scope of the injunction. The other provisions of the proposed injunction suffer from the same fatal flaws. As one more example, the proposed

19

injunction would require Hytera to "remove from its possession … All Motorola-branded documents … that Motorola contends were improperly acquired by Hytera." Proposed Order at p. 4. This goes beyond the trade secret claims, which covered about 70 documents. This reference to all documents covered by Motorola's "conten[tions]" flies in the face of Rule 65(d)'s requirement that *the injunction order itself* "describe in reasonable detail—and not by referring to the complaint or any other document—the act or acts restrained or required." Fed. R. Civ. P. 65(d)(1)(C). Motorola's proposed order improperly purports to prohibit conduct of non-party distributors, dealers, and resellers who have not been given notice and an opportunity to respond. Proposed Order at 2; Dkt. 912 at 8-9 (collecting cases).

Finally, Motorola's proposed injunction has no end date—it would remain in force forever—but Motorola cannot possibly meet its burden of justifying such a limitless injunction. A trade secret owner cannot have an injunction beyond the point that it would have taken defendants to independently develop the trade secrets. *Minn. Mining*, 259 F.3d at 609. Even using Mr. Malackowski's grossly inflated head start periods, the head start period has expired for each of the asserted trade secrets. Tr. 2199:19-21; Dkt. 907-5, PDX 10.30. It has been more than nine years since Hytera actually launched its DMR products in March 2010. As a result, Hytera would have independently developed all of the alleged intellectual property by now. *See* Dkt. 954 at 7.

In short, Motorola's proposed "injunction does not comply with Fed. R. Civ. P. 65(d) because the terms are too vague to give the defendants fair notice of the prohibited conduct." *Am. Can*, 742 F.2d at 326. The Court should deny Motorola's motion. Motorola also seeks a quarantine and removal of specific materials it contends were improperly acquired, and Hytera proposes an alternative order to address this issue.

## IV.    A reasonable royalty would be more equitable than an injunction

For the reasons given above, Motorola cannot establish an entitlement to any prospective relief.  Should the Court disagree, however, it should reject Motorola's bid for a permanent injunction and instead limit it to a reasonable royalty for Hytera's alleged use of its intellectual property.  An injunction would be particularly inequitable here in light of the exceptional circumstances posed by the ongoing COVID-19 pandemic and crucial first responders' heavy reliance on Hytera technology.

The reality is that Motorola has already been awarded its reasonable royalty.  A substantial portion of the jury's damages award comprises what Motorola's own expert pronounced a *fully paid, lump sum, perpetual license* for the asserted trade secrets and source code.  Malackowski testified that this $73.6 million figure was a "lump sum" reasonable royalty amount that would compensate Motorola for a "perpetual license to use [Motorola's] technology," "[p]aid in full." Dkt. 955, Malackowski Dep. 221:24-222:18 (It is no coincidence that the "avoided R&D" amount awarded by the jury is the reasonable royalty amount, since the amount it would cost a firm to develop a technology itself is a plausible estimate of the maximum amount that it would pay to license that technology.)  Having been awarded the price of this "perpetual license to use" its alleged trade secrets—on top of all of Hytera's past profits from its sales of accused products— Motorola cannot equitably claim entitlement to an injunction on future production and sales or to further royalty payments. Under these circumstances, a reasonable royalty for future sales is zero. *See* Ex. 1, Aron Decl., ¶¶ 150-52.

The Court should reject Motorola's new royalty proposal out of hand.  *See id.* ¶¶ 123-130. Under the DTSA, the court has the authority to require payment of a "reasonable royalty for no longer than the period of time for which such use [of the trade secrets] could have been prohibited." 18 U.S.C. § 1836(b)(3)(A)(iii).  Motorola now requests a permanent royalty award of ████

████████ a demand for which it offers no support. *See* Motorola Br. 15. Motorola openly admits that the amount it requests is *three times Hytera's average profit on each device* (*id.*), meaning that Hytera would *lose* ████ on average for every device sold. Indeed, the amount that Motorola demands is *higher than the full price* of many of Hytera's products. It is thus not a reasonable royalty at all. *See* Ex. 1, Aron Decl. ¶¶ 139-48. It is a de facto injunction, which we explained above would be contrary to the public interest. The amount is also based on the faulty assumption that Hytera misappropriated all 21 alleged trade secrets, even though the jury verdict reflects only that the jury found that one (unspecified) secret had been misappropriated. And Motorola presents a royalty award as an alternative "if an injunction is not entered" (Br. 15), but it is well aware that the amount it demands would be functionally *identical* to a permanent injunction, since Hytera obviously cannot sell its products if it is forced to pay Motorola three times its profits on each sale. Motorola's proposal is not credible.

Even though Motorola is not entitled to *any* royalty, Dr. Aron has computed royalty figures that would more than appropriately compensate Motorola. *See* Ex. 1, Aron Decl. ¶¶ 149-238. Dr. Aron identifies the legal framework that she used (the *Georgia-Pacific* factors) and the parameters of hypothetical licensing negotiation that a reasonable royalty would reflect. *See id.* ¶¶ 161-77. Applying that framework and those parameters, Dr. Aron arrives at a reasonable royalty rate that is consistent with economic factors affecting both parties and with the evidence provided in this case. The details of her analysis are set forth in her declaration. *See id.* ¶¶ 178-236. Dr. Aron concludes that a reasonable global royalty going forward would be no more than ████ per unit. *See id.* ¶ 238.

## V.     Any injunction should be limited to the United States

The Court should reject Motorola's extraordinary demand for the Court to directly regulate the extraterritorial commercial conduct of a foreign corporation. *See* Br. 13-14. As this Court

recognized, the issue of the Court's authority to regulate activity wholly outside of the United States under the federal statutes at issue is a substantial question of first impression. Dkt. 834 at 10, 26.

Nothing in the text of the DTSA provides any "clear indication" of congressional intent to create a private right of action reaching around the world. Dkts. 758, 806, 836, 866, 908. This Court ruled otherwise based on its reading of the terms "offense" and "offender" in 18 U.S.C. § 1837 as referring to "unlawful actions that are not criminal." Dkt. 834 at 16. Hytera continues to disagree with that ruling, but, even if it were correct, it would not support the worldwide injunction that Motorola demands. By its terms, § 1837 provides only a partial, carefully circumscribed rebuttal of the presumption. It is undisputed that § 1837(1) does not apply to the Hytera parent entity, which is incorporated in the People's Republic of China. And no "act in furtherance" of any foreign "offense" covered by the proposed worldwide injunction was committed in the United States. *See* 18 U.S.C. § 1837(2). Motorola contends that Hytera representatives committed a domestic act in furtherance by participating in trade shows in Las Vegas. But while participation in U.S. trade shows may have increased Hytera's sales in the United States, it was not an "act in furtherance" of the purely extraterritorial conduct that the worldwide injunction would regulate, such as manufacturing radios in China.

It is undisputed that copyright protections do not have any extraterritorial operation. This Court nonetheless accepted Motorola's belated theory that it could recover for Hytera's foreign sales under the "predicate-act doctrine." Dkt. 834. While Hytera continues to disagree with this ruling (*see* Dkts. 758, 806, 836, 866, 908), it would not justify a worldwide *injunction* in any event. The constructive trust theory upon which the predicate-act doctrine is premised only addresses *disgorgement of foreign profits*. *See Sheldon v. Metro-Goldwyn*, 106 F.2d 45, 52 (2d Cir. 1939). "There appear to be no reported cases … in which the extraterritorial manufacture and distribution

MSA0383

of infringing products was enjoined on the basis of copyright infringement occurring within the United States." 4 Neville B. Nimmer & David Nimmer, *Nimmer on Copyright* § 14.06[C][2][a][i] (2019).

Moreover, even if the doctrine could authorize an injunction of foreign conduct that is directly linked to an act of copyright infringement committed by Hytera in the United States, Motorola has failed to point to any such predicate act. It argues that the former Motorolans' copying of code onto their computers in Malaysia was a predicate in the United States because the servers from which the code was copied were supposedly located in Chicago. But ***there is absolutely no evidence that the code was copied from servers in the United States***. The evidence showed that the code would in fact have been copied from servers in Penang, Malaysia. Tr. 444:13-445:1, 524:23-525:4, 5148:5-5151:7, 5152:23-5154:2, 5206:12-5216:8, 5325:7, 5326:16; DTX-5616; DTX-5614; DTX-5617. The predicate act doctrine does not apply here.

## VI. The issuance of a permanent injunction is foreclosed by laches

Equitable relief should also be foreclosed by the doctrine of laches because of Motorola's unreasonable delay in seeking such relief and the resulting prejudice to Hytera. *See Hot Wax, Inc. v. Turtle Wax, Inc.*, 191 F.3d 813, 820 (7th Cir. 1999) ("The equitable doctrine of laches is derived from the maxim that those who sleep on their rights, lose them.").

In intellectual property cases, laches can limit "appropriate injunctive relief" at the remedial stage based on a plaintiff's "delay in commencing suit." *Petrella v. Metro-Goldwyn-Mayer, Inc.*, 572 U.S. 663, 687 (2014). In one case cited with approval in *Petrella*, the Second Circuit held that laches required denial of any injunctive relief because plaintiff's "unreasonable and inexcusable delay" in bringing suit caused prejudice to defendant. *New Era Publications Int'l v. Henry Holt & Co.*, 873 F.2d 576, 584–85 (2d Cir. 1989). Laches applies to limit relief where there was (1) "an unreasonable lack of diligence," and (2) "prejudice arising therefrom." *Hot Wax*,

24

191 F.3d at 820 (citation omitted); *see also Pruitt v. Chicago*, 472 F.3d 925, 927 (7th Cir. 2006). This is precisely such a case.

*First*, as set forth in Hytera's prior briefing on equitable defenses, Motorola failed to exercise diligence. *See* Dkt. 966 at 3-7. At a minimum, Motorola had constructive knowledge for years of facts sufficient to require Motorola to inquire and take action to protect its rights. *Robertson Transformer Co. v. Gen. Electric Co.*, 191 F. Supp. 3d 826, 831-32 (N.D. Ill. 2016). *Second*, as a result of Motorola's unreasonable lack of diligence, Hytera has experienced significant prejudice. Dkt. 966 at 7-9. By waiting nine years to file suit, Motorola not only prevented Hytera from correcting the potential problems early in the development process, but it also kept Hytera on the DMR path—including an investment of close to $80 million in DMR research and development since launching the radios in 2010—deterring its pursuit of alternative dPMR standard. *Id.*; *cf. Hot Wax*, 191 F.3d at 823-24 ("[h]ad Hot Wax successfully pressed its claims in a timely manner, Turtle Wax certainly could have invested its time and money in other areas"); *see also Petrella*, 572 U.S. at 687-88. Accordingly, laches forecloses a permanent injunction in this case.

## CONCLUSION

Motorola's motion for a permanent injunction should be denied. If an injunction is issued, Hytera respectfully requests a stay of the worldwide scope of the injunction pending the resolution of appellate proceedings. At a minimum, the Court should permit Hytera and its distributors and resellers to continue servicing existing customer devices and networks—including by issuing additional radios and other Hytera products—pending resolution of the appeal.

Date:  June 9, 2020                                    Respectfully submitted,

25

MSA0385

/s/ *Boyd Cloern*

Boyd Cloern (*pro hac vice*)
bcloern@steptoe.com
Michael Allan (*pro hac vice*)
mallan@steptoe.com
Jessica Rothschild (*pro hac vice*)
jrothschild@steptoe.com
Kassandra Officer (*pro hac vice*)
kofficer@steptoe.com
David Bettwy (*pro hac vice*)
dbettwy@steptoe.com
Brian Johnson (*pro hac vice)*
bjohnson@steptoe.com
Alice Loughran (*pro hac vice*)
aloughran@steptoe.com
Scott Richey (*pro hac vice)*
srichey@steptoe.com
Christopher Suarez
csuarez@steptoe.com
John William Toth (*pro hac vice*)
btoth@steptoe.com
STEPTOE & JOHNSON LLP
1330 Connecticut Avenue NW
Washington, DC 20036
Telephone:  (202) 429-3000
Facsimile:  (202) 429-3902

Daniel Stringfield
dstringfield@steptoe.com
Tron Fu
tfu@steptoe.com
STEPTOE & JOHNSON LLP
227 West Monroe Street, Suite 4700
Chicago, IL 60606
Telephone: (312) 577-1300
Facsimile: (312) 577-1370

Mark McDougall (*pro hac vice*)
mmcdougall@calfee.com
Joshua Ryland (*pro hac vice*)
jryland@calfee.com
Todd Tucker (*pro hac vice*)

26

ttucker@calfee.com
CALFEE, HALTER & GRISWOLD LLP
The Calfee Building
1405 East Sixth Street
Cleveland, OH 44114
Telephone:  (216) 622-8200
Facsimile:  (216) 241-0816


*Attorneys for Defendants Hytera*
*Communications Corp., Hytera America, Inc.,*
*and Hytera Communications (West), Inc.*

27
MSA0387

**CERTIFICATE OF SERVICE**

I, Boyd Cloern, an attorney, hereby certify that on June 9, 2020, I caused a true and correct copy of the foregoing opposition to be served via the Court's ECF system upon all counsel of record.

*/s/Boyd Cloern*
Boyd Cloern

MSA0388

## CERTIFICATE OF SERVICE

I hereby certify that on June 11, 2024, a copy of the foregoing separate appendix was filed electronically. Service of this filing will be made on all ECF-registered counsel by operation of the court's electronic filing system. Parties may access this filing through the court's system.

*s/* John C. O'Quinn, P.C.
John C. O'Quinn, P.C.

No. 24-1531

# In The United States Court of Appeals for The Seventh Circuit

MOTOROLA SOLUTIONS, INC. AND
MOTOROLA SOLUTIONS MALAYSIA SDN. BHD.,
*Plaintiffs-Appellees*

v.

HYTERA COMMUNICATIONS CORPORATION LTD.,
*Defendant-Appellant.*

On Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division
Case No. 1:17-cv-01973
Honorable Martha M. Pacold

**APPENDIX FOR PLAINTIFFS-APPELLEES
VOLUME II OF III**

Michael W. De Vries
Kirkland & Ellis LLP
555 South Flower Street, 3700
Los Angeles, CA 90071

Adam R. Alper
Kirkland & Ellis LLP
555 California Street, 27th Floor
San Francisco, CA 94104

Leslie Schmidt
Kirkland & Ellis LLP
601 Lexington Ave.
New York, NY 10022

John C. O'Quinn, P.C.
*Counsel of Record*
Jason M. Wilcox
KIRKLAND & ELLIS LLP
1301 Pennsylvania Avenue NW
Washington, DC 20004

*Counsel for Plaintiffs-Appellees*

June 11, 2024

# MOTOROLA'S SEPARATE APPENDIX
# TABLE OF CONTENTS

## VOLUME I OF III

**DOCUMENT**                                                                    **PAGE**

Complaint, dated March 14, 2017 (R.1) ................................................. MSA0001-34

Amended Complaint, dated August 2, 2018 (R.266) ...............................MSA0035-73

Trial Transcript Excerpts Volume 2A (pgs. 19-24)
November 7, 2019 (R.783)...............................................................MSA0074-82
    Opening Statement by A. Alper (Motorola)

Trial Transcript Excerpts Volume 2B (pgs. 203-206)
November 7, 2019 (R.783)........................................................... MSA0083-89-
    Direct Examination of Russ Lund (Motorola Witness)

Trial Transcript Excerpts Volume 3B (pgs. 395-401)
November 12, 2019 (R.784)..............................................................MSA0090-99
    Direct Examination of Scott Shepard (Motorola Witness)

Trial Transcript Excerpts Volume 5B (pgs. 722-725)
November 14, 2019 (R.786)............................................................MSA0100-106
    Direct Examination of Jesus Corretjer (Motorola Witness)

Trial Transcript Excerpts Volume 8B (pgs. 1153-1160, 1203-1208, 1233-1240)
November 20, 2019 (R.789)...............................................................MSA0107-0131
    Direct Examination of Stephen Wicker (Motorola Witness)

Trial Transcript Excerpts Volume 9A (pgs. 1297-1299, 1330-1332)
November 21, 2019 (R.790).............................................................MSA0132-140
    Direct Examination of Stephen Wicker (Motorola Witness)

Trial Transcript Excerpts Volume 9B (pgs. 1480-1486)
November 21, 2019 (R.790)..............................................................MSA0141-150
    Cross Examination of Stephen Wicker (Motorola Witness)

Trial Transcript Excerpts Volume 10A (pgs. 1548-1550)
November 25, 2019 (R.791).................................................................MSA0151-156
    Cross Examination of Stephen Wicker (Motorola Witness)

Trial Transcript Excerpts Volume 11B (pgs. 1838-1842, 1884-1894, 1907-1910, 1924-1927)
November 27, 2019 (R.792)......................................................................MSA0157-183
    Direct Examination of Sandeep Rangan (Motorola Witness)

Trial Transcript Excerpts Volume 13B (pgs. 2158-2161)
December 2, 2019 (R.794) ......................................................................MSA0184-190
    Direct Examination of James Malackowski (Motorola Witness)

Trial Transcript Excerpts Volume 22A (pgs. 3258-3262)
December 17, 2019 (R.803) .....................................................................MSA0191-198
    Re-Cross Examination of Luo Junping (Hytera Witness)

Trial Transcript Excerpts Volume 30A (pgs. 4405-4407)
January 28, 2020 (R.924).........................................................................MSA0199-204
    Direct Examination of Andy Grimmett (Hytera Witness)

Trial Transcript Excerpts Volume 30B (pgs. 4591-4594, 4624-4626)
January 28, 2020 (R.924).........................................................................MSA0205-214
    Direct Examination of Andy Grimmett (Hytera Witness)
    Cross Examination of Andy Grimmett (Hytera Witness)

Trial Transcript Excerpts Volume 33B (pgs. 5093-5098, 5131-5137)
February 4, 2020 (R.927) .........................................................................MSA0215-230
    Direct Examination of Stephen Wicker [Rebuttal] (Motorola Witness)

Trial Transcript Excerpts Volume 34A (pgs. 5220-5223)
February 5, 2020 (R.928) .........................................................................MSA0231-236
    Cross Examination of Stephen Wicker [Rebuttal] (Motorola Witness)

Trial Transcript Excerpts Volume 34B (pgs. 5279-5283)
February 5, 2020 (R.928) .........................................................................MSA0237-244
    Re-Direct Examination of Stephen Wicker [Rebuttal] (Motorola Witness)

Trial Transcript Excerpts Volume 35A (pgs. 5355-5362)
February 10, 2020 (R.929) .......................................................................MSA0245-254
    Direct Examination of James Malackowski [Rebuttal] (Motorola Witness)

Trial Transcript Excerpts Volume 35B (pgs. 5409-5412, 5466-5469)
February 10, 2020 (R.929) .......................................................................MSA0255-264
    Cross Examination of James Malackowski [Rebuttal] (Motorola Witness)

Trial Transcript Excerpts Volume 37A (pgs. 5557-5560)
February 12, 2020 (R.931) ................................................................MSA0265-271
   Cross Examination of James Malackowski [Rebuttal] (Motorola Witness)

Final Jury Instructions, dated February 14, 2020 (R. 895) ....................MSA0272-326

Plaintiffs' Motion For Permanent Injunction, dated April 2, 2020 (R.961) ..................
    ........................................................................................MSA0327-355

Opposition to Plaintiffs' Motion For a Permanent Injunction, dated June 9, 2020
(R.987)...............................................................................MSA0356-388

## VOLUME II OF III

Motorola's Reply in Support of its Motion for a Permanent Injunction, dated June 23,
2020 (R.996)........................................................................MSA0389-423

Order re Pending Motions, dated December 17, 2020 (R.1097)............MSA0424-0430

Findings of Fact and Conclusion of Law in Relation to the Court's October 19 and
November 10, 2020 Orders, dated January 8, 2021 (R.1100) ...............MSA0431-0469

Motorola's Submission Regarding and Ongoing Royalty, dated January 28, 2021
(R.1118)...............................................................................MSA0470-0491

Hytera's Submission Regarding a Reasonable Royalty, dated February 17, 2021
(R.1130)...............................................................................MSA0492-511

Order re Motion for Instructions and Supplemental Motion For Attorneys' Fees,
dated October 15, 2021 (R.1250)............................................................MSA0512-524

Order re Embedded Motion to Reconsider in its Submission on the Parties' Disputes
as to the Court-Ordered Royalties, dated April 12, 2022 (R.1338) .........MSA0525-548

Motorola's Motion that Hytera be Held in Contempt for Violating Court Orders and
Request For Hearing, dated August 3, 2022 (R.1359)............................MSA0549-552

Memorandum Opinion and Order (*Motorola v. Hytera*, Case No. 17-cv-1972, N.D.
Ill.), dated January 5, 2023(R.275)........................................................MSA0553-566

Minute Entry Regarding Joint Status Report on Discovery (*Motorola v. Hytera*, Case
No. 17-cv-1972, N.D. Ill.), Dated March 29, 2023(R.291)...............................MSA0567

Hearing Transcript, dated August 17, 2023 ...........................................MSA0568-804

## VOLUME III OF III

Memorandum Opinion and Order (R.1461), dated August 26,2023)......MSA0805-823

Joint Status Report Regarding Royalty Order (R.1463), dated September 1, 2023) ....
...........................................................................................................MSA824-828

Memorandum Opinion and Order (*Motorola v. Hytera*, Case No. 17-cv-1972, N.D. Ill.), (R.324) dated September 12, 2023 ..................................................MSA0829-845

Motorola's Memorandum in Support of Motion to Hold Hytera in Contempt for Violating Order to Produce Source Code (*Motorola v. Hytera*, Case No. 17-cv-1972, N.D. Ill.), (R.352-1) dated January 16, 2024 ..........................................MSA0846-866

Plaintiffs' Memorandum in Support of Their Motion to Open Contempt Proceedings and Enter an Anti-Suit Injunction to Protect this Court's Jurisdiction (R1482-1) dated February 20, 2024...................................................................MSA0867-893

Defendant Hytera Communications Corporation Ltd.'s Opposition to Motorola's Motion to Open Contempt Proceedings and Enter and Anti-Suit Injunction, (R.1486) dated March 6, 2024.....................................................................MSA0894-923

Plaintiffs' Emergency Motion for a Temporary Restraining Order, (R1491) dated March 11, 2024....................................................................................MSA0924-939

Plaintiffs' Memorandum in Support of their Motion to Open Contempt Proceedings and Enter and Anti-Suit Injunction to Protect this Court's Jurisdiction (R.1500) dated March 22, 2024..................................................................................MSA0940-966

Defendant Hytera Communications Ltd.'s Notice Regarding Shenzhen Litigation, (R.1507) dated March 28, 2024............................................................MSA0967-969

Spreadsheet - Diff. of H-end and L-end, Apportionment, Business Terminal, Item Attribute, (Not Dated)
**Trial Ex. DTX-5502** (Admitted February 3, 2020, Tr. pg. 4843) ........MSA0970-1004

Email from S. Chia Han Siong to G. Zhang re FPGA Analysis, (dated June 25, 2008)
**Trial Ex. PTX-19** (Admitted November 20, 2019, Tr. pg. 1195)..........MSA1005-1008

Spreadsheet Task Tracking, (Not Dated)

**Trial Ex. PTX-263**
(Admitted November 20, 2019, Tr. pg. 1204)..........................................MSA1009-1032

Email from Guoyxiang to Chanqingzhou et al. re Weekly Updates, (dated February 26, 2008)
**Trial Ex. PTX-421**
(Admitted November 26, 2019, Tr. pg. 1885)..........................................MSA1033-1034

Email from zhangjun 02973 to tangjiyue 04081, et al., re Notice about welcome Penang Visitors on March 3, 9:00 a.m., (dated February 29, 2008)
**Trial Ex. PTX-422**
(Admitted December 5, 2019, Tr. pg. 2542) ..........................................MSA1035-1041

Presentation: HYT DMR Protocol Introduction, (Not Dated)
**Trial Ex. PTX-1129**
(Admitted November 13, 2019, Tr. pgs. 569) ..........................................MSA1042-1089

Spreadsheet, Summary, Sharing Calculation Table, Commercial Terminal Codes, DRM item code-Product type, (Not Dated)
**Trial Ex. PTX-2352**
(Admitted February 10, 2019, Tr. pgs. 5357) ..........................................MSA1090-1122

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| MOTOROLA SOLUTIONS, INC., and MOTOROLA SOLUTIONS MALAYSIA SDN. BHD. ) ) ) ) | Civil Action No.: 1:17-01973 |
| Plaintiffs, ) ) | Honorable Charles R. Norgle Sr. |
| v. ) ) ) | **[PUBLIC REDACTED VERSION]** |
| HYTERA COMMUNICATIONS CORPORATION LTD., HYTERA AMERICA, INC., AND HYTERA COMMUNICATIONS AMERICA (WEST), INC. ) ) ) ) ) ) | |
| Defendants. ) ) ) | |

## MOTOROLA'S REPLY IN SUPPORT OF
## ITS MOTION FOR A PERMANENT INJUNCTION

MSA0389

**TABLE OF CONTENTS**

**Page**

I. INTRODUCTION .................................................................................................. 1

II. MOTOROLA HAS SUCCEEDED ON THE MERITS ....................................... 1

III. AN INJUNCTION IS NECESSARY TO PREVENT ONGOING
IRREPARABLE HARM TO MOTOROLA .......................................................... 3

    A. Hytera's Ongoing Use of Motorola's Trade Secrets and Copyrights Will
Cause Motorola Irreparable Harm That Monetary Damages Cannot
Remedy ...................................................................................................... 3

        1. Monetary Damages Are Inadequate Including Because Hytera Has
Unlawfully Vowed to Interfere with Motorola's Ability to Collect ........... 4

        2. Motorola Provided Significant Evidence of Irreparable Harm ................... 4

        3. Hytera's "Causal Nexus" Argument Does Not Bar an Injunction.............. 8

    B. The Balance of Harm Weighs Decidedly In Favor Of Enjoining Hytera ............. 11

    C. The Public Interest Strongly Favors Enjoining Hytera's Unlawful Conduct ....... 12

        1. Unfair Competition Is Not in the Public Interest ..................................... 12

        2. Motorola Has Capacity to Meet Demand ................................................. 14

        3. Hytera's "Additional Features" Do Not Preclude an Injunction .............. 16

        4. An Injunction Will Not Harm Public Safety............................................. 17

IV. MOTOROLA'S PROPOSED INJUNCTION IS CONSISTENT WITH RULE
65(D)................................................................................................................ 19

V. AN ONGOING ROYALTY IS NOT MORE EQUITABLE THAN AN
INJUNCTION.................................................................................................... 22

VI. A WORLDWIDE INJUNCTION IS APPROPRIATE AND NECESSARY .................. 23

VII. LACHES IS NO BAR TO AN INJUNCTION.................................................... 25

VIII. CONCLUSION................................................................................................. 25

MSA0390

## TABLE OF AUTHORITIES

**Cases**                                                                   **Page(s)**

*3M v. Pribyl*,
    259 F.3d 587 (7th Cir. 2001) ................................................................................12

*Abbott Labs. V. Andrx Pharm., Inc.*,
    452 F.3d 1331 (Fed. Cir. 2006)...............................................................................6

*Allied Erecting & Dismantling Co. v. Genesis Equip. & Mfg*,
    2010 WL 3370286 (N.D. Ohio Aug. 26, 2010),
    *aff'd* 511 F. App'x 398 (6th Cir. 2013)...................................................................2

*Am. Can Co. v. Mansukhani*,
    742 F.2d 314 (7th Cir. 1984) ................................................................................21

*Am. Family Mut. Ins. Co. v. Roth*,
    No. 05-CV-03839, 2005 WL 3700232 (N.D. Ill. Aug. 5, 2005),
    *report and recommendation adopted*, 2006 WL 2192004 (N.D. Ill. July 27, 2006)................5

*Apple Inc. v. Psystar Corp.*,
    673 F. Supp. 2d 943 (N.D. Cal. 2009), *aff'd*, 658 F.3d 1150 (9th Cir. 2011) .......................1, 9

*Apple Inc. v. Samsung Elecs. Co.*,
    695 F.3d 1370 (Fed. Cir. 2012)...............................................................................8

*Apple Inc. v. Samsung Elecs. Co.*,
    735 F.3d 1352 (Fed. Cir. 2013)............................................................................8, 9

*Apple, Inc. v. Samsung Electronics Co.*,
    678 F.3d 1314 (Fed. Cir. 2012)...............................................................................8

*Aqua Shield v. Inter Pool Cover Team*,
    774 F.3d 766 (Fed. Cir. 2014)............................................................................22, 23

*Avery Dennison Corp. v. Four Pillars Enter. Co.*,
    45 F. App'x 479 (6th Cir. 2002) .............................................................................2

*Bard Peripheral Vascular, Inc. v. W.L. Gore & Assocs.*,
    2010 WL 11484420 (D. Ariz. Sept. 9, 2010)............................................................23

*Binney & Smith v. Rose Art Indus., Inc.*,
    1995 WL 103532 (N.D. Ill. Mar 3, 1995)..................................................................6

*Black & Decker Inc. v. Robert Bosch Tool Corp.*,
    04-7955, 2006 WL 3446144 (N.D. Ill. Nov. 29, 2006) ..................................................6

MSA0391

*Broadcom v. Emulex*,
  2012 WL 13036855 (C.D. Cal. Mar. 16, 2012),
  *aff'd*, 732 F.3d 1325 (Fed. Cir. 2013) ...................................................................................16

*Brocade Commc'ns Sys., Inc. v. A10 Networks, Inc.*,
  2013 WL 140039 (N.D. Cal. Jan. 10, 2013) ...........................................................................11

*Buffalo Wild Wings Int'l, Inc. v. Grand Canyon Equity Partners, LLC*,
  829 F. Supp. 2d 836 (D. Minn. 2011) .....................................................................................12

*CardiAq Valve Techs., Inc. v. Neovasc Inc.*,
  2016 WL 6465411 (D. Mass. Oct. 31, 2016) ...........................................................................12

*Chemetall GmbH v. ZR Energy, Inc.*,
  2001 WL 1104604 (N.D. Ill. Sept. 18, 2001) ...........................................................................3

*CSIRO v. Buffalo Tech. Inc.*,
  492 F. Supp. 2d 600 (E.D. Tex. 2007) .....................................................................................14

*Dexia Credit Local v. Rogan*,
  2008 WL 4543013 (N.D. Ill. Oct. 9, 2008) .............................................................................18

*Douglas Dynamics, LLC v. Buyers Prods. Co.*,
  717 F.3d 1336 (Fed. Cir. 2013) ......................................................................................1, 8, 14

*Dulisse v. Park Int'l Corp.*,
  1998 WL 25158 (N.D. Ill. Jan. 9, 1998) ...................................................................................8

*E.W. Bliss Co. v. Struthers-Dunn*,
  408 F.2d 1108 (8th Cir. 1969) .................................................................................................21

*Erfindergemeinschaft UroPep GbR v. Eli Lilly & Co.*,
  2017 WL 3034655 (E.D. Tex. July 18, 2017) ...........................................................................4

*Forever Foundations & Frame, LLC v. Optional Prod. LLC*,
  2014 WL 12585800 (C.D. Cal. Dec. 19, 2014) .......................................................................12

*Genband US LLC v. Metaswitch Networks Corp.*,
  861 F.3d 1378 (Fed. Cir. 2017) .............................................................................................8, 9

*H-D Mich., LLC v. Hellenic Duty Free Shops S.A.*,
  694 F.3d 827 (7th Cir. 2012) ...................................................................................................19

*Hafco Foundry & Mach. Co., Inc. v. GMS Mine Repair & Maint., Inc.*,
  2018 WL 1786588 (S.D.W. Va. Apr. 12, 2018) .......................................................................16

*Helene Curtis Indus., Inc. v. Church & Dwight Co.*,
  560 F.2d 1325 (7th Cir. 1977) .................................................................................................12

MSA0392

*Hot Wax, Inc. v. Turtle Wax, Inc.*,
191 F.3d 813 (7th Cir. 1999) ..................................................................................25

*I-Flow Corp. v. Apex Med. Techs., Inc.*,
2010 WL 141402 (S.D. Cal. Jan. 8, 2010)................................................................2

*Ill. League of Advocates v. Quinn*,
2013 WL 6355552 (N.D. Ill. Dec. 5, 2013).............................................................18

*Invista N. Am. S.A.R.L. v. M & G USA Corp.*,
35 F. Supp. 3d 583 (D. Del. 2014)..........................................................................19

*Kemin Foods, L.C. v. Pigmentos Vegetales Del Centro S.A. DE C.V.*,
369 F. Supp. 2d 1075 (S.D. Iowa 2005), *aff'd*, 464 F.3d 1339 (Fed. Cir. 2006)......................2

*Luxottica USA LLC v. The Partnerships & Unincorporated Associations
Identified On Schedule "A"*,
2015 WL 3818622 (N.D. Ill. June 18, 2015)...........................................................12

*Machlett Labs., Inc. v. Techny Indus.*,
Inc., 665 F.2d 795, 798 (7th Cir. 1981) ..................................................................13

*Mazak Optonics Corp. v Marlette*,
2017 WL 3394727 (N.D. Ill. Aug. 8, 2017) ............................................................12

*McDavid Knee Guard, Inc. v. Nike USA, Inc.*,
683 F. Supp. 2d 740 (N.D. Ill. Jan. 14, 2010)...........................................................6

*Meron Tech. Distrib. Corp. v. Discreet Indus. Corp.*,
189 F. App'x 3 (2d Cir. 2006) .................................................................................3

*Mitchell v. 3PL Sys., Inc.*,
2013 WL 12129617 (C.D. Cal. Apr. 8, 2013) ........................................................19

*Molex, Inc. v. Nolen*,
759 F.2d 474 (5th Cir. 1985) ...................................................................................5

*Mondis Tech. v. Chimei InnoLux Corp.*,
822 F. Supp. 2d 639 (E.D. Tex. 2011), *aff'd* 530 F. App'x 959 (Fed. Cir.
2013) ......................................................................................................................23

*Nat'l Spiritual Assembly of Baha'is of U.S. Under Hereditary Guardianship, Inc.
v. Nat. Spiritual Assembly of Baha'is of U.S., Inc.*,
628 F.3d 837 (7th Cir. 2010) ..................................................................................19

*New Era Publications Int'l v. Henry Holt & Co.*,
873 F.2d 576 (2d Cir. 1989)....................................................................................25

MSA0393

*Okaw Drainage Dist. of Champaign & Douglas Cty., Ill. v. Nat'l Distillers & Chem. Corp.*,
   882 F.2d 1241 (7th Cir. 1989) ...................................................................................14

*One11 Imports, Inc. v. NuOp LLC*,
   2016 WL 7338422 (S.D.N.Y. Dec. 19, 2016) ...........................................................20

*Pampered Chef v. Alexanian*,
   804 F. Supp. 2d 765 (N.D. Ill. 2011) ..........................................................................8

*Polymer Techs., Inc. v. Bridwell*,
   103 F.3d 970 (Fed. Cir. 1996).....................................................................................6

*Powell v. Home Depot U.S.A., Inc.*,
   663 F.3d 1221 (Fed. Cir. 2011)..................................................................................22

*Precision Inst. Mfg. Co. v. Auto. Maint. Mach. Co.*,
   324 U.S. 806 (1945)...................................................................................................25

*PrimeSource Bldg. Prod., Inc. v. Huttig Bldg. Prod., Inc.*,
   2017 WL 7795125 (N.D. Ill. Dec. 9, 2017)..................................................................3

*Pruitt v. Chicago*,
   472 F.3d 925 (7th Cir. 2006) .....................................................................................25

*Richard Feiner & Co. v. Turner Entm't Co.*,
   1998 WL 78180 (S.D.N.Y. Feb. 24, 1998)................................................................24

*Robert Bosch LLC v. Pylon Mfg. Corp.*,
   659 F.3d 1142 (Fed. Cir. 2011)....................................................................................4

*Roton Barrier, Inc. v. Stanley Works*,
   79 F.3d 1112 (Fed. Cir. 1996)....................................................................................21

*Saban v. Caremark Rx, LLC*,
   780 F. Supp. 2d 700 (N.D. Ill. 2011) .........................................................................12

*Sanofi-Synthelabo v. Apotex, Inc.*,
   470 F.3d 1368 (Fed. Cir. 2006).....................................................................................5

*SAS Inst., Inc. v. World Programming Ltd.*,
   874 F.3d 370 (4th Cir. 2017) .....................................................................................14

*Skycam, LLC v. Bennett*,
   2012 WL 4483610 (N.D. Okla. Sept. 27, 2012) ..........................................................2

*Smith & Nephew, Inc. v. Synthes (U.S.A.)*,
   466 F. Supp. 2d 978 (W.D. Tenn. 2006)....................................................................14

MSA0394

*Sokol Crystal Prods. Inc. v. DSC Commc'ns. Corp.*,
   15 F.3d 1427 (7th Cir. 1994) ...................................................................................................25

*Span–Deck, Inc. v. Fab–Con, Inc.*,
   677 F.2d 1237 (8th Cir. 1982) ...............................................................................................2, 3

*SynQor, Inc v. Artesyn Techs., Inc.*,
   2011 WL 238645 (E.D. Tex. Jan. 24, 2011).............................................................................18

*TEK Glob., S.R.L. v. Sealant Sys. Int'l, Inc.*,
   920 F.3d 777 (Fed. Cir. 2019)...................................................................................................9

*United States v. Kirschenbaum*,
   156 F.3d 784 (7th Cir. 1998) ...................................................................................................20

*Veeco Instruments Inc. v. SGL Carbon, LLC*,
   2017 WL 5054711 (E.D.N.Y. Nov. 2, 2017)..............................................................................6

*Vendavo, Inc. v. Long*,
   397 F. Supp. 3d 1115 (N.D. Ill. 2019) ...............................................................................3, 6, 11

*Windsurfing Int'l, Inc. v. AMF, Inc.*,
   782 F.2d 995 (Fed. Cir. 1986)...................................................................................................11

*Zeigler Auto Grp. II, Inc. v. Chavez*,
   2020 WL 231087 (N.D. Ill. Jan 15, 2020) ..............................................................................3, 4

*Zenith Radio Corp. v. Hazeltine Research, Inc.*,
   395 U.S. 100 (1969)..................................................................................................................19

**Statutes**

18 U.S.C. § 1837(2) .......................................................................................................................24

**Rules**

Fed. R. Civ. P. 65.........................................................................................................................19

MSA0395

## I.    INTRODUCTION

Hytera's brazen disregard of the jury verdict in this case must finally be stopped.  Over four months after the jury found Hytera willfully and maliciously stole Motorola's trade secrets and infringed Motorola's copyrights, Hytera continues to sell the very products the jury found contain Motorola's stolen technology.  Hytera's refusal to stop selling products with Motorola's stolen trade secrets and source code unless enjoined conclusively establishes the importance and profitability of its "infringement [and misappropriation] and suggests that mere damages will not compensate for [Hytera's] increasing share of" the very market that Motorola "created with its investment in patented [or protected] technology." *Douglas Dynamics, LLC v. Buyers Prods. Co.*, 717 F.3d 1336, 1345 (Fed. Cir. 2013); *Apple Inc. v. Psystar Corp.*, 673 F. Supp. 2d 943, 949 (N.D. Cal. 2009) (granting permanent injunction and finding continued copyright infringement "would irreparably harm the competitive position and market share of Mac OS X"), *aff'd*, 658 F.3d 1150 (9th Cir. 2011).  It also confirms that injunctive relief is necessary to protect innovation—the lifeblood of the global economy—from the unlawful conduct that threatens to destroy it.  Having proven that Hytera stole its trade secrets and infringed its copyrights, Motorola should no longer be forced to compete with its own innovations.  A permanent injunction should be entered.[1]

## II.    Motorola Has Succeeded on the Merits

Despite losing every single issue considered at a three-and-a-half-month long trial, Hytera incredibly continues to argue that Motorola has not succeeded on the merits.  The crux of Hytera's argument is that the verdict form "shows only that the jury found at least one trade secret had been

---

[1] Because defendants Hytera America, Inc. and Hytera America (West), Inc. have filed for Chapter 11 bankruptcy, at this time, Motorola only requests that a permanent injunction issue as to the non-debtor defendant Hytera Communications Corp., Ltd.  *See* Dkt. 976 at 3.  Motorola's motion is without prejudice to seeking a permanent injunction against, or any other relief from, Hytera America, Inc. and Hytera America (West), Inc. at a later date.

MSA0396

misappropriated and one copyright infringed[.]" Opp. 2. Hytera's argument misunderstands the law. Moreover, Hytera does not contend in this brief (or any other) that the record was insufficient to support misappropriation of any particular trade secret. To the contrary, Hytera argues that it did not misappropriate even a single trade secret. Dkt. 954 § I.B (none of Motorola's trade secrets are sufficient described); *id.* § II.A (Motorola did not prove any of its trade secrets are protectable). Hytera's all-or-nothing approach confirms what Motorola has argued all along: the jury's verdict gives rise to a presumption that the jury found all 21 trade secrets misappropriated and all 4 copyrights infringed. *See Span–Deck, Inc. v. Fab–Con, Inc.*, 677 F.2d 1237, 1241 n. 5 (8th Cir. 1982) (general verdict "give[s] rise to the presumption that material fact issues have been resolved in favor of the prevailing party").[2] The jury was given the option to apportion damages if it found fewer than all 21 trade secrets misappropriated; yet the jury awarded the full damages amount Motorola requested. *See* Dkt. 947. Part of that award was $73.5 million for avoided R&D for ***all*** asserted trade secrets. *See* Trial Tr. 2184:17-2185:10, 2189:6-15. Based on the entirety of the jury's verdict, it is therefore clear that—consistent with the presumption—the jury ***in fact*** found all trade secrets misappropriated and all copyrights infringed. *Span–Deck*, 677 F.2d at 1241 n.5.[3]

Hytera also attempts to sidestep Motorola's overwhelming success on the merits by arguing the Court cannot grant an injunction on all 21 trade secrets without makings specific findings that

---

[2] *See also Kemin Foods, L.C. v. Pigmentos Vegetales Del Centro S.A. DE C.V.*, 369 F. Supp. 2d 1075, 1084 (S.D. Iowa 2005) (entering injunction and rejecting "arguments that the general verdict [] prohibits injunctive relief"), *aff'd*, 464 F.3d 1339 (Fed. Cir. 2006); *Skycam, LLC v. Bennett*, 2012 WL 4483610, at *2 n.2 (N.D. Okla. Sept. 27, 2012) (rejecting argument general verdict precluded injunction).

[3] Hytera's cited cases are out-of circuit and non-binding. They also do not apply to the facts here. Unlike in *Avery Dennison Corp. v. Four Pillars Enter. Co.*, 45 F. App'x 479, 487 (6th Cir. 2002), and *Allied Erecting & Dismantling Co. v. Genesis Equip. & Mfg*, 2010 WL 3370286, *1 (N.D. Ohio Aug. 26, 2010), *aff'd* 511 F. App'x 398 (6th Cir. 2013), it is clear from the verdict that the jury found all trade secrets misappropriated, including because the jury awarded the full amount of avoided R&D. Hytera also mischaracterizes *I-Flow Corp. v. Apex Med. Techs., Inc.*, 2010 WL 141402 (S.D. Cal. Jan. 8, 2010); the court in that case ***did grant*** a permanent injunction, but clarified the scope of the injunction to specify the covered products.

MSA0397

each has been misappropriated and used by Hytera. Opp. 3-4. Hytera cites no support for this argument, but in any event, the work of defining Motorola's trade secrets was done at the three-and-a-half month long trial.[4] In addition, the jury was instructed to make these very findings, and did so. Dkt. 895 at 22, 26, 29. Simply put, Hytera's feigned ignorance of what it stole is no basis for declining to enter a permanent injunction, and the jury's verdict form fully confirms Motorola has succeeded on the merits of the full extent of its claims. *See Span–Deck*, 677 F.2d at 1241 n.5; *Meron Tech. Distrib. Corp. v. Discreet Indus. Corp.*, 189 F. App'x 3, 5 (2d Cir. 2006) (no abuse of discretion where district court entered "permanent injunction as to all 266 parts of the Eclipse machine" based on general verdict); *Chemetall GmbH v. ZR Energy, Inc.*, 2001 WL 1104604, at *7 (N.D. Ill. Sept. 18, 2001) (rejecting argument that general verdict precluded entry of injunction).

### III.    An Injunction Is Necessary To Prevent Ongoing Irreparable Harm to Motorola

####    A.    Hytera's Ongoing Use of Motorola's Trade Secrets and Copyrights Will Cause Motorola Irreparable Harm That Monetary Damages Cannot Remedy

Motorola has explained in detail why Hytera's continued misappropriation of Motorola's trade secrets and infringement of its copyrights has caused, and will continue to cause, Motorola irreparable harm that cannot be compensated with monetary damages. Dkt. 962 § II.B; *Zeigler Auto Grp. II*, *Inc. v. Chavez*, 2020 WL 231087, at *10 (N.D. Ill. Jan 15, 2020); *PrimeSource Bldg. Prod., Inc. v. Huttig Bldg. Prod., Inc.*, 2017 WL 7795125, at *11 (N.D. Ill. Dec. 9, 2017) (irreparable harm established where defendant used plaintiff's trade secrets and "continue[d] to use that information to compete unfairly").[5] Hytera tries to refute the irreparable harm it has

---

[4] *See, e.g.*, Trial. Tr. 589:15-597:1, 615:17-621:25, 631:15-638:1, 709:25-724:5, 734:15-754:4, 867:4-894:20, 1001:2-1015:9, 1180:17-1190:16, 1241:14-1242:13; PTX-126, 127, 268, 328, 459, 468, 531, 532, 666 667, 672, 674, 675, 681, 686, 690, 691, 709, 711, 720, 722, 725-731, 734, 738, 742, 750, 754, 762, 766, 768, 770, 772, 776, 784, 785, 789, 791-793, 798, 802, 839, 861, 1250, 1255, 1258, 1259, 1260, 1264, 1309-1310, 1313-1317, 1330-1332, 1340-1342, 1345, 1346, 1350, 1381, 1701, 1865, 1866.

[5] Hytera also argues there is no presumption of irreparable harm in trade secret cases. Opp. 5-6. Courts in this District continue to apply the presumption. *See, e.g.*, *Vendavo, Inc. v. Long,* 397 F. Supp. 3d 1115,

caused by competing with Motorola using its stolen technology by arguing (i) monetary damages suffice; (ii) Motorola has not established price erosion, lost market share, lost customers, or reputational harm; and (iii) Motorola has not proven a causal nexus. Opp. 5-10. None of these arguments has merit. Motorola has plainly established Hytera's illegal conduct has caused irreparable harm.

1. **Monetary Damages Are Inadequate Including Because Hytera Has Unlawfully Vowed to Interfere with Motorola's Ability to Collect**

According to Hytera, any harm to Motorola is quantifiable because the jury awarded a perpetual royalty. Opp. 6-7. But as Motorola has repeatedly explained, the parties did not ask the jury to award a royalty, and the jury was not instructed to do so. *Erfindergemeinschaft UroPep GbR v. Eli Lilly & Co.*, 2017 WL 3034655, at *3 (E.D. Tex. July 18, 2017); Dkt. 936 at 4-7, Dkt. 962 at 7. In addition, monetary damages are particularly inadequate here because Hytera has made clear that it has no intention of ever paying any so-called royalty, and in fact that it will do whatever it takes—illegal or not—to avoid paying this Court's judgment, including by moving assets outside the United States. Dkt. 978-10 at 4-6. Despite contending that final judgment was entered on March 5, 2020, Hytera has refused to post a bond. The two U.S. Hytera entities have filed for bankruptcy, and without the help of foreign courts, Motorola has little hope of collecting from Hytera Communications Corporation. This "reinforces the inadequacy of a remedy at law." *Robert Bosch LLC v. Pylon Mfg. Corp.*, 659 F.3d 1142, 1155-56 (Fed. Cir. 2011) (granting injunction where defendant and parent were in "questionable financial condition").

2. **Motorola Provided Significant Evidence of Irreparable Harm**

In addition to the harm of having to unfairly compete against the Hytera products that use

---

1143 (N.D. Ill. 2019); *Zeigler Auto Grp. II,* 2020 WL 231087, at *10. Regardless, Motorola has proved multiple forms of irreparable harm it will continue to suffer in the absence of an injunction.

Motorola's stolen technology, Motorola has also identified numerous other ongoing, irreparable harms that Hytera has not shown can be quantified or remedied with money damages.

**Lost Customers**. Motorola has continued to lose customers to Hytera *even after the jury verdict*, including where it offered significant price cuts in order to try to win the bids. Ex. 13 at 140:8-23 (███████████████████████); *id.* at 141:5-142:5 (███████████████████████ ████████████); Ex. 12 ¶¶ 29-31. This is precisely the type of ongoing irreparable harm an injunction would prevent. *Molex, Inc. v. Nolen*, 759 F.2d 474, 478 (5th Cir. 1985) ("irreparable harm may be shown in customer theft situations"). Hytera does not dispute lost customers constitute irreparable harm, nor could it. *Am. Family Mut. Ins. Co. v. Roth*, No. 05-03839, 2005 WL 3700232, at *26-27 (N.D. Ill. Aug. 5, 2005) ("Where trade secrets have been misappropriated, the resultant loss of customer base and goodwill … has been held to amount to irreparable harm."), *report and recommendation adopted*, 2006 WL 2192004 (N.D. Ill. July 27, 2006).

**Decreased Pricing.** Motorola's opening brief set forth several specific examples of Motorola lowering prices around the world in order to compete with Hytera's stolen products. Dkt. 962 at 5-6; Dkt. 962-1 ¶¶ 6-11. This is irreparable harm. *See Sanofi-Synthelabo v. Apotex, Inc.*, 470 F.3d 1368, 1382 (Fed. Cir. 2006) (finding price erosion to be irreparable harm). Hytera attempts to brush this evidence away by labeling it an "anecdote" and claiming Motorola did not account for other possible explanations for the price decreases. Opp. 7. Hytera, however, knows these are not anecdotes because Hytera deposed (at its own insistence) Russ Lund, Motorola's Vice President of Product and Engineering for Professional and Commercial Radios ("PCR"). Mr. Lund testified that Motorola has had to engage in a consistent campaign of discounting its DMR products in direct response to price competition from Hytera's Accused Products. *See* Ex. 13 at 31:18-23, 33:9-34:5, 35:5-15, 37:2-13, 134:3-16, 136:23-137:6.; Ex. 12 ¶ 30. This is more than

sufficient to establish irreparable harm. *Sanofi*, 470 F.3d at 1382.

Hytera also posits price erosion is quantifiable but performs no such quantification. Opp. 7; Dkt. 986-1 ¶¶ 21-27. Regardless, Hytera's argument ignores that once Motorola has lowered prices to compete with Hytera, its dealers have and will continue to demand lower pricing. Ex. 12 ¶ 32. Once that has happened, it may be impossible to restore Motorola's previous position because "[r]equiring purchasers to pay higher prices after years of paying lower prices to infringers is not a reliable business option." *See Polymer Techs., Inc. v. Bridwell*, 103 F.3d 970, 975–76 (Fed. Cir. 1996); *Veeco Instruments Inc. v. SGL Carbon, LLC*, 2017 WL 5054711, at *13, *27 (E.D.N.Y. Nov. 2, 2017) (similar). This is the definition of irreparable harm.

Nor is there a requirement, as Dr. Aron suggests, for Motorola to conduct a market analysis against all competitors and in all regions to prove price erosion. Dkt. 986-1 ¶¶ 52-53. As explained above, Motorola has direct proof that Hytera is the cause of its lowered prices. In addition, Hytera's DMR radios products compete head-to-head with MotoTRBO products because they are the most comparable, and competitive, products in the market. Trial Tr. 2168:21-2169:13, 2175:4-21. Moreover, this type of irreparable harm requires injunctive relief. *See Vendavo, Inc. v. Long*, 397 F. Supp. 3d 1115, 1144 (N.D. Ill. 2019).

**Loss of Market Share.** "Loss of market share is a key consideration in determining whether a plaintiff has suffered irreparable harm."[6] *Black & Decker Inc. v. Robert Bosch Tool Corp.*, 04-7955, 2006 WL 3446144, *4 (N.D. Ill. Nov. 29, 2006). Mr. Lund confirmed at his

---

[6] The cases on which Hytera relies are not to the contrary. In *McDavid Knee Guard, Inc. v. Nike USA, Inc.*, 683 F. Supp. 2d 740, 749 (N.D. Ill. Jan. 14, 2010), the plaintiff "had not provided th[e] court with evidence of an actual decrease [] in market share." While the court in *Binney & Smith v. Rose Art Indus., Inc.*, 1995 WL 103532, *13 (N.D. Ill. Mar 3, 1995), said that "market share [wa]s not traditionally irreparable harm," it also explained that the plaintiff's loss of market share could, in fact, establish irreparable harm. In *Abbott Labs. V. Andrx Pharm., Inc.*, 452 F.3d 1331, 1347 (Fed. Cir. 2006), no injunction was entered because the plaintiff had "not established a likelihood of success on the merits."

6

deposition that, consistent with Motorola's internal analyses, Hytera "has been increasing their market share year over year and Motorola['s] has been declining[.]"[7] Contrary to Hytera's claim, Opp. 7, Motorola does track the competitive landscape in PCR by region, and that analysis confirms that Hytera's PCR market share has increased in all regions, whereas Motorola's market share has either decreased or remained about the same.[8]

Hytera also improperly equates lost market share with a lost sale to argue it does not constitute irreparable harm. Dkt. 986-1 ¶¶ 18-20. But lost market share is more than just a lost sale. Hytera has steadily eroded Motorola's market share; because DMR products have a life span of seven to ten years, it will take Motorola a significant amount of time to gain that market share back, if ever. Dkt. 962 at 5. Motorola's lost market share should come as no surprise to Hytera: when Hytera entered the DMR market, it took direct aim at Motorola and has made clear it is "here to stay" unless the Court orders it out of the market. Dkt. 766-8 at 215:19-217:6.

**Reputational Harm.** Hytera does not dispute that reputational harm is irreparable; instead, Hytera claims Motorola's reputation harm is "speculative attorney argument." Opp. 8. But for a decade, Hytera held itself out to be an innovator in the DMR market while in reality, it had stolen those innovations from Motorola.[9] Hytera also does not dispute that it used the money

---

[7] *See* Ex. 13 at 154:12-15, 155:1-12; *see also* Dkt. 902 (Lund Decl.) ¶ 13 and Exs. C-F.

[8] *See* Dkt. 902 at Exs. C-F.

[9] *See, e.g.*, Trial Tr. 2170:22-2171:5; Dkt. 900-21 (PTX-0005) at 5.1 (2017 Hytera press releases); Dkt. 900-23 (Ex. 16) (PTX-2101) (Hytera form letter to dealers); *see also* Trial Tr. 3534:7-15; Dkt. 900-24 (MetroCom-1973-00000067); Trial Tr. 3532:9-3534:15; Dkt. 900-25 (Ex. 18) (PTX-2277).

MSA0402

it saved by stealing Motorola's trade secrets to "leapfrog" Motorola's development. Dkt. 962 at 8-9. Not only did Hytera's theft diminish Motorola's standing in the market, Hytera now attempts to rely on those very features to try to avoid the injunction in this case. That is precisely the type of irreparable harm that an injunction is necessary to address.[10] *Dulisse v. Park Int'l Corp.*, 1998 WL 25158, at *4 (N.D. Ill. Jan. 9, 1998); *Douglas Dynamics*, 717 F.3d at 1344- 45 (reputational harm "if customers found the same 'innovations' appearing in competitors' snowplows").

### 3. Hytera's "Causal Nexus" Argument Does Not Bar an Injunction

Hytera contends no injunction should enter because there is no "causal nexus" between Motorola's harm, on the one hand, and the trade secrets Hytera stole and the copyrights Hytera infringed, on the other. Opp. 8-10. As an initial matter, this Circuit has not grafted a causal nexus requirement onto the permanent injunction analysis and Hytera cites no trade-secret and copyright-infringement case doing so. Hytera's causal nexus requirements are thus irrelevant. Moreover, the causal nexus cases Hytera cites confirm it is inapplicable here. In those cases, the Federal Circuit imposed a "causal nexus" requirement specifically for "a multi-purchaser, multi-component situation in which only a component of a larger product or system is covered by the patent in suit." *Genband US LLC v. Metaswitch Networks Corp.*, 861 F.3d 1378, 1384 (Fed. Cir. 2017). But here, Motorola's trade secrets and copyrights cover far more than just a single component of Hytera's radios; they cover the foundational architecture for the radio to process voice calls and allow users to hear each other, and to utilize a protocol stack to communicate on the DMR standard at all. Trial Tr. 614:13-615:2, 715:21-716:9, 2330:3-7. That is a far cry from the limited functionality that the patents at issue in *Apple v. Samsung* covered in a thousand-feature

---

[10] Contrary to Hytera's assertion, Opp. 6 n.6, in *Pampered Chef v. Alexanian*, 804 F. Supp. 2d 765, 805-06 (N.D. Ill. 2011), the court recognized that "loss of reputation" "would be virtually impossible to quantify."

smartphone.[11]  Just as the long-lasting battery in the analogy from *Apple* "might make a [non-infringing] laptop less desirable," 735 F.3d at 1364–65, Motorola's trade secrets enable its DMR radios to have robust and reliable voice communication using the DMR protocol—the fundamental purpose of a DMR radio.  Thus, they, too, are a driver of consumer demand, since there would be *no* demand for a DMR radio that could not reliably communicate on the DMR standard.

Regardless, even if this Court concludes a causal nexus is required, Motorola readily satisfies it.  Hytera suggests that Motorola can only prove that its trade secrets and copyrights "are drivers of consumer demand" if "customers do not purchase Hytera's DMR products because of generic features included in all radios."  Opp. 9-10.  That is not the standard.  "Driving demand[] does not require a patented feature to be the only basis of consumer demand."  *TEK Glob., S.R.L. v. Sealant Sys. Int'l, Inc.*, 920 F.3d 777, 792 (Fed. Cir. 2019).  It is "enough … to show that a significant reason consumers bought its device was the presence of the patented features."  *Id.*  Said another way, "[i]f all but an insignificant number of purchases from the infringer would have been made *even without the infringing feature*, the causal connection to the asserted lost-sale-based injury is missing."  *Genband*, 861 F.3d at 1384 (emphasis added).  Here, the evidence presented and accepted by the jury at trial establishes that without Motorola's trade secrets and copyrights, Hytera would not have sold a single DMR radio.[12]  *See also* Trial Tr. 5075:2-5076:12 (without Motorola's source code, Hytera's DMR radios "simply would not function.").  Before its

---

[11] *See Apple, Inc. v. Samsung Electronics Co.*, 678 F.3d 1314, 1317-19 (Fed. Cir. 2012) and *Apple Inc. v. Samsung Elecs. Co.*, 735 F.3d 1352, 1358 (Fed. Cir. 2013) (patents relating to scrolling and zooming functionality, and rounded shape of the phone corners); *Apple Inc. v. Samsung Elecs. Co.*, 695 F.3d 1370, 1372 (Fed. Cir. 2012) (patent related to "unified search" function).

[12] While Mr. Grimmett's declaration (Dkt. 986-3) parrots his trial testimony alleging that Motorola's trade secrets do not drive consumer demand, both he and another Hytera expert admitted at trial that Motorola's trade secrets were critical to the operation of DMR radios.  *See, e.g.*, Trial Tr. 4717:20-4719:8 (ROSAL specification contains "utmostly necessary" technology); *id.* at 4090:23-4091:7 ("but for the Motorola code that was stolen," the libraries Hytera claims to have independently written "would not work").

theft, Hytera's DMR development was described, internally, as a "monolithic, spaghetti system" (PTX-608) that was incomplete (PTX-2202) and "unhealthy" (PTX-202); their failure to complete a prototype rendered their work "useless." PTX-2202; *see also* Trial Tr. 1882:6-1926:2. These problems were solved when Hytera stole Motorola's DMR radio trade secrets, which Hytera rapidly used to turn its incomplete and "useless" product into the functioning product that competes with Motorola's products to this day. Trial Tr. 1917:16-1919:1; PTX-2025, PTX-2031.

Even Hytera's customers and experts acknowledge that Motorola's trade secrets are, at a minimum, a reason its DMR radios are purchased. For example, the ██████████ ████████████████████████████████████ (Dkt. 986-1 ¶ 70) are enabled by Motorola's DSP, noise suppression, squelch, protocol stack, and the source code trade secrets. Trial Tr. 614:13-615:2, *id.* at 715:21-716:9. Hytera had none of that functionality before stealing Motorola's trade secrets. *Id.* at 1190:17-19, 1172:18-1173:3. Likewise, the development of ████████████████ in Hytera's products (Dkt. 986-1 ¶¶ 74-76) would have been impossible in its previous "spaghetti system," which Hytera's engineers acknowledged made it "harder to respond to market shifts." PTX-608. Not until the infusion of Motorola's application layer and software architecture trade secrets, which are "very extensible" and support "add[ing] new features and new development," was Hytera able to provide the flexibility its customers claim to desire. Trial Tr. 614:13-615:5, 1182:7-1184:7. Thus, without its wholesale theft and infringement, Hytera would not be able to develop any purported "unique, customized features."

Hytera references employee and expert declarations that describe other features as reasons why customers buy Hytera radios. Opp. 9, n.8. But none of Hytera's declarants say that they would buy a Hytera radio that did not block out excess noise during voice calls or operate on the DMR standard. Tellingly, the declarants also fail to explain whether these purported Hytera

proprietary features are superior to other analogous features of Motorola's DMR radios.[13]  And, while Hytera claims that it has "released approximately ▉ customized DMR software features" and "designed many other customized features to respond to specific customer scenarios," as explained above, Hytera would not have been able to design these additional features if it had not stolen Motorola's trade secrets to use as the foundational, architectural framework of its DMR radios in the first instance.  The law is clear that Hytera's purportedly non-misappropriated and non-infringing features cannot save it from an injunction.  *Brocade Commc'ns Sys., Inc. v. A10 Networks, Inc.*, 2013 WL 140039, at *7-8 (N.D. Cal. Jan. 10, 2013) (granting injunction as to "any AX series application delivery controller that includes" infringing features).

**B.      The Balance of Harm Weighs Decidedly In Favor Of Enjoining Hytera**

According to Hytera, the balance of hardships "tilts sharply in Hytera's favor" because an injunction "could put Hytera out of the DMR market altogether."  Opp. 10.  The law requires the opposite: where, as here, "the injunctive relief sought primarily focuses on prohibiting a defendant from using information he should not have taken in the first place, the balance of harms weighs heavily in favor of granting an injunction."  *Vendavo*, 397 F. Supp. 3d at 1145.  While Hytera complains that its investments in a DMR distributor network and R&D will be lost if an injunction enters, Hytera has only been able to build a network and gain customers due to its misappropriation and infringement.  "One who elects to build a business on a product found to infringe cannot be heard to complain if an injunction against continuing infringement destroys the business so elected."[14]  *Windsurfing Int'l, Inc. v. AMF, Inc.*, 782 F.2d 995, 1003 n.12 (Fed. Cir. 1986).

---

[13] Dr. Aron also admitted that ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉  *See* Ex. 15 at 110:5-112:2; *id.* at 123:13-124:2.  That hardly suffices to determine which features Hytera's broad customer base values in the Accused Products.

[14] Motorola addresses Hytera's claim that its customers will be harmed due to lack of access to these

MSA0406

To argue Motorola will be unharmed in the absence of an injunction, Hytera once again argues that the jury's award of $73.6 million in avoided R&D is a perpetual royalty. Opp. 10–11. As Motorola has explained repeatedly, it is not (Dkt. 936 at 4-7, Dkt. 962 at 7), and it would be inequitable to hold otherwise.[15] In addition, Hytera's claim that Motorola will not lose investments in its own dealer network without an injunction ignores the substantial evidence that Motorola loses sales to Hytera, which would impact Motorola's dealer network. *See* § III.A.2, *supra*. Hytera's "arguments merit little equitable consideration in light of [Hytera's] willful use" of Motorola's trade secrets and copyrights and the balance of the hardships heavily favors Motorola.[16] *See Helene Curtis Indus., Inc. v. Church & Dwight Co.*, 560 F.2d 1325, 1333 (7th Cir. 1977).

### C. The Public Interest Strongly Favors Enjoining Hytera's Unlawful Conduct

#### 1. Unfair Competition Is Not in the Public Interest

Hytera all but ignores the paramount public interest in "upholding the sanctity of confidential information such as trade secrets and preventing others from the unauthorized use of such confidential information for their own benefit."[17] *Mazak Optonics Corp. v Marlette*, 2017

---

purported proprietary features in § III.C.2 *infra*. "[H]arm to third parties," like customers, is of little relevance to the balance-of-hardships analysis." *Buffalo Wild Wings Int'l, Inc. v. Grand Canyon Equity Partners, LLC*, 829 F. Supp. 2d 836, 847 (D. Minn. 2011).

[15] In *CardiAq Valve Techs., Inc. v. Neovasc Inc.*, 2016 WL 6465411 (D. Mass. Oct. 31, 2016), Hytera's only "authority," the jury awarded a reasonable royalty. *See id.* at *8.

[16] While an equitable remedy like an injunction cannot be used to punish, courts routinely consider the willfulness of a defendant's conduct in assessing the hardship of an injunction. *See, e.g.*, *Luxottica USA LLC v. The Partnerships & Unincorporated Associations Identified On Schedule "A"*, 2015 WL 3818622, at *4 (N.D. Ill. June 18, 2015) ("because Defendant's conduct was willful, the balance of hardships favors [Plaintiff]"); *Forever Foundations & Frame, LLC v. Optional Prod. LLC*, 2014 WL 12585800, at *5 (C.D. Cal. Dec. 19, 2014) (similar). The cases Hytera cites are not to the contrary. *Saban v. Caremark Rx, LLC*, 780 F. Supp. 2d 700, 715 (N.D. Ill. 2011), discussed a preliminary injunction before any finding of willfulness, and *3M v. Pribyl*, 259 F.3d 587, 609 (7th Cir. 2001), did not discuss willfulness at all.

[17] Hytera no longer appears to assert that its exclusion would result in a "one-player" market. Its new gloss on this same argument is equally untenable for the reasons explained above.

12

WL 3394727, at *3 (N.D. Ill. Aug. 8, 2017).  In defiance of that public interest, Hytera claims it should be permitted to compete with Motorola, using Motorola's own stolen technology, because "[t]he public interest is disserved by reduced competition."  Opp. 15.  Hytera relies on an ▇▇▇ analysis conducted by Dr. Aron, which concludes that an injunction would result in ▇▇▇▇▇▇ ▇▇▇▇▇▇ for Motorola.  Dkt. 986-1 ¶¶ 110-120.  The ▇▇ is used to assess the impact mergers may have on the market.  Hytera and Motorola are not merging, and the ▇▇ does not take into account the impact on the public from allowing adjudicated trade-secret theft to continue. Ex. 14 § 4.  Moreover, Hytera's current claim that removing a single DMR supplier from the market would create untenable market power is inconsistent with its own website and trial testimony, which repeatedly touted the existence of other DMR manufacturers as a benefit of DMR radios.[18]  Dkt. 935-4.  Even the declarations Hytera submits in support of its opposition identify ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇.  Dkt. 986-2 (Min Decl.) Exs. A & B.  And, as explained in §§ III.C.2, 4, *infra*, Motorola is fully capable of satisfying demand resulting from Hytera's exclusion from the market.

Hytera also claims customers will be harmed because once Hytera leaves the market, Motorola will be free to raise its prices.[19]  Hytera, however, does not identify a public interest in low cost radios using stolen technology, making its reliance on *Machlett Labs., Inc. v. Techny Indus.*, Inc., 665 F.2d 795, 798 (7th Cir. 1981), inapposite.  *See id.* at 798 (finding there was "[a] public interest in the low cost of health care").  While some customers may enjoy the lower prices that Hytera has offered—at the expense of Motorola and the innovation economy—"cheap copies" of trade secrets and copyrights "have the effect of inhibiting innovation and incentive.

---

[18] Trial Tr. 672:18-673:14, 2024:1-11, 3409:17-22, 5047:15-5048:16, 5053:18-25, 5741:4-18; Dkt. 936-11.

[19] ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇.  *See, e.g.*, Ex. 13 at 41:7-13.

MSA0408

This detrimental effect, coupled with the public's general interest in the judicial protection of property rights in inventive technology, outweighs any interest the public has in purchasing cheaper infringing products." *Douglas Dynamics*, 717 F.3d at 1346. In a situation such as this, where Hytera has repeatedly claimed many other substitutes for DMR radios exist, the public interest does not weigh against an injunction. *See, e.g.*, *CSIRO v. Buffalo Tech. Inc.*, 492 F. Supp. 2d 600, 607 (E.D. Tex. 2007); *Smith & Nephew, Inc. v. Synthes (U.S.A.)*, 466 F. Supp. 2d 978, 985 (W.D. Tenn. 2006) (an injunction would not result in a "considerable hardship . . . because other competing products would fill any temporary void created by the injunction.").[20]

### 2. Motorola Has Capacity to Meet Demand

As Motorola explained in its opening brief, it has the capability to meet demand resulting from Hytera's exclusion from the market. Dkt. 962 at 12-13. In addition to the ██████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████. Ex. 12 ¶¶ 5-7. Motorola's manufacturing and distribution capabilities can meet this demand despite the ongoing COVID-19 pandemic. *Id.* ¶¶ 8-15; Ex. 13 at 173:2-15.

To argue otherwise, Hytera relies on Mr. Grimmett's claim that ████████████████

████████████████████████████████████████████████████████████████

████████████████.[21] Dkt. 986-3 (Grimmett Decl.) ¶ 102. But Hytera's 2018 DMR sales are well

---

[20] Hytera's cited cases regarding harm to third parties are inapposite. *Okaw Drainage Dist. of Champaign & Douglas Cty., Ill. v. Nat'l Distillers & Chem. Corp.*, 882 F.2d 1241, 1248 (7th Cir. 1989) concerned the issue of whether an injunction could effectively cut off the drinking water supply of multiple towns—a harm not akin to replacement radio parts. In *SAS Inst., Inc. v. World Programming Ltd.*, 874 F.3d 370, 388 (4th Cir. 2017), the court found that "the public interests weighing in favor of an injunction rely on broad, abstract rule of law concerns" as compared to "more concrete harms" to third parties. Those circumstances do not exist here, where Motorola has articulated concrete public interests weighing in favor of an injunction and can minimize any speculative harm to third parties because Motorola's DMR radios are interoperable with Hytera's and can implement additional features required by consumers in any event.

[21] Mr. Grimmett later claims that ███████████████████████████████████████████

MSA0409

within Motorola's ████████████, which Mr. Grimmett has no basis to dispute. Dkt. 936-1, ¶ 4. While Mr. Grimmett references ██████████████████████████████ ███████████████████ (Dkt. 986-3 (Grimmett Decl.) ¶¶ 123–24), as described above, Motorola provided substantial evidence that it does have this capacity and capability.

Hytera's damages expert likewise claims that Motorola could not "meet immediate customer demands in all regions of the world." Opp. 15 (citing Aron Decl. ¶ 87 n.115). Despite some concerns expressed by Hytera and a handful of customers,[22] Motorola has consistently been able to provide products into countries or areas far and wide, even where it does not have a field office.[23] Motorola frequently supplies DMR systems to areas that just suffered a natural disaster—such as Haiti and Chile after powerful earthquakes, Australia and New Zealand after the devastating wildfires, and Liberia in the throes of the Ebola outbreak—showing that Motorola can ramp up and adapt its operations quickly, even for non-traditional customer scenarios. Ex. 12 ¶¶ 18-21. Even Hytera's customers acknowledge ██████████████████████████████.[24]

Hytera also makes much of ████████████████████████ to claim that Motorola would not be able to supply into one of Hytera's largest markets. Dkt. 986-1 ¶ 125. But Motorola has continued to supply millions of dollars of MotoTRBO products into ████████████

---

██████████████████████████████████████████████████████
████████████████████ Dkt. 936-1, ¶ 4.

[22] *See, e.g.*, Dkt. 986-7 (Hu Decl.) ¶ 8 ██████████████████████████ ██████████████████████████████████████████████████████

[23] Ex. 12 ¶¶ 18-21; *see also* Ex. 16 at 198:6-199:1 ████████████████████ ██████████████████████████████████████████████████████████

[24] Dkt. 986-10 (Camelo Decl.) ¶ 9 ██████████████████████████ ██████████████████████████████

MSA0410

██████████████████████████████████████████████████████
████████████████ . Ex. 12 ¶ 22. Thus, Motorola has established it has capacity to supply the market when Hytera is enjoined. *See Hafco Foundry & Mach. Co., Inc. v. GMS Mine Repair & Maint., Inc.*, 2018 WL 1786588, at *5 (S.D.W. Va. Apr. 12, 2018) (no public health and safety concerns where plaintiff "has the ability to supply the market").

### 3. Hytera's "Additional Features" Do Not Preclude an Injunction[25]

Hytera claims its radios are "incompatible" with Motorola's and thus customers will be harmed if Hytera can no longer sell its Accused Products. Opp. 13. The evidence soundly refutes that claim. Hytera's DMR Radios and Motorola's MotoTRBO products both use the DMR standard and thus are *required* to be interoperable. Ex. 23. In fact, Motorola and Hytera undergo annual testing to *ensure* compatibility, and their radios function smoothly together in numerous real-world examples. *See* Exs. 17-19, 24. That is unsurprising, given how much of Motorola's DNA is embedded into Hytera's products that it continues to sell to this day. Even Hytera's customers admit ████████████████████████████████████ and that, like Hytera, Motorola █████████████████████████████ . Dkt. 986-8 (Breitner Decl.) ¶¶ 7, 13.

In an effort to deflect from the reality that the parties' products are interoperable, Hytera insist that it has "unique, customized" "features" that are "not interoperable with Motorola's radios."[26] Opp. 13. Setting aside the fact that Hytera has only been able to invest a "significant"

---

[25] *Broadcom v. Emulex*, 2012 WL 13036855, at *6 (C.D. Cal. Mar. 16, 2012) (infringer "cannot claim harm from loss of incumbency advantages predicated on infringement"), *aff'd*, 732 F.3d 1325 (Fed. Cir. 2013).

[26] *See, e.g.*, Dkt. 986-7 (Hu Decl.) ¶ 27 ( ██████████████████████ ), ¶ 36 ██████
██████████████████████████████████████████████████████ ; ¶ 47 (
████████████████ ); Dkt. 986-10 (Camelo Decl.) ¶ 20 ( ████████████
████████████ ); Dkt. 986-11 (Napier Decl.) ¶ 19 (
████████████ ).

16

MSA0411

amount of R&D in additional features because it did not have to invest in developing its own DMR radio, Trial Tr. 2157:10-19, Motorola's DMR products already have existing functionality analogous to, or better than, at least many of the features Hytera describes as "unique" and "customized," and in any case could utilize its world-class engineers to quickly develop additional required features. *See, e.g.*, Ex. 12 ¶¶ 25-28; Ex. 13 at 126:2-12. For example, Motorola's ███████

███████████████████████████████████████████████████████████

███████ *See* Ex. 20. ███████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████ *See* PTX-404.10-13. And the other features Hytera lists—███████████

███████████████████████████████—either have comparable functionality in Motorola devices or have no appreciable consumer demand.[27] Likewise, Hytera's claim of ███████████████████████ being different between the companies is irrelevant; all radio operators customize ███████ and it is trivial for Motorola to adjust ███████ on products it sells to Hytera's former customers. Ex. 12 ¶ 25. Thus, Hytera's supposed unique features do not inhibit a successful replacement of Hytera's Accused Products with Motorola's DMR products.

### 4. An Injunction Will Not Harm Public Safety

Hytera submits a hodgepodge of customer and dealer correspondence to argue that no injunction should enter. *See* Dkt. 986-6.[28] As before, none were submitted under penalty of perjury and none were made available for deposition. Thus, those letters should be disregarded for that reason alone. *Ill. League of Advocates v. Quinn*, 2013 WL 6355552, at \*4 (N.D. Ill. Dec.

---

[27] *Compare* Exs. 25 and 26 (Motorola's GPS-based features) *with* DTX-4299.38 (Section 2.4.3, Location Services, discussing GPS features used in Motorola's DMR radios); *see also* Ex. 27 (Motorola's call priority functionality), Ex. 28 (Motorola's single frequency repeater functionality).

[28] The first six letters attached to Ms. Li's declaration were previously submitted with Hytera's opposition to Motorola's TRO motion, which Motorola addressed in its TRO reply. Dkt. 936 at 9-10.

5, 2013); *Dexia Credit Local v. Rogan*, 2008 WL 4543013, at \*4 (N.D. Ill. Oct. 9, 2008).

The letters themselves also fail to demonstrate that the public interest overrides entry of an injunction in this case. For example, Hytera sold DMR radios to several customers on the eve of trial and *after* the verdict. Dkt. 986-6 at Ex. A (█████████████); *id.* (████████████████); *id.* (████████); *id.* (██████████████); *id.* (██████████████). Hytera was well aware of the risk of an injunction at the time it sold these radios, and its failure to advise its customers of that risk should not be rewarded with no injunction.

Hytera also submitted 15 emails from U.S. dealers, all of which were apparently sent on ██████████, suggesting Hytera solicited this particular feedback. Hytera did not provide its responses to these emails. The emails make clear that, without warning, ████████████████, likely to create the *appearance* of a public interest "problem" to avoid an injunction.[29] As explained above, Hytera chose to continue selling radios and taking orders despite a significant risk that it would be enjoined. Ample time has passed after the February 2020 verdict for Hytera, its dealers, and its customers to prepare for Hytera's exclusion from the market. Hytera cannot now rely on its illegal actions and the purported harm those actions allegedly created to argue against an injunction. *See SynQor, Inc v. Artesyn Techs., Inc.*, 2011 WL 238645, at \*8 (E.D. Tex. Jan. 24, 2011) (granting permanent injunction and finding defendant's and customers' failure to "prepar[e] for the day when they would have to respect SynQor's patent rights is no reason to delay the injunction's effect.").

---

[29] For example, dealers made claims like ████████████████████████████████████ Dkt. 986, PDF p. 250, 252.

MSA0413

Moreover, and dispositively, Hytera's dealer emails make clear that the customers can, in fact, switch to a different DMR radio vendor.[30] Dkt. 986-6 at Ex. A. While Hytera claims this is "an expensive task in terms of both time and money," Opp. 14, Hytera implicitly concedes a switch is feasible and does not say who would bear this expense, Hytera or its customers.[31] Regardless, the ability of these customers to obtain other replacement radios, and their silence after this initial correspondence, dispositively refutes Hytera's claim that the public interest weighs against an injunction. *See, e.g.*, *Invista N. Am. S.A.R.L. v. M & G USA Corp.*, 35 F. Supp. 3d 583, 611 (D. Del. 2014) (granting permanent injunction even where "[c]ustomers will suffer the costs associated with qualifying a new product and the downtime associated with such qualification.").

## IV. Motorola's Proposed Injunction Is Consistent with Rule 65(d)

Hytera identifies five purported issues with Motorola's proposed injunction. *First*, Hytera claims that the injunction would "improperly … prohibit conduct of non-party distributors, dealers, and resellers." Opp. 20. Federal Rule of Civil Procedure 65 expressly states that an injunction binds "persons who are in active concert or participation" provided they receive notice. Fed. R. Civ. P. 65(d)(2)(C). Hytera does not dispute that it is acting in concert with its dealers (many of whom submitted letters opposing this injunction), and thus it is proper to subject them to the injunction.[32] *H-D Mich., LLC v. Hellenic Duty Free Shops S.A.*, 694 F.3d 827, 842 (7th Cir. 2012)

---

[30] Dkt. 986-6 at Ex. A (PDF p. 261) ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

[31] Even if Hytera's customers were to bear such a cost, that still does not weigh against an injunction. *Mitchell v. 3PL Sys., Inc.*, 2013 WL 12129617, at *5 (C.D. Cal. Apr. 8, 2013) (entering injunction despite the fact "it may be costly or disruptive for these customers to transition away from" infringing software).

[32] Hytera's cases are inapposite because they either relate to contempt proceedings, *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 112 (1969) and *Nat'l Spiritual Assembly of Baha'is of U.S. Under Hereditary Guardianship, Inc. v. Nat. Spiritual Assembly of Baha'is of U.S., Inc.*, 628 F.3d 837, 853 (7th Cir. 2010), or injunctions that included non-parties that were "neither acting in concert … nor [] in the capacity of agents" of the enjoined party. *United States v. Kirschenbaum*, 156 F.3d 784, 794 (7th Cir. 1998)

MSA0414

*Second*, Hytera claims not to understand what it means "to remove from its possession … All Motorola-branded documents … that Motorola contends were improperly acquired by Hytera." Opp. 20. Yet this portion of Motorola's proposed order *adopted Hytera's own proposal*. *Compare* Dkt. 961 at 3, *with* Dkt. 987-12 at 2. Hytera's contention that its own language is somehow incomprehensible confirms that Hytera will say anything, regardless of whether it has a basis to do so, to avoid an injunction and obeying the law.

*Third*, Hytera argues § I(2)(ii) of Motorola's proposed injunction is overbroad because it would prohibit Hytera from selling "any other product developed or sold, based in whole or in part, on any of the Accused Products or Motorola's Trade Secret Information." Opp. 18–19. Motorola's stolen trade secrets are the foundation of Hytera's Accused Products so any product Hytera develops based on those products would necessarily rely on those trade secrets. Trial Tr. 5075:2-5076:12. Nonetheless, to limit disputes, Motorola will revise § I(2)(ii) of its proposed order to state "any other product substantially derived from Motorola's Trade Secret Information, which includes Motorola's Trade Secret Information contained in the Accused Products."[33]

*Fourth*, Hytera contends it does not comprehend Motorola's definition of Trade Secret Information, specifically "what it means for information to be 'derived … in part' from other information."[34] Opp. 17–18. Hytera *itself* used the phrases "in whole or in part" and "derived" in its proposed injunction. Those same phrases are not inscrutable simply because Motorola is using them. Moreover, failing to define Motorola's Trade Secret Information to include information

---

and *One11 Imports, Inc. v. NuOp LLC*, 2016 WL 7338422, at *2-3 (S.D.N.Y. Dec. 19, 2016).

[33] Hytera also professes confusion about inclusion of "sold" in § I(2)(ii), which Motorola's revision removes from that section. Opp. 19–20.

[34] Hytera does not dispute that Motorola's definition of Motorola Copyrighted Works is proper. To the extent Hytera's confusion stems from the phrase "Motorola confidential documentation," Motorola will clarify in its revised order that this refers to "Motorola technical confidential documentation."

derived from Motorola's confidential technical documents would allow Hytera to continue using Motorola's trade secrets in the form of rebranded Hytera documents—an action Hytera intentionally took to obscure its theft and about which substantial evidence was provided at trial. *See, e.g.*, Trial Tr. 1157:7-17; *id.* at 1159:22-1161:15. Thus, Motorola's proposed injunction is narrowly tailored to the facts of this case and the cases Hytera cites are inapposite.[35]

To the extent the Court credits Hytera's claim not to know which Motorola trade secrets are in its possession, that lack of knowledge is because Hytera refused to properly investigate. But that does not make Motorola's proposed injunction vague. For example, Jim Luo, who supposedly oversaw Hytera's "investigation" into the theft, admitted that he did not look at all the evidence or speak with highly relevant employees in order to conduct a thorough investigation. Trial Tr. 3116:25-3118:21, 3150:16-3151:22, 3159:1-15. And when Hytera's counsel told Hytera how to take Motorola's trade secrets out of its products in 2018, Hytera did not take that advice and instead fired that counsel. *Id.* 5286:2–5287:10, 3186:14-23. As set forth in § II, *supra*, Motorola described its trade secrets with specificity. The jury concluded that this evidence was "concrete information that … constitute[d Motorola's] trade secrets." Dkt. 895 at 27. Hytera's feigned ignorance is a problem of its own making and provides no basis for denying an injunction.

*Finally*, Hytera contends Motorola's proposed injunction must have an end date because "Hytera would have independently developed all of the alleged intellectual property by now." Opp. 20. Hytera's sole support for this argument is the head-start argument that the jury considered

---

[35] *See Am. Can Co. v. Mansukhani*, 742 F.2d 314, 331 (7th Cir. 1984) (finding district court erred by using functional definition, as opposed to actual trade secrets); *E.W. Bliss Co. v. Struthers-Dunn*, 408 F.2d 1108, 1114 (8th Cir. 1969) ("The seven areas in which the defendants are not to be employed reflect the trial court's findings that Eagle possesses certain **undescribed** secrets within these **generically-defined** areas") (emphasis added); *Roton Barrier, Inc. v. Stanley Works*, 79 F.3d 1112, 1122 (Fed. Cir. 1996) (proposed order did "not set forth what the trade secret business and technical information is that cannot be disseminated").

MSA0416

and rejected. *Id.* As Motorola made clear at trial and throughout these post-trial briefs, Hytera was incapable of developing a comparable DMR radio in a commercially reasonable time. Indeed, Hytera's own witnesses admitted that Hytera's DMR products contain Motorola's trade secrets and copyrighted source code ***to this day***, confirming Hytera simply could not in fact develop a DMR radio comparable to Motorola's without Motorola's trade secrets and copyrights. *See* § III.A.3, *supra*. Thus, there is no basis on which to time-limit the injunction.

## V.     An Ongoing Royalty Is Not More Equitable Than an Injunction

An injunction is the appropriate remedy for Hytera's ongoing willful and malicious misappropriation of Motorola's trade secrets and infringement of its copyrights. Anything else will simply teach other companies considering illegal conduct that they can and should disregard the innovation rights protected by Congress. Nonetheless, if the Court disagrees, an ongoing royalty of ███████ per-unit should be awarded that accounts for both Hytera's profits and punitive damages.[36] Dkt. 962 § II.F. Hytera argues against any royalty because Motorola "has already been awarded its reasonable royalty" and Motorola did not define its trade secrets. Opp. 21. But, as explained in § III.A.1 above, neither argument has merit.

Hytera also argues Motorola's proposed ongoing royalty is improper because it exceeds Hytera's profits on the adjudicated products. But it is "settled law that an infringer's net profit margin is ***not*** the ceiling by which a reasonable royalty is capped." *Powell v. Home Depot U.S.A., Inc.*, 663 F.3d 1221, 1238 (Fed. Cir. 2011). Using Hytera's profits as a cap ignores that Hytera has been selling infringing products "without accounting for any royalty." *Aqua Shield v. Inter Pool Cover Team*, 774 F.3d 766, 772 (Fed. Cir. 2014). While Hytera complains that it could not

---

[36] Motorola's opening brief referenced an ongoing royalty rate of ███████ which was a typographical and mathematical error.

continue to sell its radios at current prices with Motorola's royalty, Hytera could simply raise prices to account for the royalty. That "may be the only way to adequately compensate [Motorola] for the use of its technology." *Id.* at 773. Moreover, as Hytera recognizes, "a post-verdict ongoing royalty [should] take[] into account factors that may have changed since the trial on damages." Opp. 22. Those changed circumstances are an adjudication that Hytera's misappropriation was willful and malicious. Thus, if Hytera wishes to continue its willful and malicious misappropriation—as it clearly does—an ongoing royalty must take that into account. *See Bard Peripheral Vascular, Inc. v. W.L. Gore & Assocs.*, 2010 WL 11484420, at *6 (D. Ariz. Sept. 9, 2010) (enhancing ongoing royalty where "adjudged willful infringer[,] voluntarily chose[] to continue its post-verdict infringement unabated"); *see also Mondis Tech. v. Chimei InnoLux Corp.*, 822 F. Supp. 2d 639, 653 (E.D. Tex. 2011) (doubling "due to willfulness"), *aff'd* 530 F. App'x 959 (Fed. Cir. 2013).

Finally, Dr. Aron's proposed royalty of ▮▮▮▮ per device would reward Hytera for its misappropriation and encourage further unlawful conduct by Hytera and others. Dr. Aron purports to calculate this royalty based on Motorola's lost profits per device, but this methodology cannot be squared with Dr. Aron's opinion on Motorola's lost profits in her expert report. Ex. 14 § 5.2 (correcting Dr. Aron's errors results in a per-unit royalty of ▮▮▮▮, or ▮▮▮▮▮▮▮▮ to account for punitive damages). Dr. Aron's willingness to change her own methodology confirms that Hytera and its experts will stop at nothing to diminish Motorola's recovery in this case.

## VI.    A Worldwide Injunction Is Appropriate and Necessary

To argue against a worldwide permanent injunction, Hytera reurges arguments the Court and the jury already rejected. For example, the Court held that Motorola "presented evidence sufficient to support a finding that an act in furtherance of the offense has been committed in the United States," and as a result, the DTSA applied extraterritorially. Dkt. 834 at 17, 23. While

Hytera admits that "participation in U.S. trade shows may have increased Hytera's sales in the United States,"[37] Hytera suggests that the "act in furtherance" must mirror and be limited to the specific conduct that would be enjoined (*e.g.*, trade-show participation could not support an injunction on foreign manufacturing). Opp. 23. But that is not what § 1837 says and not what the Court held. To invoke the extraterritorial application of the DTSA, the plain language of § 1837(2) only requires the "***an act*** in furtherance" be committed in the U.S. 18 U.S.C. § 1837(2). It does not say, as Hytera's interpretation would require, that "the ***same*** act" be committed in the U.S. and outside the U.S. Based on this plain language, the Court concluded that Hytera's admitted participation in trade shows in the U.S. permitted extraterritorial application of the DTSA. Dkt. 834 at 17, 23. No separate requirement exists for injunctions, and thus, a worldwide injunction should enter under the Court's rulings on the extraterritorial application of the DTSA here.

As for copyright infringement, the jury concluded it was appropriate to award profits based on Hytera's worldwide sales because Hytera committed a predicate act for its infringement in the U.S. *See* Dkt. 895 at Instruction No. 41. To argue against a worldwide copyright injunction based on this conduct, Hytera parrots a treatise that is unaware of any cases awarding a worldwide injunction for copyright infringement. Opp. 23. Hytera, however, continues to ignore the case Motorola cites in which a court did just that. Dkt. 962 at 14. In *Feiner*, the court refused to limit a permanent injunction to the U.S. where the predicate infringing act occurred in the U.S. *Richard Feiner & Co. v. Turner Entm't Co.*, 1998 WL 78180, at \*1–3 (S.D.N.Y. Feb. 24, 1998). The same reasoning applies here, and a worldwide injunction should enter.

---

[37] Hytera's participation in the IWCE conferences to advertise its brand and products undeniably furthers its ***worldwide*** sales of its DMR products containing Motorola's trade secrets and copyrighted source code, particularly given the attendance of customers from around the globe. *See, e.g.*, Ex. 21 ("6,561 verified attendees" and "57 countries represented" and IWCE); Ex. 22 (similar).

**VII.    Laches Is No Bar to an Injunction**

Hytera asks the Court to condone its theft and enter no injunction because Motorola supposedly waited too long to bring suit. Opp. 24-25. Hytera's argument fails because in rejecting Hytera's statute of limitations defense, the jury necessarily concluded Motorola did not delay.[38] *Sokol Crystal Prods. Inc. v. DSC Commc'ns. Corp.*, 15 F.3d 1427, 1430 (7th Cir. 1994). Laches is also unavailable to Hytera because it fraudulently concealed its theft.[39] *Precision Inst. Mfg. Co. v. Auto. Maint. Mach. Co.*, 324 U.S. 806, 814 (1945). Hytera nonetheless complains it is not fair to enjoin Hytera because Motorola should have uncovered its fraud and theft before Hytera spent $80 million on R&D. Opp. 25. This is precisely why an injunction is necessary. Setting aside the fact that Hytera's $80 million in R&D expenditures are based on data fabricated for trial, Hytera thought its investment in DMR was safe *because it hid its theft from Motorola.* Nor is there any support for Hytera's claim that if it had been caught sooner, it would have developed a dPMR radio. To the contrary, even after a jury found it to have willfully and maliciously misappropriated Motorola's trade secrets, Hytera still will not stop selling the adjudicated products. The only way Hytera will stop is if the Court orders it do so.

**VIII.    CONCLUSION**

For the foregoing reasons and those in Motorola's prior briefing (Dkts. 900, 936, 962), Motorola requests that the Court enter a permanent injunction, the terms of which are set forth in the accompanying [Proposed] Permanent Injunction Order.

---

[38] Motorola filed suit in March 2017, shortly after it discovered Hytera's theft in late 2016. Thus, Hytera's cases are inapposite. *New Era Publications Int'l v. Henry Holt & Co.*, 873 F.2d 576, 578 (2d Cir. 1989) (aware of claim two years); *Hot Wax, Inc. v. Turtle Wax, Inc.*, 191 F.3d 813, 822 (7th Cir. 1999) (aware of claim for 20 years); *Pruitt v. Chicago*, 472 F.3d 925, 927 (7th Cir. 2006) (aware of claim for 10 years).

[39] Trial Tr. 1154:5-11, 1196:11-1197:22, 1200:10-1201:18, 1206:7-1207:2, 1208:6-1210:21, 1252:14-22, 1262:2- 15, 1273:1-13, 1274:1-12, 1298:1-17, 1300:3-6, 1360:1-8, 1389:19-25, 1393:25-1394:5, 1503:9-14, 1539:13-17, 1551:23-1552:2, 1743:2-20, 1744:8-19, 1745:2-1746:9, 1754:2-16, 1799:3-9.

MSA0420

DATED: June 23, 2020

Respectfully submitted,


*/s/ Michael W. De Vries*

Adam Alper (*admitted pro hac vice*)
adam.alper@kirkland.com
Akshay S. Deoras (*admitted pro hac vice)*
akshay.deoras@kirkland.com
Brandon H. Brown (IL Bar No. 266347 CA)
brandon.brown@kirkland.com
Barbara Barath (*admitted pro hac vice*)
barbara.barath@kirkland.com
Reza Dokhanchy (*admitted pro hac vice*)
reza.dokhanchy@kirkland.com
KIRKLAND & ELLIS LLP
555 California Street
San Francisco, CA 94104
Telephone: (415) 439-1400
Facsimile: (415) 439-1500


Michael W. De Vries (*admitted pro hac vice*)
michael.devries@kirkland.com
Christopher Lawless (*admitted pro hac vice*)
christopher.lawless@kirkland.com
Justin Singh (*admitted pro hac vice*)
justin.singh@kirkland.com
Ali-Reza Boloori (*admitted pro hac vice*)
ali-reza.boloori@kirkland.com
Benjamin A. Herbert *(admitted pro hac vice)*
benjamin.herbert@kirkland.com
KIRKLAND & ELLIS LLP
555 South Flower Street
Los Angeles, CA 90071
Telephone: (213) 680-8400
Facsimile: (213) 680-8500


David Rokach (IL SBN: 6279703)
david.rokach@kirkland.com
Megan M. New (IL SBN 6300422)
megan.new@kirkland.com
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, IL 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200

26

Leslie M. Schmidt (*admitted pro hac vice*)
leslie.schmidt@kirkland.com
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900

Attorneys for Plaintiffs
*Motorola Solutions, Inc. and Motorola
Solutions Malaysia SDN. BHD.*

27

**<u>CERTIFICATE OF SERVICE</u>**

I, Michael W. De Vries, an attorney, hereby certify that on June 23, 2020, I caused a true and correct copy of the foregoing document to be served via the Court's ECF system upon all counsel of record.

DATED:  June 23, 2020

*/s/ Michael W. De Vries*

Michael W. De Vries

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

MOTOROLA SOLUTIONS, INC., et al.,              )
                                               )
      Plaintiffs,                              )
                                               )
      v.                                       )    Civil Action No. 1:17-cv-1973
                                               )
                                               )
HYTERA COMMUNICATIONS CORP.                    )
LTD., et al.,                                  )
                                               )    Hon. Charles R. Norgle
      Defendants.                              )

## ORDER

Motorola's motion for permanent injunction [961] is denied. Motorola's alternative request for a reasonable royalty [961] is granted, in an amount to be determined. Hytera's motion for findings on equitable issues and for an amended judgment [961] is granted to the extent that the Court will issue findings, but denied as to the substantive relief sought.

For case control purposes, the pending motions to seal [1035] [1082] and to appear pro hac vice [1039] [1052] [1090] are granted. Hytera's motion for a staggered briefing schedule [1091] has previously been granted. Hytera's motion to file a surreply re attorneys' fees [1055] is granted.

Motorola's motion to alter judgment [957], the various motions to quash citations [1020] [1022] [1069], Motorola's motion for disbursement of funds [1062], and Motorola's motion for attorneys' fees [977] remain under advisement.

## STATEMENT

      Several post-trial motions remain pending before the Court. This Order deals with two: Motorola's motion for permanent injunctive relief[1] and Hytera's motion for findings on equitable issues and for an amended judgment. Motorola's motion for a permanent injunction is denied. Hytera's motion for findings on equitable issues and an amended judgment is granted insofar as the Court will issue findings but is denied as to the substantive relief sought.

      Consistent with the parties' briefing and 18 U.S.C. § 1836(b)(3)(A)(iii), Hytera shall be ordered to pay a reasonable royalty to Motorola for the future use of Motorola's trade secrets. Per

---

[1] To the extent the Court has not formally denied Motorola's earlier motions for injunctive relief (motion for temporary restraining order and for a preliminary injunction (following trial)) those motions are also now denied.

1

MSA0424

Hytera's request in its supplemental memorandum, Dkt. 1085, the amount of the reasonable royalty will remain to be determined, as discussed below.

This Order will be organized into three sections: A. Injunctive Relief; B. Reasonable Royalty; C. Hytera's Motion for Findings and To Alter Judgment. The Court assumes the reader's familiarity of the facts and procedural posture of this case. See Dkt. 1088. Briefly, Motorola prevailed in a lengthy and well-litigated jury trial in this case. The jury awarded Motorola the full amount of damages for which it was permitted to argue. This resulted in a $764.6 million verdict, which encompassed $345,761,165 in compensatory damages ($136.3 million under the Copyright Act, $ 135.8 million under the DTSA for actual losses, and $73.6 million for savings on avoided research and development costs) and $418,800,000 in punitive damages. Following Hytera's Rule 50(b) motion, the Court determined that the Copyright Act disgorgement and the avoided research and development costs were equitable in nature. See Dkt. 1088. The Court will enter Findings of Fact and Conclusions of Law on the remaining equitable issues shortly after this Order.

Turning first, then, to the important issue of injunctive relief.

**A. Injunctive Relief**

Plaintiffs Motorola Solutions, Inc., and Motorola Solutions Malaysia SDN. BHD. have moved this Court to enter a permanent injunction enjoining Defendants Hytera Communications Corporation Ltd., Hytera America, Inc., and Hytera Communications America (West), Inc. and all those acting together with any of them from continuing to misappropriate Motorola's trade secrets and infringe Motorola's copyrights, including any further sales of the portable, mobile, and repeater Digital Mobile Radio ("DMR") products at issue in this case, anywhere in the world. Following trial, Motorola immediately moved for a temporary restraining order, followed by a preliminary injunction. No preliminary injunction motion was filed prior to the jury verdict in this case.

With respect to injunctive relief, the Defend Trade Secrets Act states that a Court "may grant an injunction . . . to prevent any actual or threatened misappropriation[.]" 18 U.S.C. 1836(b)(3)(A)(i). Generally, "[a]n injunction is a drastic and extraordinary remedy, which should not be granted as a matter of course." Monsanto Co. v. Geertson Seed Farms, 561 U.S. 139, 165-66 (2010). An injunction is not a punitive tool, but rather a vehicle for preventing injury. 3M v. Pribyl, 259 F.3d 587, 609 (7th Cir. 2001).

Although the DTSA does not lay out what standard should apply when considering injunctive relief, well-established principles of equity dictate that a plaintiff seeking a permanent injunction must satisfy a four-factor test before a court may grant such relief. A plaintiff must demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction. eBay Inc. v. MercExchange, L.L.C., 547 U.S. 388, 391, 126 S. Ct. 1837, 1839, 164 L. Ed. 2d 641 (2006).

2

MSA0425

The parties make substantial arguments as to each factor outlined above. The Court will address each in turn after briefly addressing Hytera's argument that Motorola has not shown success on the merits.

(1) Success on the merits

The jury found liability and awarded the maximum available damages to Motorola. Hytera first argues that because the jury was given a general verdict form, Motorola has not shown that it has succeeded on the merits of showing that each of the asserted 21 trade secrets has been misappropriated.

On this point, the Court agrees with Motorola that it has shown success on the merits in this case. The jury was given the option to apportion damages if it found fewer than all 21 trade secrets misappropriated; yet the jury awarded the full damages amount Motorola requested. See Dkt. 947. Part of that award was $73 million for avoided research and development for all asserted trade secrets. See Trial Tr. 2184:17-2185:10, 2189:6-15. Based on the entirety of the jury's verdict, it is therefore clear that the jury in fact found all trade secrets misappropriated and all copyrights infringed. This is consistent with the presumption discussed by the Eighth Circuit in Span–Deck, Inc. v. Fab–Con, Inc., 677 F.2d 1237, 1241 n. 5 (8th Cir. 1982) (general verdict "give[s] rise to the presumption that material fact issues have been resolved in favor of the prevailing party").

Thus, Motorola succeeded on the merits.

2) Irreparable Harm and Adequate Remedy at Law

The parties, consistent with much case law, have folded the first two eBay factors into one analysis, and the Court will do the same. Motorola first argues that its success on the merits in this case entitles it to a presumption of irreparable harm. Dkt. 962 at 3 (citing Vendavo, Inc. v. Long, 397 F. Supp. 3d 1115, 1143 (N.D. Ill. 2019); Intertek USA, Inc. v. AmSpec, LLC, No. 14-CV-6160, 2014 WL 4477933, at *6 (N.D. Ill. Sept. 11, 2014)).

Hytera counters this initial argument by pointing to eBay and various circuit court opinions which analyze whether such a presumption should operate in similar circumstances. Dkt. 986 at 5-6 (citing eBay, 547 U.S. at 391; Flava Works, Inc. v. Gunter, 689 F.3d 754, 755 (7th Cir. 2012) ("the Supreme Court's subsequent opinion in [eBay] made clear that there is no such presumption"); Faiveley Transp. Malmo AB v. Wabtec Corp., 559 F.3d 110, 118 (2d Cir. 2009)). The Court agrees with Hytera that no presumption of irreparable harm should be given.

Motorola next raises three substantive arguments as to irreparable harm: (1) that Hytera is eroding Motorola's market share; (2) that Hytera's lower prices are causing price erosion for Motorola; and (3) that Hytera's use of Motorola's trade secrets cause Motorola reputational harm. Hytera responds by arguing that the first two categories of harm can be quantified with damages and that the third is speculative. Hytera also argues that Motorola has not shown a causal nexus between the harm and the intellectual property at issue in this case, citing Apple, Inc. v. Samsung Electronics Co., 678 F.3d 1314, 1324 (Fed. Cir. 2012).

3

MSA0426

The Court agrees with Hytera that the market share and pricing injuries suffered by Motorola can be compensated by monetary damages and that any reputational harm is speculative. Generally, actual damages can include lost sales as a result of the competitor's entry into a market, as well as price erosion. Roton Barrier, Inc. v. Stanley Works, 79 F.3d 1112, 1119-20 (Fed. Cir. 1996). Motorola has, throughout the trial, shown that it can quantify the market share that it has lost, and the measure of damages which were awarded specifically contemplated which of Hytera's sales Motorola would have made if Hytera had not misappropriated its trade secrets. Motorola's damages were then based on the profit Motorola would have made on those sales, which the jury awarded. Economic experts skillfully laid out how these damages were quantified in this case over days of disputed testimony.

While the damages in this case are backward-looking only, and the injunction would prevent future harm, the nature of the harms suffered, and potentially to be suffered, by Motorola are compensable with damages. In this respect, the words of another district court are persuasive, "[T]his case is about money. No historic building is going to be destroyed. No toxins are going to be released into the environment. No ship is going to leave port, never to return." Wells Fargo Ins. Servs. USA, Inc. v. King, No. 15-cv-4378 (PJS/JJK), 2016 WL 299013, at *8 (D. Minn. Jan. 25, 2016).

While in some instances the theft of trade secrets no doubt could constitute irreparable harm, this is not the case, and given the testimony the Court has heard about how the damages to Motorola can specifically be quantified and analyzed, the Court cannot say that there is no adequate remedy at law for any market share or price erosion.

With respect to reputational harm, the Court agrees with Hytera that such harm is speculative and based on attorney argument that the Court does not agree with. Although Hytera has positioned itself in a certain way, including with respect to this lawsuit, the ultimate vindication of Motorola's rights tends to cut against a finding that Motorola has suffered reputational harm in this case.

Finally, although the Court finds that Motorola likely could quantify the harm through extensive expert analysis during a lengthy litigation process, this would likely require repeat lawsuits covering different time periods. This matter has been a lengthy, expensive process for both sides, and although the damages likely could be quantified, the Court recognizes that the task of doing it is not an easy or inexpensive one.

In sum, the Court finds that Motorola could quantify its future losses and remedy them in a future suit, thus rendering a permanent injunction inequitable in this scenario.

### 3) Balance of the Hardships

Although an adequate remedy at law does exist—and thus renders an injunction inequitable in this case—the Court will briefly address several arguments as to the remaining factors. First, with respect to the balance of the hardships between the parties, this factor favors Motorola. Hytera argues that an injunction would render years of its work, including on features not at issue in this litigation, worthless and could effectively push Hytera out of the DMR market altogether.

4

MSA0427

Motorola has a strong interest, however, in protecting its intellectual property and the years of research and development that it has put into its products. Motorola argues that it is essentially being forced to compete against its own technology, and that because of the past savings that Hytera benefited from by stealing Motorola's technology, it has also been able to undercut Motorola's prices and gain market share around the world. Motorola has a strong interest in competing on a balanced playing field in which intellectual property rights are respected. Indeed, the Court agrees that where "the injunctive relief sought primarily focuses on prohibiting a defendant from using information he should not have taken in the first place, the balance of harms weighs heavily in favor of granting an injunction." Vendavo, Inc. v. Long, 397 F. Supp. 3d 1115 (N.D. Ill. 2019); see also Windsurfing Int'l, Inc. v. AMF, Inc., 782 F.2d 995, 1003 n.12 (Fed. Cir. 1986) ("One who elects to build a business on a product found to infringe cannot be heard to complain if an injunction against continuing infringement destroys the business so elected.").

Thus, this factor strongly favors injunctive relief.

4) The Public Interest

Finally, Hytera makes a substantial argument that the public interest weighs against permanent injunctive relief. Hytera argues that a permanent injunction would result in great costs and have direct impact on innocent third parties. Hytera argues that its DMR radios and its associated infrastructure are used by foreign governmental entities, militaries, first responders, hospitals, airlines, utilities, sports teams, security firms, schools, security firms and other entities around the world.

Certainly the Court would hesitate to put first responders and others in a position where their lives would be at risk if a permanent injunction would be granted, but that does not realistically seem to be the case here, as those third parties could simply continue using the radios already in their possession and buy new replacements from another DMR radio provider—one which is not built around misappropriated trade secrets. As was presented in great detail at trial, DMR radios adhere to a specific standard such that different brands are interoperable. Moreover, Motorola has credibly argued that it has the production capacity to pick up the slack around the world should Hytera be enjoined from selling its misappropriating products.

Hytera's argument to the contrary builds around a principle which this Court rejects. Hytera in essence argues that because their sale of the misappropriating products has become so widespread—to governments, first responders, airlines, and others around the world—that it would be inequitable to stop them from continuing to sell the products which are built from the work of Motorola. The Court rejects this principle. Rather, the public interest is better served when intellectual property rights are protected and when infringers are held to account, no matter how widespread the stolen products become.

As Motorola argues, "cheap copies" of trade secrets and copyrights "have the effect of inhibiting innovation and incentive. This detrimental effect, coupled with the public's general interest in the judicial protection of property rights in inventive technology, outweighs any interest the public has in purchasing cheaper infringing products." Douglas Dynamics, LLC v. Buyers Prods. Co., 717 F.3d 1336 (Fed. Cir. 2013).

MSA0428

Thus, this factor also strongly favors an injunction. Regardless, the Court finds that an injunction in this case would be inequitable and thus continues on to the alternative relief—a reasonable royalty.

B. Reasonable Royalty

Where exceptional circumstances render an injunction inequitable, the DTSA provides that a court may "condition[] future use of the trade secret upon payment of a reasonable royalty for no longer than the period of time for which such use could have been prohibited[.]" 18 U.S.C. § 1836(b)(3)(A)(iii).

Here, exceptional circumstances certainly do exist. The potential scope, impact, and difficulties a worldwide injunction could cause, particularly during an ongoing pandemic, pose a large potential problem. And although Motorola has been able to quantify its losses in this case, and likely could again, the process of doing so has been extremely expensive, time-consuming, and difficult. Thus, as Hytera perceptively states in its supplemental submission, "[t]he path forward" in this case is for the award of a reasonable royalty. Dkt. 1084 at 12.

Because the arguments in the pending briefing are undeveloped as to what a reasonable royalty in this case would be, the Court will allow the highly competent counsel in this case to confer and propose a process as to determining this royalty. Hytera points out that the parties are currently mediating this issue, and the Court does not want to discourage an agreement among the parties. Thus, the parties shall submit a proposed plan no later than January 14, 2021. If no agreed plan can be reached, each party shall submit its own proposal. See Paice LLC v. Toyota Motor Corp., 504 F.3d 1293, 1314-15 (Fed. Cir. 2007).

C. Hytera's Motion for Findings on its Equitable Defenses and for an Amended Judgment

Separately, Hytera filed a motion following trial asserting that the Court should reduce the unjust enrichment award because the equitable doctrine of laches should trigger. Hytera additionally argues that "Motorola clearly, unequivocally, and decisively, waived its right to claim trade secret protection over the information Motorola claimed constituted a trade secret misappropriated by Hytera." Dkt. 966 at 10.

In this case, the Court agrees with Motorola that Hytera's laches defense fails because it is based entirely on fact issues already resolved against Hytera by the jury's verdict on Hytera's statute of limitations defense. The jury's findings on common factual issues govern and are binding on the Court. Avitia v. Metro. Club of Chicago, Inc., 49 F.3d 1219, 1231 (7th Cir. 1995); Snider v. Consolidation Coal Co., 973 F.2d 555, 559 (7th Cir. 1992) ("when common issues are simultaneously tried to both a judge and a jury, the jury's findings with respect to those common issues are binding upon the judge").

Here, the laches analysis "essentially collapses into the statute of limitations analysis[,]" which the jury considered, was instructed on, and determined did not apply. Sokol Crystal Prods. Inc. v. DSC Commc'ns. Corp., 15 F.3d 1427, 1430 (7th Cir. 1994). Hytera's laches and waiver equitable defenses are premised on factual issues already resolved against Hytera by the jury in

6

connection with its statute of limitations defense, and depend on identical fact issues (e.g., concerning whether Motorola exercised "reasonable diligence" in bringing suit; whether Hytera engaged in fraudulent concealment; and whether the materials Motorola claimed as trade secrets were, in fact, secret and adequately protected), and the very same evidence underlying those issues.

As such, the Court agrees with Motorola's argument and rejects Hytera's laches defense and will submit findings consistent with that position.

Next, Hytera argues that Motorola "clearly, unequivocally, and decisively, waived its right to claim trade secret protection over the information Motorola claimed constituted a trade secret misappropriated by Hytera." This argument is similarly foreclosed by the jury's finding on the parallel issue of the existence of Motorola's trade secrets.

Specifically, Hytera argued to the jury that Motorola was not entitled to trade secret protection based on (1) Motorola's registering of source code with the Copyright Office, (2) Motorola's internal policies regarding document labeling, internal trade secret registration, and invention awards, and (3) Motorola's obtaining patents and lodging deposit copies with the Copyright Office. The jury rejected each of these arguments, finding for Motorola on liability. Accordingly, Hytera's requested fact findings that Motorola "clearly, unequivocally, and decisively, waived its right to claim trade secret protection" are incompatible with, and precluded by, the jury's fact findings.

In sum, the Court has closely reviewed the respective arguments of the parties and agrees with Motorola on the substance of the equitable issues of waiver and laches.

IT IS SO ORDERED.

ENTER:

CHARLES RONALD NORGLE, Judge
United States District Court

DATE: December 17, 2020

7

MSA0430

Case: 1:17-cv-01973 Document #: 1100 Filed: 01/08/21 Page 1 of 39 PageID #:72753

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| MOTOROLA SOLUTIONS, INC., et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Civil Action No. 1:17-cv-1973 |
| v. | ) | |
| | ) | |
| HYTERA COMMUNICATIONS CORP. | ) | |
| LTD., et al., | ) | Hon. Charles R. Norgle |
| | ) | |
| Defendants. | ) | |

**FINDINGS OF FACT AND CONCLUSIONS OF LAW IN RELATION TO THE COURT'S
OCTOBER 19 AND NOVEMBER 10, 2020 ORDERS**

1

## FINDINGS OF FACT

### I. BACKGROUND

1. Following a nearly four-month trial, the jury returned a verdict for Motorola and awarded $345,761,165 in compensatory damages for Hytera's misappropriation of Motorola's trade secrets and infringement of Motorola's copyrights. Dkt. 898 at 5.

2. With respect to the DTSA, the jury was properly instructed that Motorola was seeking damages from May 11, 2016 to June 30, 2019. Dkt. 895 at Instruction No. 32. With respect to copyright infringement the jury was properly instructed that Motorola was entitled to recover profits Hytera made through June 30, 2019 because of Hytera's copyright infringement. *Id.* at Instruction No. 40.

3. The jury was properly instructed regarding lost profits under the DTSA. The jury was instructed: "Instruction No. 30: To recover its actual loss, Motorola must prove: 1. A reasonable probability that, if Hytera had not misappropriated trade secrets, Motorola would have made additional sales of DMR products that Hytera made; and 2. The amount of profit Motorola would have made on those sales." Dkt. 895 at Instruction No. 30. Hytera did not object to this instruction. Tr. at 5575:23-5578:5.

4. The jury was similarly appropriately instructed that it could award Motorola's actual loss and Hytera's unjust enrichment to the extent it exceeds Motorola's actual loss: "Instruction No. 31: Unjust enrichment is the amount Hytera benefited as a result of any misappropriation to the extent it exceeds Motorola's actual loss. If you find that Motorola has proven by a preponderance of the evidence the amount that it is entitled to unjust enrichment damages in excess of its actual loss, you must deduct the costs and expenses that Hytera proves by a preponderance of the evidence that it incurred related to that benefit." Dkt. 895 at Instruction No. 31. Hytera did not object to this instruction. Tr. at 5575:23-5578:5.

2

MSA0432

5.     The jury was also instructed on damages for Motorola's claim for copyright infringement: "Instruction No. 40: Motorola is entitled to recover the profits that Hytera made through June 30, 2019, because of Hytera's copyright infringement. Hytera's profits are revenues that Hytera made because of the infringement, minus Hytera's expenses in producing and selling the infringing DMR radios. Motorola must prove Hytera's revenues and a causal relationship between the infringement and those revenues. Hytera must prove its own expenses and any portion of its profits that resulted from factors other than infringement of Motorola's copyright." Dkt. 895 at Instruction No. 40. Hytera did not object to this instruction, other than with respect to the temporal scope of copyright damages. Tr. at 5575:23-5578:5.

6.     The jury was properly instructed not to award double recovery to Motorola: "Instruction No. 42 - No Double Recovery: If you award Motorola damages for both its trade secret misappropriation claims and its copyright claims, you must not award damages in a manner that results in double recovery for the same injury." Dkt. 895 at Instruction No. 42. Hytera did not object to this instruction. Tr. at 5575:23-5578:5.

## II.     THE TRADE SECRET MISAPPROPRIATION DAMAGES AWARDED TO MOTOROLA BY VIRTUE OF THE ADVISORY JURY VERDICT CONTAINED DOUBLE RECOVERY

7.     Motorola proved that Hytera stole 21 distinct trade secrets at trial (collectively, "Misappropriated Trade Secrets"). For each trade secret, Motorola presented highly confidential technical and engineering materials relevant to that specific trade secret and explained those materials through five fact witnesses and numerous experts across more than 25 hours of testimony. Motorola's witnesses explained that these stolen materials constituted the "playbook" by which Motorola engineers built its two-way radio devices. Tr. at 723:16-724:5. Motorola's fact witnesses and experts testified in detail when explaining what was contained in each confidential technical and engineering material and how the processes contained therein combined into a

3

coherent whole to create the digital radio functionalities at issue in the trial. Tr. at 615:8- 621:25, 625:7-626:19, 630:14-631:14, 706:6-707:2, 709:1-715:12, 716:10-717:2, 718:13-719:3, 739:9-740:15, 741:15-747:4.

8. The Court denied Hytera's motion for judgment as a matter of law or new trial with respect to Motorola's trade secret misappropriation claim. Dkt. 1088 at 7-11.

9. The jury awarded $209.4 million for Hytera's trade secret misappropriation under the DTSA. Tr. at 2191:23-2192:7; 2198:9-17; PTX-2071, PTX-2226, DTX-4057; Tr. at 2184:20- 2189:20; PTX-2070.2-.4, .8; PTX-2077. The $209.4 million was comprised of $73.6 million in Hytera's avoided R&D costs and $135.8 million in Hytera's profits. Tr. at 5365:10-18 (avoided R&D); PTX-2071.2-.4; DTX-4057, PTX-2071.18-19.

10. The $209.4 million exceeds Motorola's $86.2 million in Motorola's lost profits due to Hytera's trade secret misappropriation under the DTSA. Tr. at 2205:15-20; 5396:16-20; PTX-2068.2, PTX-2069.2, PTX-2067.5; DTX-4057.

11. The disgorgement of Hytera's profits is an equitable remedy. See Dkt. 1088 and Order accompanying these findings.

12. The Court initially misapprehended the nature of the $135.8 million award in its October 19, 2020 Order, but the parties agree that that number reflects a measure of Hytera's profits in the relevant time period, not the actual losses suffered by Motorola (though Hytera disputes the substantive accuracy of that number). The $135.8 million figure does not reflect Motorola's actual losses, despite the Court characterizing them as such in Dkt. 1088.

### A. Hytera Needed Motorola's Trade Secrets to Enter the DMR Market

13. In 2004, the FCC announced new regulations requiring companies and users around the world, including in the United States, to move from analog products to digital products. Tr. at

4

2159:25-2160:7. Mr. Malackowski testified that this provided a business incentive for Hytera to enter the digital radio market quickly in order to develop a digital radio before the regulation took effect. *Id.* at 2160:8-12. Hytera discussed this incentive in a presentation, explaining that Hytera needed to create new business and replace analog radios in line with the FCC mandate. *Id.* at 2160:20-2161:2; PTX-1129.

14.     Hytera's CEO recognized Hytera's need to develop a DMR product quickly. Tr. at 1849:3-14, PTX-416 (2007 Hytera slideshow with statement from Chairman Chen shows "that Mr. Chen has identified DMR as critical and has recognized Motorola as a key competitor in that segment of the market and wants to leapfrog Motorola.").

15.     Mr. Malackowski testified that email communications between Chairman Chen and G.S. Kok highlighted the importance entering the DMR market quickly, as shown by the fact that the project was being dealt with at the senior-most level within Hytera. Tr. at 2166:22-2167:2.

16.     About two weeks after G.S. Kok joined Hytera, he emailed Chairman Chen to say that he was "surprised also to find out that we do not have a prototype after three years. In addition, that each circuit block needs to be merged and a new board layout." PTX-421; PDX-9.57; Tr. at 1885:9-1886:20. He stated that Hytera's DMR "team will need injection of Subject Matter Expert; (SME) from Motorola Penang and Motorola Chengdu. This will be most important if we want to leap frog onto the DMR business." *Id.*

17.     Hytera entered the DMR market in 2010, making Hytera the second to the DMR market behind Motorola. Tr. at 2167:10-2168:10. According to Mr. Malackowski, there is a significant advantage to being the second to enter the market. Tr. at 2163:1-6. Hytera's witnesses confirmed this competitive advantage, noting that being late to the market is difficult because competitors will have a lead so Hytera would always be playing catchup. Tr. at 2167:23-2168:5.

18.     Mr. Malackowski testified that Hytera's access to Motorola's copyrights and trade secrets

5

MSA0435

allowed Hytera to accelerate their entry to the market, which allowed them to enter the market sooner than they otherwise would have. Tr. at 2161:12-18.

19. Dr. Rangan described "four high-level reasons" why Hytera would not have been able to independently without using or accessing Motorola's trade secrets. These reasons include: "there's no architecture or framework for this. That's the overall way that the whole product would have been architected. The protocol stack was not complete. In fact, it was extremely limited. There was no demonstration of interoperability. And the source code, the way it was structured, was fundamentally flawed and would prevent any further progress." Tr. at 1888:19-1889:7; PDX-9.58.

20. Specifically, Dr. Rangan testified that he saw a "complete absence" of "architectural framework components," such as an operating system, in Hytera's development documents and materials prior to February 2008, despite Hytera's claim that it had a prototype for a DMR radio that was 75 percent complete by that time. Tr. at 1890:19-1892:5.

21. Dr. Rangan also testified that Hytera's DMR development lacked a protocol stack, which "defines the sequence of operations that the transmitter or receiver would have to do to communicate." Tr. at 1892:6-1893:20. Dr. Rangan did not see any evidence in Hytera's development documents as of February 2008 that Hytera "was able to send a group call, short message, or data service message" as it claimed. DTX-3219; Tr. at 1894:8-1896:24. Hytera also lacked the ability to perform basic functions like emergency calls, showing that "Hytera, prior to 2008, was still very far from coming close to a 75 percent complete protocol stack." Tr. at 1900:6-1901:22; PTX-1987 at 29-30; Tr. at 1902:5-1903:12, PTX-1085 (email from Roger Zhang to Sam Chia stating that "Our group has been engaged in protocol development for a period of time" and has "met many problems which have troubled us for a long time."); PTX-203, PTX-204, Tr. at 1904:12-1906:17 (Hytera engineer Yu Yang stating that "When we were doing the work" prior to the arrival of G.S. Kok, Y.T. Kok, and Sam Chia, "most of the requirements [in PTX-204 listing

6

protocol stack requirements] cannot be met," and the DMR project "has grown up in an unhealthy situation").

22. Dr. Rangan further explained that Hytera's purported prototype "did not demonstrate interoperability, meaning "the ability of a device from one manufacturer to communicate to the device of another manufacturer," which is "absolutely essential" for DMR radios. Tr. at 1907:5-1908:5. While Hytera relied upon PTX-1988 to "demonstrate interoperability," Dr. Rangan explained that this document does not show that Hytera had the ability to complete a group call, and instead described a "debugging hardware platform" that is "a version of the system that's in a much earlier stage of development [than a prototype] where you're still trying to build up basic features." Tr. at 1908:6-1909:16. The "debugging platform" "doesn't have that man/machine interface, the interface between the keypad and the screen. So that's being simulated here on this PC," and did not allow a call with a question and response but instead "[w]e just have a portion of the sound, and it's just echoing back." Tr. at 1910:7-1913:6.

23. Additionally, Dr. Rangan explained that in reviewing the source code directories Hytera produced, he "found really that there were two fundamental flaws in the way that the source code was written in a manner that would prevent the developers from continuing development. First of all, the source code files were unfinished but also what you would say that the code was monolithic spaghetti code." Tr. at 1916:1-17. "Essential" source code files were classified by Hytera as "unfinished," and there was no indication that they were ever completed by Hytera prior to G.S. Kok's arrival in February of 2008 or prior to the arrival of Y.T. Kok and Sam Chia. Tr. at 1916:18-1919:8; PTX-2031, PTX-2025.

24. Hytera also had "monolithic spaghetti code" prior to the arrival of G.S. Kok, Y.T. Kok, and Sam Chia. Tr. at 1919:9-25; PTX-607.6. An internal Hytera presentation given by Y.T. Kok in July 2008, titled "HYT common platform architecture," describes Hytera's DMR development

7

as a "monolithic, spaghetti system." *Id.* Dr. Rangan explained that "monolithic" code is not well organized because it "just appears as one large piece of code," and a "spaghetti system" is "a highly problematic way of software and refers to the following, that any one part of the code can affect other parts of the code. So when you're trying to analyze the code, looking how one part of the code affects another is like trying to find two ends of a strand of spaghetti in a big bowl of pasta." Tr. at 1920:1-15. Y.T. Kok identified in his presentation problems caused by the monolithic spaghetti system, including that "it's difficult to isolate components and reuse them" because "they're completely intertwined with one another," and also because "it's poorly portable. So if you want to take one piece of software out and use it in another piece of software or in another hardware platform, it becomes very, very difficult to do that." Tr. at 1921:2-23. Additionally, both Dr. Rangan and Y.T. Kok's presentation recognized that "once you get spaghetti code, it becomes harder to change and the development becomes more and more laborious. It costs more and it takes longer. But also what's very important is the problem of debugging or fixing errors. It's very hard to trace errors because of the spaghetti problem. And any time you try to fix one part of the code, you generally introduce bugs in other parts of the code." Tr. at 1921:25-1922:15; PTX-607.7.

25. Dr. Rangan testified that Hytera never released a DMR product based on its pre-February 2008 development efforts, and instead Hytera "abandoned those efforts and ended up following a development path based on Motorola misappropriated code." Tr. at 1925:6-1926:2 ("Two and a half years since this lawsuit has began, ... Hytera continues to use Motorola confidential and proprietary information for its development," which "indicates that Hytera is still not possible to independently develop [a] DMR product without Motorola confidential and proprietary information.")

26. As Dr. Rangan explained, Hytera "would actually have never conceived of these or implemented these trade secrets in any commercially reasonable period of time, but even if they

8

were to, the time for Motorola took to develop these trade secrets would be an absolute minimum or baseline for that time." Tr. at 1950:13-1951:7. Because Hytera still has not, to this day, developed a comparable DMR product without use of Motorola's trade secrets and source code, the sales of its accused DMR products are due to its misappropriation and ongoing use of Motorola's trade secrets.

### B. Hytera Avoided Spending $76.3 Million in Research and Development by Misappropriating the 21 Trade Secrets

27. As a result of Hytera's theft of Motorola's trade secrets, Hytera was able to significantly reduce the amount of money that it spent on developing the accused DMR products. Tr. at 2156:21-24 (Mr. Malackowski testifying that "Hytera benefited from use of the Motorola trade secrets and copyrights, and they were able to reduce their own R&D expense accordingly").

28. Motorola spent $117.8 million to develop the Misappropriated Trade Secrets, which was only a portion of the research and development that Motorola invested to launch its DMR radios. Tr. at 2155:9-2156:14 (citing PDX-10.6). By contrast, Hytera spent $12.6 million in R&D before launching its DMR radios, confirming the substantial savings Hytera realized from its theft. Tr. at 2156:2-9; PDX-10.6.

29. Motorola's expert, Mr. Malackowski, testified that Motorola should be awarded $73.6 million in Hytera's avoided R&D costs. Tr. at 5365:10-18.

### a. Mr. Malackowski Properly Relied on Development Times for the Misappropriated Trade Secrets

30. Motorola presented extensive testimony concerning the amount of time it took Motorola to develop the Misappropriated Trade Secrets in staff months, i.e., the amount of work an engineer could perform in one month. Tr. at 193:18-194:7, 2185:18–2189:20. Staff months is a common way to perform engineering project management. *Id.* at 1928:4-13.

MSA0439

31.     Motorola presented testimony from Motorola engineers Russ Lund, Mark Boerger, Jesus Corretjer, Dan Zetzl, and Sanjay Karpoor, who developed and oversaw development of the trade secrets at issue. Tr. at 593:24-594:1, 597:7-9, 622:5-7, 633:4-6, 640:8-10, 707:14-708:3, 729:17-22, 741:6-14, 754:19-23, 866:11-15, 877:10-13, 880:2-6, 883:8-12, 887:15-20, 892:14-18, 998:25-999:5.

32.     Motorola also presented testimony from Dr. Rangan, who relied on his experience leading software and hardware teams that worked on similar types of technology to the Misappropriated Trade Secrets, to establish the staff months necessary to develop the Misappropriated Trade Secrets. Tr. at 1926:3-1928:13 (Dr. Rangan testifying that his determination of the development times for Motorola's trade secrets was based on trial and deposition testimony from Motorola's senior engineers who "were deeply involved in the DMR development" about the "head count and staff months for each asserted trade secret[]," consideration of Motorola's "source code and all the design documents as well for the asserted trade secrets to try to assess the development effort," and application of his own experience leading software and hardware teams).

33.     The following are the staff months to develop each Misappropriated Trade Secret:

| Trade Secret | Staff Months to Develop | Citation |
|---|---|---|
| DMR Source Code | 87 engineers 9,468 staff months | Tr. at 593:24-595:10; PDX-4.6 |
| DMR Mobile Source Code | 80 engineers 3,600 staff months | Tr. at 595:11-609:14; PDX-4.8 |
| DMR Software Architecture | 80 engineers 5,478 staff months | Tr. at 622:1-12; PDX-4.15 |
| Operating System Architecture | 5 engineers 294 staff months | Tr. at 632:24-634:5; PDX-4.19 |
| VRIS | 17 engineers 600 staff months | Tr. at 639:25-641:11; PDX-4.23 |
| Digital Signal Processing Framework | 25 engineers 900 staff months | Tr. at 707:13-708:16; PDX-5.4 |
| Noise Suppression | 2 engineers 7 staff months | Tr. at 707:13-708:16; PDX-5.4 |
| Squelch | 4 engineers 20 staff moths | Tr. at 707:13-708:16; PDX-5.4 |
| Carrier Detection | 2 engineers 8 staff months | Tr. at 707:13-708:16; PDX-5.4 |

MSA0440

| DSP Code | 25 engineers 3000 staff months | Tr. at 707:13-708:16; PDX-5.4 |
|---|---|---|
| Testing and Benchmarking | 12 engineers 720 staff months | Tr. at 729:17-730:4; PDX-5.7 |
| Hardware Abstraction Layer | 15 engineers 376 staff months | Tr. at 741:3-14; PDX-5.11 |
| L1 Timer, Framer, and Frame Scheduler | 8 engineers 72 staff months | Tr. at 741:3-14; PDX-5.11 |
| Hardware | 75 engineers 2,700 staff months | Tr. at 754:19-23; PDX-5.14 |
| Ergonomic Layer | 20 engineers 1,584 staff months | Tr. at 866:11-867:3; PDX-6.6 |
| Application Layer | 40 engineers 2,700 staff months | Tr. at 877:9-25; PDX-6.9 |
| VOX | 4 engineers 36 staff months | Tr. at 880:2-10; PDX-6.12 |
| DMR Protocol Stack | 42 engineers 1,512 staff months | Tr. at 883:8-884:2; PDX-6.15 |
| Connectivity | 4 engineers 65 staff months | Tr. at 887:15-24; PDX-6.18 |
| XCMP | 15 engineers 720 staff months | Tr. at 892:14-893:3; PDX-6.21 |
| Repeater | 20 engineers 3,248 staff months | Tr. at 998:25-999:5; PDX-7.4 |

34. Based on Motorola's costs per engineer, Mr. Malackowski determined that Motorola spent $117.8 million to develop the Misappropriated Trade Secrets. Tr. at 2155:15-2156:9; PTX-2070.8 ($6,391 Motorola cost per head). To arrive at the $117.8 million, Mr. Malackowski only included development times for the following trade secrets to avoid double counting: Connectivity, XCMP, Software, DMR Protocol Stack, Hardware, Testing and Benchmarking, and Repeater Functionality. Tr. at 2189:9-20 (Mr. Malackowski explaining that the remaining trade secrets "are simply subcomponents or a subset, parts of the whole [accounted for by these seven trade secrets] as described"); *see also* Tr. at 1946:24-1948:17.

35. Motorola also presented evidence that it would have taken Hytera at least as long as Motorola to develop the misappropriated trade secrets. Tr. at 1950:13-1951:7 (Dr. Rangan: "It's my view that [Hytera] would actually have never conceived of these or implemented these trade secrets in any commercially reasonable period of time, but even if they were to, the time for Motorola took to

11

develop these trade secrets would be an absolute minimum or baseline for that time.").

36. Motorola's estimates for the development of the Misappropriated Trade Secrets were conservative, and were based on the work of highly skilled engineers. *Id.* at 1948:18-1949:21. Prior to the arrival of G.S. Kok, Y.T. Kok, and Sam Chia, Hytera did not have engineers with comparable skills to those at Motorola because they lacked DMR experience and the ability to recruit similar levels of talent. *Id.* at 1949:22-1950:20.

37. Hytera's attempts to dispute this evidence regarding the amount of time that it took to develop the Misappropriated Trade Secrets were not credible. For example, Hytera's expert, Barbara Frederiksen-Cross, testified that it would take Hytera between 1.7 and 6.4 months to rewrite the misappropriated source code contained in the DSP, RFhal, and RAF libraries Hytera misappropriated. Tr. at 3972:3-7, 3973:23-3974:9. But the methodology she used to calculate Hytera's rewrite time is not reliable and has been referred to as "malpractice" in the relevant field. PTX-2370.552 (The expert whom Barbara Frederiksen-Cross relied on, Capers Jones, wrote "LOC metrics became less and less useful until sometime around 1985 they started to become actually harmful. . . . [I]t is fair to say that in many situations usage of LOC metrics can be viewed as professional malpractice. . . ."); Tr. at 4133:6-4134:2, 4137:24-4138:23, 4139:12-16 ("Q. In -- despite the -- despite the concerns and problems that the expert you're relying on is saying applies to the metrics you used, you still presented your testimony to the jury, fair? A. That is correct, yes.") (Barbara Frederiksen-Cross); *see also* Tr. at 5074:1-20 (Dr. Wicker explaining that merely counting lines of code "fails to take into account the importance of the source code, how the code is used ... and does not accurately reflect what happened in this case."); Tr. at 5076:4-5080:23 (Dr. Wicker explaining that Hytera radios "simply would not function").

38. Dr. Aron's reliance on 7,920 staff months was similarly not credible. Although Dr. Aron testified that the 7,920 staff months was Dr. Grimmett's opinion, Tr. at 4864:7-16, all Mr. Grimmett said was that a Motorola document supposedly suggested that the entire MotoTRBO project would take "7,900 or so staff months." *Id.* at 4559:17-4560:6. Mr. Malackowski explained that the Motorola document Dr. Aron referred to (DTX-4715) was incomplete with respect to development times for the Misappropriated Trade Secrets because it included only a portion of the

12

work that went into those trade secrets. *Id.* at 2331:12-2332:8.

39. Thus, just as he did to calculate Motorola's R&D costs, Mr. Malackowski used Motorola's estimated staff months for developing seven non-overlapping trade secrets in order to ensure there was no overlap in his calculations of Hytera's avoided R&D costs. Tr. at 2188:18-2189:20; PTX-2070.1.

### b. Mr. Malackowski Used Reliable Data to Determine the Cost Per Engineer in China

40. To calculate Hytera's avoided R&D costs, Mr. Malackowski multiplied Hytera's average monthly engineering costs by the estimated staff months required to develop each of the trade secrets. Tr. at 2184:25-2185:10. Because Mr. Malackowski found that Hytera's financial records were incomplete and inaccurate, Tr. at 2258:20-2259:1, he used Motorola's engineering costs for engineers located in China to estimate Hytera's engineering costs, which Mr. Malackowski testified would represent the same cost to Hytera because it was a competitive market. Tr. at 2186:20-2188:13 (Mr. Malackowski testifying that he "used the Chengdu, China figures, which at the bottom [of PTX-2070.8] are $3,992 per month per engineer.").

41. Hytera, however, asserts that the amount of avoided R&D should be calculated using Hytera's engineering costs, instead of Motorola's. Dkt. 954 at 6; Tr. at 4858:4-4864:16 (Dr. Aron using Hytera's engineering cost of $1,638 in 2010); DTX-4715; DTX-5607. As Mr. Malackowski explained, however, Hytera's data were not credible. Specifically, Mr. Malackowski testified that Hytera's labor rates in China "varie[d] in unexplainable ways on a year-by-year, hour-by-hour basis," e.g., "a secretary [was paid] $5 an hour, []an engineer [was paid] less than that, and then two years later [he] would see huge differences." Tr. at 2258:10-2260:10 (explaining costs increased by 70% one year and then decreased again). "Cherry-picking" Hytera's 2010 engineering costs, as Dr. Aron did, was thus not a fair reflection of Hytera's engineering costs. *Id.* at 2262:2-18.

42. Thus, using the time it took Motorola to develop the seven, non-overlapping trade secrets and

13

Motorola's cost-per engineer in China, Mr. Malackowski concluded that Hytera avoided spending at least the following in R&D by misappropriating the 21 trade secrets.

*Motorola Solutions, Inc., and Motorola Solutions Malaysia Sdn. Bhd. v. Hytera Communications Corporation Ltd, Hytera America, Inc., and Hytera Communications America (West), Inc.*
**SUMMARY OF MOTOROLA DEVELOPMENT COST AND HYTERA AVOIDED COSTS DUE TO TRADE SECRETS**
Appendix 7.0
Updated October 30, 2019

| Trade Secret [1] | Motorola's Estimated Development Cost [2] | Hytera's Development Cost Savings [3] |
|---|---|---|
| Connectivity | $415,434 | $259,478 |
| DMR Protocol Stack | 9,663,630 | 6,035,852 |
| XCMP | 4,601,728 | 2,874,215 |
| Repeaters | 20,758,908 | 12,965,903 |
| Product Testing/Benchmarking | 4,601,728 | 2,874,215 |
| Hardware | 17,256,481 | 10,778,306 |
| DMR Source Code/Software | 60,512,728 | 37,795,928 |
| Total | $117,810,638 | $73,583,897 |

**Notes:**
[1] To avoid double counting, I have included only trade secrets that are not whole or partial subsets of other trade secrets. I have included trade secrets in this appendix based on my review of deposition testimony of Motorola witnesses.

[2] Appendix 7.2.
[3] Appendix 7.1.

PTX-2070.1; Tr. at 2184:25-2189:15.

43. Hytera avoided spending this $73,583,897 million in R&D after the enactment of the DTSA on May 11, 2016. As Mr. Malackowski explained, Hytera avoided spending this R&D "with each and every [accused] product. There is no product that can be brought to the market in this case without the benefits of that research and development. So it relates to each and every product at the time that product is introduced," including "products released in February 2017 and January 2019." Tr. at 5364:22-5365:6.

44. In addition, Hytera continued to launch new products using Motorola's trade secrets and copyrighted source code after this lawsuit was filed. Tr. at 5364:16-5365:6; DDX-22.12 (Dr. Aron's slide showing three accused products launching in January 2019). These products were sold in the United States after the DTSA's enactment, meaning Hytera avoided spending the $73.6 million in the United States. PTX-2070, PTX-2071, PTX-2226, DTX-4057.

14

### c. The Amount of Hytera's Avoided R&D Would Not Equate to a Perpetual License

45. Hytera asserts that an award of $73.6 million amounts to a perpetual license. Dkt. 954 at 6. Hytera, however, agreed that the jury should not be instructed to award a reasonable royalty, nor did Hytera present any evidence that its avoided R&D would, in fact, constitute a royalty, perpetual or otherwise.

46. Accordingly, the Court finds that the evidence supports $73.6 million for Hytera's avoided research and development costs for Hytera's trade secret misappropriation under the DTSA.

47. As discussed further below, however, although this figure is supported, an award of the avoided research and development and Hytera's profits would constitute double recovery.

### C. Hytera Earned $135.8 Million in Profits from Its Misappropriation

48. Hytera began selling DMR radios that contained or were created with the Misappropriated Trade Secrets in 2010. Tr. at 204:19-20, 2020:22-2021:4, 2395:3-4, 5138:15-5140:8.

49. Without the benefit of the Misappropriated Trade Secrets, Hytera could not have made the sales and profits on its DMR products at issue in this case. *See* Section II.A., *supra*; *see also* Tr. at 4717:20-4719:8 (Mr. Grimmett agreeing that ROSAL specification contains "utmostly necessary" technology), 4090:23-4091:7 (Ms. Frederiksen-Cross testifying that "but for the Motorola code that was stolen," the libraries Hytera claims to have independently written "would not work"), 5075:2-5076:12 (Dr. Wicker explaining that without Motorola's source code, Hytera's DMR radios "simply would not function."). Thus, Hytera's profits on its DMR radios are a direct result of Hytera's theft.

50. Mr. Malackowski identified a causal nexus between Hytera's trade secret misappropriation and gross revenues for DMR radios based on the amount Hytera spent on R&D to launch their first DMR product. Tr. at 2156:2-24 ("I was looking here for the nexus of my damage claim, which is basically whether or not there was a relationship between the trade secrets and copyright at issue and the profits that I seek for both companies. Hytera benefited from the use of Motorola trade secrets and

15

MSA0445

copyrights, and they were able to reduce their own R&D expenses accordingly.").

51. Hytera stole the Misappropriated Trade Secrets from Motorola's COMPASS system and ClearCase system, respectively, servers for which are located in the United States and are accessible at Motorola's facilities, including its Schaumburg office. Tr. at 209:22–210:11, 211:2–14, 373:21–24, 379:21–380:5, 380:18–21, 396:20–25, 443:16–21, 521:18–20, 989:17–19, 997:10–998:2, 1001:2–20, 1009:15–1010:21, 5150:5–12.

52 Hytera committed acts in furtherance of its misappropriation in the United States by advertising, promoting, and marketing products embodying the Misappropriated Trade Secrets in the United States, including at numerous trade shows. For example, Qi Yin, the "Director of Presales Support and Post-Sales Service for the Americas at Hytera," stated that his "responsibilities span initial client development through service after a sale of products and/or systems and include learning and understanding customers' technical requirements," including for Hytera's customers in the U.S. Dkt. 916 ¶¶ 3-5, 7. And Hytera's trial witnesses acknowledged that Hytera attended the IWCE trade show in the United States to advertise and promote its DMR products that benefit from its misappropriation. Tr. at 3310:3-15 (Xu Hailin: Hytera launched DMR radios in the United States); *id.* at 3460:15-17 (Andrew Yuan: "in America ... the most important event is the IWCE [conference]"); *id.* at 3528:21-3529:25 (Andrew Yuan prepares "talking points for Hytera's employees who are at this trade show"); *id.* at 3231:8-16 (Jim Luo: IWCE in the U.S. is where "all the companies, such as Motorola ... or Hytera, would distribute information about their companies, including their products as well."); Dkt. 834 at 21-22 ("Plaintiffs have introduced evidence in this case sufficient to support a finding that 'use' of the alleged trade secrets has occurred domestically. Specifically, it has been undisputed throughout trial that Defendants have advertised, promoted, and marketed products embodying the allegedly stolen trade secrets domestically at numerous trade shows. This constitutes 'use.'").

16

MSA0446

53. Because Hytera committed acts in furtherance of its misappropriation in the United States after the DTSA's enactment, Motorola is entitled to damages based on Hytera's worldwide revenues for its DMR radios.

### a. Mr. Malackowski Properly Calculated Hytera's Profits From Its Misappropriation

54. From 2010 to June 2019, Mr. Malackowski identified Hytera's revenue for the accused DMR portable radios as $532,025,673, with mobile radios adding "another 111 million" dollars; for accused DMR repeaters as $91,166,965; and for DMR accessories as $53,202,567. Tr. at 2191:14-2193:13; 2195:8-12; PDX-10.25; PTX-2071, PTX-2226, DTX-4057.

55. Dr. Aron did not dispute the revenues Mr. Malackowski presented for the accused Hytera products. Tr. 4958:23-4959:2; PTX-2226.

56. In determining the amount of Hytera's profits, Mr. Malackowski deducted costs that would vary with production of additional radios, i.e., costs of goods sold, patent royalties, sales department, and asset impairment. *Id.* at 2196:5-2197:12. Mr. Malackowski did not deduct costs associated with management or administration, legal fees, or research and development. *Id.*

57. Mr. Malackowski calculated Hytera's profits from its misappropriation of Motorola's trade secrets by multiplying Hytera's actual revenues for the accused products by Hytera's profit margin. Tr. at 2189:21-2190:7 (citing PDX-10.24, PTX-2071), Tr. at 2191:14-2192:18 (citing PDX- 10.25). After deducting costs and expenses, Mr. Malackowski identified the amount of worldwide profits Hytera earned as a result of Hytera's trade secret misappropriation as $272 million. Tr. at 2195:13-2198:20, 5389:18–22 (referring to PDX 26.7). Adjusting the calculation for May 11, 2016 forward, the amount of Hytera's profits is $135.8 million.

58. Dr. Aron agreed with Mr. Malackowski's deductions in calculating Hytera's profit margins, except with respect to Hytera's research and development expenses. Tr. at 4826:25- 4827:8, 4838:4-4840:2.

17

MSA0447

59. Mr. Malackowski explained that he did not deduct Hytera's research and development expenses because he found that data, which Hytera produced during fact discovery, to be unreliable. Tr. at 2196:5–2198:8; PDX-10.28. For example, Hytera's R&D data indicated that in 2014, Hytera spent $6 million in R&D to launch two radios, but in 2016, Hytera spent two-and-a- half times that amount ($17 million) to launch a single radio. *Id.* Mr. Malackowski further explained that data "was not specific to these products [at issue] and was not correlated or related to the introduction of these products in a way that they should be deducted." Tr. at 2197:7-2198:8; PDX-10.28; PTX-2352.

60. As a result, Mr. Malackowski did not deduct Hytera's R&D costs from its revenues when determining the amount of profit Hytera earned from its trade secret misappropriation. Tr. at 5363:11-18 (Mr. Malackowski explaining that "the accounting standards specifically talk about the use of data and that that data must be reliable, and if it isn't, it shouldn't be used. So in my opinion, consistent with what I testified to last year, those deductions should not be made. They're not appropriate.").

61. Hytera, however, contends that its profits should be reduced by the amount that it claims to have actually spent on R&D for its DMR radios and for its "legitimate contributions" to its DMR radios. Dkt. 954 at 7-9. Hytera's arguments are without merit and not supported by the facts.

62 At trial, Dr. Aron did not assert that the R&D data Hytera produced during fact discovery was reliable. Instead, Dr. Aron revised her own opinions at trial based on new, revised R&D data that Hytera produced mid-trial. Tr. at 5355:10-5356:3; DTX-5502. According to Dr. Aron, there was only one change to the R&D data produced during trial, that is, "It was a filtering down of the data that was originally produced. It's the same data, but it's a subset of the data." Tr. at 5012:6-12. Andrew Yuan, Hytera's VP of Sales and President of North and South America, testified that the R&D data was created and stored by Hytera in the ordinary course of business. Tr. at 3422:13- 21.

63. Neither Dr. Aron's nor Mr. Yuan's testimony was credible. Although Dr. Aron asserted that

18

MSA0448

the "new" data was only a subset of the "old" data, Mr. Malackowski explained that was not the case. According to Mr. Malackowski, if the newly produced R&D data is "a subset of the [original] data, it should be less than what was originally produced. It's filtered away and you're just looking at part of it. That's not what happened," and instead, "It's not just data filtering. Somebody went in and changed the codes to attribute more R&D expense to the products to this litigation, and that change was made during the litigation." Tr. at 5356:16-5361:13; PDX-28 at 176; *compare* PTX-2352 at 24-25 *with* DTX-5502 at 27.

64. Mr. Malackowski also explained that, contrary to Mr. Yuan's assertion, "it just cannot be possible that the data that was received during trial was prepared in normal course based upon records that happened 5 to 10 years ago and that are not a subset but now are greater than they ever were." Tr. at 5362:16-5363:10.

65. Because Hytera's R&D data was not credible, it was appropriate for Mr. Malackowski not to deduct those purported expenditures in arriving at Hytera's profit margins.

66. Dr. Aron also incorrectly asserted that Mr. Malackowski's "analysis overstates the unjust enrichment claim because it fails to deduct research and development expenses that were incurred by Hytera after the accused devices were introduced over a long period of time and that wouldn't have been incurred had those products not been introduced into the market." Tr. at 4827:1-8; *see also* Tr. at 4854:10-14 (Dr. Aron opining that "Mr. Malackowski's refusal to deduct these post-launch research and development expenses" "inflates or increases his [unjust enrichment] damages amount by $79.6 million."); Tr. at 4856:3-23.

67. Hytera's R&D expenses are not accurate, and thus, should not be deducted. *See also* Tr. at 5447:10-18. In addition, Mr. Malackowski explained that Hytera used the substantial amount of R&D expenditures that it saved through its misappropriation to try to "leapfrog" Motorola in the market by developing additional DMR features to differentiate its products. Tr. at 2157:8-19 (Mr.

19

MSA0449

Malackowski explaining that "the one who takes the intellectual property without payment can then use whatever money they have, not to catch up, but to actually try to get ahead, to develop something that will differentiate themselves and leap ahead of the innovator.").

### b. Hytera's Attemot to Limit Disgorgement of Its Profits with a "Head Start" Period Fails

68. Hytera asserts that its disgorgement must be limited to a head start period. Dkt. 954 at 6-7. Specifically, Hytera asserted that disgorgement should be limited to Hytera's profits from 2010 to 2014 because (i) all of the Misappropriated Trade Secrets other than Motorola's DMR Source Code, DSP Source Code, and Repeaters could have been developed in under four years; and (ii) the DMR Source Code, DSP Source Code, and Repeater trade secrets were supposedly invalid. *Id.*

69. Hytera's head start argument fails because the Court concluded that none of the Misappropriated Trade Secrets, including DMR Source Code, DSP Source Code, and Repeater, were invalid as a matter of law. Dkt. 1088 at 7-9. Thus, Hytera still, to this day, could not have launched DMR radios comparable to Motorola's without the Misappropriated Trade Secrets, making the head start period is inapplicable. *See* Tr. at 593:24-595:10 (DMR Source Code trade secret took 87 engineers 9,468 staff months to develop), 707:13-708:16 (DSP Code trade secret took 25 engineers 3,000 staff months to develop), 998:25-999:5 (Repeater trade secret took 20 engineers 3,248 staff months to develop); PDX-10.30 (DMR Source Code, DSP Source Code, Repeaters took 108 calendar months to develop), Tr. at 2199:2-13.

70. Hytera nonetheless contends that despite the Court's finding that the Misappropriated Trade Secrets were valid, "the Court must make an independent finding of what the head start period would have been and award no more than the equitable amount." Dkt. 954 at 7 n.1. Hytera cites no case law mandating such an analysis. Nonetheless, even if such an analysis were required, the evidence demonstrates that it was appropriate to award Hytera's profits through June 30, 2019.

MSA0450

71.    Hytera was incapable of developing a comparable DMR radio in any commercially reasonable time; to this day, Hytera still has not been able to develop a "comparable" DMR radio on its own. Dkt. 935-3 (Ex. 36) (Dr. Rangan slide: "Hytera Could Not Conceive Of Or Develop The Trade Secrets In A Commercially Reasonable Time"); Tr. at 1823:10–13 (testimony re same), 1950:21–1951:7 (Dr. Rangan: Hytera is still using Motorola's trade secrets "almost ten years" after Hytera's first DMR product release so "it would take at least ten years of time for them to develop these asserted trade secrets.").

72.    Motorola also presented evidence that even if Hytera could develop a comparable DMR radio in a certain period of time, that would be years from now. Tr. at 2016:22–2017:3 (Dr. Rangan: DSP source code trade secret and repeater took 23.5 years to develop), 2062:19-21 (Dr. Rangan: "Q. And your opinion is that what Hytera developed would never have worked? A. In any commercially reasonable time, no."), 1950:13-1951:7 (Dr. Rangan: "It's my view that [Hytera] would actually have never conceived of these or implemented these trade secrets in any commercially reasonable period of time, but even if they were to, the time for Motorola took to develop these trade secrets would be an absolute minimum or baseline for that time.").

73.    Hytera still has not released a DMR radio comparable to Motorola's that was not designed with the Misappropriated Trade Secrets almost four years after this case was filed, and nearly a year after the jury verdict. Tr. at 2480:10-12 ("[Q.] And you can't deny that Hytera . . . whether or not Hytera is currently using a single line of Motorola source code? [A.] I don't deny it. I know it as a fact.") (Pengfei Sun), 1950:21–1951:7 (Dr. Rangan: Hytera is currently still using Motorola's trade secrets "almost ten years" after Hytera's first DMR product release so "it would take at least ten years of time for them to develop these asserted trade secrets.").

74.    Hytera's experts attempted to argue that the Misappropriated Trade Secrets were not important to Hytera's development of DMR radios, and that without the misappropriation, Hytera

21

MSA0451

could have released its radios in six months, but those assertions were not credible.

75.  Mr. Grimmett claimed that Hytera used only a "very small amount" of Motorola's trade secrets to develop its DMR radios and that six months was "quite generous." Tr. 4282:23-4284:9. Yet Mr. Grimmett admitted that PTX-479, Hytera's ROSAL specification, describes "a standard and common operating system environment that is utmostly necessary," and is thus "important" and presumably "would provide a competitive advantage." Tr. at 4718:7-4719:8; PTX-479. Mr. Grimmett further admitted that this ROSAL specification was written by Y.T. Kok, and that he copied "a good amount" of its contents from a Motorola confidential document. Tr. at 4719:9-17. While Mr. Grimmett further admitted that Hytera's Professor Sun sent an email in September 2009—after G.S. Kok, Y.T. Kok, Sam Chia, and Peiyi Huang joined Hytera but before Hytera launched its DMR product—declaring that Hytera's common platform architecture ("CPA"), which it stole from Motorola, "is very important to the standardization of Hytera's future products" (Tr. at 4720:4-4721:2; PTX-2205), Mr. Grimmett also acknowledged that just the day prior, he had "testified that the entire software architecture trade secret ... did not provide any competitive advantage to Hytera" and "was generally known" (Tr. at 4721:9-23). And despite acknowledging that Hytera's Roger Zhang "is talking about having many problems" with "the transplanting of the protocol stack" in January 2007 (PTX-1984), prior to G.S. Kok, Y.T. Kok, Sam Chia, and Peiyi Huang joining Hytera, and is "still having many problems with the DMR protocol stack" a year and a half later in June 2008 (PTX-542), Mr. Grimmett stood by his testimony that "Motorola's protocol stack provides no competitive advantage to Hytera." Tr. at 4732:14-4734:5.

76.  Hytera's other technical expert, Ms. Frederiksen-Cross, confirmed that "but for the Motorola code that was stolen," the libraries Hytera claims to have independently written "would not work." Trial Tr. 4091:4-7.

77.  Dr. Aron's claim that Hytera would immediately catch up to its current level of sales

22

MSA0452

whenever it released a DMR radio was likewise not credible. Indeed, even Dr. Aron agreed that a late market entrant "may lose more sales if the late or delayed entry would have affected its ability to build its demand up." Tr. at 4880:19–4881:9. Dr. Aron also testified that as Hytera releases additional models, Hytera will customize those products for specific uses based on customer feedback. Tr. at 4853:19-23 ("As the company puts out additional models, . . . customers see customization of those products for their specific uses, so they will come back to Hytera, and the engineers will do customization on those products."). This was consistent with Mr. Malackowski's testimony. Tr. at 5375:2–21 (Malackowski: had Hytera "entered the market in 2014, [i]t would make no sense they could have obtained all the sales they actually did with the benefit of having started several years earlier."), 5375:22–5377:9 (Malackowski: in DMR market, "you build sales over time because you work with your customers to ramp up their need across their entire business. So you can't come in years later and pick up where you otherwise would have been.").

78. The Court finds the evidence supports disgorgement of $135.8 million for Hytera's profits due to Hytera's trade secret misappropriation under the DTSA.

### D. Hytera's $135.8 Million Profits from Its Misappropriation Are the Proper Amount of Unjust Enrichment, the $73,583,897 Addition for Avoided Research and Development Constitutes Double Recovery

79. Mr. Malackowski testified that, because all of the trade secrets were misappropriated, the full amount of Hytera's profits in addition to Hytera's avoided R&D should be awarded. Tr. at 2200:5–11; *see also* Tr. at 5353:3-14 (Mr. Malackowski testifying that "there are two components" to his unjust enrichment opinion: "There are the profits that Hytera actually made on the sales that are accused and it's the R&D that they saved that they did not have to spend because they misappropriated the trade secrets."); PDX-10.29-.32, PDX-26.7.

80. Awarding both the amount of R&D that Hytera avoided spending through its

23

MSA0453

misappropriation and Hytera's profits from sales of DMR radios developed with the misappropriated trade secrets constitutes double recovery, however. See Tr. 4856:3-22 (Dr. Aron explaining why Motorola's request for both Hytera's profits and avoided research and development amounts to double recovery).

81. By force of the Court's reasoning in the October 19, 2020, the disgorgement of Hytera's profits is an equitable remedy, as the award is not a specific proxy for Motorola's actual losses.

82. By force of the Court's reasoning in the October 19, 2020 Order, awarding Hytera's avoided costs and Hytera's profits is double recovery.

83. The Court finds that $135.8 million should be awarded for Hytera's trade secret misappropriation under the DTSA. The disgorgement of Hytera's profits and the award of Hytera's avoided research and development would constitute double recovery, however.

84. The proper award, then, is $272,117,268, when including the Copyright Act disgorgement, discussed below.

85. Because the punitive damages in this case are a function of the compensatory damages under the DTSA, the punitive damages award must therefore also be reduced so as to adhere to the statutory provision of the DTSA. 18 U.S.C. 1836 (b)(3)(C) (stating that an award of exemplary damages may not exceed 2 times the amount of the compensatory award).

86. Punitive damages, then, shall be reduced to $271.6 million.

## III. THE COPYRIGHT INFRINGEMENT AWARD TO MOTOROLA IS PROPER

### A. Hytera's Infringement

87. Motorola holds certificates of copyright registration for the MotoTRBO program in its radios. PTX-1527, PTX-1528, PTX-1645, PTX-1659, Tr. at 200:22-202:23; Dkt. 895 at Instruction No. 3 ("The following are stipulated facts: ... 9. The U.S. Copyright Office issued registration certificates relating to certain software associated with Motorola's DMR radio products at issue in this case.").

24

MSA0454

88. Motorola witnesses testified that the content of Motorola's copyrights was original and creative. Tr. at 607:11-23, 862:18-864:9, 1437:7-12. Hytera presented no countervailing evidence.

89. Hytera had access to Motorola's copyrighted source code, and copied thousands of lines of that copyrighted source code that was original to Motorola into its own products. Tr. at 874:19- 876:9, 1432:5-1436:8; PTX-2090 and PTX-2091 (Exhibits C and D to Dr. Wicker's report). Hytera concedes that it copied Motorola's copyrighted DMR source code. Tr. at 3781:14-21.

90. The Court denied Hytera's motion for judgment as a matter of law or new trial with respect to Motorola's copyright infringement claim. Dkt. 1088 at 11-13.

### B. Hytera's Profits

91. Hytera began selling DMR radios that contain Motorola's copyrighted DMR source code in 2010. Tr. 204:19-20, 2020:22-2021:4, 2395:3-4, 5138:15-5140:8.

92. Dr. Wicker explained that none of Hytera's DMR radios would function without Motorola's copyrighted source code. Tr. at 5075:7-5076:12 (citing PDX-20.5) (Dr. Wicker describing three libraries "in extensive use in Hytera's radios" that Hytera acknowledges were taken from Motorola; explaining that Hytera radios "would not function" without stolen code), 5073:10- 25 (Dr. Wicker explaining that "all 3500 ... source code files" in Hytera's radios "are contaminated or were developed with knowledge and availability of Motorola source code"), 5080:3-23 (Dr. Wicker explaining that even source code "done by someone other than what [Mr. Grimmett] refers to as the Malaysian team" is "still making use of Motorola's code" by "calling on Motorola's library ... for its functionality.

93. The copyrighted source code that Hytera copied was taken from Motorola's ClearCase system and brought over to Hytera. Tr. at 443:18–21, 5087:3-5088:13; PTX-2100.825; PTX- 1316.3. Dr. Stephen Wicker, Motorola's technical expert, explained that the main ClearCase server is in Illinois, and that server is mirrored in other locations. Tr. 5150:5-5151:3. As a result, the other ClearCase

25

MSA0455

servers "reflect[] material that is in Illinois" and "anything that happens on one of those other [ClearCase] sites goes to Illinois." *Id.*

94. Because Hytera's copyright infringement in the United States is directly linked to its foreign sales of DMR radios, Motorola is entitled to Hytera's worldwide profits from its DMR radios.

95. Mr. Malackowski identified a causal nexus between Hytera's copyright infringement and gross revenues for DMR radios based on the amount Hytera spent on R&D to launch their first DMR product. Tr. at 2156:2-24 ("I was looking here for the nexus of my damage claim, which is basically whether or not there was a relationship between the trade secrets and copyright at issue and the profits that I seek for both companies. Hytera benefited from use of the Motorola trade secrets and copyrights, and they were able to reduce their own R&D expense accordingly.").

96. From 2010 to June 2019, Mr. Malackowski identified Hytera's revenue for the accused DMR portable radios as $532,025,673, with mobile radios adding "another 111 million" dollars; for accused DMR repeaters as $91,166,965; and for DMR accessories as $53,202,567. Tr. at 2191:14-2193:13; 2195:8-12; PDX-10.25; PTX-2071, PTX-2226, DTX-4057.

97. Dr. Aron did not dispute the revenues Mr. Malackowski presented for the accused Hytera products. Tr. 4958:23-4959:2; PTX-2226.

98. In determining the amount of Hytera's profits, Mr. Malackowski deducted costs that would vary with production of additional radios, i.e., costs of goods sold, patent royalties, sales department, and asset impairment. Tr. at 2196:5-2197:12. Mr. Malackowski did not deduct costs associated with management or administration, legal fees, or research and development. *Id.*

99. Mr. Malackowski calculated Hytera's profits from its infringement of Motorola's copyrights by multiplying Hytera's actual revenues for the accused products by Hytera's profit margin. Tr. at 2189:21-2190:7 (citing PDX-10.24, PTX-2071), Tr. at 2191:14-2192:18 (citing PDX-10.25). After deducting costs and expenses, Mr. Malackowski identified the amount of worldwide profits Hytera

26

MSA0456

earned as a result of Hytera's copyright infringement as $272 million. Tr. at 2195:13-2198:20, 5389:18–22 (referring to PDX 26.7).

100. Dr. Aron agreed with Mr. Malackowski's deductions in calculating Hytera's profit margins, except with respect to Hytera's research and development expenses. Tr. at 4826:25- 4827:8, 4838:4- 4840:2. For the reasons explained above, Mr. Malackowski properly concluded that Hytera's R&D expenses should not be deducted in calculating Hytera's profits.

101. The Court finds that the evidence supports disgorgement of $136.3 million in Hytera's profits for Hytera's copyright infringement.

## IV. HYTERA'S MOBILE RADIOS ARE PROPERLY INCLUDED IN THE DAMAGES AWARD FOR COPYRIGHT INFRINGEMENT AND TRADE SECRET MISAPPROPRIATION

102. Motorola's technical expert, Dr. Wicker, testified that mobile radios use the same code as the accused devices and repeaters, and Hytera's interrogatory response confirming that fact was admitted without objection from Hytera's counsel. Tr. at 1428:5-13; 1431:14-21; 5124:2-20; DDX-14.10; PTX-1740. Hytera's expert, Barbara Frederiksen-Cross, agreed, testifying that Hytera's accused mobile devices include the same code as Hytera's accused devices and repeaters. Tr. at 3795:4–14 ("The way the code is organized is there is repeater specific code and then subscriber specific code, which includes the code that's used in both the mobile and handheld devices.").

103. Motorola introduced testimony related to Hytera's mobile products, to which Hytera did not object. For example, Mr. Malackowski testified to the amount of Hytera's revenue from the accused mobile products, as well as the profit margin for Hytera's accused products, including mobiles. Tr. at 2191:23-2192:3; 2198:9-17; PTX-2071, PTX-2226, DTX-4057. Hytera did not object to any of this evidence when it was admitted. On rebuttal, Mr. Malackowski provided a sum of that information. Tr. at 5395:11-24.

104. Hytera does not contend that Mr. Malackowski's calculations are inaccurate. Instead, Hytera's

27

witnesses disputed in a conclusory manner that Hytera's DMR mobile radios were accused. Tr. at 2581:3-7 (Mr. Sun testifying that he understands mobiles are not at issue in the case); 3278:7-9 (Mr. Luo testifying that he understands Motorola is not accusing mobile radios); 3408:22-24 (Mr. Yuan testifying that "[a]ll of the mobiles was not accused"); 3426:21-25 (same); Dkt. 898. Hytera's witness testimony is plainly contradicted by the facts, which unequivocally demonstrate that Hytera's mobile radios include Hytera's DMR mobile radios and misappropriated trade secrets.

105. Because Hytera's DMR mobile radios include Motorola's misappropriated trade secrets and infringed copyrights (Tr. at 1428:5-13; 1430:17-1431:21 3795:4–14; DDX-14.10; PTX-1740), they are properly included in the award.

## V.    THE REDUCED AWARD OF $272,117,268 IS NOT EXCESSIVE AND NO REMITTITUR SHOULD BE GRANTED

106. The award of $345,761,165 must be reduced to avoid double recovery for Motorola. The award cannot contain a disgorgement of profits and the avoided research and development costs, as outlined in the Court's October 19, 2020 Order and as further discussed below.

107. The reduced award of $272,117,268 is not excessive.

108. Hytera asserts that "there is no rational connection between the evidence in this case and award of $345.8 million for trade secret misappropriation and copyright infringement." Dkt. 954 at 39-40. In support, Hytera repeats arguments that that have been addressed above. *Id.* at 39 (Hytera arguing damages should be limited to a head start period,); *id.* at 40 (Hytera arguing copyright damages should be limited to U.S. only); *id.* (Hytera arguing compensatory damages should be limited to $73.6 million).

109. Second, Hytera argues that the award is "monstrously excessive because it exceeds total profits for all products—not just accused products." *Id.* at 39. Hytera's argument is misleading. As Mr. Malackowski explained at trial, Hytera's claim that it made only $265 million in profits over a 9.5 year period ignored that Hytera used its $734 million in accused revenues "to make acquisitions

28

to enhance its competitive position." Tr. 5343:18–5344:3, 5348:25-5351:20; *see also* PTX-968. Even Hytera's expert did not deduct Hytera's expenditures in acquiring new companies to enhance its competitive position in calculating Hytera's ill-gotten profits. Tr. 4837:16–4840:14.

110. Third, Hytera contends that the award of $345 million is not comparable to awards in similar cases. Dkt. 954 at 40. This is incorrect. Hytera sold the accused products for nearly ten years, continued to sell the accused products after they were sued, and made $734.1 million in revenue on those products. Tr. 2191:23-2192:7, 5344:1-3. Awards in trade secret cases with a similar breadth of theft have neared or exceeded the $345 million awarded in this case. *E.I. DuPont de Nemours & Co. v. Kolon Indus., Inc.*, No. 3:09-cv-58, 2012 WL 1202485, at *1 (E.D. Va. Apr. 10, 2012) ($919.9 million compensatory damages verdict in trade secret misappropriation case); *Syntel Sterling Best Shores Mauritius Ltd. v. TriZetto Grp., Inc.*, 328 F.R.D. 450, Dkt. 931 at 4 (S.D.N.Y. Oct. 27, 2020) (jury verdict form awarding $284 million compensatory damages for trade secret misappropriation).

## VI. MOTOROLA SHOULD BE AWARDED $272,117,268 FOR HYTERA'S TRADE SECRET MISAPPROPRIATION AND COPYRIGHT INFRINGEMENT

111. The Court finds that Motorola should be awarded $135.8 million for Hytera's profits due to Hytera's trade secret misappropriation under the DTSA, for the time period from May 11, 2016 to June 30, 2019.

112. The Court finds that Motorola should be awarded $136.3 million in Hytera's profits for Hytera's copyright infringement, for the time period from 2010 to May 10, 2016.

113. The total compensatory award, therefore, is $272,117,268, excluding punitive damages.

29

## CONCLUSIONS OF LAW

### I.     DAMAGES - BURDEN OF PROOF

1.     Motorola had the burden of proving whether Hytera caused the damage that Motorola is claiming by a preponderance of the evidence. *See Playwood Toys, v. Learning Curve Toys*, No. 94-cv-6884, 2000 WL 36740990 (N.D. Ill. Aug. 15, 2000), ECF No. 19 (Jury Instructions); Federal Civil Jury Instructions of the Seventh Circuit, Instruction No. 12.8.1

### II.    TRADE SECRET DAMAGES

2.     Under the DTSA, the Court may award the following for misappropriation of trade secrets: "(i)(I) damages for actual loss caused by the misappropriation of the trade secret; and (II) damages for any unjust enrichment caused by the misappropriation of the trade secret that is not addressed in computing damages for actual loss[.]" 18 U.S.C.A. § 1836(3)(B).

3.     "[T]he measure of unjust enrichment damages is the benefit conferred to the defendant." *Medmarc Cas. Ins. Co. v. Avent Am., Inc.*, 612 F.3d 607, 611 (7th Cir. 2010). "[I]n the trade secret misappropriation context, the proper measure of unjust enrichment damages is 'the total gains of [a defendant's] wrongdoing,'" which includes the defendant's profits from the misappropriation and the costs the defendant avoided incurring due to the misappropriation. *Steves & Sons, Inc. v. JELD-WEN, Inc.*, No. 3:16-CV-545, 2018 WL 2172502, at *6-7 (E.D. Va. May 10, 2018); *Syntel Sterling Best Shores Mauritius Ltd. v. TriZetto Grp.*, No. 15 CIV. 211 (LGS), 2020 WL 5822058.

4.     To establish the defendant's ill-gotten profits, "[t]he plaintiff has the burden of establishing the defendant's sales; the defendant has the burden of establishing any portion of the sales not attributable to the trade secret and any expenses to be deducted in determining net profits. *Cartel Asset Mgmt. v. Ocwen Fin. Corp.*, 249 F. App'x 63, 79 (10th Cir. 2007) (quoting

30

MSA0460

Comment (f) to the Restatement (Third) of Unfair Competition § 45 (1995)); *Peerless Indus., Inc. v. Crimson AV LLC*, No. 11-cv-1768, Jury Instructions at 45 (N.D. Ill. June 24, 2016) (Dkt. 610).

5.      Avoided costs are "the avoided costs that would have been incurred to achieve the same result without access to those trade secrets." *Miller UK Ltd. v. Caterpillar, Inc.*, No. 10-CV-03770, 2015 WL 10818831, at *13 (N.D. Ill. Nov. 1, 2015) (internal quotations omitted).

6.      Unjust enrichment for trade secret misappropriation is not limited to a head start period. *RRK Holding Co. v. Sears, Roebuck & Co.*, 563 F. Supp. 2d 832, 836 (N.D. Ill. 2008) ("While Illinois case law requires damages be limited to a head start period for injunctive relief, it has not made such a requirement for monetary damages.").

7.      Rather, "[t]o prevent underenforcement and to remedy the defendant's increased market share, therefore, it is equitable to grant ... monetary damages beyond [a] 'head start' period." *Agilent Techs., Inc. v. Kirkland*, No. CIV.A. 3512-VCS, 2010 WL 610725, at *27 (Del. Ch. Feb. 18, 2010); *see also Russo v. Ballard Med. Prods.*, 550 F.3d 1004, 1020 (10th Cir. 2008).

8.      Hytera's avoided R&D does not constitute a fully paid up royalty because there is no evidence supporting that conclusion. *See Erfindergemeinschaft UroPep GbR v. Eli Lilly & Co.*, No. 15-cv-1202, 2017 WL 3034655, at *2–3 (E.D. Tex. July 18, 2017) (rejecting argument verdict was fully paid-up license where "parties did not argue to the jury (or the Court) that the damages award would constitute compensation for a paid-up license").

9.      Notwithstanding Motorola's request to the jury for an award of Hytera's profits only, this Court previously ruled that the jury's award "is properly characterized as a 'case-specific proxy for ... losses' that rendered the award a "legal remedy." Dkt. 1088 at 26.

10.      That ruling was based on the belief by the Court that the $135.8 award represented Motorola's lost profits, not Hytera's profits.

31

MSA0461

11.     The Court's legal reasoning remains the same, but this factual inaccuracy must be corrected.

12.     *Texas Advanced Optoelectronic Sols., Inc. v. Renesas Elecs. Am., Inc. ("TAOS")*, 895 F.3d 1304, 1318–26 (Fed. Cir. 2018) instructs that "[i]n some cases, a plaintiff seeking disgorgement as a remedy for trade secret misappropriation might prove that this measure of relief, though focused on the defendant's gains, is good evidence of damages in the form of the plaintiff's losses or of a reasonable royalty for use of the secret."

13.     Hytera's profits are not a proxy for Motorola's actual losses in this case. *See Fair Isaac Corp. v. Fed. Ins. Co.*, 408 F. Supp. 3d 1019, 1031 (D. Minn. 2019), aff'd, 468 F. Supp. 3d 1110 (D. Minn. 2020).

14.     Motorola may not recover both Hytera's profits and avoided R&D because this amounts to impermissible double recovery. If Motorola recovers Hytera's profits, then it is recovering the amounts Hytera saved in research and development from the alleged misappropriation. *Salisbury Laboratories, Inc. v. Merieux Laboratories, Inc.*, 908 F.2d 706 (11th Cir. 1990); *see also In re Mud King Prods., Inc.*, 514 B.R. 496, 523–24 (Bankr. S.D. Tex. 2014) (rejecting trade secret owner's request to recover both disgorgement of debtor's profits and "hypothetical development costs" because "no case allows development costs where defendant's profits are shown"); *Hallmark Cards, Inc. v. Monitor Clipper Partners, LLC.* No. 08-0840-CV-W-ODS, 2012 WL 3047308, at *3 n.4 (W.D. Mo. July 25, 2012) ("Most of the authorities cited indicate that the defendant's cost savings may be used to value gain instead of, and not as well as, profits earned from the misappropriation. This is undoubtedly based on the need to avoid double counting of gains.").

15.     The clear indication of Congress in amended Chapter 90 of Title 18 of the U.S. Code was to extend the extraterritorial provisions of Section 1837 to Section 1836, meaning Section 1836 may have extraterritorial reach subject to the restrictions in Section 1837. Dkt. 834 at 15.

16.     18 U.S.C. § 1837 provides: "This chapter also applies to conduct occurring outside the United States if— (1) the offender is a natural person who is a citizen or permanent resident

32

alien of the United States, or an organization organized under the laws of the United States or a State or political subdivision thereof; or (2) an act in furtherance of the offense was committed in the United States."

17. The "offense," in context of the 18 U.S.C. § 1837(2), is the misappropriation of a trade secret. This is clear through the plain language of the statute. *See* 18 U.S.C. § 1836(b). As courts have recognized, misappropriation can occur through any of three actions: (1) acquisition, (2) disclosure, or (3) use. *Zaccari v. Apprio, Inc.*, 390 F. Supp. 3d 103, 112-13 (D.D.C. 2019) (the DTSA "permits plaintiffs to bring private causes of action if they 'own[] a trade secret that is misappropriated.' 18 U.S.C. § 1836(b)(1). Misappropriated means either '(A) acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or (B) disclosure or use of a trade secret of another without express or implied consent by a person' who meets one of several conditions. 18 U.S.C. § 1839(5)(A)- (B). As some courts have put it, the DTSA thus authorizes suits alleging three theories of trade secret misappropriation: (1) acquisition, (2) disclosure, and (3) use. *See, e.g., AUA Private Equity Partners, LLC v. Soto*, No. 1:17-8035-GHW, 2018 WL 1684339, at *4 (S.D.N.Y. Apr. 5, 2018); *Camick v. Holladay*, 758 F. App'x 640, 645 (10th Cir. 2018).").

18. "[M]arketing goods that embody the trade secret, employing the trade secret in manufacturing or production, relying on the trade secret to assist or accelerate research or development, or soliciting customers through the use of information that is a trade secret ... all constitute 'use.'" *Cognis Corp. v. CHEMCENTRAL Corp.*, 430 F. Supp. 2d 806, 812 (N.D. Ill. 2006).

19. Section 1837 of the DTSA does not define what constitutes "an act in furtherance of the offense." In *Luminati Networks Ltd. v. BIScience Inc.*, No. 2:18-CV-00483-JRG, 2019 WL 2084426, at *9 (E.D. Tex. May 13, 2019), a Texas district court case analyzing Section 1837 wrote, "this language is not foreign to the common law but is regularly used in the area of

33

federal conspiracy law." *Id.* (citing *Yates v. United States*, 354 U.S. 298, 334 (1957) ("[T]he overt act must be found...to have been in furtherance of a conspiracy. "); *Findlay v. McAllister*, 113 U.S 104, 114 (1885) ("[T]o sustain the action it must be shown not only that there was a conspiracy, but that there were tortious acts in furtherance of it.")

20.     "[W]here Congress borrows terms of art in which are accumulated the legal tradition and meaning of centuries of practice, it presumably knows and adopts ... the meaning its use will convey to the judicial mind unless otherwise instructed." *Morissette v. United States*, 342 U.S. 246, 263 (1952).

21.     As did the *Luminati* court, this Court looks to the established common law meaning of "in furtherance of" when interpreting the extraterritoriality provision of the DTSA. 18 U.S.C. § 1837(2). The Court agrees with *Luminati*'s analysis on this point: "Applied to the DTSA, *Yates* makes clear that the act in furtherance of the offense of trade secret misappropriation need not be the offense itself or any element of the offense, but it must 'manifest that the [offense] is at work' and is not simply 'a project in the minds of the' offenders or a 'fully completed operation.' [*Yates*, 354 U.S. at 334.] Put another way, an act that occurs before the operation is underway or after it is fully completed is not an act 'in furtherance of' the offense." 2019 WL 2084426, at *10.

22.     If Motorola has shown that Hytera has taken actions that "manifest that the offense is at work"—the offense being the misappropriation—then Section 1837 has been satisfied and the chapter (including Section 1836(b)) also applies to acts occurring outside the United States.

23.     Motorola introduced evidence in this case sufficient to support a finding that "use" of the trade secrets has occurred domestically. It was undisputed throughout trial that Hytera has advertised, promoted, and marketed products embodying the allegedly stolen trade secrets domestically at numerous trade shows and that as a result, Section 1837(2) was satisfied and

34

MSA0464

the DTSA applied extraterritorially. *See* Dkt. 834 at 21–23; *Gen. Universal Sys., Inc. v. HAL, Inc.*, 500 F.3d 444, 450 (5th Cir. 2007); *Cognis Corp. v. CHEMCENTRAL Corp.*, 430 F. Supp. 2d 806, 812 (N.D. Ill. 2006).

24.     The DTSA applies to a "use"-based private cause of action even if the acquisition occurred before effective date of the statute or if the use began before the effective date. *See* Pub. L.114- 153, May 11, 2016 (18 U.S.C. § 1833 Note) ("The amendments made by this section shall apply with respect to any misappropriation of a trade secret ... for which any act occurs on or after the date of the enactment of this Act."). This broad language, coupled with the omission of the provision in the Uniform Trade Secret Act limiting such recovery, support the position that "use" in this case occurring after effective date serves as a proper basis for this action.

25.     Alternatively, the application of the DTSA and the ITSA in this case is domestic because Hytera's misappropriation occurred in the United States. 18 U.S.C. § 1839(5)(A) (defining misappropriation to include "acquisition"). The theft occurred in the United States when Hytera employees stole Motorola's trade secrets from the Compass and ClearCase systems because those systems are accessible at Motorola's Schaumburg office. *Flavorchem Corp. v. Mission Flavors & Fragrances, Inc.*, 939 F. Supp. 593, 597–98 (N.D. Ill. 1996) (finding that because trade secrets were copied in Illinois and injury occurred in Illinois, Illinois was the location of the tortious conduct); *Specht v. Google, Inc.*, 660 F. Supp. 2d 858, 866 (N.D. Ill. 2009) (because infringement "took place on the Internet" it "presumably occurr[ed] in Illinois"); *Strabala v. Zhang*, 318 F.R.D. 81, 111 (N.D. Ill. 2016) ("where the internet is concerned, a person's conduct may be expressly aimed at a specific person or entity in another forum that causes harm in that forum without having express knowledge as to the ... location of the ... entity being affected").

26.     This is sufficient to establish that Motorola's claim for misappropriation is based on

MSA0465

conduct that occurred in this District. *See WesternGeco v. ION Geophysical Corp.*, 138 S. Ct. 2129, 2138 (2018) ("[T]he object[s] of the statute's solicitude[] can turn on the 'conduct,' 'parties,' or interests that it regulates or protects."); *IPOX Schuster, LLC v. Nikko Asset Mgmt. Co.*, 304 F. Supp. 3d 746, 759 (N.D. Ill. 2018) (ITSA applied domestically because "[defendant] used a conduit to request and receive information from [plaintiff], which is based in Illinois"). The fact that the acquisition occurred prior to the enactment of the DTSA does not preclude a domestic application of the statute based on that acquisition because the DTSA applies to continuing misappropriations, so long as "any act occurs on or after the date of the enactment of this Act." *See* Pub. L.114-153, May 11, 2016 (18 U.S.C. § 1833 Note).

27.     As a result, "any damage award flowing from … domestic misappropriation would not run afoul of the presumption against the extraterritorial application of law." *See Turnkey Sols. Corp. v. Hewlett Packard Enter. Co.*, No. 15-cv-1541, 2017 WL 3425140, at *8 (D. Colo. Aug. 9, 2017) (denying summary judgment that plaintiff could not seek damages for extraterritorial sales under Colorado's UTSA); *see also Envtl. Def. Fund, Inc. v. Massey*, 986 F.2d 528, 531 (D.C. Cir. 1993) ("Even where the significant effects of the regulated conduct are felt outside U.S. borders, the statute itself does not present a problem of extraterritoriality, so long as the conduct which Congress seeks to regulate occurs largely within the United States.").

28.     Hytera's profits due to Hytera's trade secret misappropriation under the DTSA, for the time period from May 11, 2016 to June 30, 2019, is $135.8 million.

29.     The Court will award this disgorgement of Hytera's profits. "[B]y disgorging any net profits from the infringer, lost profit damages eliminate a major incentive to steal the copyright instead of fairly negotiating for its use with the owner." *McRoberts Software, Inc. v. Media 100, Inc.*, 329 F.3d 557, 568 (7th Cir. 2003).

## III. COPYRIGHT INFRINGEMENT DAMAGES

30.     Motorola's certificates of registration for the MotoTRBO program in its radios are

36

MSA0466

"prima facie evidence of the validity of the copyright," 17 U.S.C. § 410(c), including "both valid ownership of copyright and originality." *Associated Press v. Meltwater U.S. Holdings, Inc.*, 931 F. Supp. 2d 537, 549 (S.D.N.Y. 2013).

31.     The Copyright Act permits a plaintiff to recover "profits of the infringer that are attributable to the infringement." 17 U.S.C. § 504(b). To establish the infringer's profits, "the copyright owner is required to present proof only of the infringer's gross revenue, and the infringer is required to prove his or her deductible expenses and the elements of profit attributable to factors other than the copyrighted work." *Id.*; *see also* Dkt. 895 at Instruction No. 40.

32.     The Seventh Circuit has held that the continuing violation doctrine applies in copyright cases. *See Taylor v. Meirick*, 712 F.2d 1112, 1118-19 (7th Cir. 1983). As Judge Posner wrote, "When the final act of an unlawful course of conduct occurs within the statutory period, these purposes are adequately served, in balance with the plaintiff's interest in not having to bring successive suits, by requiring the plaintiff to sue within the statutory period but letting him reach back and get damages for the entire duration of the alleged violation." Dkt. 1088 at 12 (quoting *Taylor*, 712 F.2d at 1119).

33.     While "a plaintiff must show a causal nexus between the infringement and the gross revenues," *Bell v. Taylor*, 827 F.3d 699, 710 (7th Cir. 2016), "[t]he Seventh Circuit [requires] only a minimal connection between revenue and infringement in direct profit cases," *Bergt v. McDougal Littell*, 661 F. Supp. 2d 916, 927 (N.D. Ill. 2009). "Thus, all a plaintiff must do to meet his burden in the Seventh Circuit is provide a figure limited to the profit stream resulting from the infringement."

34.     The defendant "bear[s] the burden of proving the amount and reasonableness of all

37

deductions by a preponderance of the evidence." *Liu v. Price Waterhouse LLP*, No. 97 CV 3093, 2000 WL 1644585, at *5 (N.D. Ill. Oct. 30, 2000).

35.     "If an infringing act occurred within the United States, then the plaintiff may recover for foreign violations that are directly linked to the domestic infringement." Dkt. 834 at 25-27; *see also Tire Eng'g & Distrib., LLC v. Shandong Linglong Rubber Co.*, 682 F.3d 292, 307 (4th Cir. 2012) ("Recovery of damages arising from overseas infringing uses [is] allowed [when] the predicate act of infringement occurring within the United States enabled further reproduction abroad."); *L.A. News Serv. v. Reuters Television Int'l, Ltd.*, 149 F.3d 987, 991–92 (9th Cir. 1998) (tracing the predicate act doctrine to Judge Learned Hand's opinion in *Sheldon v. Metro–Goldwyn Pictures Corp.*, 106 F.2d 45 (2d Cir. 1939), *aff'd*, 309 U.S. 390 (1940)); *Update Art, Inc. v. Modiin Publ'g, Ltd.*, 843 F.2d 67, 73 (2d Cir. 1988).

36.     Hytera's profits from selling DMR radios that include Motorola's copyrighted works— whether in the U.S. or outside the U.S.—are properly recoverable, including because Hytera has promoted, advertised, marketed, and sold its DMR products containing Motorola's copyrighted source code in the United States, including at trade shows. *See Sheldon v. Metro-Goldwyn Pictures Corp.*, 106 F.2d 45, 52 (2d Cir. 1939) ("profits made from exhibiting the infringing picture outside the United States" were available as damages because infringer made negatives used to generate picture in U.S.), *aff'd*, 309 U.S. 390 (1940).

37.     Hytera's profits from its copyright infringement are $136.3 million. Tr. at 5389:18-22.

38.     Motorola is not entitled to a double recovery for the same wrongful conduct under both its trade secret misappropriation and copyright claims. *Thermodyne Food Serv. Prods. v McDonald's Corp.*, 940 F. Supp. 1300, 1310 (N.D. Ill. 1996).

39.     As discussed above, the recovery of Hytera's profits and Hytera's avoided costs constitutes a double recovery.

MSA0468

40.     The total award is comprised of $135.8 in disgorged profits under the DTSA, $136.3 million in disgorged profits under the Copyright Act, for a total of $272.177,259 million in disgorged profits to be awarded to Motorola.

41.     Punitive damages are awarded only on the DTSA claim, and the Court follows the jury in awarding the maximum--$271.6 million.

42.     The total award, then, shall be reduced to $543.7 million.

## V.     THE AWARD IS NOT EXCESSIVE AND NO REMITTITUR SHOULD BE GRANTED.

43.     In deciding whether to award a new trial on damages or remittitur, courts consider "[1] whether the award is 'monstrously excessive,' [2] whether there is a rational connection between the award and the evidence, and [3] whether the award is roughly comparable to awards made in similar cases." *Gracia v. SigmaTron Int'l, Inc.*, 842 F.3d 1010, 1022 (7th Cir. 2016) (declining to remit damages award); *Riemer v. Ill. Dep't of Transp.*, 148 F.3d 800, 808 (7th Cir. 1998) (same). The first two factors "are really just two ways of describing the same inquiry: whether the jury verdict was irrational." *Adams v. City of Chicago*, 798 F.3d 539, 543 (7th Cir. 2015). "In order to determine whether the jury's verdict was irrational, the district court must review the trial record as a whole in the light most favorable to the verdict." *Id.*

44.     Courts in the context of copyright infringement have held that "[d]efendants cannot limit the amount at issue in the underlying claim to the profits they received. . . ." *Owners Ins. Co. v. Cruz Accessories*, No. 2:17-CV-2215-PMD, 2018 WL 902290, at *2 (D.S.C. Feb. 15, 2018).

IT IS SO ORDERED.

ENTER: _____

CHARLES RONALD NORGLE, Judge
United States District Court

DATE: January 8, 2021

39

MSA0469

**THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| MOTOROLA SOLUTIONS, INC., and MOTOROLA SOLUTIONS MALAYSIA SDN. BHD. | ) ) ) ) | |
| Plaintiffs, | ) ) ) | Civil Action No.: 1:17-cv-01973 |
| v. | ) ) | Honorable Charles R. Norgle Sr. |
| HYTERA COMMUNICATIONS CORPORATION LTD., HYTERA AMERICA, INC., AND HYTERA COMMUNICATIONS AMERICA (WEST), INC. | ) ) ) ) ) ) | **PUBLIC VERSION - REDACTED** |
| Defendants. | ) ) ) | |

<u>**MOTOROLA'S SUBMISSION REGARDING AN ONGOING ROYALTY**</u>

MSA0470

**TABLE OF CONTENTS**

**Page**

I.    INTRODUCTION ............................................................................................. 1

II.   ARGUMENT .................................................................................................... 3

    A.    An Ongoing Royalty Based on the $272 Million Compensatory Award Is the Minimum That Should Be Awarded .................................................. 4

    B.    Hytera Must Make Payments to Continue Selling the Accused Products .............. 8

    C.    Payment Procedures Should Be Consistent with the Parties' DMR License ....... 11

    D.    Additional Terms Are Also Necessary to Protect Motorola's Rights................... 12

        1.    The license should bind the successor-in-interest to Hytera U.S.............. 12

        2.    Hytera should protect the confidentiality of the misappropriated trade secrets and copyrighted works through quarantine and removal. ...................................................................................... 13

        3.    Hytera should be required to provide notice of alleged redesigns............ 14

III.  CONCLUSION................................................................................................. 15

MSA0471

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc.*,
   694 F.3d 1312 (Fed. Cir. 2012)............................................................................................7

*Affinity Labs of Tex., LLC v. BMW N. Am., LLC*,
   783 F. Supp. 2d 891 (E.D. Tex. 2011)..................................................................................3

*Am. Falls Reservoir Dist. No. 2 v. Crandall*,
   85 F.2d 864 (9th Cir. 1936) .................................................................................................9

*Amado v. Microsoft Corp.*,
   517 F.3d 1353 (Fed. Cir. 2008).............................................................................................4

*Aqua Shield v. Inter Pool Cover Team*,
   774 F.3d 766 (Fed. Cir. 2014)...........................................................................................4, 7

*Arctic Cat Inc. v. Bombardier Recreational Prod. Inc.*,
   876 F.3d 1350 (Fed. Cir. 2017)..........................................................................................5, 7

*Asetek Danmark A/S v. CMI USA Inc.*,
   852 F.3d 1352 (Fed. Cir. 2017)............................................................................................6

*Bard Peripheral Vascular, Inc. v. W.L. Gore & Assocs., Inc.*,
   682 F.3d 1003 (Fed. Cir. 2012).............................................................................................3

*Bard Peripheral Vascular, Inc. v. W.L. Gore & Assocs., Inc.*,
   No. CV-03-597, 2010 WL 11484420 (D. Ariz. Sept. 9, 2010), *aff'd*, 670 F.3d
   1171 (Fed. Cir. 2012)..............................................................................................3, 7, 9, 14

*Bianco v. Globus Med., Inc.*,
   53 F. Supp. 3d 929 (E.D. Tex. 2014)....................................................................................4

*Bos. Sci. Corp. v. Cordis Corp.*,
   838 F. Supp. 2d 259 (D. Del. 2012), *aff'd*, 497 F. App'x 69 (Fed. Cir. 2013).................3, 5

*Brocade Commc'ns Sys., Inc. v. A10 Networks, Inc.*,
   2013 WL 890126 (N.D. Cal. Jan. 23, 2013) .......................................................................10

*Cadence Design Sys., Inc. v. Avant! Corp.*,
   125 F.3d 824 (9th Cir. 1997) ...............................................................................................3

*Creative Internet Advert. Corp. v. Yahoo! Inc.*,
   674 F. Supp. 2d 847 (E.D. Tex. 2009)..............................................................................4, 12

MSA0472

*Douglas Dynamics, LLC v. Buyers Prod. Co.*,
    717 F.3d 1336 (Fed. Cir. 2013)......................................................................................7

*Finisar Corp. v. DirecTV Grp., Inc.*,
    No. 1:05-CV-264, 2006 WL 7350655 (E.D. Tex. Sept. 27, 2006)........................................10

*Hynix Semiconductor Inc. v. Rambus Inc.*,
    No. C-00-20905, 2009 WL 10662882 (N.D. Cal. May 26, 2009)...........................................10

*Integrated Tech. Corp. v. Rudolph Techs., Inc.*,
    No. CV-06-2182, 2012 WL 12507656 (D. Ariz. July 23, 2012)............................................15

*Joyal Prod., Inc. v. Johnson Elec. N. Am., Inc.*,
    No. CIV. A. 04-5172, 2009 WL 512156 (D.N.J. Feb. 27, 2009), *aff'd*, 335 F.
    App'x 48 (Fed. Cir. 2009)..............................................................................................7

*Mitutoyo Corp. v. Cent. Purchasing, LLC*,
    499 F.3d 1284 (Fed. Cir. 2007).......................................................................................5

*Mondis Tech. Ltd. v. Chimei Innolux Corp.*,
    No. 2:11-CV-378, 2012 WL 1554645 (E.D. Tex. Apr. 30, 2012), *aff'd* 499 F.
    App'x 971 (Fed. Cir. 2013) ...........................................................................................13

*Mosler v. S/P Enters., Inc.*,
    888 F.2d 1138 (7th Cir. 1989) .......................................................................................9

*Paice LLC v. Toyota Motor Corp.*,
    504 F.3d 1293 (Fed. Cir. 2007).......................................................................................4

*Paice LLC v. Toyota Motor Corp.*,
    609 F. Supp. 2d 620 (E.D. Tex. 2009)..............................................................................7

*Petrella v. Metro-Goldwyn-Mayer, Inc.*,
    572 U.S. 663 (2014)......................................................................................................3

*Roland Mach. Co. v. Dresser Indus., Inc.*,
    749 F.2d 380 (7th Cir. 1984) .........................................................................................9

*Warner Lambert Pharm. Co. v. Sylk*,
    348 F. Supp. 1039 (E.D. Pa. 1971), *aff'd*, 475 F.2d 1398 (3d Cir. 1973)..............................9

*XY, LLC v. Trans Ova Genetics*,
    890 F.3d 1282 (Fed. Cir. 2018).......................................................................................8

**Statutes**

18 U.S.C. § 1836.............................................................................................................3, 9, 10

MSA0473

Pursuant to the Court's December 18, 2020 order, Plaintiff Motorola Solutions, Inc. and Motorola Solutions Malaysia SDN. BHD (collectively, "Motorola") provides its proposal for Hytera's ongoing royalty.[1] The parties met and conferred but were unable to reach agreement. For the reasons stated herein, Motorola respectfully requests that the Court award an ongoing royalty of ███ for radios (portables and mobiles) and ███ for repeaters.

## I. INTRODUCTION

No amount can ever fully compensate Motorola for the harm Hytera's willful and malicious theft has caused. Despite the Court's conclusion that "the jury returned a verdict and award that are proper under the law and supported by overwhelming evidence," Dkt. 1088 at 2, Hytera continues to sell products that it knows contain Motorola's stolen trade secret and copyrighted technology around the world, undeterred by the U.S. laws it violated. As a direct result of those ongoing sales, Motorola continues to lose DMR customers to Hytera—several of which were lost *following* the jury's verdict—and has repeatedly been forced to provide deep price discounts to win certain contracts over Hytera. Dkt. 1081 § II.A.2. While Hytera claims Motorola is "not without relief in the absence of an injunction" because the Court could impose an ongoing royalty, Dkt. 1085 at 10, any such relief requires that Hytera actually pay that royalty and the damages it has owed for nearly a year. But Hytera has made clear that it does not intend to do so, which means, given the denial of Motorola's injunction request, Motorola will receive *no remedy at all* for establishing one of the largest technology thefts in modern American history.

Hytera's multi-faceted campaign to avoid paying the judgment includes failing to post a

---

[1] Because of the irreparable nature of the harm Hytera's ongoing misappropriation and infringement has caused and Hytera's determination not to pay any of the damages owed to Motorola, Motorola maintains an injunction is the only proper way to address Hytera's ongoing illegal conduct. Nonetheless, while Motorola does not consent to Hytera's continuing use of Motorola's technologies, because the Court has denied Motorola's injunction request, Dkt. 1097, Motorola submits this briefing on the royalty issue without waiver of its position that an injunction should issue.

bond, opposing every one of Motorola's efforts to collect on the judgment, and even refusing to disclose what assets it possesses to satisfy the judgment. Dkts. 1020, 1021. Just two days ago, Hytera told the Court that it would appeal rather than comply with the Bank of China turnover order. Ex. 1. The Hytera U.S. entities declared bankruptcy specifically to evade the judgment, and Hytera has suggested the new Hytera U.S. entity that is acquiring assets from the bankrupt entities will not submit to this Court's jurisdiction. Ex. 2 at 18:6-9 (Hytera saying "***whether or not it would ever be appropriate for the buyer to submit to the jurisdiction of the Illinois court***" was unclear).

For damages even to approach adequately addressing Hytera's illegal conduct, Hytera must actually pay those damages. That means the royalty for Hytera's ongoing use of Motorola's trade secrets and copyrighted technology must not put Hytera in a position where—as is the current state of affairs—it remains financially advantageous for Hytera to have stolen Motorola's technologies. Such a result would harm Motorola, and incent other bad actors around the world to continue engaging in precisely the type of unlawful conduct that the DTSA was designed to address. Therefore, if its ongoing illegal conduct is not to be enjoined, Hytera should pay an ongoing royalty of ▮ per unit for radios and ▮ per unit for repeaters for its unabated misappropriation and infringement. Ex. 3 at 2. These per-unit rates are based on the $272 million compensatory damages award because that award reflects value attributable to the Misappropriated Trade Secrets and Copyrighted Works.[2] Dkt. 1100 ¶¶ 54-57.

To be clear, these rates are the floor, not the ceiling, for an ongoing royalty. Not only are Motorola and Hytera direct competitors, but "there has been a post-verdict change in the Parties'

---

[2] Misappropriated Trade Secrets are the 21 distinct trade secrets Motorola proved at trial that Hytera stole. Copyrighted Works are the four certificates of copyright registration for the MotoTRBO program in Motorola's radios. PTX-1527; PTX-1528; PTX-1645; PTX-1659. Because Motorola's Copyrighted Works are subsumed within Motorola's DMR source code trade secret Tr. 309:21-310:1, for ease of reference, Motorola's references to its trade secrets herein includes its copyrighted works.

legal relationship in that [Hytera] is now an adjudged willful [misappropriator and] infringer, …

and [] has voluntarily chosen to continue its post-verdict infringement unabated." *Bard Peripheral*

*Vascular, Inc. v. W.L. Gore & Assocs., Inc.*, No. CV-03-597, 2010 WL 11484420, at *6 (D. Ariz.

Sept. 9, 2010) (ongoing royalty higher than jury award), *aff'd*, 670 F.3d 1171, 1193 (Fed. Cir.

2012).[3]  "[T]he public interest is not served by allowing a willful [misappropriator and] infringer

to continue to secure windfall profits based on its infringement." *Id.*, at *2. Indeed, the jury's and

the Court's quantification of Hytera's willful and malicious conduct in the form of exemplary

damages confirms that a significant upward adjustment to Motorola's proposed rates would be

appropriate.  Thus, to best attempt to achieve the objectives of U.S. trade secret and copyright law

in the absence of an injunction, Motorola respectfully requests that an ongoing royalty of at least

███ per unit for radios and ███ per unit for repeaters be awarded.

## II.      ARGUMENT

Under Section 1836, "in exceptional circumstances that render an injunction inequitable,"

"a court may … condition[] future use of the trade secret upon payment of a reasonable royalty for

no longer than the period of time for which such use could have been prohibited." 18 U.S.C.

§ 1836(3)(A)(iii). The Copyright Act similarly permits the award of an ongoing royalty for

continued infringement if no injunction enters. *Petrella v. Metro-Goldwyn-Mayer, Inc.*, 572 U.S.

663, 688 (2014); *Cadence Design Sys., Inc. v. Avant! Corp.*, 125 F.3d 824, 829 (9th Cir. 1997).

To determine the amount of an ongoing royalty, courts recognize that "the trial testimony

and jury findings with respect to past damages can provide a basis for calculating a market royalty

for any ongoing [misappropriation and] infringement." *See Affinity Labs of Tex., LLC v. BMW N.*

---

[3] The Federal Circuit subsequently vacated this decision in part, but in doing so reaffirmed that its analysis of the ongoing royalty remained unchanged. *Bard Peripheral Vascular, Inc. v. W.L. Gore & Assocs., Inc.*, 682 F.3d 1003, 1005 n.1 (Fed. Cir. 2012).

*Am., LLC*, 783 F. Supp. 2d 891, 898 (E.D. Tex. 2011); *see also See Bos. Sci. Corp. v. Cordis Corp.*, 838 F. Supp. 2d 259, 275–76 (D. Del. 2012) (awarding "effective damages rate" based on verdict awarding lost profits and reasonable royalty as ongoing royalty), *aff'd*, 497 F. App'x 69 (Fed. Cir. 2013). There is, however, "a fundamental difference [] between a reasonable royalty for pre-verdict infringement and damages for post-verdict infringement." [4]  *Amado v. Microsoft Corp.*, 517 F.3d 1353, 1361–62 (Fed. Cir. 2008); *see also Paice LLC v. Toyota Motor Corp.*, 504 F.3d 1293, 1316–17 (Fed. Cir. 2007) (Rader, J., concurring). As a result, in setting an ongoing royalty, courts should consider the "change in the parties' bargaining positions, and the resulting change in economic circumstances, resulting from the determination of liability," often under a modified *Georgia-Pacific* framework. *Amado*, 517 F.3d at 1361-62. Failure to do so "would create an incentive for every defendant to fight each … case to the bitter end[. W]ithout consideration of the changed legal status, there is essentially no downside to losing." *Creative Internet Advert. Corp. v. Yahoo! Inc.*, 674 F. Supp. 2d 847, 861 (E.D. Tex. 2009) (citation omitted).

### A. An Ongoing Royalty Based on the $272 Million Compensatory Award Is the Minimum That Should Be Awarded

Motorola was awarded $272 million in compensatory damages, based on ▮▮▮▮▮ units of radios and repeaters, for Hytera's copyright infringement and trade secret misappropriation. PTX-2071.30; DTX-4057. The per-unit rates derived from this award are ▮▮▮ for radios (portables and mobiles) and ▮▮▮ for repeaters. [5] Ex. 3 at 2. These per-unit rates are the floor for

---

[4] Although much of the case law surrounding post-verdict ongoing royalties is in the patent context, patent infringement is sufficiently analogous to copyright infringement and trade secret misappropriation that *Paice*, and other cases applying the same reasoning "provide an appropriate starting point for … deciding … what the amount of that royalty should be." *Bianco v. Globus Med., Inc.*, 53 F. Supp. 3d 929, 932 (E.D. Tex. 2014); *see also Aqua Shield v. Inter Pool Cover Team*, 774 F.3d 766, 772 (Fed. Cir. 2014) (copyright law "uses a hypothetical negotiation to estimate fair market value in a similar way" to patent law).
[5] The precise per-unit royalty rates for portable radios is ▮▮▮ and for mobiles is ▮▮▮. To simplify the royalty process, however, Motorola proposes a single per-unit rate for radios.

4

the ongoing royalty award; indeed, permitting Hytera to pay *less* for its unauthorized use of Motorola's technologies following the jury's verdict would reward Hytera for losing at trial and frustrate the purpose of U.S. intellectual property law. *See Bos. Sci.*, 838 F. Supp. 2d at 275–76 (declining to allow "an adjudicated willful infringer, to effectively owe less for its post-verdict infringement than …for its pre-verdict infringement"). Given Motorola's improved bargaining position post-verdict, an increase in those per-unit rates is clearly warranted. *See Arctic Cat Inc. v. Bombardier Recreational Prod. Inc.*, 876 F.3d 1350, 1370 (Fed. Cir. 2017) (affirming award of "ongoing royalty amount high than the jury rate").

The *Georgia-Pacific* factors confirm that the $272 million award is the appropriate starting point for the ongoing royalty.[6] The $272 million represents the portion of the profits that should be credited to the trade secrets or copyrights, as determined by the jury (and confirmed by the Court), making it an appropriate starting point for the royalty (factor 13). Dkt. 1100 §§ II.C, III.B; s*ee Mitutoyo Corp. v. Cent. Purchasing, LLC*, 499 F.3d 1284, 1292 (Fed. Cir. 2007) (royalty based on profit margin was "reasonable given the contentious history between these two parties"). The Court has already concluded Mr. Malackowski properly calculated these profits based on Hytera's radios and repeaters, and the accessories whose sales were driven by the radios and repeaters (factor 6). Dkt. 1100 §§ II.C, III.B. The Court further concluded these profits were properly awarded for the misappropriation and infringement. *See id.* Indeed, "[w]ithout the benefit of the Misappropriated Trade Secrets, Hytera could not have made the sales and profits on its DMR products at issue[.]" Dkt. 1100 ¶ 49; *see also id.* ¶ 92 (same for Copyrighted Works).

Hytera's use of the Misappropriated Trade Secrets is widespread and long-standing (factor

---

[6] Some factors are not relevant here. For example, Motorola has never licensed the asserted trade secrets, and Hytera has not licensed technology comparable to the asserted trade secrets, and there is no customary royalty in the industry, making Factors 1, 2, and 12 neutral. Ex. 3 at 5, 8. In addition, the duration of the license is neutral because unlike patents, trade secrets have no set expiration (Factor 7). *Id.* at 6.

11): for over a decade, Hytera has incorporated the Misappropriated Trade Secrets into its radios and documentation and used Motorola's own trade secrets to compete against it. Tr. at 1950:21-1951:7. In that time, Hytera profited well beyond the $272 million from its theft, using the hundreds of millions that it earned from its theft to expand its business through acquisitions of other companies and earn even greater revenues (factor 8). Tr. at 5348:25-5351:23. In fact, "[t]o this day, Hytera still has not been able to develop a 'comparable' DMR radio on its own." Dkt. 1100 ¶¶ 71, 73. Hytera's inability to design around Motorola's trade secrets after more than a decade underscores the utility and advantages of the Misappropriated Trade Secrets (factors 9 and 10). Ex. 3 at 7; Dkt. 1100 ¶¶ 71-74.

Hytera and Motorola's relationship as competitors further confirms that the royalty should be at least Hytera's profits prior to the jury verdict, as a floor (factor 3). The Misappropriated Trade Secrets are also critical to Motorola, which invested hundreds of millions of dollars to develop this technology that Hytera stole. Tr. at 715:21-716:1, 719:5-20, 740:6-15, 839:3-14, 1007:20-24, 1232:4-19, 1245:25-1246:12, 1293:6-20, 2156:2-9. Hytera's theft has caused Motorola to lose at least $86.2 million in profits from these radios. Dkt. 1100 ¶ 10. And even though Motorola has never licensed the Misappropriated Trade Secrets (factor 4), Motorola is now required to permit an adjudicated thief to compete with it in the market, which will further diminish Motorola's profits and reputation as being the sole provider of the trade secrets it developed (factors 3 and 5). Ex. 3 at 5-6; Tr. at 405:16-408:8, 2156:25-2157:7. Therefore (and although Motorola does not consent to the license and maintains Hytera must be enjoined) to attempt to compensate Motorola for the market position that Hytera continues to steal with its willful and malicious misappropriation and infringement, the ongoing royalty should be a per-unit rate based on the $272 million award. *See Asetek Danmark A/S v. CMI USA Inc.*, 852 F.3d 1352, 1362 (Fed. Cir. 2017) (IP holder "unlikely

to be interested in accepting a royalty rate lower than its profit margin on the patented products.").

The per-unit royalty based on the $272 million award leaves Hytera with between ███ and ███ of its average revenue per-unit, which is more than reasonable. Ex. 3 at 9. Regardless, the law is clear that Hytera's pre-verdict profits are not a royalty cap, *see Arctic Cat*, 876 F.3d at 1370, and using Hytera's profits as such ignores that Hytera has been selling infringing products "without accounting for any royalty." *Aqua Shield v. Inter Pool Cover Team*, 774 F.3d 766, 772 (Fed. Cir. 2014). Hytera's "selling price can be raised if necessary to accommodate a higher royalty rate, and indeed, requiring [Hytera] to do so may be the only way to adequately compensate [Motorola] for the use of its technology." *Douglas Dynamics, LLC v. Buyers Prod. Co.*, 717 F.3d 1336, 1346 (Fed. Cir. 2013) (vacating ongoing royalty capped at infringer's profits). Put simply, Hytera "controls its pricing as well as its conduct; if [Hytera's Accused Products] are no longer profitable, it can choose to cease its infringing conduct or simply pass increased … costs along to the consumer." *Paice LLC v. Toyota Motor Corp.*, 609 F. Supp. 2d 620, 627–28 (E.D. Tex. 2009).

Based on the changed circumstances post-verdict, however, the per-unit rates derived from the $272 million award are the lowest ongoing royalty that would be appropriate. *See Arctic Cat*, 876 F.3d at 1370. Motorola is now in a far stronger bargaining position compared to Hytera as a result of its adjudicated theft. *See ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc.*, 694 F.3d 1312, 1342 (Fed. Cir. 2012). In addition, Hytera's misappropriation and infringement was willful and malicious ***before*** the verdict, and Hytera has continued that very same conduct for nearly one year after the verdict. Enhancement of the ongoing royalty is therefore especially appropriate. *See Bard*, 2010 WL 11484420, at *2; *Joyal Prod., Inc. v. Johnson Elec. N. Am., Inc.*, No. CIV. A. 04-5172, 2009 WL 512156, at *14 (D.N.J. Feb. 27, 2009) (concluding royalty rate more than 3X the verdict was "equitable" because "it would not allow Johnson to profit from any further willful

infringement" and "would adequately compensate Joyal for being unwillingly deprived of its right to exclusivity"), *aff'd*, 335 F. App'x 48 (Fed. Cir. 2009).

Although Hytera identifies no changed circumstance in its favor, Hytera has insisted in negotiations related to this filing that it is entitled to pay a far lower per-unit royalty rate than the jury's effective rate. That position is plainly contrary to the law. *See XY, LLC v. Trans Ova Genetics*, 890 F.3d 1282, 1296–98 (Fed. Cir. 2018) (vacating ongoing royalty award lower than jury's effective rate). Hytera asserts, through its expert Dr. Aron, that the royalty should be (i) $0; or (ii) ███ /unit, which is based on a flawed calculation of Motorola's average-profit-per unit. Dkt. 986, Ex. 1 ¶¶ 150–53, 238. Dr. Aron's $0 royalty opinion is premised on the argument, rejected many times over and now law of the case, that the $73.8 million avoided R&D award was a fully paid up royalty. *Id.*, Ex. ¶¶ 150–52. It was not, and Hytera agreed not to ask the jury to award a reasonable royalty. Dkt. 1100 ¶ 45. With respect to her ███ /unit opinion, Dr. Aron provides no justification for allowing Hytera to pay far less now that it is an adjudicated willful and malicious trade-secret misappropriator. Instead, Dr. Aron performs her analysis without regard to the verdict, relying on the very same evidence the jury and the Court considered and rejected, which "essentially amounts to undoing" the trial.[7] *See XY*, 890 F.3d at 1297. Granting Hytera the lower royalty it seeks would create an "absurd practical result ... that [Motorola] would have been better off forgoing the … ongoing royalty and suing [Hytera] repeatedly for future infringement at the jury's [implied] rate." *See id.* Accordingly, an ongoing royalty of at least ███ per unit for Hytera's radios and ███ per unit for Hytera's repeaters should be awarded.

---

[7] *Compare* Dkt. 986-1 ¶ 232, 237 (apportionment is a mitigating factor) *with* Tr. 4830:5-17, 4945:13-4948:20 (Aron testimony re apportionment); *compare* Dkt. 986-1 ¶ 237 (Motorola royalty fees for its standard essential patents ("SEP")) *with* Tr. 1657:2-1658:24, 3106:7-3108:5, 3456:20-3457:25 (Wicker, Luo, and Yuan testimony re SEP license rates).

**B.      Hytera Must Make Payments to Continue Selling the Accused Products**

Section 1836 places two important conditions on Hytera's continued use of Motorola's trade secrets: (i) "***upon payment*** of a reasonable royalty"; (ii) "for no longer than the period of time for which such use could have been prohibited." 18 U.S.C. § 1836(b)(3)(A)(iii). Motorola therefore respectfully requests that the Court address both of those mandatory aspects of the statute in its ongoing royalty ruling.

As to the first, the statute's use of "upon payment" makes clear that payment must actually be made for Hytera's objected-to use to continue. *See Warner Lambert Pharm. Co. v. Sylk*, 348 F. Supp. 1039, 1044 (E.D. Pa. 1971) (agreement that provided for discharge of claims "upon payment" of a settlement meant "actual payment of [settlement] was required" rather than "mere promise to pay"), *aff'd*, 475 F.2d 1398 (3d Cir. 1973); *Am. Falls Reservoir Dist. No. 2 v. Crandall*, 85 F.2d 864, 865 (9th Cir. 1936) (where statute prohibited deprivation rights "upon payment," plaintiff "could acquire the rights claimed only upon payment, and there being no proof of such fact here," case was properly dismissed); *cf. Mosler v. S/P Enters., Inc.*, 888 F.2d 1138, 1143 (7th Cir. 1989) ("[i]t is impossible to reconcile the judgment, requiring tender upon payment, with the statute, requiring payment upon tender"). Thus, if Hytera does not pay the royalty it owes, it must immediately stop selling or distributing the Accused Products—by Court order, if necessary. *See Bard*, 2010 WL 11484420, at *8 (compulsory license terminated if royalty payments not timely).

Hytera likewise should not be permitted to delay its payment of these royalties pending appeal. Hytera asked the Court to deny Motorola's request for an injunction because "[t]he path forward" was a reasonable royalty. Dkt. 1085 at 10. The Court agreed, and denied Motorola's request for an injunction, explaining that "[t]his case is about the money." Dkt. 1097 at 6, 7. If Hytera is permitted to withhold all royalty payments pending appeal, Motorola would be left with no remedy at all, and Hytera could continue devaluing Motorola's trade secrets and copyrights

MSA0482

while profiting from their use. *See Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 386 (7th Cir. 1984) (inability to collect from defendant renders monetary relief inadequate). Such a result would be particularly inequitable given that Hytera's unabashed attempts to avoid paying the judgment. *See* § I, *supra*. Hytera should therefore begin paying the royalty for sales of Accused Products into an escrow account, which will safeguard any funds pending appeal, as soon as the Court's order is entered. *See Hynix Semiconductor Inc. v. Rambus Inc.*, No. C-00-20905, 2009 WL 10662882, at *2 (N.D. Cal. May 26, 2009) (requiring ongoing royalties to be paid into escrow pending appeal); *Finisar Corp. v. DirecTV Grp., Inc.*, No. 1:05-CV-264, 2006 WL 7350655, at *2 (E.D. Tex. Sept. 27, 2006) (escrow account "should reduce the need for further proceedings after all appeals are exhausted, regardless of which party ultimately prevails.").

With respect to the second condition, Hytera's payments should continue for the entire duration of its use of the Misappropriated Trade Secrets and Copyrighted Works. § 18 U.S.C. § 1836(3)(A)(iii). Despite Hytera's claim it only received a six month "head start" from its misappropriation and infringement, Dkt. 1096-2 ¶ 16, Hytera has *yet* to redesign its radios to stop its use of Motorola's trade secrets and copyrights during the nearly four-year pendency of this case. Although Hytera blamed its failure to attempt a redesign until summer 2019 on Motorola, Tr. 3133:19-3137:13, 3239:19-3240:14, 4140:10-21, Hytera's so-called redesign was little more than cosmetic changes to the very Motorola code that Hytera had stolen. *Id.* 1437:16–1440:13. The Court also concluded Hytera was incapable of independently developing a single one of Motorola's trade secrets, let alone that it even tried to do so, and substantial evidence showed Hytera lacked those very capabilities. Dkt. 1100 ¶ 71. Thus, Hytera must pay royalties for the entire period of its use of Motorola's trade secrets and copyrights. *See Brocade Commc'ns Sys., Inc. v. A10 Networks, Inc.*, 2013 WL 890126, at *4 (N.D. Cal. Jan. 23, 2013) (entering injunction

where defendant failed to provide evidence of inevitable discovery "through proper means" or "evidence about how long those proper means would take").

### C. Payment Procedures Should Be Consistent with the Parties' DMR License

To minimize ongoing disputes between the parties and the Court, Motorola respectfully requests that the Court also address the following items related to the ongoing royalty, to ensure there are no unnecessary disputes between the parties following the Court's order.

*First*, Hytera's first payment under the license should include Accused Products (as defined in Ex. 4) sold or distributed anywhere in the world from July 1, 2019 to the quarter preceding the first payment due date. The verdict does not include these sales because by its terms it only addresses Hytera's sales through June 30, 2019, Dkt. 898 at 4, and the Court denied Motorola's request for supplemental damages.[8] Dkt. 1101. Hytera only produced selective and incomplete updated financial data after July 1, 2019 that (it believed) would help its case. Tr. at 2214:5-12, 5355:14-5356:25. Not compensating Motorola for these sales would harm Motorola while granting Hytera a windfall for its continued willful and malicious theft, a tremendously inequitable result. Hytera should not be rewarded for its discovery gamesmanship and its willful and malicious theft with over a year and a half of "free sales." Hytera must therefore pay a royalty for any sales of adjudicated products not included in the verdict, which only addressed sales through June 30, 2019.

*Second*, Hytera's remaining payments should be made on a quarterly basis for units sold or distributed anywhere in the world in the preceding quarter consistent with the essential patent license between the parties (i.e., Hytera's royalty payment due on March 31 is for the quarter ending December 31). In addition, for all payments, at least fifteen days before Hytera's royalty

---

[8] At a minimum, Hytera must pay royalties from November 6, 2019 (the first day of trial) forward. Any other conclusion would require a plaintiff to continually update its damages throughout trial, and incentivize the defendant to induce delays so it can minimize the damages it owes.

payments are due, Hytera must certify to Motorola the number of Accused Products sold anywhere in the world for the quarter upon which payment is due. Any past-due payments shall be subject to 1% interest per month.[9] Hytera agreed to quarterly payments, this certification process, and this interest rate in the parties' DMR license. *See Creative Internet Advert. Corp. v. Yahoo! Inc.*, 674 F. Supp. 2d 847, 861–62 (E.D. Tex. 2009) (payments 60 days after quarter close).

*Finally*, the same audit process the parties agreed to in the DMR license should apply to here. Specifically, Motorola should be permitted to retain an accounting firm to examine and audit Hytera's financial records with respect to the Accused Products, and if the audit reveals underpayment by Hytera, the same penalties for underpayment that Hytera agreed to in the DMR license shall apply here. In addition, if Hytera identifies a verifiable overpayment within 12 months of the payment being made, Hytera may credit that amount against future payments.

### D. Additional Terms Are Also Necessary to Protect Motorola's Rights

#### 1. The license should bind the successor-in-interest to Hytera U.S.

Hytera's new U.S. entity, which was created to purchase the remaining assets of the defendant Hytera U.S. entities as part of their bankruptcy, should be subject to the ongoing royalty. Less than four months after the verdict in this case, Hytera's two U.S. entities filed for bankruptcy in the hopes that the bankruptcy would extinguish the U.S. entities' judgment debt to Motorola. Ex. 5 ¶ 30. Hytera has nearly succeeded in that goal, with the bankruptcy court approving an asset sale from the two Hytera U.S. entities that are parties to this case to a new Hytera U.S. entity that is not. Ex. 7. The new U.S. entity (a subsidiary of Hytera China) is expected to engage in substantially the same business operations, i.e., sales of Accused Products, as the now-bankrupt U.S. entities. Ex. 6 at 6. Failure to subject the new U.S. entity to the ongoing royalty would make

---

[9] Only Hytera's ongoing royalty payments would be subject to this interest rate, which Motorola proposes as an attempt to limit disputes before the Court.

the Court's order for Hytera pay ongoing royalties "a nullity." *Mondis Tech. Ltd. v. Chimei Innolux Corp.*, No. 2:11-CV-378, 2012 WL 1554645, at *7 (E.D. Tex. Apr. 30, 2012) (extending ongoing royalty to successors and assigns of distressed infringer's business), *aff'd* 499 F. App'x 971 (Fed. Cir. 2013). This is the result Hytera seeks, which it made clear on December 17, 2020, when it refused to acknowledge that its new U.S. entity was subject to this Court's jurisdiction. Ex. 2 (Hytera arguing "***whether or not it would ever be appropriate for the buyer to submit to the jurisdiction of the Illinois court***" was unclear). So Hytera cannot "completely avoid [its] obligation to pay ongoing royalties" on the Accused Products, Hytera's new U.S. entity should be subject to the ongoing royalty. *See Mondis*, 2012 WL 1554645, at *7.

### 2. Hytera should protect the confidentiality of the misappropriated trade secrets and copyrighted works through quarantine and removal.

While Motorola understands the Court's order permits Hytera to continue to sell the Accused Products, Hytera must be required to maintain the Misappropriated Trade Secrets and Copyrighted Works in its possession as confidential to avoid the need to quantify an additional royalty for that separate ongoing use of the trade secrets. To do so, Hytera should be required to remove and quarantine the confidential Motorola documents and source code still in its possession.[10] Hytera proposed that it undertake quarantine and removal procedures nearly a year ago, and cannot now complain these procedures are unwarranted. Dkt. 907-2, §§ I(2), II. Motorola proposes limited adjustments to Hytera's proposals, to ensure Motorola's confidential information is sufficiently safeguarded, and that the parties work in good faith to resolve any issues before seeking Court intervention.[11]

---

[10] If Hytera becomes aware of a disclosure of the Misappropriated Trade Secrets or Copyrighted Works outside of Hytera, it should also be required to notify Motorola within five (5) days and immediately take steps to protect the information that was published or disclosed.

[11] Motorola proposes the following additions to Hytera's proposal: (i) including Motorola's Copyrighted Works, which include Motorola's confidential source code, in the quarantine; (ii) including engineers working on any redesign as a custodian; (iii) including all Hytera storage media possessed by a custodian;

Requiring Hytera to maintain the confidentiality of Motorola's confidential information through a quarantine process will not thwart Hytera's ability to sell the Accused Products. While Motorola maintains those sales should cease and does not waive its injunction request, Motorola is not requesting in this filing that the Motorola source code on Hytera's radios be removed (although Hytera should do so); rather, Motorola is requesting that Hytera safeguard the confidential Motorola information in its possession, given that Hytera itself claims it does not need that information at all. Tr. 3139:10-3141:15, 3972:3-7, 3973:23-3974:9  Moreover, Hytera has argued throughout this litigation that Motorola's trade secrets were not "sufficiently secret" and instead "include information generally known in the industry." Dkt. 954 at 12; *see also id.* at 2-3. Although the jury and the Court rejected these arguments, Hytera's refusal to acknowledge the secrecy of these trade secrets makes Hytera less likely to safeguard them, further risking public disclosure given their widespread use at Hytera. Dkt. 954 at 14 (citing Tr. 284-286, 521:18-524:14, 1799-1800); Dkt. 1088 at 7-11. Accordingly, Hytera should be required to maintain the confidentiality of Motorola's Misappropriated Trade Secrets and Copyrighted Works through quarantine and removal. If it does not, an additional royalty payment for that non-sale use of the trade secrets will be required.

### 3. Hytera should be required to provide notice of alleged redesigns.

In a further effort to minimize disputes between the parties and before the Court, the license should also require Hytera to provide Motorola at least 180 days notice before the first anticipated commercial sale of any radio product Hytera contends is not developed in whole or in part, based on any of the Accused Products, Motorola Trade Secrets, or Motorola Copyrighted Works. *See Bard*, 2010 WL 11484420, at *10 (requiring 180 days' notice before first sale of a new product).

---

(iv) including database or document management systems in addition to the SVN; and (v) for any Motorola-branded documents Hytera contends are not confidential, Hytera shall identify those to Motorola in writing.

14

Hytera should also be required to provide Motorola, on an outside counsel's only basis, a working copy of such radio product, all source code, and technical manuals and specifications setting out the operational details of the radio product sufficient to allow Motorola to evaluate whether such products are subject to this ongoing royalty. Within sixty (60) days of receipt of these materials, Motorola shall confirm whether such radio product is subject to the ongoing royalty.

Requiring notice of new products is warranted based on Hytera's misrepresentation of its prior attempts to redesign its products. Although Hytera claimed at trial that its delay in redesigning its radios until summer 2019 was Motorola's fault, Tr. 3133:19-3137:13, 3239:19-3240:14, 4140:10-21, Hytera's counsel told Hytera it needed to redesign its products *one year earlier*. *Id.* 5286:4-5287:10; *see also id.* 4142:3-4143:10 (Hytera informed by litigation counsel it needed to redesign products in 2017). Instead of redesigning its products, Hytera fired that counsel. *Id.* at 3186:7-23. And, as explained in § II.B. *supra*, Hytera's redesign still relied on and used Motorola trade secrets and copyrights. *Id.* 1437:16–1440:13. Accordingly, to ensure a Hytera "redesign" is, in fact, a lawful redesign, and hence not subject to the ongoing royalty. Motorola should be given notice and an opportunity to inspect and analyze such products before their release. *See Integrated Tech. Corp. v. Rudolph Techs., Inc.*, No. CV-06-2182, 2012 WL 12507656, at \*11 (D. Ariz. July 23, 2012) (requiring defendant to present proposed modifications to plaintiff due to defendant's "inability to honestly and accurately represent" whether its products include the infringing technology). This process will reduce, not exacerbate, disputes between the parties, which is Motorola's (and presumably, Hytera's) goal.

## III. CONCLUSION

For the foregoing reasons, Motorola respectfully requests that the Court award an ongoing royalty and order the parties to submit a proposed license agreement consistent with the Court's rulings.

DATED: January 28, 2021                    Respectfully submitted,


                                           */s/ Justin Singh*
                                           Adam Alper (*admitted pro hac vice*)
                                           adam.alper@kirkland.com
                                           Akshay S. Deoras (*admitted pro hac vice)*
                                           akshay.deoras@kirkland.com
                                           Brandon H. Brown (IL Bar No. 266347 CA)
                                           brandon.brown@kirkland.com
                                           Barbara Barath (*admitted pro hac vice*)
                                           barbara.barath@kirkland.com
                                           Reza Dokhanchy (*admitted pro hac vice*)
                                           reza.dokhanchy@kirkland.com
                                           KIRKLAND & ELLIS LLP
                                           555 California Street
                                           San Francisco, CA 94104
                                           Telephone: (415) 439-1400
                                           Facsimile: (415) 439-1500

                                           Michael W. De Vries (*admitted pro hac vice*)
                                           michael.devries@kirkland.com
                                           Christopher Lawless (*admitted pro hac vice*)
                                           christopher.lawless@kirkland.com
                                           Justin Singh (*admitted pro hac vice*)
                                           justin.singh@kirkland.com
                                           Ali-Reza Boloori (*admitted pro hac vice*)
                                           ali-reza.boloori@kirkland.com
                                           Benjamin A. Herbert *(admitted pro hac vice)*
                                           benjamin.herbert@kirkland.com
                                           KIRKLAND & ELLIS LLP
                                           555 South Flower Street
                                           Los Angeles, CA 90071
                                           Telephone: (213) 680-8400
                                           Facsimile: (213) 680-8500

                                           David Rokach (IL SBN: 6279703)
                                           david.rokach@kirkland.com
                                           Megan M. New (IL SBN 6300422)
                                           megan.new@kirkland.com
                                           KIRKLAND & ELLIS LLP
                                           300 North LaSalle
                                           Chicago, IL 60654
                                           Telephone: (312) 862-2000
                                           Facsimile: (312) 862-2200

                                           Leslie M. Schmidt (*admitted pro hac vice*)
                                           leslie.schmidt@kirkland.com
                                           Joshua L. Simmons (*admitted pro hac vice*)
                                           joshua.simmons@kirkland.com
                                           KIRKLAND & ELLIS LLP
                                           601 Lexington Avenue

16

MSA0489

MSA0490

New York, NY 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900

Attorneys for Plaintiffs
*Motorola Solutions, Inc. and Motorola
Solutions Malaysia SDN. BHD.*

17

## CERTIFICATE OF SERVICE

I, Justin Singh, an attorney, hereby certify that on January 28, 2021, I caused a true and correct copy of the foregoing document to be served via the Court's ECF system upon all counsel of record.

DATED: January 28, 2021

/s/ Justin Singh
Justin Singh

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| MOTOROLA SOLUTIONS, INC., and MOTOROLA SOLUTIONS MALAYSIA SDN. BHD.<br><br>        Plaintiffs,<br><br>        v.<br><br>HYTERA COMMUNICATIONS CORPORATION LTD., HYTERA AMERICA, INC., and HYTERA COMMUNICATIONS AMERICA (WEST), INC.<br>        Defendants. | Case No. 1:17-CV-01973<br><br>Honorable Charles R. Norgle Sr.<br><br>**Redacted/Public Version** |

**HYTERA'S SUBMISSION REGARDING A REASONABLE ROYALTY**

MSA0492

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................. 1

ARGUMENT ....................................................................................................................... 2

I.     ONGOING ROYALTY RATE ................................................................................. 2

        A.     Motorola's rate proposal fails as a matter of law and logic ................................... 2

        B.     A reasonable royalty is ██████ per radio and ██████ per repeater ....................... 6

        C.     The royalty rate starts on the date the Court denied the injunction ..................... 11

        D.     The royalty rates are to be applied only to IP adjudicated at trial ........................ 11

II.     NON-MONETARY TERMS....................................................................................... 13

MSA0493

## INTRODUCTION

This Court ruled that Hytera should not be enjoined from selling the accused products in the future but should instead pay a "reasonable royalty" on "future use." Dkt. 1097 at 6. Motorola has chosen to read the quoted words completely out of the Court's ruling and the DTSA.

Motorola arrives at its proposed rates by dividing the number of units into the jury verdict. It then asks for royalty payments back to June 2019. But this is a second attempt at obtaining supplemental disgorgement damages—which the Court already denied. It is not a reasonable royalty. Motorola argues that its proposal presents a reasonable split of the "revenues" but this is irrelevant. Dkt. 1118 at 7. Hytera's revenues are not its profits. Motorola's proposal would leave Hytera with no prospect of making any profit (in fact, Hytera would be selling at a substantial loss). As Judge (later Justice) Stevens explained for the Seventh Circuit, a licensee would not be willing to pay 100% of his profits in exchange for a license. *Zegers v. Zegers*, 458 F.2d 726, 728 n.8 (7th Cir. 1972). It is thus a "basic error" to set a royalty that would not allow the defendant to make any reasonable profit. *See id*.

The royalty rate analysis is governed by the *Georgia-Pacific* factors. While Motorola purports to conduct a *Georgia-Pacific* analysis, it never actually uses that analysis in reaching its proposed royalty rates. In fact, Motorola's royalty submission relies on many of the same arguments that it presented in its injunction papers. Hytera, in an effort to reach a compromise, proposes a royalty rate that is not only reasonable, but is far more than most companies in Hytera's shoes would ever propose in a negotiation. This Court denied the injunction motion, and Motorola did not appeal that ruling. Consistent with the economic factors affecting both parties, a reasonable ongoing royalty is ███████ per radio and ███████ per repeater. *See* Ex.1. In contrast, under Motorola's proposal, Hytera would be paying **more than double** the amount of Hytera **profit** on **each radio**. No reasonable licensee would agree to such an arrangement.

1

Motorola proposes additional, non-monetary terms on Hytera's future conduct but these proposals will lead to endless litigation and require ongoing judicial management—with no end in sight. These proposals are not grounded in any statutory authority and are also unnecessary. Hytera and Motorola already have a cross-license licensing arrangement in place to govern non-monetary terms related to DMR standard essential patents, and there has never been an issue in the ten years of this arrangement. Further, Hytera agrees to pay into an escrow account the ongoing royalty amounts on future use of the products adjudicated at trial. Nothing more is authorized by the DTSA or required.

## I.     ONGOING ROYALTY RATE

### A.     Motorola's rate proposal fails as a matter of law and logic

As to the royalty rates, Motorola's proposal flies in the face of the DTSA's plain language and the Court's order awarding a reasonable royalty in lieu of an injunction. *See* Dkt. 1097. Seeking an amount greater than all of Hytera's potential profits as a royalty "floor"—and forcing Hytera to sell at a loss—is not a true royalty and is certainly anything but a reasonable one. *See* Dkt. 1118 at 2, 4. Instead, Motorola asks the Court to award what is, in effect, a *de facto* injunction—or perpetual supplemental damages—by requiring Hytera to continue disgorging all profits based purely on the damages awarded at trial, which did not include a determination of a royalty. Motorola's approach is legally improper and illogical for two primary reasons.

*First*, Motorola's proposal is inconsistent with the DTSA's plain language. As emphasized in the prior order, this Court's authority under the DTSA is limited to awarding a "*reasonable* royalty." Dkt. 1097 at 6 (emphasis added). This terminology in the DTSA is not a mistake, as courts well know that "royalty" and defendant's "profits" are discrete and separate concepts under the law. *E.g., Hanson v. Alpine Valley Ski Area*, 718 F.2d 1075, 1078 (Fed. Cir. 1983). Yet Motorola simply divides the number of product units from trial into the $272 million in disgorged

2

profits awarded by the Court. *See* Dkt. 1118 at 2, 4. This is not a reasonable royalty. It is supplemental damages, which the Court lacks authority to impose. *See* Dkt. 1101.

As Justice Stevens explained, a defendant's profits and a reasonable royalty are distinct concepts. *See Zegers*, 458 F.2d at 728 n.8. While profits can be a "relevant factor in the calculation of a reasonable royalty," utilizing profits as a measure of damages is "quite different" than looking to profits as a factor in assessing "what a willing purchaser of a license might be expected to pay as a royalty." *Id*. Put simply, a defendant's profits for purposes of calculating damages at trial for past conduct bears little relation to the question of what amount of profit a willing licensee would agree to forego to secure future use. *Id.* (recognizing that a licensee would presumably never agree to pay "100% of his profits"). Indeed, over the course of this litigation, Motorola's own expert provided far different calculations for all three of the distinct damages methodologies—*i.e.*, lost profits, unjust gains, and a royalty. Mr. Malackowski determined that a reasonable royalty rate, when translated to a per-unit figure, would be ██████████████████—about half of what Motorola now seeks.[1]

*Second*, requiring Hytera, as a licensee, to sell with no prospect of a profit—and actually at a significant loss—is the very antithesis of a "reasonable" royalty. In a royalty negotiation, it is not reasonable to set the "floor" greater than all of the prospective licensee's profits, especially where the Court has already determined that exceptional circumstances render an injunction inequitable. *See* Dkt. 1097 at 6. As Justice Stevens explained, because a royalty award is based

---

[1] Mr. Malackowski testified under oath that $73.6 million was a "lump sum" reasonable royalty amount that would compensate Motorola for a "perpetual license to use [Motorola's] technology," "[p]aid in full." Dkt. 955, Malackowski Dep. 221:24-222:18; *see also* Tr. 5382:19-5383:3 (calculating lost profits at $174,400,445 and unjust enrichment at $345,761,156). This "lump sum" figure equated to per-unit royalty rates of ████ (device) and ████ (repeater). *See* Ex. 1, Feb. 17 Declaration of Dr. Aron, at ¶ 150. In post-trial briefing, Motorola asserted that Mr. Malackowski's previous royalty admission was irrelevant because Motorola did not ask the jury to award a royalty. But now, Motorola *is* asking this Court to award an ongoing royalty.

3

on a hypothetical negotiation between a willing licensor and licensee, "[i]t would, of course, be most unlikely that a licensee would be willing to pay 100% of his profits." *Zegers*, 458 F.2d at 728 n.8. Justice Stevens explained that **awarding a royalty without allowing the defendant to gain a "'reasonable profit'" is "basic error."** *Id.* (quoting *Georgia Pacific v. U.S. Plywood Champion*, 446 F.2d 295, 299 (2d Cir. 1971)) (emphasis added).

Consistent with the Seventh and Second Circuits, and contrary to Motorola's proposal, it is clear that, by definition, a "reasonable" royalty must allow for the defendant/licensee to make a "reasonable" profit.[2] Indeed, this common sense axiom is captured by the final factor in the *Georgia-Pacific* analysis, which asks, in the hallmark hypothetical negotiation scenario where both parties are "reasonably and voluntarily trying to reach an agreement," how much would a licensee be "willing to pay as a royalty and yet be able to make a reasonable profit." *Georgia-Pacific*, 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970), *mod. and aff'd*, 446 F.2d 295 (2d Cir. 1971).

In a failed bid to find analogous support for its approach, Motorola cites to a number of patent cases, all of which are outside the Seventh Circuit. *See* Dkt. 1118 at 3-8. The patent cases arise under a different statutory scheme, under which the patent holder has a legal monopoly and the courts must "prevent the violation of any right secured by patent." 35 U.S.C. § 283. And in nearly all of those cases, unlike here, the plaintiffs elected a royalty as at least part of their measure

---

[2] *E.g.*, *Lindemann Maschinenfabrik GmbH v. American Hoist & Derrick Co., Harris Press & Shear Div.*, 895 F.2d 1403, 1408 (Fed. Cir. 1990) (holding that plaintiff's expert's opinion was "absurd" because it would result in defendant paying a royalty "in excess of what it expected to make in profit"); *Hughes Tool Co. v. Dresser Industries, Inc.*, 816 F.2d 1549, 1558 (Fed. Cir. 1987) (reversing reasonable royalty award of 25% as arbitrary where it failed to leave the infringer "with a reasonable profit"); *Square Liner 360°, Inc. v. Chisum*, 691 F.2d 362, 377 (8th Cir.1982) ("that a reasonable royalty would leave an infringer with a reasonable profit . . . is implicit"); *Century Werecker v. E.R. Buske Mfg. Co. Inc.*, 898 F. Supp. 1334, 1337-38 (N.D. Iowa 1995) ("[I]t is implicit in the 'reasonable royalty' methodology that the infringer would be left with a reasonable profit"); *Mobil Oil Corp. v. Amoco Chemicals Corp.*, 915 F. Supp. 1333, 1365–66 (D. Del. 1994) (rejecting plaintiff's royalty analysis as "unsound" where it left no profit for defendant because "[t]he hypothetically negotiated royalty must be reasonable—it must pass a reality test").

4

of damages at trial, which became a reference point for the ongoing royalty analysis; yet the courts still recognized the need to permit the defendant/licensee to make a reasonable profit. *See, e.g.*, *Bard Peripheral Vascular, Inc. v. W.L. Gore & Assocs., Inc.*, No. CV-03-597-PHX-MHM, 2010 WL 11484420, at \*7 (D. Ariz. Sept. 9, 2010) (awarding an ongoing royalty rate that was slightly higher than the jury's 10% rate at trial, but less than requested by plaintiff, which was the "fair result of a renewed hypothetical negotiation" that would enable defendant to "continue to make a reasonable, albeit reduced, profit on the products it sells"); *Creative Internet Advert. Corp. v. Yahoo! Inc.*, 674 F. Supp. 2d 847, 861 (E.D. Tex. 2009) (recognizing that "post-verdict infringement should typically entail a higher royalty rate than the reasonable royalty found at trial," but also holding that the critical question thereafter is "what amount of money would reasonably compensate a patentee for giving up his right to exclude yet allow an ongoing willful infringer to make a reasonable profit?" (citations and quotations omitted)).[3]

Motorola's expert speculates that Hytera can make a profit by raising its prices. *See* Dkt. 1118, Ex. 3 (Expert Report at 3-4). Under this theory, the analysis of Justice Stevens in *Zegers* was flawed because the defendant would always have the option of raising the prices. Moreover, as Dr. Aron explains in her Declaration, an increase in prices sufficient to obtain a material profit per unit would ultimately operate to lower Hytera's overall profits. Ex. 1 (attached hereto), February 17 Declaration of Dr. Debra J. Aron, ¶¶ 206-07. This is because the increase in price

---

[3] *See also Mitutoyo Corp. v. Cent. Purchasing, LLC*, 499 F.3d 1284, 1292 (Fed. Cir. 2007) (upholding royalty rate from trial that was based on plaintiff's profit margin of 29.2%, which was less than half of defendant's anticipated 70% profit margin, leaving defendant with significant profit potential); *XY, LLC v. Trans Ova Genetics*, 890 F.3d 1282, 1296–98 (Fed. Cir. 2018) (vacating ongoing royalty award, on appeal by plaintiff, where the royalty rate of 12.5% was slightly lower that the jury's rate at trial, but also recognizing that "district courts may award a lower ongoing royalty rate" depending on the circumstances).

will cause a disproportionally larger decrease in demand, potentially to the point of product insolvency. *See id.*

Finally, Motorola claims that it is perfectly reasonable to impose a royalty that would prevent any possible profit (and lead to a substantial loss) because Hytera can simply choose to stop selling the accused products or significantly raise its prices (in the middle of a pandemic). *See* Dkt. 1118 at 7. In other words, Motorola readily acknowledges that the true motivation for its proposal is not to reach a reasonable royalty but instead to impose a *de facto* injunction. But this Court already determined that a worldwide injunction would be improper, "particularly during an ongoing pandemic." Dkt. 1097 at 6. Forcing Hytera to stop selling the products is not a reasonable royalty proposal and makes a mockery of the hypothetical negotiation analysis.

**B.      A reasonable royalty is ▇▇▇ per radio and ▇▇▇ per repeater**

While the parties appear to agree that the Court's determination of a reasonable royalty is governed by the *Georgia-Pacific* framework, Motorola does not actually perform such an analysis. Rather, its analysis begins and ends with a theory that the royalty rates should be based on a continuation of the total profit disgorgement award from trial—*i.e.*, "supplemental damages," which the Court already rejected. *See* Dkt. 1101. Not surprisingly, after paying lip service to the *Georgia-Pacific* factors, Motorola concludes that none of the factors change their calculation.

Motorola focuses a great deal on what it views as an improved position post-trial based on the finding of liability (*e.g.*, Dkt. 1118 at 7), but ignores the critical shift that occurred when the Court denied the injunction. *See Paice LLC v. Toyota Motor Corp.*, 609 F. Supp. 2d 620, 624 (E.D. Tex. 2009). The court in *Paice*, a case relied upon by Motorola, recognized that "the threat of a permanent injunction serves as a big stick," so when a court denies an injunction, "the question instead becomes: what amount of money would reasonably compensate a patentee for giving up his right to exclude yet allow an ongoing willful infringer to make a reasonable profit?" *Id*.; *see*

MSA0499

*also Bard*, 2010 WL 11484420, at *2 (recognizing that the royalty analysis should be "based on the Parties' legal positions and the economic conditions as they are found on . . . the day after the Court's order denying [plaintiff's] request for a permanent injunction"). Other courts agree that the date of the hypothetical negotiation is when the Court denies the injunction.[4] In other words, once the injunction was denied, that automatically and significantly lowered the previous negotiation ceiling of Hytera's full profit margin. Now, therefore, any ongoing royalty rate necessarily must be something materially lower than all of Hytera's profits.

Further, Hytera's bargaining position was improved when the Court reduced the damages by $221 million on January 8, 2021. As Mr. Malackowski states, "the $272 million award" as reflected in the January 8 order, "is an appropriate starting point for determining the ongoing royalty." Dkt. 1118, Ex. 3 (Expert Report at 3-4). Hytera also has the right to appeal the Court's final judgment, and the issues for appeal (including extraterritoriality jurisdiction and apportionment) concern substantial legal issues of first impression. *See* Dkt. 834 at 10, 26. "It would be error for the Court to completely discredit this factor [likelihood of succeeding on appeal] as it pertains to the parties' bargaining positions" for the post-judgment royalty analysis. *See Amado v. Microsoft Corp.*, No. SA CV 03-242, 2018 WL 8641264, at *7 (C.D. Cal. Dec. 4, 2008).

Dr. Aron, in contrast to Motorola's submission, provides a reasoned and substantial analysis of the 15 *Georgia-Pacific* factors. As the case law explains, the most critical factor is the last one—Factor 15—or what's known as the "hypothetical negotiation."[5] The remaining 14

---

[4] *See Presidio Components v. American Tech. Cerameics,* 2010 WL 3070370, at *5 (S.D. Cal. Aug. 5, 2010) ("At the outset, the Court agrees with [Defendant] that the appropriate date for the hypothetical negotiation is April 13, 2010, when the Court upheld the jury's finding of validity and infringement, and when the Court denied [plaintiff's] motion for a permanent injunction."), *rev'd in part on other grounds* 702 F.3d 1351 (Fed. Cir. 2012); *Amado v. Microsoft Corp.*, No. SA CV 03-242, 2018 WL 8641264 (C.D. Cal. Dec. 4, 2008);

[5] Dr. Aron concludes that the *Georgia-Pacific* hypothetical negotiation would take place in January 2021, subsequent to (a) the Court's revised final judgment, (b) confirmation of the jury's award of

7

factors essentially provide a guideline for issues that would be part of this hypothetical negotiation. Factor 15 requires the consideration of the amount a licensor and licensee would negotiate had they been both reasonably and voluntarily trying to reach an agreement. *See Georgia-Pacific Corp.*, 318 F. Supp. at 1120. As applied here, Factor 15 makes crystal clear that any "reasonable" royalty awarded by the Court must be an amount that: a) Motorola *and* Hytera would have agreed upon if they were "*voluntarily* trying to reach an agreement"; b) would be acceptable to Motorola, "who was *willing* to grant a license*"*; and c) would be acceptable to Hytera, who "would have been *willing to pay* as a royalty *and yet be able to make a reasonable profit*." *Id.* (emphases added).

Tellingly, Motorola completely ignores Factor 15 in its filing, and Mr. Malackowski fails to even address, much less account for, the "reasonable profit" requirement. By contrast, Dr. Aron, in applying Factor 15 and sound economic principles, methodically determines that the "reasonable" amount that would be acceptable to Motorola—again, under the required presumption that it was acting reasonably, rationally, and willingly—would be no less than the amount Motorola can make if it sells its proportional share of Hytera's radios itself: ▮▮▮ per unit for radios and ▮▮▮ per unit for repeaters. *See* Aron Decl. at ¶¶ 93-103. Dr. Aron likewise determines that the negotiating ceiling for Hytera would be its per-unit profits of ▮▮▮ for radios and ▮▮▮ for repeaters. *Id.* ¶¶ 60-92. However, because that upper limit would swallow 100% of Hytera's profits, it violates *Georgia Pacific*'s common-sense mandate that Hytera "be able to make a reasonable profit." *Georgia-Pacific Corp.*, 318 F. Supp. at 1120.[6]

---

unjust enrichment damages on accused sales, (c) the Court's denial of a permanent injunction, and (d) vacatur of the jury's award of avoided R&D expenses. *See* Aron Decl. ¶ 57. If the negotiation date was instead December 2020, her analysis would not differ materially. *Id.* n.17.

[6] Dr. Aron's calculation of Hytera's future per-unit profits deducts R&D and management expenses, which Motorola disputes. Dr. Aron addresses each of Motorola's qualms with these deductions. *See* Aron Decl., ¶¶ 69-92, 160-167, 176-179, 208-244. Notably, Dr. Aron explains that determining Hytera's maximum willingness to pay for future sales is fundamentally different from calculating disgorgement of past sales, which is the context for Mr. Malackowski's attacks

Starting from the royalty "negotiating ranges" dictated by Factor 15—*i.e.*, between ██████ and ██████ per radio, and between ██████ ██ ██████ per repeater—Dr. Aron applies the remaining Factors to determine where within those negotiating ranges the reasonable royalty lies. *See* Aron Decl. ¶¶ 104-45. After a carefully analysis, Dr. Aron concludes that a reasonable forward-looking royalty as of January 2021 would be ██████ per unit for accused device models and ██████ per unit for accused repeater models. *Id.* ¶¶ 146-47. Though Dr. Aron's conclusion is supported by her evaluation of all 14 remaining Factors, a few are worth highlighting.

For Factors 2 and 4, Dr. Aron evaluates the applicability of the only comparable license for the disputed technology: the "essential" DMR patent license between Motorola and Hytera, under which Hytera pays Motorola ██ per radio and ██ per repeater. *Id.* ¶¶ 107-17, 119. Dr. Aron observes that the patent license, which was made on FRAND (or "fair, reasonable and non-discriminatory" terms), provides insight into a rate that the parties have previously considered "fair" and "reasonable." *Id.* ¶¶ 109, 111, 117. And both the patent license and the royalty at issue here are for the very same technology: DMR. *Id.* ¶ 115. But the "essential" patent license is more valuable because it is indisputably *required* to sell a DMR radio—*i.e.*, all DMR manufacturers license the patents. But *none* license the trade secrets and copyrights, except Hytera under the prospective royalty in question. *Id.* ¶¶ 113, 116. Thus, while Dr. Aron does not advocate for the same ████████████████ royalty that the parties previously agreed was "fair" and

---

on the R&D data. *Id.* ¶¶ 69-74. Dr. Aron also explains how those attacks were founded on misrepresentations that Mr. Malackowski made on the last day of trial. *Id.* at ¶ 70. Because Dr. Aron and Hytera were not permitted to affirmatively address the misrepresentations through sur-rebuttal, Dr. Aron addresses them in her declaration. *Id.* at ¶¶ 70, 208-244. Critically, Dr. Aron also endeavors to benchmark Hytera's R&D expenses against other DMR competitors, including Motorola itself, and confirms that Hytera's deductible R&D amounts are proper and in line with the rest of the industry. *Id.* ¶¶ 75-82.

MSA0502

"reasonable" for *threshold* DMR technology, she concludes that the existence of the patent license confirms the lower end of the negotiating range is appropriate here. *Id.* ¶¶ 114-17.

For Factor 9, Dr. Aron considers alternatives available to Hytera that would reduce Hytera's need to license the IP, and therefore, the amount that Hytera would reasonably agree to pay. *See id.* ¶¶ 133-37. By 2021, Hytera could pivot to its non-accused TETRA and commercial-tier DMR radios, which compete with the accused DMR radios. *Id.* ¶ 134. Also in 2021, there are now a myriad of other DMR manufactures in the market, such as JVC Kenwood or Tait, so Hytera could license the technology from them under potentially more-favorable terms rather than licensing from Motorola. *Id.* ¶ 135. Finally, since at least 2011, there are inexpensive DMR chipsets available that obviate the need for a license to the Motorola technology. *Id.* ¶ 136.

Furthermore, in addition to conducting her reasonable royalty analysis, Dr. Aron evaluated Mr. Malackowski's opinions and identified numerous errors. *See id.* ¶¶ 148-205. Most serious among these was his failure to perform any reasonable royalty analysis whatsoever. Instead, he simply extrapolated the unjust enrichment disgorgement of all Hytera profits on a per-unit basis. *Id.* ¶¶ 12-14, 148. As Dr. Aron observes, unjust enrichment and reasonable royalties are totally incompatible concepts from an economics standpoint. *Id.* ¶¶ 12-13, 148. Whereas the royalty that the Court will determine here must be "reasonable" —which at the most fundamental level requires that Hytera be permitted the prospect of a "reasonable profit"—Mr. Malackowski proposal of a rate **more than twice** Hytera's profits is the antithesis of that mandate. *Id.* In fact, other than his direct quotation of Factor 15, Mr. Malackowski omits the phrase "reasonable profit" from his entire report.

Mr. Malackowski also errs is his complete abandonment of his prior royalty opinions, wherein he determined that effective per-unit royalties of ████████████████████ would be "reasonable." *Id.* ¶¶ 15, 149-51. Mr. Malackowski's only apparent justification for jettisoning

10

his prior analysis is the jury's verdict. *Id.* ¶¶ 15, 151. But, as Dr. Aron notes, the *Georgia Pacific* analysis already presumes misappropriation of valid intellectual property, so the jury's verdict would not impact the parties' hypothetical negotiation, and it certainly would not justify Mr. Malackowski's revised opinion doubling the royalty rates that Motorola now seeks. *Id.* "[A] jury finding of infringement and no invalidity does not change any logically consistent analysis; rather, it merely confirms the original assumption of those facts." *Cummins-Allison Corp. v. SBM Co.*, 584 F. Supp. 2d 916, 918 (E.D. Tex. 2008). "It is inconsistent and unnecessarily confusing to adopt the position that once the assumed facts upon which the expert's analysis of the hypothetical negotiation are confirmed by a verdict, the expert can change his opinion of a reasonable royalty rate." *Id.* *Accord Presidio Components*, 2010 WL 3070370, at *5. In short, the Court should adopt Dr. Aron's royalty rate as the most reasonable and economically justified.

### C. The royalty rate starts on the date the Court denied the injunction

Motorola seeks royalties for pre-judgement sales, back to June 2019. *See* Dkt. 1118 at 11. This is inconsistent with the DTSA's plain language, which directs that when exceptional circumstances render an injunction inequitable, a court may "condition[] *future* use of the trade secret upon payment of a reasonable royalty . . . ." 18 U.S.C. § 1836(b)(3)(A)(iii) (emphasis added). Royalty payments on *past* uses are not authorized. As this Court found, it lacks authority to award supplement damages back to June 2019. *See* Dkt. 1101 at 1. Furthermore, as established above, the courts have repeatedly stated that the start date for ongoing royalties is the date the Court denies the injunction. *E.g.*, *Presidio Components*, 2010 WL 3070370, at *5; *Amado v. Microsoft Corp.*, 2018 WL 8641264. As applied here, the start date would be December 17, 2020.

### D. The royalty rates are to be applied only to IP adjudicated at trial

After 3 years of discovery, Motorola narrowed the scope of the IP and Accused Products to be adjudicated in a jury trial. Now, however, Motorola proposes royalty payments on products

11

MSA0504

and IP not even at issue (much less adjudicated) in the jury trial. *See* Dkt. 1118, Ex. 4 (list of Accused Products). This is contrary to due process and case law.

First, Motorola's list of "Accused Products" includes Hytera products that were **not** adjudicated at the jury trial: MD65X, PDC76X R1.5, PDC76X R1.6, PDC76X R2.1, RD106Xi. Dkt. 1118, Ex. 4 at bullet number 4. None of these products were included in Motorola's prior expert reports and were not the basis of the jury's damages award. They cannot be the basis for any ongoing royalty.

Second, Motorola's list defines "trade secrets" and "copyrighted works" as vaguely and broadly as possible, going *far beyond* the IP adjudicated in the jury trial. *See* Dkt. 1118, Ex. 4 at bullet number 3 & n.2 (providing that the royalties shall be imposed on "[a]ll products developed, in whole or in part, with any of Motorola's Trade Secret Information or Copyrighted Works" and then defining those terms to be as vague and sweeping as possible). As Hytera explained in its opposition to the injunction—where Motorola had proposed virtually identical language—this language is hopelessly vague and an invitation to endless litigation. *See* Dkt. 987 at 16-20.[7] Moreover, Motorola's definitions purport to expand well beyond the scope of what was adjudged at trial. *See id*. This is improper. Under the case law, the royalty rates can be applied *only* to products containing the trade secrets that the jury found had been misappropriated. *See Fractus, S.A. v. Samsung Elecs. Co.*, 2013 WL 1136964, at *2 (E.D. Tex. Mar. 15, 2013) (denying request to include nonaccused products in the scope of ongoing royalties). As Motorola has successfully argued in other cases, it would be inappropriate to award ongoing royalties beyond the IP that is

---

[7] Motorola's proposed list includes the phrasing "in whole or in part." Dkt. 1118, Ex. 4 at bullet numbers 1 and 3. But the "in part" language is inconsistent with circuit precedent, which requires that the product be "substantially derived" from the trade secrets adjudicated at trial. *American Can Co. v. Mansukhani*, 742 F.2d 314, 326 (7th Cir. 1984). Dkt. 987 at 19-20.

12

MSA0505

the subject to the jury's verdict. *See Saint Lawrence Comms v. Motorola Mobility LLC*, 2017 WL 6268735, at *5 (E.D. Tex. 2017).

Finally, Motorola's proposal has no end date—it would remain in force forever—but Motorola cannot possibly meet its burden of justifying such a limitless royalty rate. Its proposal is inconsistent with the statutory requirement that royalty be "for no longer than the period of time for which such use could have been prohibited." 18 U.S.C. 1836(3)(A)(iii).

## II.    NON-MONETARY TERMS

Motorola dedicated nearly half its brief—intended to address "what a reasonable royalty in this case would be" (Dkt. 1097 at 6)—to non-monetary terms, many of which have no bearing on the royalty and will only lead to endless litigation before this Court. *See* Dkt. 1118 at 8-15.

**Agreed Administrative Terms.** For more than a decade, Motorola and Hytera have engaged in a cross-license arrangement regarding DMR radios—including among them, the adjudged products at issue. *See* DTX-3058. Hytera agrees that the timing of payments under that agreement (quarterly payments for sales in the preceding quarter), certification by Hytera of the number of sales of covered products to "unaffiliated third parties" and the audit process contemplated by that agreement are all reasonable terms to apply to any royalty ordered by the Court here. The parties have had no disputes concerning the reporting procedure contemplated by that agreement.

Additionally, Hytera agrees that any royalty payments on future sales (starting from December 17, 2020) of the products adjudged at trial should be made into an escrow account pending the exhaustion of all appeals, including any petition for *certiorari*.

**Motorola's successor-in-interest argument**. Motorola's proposal to bind "Hytera's new US entity" (Dkt. 1118 at 12-13), is improper and unnecessary. First, that "new U.S. entity" is not a party to this dispute. Second, the Bankruptcy Court has clearly ruled that it is not a successor-

13

MSA0506

in-interest to any party here. *E.g.*, Ex. 2 at ¶ 9 ("The Purchaser [new U.S. entity] shall not be deemed or considered a successor to the Debtors [the U.S. entity defendants in this action] or the Debtors' estates by reason of any theory of law or equity and the Purchaser has not assumed nor is it in any way responsible for any liability or obligation of the Debtors or the Debtors' estates . . . .") and ¶¶ K, L, 6, 7, 8; and Ex. 3 at ¶ 9 (same). Finally, there is no need to involve the new U.S. entity, as the existing license agreement—which Hytera agrees should apply here— requires that Defendant Hytera Communications Corp. Ltd. report sales by any Hytera entity to "unaffiliated third parties." As the Bankruptcy Court made clear, the new U.S. entity is a Hytera affiliate; thus, Hytera China will be obligated under the license agreement for sales by that entity.

**Quarantine and Removal.** Motorola asks the Court to order Hytera to "remove and quarantine the confidential Motorola documents and source code still in its possession." Dkt. 1118 at 13. Motorola sought this relief in its permanent injunction motion, Dkt. 961 at 2–4, which the Court denied. *See* Dkt. 1097 at 1. Motorola's proposal is also unnecessary. The Court has already recognized that "exceptional circumstances" warrant permitting Hytera's continued use, subject to this royalty. Dkt. 1097 at 6. Motorola appears to acknowledge that requiring Hytera to remove *source code* from its products would thwart Hytera's ability to provide the business continuity demanded by those exceptional circumstances and a royalty payment. *See* Dkt. 1118 at 14. Requiring Hytera to excise technical documentation would be equally inappropriate.

**Enforcement Mechanisms.** Motorola proposes a number of terms under the guise of "limit[ing] disputes before the Court." Dkt. 1118 at 12 n.9. In actuality, Motorola's proposals are designed to circumvent the proper procedures for addressing noncompliance—contempt.

A finding of contempt requires clear and convincing evidence of a significant violation of an unambiguous order, without reasonable and diligent efforts by the alleged contemnor. *Lightspeed Media Corp. v. Smith*, 761 F.3d 699, 711 (7th Cir. 2014). The resulting penalty must

14

be designed to compel compliance or to compensate the complainant. *Id.* at 712. Motorola seeks to usurp the Court's role in making those findings and vitiate Hytera's right to be heard in defense. There is no need for preemptive restraint, as Motorola can pursue a remedy either via contempt or in a "future suit." Dkt. 1097 at 4. Motorola's proposal for a shortcut should be rejected.

Motorola's proposal for 180 days' notice before selling "any radio product Hytera contends is not developed in whole or in part" on its materials (Dkt. 1118 at 14) similarly circumvents the Court's exercise of its contempt power. In the context of patent infringement, the determination of whether a redesigned product violates an injunction requires a two-step test. First, the plaintiff must show the new product is "not more than colorably different from the product found to infringe" with "focus on those elements of the adjudged infringing products" proven to infringe. *TiVo Inc. v. EchoStar Corp.*, 646 F.3d 869, 879 (Fed. Cir. 2011). If the differences are more than colorable, the plaintiff must bring a separate action and contempt is "not the appropriate remedy." *Proveris Sci. Corp. v. Innovasystems, Inc.*, 739 F.3d 1367, 1371 (Fed. Cir. 2014). If the differences are merely colorable, then the Court proceeds to the traditional contempt analysis. *Id.* This framework has been applied in trade secret contexts as well. *Bianco v. Globus Med., Inc.*, No. 2:12-CV-00147-WCB, 2014 WL 5462388, at *22 (E.D. Tex. Oct. 27, 2014), *aff'd*, 618 F. App'x 1032 (Fed. Cir. 2015); *see also* Dkt. 1118 at 4 n.4.

As discussed above, the parties agree to payment and reporting mechanisms that they have followed for years without issue. Nor does Motorola need to track Hytera's every move to ensure disputes are resolved. On the contrary, Motorola's proposal invites extrajudicial conflict on even trivial issues, rather than requiring Motorola to form a good faith basis for pursuing the remedies that the law provides—contempt or a "future suit." Dkt. 1097 at 4. Motorola can quantify its harm in the event such a dispute arises. *Id.* Nothing more is needed.

15

Date:  February 17, 2021

Respectfully submitted,

/s/ *Boyd Cloern*

Boyd Cloern (*pro hac vice*)
bcloern@steptoe.com
Michael Allan (*pro hac vice*)
mallan@steptoe.com
Jessica Rothschild (*pro hac vice*)
jrothschild@steptoe.com
David Bettwy (*pro hac vice*)
dbetwy@stepteo.com
Brian Johnson (*pro hac vice)*
bjohnso@steptoe.com
Alice Loughran (*pro hac vice*)
aloughran@steptoe.com
Scott Richey (*pro hac vice)*
srichey@steptoe.com
Christopher Suarez
csuarez@steptoe.com
John William Toth (*pro hac vice*)
btoth@steptoe.com
STEPTOE & JOHNSON LLP
1330 Connecticut Avenue NW
Washington, DC 20036
Telephone:  (202) 429-3000
Facsimile:  (202) 429-3902

Daniel Stringfield
dstringfield@steptoe.com
Tron Fu
tfu@steptoe.com
STEPTOE & JOHNSON LLP
227 West Monroe Street, Suite 4700
Chicago, IL 60606
Telephone: (312) 577-1300
Facsimile:  (312) 577-1370

Mark McDougall (*pro hac vice*)
mmcdougall@calfee.com
Joshua Ryland (*pro hac vice*)
jryland@calfee.com
Todd Tucker (*pro hac vice*)
ttucker@calfee.com
CALFEE, HALTER & GRISWOLD LLP
The Calfee Building
1405 East Sixth Street

16

MSA0509

Cleveland, OH 44114
Telephone: (216) 622-8200
Facsimile: (216) 241-0816

17

MSA0510

## CERTIFICATE OF SERVICE

I, Boyd Cloern, an attorney, hereby certify that on February 17, 2021, I caused a true and correct copy of the foregoing submission to be served via the Court's ECF system upon all counsel of record.

/s/ Boyd Cloern  
Boyd Cloern

MSA0511

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| MOTOROLA SOLUTIONS, INC., et al., <br><br> Plaintiffs, <br><br> v. <br><br> HYTERA COMMUNICATIONS CORPORATION LTD., et al., <br><br> Defendants. | Case No. 1:17-cv-01973 <br><br> Hon. Charles R. Norgle |

## ORDER

Defendant Hytera Communications Corporation Ltd.'s motion for instructions under Local Rule 54.3(g) [1187] [1188] is denied. Plaintiffs' supplemental motion for attorneys' fees from Hytera Communications Corporation Ltd. [1203] is granted. The Court awards attorney fees to Plaintiffs from Hytera Communications Corporation Ltd. in the amount of $34,244,385.50.

## MEMORANDUM OPINION

Plaintiffs, Motorola Solutions, Inc. and Motorola Solutions Malaysia SDN. BHD., prevailed on their trade secret misappropriation and copyright infringement claims against Defendants, Hytera Communications Corporation Ltd., Hytera America, Inc., and Hytera Communications America (West), Inc., ultimately securing an award from the Court totaling $543.7 million, Dkt. 1099, as well as a reasonable royalty that the Court will soon determine, Dkt. 1097, 1105, 1112. Motorola thereafter moved for attorney fees from Hytera Communications Corporation Ltd.,[1] which the Court granted as to Motorola's entitlement to reasonable attorney fees as the prevailing party. Dkt. 1156 at 4. However, the Court denied Motorola's initial attorney fee motion as to the amount of the fee award because the parties failed to comply with the pre-

---

[1] Motorola does not seek fees from the other Hytera Defendants because the case was automatically stayed against them as a result of their voluntary petitions under chapter 11 of the Bankruptcy Code. Dkt. 981.

MSA0512

motion requirements under Local Rule 54.3. Ibid. The Court instructed the parties to comply with Local Rule 54.3 and granted Motorola leave to file a supplemental motion on the amount of the attorney fee award if the parties were unable to reach an agreement. Ibid.

Now before the Court are two motions. First is Hytera's motion for instructions under Local Rule 54.3(g), in which Hytera requests discovery from Motorola on the billing arrangement between Motorola and its counsel as well as counsel's billing records for the other matters that were included in counsel's flat fee invoices to Motorola. Second is Motorola's supplemental motion for attorney fees, in which Motorola ultimately requests $34,244,385.50.

## I. LEGAL STANDARD

On Motorola's supplemental attorney fee motion, where the only remaining issue is the amount of reasonable attorney fees to which Motorola is entitled, the starting point for reasonable fees is calculation of a lodestar, each attorney's reasonable hourly rate multiplied by the number of hours the attorney reasonably expended. Montanez v. Simon, 755 F.3d 547, 553 (7th Cir. 2014). Although the lodestar is presumptively reasonable, ibid., it may be adjusted based on factors like the complexity of the legal issues involved, the degree of success obtained, and the public interest advanced by the litigation, Schlacher v. Law Offices of Phillip J. Rotche & Assocs., P.C., 574 F.3d 852, 856-57 (7th Cir. 2009).

## II. ANALYSIS

Motorola argues that its attorneys' hourly rates, which range from $555 to $1565, and the 35,005 total hours they expended are reasonable based on the complexity of the case and Motorola's preemptive reduction in the hours and fees actually incurred. Hytera objects to the reasonableness of both the rates and hours of Motorola's counsel.

2

**A. The hourly rates of Motorola's counsel sought by Motorola are reasonable.**

Hytera's first argument against the reasonableness of the rates charged by Motorola's counsel overlaps with Hytera's arguments in its motion for instructions. In each, Hytera raises concerns about the billing arrangement between Motorola and its counsel in which Motorola's counsel periodically invoiced Motorola large amounts for this litigation and numerous other matters related to Hytera with little explanation. Hytera claims that arrangement makes it impossible for it or even for Motorola to know how much of each invoice was related to this litigation, and how many hours and at what hourly rate contributed to the portion of each invoice related to this litigation. In its motion for instructions, Hytera insists that it needs that and more information to be able to calculate an effective billing rate for Motorola's counsel in this litigation. And in its response to Motorola's supplemental attorney fee motion, Hytera suggests that Motorola's requested award should be reduced considerably because Motorola has not produced any evidence of what amounts and what rates Motorola actually paid its counsel in this litigation.

But, as Motorola explains, Hytera's arguments miss the mark. To begin, Hytera's suggestion that Motorola has not produced any evidence of what amounts and what rates Motorola actually paid its counsel in this litigation is not true. Sure, the invoices that Motorola produced from its counsel aggregated fees related to several matters other than this litigation with little explanation and without attaching detailed billing records. But the invoices and their lack of detail are a red herring. Motorola has produced and submitted all time-keeping entries for the fees it seeks, which Hytera cannot dispute given its objections, addressed below, to a variety of the entries. The time-keeping entries also include the applicable hourly rate, which were confirmed by declarations produced by Motorola. And Motorola produced and submitted a declaration from in-house counsel confirming that Motorola agreed to pay the applicable rates for each attorney who

3

performed work in this litigation. Further, contrary to Hytera's suspicion, Motorola's counsel expressly disclaimed the existence of any flat fee arrangement with Motorola to Hytera's counsel. Accordingly, the Court concludes that Motorola's production documents and declarations satisfied its obligations under Local Rule 54.3 to provide Hytera with the time, work, and hourly rate records on which its attorney fee request is based. Hytera's motion for instructions is therefore denied.

Hytera's opposition to Motorola's supplemental attorney fee motion on this point stresses its disbelief that Motorola has in fact paid to its counsel at least as much as Motorola seeks in attorney fees. Hytera characterizes the declaration of Motorola's in-house counsel that Motorola has paid at least $34,325,064 to its counsel related to this litigation as carefully worded to conceal the fact that Motorola is attempting to "use this fee petition to subsidize its global campaign against Hytera." Dkt. 1214 at 3. But the Court accepts the declaration for what it plainly says—that Motorola has paid its counsel more than $34 million for this litigation. Hytera's argument to the contrary pure speculation. And a more important point as to whether Motorola has or has not paid its counsel the fees the two agreed to is that, though perhaps "the *best evidence* of whether attorney's fees are reasonable is whether a party has paid them," Cintas Corp. v. Perry, 517 F.3d 459, 469 (7th Cir. 2008) (emphasis added), a party seeking attorney fees does not necessarily have to prove that the fees sought have in fact been paid to be found reasonable. Rather, reasonableness of hourly rates may also be supported by what the client agrees to pay, which also serves as an upper limit. Bell v. Lantz, 825 F.3d 849, 854 (7th Cir. 2016). As mentioned above, Motorola has established that it agreed to pay the applicable hourly rate for each attorney that performed work in this litigation.

To justify Hytera's proposed reduction in the attorney fees to which Motorola is entitled, Hytera also invokes Straight Path IP Grp., Inc. v. Cisco Sys., Inc., No. C 16-03463 WHA, 2020

4

MSA0515

WL 5522993, at *17 (N.D. Cal. Mar. 4, 2020) *report and recommendation adopted*, 2020 WL 2539002 (N.D. Cal. May 19, 2020), where a district court adopted a special master's report and recommendation awarding only half of the petitioner's documented flat monthly fees to its counsel where the petitioner failed to provide detailed billing records and invoices appeared to show that counsel's work involved other matters to limit the risk of fee stuffing or matter swapping. But however persuasive that case is on its own facts, this case's facts are completely distinguishable. Unlike Straight Path, Motorola and its counsel do not have any documented flat monthly fee billing arrangement. Instead, Motorola's counsel has disclaimed any such arrangement and Motorola's in-house counsel submitted declarations that acknowledge that Motorola agreed to pay applicable hourly rates for each attorney who performed work in this litigation. That Motorola received invoices from its counsel that aggregated the outstanding amounts due across multiple matters does not change that agreed billing arrangement. And Motorola has also submitted detailed and contemporaneous records of the time, tasks, and rates for which Motorola seeks fees.

Next, Hytera argues that the hourly rates that Motorola seeks to recover for each of its attorneys—between $555 to $1565—is unreasonable. On hourly rates, reasonableness is "based on the 'market rate' for the services rendered." Spegon v. Catholic Bishop of Chicago, 175 F.3d 544, 555 (7th Cir. 1999). In other words, hourly rates must "be reasonable within the community." Jeffboat, LLC v. Dir., Off. Of Workers' Comp. Programs, 553 F.3d 487, 490 (7th Cir. 2009). But reasonableness of hourly rates is also dependent on the specific attorney's experience and qualifications. Trs. of Chi. Plastering Inst. Pension Trust v. Cork Plastering Co., 570 F.3d 890, 905 (7th Cir. 2009). Thus, "[t]he best evidence of an attorney's market rate is his or her actual billing rate for similar work." Johnson v. GDF, Inc., 668 F.3d 927, 933 (7th Cir. 2012). "'[T]he next best evidence' of the market rate for an attorney," is "'evidence of rates similarly experienced attorneys

5

in the community charge paying clients for similar work and evidence of fee awards the attorney has received in similar cases.'" Ibid.

Instead of Motorola's proposed rates, Hytera suggests the Court should use the 75th percentile rates in Chicago from the American Intellectual Property Law Association 2019 Report of the Economic Survey—$415 for associates and $644 for partners—as the ceiling on reasonable rates. Hytera notes that courts regularly apply local 75th percentile rates in AIPLA reports as reasonable, including a case in which a party represented by Motorola's counsel successfully argued that hourly rates for attorney fees sought by the opposing party should be reduced to the 75th percentile rates in Texas from the 2011 AIPLA report. See Pact XXP Techs., AG v. Xilinx, Inc., No. 2:07-cv-563, 2013 WL 4735047, at *2 (E.D. Tex. Sept. 3, 2013); see also T&M Inventions, LLC v. Acuity Brands Lighting, Inc., No. 14 C-947, 2016 WL 7441650, at *1 (E.D. Wis. Dec. 27, 2016); Intellect Wireless, Inc. v. HTC Corp., No. 09 C 2945, 2015 WL 136142, at *7 (N.D. Ill. Jan. 8, 2015); Prenda Law, Inc. v. Godfread, No. 13-CV-4341, 2014 WL 2699817, at *3 (N.D. Ill. June 12, 2014).

Though rates in AIPLA reports can serve as proper points of reference for determining reasonable rates in intellectual property cases, they are not determinative. Though many courts have referenced AIPLA reports, other courts have referenced rates included in reports from Valeo Partners. See Ballinasmalla Holdings Ltd. v. FCStone Merch. Servs., LLC, No. 18-CV-12254 (PKC), 2020 WL 814711, at *2 (S.D.N.Y. Feb. 19, 2020); Howmedica Osteonics Corp. v. Zimmer, Inc., No. CV 05-897 (WHW)(CLW), 2018 WL 2378406, at *15-*16 (D.N.J. May 23, 2018); Ferriss v. All. Publ'g, Inc., No. 15-CV-05675-EMC, 2016 WL 7116110, at *14 (N.D. Ca. Dec. 6, 2016). Motorola references the Valeo 2019 Attorney Hourly Rate Report in support of the reasonableness of the hourly rates Motorola was charged and seeks.

6

MSA0517

Though the Court considers both AIPLA and Valeo reports proper points of reference for determining the reasonableness of hourly rates, other relevant considerations lead the Court to conclude that the hourly rates Motorola asserts are reasonable. First, the Court finds that in the context of this case the Valeo report on which Motorola relies includes data that is more comparable to Motorola's counsel than the AIPLA report as to rates of similarly experienced attorneys in the relevant community. This case is not a run-of-the-mill intellectual property case confined to the Chicago area. It is a case between global competitors with hundreds of millions of dollars at stake where "the subject matter of the litigation is one where the attorneys practicing it are highly specialized and the market for legal services in that area is a national market." Jeffboat, 553 F.3d at 490. Additionally, the Court finds that the qualifications, experience, skills, and performance of Motorola's counsel justifies an hourly rate that exceeds the Chicago rates in the AIPLA report. Motorola also notes that the hourly rates charged by Hytera's counsel significantly exceeds the Chicago rates in the AIPLA report, which in the Court's view is likewise justified based on the qualifications, experience, skills, and performance of Hytera's counsel. Further, as mentioned above, though Hytera disputes the matter, the Court concludes that Motorola has submitted evidence that it in fact paid its counsel the hourly rates it asserts, which is "[t]he best evidence of an attorney's market rate." Johnson, 668 F.3d at 933. Accordingly, the Court concludes that Hytera's arguments and heavy reliance on the 2019 AIPLA report fail to establish "'a good reason why a lower rate is essential.'" People Who Care v. Rockford Bd. of Educ., Sch. Dist. No. 205, 90 F.3d 1307, 1313 (7th Cir. 1996) (quoting Gusman v. Unisys Corp., 986 F.2d 1146, 1151 (7th Cir. 1993)).

MSA0518

**B. The hours sought by Motorola for time expended by Motorola's counsel are reasonable.**

Hytera next objects to Motorola's requested hours as excessive, duplicative, and otherwise unreasonable. Hytera first suggests that the Court should reduce 17,554.3 of Motorola's claimed hours by 30% because the corresponding 3,113 time-keeping entries were block-billed or vague, whether on their own or because of Motorola's redactions. Hytera concedes that block billing is not a prohibited practice but notes that certain circumstances support reduction or outright exclusion of block billed time. But such circumstances exist only "when it becomes impossible to tell how much time was spent on specific tasks." Samirah v. Lynch, No. 03 CV 1298, 2015 WL 3524790, at *4 (N.D. Ill. June 1, 2015) (citing Nat'l Rifle Ass'n of Am. v. Vill. of Oak Park, 871 F. Supp. 2d 781, 791 (N.D. Ill. 2012)). And, importantly, the nature and complexity of a case is a significant factor in determining whether block billed entries "allow a reasonable assessment of the overall amount of properly compensable time." Phoenix Bond & Indem. Co. v. Bridge, Nos. 05 C 4095 and 07 C 1367, 2012 WL 6091112, at *7 (N.D. Ill. Dec. 7, 2012). In large and complex cases, "attorneys are routinely performing multiple tasks on any given day" such that "it is neither surprising nor inappropriate for them to aggregate their work into a single entry." Ibid. (citing Top Tobacco, L.P. v. N. Atl. Operating Co., No. 06 C 950, 2007 WL 2688452, at *4 (N.D. Ill. Sept. 6, 2007)). This case was not just large and complex. It is not an understatement to say that this case falls in the category of the largest and most complex. And the Court concludes that the entries Hytera identifies as block billed nevertheless "are sufficiently detailed to allow a determination that those entries are reasonable." Baier v. Rohr-Mont Motors, Inc., 175 F. Supp. 3d 1000, 1024 (N.D. Ill. 2016).

Much the same analysis applies to the entries that Hytera characterizes as vague. The overarching standard is whether the entries are sufficiently detailed to allow a determination that

8

those entries are reasonable. Ibid. Most of the entries Hytera objects to on vagueness grounds are generic references to preparing for trial without detailing which specific trial-related tasks. But "[f]or lawyers preparing for trial . . . it is common and reasonable for them to record preparation time as just that—trial preparation—without further specificity." Phoenix Bond & Indem. Co., 2012 WL 6091112, at *7 n. 5. In fact, "[i]t would be entirely unreasonable to impose, at the risk of forfeiting a fee award, a standard that would require them to disaggregate such time into its components" because "[t]rial preparation involves a variety of interrelated tasks that cannot be neatly subdivided for billing purposes." Ibid. Hytera's citation to First Midwest Bank v. City of Chi., 337 F. Supp. 3d 749, 796 (N.D. Ill. 2018), where the court reduced by half a paralegal's single entry for 174.5 hours for "preparing for and assisting at trial" is unhelpful. So is Gibson v. City of Chi., 873 F. Supp. 2d 975, 987 (N.D. Ill. 2012), where the court reduced by half, 3.55 hours, time related to vague entries for "'preparation' for various court appearances."

Hytera also requests a 30% reduction in the 194 hours associated with 54 entries that Motorola partially redacted because, according to Hytera, those redactions render the entries vague. Redaction of time records are allowed by Local Rule 54.3(d)(5)(A), but "should be limited to the extent necessary to protect" privileged information "while, to the extent possible, maintaining the opposing party's ability to determine the reasonableness of the entry." Kurgan v. Chiro One Wellness Centers LLC, No. 10-cv-1899, 2015 WL 1850599, at *7 (N.D. Ill. Apr. 21, 2015). Hytera selectively quotes Reid v. Unilever United States, Inc., No. 12 C 6508, 2015 WL 3653318, at *8 (N.D. Ill. June 10, 2015) for the proposition that a court may disallow redacted entries if the entries are "so redacted that it is 'difficult if not impossible' for a court to sufficiently evaluate the services rendered and fees charged." But Hytera disregards the clause in the same sentence that adds a condition to rejection of redacted entries. Not only must the redactions render

9

the entries difficult or impossible to sufficiently evaluate them, but they must also result in "'the exclusion of basic material information which undermines the integrity of the entire petition.'" Reid, 2015 WL 3653318, at *8 (quoting Vitug v. Multistate Tax Comm'n, 883 F. Supp. 215, 223-24 (N.D. Ill. 1995)). Though Motorola offered to make unredacted entries available for in camera review, the Court finds that is not necessary because the redacted entries are minor and do not undermine the entirety of Motorola's request. Additionally, the Court's review of the redacted entries allows the Court to conclude that the entries relate to this litigation and are reasonable.

In their response to Motorola's supplemental motion, Hytera does not address the other entries that it identified as vague, so the Court declines to address them too. See Baier, 175 F. Supp. 3d at 1024 ("If a defendant fails to 'specifically object to the requested attorneys' fees, the Court will generally award the requested fees." (quoting Boim v. Quranic Literacy Inst., No. 00 C 2905, 2003 WL 1956132, at *7 (N.D. Ill. Apr. 24, 2003))).

Hytera next argues that Motorola's fees should be reduced for overstaffing at depositions and more generally. As to overstaffing at depositions, Hytera acknowledges that Motorola agreed not to seek fees for attendance at depositions by more than two attorneys, but Hytera insists that only one attorney's attendance at defensive depositions is reasonable and views any more than that as unreasonable training opportunities for associates. To be sure, for some cases, like relatively simple contract disputes or even somewhat straightforward constitutional claims, it may be unreasonable to award fees for more than one attorney to attend a deposition. See, e.g., Entertainment Software Ass'n v. Blogojevich, No. 05 C 4265, 2006 WL 3694851, at *8 (N.D. Ill. Aug. 9, 2006) ("Two or three attorneys regularly attended depositions when one would have sufficed" in case raising First Amendment challenge to laws that restricted sales of violent and sexually explicit video games); Chi. Messenger Serv. V. Nextel Commc'ns, Inc., No. 01 C 8820,

10

2005 WL 643270, at *3 (N.D. Ill. Mar. 16, 2005) (in contract dispute, two attorneys attending depositions of three witnesses and to a motion call to extend discovery was unreasonable). But attendance of two lawyers at a deposition is not inherently unreasonable and may be reasonable particularly in complex cases with voluminous documents. See, e.g., Littlefield v. Mack, 750 F. Supp. 1395, 1405 (N.D. Ill. 1990) (presence of more than one attorney at deposition is standard practice and particularly appropriate in complex case with numerous exhibits); Phoenix Bond & Indem. Co., 2012 WL 6091112, at *8 (multiple attorneys charging for, among other things, deposition preparation and attendance reasonable based on complexity of case and evidence). The Court reiterates that this case is in the category of the largest and most complex, with exceptionally voluminous documents. Motorola's limited request for attendance of at most two attorneys at depositions is reasonable.

Hytera concludes that a global deduction of 20% is warranted because of partner-heavy staffing and other overstaffing for internal meetings, motions, trial attendance, witness preparation, expert reports, and administrative tasks. In some sense, Hytera generally attacks the overall "billing judgment" of Motorola's counsel in a sense arguing counsel could not have properly and reasonably billed Motorola for the fees it seeks from Hytera. True, under the reasonableness standard, "[c]ounsel for the prevailing party should make a good faith effort to exclude from a fee request hours that are excessive, redundant, or otherwise unnecessary, just as a lawyer in private practice is ethically obligated to exclude such hours from his fee submission." Hensley v. Eckhart, 461 U.S. 424, 434 (1983). But Motorola has done just that. Motorola excluded from its fee request time expended on pre-litigation investigation, this fee motion, and post-judgment enforcement proceedings, as well as all time expended by paralegals and other staff and time expended by

11

attorneys who worked fewer than 1,000 hours on this litigation (including, as Hytera notes, nine partners who entered appearances, at least four of whom examined witnesses at trial).

Ultimately, Hytera's objections to Motorola's requested hours are, as Motorola suggests, largely improper hypocritical attacks that the Local Rule 54.3 process is designed to prevent. Farfaras v. Citizens Bank & Tr. Of Chicago, 433 F.3d 558, 569 (7th Cir. 2006). Accepting Hytera's arguments would require the Court to conclude that Motorola should be awarded fees for about 10,000 fewer hours than Hytera's counsel expended in this litigation with similar staffing and billing practices. Like Motorola, Hytera too engaged in block billing, generic trial preparation entries, and use of redactions. Hytera's counsel also staffed attorneys who billed at partner-level rates at similar levels to Motorola's counsel. Based on those examples, among others, the Court rejects Hytera's position. Hytera claims that its billing practices and recordkeeping as a defendant should not be viewed the same way as Motorola's because only Motorola, as the plaintiff, could have expected to seek attorney fees after prevailing. But the Court is not convinced by Hytera's argument on that point because both Motorola and Hytera are represented by large elite law firms that maintain staffing, recordkeeping, and billing practices that are very regimented even if not perfect or perfectly efficient. See Phoenix Bond & Indem. Co., 2012 WL 6091112, at *7 ("this sort of timekeeping is the norm in the marketplace").

The Court reiterates that the most significant factor that supports the Court's finding that Motorola's requested fees are reasonable is the scale and complexity of this case. Hytera's objections largely disregards that factor in its response to Motorola's supplementary motion, as well as the response's selective citations to caselaw. But this litigation has spawned more than 1,200 docket entries and, as Motorola notes, it involved more than 68 million pages of documents, 528 hours of depositions, unparalleled motion practice, and a trial that occurred over more than

12

MSA0523

three and a half months where several thousand exhibits were exchanged of which 761 were ultimately admitted. And Hytera's conduct in this litigation significantly added to Motorola's litigation costs because, as the Court concluded in its prior order finding that Motorola is entitled to reasonable attorney fees, many of Hytera's litigating positions were objectively unreasonable. Dkt. 1156 at 4. Nevertheless, Hytera's competent counsel consistently manifested their determination to do their professional best on behalf of their client. Accordingly, the Court grants Motorola's supplemental motion and awards attorney fees to Motorola from Hytera Communications Corporation Ltd. in the amount of $34,244,385.50.

IT IS SO ORDERED.

ENTER:

CHARLES RONALD NORGLE, Judge
United States District Court

DATE: October 15, 2021

13

MSA0524

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| MOTOROLA SOLUTIONS, INC., et al., | |
| Plaintiffs, | |
| v. | Case No. 1:17-cv-01973 |
| HYTERA COMMUNICATIONS CORPORATION LTD., et al., | Hon. Charles R. Norgle |
| Defendants. | |

**ORDER**

Defendant Hytera Communications Corporation Ltd.'s embedded motion to reconsider in its submission on the parties' disputes as to the court-ordered royalties [1315] is denied. The parties shall submit to the Court an order with the terms of Hytera's royalty obligations in the form as proposed by the parties [1309] and including terms consistent with this order as to the disputed issues by April 19, 2022 for the Court's review, approval, and entry.

**MEMORANDUM OPINION**

After denying Motorola's request for a permanent injunction, granting Motorola's alternative request for a reasonable royalty, and receiving substantial briefing on the royalty issue, the Court concluded that a perpetual royalty of $80.32 per radio and $378.16 per repeater is reasonable and appropriate on Hytera's sales of its products that incorporate Motorola's misappropriated trade secrets and infringed copyrights starting July 1, 2019. Dkt. 1289. The Court also ordered that the terms of Hytera's royalty obligation generally be consistent with the parties' long-standing DMR patent license agreement, with a few deviations based on circumstances specific to the royalty issues. Ibid. And the Court ordered the parties to jointly file "a proposed royalty agreement" consistent with the Court's rulings on the royalty issues for the Court's review and approval. Ibid.

MSA0525

After receiving a few extensions, the parties filed a joint submission, Dkt. 1308, as well as a proposal for the form of the order that will ultimately contain all details of the Court-ordered royalties, Dkt. 1309.[1] Despite the parties' efforts to meet and confer regarding the details of the royalties, the parties' joint submission notes disputes between the parties on dozens of items, including on definitions; the scope of Hytera's license; Hytera's confidentiality obligations; Hytera's payment and reporting obligations; record retention and auditing procedures; the term and any terminating events of Hytera's license; dispute resolution procedures; representations, warranties, and guarantees; change of control over Hytera; disclaimers; the form of notices; and appendices. The parties also filed separate submissions regarding the details of the royalties. Dkt. 1314, 1315, 1318. And Motorola filed a response to Hytera's submission. Dkt. 1330, 1331.

## I. Hytera's imbedded motion to reconsider the start date of its royalty obligation is denied.

Hytera's submission not only explains its position on the disputed details of the royalties, but also embeds a motion asking the Court reconsider or modify its December 14, 2021 order that set the beginning of Hytera's royalty obligation on July 1, 2019 and required Hytera's first royalty payment to include royalties due for its sales from July 1, 2019 through the relevant quarter. Hytera argues that the Court's ruling was made on a mistaken assumption that the parties reached an agreement on the issue, it is financially unable to make the lump sum payment that it estimates will be $45 million, and the intervening event of the U.S. Department of Justice partially unsealing a criminal indictment against it for acts arising out of the same events that led to this case justify reconsideration and modification.

---

[1] The Court acknowledges that what it previously characterized as "a proposed royalty agreement" is more properly characterized not as an agreement but as an order, as the parties have proposed. See Dkt. 1309.

2

Hytera suggests two modifications to the December 14 order's requirement that Hytera's first royalty payment include a lump sum for all sales from July 1, 2019 through the relevant quarter. Hytera first suggests that the Court modify the order so that Hytera's royalty obligation begins on the December 14, 2021 (the date of the royalty order) or, alternatively, no earlier than December 17, 2020 (the date of the Court's order denying Motorola's request for a permanent injunction). Second, Hytera asks that the Court permit any royalty payments for its past sales of relevant products to be made "over a period of time under a payment plan—a plan that can be worked out based on Hytera's financial information with the assistance of a magistrate judge or special master."

Setting aside Motorola's procedural objections regarding the timeliness of Hytera's motion under Rules 59(e) or 60(b), see Fed. R. Civ. P. 54(b) (any order that adjudicates fewer than all the claims or rights and liabilities of fewer than all the parties "may be revised at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities"), Hytera's motion fails on the merits. Motions to reconsider should not merely rehash previously rejected arguments or argue points that could have been made in the first instance. Ahmed v. Ashcroft, 388 F.3d 247, 249 (7th Cir. 2004. Rather, "'[m]otions for reconsideration serve a limited function: to correct manifest errors of law or fact or to present newly discovered evidence.'" Caisse Nationale de Credit Agricole v. CBI Indus., Inc., 90 F.3d 1264, 1269 (7th Cir. 1996) (quoting Keene Corp. v. Int'l Fidelity Ins. Co., 561 F. Supp. 656, 665 (N.D. Ill. 1982)). In other words, the Court has discretion to reconsider prior rulings where the Court "'has a conviction at once strong and reasonable that the earlier ruling was wrong, and if rescinding it would not cause undue harm to the party that had benefitted from it.'" HK Sys., Inc. v. Eaton Corp., 553 F.3d 1086, 1089 (7th Cir. 2009) (quoting Avitia v. Metro. Club of Chicago, Inc., 49 F.3d 1219, 1227 (7th Cir. 1995)).

3

MSA0527

Hytera's argument that the Court misapprehended that it agreed to make a lump sum payment into escrow itself misapprehends the Court's December 14, 2021 order. There is no dispute that the parties agreed that any royalty payments made by Hytera would be made into an escrow account pending the parties' exhaustion of all appellate proceedings, unless and until the Court orders otherwise. However, Hytera's position that it only agreed to make royalty payments on "future sales (starting from December 17, 2020)" does not justify reconsideration or modification of the December 14, 2021 order.

To begin, Hytera's characterization of its sales starting on December 17, 2020 as "future sales" makes no sense as the brief in which Hytera made that claim was filed months later, on February 17, 2021 such that even at the time Hytera made the claim, and no less at the time the Court entered the December 14, 2021 order, many sales on which Hytera agreed to pay royalties into escrow can only be considered to have been past sales. More importantly, Hytera's position that it agreed to pay royalties into escrow on sales starting December 17, 2020 is derivative of its argument that its royalty obligation started on December 17, 2020, the date that the Court denied Motorola's request for a permanent injunction. But the Court rejected Hytera's argument on that point and instead concluded that Hytera's royalty obligation began on July 1, 2019. Hytera's arguments in its motion to reconsider that the Court's ruling was wrong does nothing more than rehash its prior arguments, and do not convince the Court that its earlier ruling was wrong.

Next Hytera argues that it could not agree to a lump-sum payment of royalties for sales starting July 1, 2019 because it does not have sufficient liquid assets to make a payment it estimates will be $45 million. Motorola's response is largely unhelpful because it mostly argues that Hytera's position provides support for Motorola's motion to reconsider the Court's denial of its request for a permanent injunction. Nevertheless, Hytera's arguments regarding its financial ability to make

4

the initial royalty payment as required by the Court fail because its financial condition is by its own account not new.

"To support a motion for reconsideration based on newly discovered evidence, the moving party must 'show not only that this evidence was newly discovered or unknown to it until after the hearing, but also that it could not with reasonable diligence have discovered and produced such evidence [during the pendency of the motion].'" Caisse Nationale de Credit Agricole, 90 F.3d at 1269 (quoting Englehard Indus., Inc. v. Research Instrumental Corp., 324 F.2d 347, 352 (9th Cir. 1963)). However, by Hytera's own admission, Hytera's financial condition was known to it and its counsel when Hytera submitted its initial brief on the royalty issues in February 2021, yet Hytera made no argument that because of its financial condition its royalty obligation should begin later than July 1, 2019 or that any royalty obligation that began before December 17, 2020 should be paid over a period of time. In other words, Hytera's financial condition is not newly discovered evidence and Hytera could have raised those arguments in the first instance, but it did not.

Finally, Hytera suggests that other intervening events justify reconsideration and modification of its royalty obligations on its sales between July 1, 2019 and December 17, 2020. Specifically, Hytera argues that the criminal indictment that has been partially unsealed by the U.S. Department of Justice has put even more stress on its financial condition. But the Court concludes that Hytera's argument does not justify reconsideration or modification of the Court's December 14, 2021 order. As Hytera notes, "financial inability to pay" is generally a defense to a civil contempt motion for failure to comply with a court order directing payment. Dkt. 1315 at 29 n. 11 (citing In re Res. Tech. Corp., 624 F.3d 376, 387 (7th Cir. 2010)). The Court will cross that bridge only if and when it has to. For now, the Court's ruling that Hytera's royalty obligation starts

5

on July 1, 2019 and that Hytera's first royalty payment shall include royalties due for its sales from July 1, 2019 through the relevant quarter stands.

## II. The Court's rulings on the parties' disputed details of Hytera's court-ordered royalties.

Turning to the disputed details of the court-ordered royalties, though the parties generally agree to the form of the order and to several details, the parties have presented the Court with dozens of disagreements, which the Court will address in order.

### A. Definitions

The parties disagree about how three terms should be defined: "affiliate," "covered products," and "covered equipment transaction." On "affiliate," Motorola argues that the definition should exclude the now-bankrupt U.S.-based defendants in this case, Hytera America, Inc. and Hytera Communications America (West), Inc., as well as any entity owned or controlled by any governmental authority. According to Motorola, such entities should be excluded because the court-ordered license should not extend to the entities Hytera bankrupted to avoid paying the judgment in this case or to any entity controlled by the Chinese government, "which is a real risk with respect to entities in communist countries with a history of governmental takeover." Dkt. 1318 at 2. The Court rejects Motorola's arguments on this point.

As Hytera notes, the now-bankrupt U.S.-based defendants in this case were inarguably affiliates of the remaining China-based defendant and carving out those entities from the definition of affiliate would exclude sales on which Hytera China would otherwise owe royalties. And Motorola's argument that "affiliate" should exclude entities "owned or controlled by any governmental authority" is needlessly redundant because any entity owned or controlled by a government authority already falls outside of the definition that the parties have agreed to—"any legal entity, more than fifty percent (50%) of whose outstanding shares or securities representing

6

the right to vote for the election of directors or other managing authority are, or more than fifty percent (50%) if [sic] whose equity interest is now or hereafter, owned or controlled, directly or indirectly by that party (but only so long as such ownership or control or equity interest exists)." The Court adopts Hytera's position on the definition of "affiliate."

Next, the parties dispute the definition of "Covered Products." The Court previously ruled that Hytera's royalty obligation applies to the products that Motorola specifically identified in its submission. See Dkt. 1289 at 6 (identifying "Dkt. 1118-3 (Motorola's list of 'Accused Products')"). Hytera's position is that the definition of "Covered Products" should track the Court's ruling, whereas Motorola argues that the definition should reference an appendix and specify, "which for the avoidance of doubt, any product based in whole or in part, on or from or incorporating any of the Motorola Trade Secret Information or Motorola Copyrighted Works (or any portion thereof) in any manner whatsoever, as defined in Appendix A to this Agreement."

Hytera objects to Motorola's additions because Motorola's proposed appendix is meaningfully different from Motorola's list of "Accused Products" from its previous submissions on the royalty issue and because Motorola's proposal and its proposed appendix are an improper attempt to prejudge new Hytera products that have not been adjudicated to incorporate Motorola's trade secrets or copyrights. Motorola, on the other hand, claims that Hytera's proposed definition is too limited because it would enable Hytera to flout its royalty obligations by relabeling or renumbering its products. But Hytera makes no argument that it can avoid its royalty obligations by relabeling or renumbering its products. Indeed, the royalty applies to the products specifically identified by Motorola. Motorola identified those products by product number, but Hytera cannot avoid its royalty obligations merely by renumbering its products: if a renumbered product is identical to a product for which Hytera owes royalties, Hytera owes royalties all the same.

7

Motorola also argues that Hytera's new "H-Series" products should be included because "Hytera has produced no evidence that those products do not use Motorola's trade secrets and copyrights, and there is no reason to believe that it did." Dkt. 1318 at 3. That argument fails. The Court ordered that Hytera owes royalties on the Hytera products Motorola identified as having been adjudicated in this case to incorporate Motorola's trade secrets and copyrights. Motorola makes no argument that Hytera's H-Series products have been adjudicated as incorporating Motorola's trade secrets or copyrights, and Motorola's attempt to shift the burden to Hytera to disprove that its products that have not been adjudicated in this case incorporate Motorola's trade secrets or copyrights is improper. The Court adopts Hytera's position on the definition of "Covered Products."

The last of the parties' disputes on definitions is "Covered Equipment Transaction." Motorola proposes to add a clause to the definition to which the parties otherwise agree. Specifically, Motorola proposes to exclude from the definition of "Covered Equipment Transaction" any transaction that is "out of compliance with any U.S. law, including, for the avoidance of doubt, U.S. laws and regulations relating to economic sanctions and export controls (any of the foregoing instances of non-compliance, 'U.S. Law Non-Compliance')." Motorola argues that clarification is necessary because Hytera's royalty obligations as ordered by the Court imply that Motorola is obligated to provide a license to Hytera for use of its trade secrets and copyrights and, therefore, must transact business and otherwise deal with Hytera. Motorola continues that if, for example, the U.S. government designates Hytera as a "Specially Designated National," Motorola would be prohibited from all transactions and dealings with Hytera. Motorola's proposal, therefore, would preserve Motorola's ability to comply with U.S. law concerning economic sanctions and export controls.

8

MSA0532

Hytera, on the other hand, claims that Motorola's proposal would grant Motorola authority and discretion to decide whether Hytera has violated U.S. law and, therefore, is acting outside the scope of its license. But the Court disagrees with Hytera's characterization and, rather, agrees with Motorola's concern with ensuring its ability to comply with U.S. laws governing economic sanctions and export controls. The Court therefore adopts Motorola's position on the definition of "Covered Equipment Transaction."

## B. Scope of License

The parties next dispute a variety of details regarding the scope of Hytera's license of Motorola's trade secrets and copyrights for which the Court has ordered Hytera to pay royalties. On the first item, section 2.1 of the parties proposed order, Hytera challenges Motorola's proposal to reference its proposed appendix of the Hytera products on which it owes royalties. For the reasons explained above, the Court agrees with Hytera.

The parties also dispute whether it should be phrased in the active or passive voice. Specifically, Motorola proposes that it should be phrased in the active voice ("Motorola grants Hytera and its Affiliates a limited, non-transferable, non-exclusive, non-sublicensable, royalty-bearing, compulsory license . . .") whereas Hytera's proposal is more passive ("Hytera and its Affiliates shall have a limited, non-transferable, non-exclusive, non-sublicensable, royalty-bearing, license . . ."). Because, as the Court acknowledged in footnote 1, above, that the form of Hytera's royalty obligation is more properly characterized as an order, rather than an agreement, the Court agrees with Hytera.

Relatedly, Hytera disputes Motorola's characterization of the license as "compulsory" because every part of the license and Hytera's royalty obligations are compulsory. Motorola does not address this issue, but nevertheless, the Court agrees with Hytera on this point too. As the

9

Court has acknowledged, its prior order requiring the parties to submit a proposed royalty agreement was a misnomer because the parties are not entering this royalty arrangement out of an agreement, but because of the Court's order.

Hytera also disputes Motorola's proposal to condition the license not just on payment of the required royalties, but on "complete and satisfactory" payment. Hytera claims that its proposal, conditioning the license on payment of the required royalties adequately protects Motorola's interests and Motorola's proposal to condition the license on "complete and satisfactory" payment merely invites disagreement. Motorola, on the other hand, claims that without its proposed "complete and satisfactory" language, Hytera could circumvent its royalty obligations and yet retain its license for Motorola's trade secrets and copyrights by merely making a single payment. But Motorola's position is belied by Hytera's continuing obligation to make royalty payments. If Hytera fails to make a royalty payment when one is due, the dispute resolution procedures are triggered, and the parties may ultimately involve the Court to compel compliance with Hytera's royalty obligation. In sum, the Court adopts Hytera's proposal for paragraph 2.1.

On paragraph 2.2, the parties dispute whether the scope of Hytera's license of Motorola's trade secrets and copyrights should be defined by reference to Hytera's proposed appendix. For the same reasons as explained above, the Court concludes that it should not. Rather, the Court adopts Hytera's position on paragraph 2.2.

Last on the scope of Hytera's license is Motorola's proposal to include a paragraph specifying that the scope of Hytera's license does not and should not be construed to immunize, establish a defense to, or otherwise protect Hytera from criminal liability for its possession, use, or transfer of Motorola's trade secrets or copyrights. Hytera objects to including this paragraph because the impact of the Court's imposition of royalty obligations on Hytera on any criminal

10

MSA0534

proceeding is the providence of the court exercising jurisdiction over that criminal proceeding. Motorola argues that the Court's imposition of royalty obligations on Hytera should be clear that Hytera's continued use of Motorola's trade secrets and copyrights is not with Motorola's permission or agreement, but by order of the Court. For the reasons expressed above, the Court agrees that Hytera's royalty obligation is a result of the Court's order and not by any agreement of the parties. Nevertheless, the Court agrees with Hytera that Motorola's proposal to disclaim any immunity, defense to, or protection from criminal liability as a result of Hytera's court-ordered royalty obligation is unnecessary.

## C. Confidentiality Obligations

On the first paragraph concerning Hytera's confidentiality obligations as to Motorola's trade secrets and copyrights, the parties dispute how best to extend Hytera's confidentiality obligations to its affiliates. Hytera proposes requiring affiliates that engage in covered transactions to execute a document, in a form substantially identical to a template that Hytera proposes be included in an appendix, that reflects the affiliate's agreement to be bound by the confidentiality obligations.

Motorola claims that Hytera's proposal is unnecessary because all Hytera affiliates are or should be bound by the Court's order. But the Court agrees with Hytera, particularly because the Court has previously ruled that only Hytera is bound by the royalty obligation, even though the obligation extends to sales of covered products by affiliated entities. Additionally, as Hytera notes, Motorola's proposal invites the Court to assert jurisdiction over entities not before it and requires Hytera to guarantee compliance by entities it does not necessarily control. The Court concludes that Hytera's proposal provides a better framework for extending its confidentiality obligations to

11

MSA0535

its affiliates. Therefore, the Court adopts Hytera's position on paragraph 3.1, including Hytera's proposed appendix.

Though not a part of the Court's prior orders, Hytera has agreed to include a provision requiring it to notify Motorola if it becomes aware of any breach of its confidentiality obligations. The first dispute is whether this provision should explicitly apply to Hytera's affiliates or just to Hytera. For the same reason as above, Hytera argues that this provision should apply only to it and should not impose any obligation directly on any affiliate whereas Motorola argues that this obligation should be imposed on Hytera as well as its affiliates. The Court agrees with Hytera on this point because, again, the Court's order acts directly only as to Hytera. Though Motorola claims that Hytera's position on this point will absolve Hytera of any obligation to notify Motorola of breaches of its affiliates' confidentiality obligations (extended by the affiliate's written agreement), in the Court's view, under Hytera's proposal, Hytera is obligated to notify Motorola of any confidentiality breach that it becomes aware of, whether by itself or its affiliates (who must agree in writing to abide by the confidentiality obligations).

Next, though Hytera agrees to assist Motorola with action requested by Motorola in connection with any confidentiality breach, Hytera seeks to limit that agreement only to "reasonable" actions requested by Motorola whereas Motorola seeks to bind Hytera to assisting with any action requested by Motorola. Similarly, Hytera seeks to condition its assistance obligation "to the extent allowed under applicable law," which Hytera claims is particularly important because it is a Chinese entity subject to Chinese laws. On each of these issues, Motorola claims that Hytera's positions are insufficient to protect its interests. But considering that Hytera's agreement to this provision is gratis, the Court agrees with and adopts Hytera's position on paragraph 3.2.

12

MSA0536

## D. Payment and Reporting

The parties dispute numerous details regarding Hytera's payment and reporting obligations. First, as to Hytera's sales of covered products from July 1, 2019 and December 31, 2021, Hytera suggests that its payment obligation "shall be determined by the Court following subsequent submissions by the Parties. Motorola, on the other hand, proposes that Hytera "shall pay no less than $50 million into the escrow account . . . by March 31, 2022." The Court rejects both parties' proposals. The Court previously ruled that Hytera's first royalty payment "shall include royalties due for its sales from July 1, 2019 through the relevant quarter." Dkt. 1289. The Court has rejected Hytera's motion to reconsider the start date of its royalty obligation embedded in its submission currently before the Court. And Hytera's submission does not otherwise justify why royalty payments for its sales of covered products from July 1, 2019 to December 31, 2021 must first be determined by the Court after yet more submissions.

Motorola's proposal is equally unsupported. To be sure, Hytera estimates that its first royalty payment due for its sales of covered products from July 1, 2019 to the end of the first relevant quarter will exceed $65 million. But Motorola's suggestion that Hytera be required to pay $50 million for its sales of covered products between July 1, 2019 and December 31, 2021 is unsupported by any argument or evidence. Rather, the Court reiterates its previous ruling: Hytera's first royalty payment shall include royalties due for sales of covered products for its sales from July 1, 2019 through the end of the relevant quarter in the same manner that Hytera's royalty payments are to be made going forward for each quarter. To avoid any confusion, the Court will clarify the parties' responsibilities regarding Hytera's first royalty payment below, after addressing the parties' remaining disputes on payment and reporting.

13

MSA0537

The parties agree that going forward that on January 21, April 20, July 21, and October 21 of each year, Hytera shall provide Motorola by email or fax a certified written report of its sales of covered products for the preceding three-month period. The parties dispute the format of the report to be included as an appendix. Hytera's proposal merely includes line items for the total number of covered repeaters sold, the total number of covered terminals sold, the total royalty owed for the covered repeaters sold, the total royalty owed for the covered terminals sold, and the total royalty payment due. Motorola's proposed format, by contrast, would require Hytera to report sales by country and to include line items for the selling entity (Hytera or an affiliate), the identity of third-party customers (if as an OEM), and the product branding (Hytera, affiliate, or third-party). Motorola claims those additional line items are necessary to provide transparency, to reduce disputes, and to protect against non-compliance. Hytera opposes that more detailed reporting as inconsistent with the parties' DMR patent license, but the Court is unpersuaded because, as Motorola notes, Hytera's royalty obligation and its coordinate license to use Motorola's technology differs in significant respects from the parties' DMR patent license. Accordingly, the Court adopts Motorola's proposed reporting format, to be included as an appendix to the final order on Hytera's royalty obligation.

Next, Hytera proposes that on receipt of quarterly reports, Motorola shall deliver an invoice for payment of the royalties due by email or fax to Hytera. Motorola disputes the inclusion of that provision because it imposes an unnecessary burden. The Court agrees. The reports due will reveal the royalties that Hytera owes, and the Court concludes that there is no reason to require Motorola to provide an invoice for amounts revealed by Hytera's quarterly reports. The parties agree that Hytera's quarterly royalty payments will be due on January 31, April 30, July 31, and October 31 for the preceding three-month period each year. However, for the same reason that the Court has

14

rejected Hytera's proposal that Motorola be required to deliver an invoice to Hytera, the Court rejects Hytera's proposal that its quarterly royalty payments shall be due within 30 days after receipt of an invoice from Motorola. Rather, Hytera's quarterly royalty payments shall be due on January 31, April 30, July 31, and October 31 for the preceding three-months of each year.

As the Court noted in its prior royalty ruling, the parties agree that Hytera's royalty payments shall be made into an escrow account pending the parties' exhaustion of all appellate proceedings, unless and until the Court orders otherwise. Dkt. 1289. But the parties dispute when and how the escrowed funds may be transferred. Hytera suggests that the escrowed funds may be transferred "only upon order of this Court." Motorola proposes that the escrowed funds shall be transferred within seven days of the Seventh Circuit's mandate issuing from any appeal from the judgment in this matter or, if no appeal is taken, within seven days of the expiration of time for initiating such appeal.

The Court's prior order did not address disposition of the escrowed funds, just the parties' agreement that Hytera's royalty payments shall be made into an escrow account pending the parties' exhaustion of all appellate proceedings, unless and until the Court orders otherwise. Motorola expresses concern that Hytera's proposal will require additional Court intervention, the burdens of which the Court is fully aware based on the high stakes of this case and the incredibly high volume of docket entries that it has generated. But the Court concludes that Hytera's proposal to require an order of the Court to transfer Hytera's royalty payments out of the escrow account is appropriate nonetheless.

The parties next dispute how Hytera's royalty payments may affect any other obligations to Motorola that Hytera has or may incur regarding the covered products. Hytera proposes that any overlapping remedies shall be set-off to the fullest extent allowed by law and under no

15

MSA0539

circumstances shall it be required to pay more than one royalty fee on any sale of a covered product or shall Motorola be entitled to a double recovery. Motorola, on the other hand, takes the opposite position, that Hytera's royalty payments may not be set-off or reduced by any payments that Hytera makes under any separate obligation, unless or until Hytera has paid the full amount of the judgment in this case, including interest and attorney fees.

The Court rejects both parties' proposals and rejects the inclusion of any reference to other obligations to Motorola that Hytera has or may incur regarding the products covered by the royalty. The extent to which Hytera's royalty payments may offset any other obligation Hytera has or may incur is a decision to be made in an appropriate forum that likely will not be this Court. And the extent to which Hytera is entitled to offset its royalty obligations as a result of other payments made is purely speculative at this point such that the Court will decide the issue when it arises. But there will be no provision in the Court's final royalty order that addresses setoffs or reduction in Hytera's royalty payments.

Last, Motorola proposes a paragraph that acknowledges "for the avoidance of doubt" that Hytera's royalty obligations resulting from this case are exclusive of any royalties Hytera owes under any other agreement, particularly the parties' standard essential DMR patent license agreement. While the Court is mindful of Motorola's assertion that Hytera has paid no royalties under the parties' DMR patent license for years, and the Court agrees that Hytera's royalty obligation from this case and its obligations under the DMR patent license are separate and distinct, the Court ultimately agrees with Hytera that there is no reason to include that provision.

With those disputes resolved, the Court turns back to Hytera's first royalty payment. While the parties draw a dividing line for Hytera's royalty obligations on January 1, 2022, that dividing line is inconsistent with the Court's prior order. Rather, the Court's prior order in no uncertain

16

MSA0540

terms required Hytera's first royalty payment to be made after the first relevant quarter and to include royalties owed for sales of covered products starting July 1, 2019.

The Court orders that Hytera's first royalty payment will include all sales of covered products through the end of the second quarter of 2022. Thus, consistent with the other terms as resolved by the Court, above, Hytera shall provide to Motorola by email or fax reports of all sales of covered products from July 1, 2019 through June 30, 2022 by July 21, 2022. And Hytera's first royalty payment for the amounts reflected in those reports shall be made into the escrow account by July 31, 2022. Thereafter, Hytera shall provide quarterly reports (on each subsequent January 21, April 20, July 21, and October 21) and payments for the sales reflected in those reports (on each subsequent January 31, April 30, July 31, and October 31) into the parties' agreed escrow account (pending exhaustion of all appellate proceedings, unless and until the Court orders otherwise) or, on or after entry of a final, non-appealable judgment in this case, by wire transfer to Motorola.

### E. Records and Audit Rights

The parties' dispute about whether the final royalty order ought to apply only to Hytera or also to its affiliates resurfaces on Hytera's record-keeping obligations. Hytera proposes that the order should apply only to it, with a concession that Hytera require affiliates that sell covered products to execute an agreement to comply with the Hytera's record-keeping obligations (on the same form that the Court approved, above, for extending Hytera's confidentiality obligations to its affiliates). Motorola again maintains that the order should directly apply to Hytera's affiliates, arguing that ordering Hytera to require its affiliates to execute a separate agreement unnecessarily adds administrative complexity that will prime Hytera with arguments to evade compliance. As on the dispute regarding Hytera's confidentiality obligations, the Court sides with Hytera. Hytera's

MSA0541

position indeed adds some administrative complexity to the process. But it avoids significant concerns about the Court's jurisdiction over Hytera's affiliates that are not parties to this case while achieving the practical result of binding Hytera affiliates to the terms of the order.

The parties also dispute some details about Motorola's rights to examine and audit Hytera's records of covered product sales. Hytera suggests that Motorola's rights should be qualified "subject to any requirement or permission or approval under any applicable laws and regulations of P.R. China (e.g. National Security Law, Data Security Law, etc.)." Motorola, by contrast, proposes:

> Prior to the commencement of any audit, Hytera shall assemble in a single location in the United States Hytera's and its Affiliates' necessary books and records for such audit, and shall make available such personnel as are reasonably necessary to interpret and explain such books and records to Motorola Solutions, provided however, for the avoidance of doubt, such location of records in the United States does not limit Motorola Solutions' audit right to only that location. Neither Hytera nor any of its Affiliates will assert that any law or regulation of any jurisdiction around the world prevents compliance with this Section 4. Any discrepancies in any audit will be resolved in favor of Motorola Solutions.

Hytera's proposal provides a vague and blanket carve out to its obligation to produce records regarding its and its affiliates' sales of covered products that could be abused. But Motorola's position is merely the inverse of Hytera's, giving short shrift to Hytera's legitimate concerns about facing criminal or civil liability under Chinese law.

Previously, on Hytera's motion Motorola's citation to discover assets in Motorola's ongoing supplementary collection proceedings in this case, Motorola expressed willingness to accommodate Hytera's request for a protocol to alleviate Hytera's concern about its exposure to criminal and civil liability in China related to producing information and documents to Motorola in this case. The Court accepted Motorola's representations, ordering the parties to confer and

18

MSA0542

submit an agreed protocol order. Dkt. 1172 at 20. The Court's review of the docket reveals that no such agreed protocol order was submitted to or entered by the Court.

But the Court's order that the parties confer regarding an agreed protocol order was not unprecedented in this case. Rather, the Court noted that during discovery on the merits of this case, the parties agreed to a protocol for Hytera to review its responsive documents for Chinese state secrets, memorialized in an agreed order entered by the Magistrate Judge supervising discovery. See Dkt. 352 at ¶ 5. The bottom-line of the agreement, however, was that disputes that were not resolved by the parties could be brought to the Court. Id. at ¶ 5(iv), (v).

The Court concludes that the parties' previous agreed protocol during discovery on the merits of this case is an appropriate method to resolve the parties' dispute on Motorola's examination and audit rights in the context of the Court's royalty order. As the Court noted in its order denying Hytera's motion to quash, Hytera recognized that principles of international comity do not automatically render Hytera's obligations to produce documents and information as ordered by this Court invalid by the mere existence of Chinese "blocking statutes." See Societe Nationale Industrielle Aerospatiale v. U.S. Dist. Ct. for S. Dist. of Iowa, 482 U.S. 522, 544 (1987). But just as the parties' agreed to a protocol during discovery, the Court concludes that the final royalty order will include a protocol in the same form for resolution of disputes related to Hytera's production of records to Motorola's designated "internationally recognized accounting firm," through which Motorola will conduct any royalty audits, with any disputes that are not resolved by the parties to be brought before the Court by motion.

**F. Term and Termination**

As to the term of Hytera's royalty obligation and license of Motorola's trade secrets and copyrights, Hytera proposes simply that it "remain in effect unless and until terminated or modified

19

MSA0543

by the Court." Motorola, on the other hand, seeks to qualify that by identifying a variety of "terminating events." The terminating events Motorola proposes include: non-compliance with U.S. laws, specifically "as determined in Motorola's business judgment;" a written notice of termination by Motorola to Hytera after Hytera's violation of the royalty order and failure to cure the violation within 30 days after receipt of the notice, after which "Hytera and its Affiliates shall be thereafter enjoined from any further use of the Covered Products anywhere in the world;" a final non-appealable judgment in this case that Hytera is not liable for trade secret misappropriation or copyright infringement, only to the extent Hytera is held not liable; immediately as to Hytera affiliates that cease to be Hytera affiliates; and designation of Hytera, its affiliates, or any entity that owns or controls Hytera on a restricted party list issued under U.S. economic sanctions or export control laws and regulations.

Hytera objects to the inclusion of any of those terminating events, and the Court rejects them. As the Court has clarified, Hytera's royalty obligation is court-ordered, and Motorola may not retain unilateral authority to terminate it for Hytera's non-compliance with U.S. laws "as determined in Motorola's business judgment." Similarly, if Hytera violates the Court's royalty order, Motorola may seek to enforce the order, but it, again, may not retain unilateral authority to terminate it and to convert it into a permanent injunction. Motorola's proposal that a final non-appealable judgment that Hytera is not liable will terminate Hytera's royalty obligation to the extent Hytera is not liable is unnecessary and will surely be a part of any such judgment.

As the Court has repeatedly stressed, the Court's royalty order applies to Hytera, which is responsible for making any payments due for sales made by its affiliates and the Court's order does not apply directly to Hytera's affiliates. And the Court's adoption of Motorola's proposal for the definition of "Covered Equipment Transaction," above, alleviates Motorola's concern with

20

MSA0544

ensuring its ability to comply with any economic sanctions or export controls imposed under U.S. laws and regulations. Accordingly, the Court rejects Motorola's position and adopts Hytera's position on these issues.

## G. Dispute Resolution

On dispute resolution, Hytera does not dispute that the Court should retain jurisdiction to enforce, modify, or terminate its orders, but that it is unnecessary to explicitly state as much. The Court agrees with Hytera on that point. Hytera also objects to Motorola's proposal to include a choice-of-law provision under which disputes would be governed by Delaware law "without reference to its conflicts of laws rules." Motorola argues that "Delaware is a common international standard to govern commercial contracts, and forecloses Hytera from arguing that this agreement is the subject of some other law and potentially argue that law allows Hytera to fail to comply with the license." The Court perceives that Motorola's position on that point is based on the Court's mis-designation of Hytera's final royalty obligations as being in the form of an agreement, rather than an order. In any event, and in light of the Court's clarification that the form of Hytera's final royalty obligations will be in the form of an order and not an agreement between the parties, the Court agrees with Hytera that it is inappropriate to designate Delaware law as controlling the construction, validity, interpretation, and performance of the Court's order.

## H. Representations and Warranties; Guarantee

Motorola proposes including several representations, warranties, and guarantees, to all of which Hytera objects. Again, the Court perceives Motorola's position to be the understandable result of the Court's prior mis-designation of Hytera's final royalty obligations to be in the form of an agreement rather than an order. Having clarified that the form of Hytera's royalty obligations

21

MSA0545

will be in the form of an order and not an agreement, the Court agrees with Hytera and rejects Motorola's proposals to include representations, warranties, and guarantees.

## I. Change of Control

Hytera acknowledges limits on its ability to transfer or assign its rights and privileges to sell the covered products (in exchange for royalty payments to Motorola) proposing that they "may be assigned or transferred by either party only with the prior written consent of the other party, or with approval by the Court, and in all cases subject to the approval of any governmental authority as then may be required." Hytera qualifies that proposal by suggesting a provision that "in the event that Hytera subsequently comes under the ownership or control of another entity active in a material way in the field of land-mobile radio communications, all licenses granted herein shall thereafter be exercisable only in a manner that does not extend to the operations of the new controlling entity."

Motorola's proposes different language, but the bottom line of Motorola's position is largely consistent with Hytera's. First, Motorola suggests that the rights and obligations under the royalty order "shall not be assigned . . . in whole or in part by Hytera without the prior written consent of Motorola." And Motorola agrees with Hytera that Hytera's rights "shall not extend to any acquirer entity." But Motorola proposes that Hytera be required to provide written notice to Motorola within fifteen days of any change of control "or in any event as early as applicable laws allow." Motorola also suggests including definitions of "Change of Control" and "Control." But the Court concludes none of Motorola's additional requests are necessary or appropriate. Additionally, the Court adopts Hytera's proposals on these details because they are consistent with the Court's clarification that Hytera's ultimate royalty obligations will be in the form of an order that applies directly to Hytera.

22

## J. Disclaimer

Motorola proposes the following disclaimer, to which Hytera objects:

EXCEPT AS OTHERWISE EXPRESSLY SET FORTH HEREIN, MOTOROLA DOES NOT MAKE ANY REPRESENTATIONS OR WARRANTIES OF ANY KIND, EXPRESS OR IMPLIED, STATUTORY OR OTHERWISE, CONCERNING THE SUBJECT MATTER OF THIS AGREEMENT OR THE INTELLECTUAL PROPERTY LICENSED TO HYTERA HEREUNDER. EXCEPT AS EXPRESSLY SET FORTH HEREIN, MOTOROLA EXPRESSLY DISCLAIMS ON BEHALF OF ITSELF AND ITS AFFILIATES ANY AND ALL WARRANTIES OF ANY KIND, EXPRESS OR IMPLIED, INCLUDING ANY WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, OR NON-INFRINGEMENT OF THIRD PARTY INTELLECTUAL PROPERTY RIGHTS.

The Court agrees with Hytera that this disclaimer is unnecessary, based on the Court's clarification that Hytera's final royalty obligations will be in the form of an order and not an agreement between the parties.

## K. Form of Notices

The parties agree that the order should include a provision as to the form of notices that "Except as otherwise specifically provided herein, all notices required or permitted hereunder shall be delivered to counsel of record in the above-captioned matter." Hytera, however, disputes Motorola's proposal that "The date of receipt of such a notice shall be the date for the commencement of the running of the period provided for in such notice, or the date at which such notice takes effect, as the case may be." But in its separate submission, Hytera does not explain why it objects to that proposal. Motorola's separate submission acknowledges the dispute, but does not explain it beyond noting that it "should be non-controversial" because it "simply specifies how and to whom notice should be provided." The Court agrees with Motorola and adopts its proposed language concerning the effective date of notices.

23

* * *

As explained above, the Court denies Hytera's motion to reconsider embedded in its separate submission. The parties shall submit to the Court a final royalty order consistent with the Court's guidance as to the disputed details by April 19, 2022 for the Court's review, approval, and entry.

IT IS SO ORDERED.

ENTER:

CHARLES RONALD NORGLE, Judge
United States District Court

DATE: April 12, 2022

24

MSA0548

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

MOTOROLA SOLUTIONS, INC., and
MOTOROLA SOLUTIONS MALAYSIA
SDN. BHD.,

        Plaintiffs,

        v.

HYTERA COMMUNICATIONS
CORPORATION LTD.,
HYTERA AMERICA, INC., AND
HYTERA COMMUNICATIONS
AMERICA (WEST), INC.,

        Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Civil Action No.: 1:17-cv-01973

Honorable Charles R. Norgle Sr.

## MOTOROLA'S MOTION THAT HYTERA BE HELD IN CONTEMPT FOR VIOLATING COURT ORDERS AND REQUEST FOR HEARING

Plaintiffs Motorola Solutions, Inc., and Motorola Solutions Malaysia SDN. BHD. ("Motorola") respectfully request that the Court find Hytera in contempt of the Court's July 5, 2022 Royalty Order (Dkt. 1349) and the Court's Citation Order (Dkt. 1005; Dkt. 1021-2 at 7-8; Dkt. 1172 at 18; Dkt. 1348 at 3).

First, under the Royalty Order, Hytera was required to make a payment (based on Hytera's DMR radio sales from July 1, 2019 to June 30, 2022) into an escrow account by July 31, 2022. Dkt. 1349 at 4 (Section 5.3 requiring that "[p]ayments shall be due for the amounts reflected in these quarterly reports on each subsequent January 31, April 30, July 31, and October 31, and made into the Parties' agreed escrow account . . ."). Hytera made no such payment and has confirmed it has no intention to do so. Second, as presented in the accompanying memorandum, Hytera unabashedly violated the Citation Order by various actions relating to the disposition of assets.

Unless Hytera is held in contempt and subjected to harsh contempt sanctions, there is no doubt that Hytera will continue to make a mockery of these legal proceedings by continuing to simply decide not to comply with this Court's orders whenever it chooses. Because Hytera's failure to pay the ongoing royalty violated the Court's Royalty Order, and Hytera has violated the Court's Citation Order, Hytera should be held in contempt and (1) enjoined from selling any two-way radio equipment worldwide, regardless of whether it is subject to the Royalty Order, unless and until all of Hytera's past due royalties are fully paid into escrow; (2) ordered to pay an additional penalty of 100% of the past-due royalties, per the terms Hytera agreed to (Dkt. 1349 at 6.3.4.); and (3) should have its assets in the United States sequestered and seized, including Hytera US Inc. (HUSI). Motorola also respectfully requests an opportunity to be heard on these issues at a hearing.

DATED: August 3, 2022

Respectfully submitted,

/s/ Adam Alper

Adam Alper (*admitted pro hac vice*)
adam.alper@kirkland.com
Akshay S. Deoras (*admitted pro hac vice)*
akshay.deoras@kirkland.com
Brandon H. Brown (IL Bar No. 266347 CA)
brandon.brown@kirkland.com
Barbara Barath (*admitted pro hac vice*)
barbara.barath@kirkland.com
Reza Dokhanchy (*admitted pro hac vice*)
reza.dokhanchy@kirkland.com
KIRKLAND & ELLIS LLP
555 California Street
San Francisco, CA 94104
Telephone: (415) 439-1400
Facsimile: (415) 439-1500

Michael W. De Vries (*admitted pro hac vice*)
michael.devries@kirkland.com
Christopher Lawless (*admitted pro hac vice*)
christopher.lawless@kirkland.com

2

MSA0550

Justin Singh (*admitted pro hac vice*)
justin.singh@kirkland.com
Ali-Reza Boloori (*admitted pro hac vice)*
ali-reza.boloori@kirkland.com
Benjamin A. Herbert *(admitted pro hac vice)*
benjamin.herbert@kirkland.com
KIRKLAND & ELLIS LLP
555 South Flower Street
Los Angeles, CA 90071
Telephone: (213) 680-8400
Facsimile: (213) 680-8500

David Rokach (IL SBN: 6279703)
david.rokach@kirkland.com
Megan M. New (IL SBN 6300422)
megan.new@kirkland.com
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, IL 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200

Leslie M. Schmidt (*admitted pro hac vice*)
leslie.schmidt@kirkland.com
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900

Attorneys for Plaintiffs
*Motorola Solutions, Inc. and Motorola
Solutions Malaysia SDN. BHD.*

MSA0551

## CERTIFICATE OF SERVICE

I, Adam Alper, an attorney, hereby certify that on August 3, 2022, I caused a true and correct copy of the foregoing document to be served via the Court's ECF system upon all counsel of record.

DATED: August 3, 2022

/s/ Adam Alper
Adam Alper

MSA0552

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| MOTOROLA SOLUTIONS, INC. | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | No.  1:17-cv-01972 |
| **v.** | ) | |
| | ) | **District Judge Franklin U. Valderrama** |
| HYTERA COMMUNICATIONS | ) | |
| CORPORATION LTD., | ) | **Magistrate Judge Jeffrey I. Cummings** |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Motorola Solutions, Inc., has filed a motion seeking leave to amend its final infringement contentions and to compel defendants – Hytera Communications Corporation Ltd. and Hytera America (collectively "Hytera") – to supplement their responses to various discovery requests with information regarding Hytera products that were released in October 2021.[1]  (Dckt. #254).  Hytera filed a response, arguing that Motorola failed to show good cause to amend its final infringement contentions and that the discovery sought by Motorola is irrelevant because it relates to products that are not accused in this matter.  (Dckt. #263).  For the reasons that follow, the Court grants Motorola leave to amend its final infringement contentions and finds that Hytera must amend its discovery responses accordingly.

## I.    BACKGROUND

Motorola filed this lawsuit in 2017 alleging that Hytera had infringed on seven patents (namely, patents '284, '169, '869, '701, '991, '972, and '111) that are related to digital, two-way

---

[1] Pursuant to the parties' stipulation of voluntary dismissal with prejudice, all claims against defendant Hytera Communications America (West), Inc., were dismissed on July 21, 2022.  (Dckt. #269).

MSA0553

radio technologies. (Dckt. #1). Hytera subsequently brought a counterclaim against Motorola, seeking declarations of invalidity and noninfringement. (Dckt. #105).

Motorola served its final infringement contentions on August 5, 2020. These contentions included the redesigned "i-Series" DMR radios, which Hytera had released in 2019. (Dckt. #254 at 4). On or around October 29, 2021, Hytera announced the launch of yet another line of DMR radios: the "H-Series." (*Id.*). Thirteen days later, during a meet and confer, Motorola informed Hytera that it would seek additional discovery related to the H-Series products. (Dckt. #254 at 4; Dckt. #263 at 5). On November 16, 2021, Motorola sent Hytera a letter doing just that. (Dckt. #263-2). In particular, Motorola asked that Hytera supplement its document production, source code production, and interrogatory responses to include information regarding the H-Series radios, as well as provide a witness to testify at a deposition about technical details, marketing, and financial data related to the H-Series. (Dckt. #246). On November 19, 2021, Hytera informed Motorola that it would not provide the requested information because the H-Series products had not been accused of infringement. (Dckt. #263 at 5).

The parties were unable to come to an agreement and, on November 23, 2021, they submitted a joint status report outlining their positions on discovery related to the H-Series. (Dckt. #246). On January 3, 2022, the Court ordered Hytera "to provide limited discovery" stipulating: (1) whether the H-Series products include any of the accused features, and (2) whether the H-Series is intended for sale in the United States. (Dckt. #247). Following this disclosure, the parties were to meet and confer to "determine whether any further discovery related to the H-Series radios [was] appropriate." (*Id.*). The Court also set a fact discovery deadline of February 18, 2022. (*Id.*).

MSA0554

Pursuant to the Court's order, Hytera supplemented its response to Motorola's Interrogatory No. 11 on January 18, 2022.  Hytera disclosed that the H-Series included four two-way radios, a mobile radio, and a DMR repeater, which a third-party had begun importing into the United States.  (Dckt. #250 at 3).  Hytera further stipulated that the H-Series products had the "same functionality as the i-Series" with respect to the accused features related to the '284 and '169 patents.  (*Id.*).

On February 17, 2022, Motorola sent Hytera a letter asking that Hytera: (1) confirm whether its statement that the H-Series incorporated "the same functionality as the i-Series" meant that the products use the same source code as the i-Series for the accused features; and (2) disclose whether it would raise any new or different non-infringement defenses for the H-Series. (Dckt. #250-1).  Fact discovery closed the next day.  On February 22, 2022, Hytera responded that it would not answer the two questions posed by Motorola, as the questions were "procedurally out of time and substantively inappropriate." (Dckt. #250-2).  During a subsequent meet and confer on March 3, 2022, Hytera confirmed that it would oppose Motorola's request for leave to supplement its infringement contentions and that it would not provide any discovery related to the H-Series absent a Court order.  (Dckt. #254).  Motorola filed the instant motion on March 14, 2022.

## II.    LEGAL STANDARD

The Northern District of Illinois has adopted local patent rules designed "to prevent a 'shifting sands' approach to claim construction by forcing the parties to 'crystallize their theories of the case early in litigation.'" *Beckman Coulter, Inc. v. Sysmex Am., Inc.*, No. 18-cv-6563, 2019 WL 1875356, at *2 (N.D.Ill. Apr. 26, 2019); *Nordstrom Consulting, Inc. v. Innova Sys., Inc.*, No. 18-cv-3011, 2022 WL 16744177, at *2 (N.D.Ill. Nov. 4, 2022).  Motions to amend final

MSA0555

infringement contentions are governed by Local Patent Rule 3.4, which provides that a party may amend its final infringement contentions "only by order of the Court upon a showing of good cause and absence of unfair prejudice to opposing parties, made promptly upon discovery of the basis for the amendment."  LPR 3.4; *Oleksy v. Gen. Elec. Co.*, No. 06 C 1245, 2013 WL 3944174, at *2 (N.D.Ill. Jul. 31, 2013).  The party seeking to amend its infringement contentions bears the burden of establishing good cause and lack of unfair prejudice.  *Thermapure, Inc. v. Giertsen Co. of Illinois*, No. 10 C 4724, 2012 WL 6196912, at *1 (N.D.Ill. Dec. 11, 2012).

As for Motorola's motion to compel, a party may file such a motion under Federal Rule of Civil Procedure 37 whenever another party fails to respond to a discovery request or when its response is insufficient.  Fed.R.Civ.P. 37(a).  Courts resolve these disputes by adopting a liberal interpretation of the discovery rules.  *Chicago Reg. Council of Carpenters Pension Fund v. Celtic Floor Covering, Inc.*, 316 F.Supp.3d 1044, 1046 (N.D.Ill. 2018).  Rule 26 provides that "[p]arties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense."  Fed.R.Civ.P. 26(b)(1); *see Motorola Sols., Inc. v. Hytera Commc'ns Corp.*, 365 F.Supp.3d 916, 924 (N.D.Ill. 2019) ("Relevance focuses on the claims and defenses in the case, not its general subject matter.").  Discoverable information is not limited to evidence admissible at trial.  Fed.R.Civ.P. 26(b)(1).  The Court has broad discretion both in managing discovery matters and when enforcing the Local Patent Rules.  *Medline Indus., Inc. v. C.R. Bard, Inc.*, 511 F.Supp.3d 883, 888-89 (N.D.Ill. 2021).

## III.    ANALYSIS

Motorola asserts that it has shown good cause for the proposed amendments to its final infringement contentions and that the amendments it seeks will not unfairly prejudice Hytera.  Motorola further argues that – regardless of whether the contentions are amended – Hytera has

MSA0556

an obligation to supplement its discovery responses with information related to its new H-Series. The Court will address each argument in turn.

## A. Motorola may amend its final infringement contentions to include Hytera's H-Series products.

Motorola seeks leave to amend its final infringement contentions to accuse the H-Series of infringing four patents: '284, '169, '869, and '701. (Dckt. #254 at 7). Hytera opposes this motion, calling the effort to supplement a "fishing expedition" and arguing that it would be "greatly prejudiced" by the additional discovery such an amendment would prompt. (Dckt. #263 at 4). For the following reasons, the Court finds that Motorola has met its burden under Local Patent Rule 3.4 to show both good cause and lack of unfair prejudice.

### 1. Motorola has established good cause to amend its infringement contentions.

"Courts have interpreted the good cause requirement to not only require a showing that a valid basis for amendment exists but also that the party seeking leave to amend acted diligently." *Oleksy*, 2013 WL 3944174, at *2. Hytera first argues that Motorola has failed to offer a valid basis for amendment because it "does not have requisite information to even allege the H-Series as an accused product at this point." (Dckt. #263 at 8). Hytera goes on to say that Motorola is in a pickle, as it "failed to conduct a pre-suit investigation relating to the H-Series before discovery closed, but it needs discovery to justify adding the H-Series to this case." (*Id.*). The Court disagrees.

First, the Court notes that Motorola *has* offered a basis for its amendment: namely, Hytera's own January 18, 2022 disclosure. In particular, Hytera admits that the H-series products include the "same functionality" as the accused i-Series products as related to patents '284 and '169. (Dckt. #250 at 3). With regard to the other two patents – '869 and '701 –

MSA0557

Motorola plans to "accuse the H-Series under the same theory with which it accuses the i-Series of infringing those two patents." (Dckt. #254 at 8). In other words, Motorola has the same bases for accusing the H-Series products as it does for the already-accused i-Series products.

Second, infringement contentions do not "require a party to set forth a prima facie case of infringement and evidence in support thereof." *Realtime Data, LLC v. Packeteer, Inc.*, No: 6:08-cv-144, 2009 WL 2590101, at *5 (E.D.Tex. Aug. 18, 2009). Rather, they are "meant to frame the scope of the case in order to provide for timely discovery." *Fujitsu Ltd. v. Tellabs Operations, Inc.*, Nos. 08 C 3379, 09 C 4530, 2012 WL 5444979, at *4 (N.D.Ill. 2012); *see also PersonalWeb Techs., LLC Google Inc.*, No. C13-01317-EJD (HRL), 2014 WL 218164, at *4 (N.D.Cal. Jan. 17, 2014) ("[T]he expectation that a 'patentee would have a precise sense of its infringement theory at the outset' is 'unrealistic . . . [where] the patentee may not have been able to get access to the necessary information because it is hidden from view . . . .'"), *quoting* Peter S. Menell et al., Federal Judicial Center, Patent Case Management Judicial Guide 4-14 (2009). It is enough, therefore, that a plaintiff give "reasonable notice to the defendant [as to] why the plaintiff believes it has a reasonable chance of proving infringement and raise a reasonable inference that all accused products infringe." *Digital Reg of Texas, LLC v. Adobe Sys., Inc.*, No. CV 12-01971-CW (KAW), 2013 WL 633406, at *3 (N.D.Cal. Feb. 20, 2013).

Hytera does not claim any confusion as to why Motorola believes the H-Series products infringe upon the four listed patents. Accordingly, the Court finds that the reasons submitted by Motorola for adding the H-Series are sufficient to constitute a valid basis for the amendment. *See Midwest Athletics and Sports All. LLC v. Xerox Corp.*, No. 19-cv-6036W, 2021 WL 2906372, at *8 (W.D.N.Y. Jul. 9, 2021) (noting that a party need not confirm its infringement theories before asserting proposed allegations); *Fujitsu Ltd.*, 2012 WL 5444979, at *6 (same).

The Court further notes that Motorola's inability to provide the evidence that would generally support a motion to amend – such as source code – is entirely the result of Hytera's refusal to answer the questions that would allow it to do so. *See Linex Techs., Inc. v. Hewlett-Packard Co.*, No. C13–159 CW, 2013 WL 5955548, at *2 (N.D.Cal. Nov. 6, 2013) ("Courts typically grant leave to amend infringement contentions after a patentee has been given the opportunity to inspect relevant source code."). On February 17, 2022, Motorola asked Hytera to confirm whether the H-Series products contain the same source code as the i-Series products for the accused features and whether Hytera would raise any new or different non-infringement defenses for the H-Series. After refusing to comply with these requests, Hytera cannot now fault Motorola for failing to produce that same evidence in support of the instant motion. *See Mondis Tech., Ltd. v. LG Electronics, Inc.*, Nos. 2:07-cv-565-TJW-CE, 2:08-cv-478-TJW, 2011 WL 2149925, at *2 (E.D.Tex. May 5, 2011) ("TPV cannot complain of prejudice when it was TPV's discovery procedures that created, at least in part, the problem.").

As for whether Motorola acted with diligence, "the relevant inquiry is not when the party learned about the information, but when it *could have* made the discovery." *Sloan Valve Co. v. Zurn Indus., Inc.*, No. 10 C 204, 2013 WL 622951, at *2 (N.D.Ill. Feb. 20, 2013) (emphasis added). Here, as explained in Section I, Hytera announced the release of the H-Series on October 29, 2021. Less than two weeks later – on November 11, 2021 – Motorola informed Hytera that it would seek additional discovery related to the H-Series products. Hytera refused to provide the requested information, prompting Motorola to seek relief from this Court, which was granted on January 3, 2022. On January 18, 2022, Hytera admitted that the H-Series products shared the same functionality as the i-Series. One month later, Motorola posed additional questions related to that disclosure, which Hytera twice refused to answer. Motorola

7

filed the instant motion eleven days after the second refusal. In light of this timeline, the Court finds that Motorola acted diligently.

First, the fact that Motorola could not have independently accessed information regarding the H-Series prior to Hytera's October 29 announcement supports a finding of diligence. *See GREE, Inc. v. Supercell Oy*, No. 2:19-cv-00311-JRG-RSP, 2020 WL 7698831, at *2 (E.D.Tex. 2020) ("The Court has routinely held that a patentee has good cause to amend its infringement contentions to include newly accused products that the defendant introduced to the market after the plaintiff served its initial infringement contentions."); *compare Pavo Sols. LLC v. Kingston Tech. Co. Inc.*, No. 8:14-cv-1352-JLS-KES, 2018 WL 5099294, at *2 (C.D.Cal. July 18, 2018) (finding a lack of diligence where plaintiff could have discovered the potentially infringing devices earlier had it conducted a more thorough investigation).

Second, while Hytera makes much of the fact that Motorola waited until after fact discovery had closed to file the instant motion, (Dckt. #263 at 10), the Court finds it more pertinent that Motorola waited only *thirteen days* after the release of the H-Series to notify Hytera that it would request additional discovery related to those products. Courts have found that such prompt discovery requests regarding potential infringement contentions are sufficient to put the opposing party on notice and, therefore, support a finding of diligence. *See, e.g., Polaris PowerLED Techs. v. Samsung Elecs. Am., Inc.*, No. 2:17-cv-00715-JRG, 2019 WL 11585349, at *3 (E.D.Tex. Apr. 24, 2019) ("The Note9 and Kant M2/M3 TVs had not yet been launched by the time Polaris served its initial infringement contentions, and Polaris was diligent in seeking discovery on these products and seeking to amend its contentions as soon as it became aware that these products might infringe."); *Bd. of Tr. of Leland Stanford Junior Univ. v. Roche Molecular Sys., Inc.*, No. C 05–4158, 2008 WL 624771, at *3 (N.D.Cal. March 4, 2008)

8

("Though Stanford was arguably not diligent in pursuing the amendment with this court, it was diligent in notifying and seeking discovery from Roche."); *IXYS Corp. v. Advanced Power Tech., Inc.*, 321 F.Supp.2d 1133, 1152 n.19 (N.D. Cal. 2004) ("While [defendant's] motion makes clear that it has not complied fully with the letter of the local rules, the court finds that [plaintiff] has long been on notice of these potential combination[s].").[2]

Perhaps Motorola should not have waited a month to seek clarification regarding Hytera's January 18, 2022 disclosure, as Hytera suggests. (Dckt. #263 at 11). But the Court does not find this delay to be dispositive. *See Linex Techs., Inc.*, 2013 WL 5955548, at *1 ("[E]ven if the movant was arguably not diligent, the court retains discretion to grant leave to amend."). Even if Motorola had immediately sought clarification regarding Hytera's statement that the H-Series contained the "same functionality" as the contested i-Series and filed a motion to amend its contentions that very day, the motion would not have been resolved until after the fact discovery deadline. In other words, the parties would be in precisely the same position as they are in now. Because Motorola has shown that it has a valid basis for its proposed amendments (the new products incorporate the same technology as other accused products) and that it acted with diligence (by promptly seeking discovery after Hytera announced the new

---

[22] The above-outlined circumstances – namely, that Motorola (1) could not have discovered information related to the H-series prior to Hytera's announcement; (2) promptly notified Hytera that it would seek discovery on these products; and (3) diligently pursued, through court filings and meetings with opposing counsel, additional discovery related to these products in the following weeks – distinguishes this case from those cited by Hytera. *Thermapure*, 2012 WL 6196912, at *1; *O2 Micro Int'l Ltd. v. Monolithic Power Sys., Inc.*, 467 F.3d 1355, 1367 (Fed.Cir. 2006) (finding no diligence where plaintiff failed to explain why it took three months to sufficiently develop a theory supporting its proposed amended contentions); *Philps North America LLC v. Fitbit LLC*, No. 19-11586-FDS, 2021 WL 5417103, at *3 (D. Mass. Nov. 19, 2021) (although defendant was on notice that plaintiff would seek an amendment, the court found a lack of diligence where "plaintiff *did nothing* for many months after that 'notification'") (emphasis added).

9

product line and seeking leave to amend within five months of the products' release), the Court finds that it has met its burden of showing good cause to amend.

### 2. Hytera will not be unfairly prejudiced by the proposed amendments to Motorola's infringement contentions.

The Court further finds that permitting Motorola to amend its final infringement contentions would not unfairly prejudice Hytera. First, the fact that Motorola accuses the H-Series products under the same theories of infringement as the i-Series weighs strongly against a funding of unfair prejudice. *See Midwest Athletics and Sports All. LLC*, 2021 WL 2906372, at *7 (finding no undue prejudice where new products "are alleged to infringe for the same reason as the currently accused products"); *Philips North Am. LLC*, 2021 WL 5417103, at *5 ("Some district courts have found that a party may move to add a new or updated product without prejudicing the non-moving party if that addition would not substantially change the asserted infringement theory.") (citing cases); *Zest IP Holdings, LLC v. Implant Direct MFG, LLC*, No. 10-cv-0541-GPC-WVG, 2013 WL 1626111, at *4 (S.D.Cal. Apr. 15, 2013) (granting motion to amend infringement contentions to add updated version of accused product, where plaintiff argued that same patent claims and infringement theories applied).

The Court acknowledges that fact discovery has now closed and, at a certain point, this case must begin "to narrow, not expand." *Richtek Tech. Corp. v. uPi Semiconductor Corp.*, No. C 09-05659 WHA, 2016 WL 1718135, at *3 (N.D.Cal. Apr. 29, 2016); *see also Rembrandt Patent Innovations, LLC v. Apple Inc.*, Nos. C 14-05094 WHA, C 14-05093 WHA, 2015 WL 8607390, at *3 (N.D.Cal. Dec. 13, 2015) ("There must be some reasonable cut-off date after which [a patent holder] cannot further expand the case simply because [the accused infringer]'s product cycle has outpaced the resolution of this case."). Nonetheless, Motorola has stipulated that the additional discovery needed with regard to its proposed additions would be "targeted"

10

and "limited," such that it could be completed within thirty to sixty days.  (Dckt. #254 at 11).

This, too, supports a finding that Hytera would not suffer unfair prejudice.  *See Midwest Athletics and Sports All. LLC*, 2021 WL 2906372, at *7 (finding no prejudice where plaintiff represented that the addition of new products would require "minimal discovery limited to technical documents, such as user guides and product manuals, and financial information").

Furthermore, while the Court agrees with Hytera's assertion that it would incur some expense and burden if required to engage in additional discovery, Hytera fails to explain how the targeted discovery sought by Motorola would cause it to experience "undue prejudice."  *See Corel Software, LLC v. Microsoft Corp.*, No. 2:15-cv-00528-JNP-PMW, 2018 WL 5792323, at *3 (D.Utah Nov. 5, 2018) ("[I]t is usually true that any amendment of the Final Contentions would lead to additional work and expense on the part of the non-amending party.  Thus, the inconvenience and expense required by additional discovery and briefing of the new issues does not generally rise to the level of *undue* prejudice.") (emphasis in original); *Monolithic Power Sys., Inc. v. Silergy Corp.*, No. 14-cv-01745-VC (KAW), 2015 WL 5440674, at *3 (N.D.Cal. Sept. 15, 2015) ("[V]ague statements professing undue prejudice without articulating any substantive ways in which it will be prejudiced – which should be apparent because the proposed infringement contentions were provided – is insufficient.").

Finally, the Court finds that the proposed amendments would not seriously disrupt the timeline for the completion of this litigation.  As Motorola notes, claim construction has yet to be decided, expert depositions have not been taken, and the parties have not filed motions for summary judgment.  (Dckt. #254 at 11).  *See GREE, Inc.*, 2020 WL 7698831, at *4 (finding minimal prejudice caused by adding additional product on the "eve of expert reports" where amended contentions would not impact claim construction or invalidity contentions); *TurboChef*

11

*Techs., Inc. v. Garland Commercial Indus., LLC*, No. 3-07-cv-1330-F, 2010 WL 11618098, at \*3 (N.D.Tex. Mar. 9, 2010) (finding no prejudice where defendant had "not shown that the amendment of the infringement contentions [would] impact claim construction issues the Court [had] already addressed"). The Court can mitigate any potential prejudice by adjusting the discovery deadline according to the parties' needs.

Because Motorola has shown good cause for its proposed amendments and that Hytera will not be unfairly prejudiced by them, the Court grants Motorola leave to amend its final infringement contentions to include Hytera's H-Series products.

**B.      Hytera must amend its discovery responses to provide technical documentation and source code related to the H-Series products.**

The Court now turns to Motorola's request to compel amended discovery responses that include information on Hytera's H-Series products. Motorola argues that – pursuant to Federal Rule of Civil Procedure 26(e) – Hytera was obligated to supplement its responses to Requests for Production Nos. 1-8, 15-36, 40, 42-43, 45-52, 56, 60, 64, 83, 85, 104-108, 121, 131, and 133-35 with information regarding the H-Series products as soon as those products were developed and released. According to Motorola, the H-Series constituted an "Accused Product" and, therefore, was covered by these requests even before Motorola accused the H-Series of infringing its asserted patents – or, indeed, before Motorola knew the H-Series line existed. (Dckt. #254 at 12). Motorola asks that the Court compel Hytera to amend its responses to those requests and provide "a corporate designee to testify about the development and operation of the H-series." (*Id.* at 254). Hytera responds that it had no duty to supplement discovery with information about the H-Series because the H-Series "is not part of this case." (Dckt. #263 at 14).

In light of the Court's decision to grant Motorola leave to amend its final infringement contentions to include the H-Series products, the question of whether the H-Series falls under

MSA0564

Motorola's definition of an "Accused Product" is now irrelevant. Once Motorola submits its amended contentions, these products will unquestionably be a "part of the case." Accordingly, Hytera must amend its discovery responses to include information related to the H-Series.

Because Hytera maintained that it should not be required to provide *any* discovery related to the H-Series, it did not address the particular discovery requests made by Motorola in its brief opposing Motorola's motion to compel. (Dckt. #263 at 14-15). Accordingly, the parties shall meet and confer to determine what additional discovery is necessary in light of the pending amendment. Given the fact that the parties have already completed fact discovery related to Motorola's other infringement contentions, the Court expects this process will mirror the process that the parties have already completed. Motorola's stipulation that any additional discovery would be "targeted" and "limited," (Dckt. #254 at 11), further assures this Court that Motorola will tailor its requests to seek only information that is clearly relevant and important to its infringement claims. At the very least, Hytera shall: (1) provide Motorola with the source code for the soon-to-be-accused H-Series products; (2) stipulate whether it will raise any new or different non-infringement defenses for the H-Series; and (3) prepare a corporate designee to testify about the H-Series.

By February 2, 2023, the parties shall submit a joint status report setting forth: (1) what date Motorola will depose a Hytera witness regarding the H-Series products; (2) the agreed-upon scope of discovery related to Hytera's H-Series products; and (3) a reasonable deadline by which the parties expect this discovery to be completed. The Court will issue an updated fact discovery deadline following the submission of this report.

MSA0565

## CONCLUSION

For the foregoing reasons, Motorola's motion seeking leave to amend final infringement contentions and compelling discovery of technical information about Hytera's H-Series DMR Products, (Dckt. #254), is granted. Motorola shall serve its amended infringement contentions by January 13, 2023. The parties shall meet and confer to discuss what targeted discovery related to the H-Series is necessary and to determine a reasonable timeline for Hytera to provide its amended responses. By February 2, 2023, the parties shall submit a joint status report regarding their proposed schedule for the completion of the addition fact discovery specified herein.

**ENTERED: January 5, 2023**

**Jeffrey I. Cummings**
**United States Magistrate Judge**

14

MSA0566

## UNITED STATES DISTRICT COURT
### FOR THE Northern District of Illinois – CM/ECF NextGen 1.6.3
### Eastern Division

Motorola Solutions, Inc.

                Plaintiff,

v.

                                   Case No.:
                                   1:17−cv−01972
                                   Honorable Franklin
                                   U. Valderrama

Hytera Communications Corporation Ltd., et al.

                Defendant.

## NOTIFICATION OF DOCKET ENTRY

This docket entry was made by the Clerk on Wednesday, March 29, 2023:

      MINUTE entry before the Honorable Jeffrey Cummings: The Court has reviewed the parties' joint status report on discovery [290] and enters the following schedule on discovery related to the H−series products. To the extent they have not already done so, Hytera shall provide scope objections to Motorola's document requests regarding the H−series products by 3/31/23. Parties shall complete their meet and confer regarding Hytera's scope objections no later than 4/5/23. Hytera shall complete its production of technical documents by 5/3/23, and shall complete the remainder of its document production by 5/17/23. As agreed by the parties, Hytera shall make its source code available by 6/7/23 for six weeks (through 7/19/23). Rule 30(b)(6) deposition(s) shall be completed by 8/16/23. The parties shall file a joint status report on the H−series discovery by 5/10/23. Mailed notice(cc, )

**ATTENTION:** This notice is being sent pursuant to Rule 77(d) of the Federal Rules of Civil Procedure or Rule 49(c) of the Federal Rules of Criminal Procedure. It was generated by CM/ECF, the automated docketing system used to maintain the civil and criminal dockets of this District. If a minute order or other document is enclosed, please refer to it for additional information.

For scheduled events, motion practices, recent opinions and other information, visit our web site at ***www.ilnd.uscourts.gov***.

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

MOTOROLA SOLUTIONS, INC., et al.,      )
                Plaintiffs,      )
-vs-      ) Case No. 17-cv-01973
                            )
HYTERA COMMUNICATIONS      ) Chicago, Illinois
CORPORATION, LTD., et al.,      ) August 17, 2023
                            ) 10:01 a.m.
              Defendants.      )

TRANSCRIPT OF PROCEEDINGS - CONTEMPT HEARING
BEFORE THE HONORABLE MARTHA M. PACOLD

APPEARANCES:

For the Plaintiffs:     MR. ADAM R. ALPER
                    MR. AKSHAY S. DEORAS
                    Kirkland & Ellis LLP
                    555 California Street, Suite 2700
                    San Francisco, CA 94104
                    (415) 439-1400
                    Adam.alper@kirkland.com
                    akshay.deoras@kirkland.com

                    MR. JUSTIN SINGH
                    MR. MICHAEL W. DE VRIES
                    MS. N. YVONNE BEELER
                    Kirkland & Ellis LLP
                    555 S. Flower Street
                    Los Angeles, CA 90071
                    (213) 680-8400
                    Justin.singh@kirkland.com
                    michael.devries@kirkland.com
                    yvonne.beeler@kirkland.com

Court Reporter:

        KATHLEEN M. FENNELL, CSR, RPR, RMR, FCRR
                Official Court Reporter
                United States District Court
        219 South Dearborn Street, Suite 1426
                Chicago, Illinois  60604
                Telephone:  (312) 435-5569
           Kathleen_Fennell@ilnd.uscourts.gov

MSA0568

APPEARANCES:  (Continued)

For the Plaintiffs:       MS. PATRICIA A. CARSON
                          Kirkland & Ellis LLP
                          601 Lexington Avenue
                          New York, NY 10022
                          (212) 446-4800
                          Patricia.carson@kirkland.com

                          MR. JAMES NIEWIARA
                          Motorola Solutions
                          500 W. Monroe Street
                          Chicago, IL 60661
                          (847) 576-5000

For the Defendants:       MR. BOYD T. CLOERN
                          MR. JOHN WILLIAM TOTH
                          MR. JOSHUA R. TAYLOR
                          MR. FILIBERTO AGUSTI
                          Steptoe & Johnson LLP
                          1330 Connecticut Ave., NW
                          Washington, D.C. 20036
                          (202) 429-6230
                          Bcloern@steptoe.com
                          Btoth@steptoe.com
                          Jrtaylor@steptoe.com

                          MS. GRACE WANG
                          Steptoe & Johnson LLP
                          China Central Place, 29th Floor
                          Tower 2, 79 Jianguo Road
                          Chaoyang District
                          Beijing, 100025
                          +86 10 5834 1010
                          Gwang@steptoe.com

ALSO PRESENT:             MS. MINGSHU WU ZHANG
                          MS. PING (PENNY) CHEN
                          Interpreters

* * * * * * * * * * * * * * * * *

PROCEEDINGS REPORTED BY CERTIFIED STENOGRAPHER
TRANSCRIPT PRODUCED WITH A COMPUTER

(Proceedings heard in open court:)

THE CLERK:  17 C 1973, Motorola Solutions versus Hytera Communications.

Please state your name for the record.  We'll start with plaintiff.

MR. DE VRIES:  Good morning, your Honor.  My name is Mike De Vries from the law firm of Kirkland & Ellis.  I'm here on behalf of the plaintiff Motorola.

With me here today are my colleagues, Adam Alper, Akshay Deoras, Pat Carson, Justin Singh, and Yvonne Beeler.  Also with us here today is the senior vice president and general counsel of Motorola Solutions, Jim Niewiara.

THE COURT:  Good morning.

For the defense.

MR. CLOERN:  Good morning, your Honor.  Boyd Cloern from Steptoe & Johnson here on behalf of Hytera, and I'll let the other members introduce themselves.

MR. AGUSTI:  My name is Fil Agusti, your Honor, with Steptoe & Johnson.

MR. TOTH:  Bill Toth with Steptoe & Johnson.

MR. TAYLOR:  Joshua Taylor with Steptoe & Johnson.

THE COURT:  Well, good morning again everyone.  We're here -- and everyone can have a seat if you'd like.

Are there interpreters here?  If we could have the interpreters sworn.

4

(Interpreters sworn.)

THE COURT: We're here for the hearing on the motion, Motorola's motion for contempt, and so I wanted at the outset just to discuss the plan for today.

So I said before in a scheduling order that I would give each side three hours total to present, and that would include both any witness presentations and evidentiary presentations you would like to make, but also any legal arguments you would like to make.

So you're free to divide that three hours however you would like between presentation of evidence and argument, and within the argument, you can split that up however you'd like, openings, closings, you know, if you'd like to say some short argument when you introduce a witness, any of that, but you just have to keep your presentation in its entirety to three hours total.

There's also not a requirement that you use all three hours. So if you don't need that, there's not a requirement that you actually use all of it. But I wanted just to make sure there was some guardrails and there would be some, you know, equal time in case you wind up going that long.

I think also in terms of breaks, we're starting, it's a little bit after 10:00. I would like to go, if it's okay, for the morning until -- just go through until lunch, so that would be 12:30. We could at that point take a one-hour break

for lunch.  Come back 1:30.  We could then do a two-hour block from 1:30 to 3:30.  We can take an afternoon break from 3:30 to 4:00.  Then we can do another hour and a half until 5:30. That's assuming everyone uses all their time.

If you don't wind up using all your time, then we could maybe adjust those breaks a little bit, but if, in fact, people are using their whole time, then I think we should take those breaks at those preplanned times and also stick to those times as closely as we can just so that we stay on track.

So with that, let me just ask any opening comments about the process today?

MR. DE VRIES:  Thank you very much, your Honor.

In terms of process, you know, there have been -- there's a lot of briefing, of course, and I think binders full of exhibits that have been submitted as sort of indicated by the number of boxes, and I think there have been 14 different declarations that have been cited to in this briefing, and we would be happy to sit -- stand on the briefing.

But we understand from a dialogue with counsel for Hytera that they intend to bring three live witnesses today. My belief is that two of them will be translated and one of them will not.  I think that's right.

We will -- we would like to reserve our ability to put on one or possibly two witnesses in brief rebuttal, but really depending on what they say in their opening

examinations.

And so the way that we were thinking about it, if it works for your Honor, is that we would begin by giving you a presentation that lays out where we think that we're at in light of the current state of affairs and your Honor's recent ruling.

And then after that, presumably counsel for defense will want to provide a presentation and then get into their witness testimony. You know, we would like to reserve the right to conduct a brief cross-examination.

We don't fully know what they're going to say. We've exchanged some demonstrative slides, but I think that the defense has produced dozens if not more than a hundred new documents in the last day or so. And I believe, because their exhibit list is, like, 160-exhibit long, they intend to go through those with their witnesses today. And so we'd like to reserve the right to present cross-examination of their witnesses and then, depending on what they say, put on, as I said, one or possibly two live witnesses, Mr. Ed Westerman, who has submitted a number of declarations about Hytera's financial condition in the past and Mr. Yuan Wang, who has provided some opinion testimony about Chinese law.

And then we'd like to follow at the end with an ability to provide a closing, which really will be our attempt to sum up for your Honor what we think, if anything, has

changed based on the testimony that we hear here today.

THE COURT: Okay. Thanks. And that all sounds fine.

Any comments from the defense?

MR. CLOERN: Yes, your Honor.

Thank you, Mr. De Vries.

One purely housekeeping matter first. I believe that -- and let me know, guys, if I get this wrong, I think I just heard that both sides agreed to stipulate to the exhibits on the exhibit list, so we won't need to burden the Court with sort of all the authentication questions, as long as the Court is okay with that.

THE COURT: Yes, that's fine. Thanks.

MR. CLOERN: Thank you.

As far as the number of exhibits, a lot of those are -- there's really for our side three buckets of documents. One is a bunch of agreements with the banks that just need to be in the record, and our witnesses will talk about them, not each individual one, there's not time, but we'll say this set of agreements means X, Y and Z.

And then there's also a set of correspondence with the banks that our witnesses will talk about, about their efforts to work with the banks to try to pay the royalty. So we don't intend to try to go through individually 150 exhibits, but we did want to get into the record the discussions with the banks and the contracts with the banks.

So as far as the process for today, that more or less sounds good to us. I think we would have one comment. This is Motorola's motion. They're the movant. They do have the burden, so we do think they should go first with whatever presentation that they would like to give.

However, we do not believe that Motorola has made a prima facie case. The standard in the Seventh Circuit for contempt is four elements: First, an unambiguous, clear order. Obviously we have that here.

Two, not -- there's not full compliance with that order.

Three, the noncompliance is substantial.

And, four, the accused contemnor failed to make reasonable and diligent efforts to comply.

And so we don't think that there's been any evidence put in from Motorola on that. We are prepared to and do plan to put in evidence on that.

We will also be putting evidence on -- it's really a very related but separate point, which is Hytera's inability to pay the royalty, which is our burden, but we don't even need to get there if Hytera has exercised reasonable and diligent efforts because then the standard for contempt is not met, and showing that is Motorola's burden.

So we think they need to put on evidence, and we think the law in the Seventh Circuit is that when there is a

contempt hearing, they'll need to put that evidence on in the hearing.

So that would be the only modification we would have to the process. Certainly they can get up, lay out their case, make an argument, but they would need to put evidence on.

MR. DE VRIES: You know, your Honor, that -- so that is wrong on the law. But I think I have an idea about procedure, which maybe will help, but please tell me to stop talking if I should.

THE COURT: I would say -- okay, you can say briefly any comments.

So on the legal arguments about whose burden and who should be -- so right now we're just trying to do what's going to be the process today. Then if the process is going to include some opening arguments and you want to say in your opening arguments things about who has the burden and how the evidence is going to be insufficient, then you should obviously say that in your arguments.

But right now we just need to get the process, so who's going to talk first, how long, who's going to -- and then we go into that.

MR. DE VRIES: Yeah, that makes perfect sense. And that was what I was going to end up with, which is I don't think anyone is treating this as if we don't put the witnesses

in a certain order, then there's a failure of proof.

And so I think that what we intend to do is to put on our oral argument. As I said, there's a lot of, you know, evidence that's in the record. It is wrong that the Seventh Circuit requires that all of that evidence be resubmitted in the context of a hearing. That's just not legally correct.

But in any event, it sounds like there's an agreement about that this is going to come down to, this issue, about whether or not Hytera was able or it was impossible for it to make any payment in support of this and in support of the royalty order and whether they made reasonable efforts to do so.

It sounds like Hytera is planning to come in and put on all new evidence, over a hundred new documents, all of these bank contracts, all this correspondence with the banks. We've never seen it before until yesterday, and I think the way that it worked was they produced it on Monday, but then they said that the PRC needed to review it or something, and so they clawed it back, and then they reproduced it yesterday.

I think that from a purely procedural standpoint, letting us hear what they're planning to say on this, you know, they tried -- they made reasonable efforts to comply and that they had -- that it was impossible for them to comply, it would make sense for them to put on that evidence first and then for us to respond to it. We have absolutely put in

11

evidence on all four points, so it's not accurate to say that we haven't on the four.

So I think from a procedural standpoint, if we go second, that's going to make a lot more practical sense because we can respond to the, you know, multitude of new evidence that they want to put in today.

THE COURT: Okay. Let's -- if I let you guys keep going, we're going to have -- it will be half an hour into it with only arguments about arguments, and we need to stop the meta arguments. We need to just go.

So I'm going to give -- we're going to break at 12:30, as I said before. I'm going to give -- it is Motorola's motion. I'm going to give each side 15 minutes right now, so 10:15 to 10:30 for Motorola, 15 minutes after that for Hytera, and then we're going to go into the presentation of evidence.

It is Motorola's motion. I hear your point about the late disclosure, but I think, you know, I can take that into account by giving you, if you reserve some of the time for rebuttal. So let's go in that format.

I mean, did you have much longer than 15 minutes planned for an opening?

MR. DE VRIES: Mine was probably 25 or 30 because we were -- given how much record evidence is there, we weren't planning to repeat it all except in the context of my

arguments. But I can, like, try to get as close to 15 minutes as I possibly can.

THE COURT: Well, that's okay. How long was your opening?

MR. CLOERN: Your Honor, we planned to keep our opening to 5 or 6 minutes and then save more time for witnesses and a closing, so --

THE COURT: Okay. So that's fine. I did tell you before you could have -- you could allocate the time as you saw fit, and thinking through that again as I'm just sitting here, that's okay. I'm not going to -- you don't have to re-do your opening on the spur of the moment.

So you can take however much time you would like, but let's just turn to that, so --

MR. DE VRIES: Okay.

THE COURT: -- why don't you start with your opening, then you can do your opening, then we're going to go into witnesses.

MR. DE VRIES: Got it. And you'd like us to put on -- which is fine, but you'd like us to put on our witnesses first; is that right?

THE COURT: Please, yes, because it is your motion. I hear you on the late disclosure, but you can bring stuff in rebuttal on that --

MR. DE VRIES: Okay.

THE COURT: -- for that reason.

MR. DE VRIES: So if -- just to make sure I understand the process. If we decided that it would be necessary to call the witnesses that we've already called in some form of rebuttal, that would be okay, too?

THE COURT: Yes.

MR. DE VRIES: Okay.

THE COURT: Again, all this needs to be within your time limits.

MR. DE VRIES: Understood. Our plan is to use far less than the three hours, to be honest. I think our biggest question is there's all this new evidence that we have no idea what they're going to say about, and so we'll have to kind of see what they say.

THE COURT: And that's fine. So given that, I think it is fine. You can bring people back in rebuttal even if they've already taken the stand.

MR. DE VRIES: Thank you, your Honor.

MR. CLOERN: Your Honor, may I have 30 seconds?

THE COURT: Yes.

MR. CLOERN: So I forgot on the video in -- located in Hong Kong is Grace Wang who's a Steptoe lawyer.

THE COURT: Okay.

MR. CLOERN: So she wasn't here, and I apologize, Ms. Wang, for overlooking you. I didn't see you on the video

yet.

She's there with the witness, will be there with the witness only to make sure the witness has the documents he's being questioned about or if there's any problem. If there's any concern with Ms. Wang being in the room with the witness, then she can leave the witness and then come into the room only if necessary. We're happy to do it either way.

THE COURT: Okay. Why don't -- I think it would be -- why don't we cross that bridge when we get there.

MR. CLOERN: Yes.

THE COURT: But thank you for the introduction.

Good morning, Ms. Wang.

MS. WANG: Good morning, your Honor.

MR. CLOERN: And then the final point is the new evidence is it's just updates. It's all the evidence we submitted with the motion in 2022 about bank agreements and conversations with banks that happened in 2022. When your Honor's order came out in 2023 denying the Norsat issue, then those same efforts were made again, and the bank agreements just needed to be updated because they come in each year and for all the rollover.

So it's not new. It's just -- it's updated. That's what we said when we had asked for the 60-day extension, that we would need to get these updates in, and that's all it is, is updates. It's not brand new evidence.

THE COURT: Okay.

All right. So with that, everyone, let's just start the arguments, and so at this point I am -- we are now starting your three-hour clocks.

So I'll turn to Motorola.

MR. DE VRIES: Thank you, your Honor. May I hand up to the Court, if you would like, some opening slides and also, of course, to opposing counsel?

THE COURT: Yes, please.

MR. DE VRIES: And I have multiple copies if your Honor would like more than one.

THE COURT: Please, yes, for the law clerk. Thanks.

(Tendered.)

MR. DE VRIES: Is it possible to display my slides?

Is it possible to switch the display to our side, please?

THE COURT: Yes, we can do that.

MR. DE VRIES: Great. Thank you.

OPENING STATEMENT ON BEHALF OF THE PLAINTIFFS

MR. DE VRIES: So good morning again, your Honor. Let me get right into the substance here.

The first thing I wanted to say is that we are grateful for the Court's time on this very important matter for our client, Motorola Solutions. Hytera has evidenced an egregious disregard for this Court's authority. It is crystal

clear that Hytera, a multi-billion-dollar company with increasing revenues, increasing profits, positive net operating capital, and a tremendously large number of unrestricted cash and assets, could have complied if it had chosen to do so.

Its decision not to do so was a choice to disregard this Court's clear order that it should have paid, and given the evidence that Hytera did not reasonably attempt to comply with the Court's order even in part, they didn't even pay one cent even after getting your Honor's order a few weeks ago, not one cent, that it is their burden to establish that it would be impossible for them to comply even in part.

And contempt, a finding of contempt and coercive sanctions are required to compel Hytera to finally listen to this Court and to do what the Court is saying.

I'd like to very briefly walk through the kind of key background for the motion, and then I think, given some concessions on some of the factors, we can kind of get right down into the nub of the substantive issue that I think your Honor will have to grapple with.

But there's been a long history in this case. I don't have any intent to go through it in any significant way, but there's also been a long history of Hytera erecting elaborate excuses and creating time-consuming, lengthy court processes that are clearly designed to delay and avoid any

kind of ramifications for its illegal behavior.

For example, in the jury trial in this case, which we expected to last two or three weeks, Hytera questioned so many witnesses and conducted such long cross-examinations that the jury trial took four months of citizens' time where they had no idea that the trial would last that long. And throughout that, their witnesses swore, several of them, that they didn't steal Motorola's trade secrets, they didn't do anything wrong, and the jury rejected that, of course.

But now on appeal, they're not even appealing liability, and I think that, in part, this issue around contempt is similarly straightforward. They were ordered to pay. They didn't pay, not even a cent. And there have been several briefs, sur-replies, sur-sur-reply, 14 declarations, binders full of exhibits as I mentioned, and despite all of that, Hytera has not carried its burden.

It is not an exaggeration in any way to say that we discovered that Hytera commissioned one of the largest thefts of intellectual property in U.S. history. They stole millions of lines of computer source code, thousands upon thousands of technical documents, and then they stole -- I'm sorry, they sold these copycat stolen products with copied source code in them around the world, and they're now the second largest manufacturer of radio equipment -- equipment in the world, and they continue to sell that stolen technology even today.

Right now there are customers buying Motorola's stolen technology from Hytera by their own admission.

And the problem that's presented by this type of conduct could not be any more important to the U.S. economy and to the world economy. I think it is widely accepted that the theft of trade secrets, like has been commissioned by Hytera in this case, is incredibly harmful to businesses, national security interests, the security of the U.S. economy in general -- this is from the former presidential administration talking about the problem that is caused by this kind of conduct.

So, as I said, I'd like to just very briefly put this in context. I'm not going to go into any great detail, but the technology in this case involves two-way radios that are used by a variety of types of, you know, schools and construction companies and all sorts of different types of industries.

And there are a number of really important technologies that go into those devices, the two-way radio technologies. And I won't go in, of course, to any detail, but there are lots of them, and they took Motorola a really long time and a huge amount of investment to create those. And if we don't protect companies like Motorola from trade secret theft like this, the financial incentive to create technologies like this that make the world a better place will

be gone.

Now, Hytera was not in this business. It's called the DMR, Digital Mobile Radio, business. DMR refers to a standardized communication protocol that is implemented in Motorola's radios. And if you go back over a decade, Hytera was not in that business, but they wanted to be in it. As you can see here, the chairman of the company writes, "Motorola has launched the first generation of DMR products. We need to directly develop the second generation of products, and that's critical to the future development of the company."

So did they decide to do that through hard work, ingenuity, investment? Absolutely not. They decided to do that by stealing the technology. They hired three primary Motorola individuals, I've identified them here, G.S. Kok, Y.T. Kok, and Sam Chia, and a number of other Motorola engineers, and they offered to pay them large sums of money to come over.

And this is an example of an email sent by the chairman and founder of Hytera, Mr. Chen, who was originally supposed to come to the jury trial and then decided for some reason not to come, but as he tells G.S. Kok, the ringleader that had been hired from Motorola, give them large sums of money. You don't need to worry too much about that, just enjoy the comfortable life.

And there is no question that Hytera stole Motorola's

technology. This is one of the engineers. I asked him this question myself in Hong Kong. I said: "When you created the file that's been marked as Exhibit 10 -- the Hytera source code -- in November of 2008, were you referring to a copy of Motorola's source code that you had in your possession?"

And in one of the few questions I asked that his criminal defense lawyer didn't object on Fifth Amendment grounds, he clearly said: "Yes."

And there is no question that this theft occurred. I'm not going to go into any detail except to make one point. This is some computer information that we received as part of the case. There was a tremendously large amount of computer information provided in electronically stored information, and what is great about that is that you're able to go and get into the real details of what happened.

So this is a record from a witness named Huang Peiyi's laptop about files that had been deleted. But we were able to recover the names, and what it showed, as you can see here, is that Huang Peiyi sent Motorola source code to her colleague, Huang Ni, as indicated in this file.

But as I think happened so often in this case and I think is highly relevant to today, when we questioned the witnesses from Hytera, they largely lied. They straight up lied. When we asked Huang Ni whether Peiyi Huang had ever given her source code before we had discovered that other

information, she swore under oath, no, but, as I mentioned, that electronically stored information showed exactly the opposite.

And there was an intent, and it's been demonstrated, for Hytera to conceal this theft at every turn. And, again, I think this is highly relevant to today's -- to today's proceedings in the following sense.

In this email that G.S. Kok wrote, he's talking about needing to protect the company from impending lawsuits. They knew what they were doing was wrong. And so he suggests rewrite softwares to look different from Motorola. Try to change the evidence to make it hard for us to know what's really going on.

As I mentioned, their witnesses, in addition to at times testifying inaccurately, also refused to answer many, many questions on Fifth Amendment grounds. You know, do you have any explanation whatsoever for the massive amount of Motorola confidential information that you took? And, you know, refusal to answer.

And right up to the top of the company, they knew that this conduct was illegal. This is an email that was written by one of the former Motorola employees to the CEO of the company, that same Mr. Chen, and what does he say? He has some things he says that are troubling him, and one of them is that "knowing that there is a risk in going to jail and

destroying my life while the company only risk loosing money." And here, ironically, although there are -- you know, have been some criminal proceedings that have been instituted that I'm not going to get into in any way, here we are talking about whether that company is at any risk of losing money because so far, although they continue to sell the stolen technology, they have made, the defendant here, no payment towards the judgment, and they're disregarding the Court's royalty order.

The jury verdict was unanimous in favor of Motorola. They found in terms of liability, on trade secret theft, copyright infringement. They also awarded the maximum amount of both compensatory and punitive damages that we requested and found that Motorola was entitled to exemplary damages because of the willful nature of the misconduct.

So there was a lot that has happened. That was in February of 2020. As I drove around the city yesterday, I could not believe that it has been three-and-a-half years since this jury verdict occurred in this courthouse about two weeks before the pandemic shut down the country and that Hytera still hasn't paid and that they still are selling the stolen technology. There is nothing that, like, shatters my sense of justice more than that.

But putting that aside for the moment, there are a lot of briefing that's gone on. A lot of it is not at issue

today, and I have no intent to go through it. But this is the briefing that led to the contempt motion.

After the jury entered its verdict on February the 14th of 2020 and left, I asked the Court to enter a temporary restraining order stopping Hytera from continuing to sell the trade secrets. The court didn't rule on that -- on the trade secret application, didn't grant it at the time, but we set up a briefing schedule for a motion for a permanent injunction.

We filed that on April the 2nd of 2020. So that request that we're ultimately here to talk about today was made in that form in April of 2020. There was an extended briefing schedule, as there always is with Hytera, involving, as there always is with Hytera, supplemental submissions and supplemental statements.

And in the course of that, what Hytera said in response to our plea to the court to enter a permanent injunction stopping them from selling what was stolen, that the path forward is a royalty rate.

And then the court, in response, denied our permanent injunction motion and said that Motorola can be compensated by monetary damages, so I'm going to allow Hytera to continue to sell the stolen technology as long as they pay the royalty that they proposed.

Now, there were some at Hytera that knew that they shouldn't be doing this in general. This is from Pengfei Sun

who was also examined at the trial. He was asked at the trial: "When you first learned that Hytera was using Motorola's trade secrets, did you, as the vice president of research and development at Hytera, immediately stop selling the products that are accused in the case?"

And he said: "First of all, I am the vice president of research and development. If I was the president responsible for sales, I would have stopped the sales immediately."

But it's not what Hytera did. They said they wanted to keep selling. That's what they told the court. And this is from their brief. They said the path forward: Royalty rate, and they told the court an ongoing royalty can adequately compensate Motorola. Motorola is not without relief in the absence of an injunction, and what they were telling the court was just make -- let us pay a royalty and let us keep selling the stolen goods.

And the court credited those representations that Hytera's counsel made, and you can see here that the court says Hytera -- in some of the post-trial orders: "Hytera is a financially successful, profitable company whose founder" -- that's Mr. Chen -- "is still at the helm. No evidence at trial hinted at difficulties in meeting cash payments when required in the ordinary course of business."

And then fast-forward to a year and a half later

where, as he was -- as the court was entering the royalty order, the court observed that "Hytera continues to be a lucrative corporation that generates significant revenues. Nothing in the record hints that Hytera may become insolvent or judgment-proof." And that was less than a month before that first royalty obligation was due.

The order was clear on its face, and I think Mr. Cloern has now conceded that. It says that "On July 31st, Hytera's first royalty payments for the amounts reflected in the report it was to provide will be paid into the escrow account." And what it goes on to say in 5.6 is that the payment "shall be made according to the payment terms herein and remitted by wire transfer to the following escrow account," and it says, "Currency, U.S. dollars."

And there's -- that's the order.

July 31st came and it went, and Hytera paid nothing. Not 49 million, not 40 million, not 30, not 10, not 5, not 1 million, not a thousand dollars, not a hundred dollars, not even one cent. Not anything.

And despite that, they continued to sell the stolen goods, and they continue to do it today. This is their most recent royalty report from just a couple of weeks ago, indicating that they continue to sell those products today.

As a result of that, we believe it is crystal clear that we have met our burden of showing that Hytera should be

held in contempt of court.

There are four factors. Mr. Cloern acknowledged that. An unambiguous command, a violation, a significant violation, and a failure to make reasonable and diligent efforts to comply, and we have shown each and every one of those elements.

In terms of Factor 1, there is an unambiguous command by the court to pay this amount of money on July 31st, 2002, in U.S. dollars, and because we are here today, they obviously didn't do that. But there is another order that has now been violated, and that's yours, your Honor, and that is the July 11th, 2023 order that has been issued by the Court, in which the Court ordered Hytera to make the deposit into the escrow account and pointed out that the prior order made it clear that had to be in U.S. dollars.

And in a way that I feel like saying that I should say I'm startled but in no way am I startled, they have not made any attempt at even partial compliance. They didn't pay one dollar. They didn't come and say, here, we can do $2.5 million now, and we've got another 4 coming. They did nothing. And you're going to see it's because they do not respect the Court's authority, and they choose every single other person and entity other than the court.

Factors 2 and 3 are also not disputed, and we've proven that they're met. The -- Hytera did not substantially

comply. They didn't comply at all. That's the evidence that we've put in. It's conceded. And as your Honor noted, they not only didn't comply, they threatened to your Honor that if you didn't give them what they wanted in their motion to modify the royalty order, they weren't going to comply again.

And that's exactly what they followed through with. They didn't comply even after being ordered by your court -- by the Court to do so.

And I want to make one point, which is after the initial royalty payment of around almost $50 million -- we say 49 million for shorthand to not overstate it -- there were some much smaller royalty amounts that were owed on a quarterly basis, and Hytera has made those payments that are reflected on the right-hand side in connection with those royalty obligations. But the point here is that that deposit of, you know, $2.1 million approximately into escrow pays none of the 49.86 million amount that was owed and is insignificant in comparison to the amount that was owed in July of 2022.

And so the -- there was a statement that we haven't presented evidence that Hytera has failed to exercise reasonable efforts to comply. That is squarely wrong. In many ways, it's the absence of the efforts that they took that is the evidence of their lack of reasonable efforts to comply. Mr. Cloern said that all they're going to do today is put on some updates to what they had done before. I suppose we'll

see. It sounds like they've got a lot to say with their witnesses, but what they said before was that their reasonable efforts to comply consisted of, for about four weeks, reaching out to banks, and then sending correspondence with the lending institutions following the oral refusals to loan them money that confirmed the contents of the oral refusals.

That's what they said they did for a couple -- a few weeks, reached out to some banks. The banks said no, they say, and then they sent some emails that say, oh, we know that you said no. That's what they said they did to comply.

What did they not do? They didn't sell any of the substantial evidence that -- assets that we put in evidence that they have.

They didn't make any partial payment from the unrestricted cash that we've put in evidence that they clearly have, and they had plenty of time to get ready to make this payment in July of 2022. I won't go into detail here, but this lays out the timeline of kind of how this all unfolded, your Honor.

In October of 2020, Hytera advocated for a royalty. We've looked at that.

When you get to December of 2021, the court set the rate and said they were going to have to pay the full amount that leads to the $49 million. So they knew in December of 2021.

And it was ultimately due, you know, over eight months later. What did they do by their own statement? They waited until about a month before this was due, and then they claimed to call a couple of banks, and the banks allegedly said no, and then they sent some emails that says, oh, you said no, right?

But we've established that they had the resources to pay and that they should have, and the only way to make reasonable efforts to comply would be to use those resources to pay the court-ordered amounts.

As I'm showing here from Mr. Westerman, who's put in a number of declarations and is also here to provide testimony, the -- if you look at the parent only, there's this parent-subsidiary issue that I want to briefly get into, just look at the parent. In July of 2002, the parent had $42 million in cash, a billion dollars of current assets, and they had large numbers of cash receipts.

When you look at the consolidated financials that we put in, Hytera consolidated entities, the parent and the subsidiaries that it clearly controls had $122 million in cash, $1.7 billion in assets, and even after netting out all liabilities, almost a billion dollars in assets remaining. Yet they sold none of them to actually comply with the Court's order to pay U.S. dollars into escrow in the amount of $49 million.

What did they do instead? Well, Hytera's counsel, Mr. Cloern, wrote an email to Mr. Alper, myself and Ms. Schmidt, who would be here today but she's unable to. And what he told us was that Hytera has reported to us that the company is unable to obtain financing to cover the escrow amount. This is on July 28th. This is three days before the amounts are due.

And he represents that Hytera faces a liquidity crisis in the second sentence, and he goes on to say in the second paragraph -- this is all at Docket 1386, Exhibit 13, all the evidence identified on my slides -- "Hytera understands the importance of complying with the Court's orders. In prior pleadings, Motorola has pointed to the Norsat stock shares as a valuable asset."

And what he's referring to is we identified those assets as something that could be turned over to us, and we asked them to do it since they owe our client $600 million approximately in a judgment that is not stayed pending appeal, either by posting a bond or by agreement, and they said they didn't have any control over it. I'm paraphrasing, but words to that effect.

But now, Hytera's counsel says, "Motorola's pointed to the Norsat stock shares as a valuable asset." And then it says, "Hytera proposes to put the Norsat shares into escrow." Not Hytera subsidiary thinks it might be a good idea in its

own interests to do something to help the corporate parent or whatever it is that they're using to explain their about-face on the Norsat issue, but "Hytera proposes to put the Norsat shares into escrow."

And he goes on to say, "Hytera had the Norsat shares valued by the independent entity, and that independent entity (using an income method) valued the Norsat shares at" an RMB number that translates to about U.S. $56 million.

And although Hytera uses this as one part of their argument that they somehow made reasonable efforts to comply, this is exactly the opposite of that. In addition to directly contradicting their current claims about separation between parents and subsidiaries by, you know, the way that this is phrased, much more importantly, they explained that they had an asset, and in separate -- in a separate declaration, they explained they even cleared away all of the liens on that asset. And this was before the date of compliance, and that asset was worth, they say, $56 million.

What could they have done? They could have sold that asset and complied with the Court's obligation by putting less than the amount of that asset into escrow.

They didn't do that. Why? It is beyond me. I can't figure out the logic of the chess game for why they did it this way, but this is an admission that they could have. And how do we know that? I'm sorry, I'll come back to that, if I

may.

So that's an admission that they could have. And so for that reason, we have met our burden with the record evidence, we'll put on more of it today, but the declarations that have been cited in the documents and the briefing that there was an unambiguous command to pay money. They acknowledge that. Hytera violated the command. The violation was significant. They didn't even comply in any part at all. And they failed to make a reasonable and diligent effort to comply.

So that takes us back to the last point I'm going to make, and that is what is their excuse? Well, much as -- well, they say that they had an inability to pay, and I'd like to put that in the proper legal context. I know that these cases are cited in our brief. There is, I think, at least one new one, but it's all consistent.

But what's been explained by the Seventh Circuit in the *In re Res. Tech. Corporation* case is that where there has been no effort at even partial compliance with the court's order, which is what we have today, they didn't put in even a penny, not even after your Honor entered your order. They didn't try even in part, that this inability-to-pay defense requires a showing of a complete inability to pay, meaning the contemptor has the burden of establishing clearly, plainly, and unmistakably that compliance is impossible.

That is an incredibly high standard. Hytera has not come close to meeting it, and we believe that your Honor should find that they have failed to meet their burden of establishing that even partial compliance, even paying one penny into escrow at the date it was due or at any time since, was impossible. It is clearly not.

And as explained in the SEC decision from a district court in Texas that we cite at the bottom, when a party is absolutely unable to comply due to poverty or insolvency, inability to comply is a complete defense. Otherwise, the party must pay what he or she can. That is the exact opposite of what Hytera has done here.

So what didn't they do? They didn't pay any of the $49 million. They didn't propose a payment plan. What do I mean by that? They had said at one point in the briefing that maybe they would have to come up with a payment plan.

They didn't propose one. They didn't make a good-faith earnest payment in it. They didn't follow it up with any other payments. They haven't made any payments in the -- now over a year since. It's not as if, like, they had some cash free up at the end of last December and then they made a $2.5 million payment and then, you know, said, hey, we think we can free up a another six, Court, because we're really worried about you imposing contempt sanctions against us, they didn't do any of that. And as I said, they didn't

sell the Norsat shares and use the proceeds to pay any amount.

And that, I think, your Honor, if you focus on that, it refutes every single thing you're going to hear from them today because they didn't sell those shares at the time, they were worth $56 million, they claim. They don't say that they missed any obligations that they had to pay over the last year. They somehow, without selling those shares, made all their other financial obligations go, work, and they didn't -- they're not saying they're going to miss something else in the future.

And so that means that by their own admission, they could have sold those shares. They should have. They didn't because they don't respect the Court's authority at all.

And I just want to provide a little bit of this context. You're going to hear, I believe, from Mr. Kang. He submitted a number of declarations already. I think the number is six or five -- yeah, five. He's going to come in and provide more testimony.

But what he said before was that on July 14th, 2022, there was an agreement made by Hytera to sell Sepura, and this is what I was going to come to when I talked about Norsat the first time and I'm here now.

How do you know they could have sold Norsat and made the payment? Because they did it at the same exact time with another company that we had also asked them to turn over in

the turnover proceedings, and they claim that, well, it's owned by a subsidiary, so we can't control that. Something to that effect, I'm paraphrasing.

Two weeks and a couple of days before the royalties were due, they agreed to sell Sepura, and then the way that they did it is explained in this declaration. They issued the balance of the amount to a shareholder. That's another Hytera subsidiary, the shareholder. They extended a loan to Hytera, the parent, so it could pay some amounts.

There's one thing I'll briefly note, but I think the focus is on the -- of our presentation today is on the failure to pay the $49 million owed in July of 2022. The sale of Sepura was unquestionably a violation of this Court's citation order. This is Docket 1021 at 2. It includes the prohibitions.

It's incredible to me because I think much of what Hytera has said and is probably going to come and say today is that they've got these, like, restrictive agreements with banks and it somehow limits at least in some part their ability to do things. How about another order from this court that prohibits them from transferring property? They are fine with claiming that they need to comply with certain obligations when it suits them and saying that the obligation doesn't matter when it doesn't suit them.

So it was a violation of the Court's citation order,

plain and simple, to do that. But we don't need to get there because to find contempt, all you need to focus on is that they did not make any even partial attempt to comply with the order to put in $49 million approximately into escrow.

But they did sell Sepura. They sold it for nearly $160 million U.S. after the conversion. What did they do? They paid everybody else except the court. They retired bonds. They were -- paid maturing loans, I believe, we don't have enough access to the data because they kind of have given it to us in whatever form is -- they believe helpful is my belief, so we don't have all this.

I believe they prepaid loans that were not yet due to put themselves in a different better financial position, and they did it right in like probably the days, it's not exactly clear when these payments were made, before they owed the money into escrow, the $49 million.

And as other courts have found, prioritizing other debt obligations, as well as operations costs, which is sort of their whole theory, is a clear indication that the contemptor has not been diligent and energetic in their efforts. That's the *Voso* case from this district.

They claim -- Mr. Cloern said -- represented it in his email, you know, they've had -- they put in reports where they've used this term liquidity crisis. They're not in a liquidity crisis. That's not accurate.

They have, as Mr. Westerman has explained and will again today, plenty of cash on hand.  Much of it is unrestricted by their own admission, billions of dollars in assets, almost a billion dollars in net assets.  And to give you a flavor for why -- you know, you're probably wondering why are you saying this is relevant when I'm showing you kind of the witnesses from the trial saying things that we think are not true?  It's because look at what's happened even in the context of the proceeding we're on today.

Mr. Kang, you're going to hear from next, he swore under oath under penalty of perjury that Hytera has been experiencing severe liquidity problems for over two years.  That was on July 31st of 2022.  That's his declaration that's before your Honor on this motion.

With less than a week before, in an investor conference reflected in a form that we had translated that took place between July 27th and 29th of '22, so, like, the same exact time as they're selling Sepura in violation of the transfer restriction, using the funds to pay everyone else but the Court, and Mr. Kang is swearing to your Honor under oath that Hytera has been experiencing severe liquidity problems for two years, what do they tell investors?  "In the past few years, the company has effectively responded to and alleviated the challenge of tight capital by disposing of some fixed assets in combination with good operating cash flow."

And you know what word I could not find anywhere in that investor call or, frankly, any of the others that I was able to translate and look at? Liquidity crisis. That is a phrase that, as far as I can tell, is reserved for this Court when they want to explain their justification for disregarding the rulings of your Honor and the judge who was presiding over the case before.

As I mentioned, I'm not going to go into great detail because Mr. Westerman will get into this, the data that we've been provided to date and even analyzing through translations and financial analysis by a trained person who's an expert in this, Mr. Westerman, which by the way, is something that Hytera is not bringing.

You're going to hear from Grant Thornton. Look very carefully at Grant Thornton's analysis. Putting aside that it was not signed under oath, it goes out of its way to say this is not an audit. All we are doing is assembling some data at Hytera's instructions, and Hytera is responsible solely for those instructions. And there is not an analysis conducted by Grant Thornton, and I don't think you're going to hear one today, that says it would have been impossible for them to pay even a single penny in support.

Mr. Westerman, who has done that analysis, has shown and will show today that that is completely 100 percent incorrect. Even if you look at the Hytera parent, you will

see that the parent has $62 million in cash as of about a month ago. I'm approximating with those numbers. Assets of well over a billion dollars and, after you subtract out the corporate parent's liabilities, net assets of almost $700 million. That was a few weeks ago.

About a year ago, right before the money was originally due, the numbers were pretty similar.

And it's not just the numbers, but it's also what they continue to say to the market. So these are some more of those investor calls from 2023 that we were able to get translated. Again, I have not seen that it says that they say we're in a liquidity crisis, we can't possibly meet an obligation that costs $50 million.

Instead they say, "The company recently announced 2022 results with an estimated net profit attributable to the parent company of 390 million to 490 million." Those are in RMB, so you have to do a translation to U.S. dollars, but a very significant profit last year, and that's a year-over-year turnaround and significant earnings.

And then, this is just, I mean, gosh, a week ago, Hytera is talking to investors again. We'll see what Mr. Kang says. I don't recall seeing anything about bank contracts and how that was going to render them unable to comply with court-ordered payment obligations, but what they did say is that "The company has significantly improved its profitability

in the 2023 interim report" -- so now we're talking about taking us up to live -- "compared with the last year" -- which was already a good year -- "with net profit of 130 million yuan and a single quarter and profit rate of more than 9 percent in Q2" of this year." We're talking about the quarter that has the most recent information.

And things are looking even better. "In the second half of the year, the company is more confident in revenue growth." And I think, your Honor, and I've learned from having litigated this case for seven years, it is so important to contrast some of the things that we'll hear Hytera say in proceedings like this with the things that it will say in other contexts because I think that the latter can be and often is the most salient information about what's really going on.

If you look at the consolidated financials, so the parent and the subsidiaries together, the numbers go up even more. Cash of about $130 million. Assets of about 1.6 billion, and net assets, which are up over last year when you look at it at the subsidiary level, of nearly $900 million net after paying off all liabilities.

And I think there's no real question that for purposes of looking at the -- whether there's an ability to pay, including the resources of the subsidiaries as appropriate because Hytera exercises control over them, you

don't need to get there, your Honor, to be very clear, and the reason is that the corporate parent itself, as you saw, has plenty of funds and assets from which it could have satisfied this liability had it wanted to.

But if you look at the subsidiaries, that's -- there's even more. They say in their financial reports, you know, that the -- they consolidate their financial reports. They include within them the subsidiaries' financials, and they do that on the basis of control over those subsidiaries, which means, among other things, that they have authority over an invested party.

But you don't need to just look at that statement. The facts themselves make very clear that they have that control. When they wanted to, although they have at other times claimed an inability to control Sepura, the corporate parent had its subsidiary sell Sepura, give the money to the parent, and the parent used it to pay off the parent's liabilities except to this Court.

And the same thing is true for Norsat. They -- it's interesting. One of the new documents they produced yesterday is an email. I don't know who sent it, but it was sent to someone at Norsat named Arthur, and the email says something -- and I think it was sent on Monday of this week, by the way; this is their reasonable efforts to comply with the Court's orders.

On Monday, and I'm paraphrasing, perhaps they'll show it to us and explain it, they say, Arthur, could we, we have to pay some $49 million that we recently learned -- I think they said the word recently. I don't know what that could possibly mean, since they've owed the money for over a year. Would you give us some of your money? I'm paraphrasing again.

And Arthur says, oh, you know, sorry, we can't help you. We're spending that money on capital contributions, that they're doing something within the business to benefit it, presumably some kind of discretionary spending. And so when it suits them, Hytera says you can have the Norsat shares. We've taken away the liens, we'll put them into escrow, but when it comes to, like, accessing cash that this subsidiary is apparently using for discretionary purposes, they ask Arthur whether they can have the money, and Arthur says, oh, no, we prefer not to do that.

The facts show that they have control over the subsidiaries. And as we've pointed to in this case, the *Husain v. Layng* case, you know, this is something the courts have relied on, too, to show that an ownership in a separate company with enough money in an account to make a partial payment was persuasive evidence that the contemptor could have made a partial payment towards the obligations.

Again, none of that was done here.

So, finally, Hytera has failed, as I said, to meet

its heavy burden to show compliance was impossible. And I won't repeat what I've said before about that, but I would like to leave the Court with this: What you'll hear from Mr. Westerman and have seen in his declarations before is that there is a world in which they could have tried to lay out what their financial projections look like, what their anticipated operating cash flows look like, what their liabilities payments look like, and in much the same way I was imagining having a discussion with my 17-year-old son about whether he could afford something, and you could lay out, like, a plan that you have for the next couple of years to sort of figure it out, they've provided nothing like that. They have not shown that if they set up a plan, there is no where that they could take any money to satisfy what this Court wanted to, and they certainly have not shown that doing so in the context of a plan like that would render them insolvent.

Instead, they've simply decided not to pay any amount, and so they have failed in that regard to satisfy the requirement to show a complete inability to pay, that any type of payment whatsoever was impossible.

So we believe contempt sanctions should be issued. We're going to reserve until our closing to go into detail about that, your Honor, but I'll say -- I'll kind of make a final point on this.

The purpose of civil contempt sanctions are coercive, and they're intended to coerce a recalcitrant party, like Hytera, to do what it has been obligated to do by the court. And your Honor and courts generally have broad discretion in fashioning remedies like that.

And they're necessary because even in the face of your Honor's latest ruling, you know, we have not -- they followed through with their threat to continue not to comply. You know, there are many parties who would have said, gosh, the court has now set a hearing, I have one final chance to pay, let's at least pay $10,000. It will show some kind of good faith. They didn't even do that. They are thumbing their nose at the Court, and why are they doing it? What are you going to hear from them?

I pulled this up because I think it really speaks volumes in my mind about what's really going on here. This is from Mr. Kang who you're going to hear from I guess just about next, and he tells the Court in his declaration at Docket 1411 that "HCC had no choice but to comply with the lenders' directives."

We don't think that's relevant. They have all these other unencumbered assets and unrestricted cash. This isn't even the relevant question, but they said they had to comply with what the lenders wanted. And why? Because if not, it would be forced to halt operations.

What they are saying is we're going to do what the lenders want, not what the Court wants because we think that the lenders are going to force us to halt operations otherwise, and that's why the only way to coerce a company like this into actually complying with the Court's rulings is to halt their operations by enjoining them from selling any products until they comply.

And I have a very, very, very strong feeling to a certainty that if your Honor does that, we will get payment, and every bit of excuses and claims of inability to pay will go out the window.

But what they're doing is saying, no, we think that the other parties to whom we owe debts, we're afraid of them. Who are they not afraid of for whatever reason that is beyond me? The Court.

So with that, this is the end of my presentation, your Honor. Thank you for your patience. I'll turn it over to Mr. Cloern, and then we can take it with witness testimony.

THE COURT: All right. Thank you very much.

MR. CLOERN: Thank you, Mr. De Vries.

OPENING STATEMENT ON BEHALF OF DEFENDANTS

MR. CLOERN: Please the Court?

THE COURT: Yes. Please proceed.

MR. CLOERN: Thank you, your Honor.

Okay. I'm going to try to be much briefer. I think

that was 45 minutes, and I'm going to try to stick in 10, and I don't want to get into the underlying merits. However, I will make a few quick statements just to correct the record because I think they reflect on credibility, and credibility is going to be really important. That's why we have these hearings, and credibility is really important on contempt.

And Hytera is going to bring its witnesses in, and they're going to testify. And the issue here today is did Hytera take reasonable and diligent efforts to try and comply with the Court's order?

The facts are going to show 100 percent that they did. The facts are going to show that they did everything that they could possibly do, and that's Motorola's burden. We'll cite cases to that effect, but the evidence will show that Motorola's failed to meet that burden.

And if you think back about the opening statement, all 46 minutes of it, there wasn't anything about Hytera's diligent efforts, and why -- nor was there anything about what additional Hytera could have done, given how the banks have control over Hytera. So I'll get into that in a second.

The next -- the next point we go to is an inability-to-pay defense. So even if it is determined or found -- and we don't believe that will be proper or appropriate with the evidence -- but even if it were to be found that there was some effort HCC, Hytera's parent, could

have taken that it didn't take. And so the *SEC v. Hall* factors are satisfied for contempt.

Then because contempt is coercive, if the alleged contemnor has an inability to pay, cannot meet that order, then, again, contempt is not appropriate. And so that's a separate defense where the burden does shift to Hytera, and we will show and the evidence will show today that the banks have substantial rights. Hytera's not allowed to sell any assets without bank approval. All the assets that have been sold have been pursuant to bank approval. Not just that, but the banks went to Hytera and said you need to pay down more of your loans, you need to sell Sepura and then give us all the money, and that's what happened.

So Hytera was forced to make those asset sales by the bank. Hytera's not otherwise allowed to do that. And Hytera's limited in what it can do with its cash, and we'll put in evidence about that today.

So I'm going to talk for a few minutes a little bit more about the legal standards, what the evidence will show, and a preview of the banks' rights, and also the substantial criminal penalties, 3 to 7 years in prison in China for violating the banks' rights and their collateral, and if that's not an inability to pay, I don't know what is.

So -- but before I do that, I want to address a couple of the statements about the underlying merits of the

trade secret and copyright dispute.  They're not relevant here today, not one bit.  A lot of time was spent on them.  It's not relevant at all.

What's relevant is the $49 million first escrow payment.  However, to the extent they reflect upon the credibility of HCC or its personnel, I want to address them.

So the -- Hytera did not -- Hytera conceded at the trial that information was stolen from Motorola and that it was stolen by essentially seven employees at Motorola who came over to Hytera.  They took information.  They took great efforts to conceal that they took it and that they were using it, and those are the seven individuals that are indicted in the criminal case.  No one other than the Motorola employees who came over to Hytera are indicted.

So that's what the underlying bad acts are about.  We never disputed that at trial.  We conceded that at trial, and no -- there was never any allegation that there was any time wasting or that Hytera was the reason that there was a four-month trial.  The parties were both there and had equal time.

And importantly, no Hytera witness ever lied at trial.  And I know that in one of the Court's orders, that was referenced in a footnote that there is an allegation in the indictment.  But I'm involved in the criminal trial.  The DOJ has made very clear that they are not accusing anyone of

perjury.  They are not suggesting that any witness lied.

At the time the witness testified, G.S. Kok had been terminated.  There was no question about that.  There was a later point that investigation has revealed that G.S. Kok contacted Hytera because a customer had contacted him and he introduced somebody, and there was a meeting and expenses were reimbursed.  It was a one-time thing.  He was never rehired, and the DOJ has assured us that they're not accusing anyone of perjury or anything of the sort.

So -- but that's the danger in bringing up stuff like that in this proceeding because that's a separate criminal proceeding.  There's a whole bunch of issues going on there, and it shouldn't affect what's going on here.  What should affect what's going on here are the witnesses that testify today and their credibility as shown in this proceeding.

Okay.  So enough on that stuff.

So the -- my colleague from Motorola did appropriately show the four factors in *SEC v. Hall* for the Seventh Circuit.  There was an unambiguous order.  Absolutely, there's an unambiguous order, no question.

That order was not complied with.  That is true.

The compliance was -- the noncompliance was substantial. We're not going to challenge that.

And, 4, there were no reasonable and diligent efforts taken by the alleged contemnor.  That's where the fight will

be today, your Honor. And I want to clarify one thing. There has been payment, so the royalty order, which is Docket 1349 at Section 5.3, makes clear that the royalty is a payment or is going to be a series of payments for sales going into the future.

The July 31st, 2022 royalty payment was the first one. It was missed. All subsequent payments have been made to the tune of, I don't know, some two, two-and-a-half, $3 million. All those have been made, so partial payment has been made, and those are part of the diligent efforts.

What was not paid is the first royalty payment. The first royalty payment, of course, is much larger, it's 49 million, so we're not going to challenge the substantial part. But it is important that everyone understand and agree that, as the evidence will show, the royalty payments have been made and will continue to be made.

We'll get into this when the evidence comes up, but the banks that are essentially in control of Hytera view those as ordinary, everyday expenses for running Hytera's business which it has to do to continue to make money to pay the banks back.

As your Honor noted in the Court's order, that first payment includes really -- it's really more like a monetary judgment, and it includes sales dating six months back prior to even the judgment in the case and a year before there was

even ordered to be a royalty. So it was a way to sweep in supplemental damages that weren't covered at trial, right?

I mean, the royalty goes back to June 2019, and the trial itself didn't even start until August -- I'm sorry -- until October 2019, and the judgment was March 2020. So it's really for damages, and we'll get into this, and that's why the banks aren't willing to allow Hytera to borrow money for it, to sell assets to pay for it, or to use what little operating capital they have for additional partial payments beyond what they view as ordinary course of business expenses going forward.

Okay. So let's -- and that, of course, is important when we get to the inability-to-pay argument.

In the *In re Res. Tech. Corp.*, 624 F.3d 376, Seventh Circuit 2010, that talks about the inability-to-pay standard, and it does say that if there is no effort at partial compliance, if there hasn't been a partial payment, there's this really high burden, and that's what my colleagues, counsel for Motorola, suggested should apply.

However, that is not correct because there has been a partial payment. There's been a partial payment of $2-1/2 million.

And so the standard from *In Res. Tech.,* which says, "Where there's been no effort at even partial compliance with the court's order, the inability-to-pay defense requires a

showing of complete inability, meaning the party asserting the defense must establish clearly, plainly, and unmistakably that compliance with impossible."  That standard doesn't apply.

Instead, as is stated in that case, because the contemnor has made efforts at partial compliance and has made a partial payment, the Seventh Circuit law requires the contemnor need only show it has an "adequate factual basis to support the defense."  Very different standard once there has been an attempt and some partial compliance, which there has been here, because as I stated, Section 5.3 of the Court's royalty order, Docket 1349, states, "Payment shall be due for the amount reflected in these quarterly reports" -- those are the quarterly reports that shows how many royalty-bearing sales were made -- it says, "on each subsequent January 31st, April 30, July 31 and October 31," and so quarterly, "and made into the parties' agreed escrow account pending exhaustion of all appellate proceedings and unless and until the court orders otherwise," right?

So this is an ongoing royalty that has been and all payments have been made except that first payment.  So that is the standard.  So as far as the legal framework goes, it is Motorola's burden under the *SEC v. Hall* factors, and Motorola has not shown and we don't think will show in their case-in-chief that Hytera failed to make reasonable and diligent efforts.

We will then put on evidence in any case that shows that Hytera has, and then there's a separate inability-to-pay standard, and because there has been partial compliance, the more lenient standard of *In re Res. Tech.* applies, but in any event, as we'll see when we get into the bank, the rights that the banks have and what brought that about, Hytera has a complete inability to pay.

So let's just talk about that for one second.

Your Honor, Hytera was a very fast growing company after its IPO, and particularly in the 2015-to-18 time frame. Banks were throwing money at Hytera. It was very rapidly expanding, and this lawsuit came. The judgment happened in March of 2020. I think the original judgment. It's been lowered, but the original judgment was 750 million, something to that effect, and really shook the banks' confidence.

Of course, the pandemic happened right about the same time. What the evidence will show is that the banks came to Hytera and said, look, you guys owe $800 million to us, and that was fine when things are good, but now they're not good, and under the material adverse change clause, we have the right to default and accelerate all the loans. That means insolvency.

So what happened was is what we call in the financial debt world a workout. Outside of bankruptcy, Hytera and HCC convinced the banks to not require repayment of all of those

loans at once, which, of course, Hytera would not have been able to do.

And essentially the deal is that Hytera would spend its money on nothing other than its bare operating expenses so that it could continue to make money to pay down that $800 million debt.

But that wasn't -- Hytera has a good business. Depending on the year, they might make 30, 50, $100 million depending on the year, we'll see that in the financials, from operations. But it wasn't going to pay -- the banks needed to reduce their exposure much more quickly.

And so what the banks said is we also need you in 2020 to sell an asset, and Hytera sold its Houhai office building and was -- I don't know, it was 300-ish million dollars and used that to pay down bank debt. And so you'll see some statements in investor calls that says we hope we've stabilized things.

Of course, we were -- everyone was dealing with the pandemic at the time. There were all sorts of factory shutdowns in China, and that was difficult, and things get better and worse over weekly investor calls. So it's easy to cherry-pick statements here and there, but there's tons of statements that are reflecting everything that I'm telling you and the evidence will show today.

In 2022 in May another black swan landed on the lake

of Hytera, and the DOJ announced the indictment publicly to the world, and the banks were shocked again. Around the same time, Hytera issued its 2021 final annual -- or results pursuant to the, you know, rules of the Shenzhen Stock Exchange, it's a public company, has to do it, just like U.S. public companies do, and that showed a significant loss at the group level for 2021.

And so those two things happened, I believe, within a few weeks of each other, so the banks came back again in the summer of 2022 and said, well, now you guys are indicted by the DOJ, we need to ratchet the debt down another big chunk, and they said sell Sepura.

Sepura is a U.K. company. It has its own business. It's sort of like if, you know, Apple bought HTC. They do the same things, but they're completely separate. You know, they both sell phones, but they're completely separate phone companies.

Sepura has its own radios, its own business. It's all a bunch of U.K. people. You know, Hytera's a Chinese company, and Sepura ran independently. It's not a part of Hytera's core radio business selling Hytera radios, so it could be cleaved off.

It was -- the banks required it, and the subsidiary that owned Sepura was Hytera Hong Kong. Hytera Hong Kong sent that money up to HCC who used it to pay down bank debt.

And so the evidence will show, and we'll put this on, that Hytera has reduced its bank debt, which is bank loans and bonds, from 800 million right around the time of the Motorola judgment in 2020 down to about 200 million today. And the reason that Hytera is in this liquidity crisis is because the banks -- the banks have rights to monitor everything Hytera is doing. All of Hytera's money is on account at the banks. All of Hytera's account receivables are paid into accounts at the banks. All of Hytera's money flows through these ten banks. They watch it, and as Hytera makes -- is able to have excess operating cash from quarter to quarter, the banks take it and say, well, now you're repaying this loan, now you're repaying that loan, and that's what Mr. Kang is going to explain and our witness from Grant Thornton, who is Hytera's public auditors, will also explain that Hytera has been cash negative every single year at the end of the year, and Mr. Kang will explain how that happens with the banks.

Professor Feinerman will explain the bank contracts, the kinds of rights the banks have, which include those I've been talking about here in this opening.

And so, look, that's the -- that's the big picture. The diligent efforts here are that Hytera went to its banks, begged for additional borrowings. The banks said no. Begged for the right to sell assets, which Hytera doesn't have. The banks have to have the contractual right to approve that

because they have collateral, and the banks aren't going to lose the collateral. That was the basis for making all these $800 million of loans, and the banks said no.

They did that in 2022, but Hytera was willing to convince the banks, let us at least pay the ongoing royalties if you won't let us pay what's the first one, which is mostly essentially damages from the trial in a different form, and convinced the banks to put up Norsat as security so that everyone here could feel comfortable that -- you know, because that's really what an escrow account is. This money isn't going to Hytera anyway. It was -- it's really security so that when appeal is resolved and the final numbers are in, the royalty will get paid.

And because the banks would not part with their most prized kind of collateral, which is cash, right, that's the best collateral there is, of course, the banks won't part with that, they would part with the Norsat shares.

So a year later -- so, hopefully, there was hope that that would be accepted. It wasn't, and we respect the Court's decision there. We're not trying to get back into that, but it is part of the story of the reasonable and diligent efforts and that being all that Hytera could convince the banks to do.

Another run was made after your Honor's recent order to the banks, and Mr. Kang will talk about that, and again the banks refused.

So we're going to put on our case about reasonably diligent efforts. We don't think that Motorola is really going to have much to say about that, and we think that we'll prevail because there is no way that there's clear and convincing evidence here that reasonable and diligent efforts weren't taken.

And, again, even if they weren't, Hytera has a complete inability to pay because of the bank rights, and if Hytera violates its contracts with its banks, the banks will yank all the loans. The banks have all Hytera's cash and the rights to seize it, and so they'll take all Hytera's cash. No money would come here anyway because the banks have it all and will seize it all, as is their rights under Chinese law, and Hytera will go into liquidation.

Also, even if some way an asset was sold and was -- and the cash were able to be spirited out of China and into the U.S. monetary system to be paid into the escrow account, that would be a violation of the banks' rights, and under China criminal laws, which Professor Feinerman will talk about, that carries a 3- to 7-year prison sentence for violating the rights of creditors' collateral.

So -- and that's going to be the thrust of our inability-to-pay case for those two reasons, and we think the law is really clear that there are cases saying, you know, the debtor doesn't have to put themselves into insolvency in order

to establish an inability to pay, and so I think the natural extension of that is they also don't have to put themselves in prison.

All right. I think those were my comments, and I've gone for opening, and I'll reserve the rest of our time to put in the evidence and what that will show.

THE COURT: Okay. Thank you very much.

MR. CLOERN: Thank you, your Honor.

MR. DE VRIES: Mr. Cloern made a couple of notes up there. Want me to hand them to you?

I won't read them in case --

MR. CLOERN: There's nothing on there you don't know, I'm sure.

MR. DE VRIES: Your Honor, we'll go ahead and call our first witness.

I need to say for the record, given what just occurred, Mr. Cloern just told a story about a bank restructuring to avoid insolvency that apparently he says occurred in 2020 involving the over $300 million sale of their corporate headquarters and also involving Sepura in 2022.

To the best of my knowledge, despite the presence of the Court's citation order and the order from Judge Norgle requiring them to provide detailed financial information to us, I don't recall them ever providing that information in any of the declarations that we've seen, the 14 that were cited to

in this contempt sanctions motion, or documents evidencing a workout agreement with the banks, negotiations with the banks around the workarounds, or any explanation as to why, given the Court's transfer restrictions, the Court wasn't involved in those workout instructions.

So the reason we'll say that, we'll go ahead into testimony, that as you can see, the way this has been set up is now we're hearing a new story for the first time here, after multiple rounds of briefing, about things that occurred in the past when they were under court order to provide the information. We'll go ahead and respond to everything they've provided.

I suspect, given -- I mean, I suppose they'll have some evidentiary support, since there isn't any that I've seen before for the vast majority of that part of the story, that we'll need to have some rebuttal, but I just wanted to note that for the record.

MR. CLOERN: Your Honor, just to clear up the record, that is false. Everything about the Houhai building sale and Sepura sale is public record. Hytera is a publicly listed company. It's all been disclosed, and all of those public disclosures have been produced through the citation process contemporaneously. All of this information has been produced. They've had it for years. They're just now bringing it up.

MR. DE VRIES: Yeah, it's not -- just to be clear,

that's not true, because I'm not saying -- obviously, we know about the sale of the headquarters and we know about the sale of Sepura, we've talked about it throughout, I talked about it in my opening.

My point is that we were just told that there was an insolvency risk and negotiations with banks and a workaround agreement -- I don't have a live transcript -- that occurred, and that somehow maybe they're in the -- that's laid out in some of the agreements that were produced last night. My point is not that we didn't know about those sales. We've actually said that those sales violate the Court's transfer restrictions.

It's the negotiations and the claim that as a result of some negotiations with the banks over those particular sales, including -- like, I don't recall ever seeing that the banks -- there was a negotiation where the banks mandated that they sell Sepura.

If it's out there, then we'll take a look at it, but to the best of my knowledge, that part of it, the workaround agreements that led to those asset sales and now supposedly to the -- kind of the way that the liability is working is not something that I recall seeing before. I read all the declarations again in the last two days.

THE COURT: Okay. Well, you know, it's helpful that you've both flagged the point because as I was listening, that

issue -- I do remember reading in the papers about the sale of the building. I remember reading about the Sepura sale. It was a little bit -- it was kind of news to me that it was as part of a bank restructuring effort.

So that part of it did a little bit jump out to me as potentially new, but then I was, like, well, I've got to go back and reread because maybe I missed it in the papers or something. So I -- that is -- but I'm glad that you've at least flagged that. I will need to go back and take a look and see what is in there about that.

MR. DE VRIES: And that's exactly what our reaction was at our table, so I just wanted to note that, lest there be any implication, which there was, since Mr. Cloern said that what I said was false, that actually they had disclosed the entire thing that he just said -- we'll obviously just go compare the transcript to what discovery has been provided.

I just wanted to note that given that Mr. Cloern has gone out of his way to say it's our burden, we should go first, and then told a new -- from my perspective, a new story, I just wanted to note that there's, like, and then he wants to argue that we didn't meet our burden, there's obviously something unfair.

And I think that the Court could disregard all this new evidence. The law is clear. It's not like they get to withhold things, say they can't provide them. They're under

the court order under the citation to do it. Then come up with a new story and say we haven't met our burden.

That said, I don't think you're even going to need to get there, Judge, because everything that they've said does not change the fact they absolutely could have sold Norsat for more than $50 million and complied, and they have not shown and will not show that that is impossible, in addition to their unrestricted cash.

So with that, with your Honor's permission, we can go ahead and call our first witness.

THE COURT: I also just want to make clear it's not that there's no mention of banks in the papers either. There's certainly mention of banks, I mean, and attempts to reach out to banks. Banks sending emails, parties disputing about, you know, when did the efforts begin and were they -- it was the email, just a little confirmation email at the end of some back-and-forth, or was it actually when the outreach happened.

But it's really just this other aspect of how the banks may or may not have been involved in some kind of workout or workaround, an informal -- a nonformal bankruptcy style -- some kind of agreement that avoided bankruptcy. That is what jumped out slightly to me as potentially new, but, again, I would need to go back and take a look at the papers to see whether that's new or not.

MR. DE VRIES: And to be clear, that's exactly what we reacted to, too. That is the point. Not the fact that there was a sale, not that they reached out to banks. It's the suggestion that there was a formal or informal workaround agreement.

I mean, our law firm does a tremendous amount of restructuring, so I'm very familiar with these kinds of concepts. If there was an agreement reached between the banks that was the cause of, like, the Sepura sale, I don't recall seeing that agreement. I don't see the communications about it. That's really our point, too, your Honor.

MR. CLOERN: Your Honor, I just want to make sure words aren't being put in my mouth.

So I think what we have -- I have not suggested that there is any kind of formal workout agreement, that there's some document signed by HCC and its banks and there's just this big agreement with a bunch of tabs and all this stuff that says, you know, a formal workout agreement like might sometimes happen.

What there has been and what the evidence will show is a running discussion where the banks lost confidence in 2020 and came to Hytera and said you need to repay loans. So there's a certain amount of debt that comes up and matures every year, and normally while things are going good, it gets rolled over and then extended. And the banks said, no, we're

not extending the debt that's coming up this year, the principal needs to be repaid, and there was discussion about how to do that, and the banks said you need to sell assets, and the Houhai building was identified.

So then the same sort of thing happens in 2022, and the banks have these panoply of rights in their contracts, and the banks have been exercising them throughout this period under sort of the spectre of the Motorola judgment, and the banks will continue to have these rights triggered and have this control until either the Motorola issues are resolved and there's not this big, you know, billion dollars worth of liability hanging out there, or the banks are paid off.

And at this rate, you know, and Mr. Kang will testify about that, going from 800 million to 200 million, the banks will be paid off. It will be zero in the next two to three years. So at that point, this won't be -- you know, this problem will be gone.

But those are the facts. We'll all, of course, I'm sure, talk a lot about how the law applies to those facts. But those are the facts. I want to make sure it's not misunderstood. I'm not suggesting that there is an official workout document.

But all of this is disclosed, number one, in Hytera's public financials. They are regulated by the Chinese version of the SEC. All this is disclosed. I could pull out one --

it's actually attached to the Westerman declaration, where, you know, it's like most investor statements, it says, yes, we hope to have things stabilized and we hope things are doing better, but, you know, we took on all this debt and it's caused problems, and in light of the Motorola judgment, the banks are now pressuring us to pay it all back and, et cetera.

So that's all in those documents as well. Of course, they're just not pointing that stuff out.

So it's all there in the Chinese SEC required disclosures, and it is addressed in our briefs and underlying declarations. It's probably not pulled together in the way that I just did it. We focused more on individual bank rights. We're used to talking about this asset or another asset, and so it wasn't big-pictured that way, I think, in some of the prior briefing, but we did focus on the banks' rights, the banks' contracts, that the banks have the right to tell us that we can't sell assets, that the banks have -- I mean, this was in the turnover motion, right? This was the whole point of the turnover motion, which was that the banks have rights in Hytera's cash and that the banks are not -- and that the Court didn't have, under the citation, jurisdiction over that cash because it's in accounts in China held as collateral and the banks have their own senior rights in that -- in that collateral. That was our whole argument in the turnover motion, which was -- which was denied.

So these kinds of issues have been out there. Just there's a lot of briefing to go back through and a lot of supporting declarations over the last two, two-and-a-half years or so.

And, of course, there's also a lot of briefing on the citation, so it's really hard to get into all this today in the one-day hearing, but I mean we -- Hytera moved to quash the citation on the grounds that on its face the citation would shut Hytera's business down, which would, you know, we can't do that. It's a publicly listed company. It would violate tons of Chinese law to simply walk off one day because it can't make any asset dispositions and operate in the normal course.

And Motorola responded in their opposition, of course, Hytera can operate in the normal course. No one's saying that it can't operate in the normal course. And so Hytera did, and everybody's known that.

These -- these sales of Houhai and Sepura were publicly stated, and the Houhai building was in 2020 in the public financials, in the public statements of an audited public company and was never raised until years later, and it was part of Hytera staying alive, right? If they don't sell these and pay the banks back as required, the banks say, okay, well, I'm taking all your cash and foreclosing on you, and then Hytera is in liquidation and gone.

And what the citation law says is that what we're trying to do is maintain the status quo, and so these asset sales are necessary for Hytera to stay a going concern, and then it's going to make what it makes, 50 million, a hundred million dollars a year from operations, and once it gets the banks paid back, it can pay back everybody else. And that's what its plan is, and that's what we intend to show today.

In any event, we've also argued in the prior citation briefing that under the *Leibovitch* case that the citation doesn't apply to physical assets anyway. The citation applies to physical assets, tangible assets within Illinois. Outside Illinois, only intangible assets, which, of course, an 80-story office building in Shenzhen, China is not an intangible asset. So in any event --

MR. DE VRIES: So, your Honor, it sounds like there's no formal workout agreement. That's good that we have that cleared for the record.

For the record, I don't believe that we've been provided the alleged running discussions with the banks despite the citation and the Court's order that complete financial records be provided, but be that as it may, I think we're ready to proceed if your Honor would like.

THE COURT: Okay. That sounds good. Let's just turn to the witnesses, please.

MR. DE VRIES: Thanks, your Honor.

As our first witness, we would like to call our expert witness, Mr. Ed Westerman.

(Witness sworn.)

THE COURT: Okay. Just a quick reminder before we get started, we're going to pause at 12:30, and I don't mean to be rude or interrupt in the middle of the exam, but let's just try and pause there.

Thanks.

MS. CARSON: Good morning, your Honor. Pat Carson from Kirkland & Ellis representing Motorola.

May I approach? I have a binder.

THE COURT: Yes, please. Thank you.

(Documents tendered.)

MS. CARSON: Could you please switch to the Westerman slides.

EDWARD J. WESTERMAN, PLAINTIFFS' WITNESS, DULY SWORN,

DIRECT EXAMINATION

BY MS. CARSON:

Q. Good morning, Mr. Westerman. Could you please introduce yourself to the Court.

A. Sure.

My name is Edward Westerman. I work at FTI Consulting, where I'm a senior managing director and global leader of our forensic investigations practice.

I have, in terms of academic background, I have an

undergraduate degree in accounting and I have an MBA in finance. I'm a Certified Public Accountant and a Certified Fraud Examiner.

I have more than 20 years of experience working on a variety of forensic accounting projects, including financial and operational assessments of businesses, which is what we've done here, as well as financial reporting issues, asset misappropriation issues, including intellectual property, bribery, and things like that.

Prior to being at FTI Consulting, I was a partner at Deloitte and have testified as an expert in state court, federal and arbitration cases.

Q. Thank you, Mr. Westerman.

MS. CARSON: Your Honor, I'd like to qualify Mr. Westerman as an expert in forensic accounting.

THE COURT: You may. He's qualified.

MS. CARSON: Thank you.

BY MS. CARSON:

Q. And, Mr. Westerman, have you caused -- prepared some demonstratives to illustrate your testimony today?

A. Yes.

MS. CARSON: Your Honor, permission to publish the demonstratives?

THE COURT: Yes. That's fine. Thanks.

BY MS. CARSON:

Q. Mr. Westerman, before we get started, I just wanted to ask you a couple of initial questions.

Mr. Cloern said that Hytera has done everything that it possibly can do to raise the cash to pay the $49 million royalty obligation.

Do you agree with that?

A. No. We have not seen evidence of that.

Q. And in all of the information that you've reviewed in coming to your opinions in this case, do you agree with Mr. Cloern's statement that Hytera's made reasonable and diligent efforts to raise money towards the $49 million obligation that it owes?

A. I've not seen sufficient evidence of that.

Q. Now, you have several opinions, and I'd like to walk through each one of them.

Could you just, using this demonstrative, explain to the Court what you're going to talk about today.

A. Sure.

Three areas of my testimony today are, No. 1, Hytera has the financial means to pay cash to satisfy the $49 million royalty obligation, given its substantial assets and operating activities.

Hytera's publicly available financial reports evidence that it exercises control over its disclosed subsidiaries.

And Hytera's not provided information sufficient to establish it can't pay.

Q. Okay. So I want to turn to your first opinion, and coming to that opinion, have you considered Hytera's balance sheets that it's produced in this case?

A. Yes. So Hytera files annual reports, quarterly reports, and we've considered the balance sheets as part of those voluminous reports.

Q. Can you just explain what a balance sheet is?

A. Sure.

So a balance sheet at a point in time identifies an entity's assets and liabilities, so things that they own or are entitled to. Those are assets, and liabilities are obligations that are owed.

Q. Now, on this slide, you refer to current assets. What are current assets?

A. Current assets are assets, such as cash or other assets that can be converted to cash within a year.

Q. And what are noncurrent assets?

A. Noncurrent assets would be those that you don't intend to dispose of in a year, for example, or collect within a year.

Q. So based on the balance sheets that you reviewed, you've got a series of dates at the top of this slide.

Can you explain why you chose those dates?

A. Sure. So, again, these public filings of Hytera are

issued every quarter, and we start with June 30, 2022, and we go forward through the most recent financial report, which is June 30 of 2023. And that's approximately the one-year time period since the judge's ruling ordering the $49 million payment.

Q. Now, is there any information on this slide that's particularly relevant to your opinion that Hytera has the ability to pay its $49 million royalty obligation?

A. So in these public filings, what Hytera discloses is that they have pretty consistently have total assets of 1.6 or $1.7 billion over this one-year time horizon.

Q. Now, this sheet refers to Hytera consolidated balance sheets. What does consolidated mean?

A. So what we have is the Hytera parent as one entity, and then there are a bunch of entities that Hytera owns equity interests in, and many of those it's 100 percent, roughly 40 entities that are disclosed.

So this consolidated balance sheet takes the assets and liabilities of the parent plus the assets and liabilities of those other entities, and consolidated means it totals up those -- those numbers from those entities.

Q. So have you considered the assets of the parent alone?

A. Yes.

Q. Now, looking at this slide, you've again got dates starting from June 30, 2022 through June 2023.

Is there information on this slide that is particularly relevant to your opinion that Hytera could pay its $49 million obligation?

A. So, yes. So looking at this slide, again, this is the parent, not the consolidated entities, but what it shows is total assets of roughly $1.4 billion that the parent has, and when you subtract off the obligations that are in the liabilities, the net assets is roughly $700 million.

Q. Now, these are assets that Hytera reports in its annual reports, correct?

A. Correct.

Q. And this is for the parent alone?

A. Correct.

Q. Are the values that Hytera reports conservative or not conservative?

A. Well, there's a variety of accounting rules that could be conservative in certain respects. So the actual values if you sell assets could be higher.

Q. And so what would be the impact if the actual assets are higher?

A. Then the net asset value would be higher than the 700 million that's reported here.

Q. All right. We've been talking about assets generally, but have you looked at cash as assets only?

A. Yes, I have.

Q. Now, this slide talks about unrestricted cash and restricted cash.

Can you explain what restricted cash is?

A. Sure.

So just stepping back, this has the Hytera parent and subsidiaries, and this is dated as of June 30th, 2023, which is the most recent public information that we have, so just a couple months ago.

And what this shows is that the parent and the subsidiaries have total cash of 129 million. That's the far right bottom yellow number.

Of that amount, Hytera reports what is restricted cash, which may have obligations associated with it, and then unrestricted cash, and that unrestricted cash as of 6/30 is approximately $60 million in total.

Q. And of that, how much unrestricted cash does the parent have?

A. 16.2 million.

Q. And how can unrestricted cash be used, in your view?

A. That's cash, as is in the footnote here, available for payment at any time. There's not restrictions on that.

Q. Now, that footnote that you have in there, where did you get that footnote from?

A. That's a footnote in Hytera's financial statements.

Q. So this is something that Hytera put in its financial

statements?

A. Correct, the translated version.

Q. And that footnote, is that consistent with your understanding of what unrestricted cash would be?

A. Yes.

Q. Now, we've been looking at unrestricted cash assets, but did you also look at other unrestricted assets that were held by Hytera?

A. Yes.

Q. Why were you focused on unrestricted assets?

A. Well, again, as I said previously, Hytera has significant assets, over a billion dollars, and so what we see here is the total assets that are on the balance sheet for this same period since the judge's royalty order of the 49 million is, you know, somewhere between 1.9 and 1.6 billion of assets on the balance sheet.

Now, one of the things Hytera does in its financial statements is reports restricted assets, those which have, you know, something preventing them from being used. And that amount is disclosed here, and if you take the total assets per the balance sheet and you subtract off what Hytera's disclosed as restricted assets, you get unrestricted assets.

And that unrestricted asset balance in their financial statements is roughly 1.7 to $1.5 billion. So what this is saying bottom line in the red box is that there's

roughly 90 percent of the assets of Hytera are not restricted as reported in their financial statements.

Q. So we've been speaking about unrestricted assets. How does this analysis from Hytera's own balance sheets inform your opinion that Hytera has the means to pay the $49 million royalty obligation?

A. Well, what it's saying is there's significant unrestricted assets that would be available.

Q. Now, we've been talking about information that you derived from the balance sheets that are -- Hytera puts out publicly.

Have you also considered their income statements?

A. Yes.

Q. And if you could just explain what an income statement is?

A. Sure.

So the balance sheet, as I said, gives the assets and the obligations at a point in time. The income statement and the cash flows, those two statements talk about the revenue-generating activities and the expenses and costs that the company incurred for a period of time.

So what this slide is doing is moving from how much does Hytera have in assets to how much revenue in operating cash flow have they been generating, and specifically the time period that we're talking about is, again, since the royalty order, so that was back in July of 2022 through June where we have the most recent information.

And what it demonstrates is that Hytera has had significant revenues, hundreds of millions of dollars in revenues from sales of products, services, and then its net cash flows from operating activities, which is the cash that it generates from selling its products and paying its expenses is, you know, 90 to 150 million.

Q. So what can Hytera do with that net cash flow?

A. Well, that's a significant amount of cash, and why can't some of that be paid to satisfy the judgment?

Q. And to your knowledge, has any of that cash flow been used to satisfy the judgment?

A. With respect to the $49 million, my understanding is zero has been paid.

Q. Now, do we know how Hytera did use the cash flow? Have you reviewed any information to show that?

A. Yes. This is just one component of the cash flow statement and what it shows for both the Hytera consolidated and parent entity, and this, again, is for the same 12 months, the last 12-month period, is they have disposed of subsidiaries, which is Sepura, for which they represent they received 138 million in cash, and they've also had some activities where they've spent money on investments, and they call that purchase and construction of fixed assets, intangible assets, and other long-term assets, and that's an outflow of 55 million.

Q. So the information that you're providing on this slide, how does that inform your opinion that Hytera could pay its $49 million royalty obligation?

A. Well, they are generating cash, so they sold the sub that generated 138 million at the consolidated level, and they are spending money on fixed assets and intangibles of 55 million, and some of that potentially could have gone to pay the $49 million judgment instead of for these items.

Q. Now, in coming to your opinion that Hytera could pay its $49 million royalty obligation, did you also consider Hytera's ability to raise cash?

A. Yes.

Q. Now, can you just explain what you're showing on this slide?

A. Sure.

So in addition to generating cash from selling products, you know, there are expenses, right? And so this just shows, again, for this period since the royalty order, marketing costs, R&D expenses, and administrative expenses, and during this past year, Hytera spent 326 million or incurred 326 million in those various expenses.

Now, some portion of that presumably is discretionary, and if it's discretionary, instead of spending money on these things, why not have taken some of that cash and contribute it towards the judgment?

So, for example, instead of, say, running 10 marketing campaigns during this one year, what if you ran 5 marketing campaigns, and the savings associated with that would go forwards Motorola's judgment.

Same thing with research and development and administrative expenses.

Q. Now, we've heard -- I want to switch gears a little bit.

We've heard that Hytera has claimed to be in a liquidity crisis. Have you reviewed any information that's relevant to those claims?

A. Yes.

Q. Now, the title of this slide is Hytera's 2022 Lookback. What's a lookback?

A. So a lookback would be instances where companies are commenting on their past financial performance or operational performance.

Q. And why are you bringing the Court's attention to this Hytera 2022 lookback?

A. So just to step back, these are -- periodically, Hytera, like other public companies, has communications with its investors, and that's what's happening here. So this is a record of Hytera communicating with those investors.

This particular one was done as of February 3rd, 2023, and what Hytera is doing is commenting on the past fiscal year, which is 2022.

Q. Are these public statements?

A. Yes.

Q. And in this public statement from February 2023 by Hytera, what are you drawing the Court's attention to?

A. Just a few things with respect to this slide.

So, again, the company announced its 2022 results, and net profit for the parent was, you know, 390 to 490 million RMB. Now, that includes the Sepura sale.

Excluding the Sepura sale, they had a profit of 100 to 200 million, which they say is a significant improvement over 2021 and met the goal, and that 100 to 200 million converts to a 15 to $30 million U.S. dollar profit.

Q. I'd like to look at another lookback. This is from April 3rd, 2023.

Can you explain why you're directing the Court's attention to this document?

A. Sure.

So this is another communication with investor groups. It's commenting on 2022 in which Hytera says it's a turning point. They're maintaining positive cash inflows. They're reducing liabilities. They're improving their profit margins, improving the quality of their receivables, and then they talk about the next three years.

And what they say about the next three years is that revenue growth is going to be stable. It's going to remain a

double-digit growth rate, more than 100 percent, and the net profit margin is going to increase as well.

Q.  And can you also explain why you draw the Court's attention to this May 12, 2023 Hytera's public statement?

A.  So just moving forward in time, the first two were talking about 2022.  Now as we move forward, it's May, and they're talking about the first quarter of 2023, so that's this year.

And what they're saying is that the main gross profit margin has steadily increased.  There's been a decrease in interest-bearing liabilities, so we had a narrower loss.  They aim to maintain a double-digit compound growth rate.  Stable cash flow for five years, and there's been a turnaround in earnings.

Q.  And I just want to look at one more, which is from August 2023.  How many weeks ago was that?

A.  Just a few weeks ago.

Q.  And why are you flagging this particular statement?

A.  So this is now commenting on the performance of the company to investors for the first half of the year, so this is the most current one, and what it says is the company has significantly improved its profitability in this 2023 interim period compared to last year.  It's reduced corporate loans from 6 billion to 2 billion, and it's enhanced receivables collection, you know, addressed low-margin products, optimized supply chain management, improved operational efficiency and

controlled operating costs.

Q. Mr. Westerman, we've looked at a number of public statements by Hytera in the past year.

Were these statements consistent or inconsistent with Hytera's claims that it's in a liquidity crisis?

A. Well, what it signifies is a company that's turned around. It's not in decline. From what we're reading here, there's not a crisis. They're not disclosing a crisis.

Q. And in reviewing these statements, did you see any disclosures about the banks having Hytera's hands tied or not being able to function without the banks' permission?

A. Not in these investor relations activity records.

Q. I know we're a little short on time so I want to move to your second opinion that Hytera does exercise control over its subsidiaries.

A. So the other side in this case has made issues about looking at the parent and not looking at the subsidiaries, and so remember from a consolidated standpoint what you have is and what you have reported in the financial statements is the assets and liabilities of the parent and the operating activities of the parent, so that's the income, the revenue and the expenses.

And then you have all of these subsidiaries. So, remember, Hytera discloses in its financial statements, you know, it has 40-plus subsidiaries, many of which it owns

100 percent.

So what Hytera discloses and what the accounting rules require is that when you have control or power over your subsidiaries, that you consolidate those subsidiaries. And that's what Hytera has done is consolidate these subsidiaries.

Q. So in this slide that is a 2022 annual report from Hytera, how does this support your view that Hytera controls its subsidiaries?

A. Well, they disclose themselves that the consolidation of consolidated financial statements is determined on the basis of control, and control means the company has power over the invested unit, which are these subsidiaries.

So they participate in the returns. They have the ability to use their power over the invested unit to affect its return amount. So there's power there, there's influence there, and that's why you have consolidated financial statements.

So they're not just representing or presenting to the public the parent entity. They are doing the combination of the parent and those subsidiaries that they have control over.

And so all of those assets and those cash flows are presented on a consolidated basis. And that's important. I mean, the subs have significant operations and assets.

Q. Now, this slide talks about the subsidiaries moving material amounts of cash. Why is that relevant to your

opinion about control?

A.   Yeah, so in addition to the control, what we see is that there's a significant amount of transactional activity between these entities.

So this line, intercompany receivables, is, you know, hundreds of millions of dollars at different points in time. And so what that means is the entities are transacting with each other, they are operating together, and so there's, you know, a substantial amount of that intercompany activity.

Q.   Now, have you looked at other evidence that supports your opinion that Hytera parent controls its subsidiaries?

A.   Yes.

Q.   And where did that evidence come from?

A.   So, again, this was disclosed by Hytera itself in filings.

Q.   And if you can explain what that evidence was.

A.   So there's a couple of situations.

In 2022, we were talking previously about Norsat stock shares and the pledge of those shares.

So that's an instance where the Hytera parent was able to convince or work with Hytera Project Corporation to pledge those shares.

And in the second instance as we know in 2022, Hytera had its subsidiary Sepura sold for 160 million, and that was provided to the Hytera parent via loan of one of those subsidiaries.

So we're talking about subsidiaries that are, in effect, making assets available to the parent. So those are two instances of that.

Q. So, Mr. Westerman, I just want to go to your last opinion, and during Mr. De Vries' opening, he talked about how you have provided opinions about whether or not Hytera has even shown that they could not possibly come up with any of the $49 million royalty obligation, and I want to go to your last slide.

Can you explain how, for example, cash flow information and financial preparations would have allowed you to actually assess whether or not Hytera could come up with that money?

A. Sure.

So there are a variety of things that we've been asking for for a long time and have not received, and that in, you know, one instance relates to what are the future activities of these entities, okay?

And what I mean by that is, yes, we have the asset position, the liability position today. Yes, we know what the operations have been historically in terms of the generation of cash flow and income or profit.

But what we've been asking for and missing and we haven't gotten this before the royalty order for 49 million, we haven't gotten it since, are projections and forecasts and

plans so we can get an understanding of where Hytera plans to spend its money to take a look at to see if there are opportunities to pay towards the $49 million obligation.

And that would be cash flow projections; financial projections; what are they doing in terms of capital expenditures; what are they doing with respect to R&D plans; you know, what's the clear picture of debt financing obligations; what are core and noncore assets; how can those be addressed or long-term contracts?

So there's a host of information that we've been asking for.

Q. And would you need that information in order to assess whether or not Hytera, it was impossible for Hytera to comply with its royalty obligation?

A. Yes, because we could have gotten that information in the past, we could get that information today, and that would be very helpful information.

MS. CARSON: Thank you, Mr. Westerman.

Oh, your Honor, I'd like to enter into evidence, and this has been stipulated to, PCX 44 through -- 43 through 47, and also PCX 39 through 42.

In addition, we've agreed that the Demonstrative 2.6 through 2.12 and 2.23 can be admitted as evidence under 1006.

THE COURT: Okay. Thank you.

You may proceed with cross.

MR. CLOERN: Thank you, your Honor.

CROSS-EXAMINATION

BY MR. CLOERN:

Q. Okay. Good -- is it, yes -- afternoon, Mr. Westerman.

A. I just looked at that myself, by the way.

Q. My belly was telling me that it's getting there, that's for sure.

Okay. Can we look at PCDX 2.6, please.

Mr. Westerman, I believe you testified about this chart, correct?

A. Yes.

Q. Okay. And this is a chart of assets, right?

A. Yes.

Q. Okay. Now, you -- you don't dispute, do you, that Hytera's agreements with its lenders require consent to sell assets?

A. Well, that is subject to legal interpretation because those are legal agreements, counsel, so I -- ultimately, that's up to the lawyers.

Q. You have no -- so the answer to my question then is you don't dispute that?

Let me ask it this way: You don't have any opinion to dispute that Hytera's agreements with its banks require consent to sell assets?

A. That's not what I'm saying. I'm saying that whether or

not there's that consent is up to a legal interpretation.

Q. Okay. Have you looked at any of those agreements?

A. I have seen some agreements. I mean, we've been on this case for quite some time.

Q. But do you have an opinion about whether Hytera's banks, through its agreements, whether they say Hytera can't sell assets without consent?

Do you have an opinion on that?

A. Well, what I can tell you is that if you look at the footnote that identifies the restricted assets, that it's got restricted assets of roughly $195 million under what you're telling me the restrictions would be the entire company.

Q. Have you looked at the bank agreements -- are you testifying here today that the bank agreements do not contain provisions stating Hytera must obtain bank consent before selling any assets? Is that what you're saying?

A. I'm not saying that.

Q. Okay. Because you haven't recently looked at their bank agreements, have you?

A. Well, my understanding is you just sent over updated bank agreements yesterday.

Q. How about the ones that we produced in 2022, did you look at any of those?

A. I'm sure I did.

Q. But you don't recall that right now?

A.  I recall looking at some bank agreements.

Q.  All right.  And putting the legal stuff aside just reading plain English, you can't tell me whether or not any of those agreements that you recall that were produced a year ago actually have a restriction requiring consent to sell assets, right?  So that's -- you didn't consider that as part of your opinion, did you?

A.  No, I did, counsel, but what I also did is looked at the footnote.  You just used the word restriction, and in that footnote the restricted assets are not the entire, you know, assets of the company but $195 million.

Q.  So if Professor Feinerman talks about the agreements and it's put into evidence that the banks do have the right and Hytera is required to get consent before selling the assets, then these -- all these assets on PCDX 2.6 then wouldn't be available to pay the judgment absent bank consent, right?

A.  Again, I think you're asking -- no, my answer to that would be no for a couple of reasons.

No. 1, I keep going back to the fact that these are legal agreements; and, No. 2, somehow Hytera got comfortable that even with those agreements, they didn't need to disclose the entire asset balance of the company as restricted in their publicly reported financial statements.

Q.  Well, restricted has a specific definition in Chinese accounting for restricted and specific ways, isn't that right?

You're aware of that?

A.  I am, and in my view, that's a restriction.

Q.  Okay.  Well, what is the definition of restricted under the appropriate Chinese accounting principles?

A.  Pledges, liens, things like that, where you don't have the right to use those assets.

Q.  And where is that language found?

A.  In the accounting literature.

Q.  Okay.  You can't cite me any specific rule?

A.  Well, not off the top of my head, but --

Q.  Thank you.  I appreciate it.

Let's move on.

And so on PDX 2.7, you also pointed out the net assets of the parent, the -- you would agree, would you not, Mr. Westerman, that if there is a legal obligation not to sell assets absent bank consent, then if the banks don't consent, then these assets aren't available?

I'm asking if that legal obligation is there, because you said it would be a legal issue, so would you agree with that?

A.  Not necessarily.

Q.  So just to be clear in my hypothetical, the bank agreements say Hytera can't sell assets without getting the banks' consent and it's your -- you're telling me that it's your opinion that Hytera still could sell assets without

getting the banks' consent in that hypothetical?

A. There are other ways to raise cash, counsel. For example, why can't those banks be taken out and other institutions come in potentially? And maybe those other institutions would have different terms, so you have to consider that.

Q. Okay. But I -- that wasn't my question if there are other ways which would be -- I didn't ask about getting new lenders or new borrowing.

I'm asking about the existing lenders having existing loans and the rights to withhold consent to asset sales, okay?

If those rights do exist, and that's my hypothetical, if the rights do exist, then Hytera wouldn't be able to sell assets to raise cash for the royalty; do you agree with that?

A. No, I don't agree with that, and I don't agree with that because you're saying that the banks have to give consent, but what about the banks giving consent to sell certain assets.

Q. My hypothetical -- you can't -- I'm asking you please not to change my hypothetical. You're burning up my time. And so I'm just going to ask one more time, and please don't change my hypothetical.

And there's two premises here. If the bank agreements do have this provision which requires Hytera to obtain bank consent before selling assets and if the banks say no, okay, under the current debt arrangement with the current banks, then those assets wouldn't be available, right?

A. I still don't think it's clear because it depends on what the legal opinions would be associated with that.

Q. All right. Thank you. I think we get the picture.

Let's talk about Section 2.8, or PCDX 2.8.

You pointed out $16.2 million of unrestricted cash for the parent. Do you agree?

A. Yes.

Q. Okay. And the definition of restricted cash, that's cash that's literally pledged as collateral for a specific loan and held in a specific account at a specific bank for that purpose, right?

A. Okay.

Q. And unrestricted means it doesn't fit the definition of restricted, correct?

A. It says immediately available in the financial statements.

Q. Okay. So can we flip over to PCDX 2.10.

I think you testified about this, and in your opinion, looking at the numbers, Hytera parent, so HCC, the debtor here, had $150 million over -- from July 2022 to June 2023, right, so that one-year period, of net cash flows from operating activities, right?

A. Yes.

Q. So are you saying that Hytera's cash flows from operations exceeded their -- their debts from operations by $150 million?

A. No. This is talking about operating activities, which I

explained before is what you generate from selling your products less the costs that are spent as part of your operating activities.

Q. I'm sorry, I'm sorry. Thank you. That's exactly what I was trying to ask, so I appreciate your clarification.

So -- so Hytera's making money or HCC is making money from operations, right?

A. It's a positive operating cash flow.

Q. Okay. So then it would make sense for Hytera -- let me strike that.

It would make sense for HCC to continue spending the money to buy parts, advertise and sell radios because it's making money doing that, right? It's getting positive cash flow over its expenses for that, correct?

A. Well, I'm not sure I understand your question.

Q. Well, I think your chart here says that HCC has had $150 million net positive cash flow from operating activities.

A. Yes.

Q. And they have to spend money to make that money, right?

A. Yes.

Q. Okay. Thank you.

And the way HCC is going to pay back creditors is by making money, right?

A. In part.

Q. Thank you.

So now let's look back at PCDX 2.8, the 16.2 million of so-called unrestricted cash at HCC, the Hytera parent. Do you see that?

A. Yes.

Q. Okay. HCC has about, what, a billion a year in turnover?

A. In revenue?

Q. Yeah, right?

A. Yeah.

Q. And HCC has been cash flow negative in 2020, '21 and '22, right?

A. Now, when you say cash flow negative, are you talking about reductions in overall cash balances, or are you talking about the operating, investing, and financing activities of the business?

Q. So I think the latter, but let me clarify.

So when you take all the cash inflows from operations and financing, taxes and so forth and you deduct them from the outflows from operations, financing, interest, principal repayments, taxes and so forth, it's cash negative, right?

A. I would have to look at that. I know they're spending significant amounts of cash.

Q. Okay. But there's roughly a billion going in and a billion coming out. Would you agree with that?

A. Again, I'd have to look at the specific numbers, but there's significant inflows and outflows.

Q. Okay. But in the last three years, HCC has been 10 million, 12, 13 million in the red in terms of having more outflows than inflows of cash. Does that sound about right?

A. There are -- I know in certain periods at least, there are cash flows that are in excess of what's being generated.

Q. So the 16 million, having $16 million in your bank account when your cash flows are around a billion in a year, that's about 1 percent, right?

A. It's small, but that doesn't mean some portion of this couldn't be sent to Motorola.

Q. If you could focus on my question, that would help. This is cross-examination.

So it's about 1 percent, right? You're an accountant; you can do that?

A. Roughly.

Q. Thank you.

So that's pretty -- that's pretty low liquidity for a company with a billion dollars of revenue and expenses every year, only having 16 million in the bank account. That's -- that's about 1 percent of the -- of the revenue -- of the turnover a year.

That's a liquidity problem, right?

A. I -- listen, I think that a liquidity problem would be a situation where you can't generate cash from a multitude of activities.

So you could have cash sitting in the bank. You can have additional borrowings. You can go sell assets. There's any number of things you can do to raise cash or cut expenses which would therefore negate a liquidity crisis.

Q. Okay. But just -- so putting aside raising revenues, raising additional cash from additional borrowing or asset sales because we'll talk about that, putting those things aside, just looking at the cash they actually have that's in your chart, having cash in your bank account at 1 percent of your annual run rate, that is low liquidity. Do you agree?

A. I don't agree with that, counsel, and this goes back to my point about we're not getting cash flow projections, we're not getting financial projections so that we can look and see what the cash outflows are anticipated to be and the inflows so we can address that.

Q. But you know the cash inflows and outflows from 2020, '21, '22, and the first half of '23, that's all in the financials, right? That's what you've been putting in your charts, right?

A. We don't have the details, counsel. We do not have the details. We've been asking for the details. We're not getting the details.

Q. You've gotten the public financials, audited, and the roll-ups, so how is that not the details?

A. Well, first of all, they're not always audited, so we have to step back and decide what period's audited and what period

is not, right? So --

Q. That --

A. While I'm getting high-level information, we are not getting specific cash flow information. We are not getting forecasts. We are not getting R&D plans, et cetera.

Q. We'll see what the Hytera's auditors, Grant Thornton, say about that.

A. That's fine.

Q. Okay. So just for the record, you're not willing to admit that having a bank account of 1 percent of your annual turnover, that that's a thin margin?

A. No, because there's other ways to raise cash.

Q. Okay. What if we agreed to put aside those other ways to raise cash, which we'll deal with separately. I can only ask you one question at a time.

What would your answer be then?

A. I think it would depend on the magnitude of the costs that we have to pay in the future.

Q. Okay. And you haven't looked at those?

A. Well, you haven't given me any projections, despite asking on a regular basis.

Q. But you have -- have you looked at the costs for the last three years that led to only 16 million in the bank account?

A. I have, counsel, but here's the situation with that.

So those actual costs, and we've been asking for this

information for a long time, are subject to discretionary spend which could be reduced and therefore help alleviate that situation. Assets could be sold. Potentially more debt could be brought on, et cetera.

So, you know, there's things that can be done where you wouldn't be in a situation where, you know, you're saying there's this crisis.

Q. Okay. So can we look at PCDX 2.14, please?

And I think -- because you just mentioned discretionary spend -- discretionary spend, I'm sorry, and I think that's what you were talking about when you were talking about this slide, right?

A. Yes.

Q. Okay. And I think you used words like "if" and "could have;" is that correct?

A. Correct.

Q. Okay. So you don't know that there was any discretionary spend, do you?

A. I am highly confidence that there is discretionary spend. I've been dealing with companies for 20-some years, counsel, and when it comes to marketing, R&D, and administrative expenses, there are discretionary expenses.

Q. Well, can you identify a single discretionary expense here?

A. You could terminate employees. You could run fewer

marketing campaigns. You could cut your R&D costs. You could -- there's a variety of things you could do. You could look at other cost-savings measures.

I mean, this is typical activity when a company is looking to generate more cash.

THE COURT: I'm so sorry. It's 12:30. I really hate to interrupt, but I also want to keep us on track because we have a lot of stuff to get through.

So you can continue the cross when we come back.

MR. CLOERN: Sounds good, your Honor.

THE COURT: All right. And you're on the stand, sir, so please don't discuss your testimony with anyone during the break.

THE WITNESS: Okay.

THE COURT: We'll come back at 1:30 and pick back up. Thanks, everyone.

(Court adjourned, to reconvene at 1:30 p.m.)

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

MOTOROLA SOLUTIONS, INC., et al.,                    )
               Plaintiffs,         )
-vs-                                                 )  Case No. 17-cv-01973
                              )
HYTERA COMMUNICATIONS                                 )  Chicago, Illinois
CORPORATION, LTD., et al.,                           )  August 17, 2023
                              )  1:31 p.m.
             Defendants.          )

TRANSCRIPT OF PROCEEDINGS - CONTEMPT HEARING
BEFORE THE HONORABLE MARTHA M. PACOLD

APPEARANCES:

For the Plaintiffs:    MR. ADAM R. ALPER
                       MR. AKSHAY S. DEORAS
                       Kirkland & Ellis LLP
                       555 California Street, Suite 2700
                       San Francisco, CA 94104
                       (415) 439-1400
                       Adam.alper@kirkland.com
                       akshay.deoras@kirkland.com

                       MR. JUSTIN SINGH
                       MR. MICHAEL W. DE VRIES
                       MS. N. YVONNE BEELER
                       Kirkland & Ellis LLP
                       555 S. Flower Street
                       Los Angeles, CA 90071
                       (213) 680-8400
                       Justin.singh@kirkland.com
                       michael.devries@kirkland.com
                       yvonne.beeler@kirkland.com

Court Reporter:

         KATHLEEN M. FENNELL, CSR, RPR, RMR, FCRR
              Official Court Reporter
            United States District Court
       219 South Dearborn Street, Suite 1426
          Chicago, Illinois  60604
          Telephone:  (312) 435-5569
       Kathleen_Fennell@ilnd.uscourts.gov

102

APPEARANCES:   (Continued)

For the Plaintiffs:      MS. PATRICIA A. CARSON
                         Kirkland & Ellis LLP
                         601 Lexington Avenue
                         New York, NY 10022
                         (212) 446-4800
                         Patricia.carson@kirkland.com

                         MR. JAMES NIEWIARA
                         Motorola Solutions
                         500 W. Monroe Street
                         Chicago, IL 60661
                         (847) 576-5000

For the Defendants:      MR. BOYD T. CLOERN
                         MR. JOHN WILLIAM TOTH
                         MR. JOSHUA R. TAYLOR
                         MR. FILIBERTO AGUSTI
                         Steptoe & Johnson LLP
                         1330 Connecticut Ave., NW
                         Washington, D.C. 20036
                         (202) 429-6230
                         Bcloern@steptoe.com
                         Btoth@steptoe.com
                         Jrtaylor@steptoe.com

                         MS. GRACE WANG
                         Steptoe & Johnson LLP
                         China Central Place, 29th Floor
                         Tower 2, 79 Jianguo Road
                         Chaoyang District
                         Beijing, 100025
                         +86 10 5834 1010
                         Gwang@steptoe.com

ALSO PRESENT:            MS. MINGSHU WU ZHANG
                         MS. PING (PENNY) CHEN
                         Interpreters

* * * * * * * * * * * * * * * *

PROCEEDINGS REPORTED BY CERTIFIED STENOGRAPHER
TRANSCRIPT PRODUCED WITH A COMPUTER

MSA0669

(Proceedings heard in open court:)

THE COURT: Okay. We can resume with the cross.

MR. CLOERN: Thank you, your Honor.

Can we look at PDCX 2.10, please.

EDWARD J. WESTERMAN, PLAINTIFFS' WITNESS, PREVIOUSLY SWORN,

CROSS-EXAMINATION (RESUMED)

BY MR. CLOERN:

Q. Mr. Westerman, the $150 million that this slide shows, net cash flows from operating activities, you don't dispute that that money went to the banks, right?

A. Well, cash is fungible, so I'm not sure if it went to the banks or if it went to other expenses.

Q. Okay. You don't dispute that more than $150 million was paid down on bank loans in this period, do you?

A. There was a significant amount of money that was paid down towards the bank loans.

Q. In fact, $600 million from February of 2020 through the present, right?

A. I'd have to check on that, but it was a significant amount.

Q. Right. And so Hytera's net positive cash flow from operations and the proceeds of Houhai and Sepura all went to achieve that $600 million reduction, right?

A. Well, Hytera chose to make those payments.

Q. Okay. Now, I understand you dispute that the banks are

senior lenders. So in your analysis, you have not assumed that the banks have a right to be paid first, have you?

A. Well, who -- what those preferences are is another legal determination.

Q. Thank you.

MR. CLOERN: Okay. Can we bring up PCX 65, please.

BY MR. CLOERN:

Q. And let's just look at the front page, Mr. Westerman. I think this was your declaration from August 23rd, 2022; is that right?

A. Do you want to flip to the date I signed it? I mean, I'm not disputing that date, but -- August '23, Jackson, Wyoming.

Q. Yes, sir. It sounds like a great place to be. Thank you.

MR. CLOERN: All right. Can we go to the English translation, please, of Exhibit or Appendix C to Mr. Westerman's declaration.

Okay. So can you blow up, Mr. Montgomery, the first paragraph under 1, the secretary of the board of directors introduces the company's operation.

BY MR. CLOERN:

Q. Actually, first of all, before you do that, this is one of the investor relations activity records that you were talking about, correct?

A. Yes, that's what it says.

Q. Okay. And it's actually the one that you talked about

earlier from July 27 to July 29, 2022, right?

A.   I'd have to cross-reference that, but, I mean, the time looks consistent.

Q.   That's the one you talked about that was just before the royalty obligation was due, remember --

A.   Yeah, yeah.

Q.   Thanks.   Okay.

        MR. CLOERN:   So can you go back to that paragraph I identified, Mr. Montgomery?

BY MR. CLOERN:

Q.   All right.   So this first paragraph, it says, for the record:   "At present, the development of the company is in a state of gradual recovery after a series of storms.   To sum up, the storms the company has experienced in the past few years, first, relatively aggressive expansion before 2018 has left a certain financial pressure on the company, which is also the core reason for the company's poor performance in recent years.

        "Second, the impact of the pandemic on the company's overseas business expansion, including the restriction of business activities and the inclination of customer budgets to fight the pandemic, have led to delays in projects in some countries and regions.

        "Third, intellectual property and trade secret litigation has consumed a lot of energy for the company,

including management energy, resource investment, and product updates, and legal expenses, as well as the financial pressure brought by some financial institutions in the past period of time to collect loans."

Do you see that?

A. Yes.

Q. Okay. And you didn't -- you don't disagree with any of that, right?

A. That's what it says.

Q. Okay. And it does talk about all the debt and then the pandemic and the lawsuits and having to then repay debt. That's in these investor discussions, these public documents you were talking about, right?

A. Well, I'm not sure what you mean about "pay all the debt."

Q. I said and repay debt. It says at the end here, "as well as the financial pressure brought by some financial institutions in the past period of time to collect loans," right?

A. Yeah, I don't disagree with what the wording is.

MR. CLOERN: Okay. Mr. Montgomery, can you go on over to page 2, and can you pull up the second full paragraph where it starts out "On the financial side."

BY MR. CLOERN:

Q. Now, this paragraph -- I mean, I assumed you've cited this, so you've read this, you're familiar with it, right?

A. Yes, I read these.

Q. Okay. So this paragraph talks about more about repaying that debt, doesn't it?

A. Let me read it.

Q. I'll go ahead and put it in the record for you.

"On the financial side in the years of rapid growth from 2015 to 2017, the company's asset-liability ratio and period-expense ratio have increased rapidly."

So that's talking about the increasing loans, right?

A. Well, it's talking about assets and liabilities generally. It says asset, liability and expense --

Q. Asset-liability ratio from the rapid growth, correct?

A. That's what it says.

Q. Okay. Thank you.

And now later in the paragraph, it says, "At the same time, the asset-liability structure has been gradually optimized, and the asset-liability ratio dropped from nearly 63 percent at the peak to below 55 percent." Do you see that?

A. Yes.

Q. And that means the debt's going down, right, in relation to assets. They're paying off the debt, that's what that means?

A. Debt is being paid down.

Q. Thank you.

And now it says, "After the sale of Sepura, it is

expected to further drop to below 50 percent, which will also lead to a reduction in the company's overall financing costs and a reduction in interest expenses."

Do you see that?

A. Yes.

Q. So it is public that the Sepura money went to pay down the debt, now, isn't it?

A. I'm not disagreeing with that, counsel.

Q. Okay. And Motorola's had this public information for a good long time, right?

A. Yes, but that's missing one of my points.

Q. And, in fact, if we go back over the years back through into 2020, we'll see all these kinds of disclosures.

This has been a constant disclosure publicly made from HCC about what's going on, hasn't it been?

A. That's a very general statement for a period of time, so I can't agree with you.

Q. Do you see the final sentence, it says, "If this trend," right, referring to -- well, let me back up.

The sentence before that talks about managing expenses, right, and optimizing the operating expenses, right?

A. Yes.

Q. Okay. So -- so there's not discretionary, like you were speculating about, discretionary expenses. They're being optimized. That's what Hytera's stating here in these public

disclosures, correct?

A. No. I mean, optimization is a very relative term.

Q. "The company's operating expenses have decreased year by year." Do you see that?

A. I don't disagree with that.

Q. All right. So they're -- they're narrowing down, just like we talked about earlier when I was asking you about, you know, what discretionary expenses that you were unable to point out, right?

A. No.

Q. And then finally it says, "If this trend is maintained," referring to increasing revenue and narrowing expenses, "relying on recovery of the basic business and the pool of the growth-oriented business on the income side, we are confident in the gradual recovery and improvement of profitability."

Do you see that?

A. Yes.

Q. All right. So isn't it -- don't you agree then that Hytera's being straight up with this Court and fully consistent with what it's telling in its public statements that it's got tons of debt from the pre-2019 period and that the pandemic and the Motorola judgment litigation have resulted in the banks requiring that debt to be repaid, which Hytera has done including through the sale of Sepura?

A. Well, I don't see in here the requirement of the debt to

be repaid.  I mean, that's what they chose to do, what you've been talking about, but I don't see a requirement.

MR. CLOERN:  Well, that's what we're all going to see from Professor Feinerman.

So with that, your Honor, I have no further questions.

THE COURT:  Okay, thanks.

MS. CARSON:  Your Honor, just one last question.

THE COURT:  Sure.

REDIRECT EXAMINATION

BY MS. CARSON:

Q.  Mr. Westerman, in the document you were just looking at with Mr. Cloern, he had a section about the sale of Sepura.

Did you see anything in there disclosing that they had to ask -- Hytera had to ask permission to sell Hytera -- sell Sepura?

A.  No.

MS. CARSON:  Thank you.  No more questions.

THE COURT:  All right.  Any -- any further witnesses from Motorola?

MR. DE VRIES:  Yes, your Honor.  In line with the Court's directives about how we should proceed, Motorola will next call Mr. Yuan Wang.  He's an expert on Chinese law.  He's submitted a declaration in the context of post-trial briefing.

THE COURT:  You may proceed.

(Witness sworn.)

MS. BEELER: Your Honor, Yvonne Beeler for plaintiff Motorola. I will be asking Mr. Wang some questions shortly.

May I approach with slides for you?

THE COURT: Yes, please.

(Tendered.)

MS. BEELER: And I think I have to ask for the display to be switched back to our side.

THE COURT: Yes.

YUAN WANG, PLAINTIFFS' WITNESS, DULY SWORN,

DIRECT EXAMINATION

BY MS. BEELER:

Q. All right. Good afternoon, Mr. Wang. Can you please state your name for the record.

A. My name is Yuan Wang.

Q. And what is your occupation?

A. My -- I'm a partner at the Chinese law firm, Zhong Lun law firm, Shanghai office.

Q. And why are you here to testify today?

A. I'm engaged by Motorola to provide PRC law expert opinion during this hearing.

Q. I'd like to first discuss your background. Can you describe your educational history?

A. Sure.

So my LL.B. degree, I graduate from Eastern China

University of Political Science and Law in 2003, so I obtained my LL.M. degree from Boston University School of Law.  So I passed both the PRC bar and New York state bar.

Q.  Okay.  Next let's discuss your legal experience.  What was your first job after law school?

A.  After my LL.B. graduation, my first job I was working at Shanghai Pudong Area, the market supervision, market regulation bureau.  So I was law enforcement officer responsible for anti-unfair competition law enforcement and also consumer rights protection and regulation of foreign invested enterprises in Shanghai.

Q.  Okay.  Thank you.

And is that the position described in the last bullet on your Slide No. 3.4?

A.  Excuse me?

Q.  The position is described in the last bullet; is that right?

A.  Yes.

Q.  Okay.  And then moving on, what were your next jobs after that?

A.  So after pass PRC bar, I went into private practice.  I worked at Richard Wang & Co., a Shanghai local law firm.

So, after I graduate my -- with my LL.M. degree, I returned to Shanghai and joined the Reed Smith LLP Shanghai office as associate.

Q. And what kind of work did you do at Reed Smith?

A. At Reed Smith I was doing copyright and commercial works and, in particular, commodities trading legal matters, and it was highly related to security and financing laws, in particular the PRC law in this aspect, and I also do some CPA and compliance and regulatory work.

Q. Okay. And what was your next legal position?

A. I worked for Henkel, the German chemical and consumer products company, its Shanghai investment company as their senior legal counsel.

Q. And you're now currently at Zhong Lun; is that right?

A. That's correct. I joined Zhong Lun in the middle of 2018, so -- as partner. So I did corporate, contract, and commercial works, and also I did compliance regulatory, and our clients appreciate my prior experience working at government, so we helped clients deal with lots of government investigation work.

Q. Okay. And prior to this hearing here today, have you previously been involved in this case, this U.S. District Court case, Motorola versus Hytera?

A. Yes. We did some -- I did some -- personally I did some work regarding the antitrust litigation in China between Motorola and Hytera.

Q. And did you previously submit a declaration?

A. Yes.

Q. Okay. Thank you.

MS. BEELER: Your Honor, I'd like to qualify Mr. Wang as an expert in PRC legal issues and banking issues.

THE COURT: And -- yes.

MR. TAYLOR: Your Honor, I'd like to ask a couple of questions of Mr. Wang before he's qualified as an expert.

THE COURT: Okay.

MS. BEELER: I'm surprised to hear that because we did disclose Mr. Wang quite a while ago, including his exhibits, and we haven't heard anything back from you.

Is there anything in particular?

MR. TAYLOR: Your Honor, I'd like to ask Mr. Wang about his connections with Motorola and whether he's worked for them.

THE COURT: Okay. You can ask some questions.

MS. BEELER: Is that related to his expert opinion, or is that something that's more appropriate for cross?

MR. TAYLOR: I believe it would go to whether he should be qualified as an expert to render an unbiased opinion in this matter.

MS. BEELER: Sounds like credibility that's more related to cross exam.

THE COURT: Okay. So, you know, I -- why don't we do this. So there's not been -- because this is a contempt hearing, it has not, unlike a trial, we've not had a whole

schedule that gives opportunities for *Daubert* motions and all of that, and so I think, of course, you're free to ask questions about this.

I also think that because we're on a tight schedule, rather than having people getting up and down and asking questions on different topics back and forth, let's just proceed with the direct, and I will -- you know, I'll allow the testimony, subject to whatever questions you want to ask on cross, and then I can, you know, I can weigh the testimony as appropriate in light of those questions.

So let's just proceed with the direct, and we'll come back to that later.

MR. TAYLOR: Thank you, your Honor.

THE COURT: Thanks.

MS. BEELER: Yes, your Honor.

BY MS. BEELER:

Q. Mr. Wang, have you previously done any other work for Motorola?

A. Yes. I presented declarations for --

Q. And -- go ahead.

A. For -- it is related to today's hearing about -- about the guarantee fund account and its pledge, yeah, the legal matters and issues on the Chinese law.

Q. And in addition to the declaration for this case in your work in particular at Zhong Lun or even before that, have you

done other work for Motorola?

A. Do you mean Motorola Chinese company? We assist Motorola Chinese legal matters a lot, yeah.

Q. And are you able to render an unbiased expert opinion today?

A. Of course. I have good standing on the New York state bar.

Q. And what were you asked to do for this hearing today?

A. I was asked to provide PRC law expert opinion regarding the royalty, royalty order, in particular some Chinese law issues.

Q. Okay. And what materials did you consider in forming your opinions?

A. I have reviewed several prior case declarations and also the briefings provided by both parties and also the bank agreements and in particular their email correspondence between Hytera and the banks which was provided yesterday, and also other public orders and case filings, et cetera.

Q. And is everything that you reviewed in forming your opinion listed on the slide Demonstrative Exhibit 3.5?

A. Sorry, can you say that again?

Q. Is everything you reviewed --

A. Yeah.

Q. -- listed on the slide?

A. Yeah.

Q. Okay. Why did you review all of those materials?

A. Because I have to understand more of facts and backgrounds about -- about -- about a reason why we have the hearing today, and also I can better provide my expert opinion on the Chinese law.

Q. In addition to the voluminous amount of materials that you reviewed, have you also been sitting here in court today for the entirety of the hearing?

A. Sorry, it's a little bit fast.

Q. Yes. I'll slow down.

A. Can you say again?

Q. In addition to all of the materials you've reviewed to prepare, have you also been sitting here in court today since the beginning of --

A. Yeah, yeah.

Q. -- today's hearing?

A. That's correct.

Q. And as you were sitting in court, did you hear Hytera's counsel state its positions, in particular, its position that Hytera is completely unable to pay the royalty due to agreements it has with certain banks?

A. I heard that, yeah.

Q. And after reviewing all of the relevant materials and listening to the statements you've heard here in court today, in addition to Mr. Westerman's testimony, did you -- have you

formed any opinions about Hytera's positions that it is unable to pay the royalty?

A. In my personal opinion, I think Hytera has adequate -- adequate funds or all those funds coming from their sales proceeds or from other unrestricted bank accounts to pay their royalties under the order.

Q. Okay.

A. Yeah.

MS. BEELER: And for the record, we're now looking at Demonstrative Exhibit Slide 3.7.

BY MS. BEELER:

Q. Can you explain the summary of the opinions you've reached?

A. Yeah, overall, I don't think there is any PRC law that -- that is preventing Hytera from -- from issuing corporate bonds to raise the money to pay the royalties; and, secondly, Hytera's banks, they cannot completely prevent Hytera from paying the 49 million US dollar royalty to Motorola.

Q. Okay. And there's also a bullet on there about bonds. We haven't talked much about bonds today in the hearing, but just briefly can you state your position on the bonds?

A. Yeah, sure.

So to my understanding, the verdict was made in February 2020. So after that date, Hytera has successfully issued two rounds of corporate bonds to raise money in order

to support the company's operation.

So Hytera has said it must be -- it must obtain the regulatory authority's approval issuing new bonds, so their approval process is relatively straightforward. Hytera can first make its application to the Shenzhen Stock Exchange, and then after approval, the stock exchange, the application will be delivered to the Chinese -- Chinese Securities Regulation Commission, the equivalent to SEC here in the U.S., while -- and the CSIC will approve the new bonds issuance application within three months.

Q. Okay. Thank you. And in the interests of time, we'll move on from the bond issues, so thank you for that.

So today in court there's been a lot of discussion about bank agreements and bank control issues. Have you heard that today here in court?

A. Yes.

Q. And do you agree with Hytera's assertion that it cannot pay the royalty due to these agreements with its -- with its banks?

A. I totally disagree.

Q. And why do you disagree with that?

A. I mean, for -- so for Chinese company to borrow the loans from multiple banks is very normal. Very normal to borrow the loans from multiple banks, and the banks will have a lot of collaterals, such as guarantee, pledge of accounts, and

mortgages.

So, however, the borrower remains the owner of its own assets, although in some bank agreements it specifies when a borrower is going to transfer major assets, it needs to obtain -- it needs to give notice to bank and obtain consent to the bank, but doesn't mean that transferring the assets of the borrower is totally impossible, okay?

Q. Okay.

A. So by all means, Hytera can, you know, transfer or liquidate some assets to get new incomes to pay the royalty fees, and Motorola, as a judgment creditor, I think its position is not necessarily inferior than a bank's, and Motorola's justifiable rights as their creditor should also be protected under both U.S. and Chinese law.

Q. Okay. And you mentioned a lot of topics there, so let's slow down a little bit and let's take them one by one.

So you mentioned these notice and consent provisions that Hytera has brought up saying they would have to ask permission --

A. Yeah.

Q. -- from the banks. Are you familiar with these types of provisions?

A. I'm very familiar, and I also review the exhibits that -- the bank agreements provided by Hytera's lawyers yesterday.

Q. Okay. And Hytera is asserting that they'd be unable to

sell any assets due to these notice provisions.  Is that your understanding?

A.  Yes, it's my understanding.

Q.  Do you agree with that assertion?

A.  I disagree.

So -- so the different Chinese bank may have different loan agreement and also their requirement regarding -- requirement under transfer major assets may vary. So, for example, for the Citibank's loan agreement, it only says if the borrower will have -- will transfer the asset, give the notice to the bank, and then can also provide replacement collateral and also give assurance to the bank that the borrower can continue to repay the loan.

It does not necessarily mean the bank will always reject it, the borrower's plan to transfer the assets or sales of assets.

Q.  Okay.  So if I understand your testimony, you're saying -- are you saying that it is possible for Hytera to sell an asset even under these agreements with the banks?

A.  Yes, absolutely.

Q.  And I think you mentioned that the borrower typically can provide collateral or assurances in the event that they want to sell an asset, is that what you testified?

A.  That is correct.  They can provide substitute -- substitute -- substitute collaterals as a replacement to give

more assurance to the bank. And more importantly, Hytera is the owner of the -- of its own assets.

Q. Okay. And so under these notice and consent provisions in general, what would a borrower like Hytera have to do in order to sell an asset?

A. Subject to whether the asset is a major asset or not major asset, Hytera usually should give notice to the bank within 30 days in advance, and then the bank may worry about whether the sales of the assets may have a negative influence on -- on the borrower's financial capability to continue to repay the loan.

So -- but if Hytera -- but if the borrower can -- can have a detailed plan regarding it can continue to repay the loan, the transfer or sale of the asset will not significantly -- significantly have a negative impact on its financial condition to repay the loan, I don't think the bank will -- will unreasonably withhold their approval.

Q. So in general under these kinds of notice and consent provisions, it is possible that a borrower like Hytera could inform the bank and that the bank would give its consent to sell an asset. Is that your testimony?

A. Yes.

Q. Okay. And another point that we've heard a lot about is that the banks have complete control to prevent Hytera from paying the royalty or using any of its cash or any of its

assets to pay the royalty.

Is that what you understand one of Hytera's arguments to be?

A. Yes.

Q. And do you agree with Hytera's assertion that the banks can completely prevent Hytera from using any of its funds or any of its assets anywhere to pay the royalty?

A. I -- I disagree.

So I think Hytera has autonomous power to -- whether it can or wants to pay the royalty fees, it is a matter subject to Hytera's self-decision, while the only thing the bank is worrying about whether you -- if you pay the royalties may have negative impact on your financial status to continue to repay the bank's loan.

However, the bank has other collaterals, so the bank -- I think the bank has adequate -- relatively adequate assurance that Hytera can continue to repay the loan.

Q. Okay. And other than the sale of an asset that the bank may or may not control, would it be possible for Hytera to use funds in unrestricted accounts to pay the royalty?

A. Certainly, yeah. Hytera can definitely use the funds in unrestricted bank accounts to repay the royalty fees.

Q. Okay. And can you explain briefly what an unrestricted account is?

A. So unrestricted account, so let's first figure out what is

restricted account.

So to my understanding, restricted account is those bank account serving as guarantee fund deposit account, which means when Hytera is borrowing a loan from the bank, at a request of the bank, it must -- it must provide a guarantee fund deposit account to the bank, which is -- which should be under the control of the bank.

So in the event of Hytera's breach of the repayment of the loan, the bank can directly transfer the funds in the guarantee fund deposit accounts to -- to -- as a fund to repay the loan.

Okay. So for -- for those accounts which is not subject to the role of guarantee fund, they can be freely used by Hytera.

Q. Okay. And I think -- so you mentioned unrestricted accounts and then deposit accounts. Are you -- and so are you saying that there's a difference between the unrestricted account and the deposit account?

A. There are two types of -- I think -- that's different. So the unrestricted account, just like the normal savings bank account, and the owner of the account can freely use funds in accounts, yeah.

Q. And so if Hytera has several unrestricted accounts, would they be able to use it to pay the royalty without being subject to the bank's control?

A.  Hytera can freely use, which is not subject to bank's control.

MS. BEELER:  Okay.  Thank you.

CROSS-EXAMINATION

BY MR. TAYLOR:

Q.  Good afternoon, Mr. Wang.  I'm Josh Taylor.  I'm here on behalf of HCC.

A.  Good afternoon.

Q.  Can you talk to me for a minute about what work you've done for Motorola in the past?

A.  I presented declaration, and also our team assisted Motorola to provide multiple declarations regarding U.S. litigation proceedings, and also Hytera is suing Motorola in China for antitrust law issues.

Q.  So how many -- how many matters are you working with Motorola in at the moment?

A.  Does it include the Motorola China Company's matters?

Q.  Yes, any.

A.  I think several matters.  And recently Motorola Chinese Company receive a government inquiry, so I'm helping them to -- to respond to government investigation a little bit.

Q.  And you're acting as their counsel in these matters?

A.  Yes.

Q.  How much of your work is done for Motorola entities?

A.  Ever since I join Zhong Lun law firm in 2018.

Q. What percentage of your work is done for Motorola?

A. Percentage, I think around 20 percent.

Q. And that's been ongoing for how many years?

A. From 2018. It's five -- around five years.

Q. Okay. And so you're acting as their counsel in many matters?

A. Yes.

Q. And today you're acting as an expert witness for them?

A. Yes.

Q. Have you acted as their counsel in this matter?

A. Sorry?

Q. Have you acted as their counsel in this matter?

A. In this matter?

Q. Yes.

A. Yes. So U.S. -- U.S. proceeding. I'm Chinese lawyer. I'm not acting as counsel in this matter.

Q. Okay. Mr. Wang, you acknowledge that HCC's assets are in China, correct?

A. HCC, it is -- it's a Chinese company, right, correct.

Q. And its assets are in China, correct?

A. For this question, I -- to my understanding, they have also -- they also have U.S. subsidiary and may have assets in the U.S.

Q. The assets that we're talking about today for the most part, the bank accounts, the money, the cash, all of that is

in China?

A. Yeah, given the loan agreements, all from the Chinese banks, yeah.

Q. You would agree that Chinese law applies with respect to those assets?

A. Yes.

Q. And you'll agree that Chinese law and creditor priority in a debtor's assets is different than U.S. law?

A. It should be more specifically. Then I can answer yes or no.

Q. Well, is Chinese law on creditor priority different than U.S. law?

A. I mean, for security law it's quite different country by country.

Q. And so China is different than the U.S., correct?

A. Regarding mortgage or pledge of accounts?

Q. Regarding creditor priority with respect to assets.

A. I think it's very high-level question. I cannot give a very accurate yes or no answer here.

Q. Okay. Would you agree with me that the ultimate arbiter of priorities under Chinese law would be a Chinese court?

A. Yes, I agree.

Q. Okay. And a creditor who believes that another creditor is taking property in which it has a right can bring an action in China to determine that priority, correct?

A.   Determine -- you mean bring the dispute to the court to determine the priority?  Yeah, eventually if they have dispute, they can bring it to court.

Q.   I want to turn to the restrictions that you were discussing a few minutes ago.

You don't disagree that the bank agreements require the notice and consent of the banks for certain transactions, including the transfer of assets, do you?

A.   Some loan agreements they do have such contractual terms, but some banks' loan agreement, their tone is more soft.  Just saying give me notice and I will -- give me your plan and assurance that you can continue to repay, then -- and also obtaining my consent on the assurance plan.

So it's quite different.  I don't think the banks use the same boilerplate template.

Q.   Okay.  Could we turn to DCX 7 in the binder I believe you were handed?

A.   Can I see it?

Q.   This is the bank agreement with Everbright Bank, correct?

A.   Yes.

Q.   And this agreement is the current agreement that started in June 21, 2023, correct?

A.   I cannot see the date.

Q.   I'll turn your attention to Article 3.

A.   I can only see a cover page.

MR. TAYLOR:  Your Honor, may I approach?

THE COURT:  Yes.

(Tendered.)

THE WITNESS:  Thank you.

Oh, Article 3.

BY MR. TAYLOR:

Q.  Article 3.

A.  Yep.

Q.  This is the current agreement with Everbright Bank, isn't it?

A.  Yes.

Q.  I'd like to turn your attention to Article 40, please.

That provision provides if the borrower intends to make investment to substantially increase debt financing, that would include the issuance of bonds, wouldn't it?

Mr. Wang, would to substantially increase debt financing include the issuance of bonds?

A.  It says any other actions which is sufficient to change creditor's rights or debt relationship under this contract and may affect the rights, interests of the lender before paying off all the debts.

Q.  Mr. Wang, that's not my question.

A.  Sorry.

Q.  I'm looking at Article 40.

A.  Yeah, I'm reading Article 40 here.

Q. Right. And my question is does substantially increase debt financing, that would include the issuance of bonds, wouldn't it?

A. Yeah, bond issuance is a kind of debt financing, that's correct.

Q. Okay. "If the borrower intends to issue bonds," or if we continue along to the end of that second line, "or asset transfers," correct?

A. Yeah.

Q. Going to transfer its assets.

A. Yeah, here, I can see that, asset transfer.

Q. All right. "Or takes any other action which is sufficient to change the creditor's rights or debt relationship under this contract or may affect the rights and interests of the lender hereunder before paying all of the debts -- of its debts under this contract, the borrower shall notify the lender in writing 30 banking days in advance and obtain the written consent of the lender," correct?

A. Correct. Yeah, the words -- the language is exactly what you are saying.

Q. And so -- and then let's read the last sentence there: "Otherwise, the above action shall not be carried out."

So if the -- if the bank does not give its consent, HCC cannot issue bonds or transfer assets under this provision, correct?

A. I don't think so. I totally disagree what you are saying. You know, this is the bank's template, it is always restrictive, but as a borrower, if you want to sell your assets, transfer assets, you have the freedom to do so.

The only course in event of default, right, the bank is not kidnapping or coerce the borrower saying you can do nothing to raise money to pay other justifiable debtors.

Q. So Mr. Wang, what you're telling the Court is that HCC should knowingly violate its agreement with the bank to sell its assets, transfer its assets, or issue bonds; is that correct?

A. I mean, their bank is not the government, right. Still it's a commercial and private contractual relationship, so as the borrower deems fit or if it think it is necessary to pay the debts of other judgment debtors, it can always sell -- sell the assets.

Q. Mr. Wang, are you familiar with the Criminal Code of the People's Republic of China?

A. I'm not a criminal lawyer, but you can -- you can say that.

Q. All right. Are you familiar with Section 169a of the Criminal Code which provides that a director, supervisor, or senior manager of a listed company that relinquishes creditor's rights is subject to imprisonment and a fine?

A. Even if China's Criminal Code has such language, it

doesn't mean every -- every asset transfer by a borrower without the bank's consent will constitute a crime. This is overexaggerate -- overexaggerates the bank's power here.

Q. I'm sorry, I just want to clarify.

You're testifying that it's overexerting the bank's power to enforce the right that it has in Article 40 of the contract?

A. Yeah, as -- I mean, the bank is just to make sure you can repay the loan, right? If you can repay the loan, if the borrower sell any asset even without bank's consent, it will not trigger criminal offense, right?

So Hytera can always provide other supplement or replacement collaterals or to give more assurance to bank.

Q. Mr. Wang, you're not a banker, are you?

A. I'm a lawyer, but I've specified banking and security law issues.

Q. I understand that.

Are you aware of any collateral that HCC has that is not covered by Article 40 of this bank agreement?

A. I -- I -- I do not know -- I don't have a full picture about their collaterals status.

Q. Thank you.

You don't dispute that the bank agreements also limit HCC's use of proceeds, do you?

A. Can you say that again, the question?

Q. You don't dispute that the bank agreements also limit HCC's use of the loan proceeds, do you?

A. Yeah, usually the banks, the loan agreement will specify the use of their loan proceeds.

Q. So use of proceeds for a different purpose would be a violation of the agreement, correct?

A. I -- I think -- well, they're, you know, sometimes the usage of the loan proceeds could be very general, like if the loan proceeds can be used for operation expenditures, right, I mean to pay the royalty fees or license fees is kind of cost of their borrower's business operation. It can always use the bank loan proceeds to repay -- to repay the royalties.

Q. I'm sorry, did I understand you to say that the payment of a royalty --

A. Yeah.

Q. -- based on a judgment is considered a normal operating expense?

A. I think so. It could be deemed as operational cost.

Q. That's something that companies typically include as part of their operating costs in a normal budget on a regular basis?

A. It's different, different of -- obviously different from those license fees based on the licensor and licensee's negotiation and the contract. This is their -- this is their -- after Hytera has infringed Motorola's trade secrets,

it's like a compensation, right, but it's still royalty fees.

Q. I understand what a royalty is. I'm a little confused by the fact that you attribute a royalty and a judgment to a normal operating cost of a business.

A. But going forward, Hytera has to pay royalties for its future --

Q. We're not talking about going-forward payments of royalties at the moment, are we?

A. Yes.

Q. We are; the $49 million payment that has not been made that's the issue today is for a going-forward royalty?

A. It's for -- I think it's for past, past infringement products.

Q. Mr. Wang, you don't dispute that if the agreements are put into default by the banks or because of HCC's actions in violating a term such as you suggested that the banks could freeze and deduct cash from the bank accounts, do you?

A. Sorry, the question is pretty long. Can you say it again? Sorry.

Q. You don't dispute that if the bank agreement is in default, such as --

A. Yeah.

Q. -- if HCC violates Article 40 of the bank agreement as we discussed --

A. Yeah.

Q.  -- that the banks would have the right to freeze and deduct cash in the bank accounts?

A.  I mean -- I mean if, under Article 40, if Hytera transferred assets without bank's prior approval, but as long as it can continue to repay the loan, the bank -- the bank will not be bothered to deduct money from their guaranteed fund account because the loan can be -- can be continued to be repaid.

Q.  Mr. Wang, are you making an assumption that there's other assets available to repay the loan?

A.  I think Hytera has plenty of cash and sales incomes, and to my understanding in first half of this year, it has around -- it has around 2 billion RMBs sales revenues.

Q.  Mr. Wang, I'm a little confused.  Are you here as an expert as a lawyer, or are you testifying as to the financials of the company?

A.  Obviously as a lawyer, but I need to read lots of documents, and I -- to my opinion, Hytera is in very good financial condition.

Q.  And so in your view, Hytera has other assets to pay the debt?

A.  For example, unrestricted bank accounts.

Q.  What is the basis for your opinion that Hytera can pay the bank notes as well as the royalty?

And just to be clear, are you offering an opinion on

that today?

A. So I think overall, the bank will not have their super-priority on the repayment of the loan, we're not in this case, we're not in the scenario, so Hytera is already insolvent, right, it is already in bankruptcy situation, right? It is still solvent, remains solvent and has lots of cash inflow, right? Other debtors' rights, interests, should also be equally protected.

Q. Mr. Wang, I'm very confused. Are you trying to offer an opinion today that Hytera is solvent or --

A. I didn't say --

Q. -- has financial wherewithal to pay banks?

A. I didn't -- I did some research. I didn't find any other creditor applicant has filed a case for bankruptcy case in a Chinese court, so it cannot prove that Hytera is solvent, has very strong financial condition.

Q. Mr. Wang, if Hytera defaults on one of its loan agreements, that would cause a default on other loan agreements under cross-default provisions, wouldn't it?

A. Unless it has cross -- cross-default contractual terms in the bank's loan agreement.

Q. And upon a default, the banks can accelerate the amounts due, can't they?

A. Based on contractual terms in their loan agreement, it is saying so.

MR. TAYLOR: All right. Thank you, Mr. Wang.

THE WITNESS: Thank you.

MR. TAYLOR: May I approach, your Honor?

THE COURT: Yes.

(Tendered.)

MR. TAYLOR: One second, your Honor.

(Counsel conferring.)

BY MR. TAYLOR:

Q. Mr. Wang, I've handed up to you DCX 41. Have you reviewed this document?

A. Can you please give me the document in paper. This is the other agreement? It's a note from your colleague.

Q. Yes, this is the agreement.

A. Okay. This is email correspondence between the bank.

Q. Yes. Have you reviewed this correspondence before?

A. I read them all last night actually. It's very -- just provided yesterday.

Q. And just to be clear, this is a bank rejection of consent, isn't it?

A. Based on the face of the language, yes, it is, but all of these emails were, you know, email exchange happened in this month, right, while the royalty --

Q. Mr. Wang, I just asked if this was a bank's rejection of a request for consent?

A. It just say you must communicate with us in advance and

obtain the consent. I didn't see a rejection.

Q. Okay. Let's start towards the bottom of that page, but the first email that went to the bank.

In the second paragraph at the very last sentence: "Will your bank agree if Hytera uses the loans under the credit agreement to pay the aforesaid royalty?"

That's the question being asked, correct?

A. Yeah, correct.

Q. Let's go up to the top email, the first sentence: "Hello. The loan funds under the above Comprehensive Credit Contract (No. 2022 Shen Yin Qi Jian Zong Zi No. 0100) are only used for daily operating turnover and cannot be used to pay the royalty."

A. I see that.

Q. So the bank rejected the request to use the loan proceeds to pay the royalty, didn't it?

A. Yes.

MR. TAYLOR: Okay. Thank you.

MS. BEELER: Okay, Mr. Wang, just a few quick questions and follow-up.

Can we get that same exhibit up, DCX 41, please.

I think we have to switch back to Mr. Schlaifer, switch the control.

REDIRECT EXAMINATION

BY MS. BEELER:

Q. Okay. So Hytera's counsel was asking you some questions about this, and you started to say something about the date. He interrupted you with a question.

What were you going to say about the date of this email?

A. Yeah, the date is quite close to this day, right, it's August 11th, 2023. It looks like very suspicious that they in a hurry to make such email correspondence with the banks in order to -- to want to crazily to prove something here.

Q. And the date of the email is August 11, 2023. Today is August 17, 2023, so that was only six days ago, is that --

A. Yes.

Q. And when was Hytera's $49 million royalty payment due?

A. At the end of July 2022.

Q. So was that over a year ago?

A. Correct.

Q. Okay. Now, Hytera's counsel asked you some questions about whether the bank refused to give consent. Do you remember that?

A. Yes.

Q. And if we look at the second sentence of the email from the bank, it starts with "If it is necessary." Do you see that? Do you see that sentence?

A. Yeah, I see that.

Q. Okay. And for the record, I'll read it into the record.

It says, "If it is necessary to sell material assets for repayment of royalty, it is necessary to communicate with us in advance and obtain the consent of us according to the contract."

Do you see that sentence?

A. Yes.

Q. And so is the bank refusing -- is the bank telling Hytera that it's not allowed to sell an asset?

A. No.

MR. TAYLOR: Objection. Your Honor, the witness is being asked to speculate about what the banks are doing.

THE COURT: Overruled. I'll -- you know, we don't have a jury. I can evaluate this and take it into account and give it appropriate weight.

So you may proceed.

BY MS. BEELER:

Q. Okay.

A. It just mentioned you should give us prior notice and obtain our consent as what is set forth in the loan contract. It does not say we will never refuse your application, right.

Q. Right, and Hytera's counsel asked you lots of questions about this email, right?

A. Yes.

Q. And did Hytera's counsel also ask you lots of question about what this email means?

A.  Yes.

MS. BEELER:  Okay.  We can take that one down, Mr. Schlaifer.

Can we please go back to the other exhibit that Hytera's counsel used.  I think it was DCX 7.

Okay.  And let's go I think it was Article 3 that had the date that Hytera's counsel used.  It's DCX 7, page 5 of 40.

BY MS. BEELER:

Q.  Okay, what's the date on this bank agreement, Mr. Wang?

A.  So the term of the loan is from June 21st, 2023 to June 20, 2024.

Q.  And when was Hytera's royalty payment due?

A.  The end of July 2022.

Q.  So was that over a year ago?

A.  Yes.

Q.  Okay.  And let's go now to Article 40, which Hytera's counsel also asked you some questions about.

Okay.  So Hytera's counsel asked you some questions about, you know, whether substantially increasing debt financing means to issue bonds, and we discussed any other actions that are listed in this article.  Do you recall that?

A.  Yes.

Q.  And I guess four lines down, there's some language that starts with "sufficient to change the creditor's rights."  Do

you see that there?

A. Yes.

Q. So I'll read this into the record.

It starts with, "Any other action which is sufficient to change the creditor's rights or debt relationship under this contract or which may affect the rights and interests of the lender hereunder before paying off all of its debts under this contract."

Do you see that language there?

A. Yes.

Q. And so does that mean that any of these activities, like substantially increasing debt financing, have to sufficiently change the creditor's rights in order to trigger there provision?

A. Yes.

Q. Okay. And Hytera's counsel further asked you questions to the effect of what would happen if the banks did not give consent to sell an asset. Do you recall that?

A. Yes, I recall that.

Q. And Hytera's counsel suggested that if there was no consent given and a borrower were to sell the asset anyway, that would immediately result in criminal -- criminal prosecution. Do you recall that?

A. I recall that. I think it's overexaggeration, right. The criminal code is not a shield here, right?

Q. Okay. And if we turn to the next page, which is DCX 7, page 15 of 40, there's a chapter called Chapter 10 Events of Default. Do you see that?

A. Yes.

Q. And under that is Article 46. If you look at No. 4, what this chapter is saying is that there will be a default if, and if you look at No. 4, it says, "the borrower fails to comply with its covenants."

There are many listed there, but this is just one example. Do you see that?

A. Yes.

Q. So in reality, if a -- what would happen if a borrower decides to sell the assets even without the bank's consent?

A. Well, it's just very normal event of default, right? It's only a private law matter. It will not be escalated as criminal offense.

Q. And in general, we don't have a lot of time to go through every provision, I know there were several bank agreements provided yesterday by Hytera, but in general when a default -- what happens when a default is triggered?

A. Well, I think the bank will view the totality of the situation. If the borrower can maintain to repay the loan regardless whether it has sold any assets, maybe nonmajor assets to raise some fund, it will not constitute event of default.

Q. And could one example be that the borrower provides assurances?

THE COURT: Sorry, I guess there's an objection?

MR. TAYLOR: Your Honor, I believe we're getting well outside the original scope of the testimony, but also I believe we're getting into some speculation here again.

THE COURT: Okay. I -- again, we're not -- this is not a jury. We're not before a jury. It's sort of like a bench trial in a sense. I'm making the -- or I'm hearing the witnesses and making factual findings, so we don't need to be as worried about the risk that something is going to get before the jury that they're incapable of giving appropriate weight.

I am able to evaluate the fact that in some instances, he is testifying about documents he didn't generate. I'm capable of making those kinds of, you know, calls on what weight should be given to what evidence, and so we're just going to proceed.

Thanks.

BY MS. BEELER:

Q. Mr. Wang, Hytera's counsel asked you lots of questions about what would happen in the event that Hytera sells an asset without the bank's consent, right?

A. Yes.

Q. And he asked you lots of questions about criminal law,

too, right?

A. Yes.

Q. And you're not -- you told Hytera's counsel that you're not a criminal lawyer, right?

A. Yes.

Q. Okay. And so in general, can you please describe what would happen in the event of a default?

A. So the borrower disposal or transfer of its assets, whether it is major assets or nonmajor asset, as long as it can maintain its capability to repay the loan, usually it is not a serious event of default, right? So the only thing the bank is concerned about whether you can repay my loan monthly, right?

So if you is facing some emergency, you need to use the cash to pay your employees, to pay your suppliers, you are the owner of your asset. You can have the freedom to dispose of your asset, right?

So I don't think the bank is like -- like the government has the similar authority like the government to monitor every movement of the borrower, right? The relationship between a bank and a borrower is still private law relationship, and the borrower has some autonomous rights to -- to consider whether it will or not to dispose of any of its assets.

Q. And is one thing that might happen in the event of a

default is that the bank would call in its loan?

A.  It is subject to their contractual terms in the contract, yeah.

MS. BEELER:  Okay.  Thank you.

MR. TAYLOR:  Your Honor, a few follow-up questions.

THE COURT:  Okay.

RECROSS EXAMINATION

BY MR. TAYLOR:

Q.  Mr. Wang, is it your opinion that borrowers don't have to abide by their contracts in China?

A.  Don't by -- sorry --

Q.  Have to abide by their contracts?

A.  No.  Regarding whether to abide by contract, I think it is similar in the U.S. and in China.  Obviously, they should respect contract, right, but here I think we're arguing -- my point is if they can give the assurance to the bank, they can continue to repay the loan, right, the bank has no -- no reason to -- to interfere with any -- any movement to dispose of the asset.

Q.  And that's based entirely on the assumption that the bank believes that HCC could repay the loan even if it paid something else in violation of the loan agreement, isn't it?

A.  I mean, the question is if -- I mean, as -- the bank's only concern is to guarantee the repayment of my loan.  Either you can provide extra additional collaterals, right?

I mean, there -- the borrower had its own board, right? The bank is not filled with every seat of the board, right? The borrower can make its decision whether to dispose of any nonmajor asset, to liquidate it and get some cash and fund to pay other debtors, right? I think it's very straightforward common sense.

Q. So just to be clear, it's your opinion that HCC can violate its agreement with the bank and pay the royalty and then hope that the bank thinks that HCC still has enough money and assets and other things that it could pay the royalty and, therefore, the bank might not notice a default. Is that your testimony?

A. I don't think that the bank has so much energy to monitor every disposal of assets of Hytera, right? It doesn't necessarily mean any movement of dispose of my asset will constitute a material default on the loan agreement.

So my point is the borrower by all means can dispose of any kind of asset in order to get some money to pay other debtors. I think it's very clear.

Q. It's not your opinion today that Chinese contracts are not enforceable in China, is it?

A. Sorry? I can -- can you say that again? Sorry.

Q. It's not your opinion today that Chinese contracts are not enforceable in China, is it?

A. Chinese contract obviously is enforceable under Chinese

law, right.

Q. All right. Wanted to touch a little bit on that email.

You indicated that it was sent just like a week ago, correct?

A. Yes.

Q. And that's because Hytera was trying, even up until the verge of this hearing, to get consent from its banks, isn't it?

A. It looks like they are -- can you provide earlier email correspondence? I mean, we can only see --

Q. No, I've asked you a question. I'd just like an answer to that question.

A. Can you say that question again? Sorry. I don't follow.

Q. Isn't it true that this email reflects that HCC was trying up until the verge of this hearing to get consent from its banks to pay the royalty?

A. Yes.

MR. TAYLOR: Thank you.

MS. BEELER: Nothing further from me, your Honor.

THE COURT: Okay. Thank you, sir. You may be excused.

Any additional witnesses?

MR. DE VRIES: The answer is no, your Honor. Those are the witnesses that we intend to put on today, subject to the right to recall them if we need for any rebuttal. Of

course, we continue to stand by all of the declarations and other evidence that have already been submitted in connection with this matter.

THE COURT: Okay. Thank you.

Then we'll turn to Hytera's case.

Also, just a reminder, I do plan to pause again at 3:30. I just want to give a heads up to whoever happens to be doing the examination at that point.

MR. TAYLOR: Yes, your Honor. I will hopefully be done by then.

THE COURT: Okay.

MR. CLOERN: Your Honor, by the way, Hytera calls Professor James Feinerman to the stand, and he is our expert witness on Chinese financial and bank agreements.

THE COURT: Thank you.

MR. CLOERN: Mr. Taylor will get into that in more specifics. I just wanted to note for the record that we're calling Mr. Feinerman to the stand.

MR. TAYLOR: May I approach, your Honor?

(Witness sworn.)

JAMES V. FEINERMAN, DEFENDANTS' WITNESS, DULY SWORN,

DIRECT EXAMINATION

BY MR. TAYLOR:

Q. Good afternoon, Mr. Feinerman.

A. Good afternoon.

Q. Can you please state your full name for the record.

A. James Vincent Feinerman.

Q. Where do you currently reside?

A. I reside in Bethesda, Maryland.

Q. Where are you currently employed?

A. I'm a professor of Georgetown University Law Center.

Q. Can you describe your education and career path prior to Georgetown?

A. Yes. I'll try and do this briefly. I started studying Chinese language a sophomore in high school in nearby Wilmette, Illinois, and went on to Yale College, where I majored in Chinese studies.

I had a two-year fellowship after that in Hong Kong with Yale in China, after which I returned to Yale graduate school to pursue a Ph.D. program in East Asian languages and literatures. But I finished that except for the dissertation and began studying at Harvard Law School which had a program in East Asian legal studies, and that led to me getting a Ph.D. and a J.D. in 1979, when I planned to join the New York law firm Davis, Polk and Wardwell.

But it was also the year that President Carter normalized relations with China, and so instead I went to China for 16 months, studying for a year at Peking University's -- University Chinese law faculty and also for six -- sorry -- four months at the Chinese Academy of Social

Sciences Institute of Law.

And after that, I did go eventually to Davis Polk, where I practiced law for about four years until I received a call asking me to come back to join the faculty at Harvard Law School and take over the East Asian legal studies program there, which I did for two years before taking a visiting offer at Georgetown, where I've remained ever since for the last 38 years except for several leaves of absence for various things.

Q. What do you teach at Georgetown?

A. Well, I teach courses in various subjects, including corporations, corporate finance, comparative law, Chinese and other Asian law, and corporate governance.

Q. And you mentioned a number of leaves of absence since you've been at Georgetown. What were those for?

A. Well, I had one leave of absence to take up a Fulbright opportunity in Japan just shortly after I joined the faculty. It was going to expire, so I had to take it in 1986.

And I then, after I had a sabbatical in 1992 at the Woodrow Wilson International Center For Scholars had a two-year leave of absence to work at the National Academy of Sciences, where I was the executive director of the Committee On Scholarly Communication with the People's Republic of China from 1985 -- '83 to '85.

And then I had one more leave of absence on a

sabbatical in spring of 2006 to have a Fulbright distinguished visiting professorship at Tsinghua University's Faculty of Law.

Q. Have you written any publications?

A. Yes, I've written a few.

Q. Do you have an approximate number of --

A. Somewhere over 60, between 60 and 70.

Q. How many of those publications were focused on Chinese law?

A. I'd say 30 or 40 of them had some relation to Chinese law.

Q. Do you have a current curriculum vitae?

A. I do.

Q. Can you turn to Tab 1 in your binder, and can you let us know after you've looked at that, is that your current CV?

A. Yes, it is my current CV.

Q. Is everything in this CV an accurate representation of your professional experiences to date?

A. Yes, it is.

Q. What languages do you speak and/or read?

A. Well, aside from English as a native speaker, I speak two dialects of Chinese, Mandarin and Cantonese, and I can also read written Chinese. I speak and read Japanese. I speak and read Spanish, and I have a reading knowledge of French.

Q. Do you have any experience with Chinese commercial lenders?

A.   Yes, I do.   I've been an expert witness in a number of cases that have involved Chinese banks and other entities operating in China, including Big Four accounting firms.

Q.   Have you ever been qualified to testify as an expert in Chinese law?

A.   Yes, I have.

Q.   What courts have qualified you as such?

A.   The Southern District of New York a couple of times, the hearing process in the Securities and Exchange Commission, and courts in the -- I think in the District of Columbia, but this was some time ago, and more recently in the Northern District of California.

Q.   Who have your clients been in those cases?

A.   The clients have usually been law firms that were representing various Chinese defendants, including the Bank of China, the Chinese subsidiaries of Big Four accounting firms in China, and in three cases the U.S. Government, where I was the expert witness for the U.S.

Q.   Has a court ever declined to qualify you as an expert?

A.   No.

MR. TAYLOR:   Your Honor, at this time we'd tender Mr. Feinerman as an expert in Chinese law, specifically commercial and banking law.

THE COURT:   He's so qualified.

BY MR. TAYLOR:

Q.   Mr. Feinerman, did you submit a declaration previously in this case?

A.   Yes, I did.

Q.   Approximately when did you submit that declaration?

A.   Late 2021 or early 2022, I believe.

Q.   Can you turn to Tab 2 in your binder.  Once you've had a chance to review that, can you tell us is that the declaration you previously submitted?

A.   Sorry, it's got my -- yes.

Q.   In preparing that declaration, did you review any documents?

A.   Yes.  I reviewed a number of documents provided to me by the counsel for Hytera.

Q.   To the best of your knowledge, are the statements in your declaration truthful and accurate?

A.   Yes, I believe they are.

Q.   And do you still agree with the opinions you made?

A.   Yes, I do.

Q.   In your declaration, did you provide an opinion regarding the banks' interest in certain of HCC's bank accounts under Chinese law?

A.   Yes, I did.

Q.   And what was that opinion?

A.   My opinion was that the banks had a prior interest in repayment based on the loans that they had made to Hytera.

Q.   You're aware that today's hearing concerns Motorola's motion for contempt and Hytera's failure to pay $49 million to Motorola for royalties, correct?

A.   Yes, I do.

Q.   Okay.  And you're aware that HCC has taken the position that it can't pay the $49 million?

A.   I do understand that.

Q.   In connection with your testimony today, did you review existing agreements between HCC and its lenders?

A.   Yes, I did.

Q.   Approximately how many agreements did you review?

A.   Somewhere between 30 and 40 agreements.

Q.   And do you recall any of the banks that were the counterparties to some of those agreements?

A.   Well, I knew that at least three of them were three of the four biggest banks in China, the Agricultural Bank of China, the Bank of China Limited, and also the International Commercial and Industrial Bank of China.

Q.   You said they're the three largest banks in China?

A.   They're three of the largest banks in China.

Q.   Okay.  Did you review every word in the documents that you've reviewed?

A.   No, no.

Q.   What did you look at?

A.   I looked at the significant parts of these agreements that

dealt with the questions about the priority that the banks had with respect to the loans they were making to Hytera.

Q. Did you prepare a demonstrative for your testimony today?

A. Yes, I did.

Q. Can you turn to Tab 3 in the binder. And can you tell me is this the document, the demonstrative you prepared labeled HCC Demonstrative Exhibit 2?

A. Yes, and I prepared this with the assistance of counsel. We worked on this jointly.

Q. All right. And does this demonstrative reflect your understanding of certain key provisions in the agreements that you reviewed?

A. Yes, it does, and the examples basically draw from the agreements that I reviewed with counsel.

Q. Okay. Can you describe generally the types of key provisions that you were focused on?

A. Well, provisions that would prevent the payment or violating the priority of payment with respect to loans that were made to Hytera.

Q. Are the agreements you recently reviewed different in any material way from those that you reviewed in connection with your 2022 declaration?

A. No, they're similar, although they're more extensive, and there are more lenders involved.

Q. I might refer to these generically as bank agreements as

we continue on.  I hope that you're comfortable with that.

A.   I'm fine with that.

Q.   Based on your experience, what is the purpose of the types of provisions that you were focused on in your review?

A.   Well, I think they have two main purposes.  One is to make sure that the lenders get paid and that they have priority of payment over other subsequent claimants.

Q.   Based on your review of the agreements, do you have an opinion on whether HCC's lenders have priority over Motorola under Chinese law?

A.   I believe that they do, although it's, of course, a question of timing as well, depending on when those agreements were made.

Q.   And why exactly do you believe that they have priority?

A.   Because I know that, first of all, they're in the terms of the agreements that I've looked at, but also from my experience of dealing with Chinese bank lending, I know that this is a very high priority, if I can use that term in different context, from bank lenders in China to make sure that they've got that priority with regard to their right to repayment.

Q.   Were you here in the courtroom earlier today when there was some discussion about the agreements often being a one-year term but continuing on for -- and being extended, assuming that the bank was happy to continue the relationship?

A. Yes. I was here when that --

Q. And to the extent that a loan agreement is renewed or extended with the same lender, does the priority continue to date back to the original relationship date?

A. I believe that's the expectation. Sometimes it's actually part of an overall agreement from the outset, and sometimes they're just tailed one after the other so that as soon as the one agreement ends, the very next date is the next day when the successive agreement begins.

Q. And in your review, did you review what are sometimes referred to as master credit agreements?

A. Yes, I did.

Q. And what's the purpose of a master credit agreement?

A. Master credit agreement is to extend credit over a longer period of time without having a single drawdown of the entire loan, but be able to cover multiple borrowings that are made by a borrower.

Q. What's your understanding, based upon your review regarding whether any of the current agreements originated before the royalty order in 2022 was entered?

A. I think that most of the agreements, except for the ones that have the subsequent date on them, originated before the 2022.

Q. And what's your understanding about whether some of those relationships predate the judgment in 2020?

A. I think at least three or four of them predate the judgment in 2020. I've looked at dates 2018, 2019, 2017.

Q. Can you describe to the Court how a revolving line of credit operates?

A. Well, revolving line of credit, somewhat like a master credit agreement but a little different. It basically agrees that someone will be able to draw down with an upper limit a certain amount of money, and the moneys can be repaid and reborrowed during the currency of that revolving credit agreement.

Q. I want to turn back to some of the key provisions that you discussed earlier or mentioned that you reviewed.

Are there limits on the use -- on HCC's use of the loan proceeds in the bank agreements?

A. Yes, there are.

Q. And what generally is a limitation on use in a loan agreement?

A. Well, a limitation on use for a particular purpose or within a certain ambit as the agreement is, for example, for a construction project or for some other dedicated use.

Q. Did you include some representative provisions that limit the use of credit or proceeds in your demonstrative?

A. Yes. On one of the slides in the demonstrative, I included those.

Q. Which page is that?

A.   It's page 3 of this demonstrative.

Q.   And I see on page 3, there are three examples.  Are those representative of the types of limitation clauses in the various bank agreements?

A.   Yes.  They're not exhaustive, but they're representative.

Q.   And, again, what do they generally provide?

A.   They generally provide that they're extending credit for specific purposes and that, as it says in one of them, they shall be used for a certain purpose only.

For example, in Example 3, it says they shall be used for the procurement of raw materials required for the financing party's production only.

Q.   All right.  I want to move on to another one of these provisions.

Do the banks have rights to prevent HCC from transferring, selling, or disposing of HCC's assets?

A.   Yes, they do.

Q.   Did you include some of these provisions in your demonstrative?

A.   I did.

Q.   What page are those on?

A.   These are, I believe, on the following page, page 4.

Q.   Yes.  And generally what do these provisions provide?

A.   These provisions provide that there has to be, first of all, a notice to the lenders that there's going to be

something done with respect to the use of the loan proceeds, and that they then require written consent within a period of time, ordinarily 30 days, from the lender.

Q. Can HCC transfer assets without the consent of the lender?

A. I think as a practical matter and likely as a legal matter, not. In some of these agreements, it's made quite clear that they cannot.

For example, in Example 2 on this slide, the final sentence in Example 2 is "Otherwise, the above action shall not be carried out."

But the implications in the others I think are that if you don't get the consent, you at least take a great risk in considering doing something without gaining consent.

Q. So are these -- are these three examples representative of the notice and consent provisions that are in the other agreements as well?

A. I believe they are. They're not the only ones, but they're representative of similar provisions in most of the agreements.

Q. If a bank were -- in your experience, if a bank were to give consent to allow a sale of assets, what would the bank typically require regarding the use of proceeds?

A. Well, I think they would expect that, first of all, the bank would be consulted about how the use of proceeds was going to proceed after getting that consent and probably

expect to have its current borrowings paid at least in part before the proceeds were used for any other purpose.

It would be a conditional use of proceeds with the bank's approval of how the proceeds were used, not just a blanket you can use them for whatever you choose.

Q. So am I understanding you that the bank would generally require the proceeds to be paid with respect to the loans so that the loan was reduced for the reduction in assets?

A. Right. And I think that's the point, that it wouldn't necessarily say pay off our loan first before you can use any of the proceeds, but it would say negotiate with us as to, you know, what we get first before you use the proceeds for any other purpose.

Q. Whether or not a bank has a perfected security interest as we might view that in the U.S., do these notice and consent provisions allow a bank to prevent a sale or transfer of property without its consent?

A. Well, I think the expectation is that a borrower would be unlikely to take the risk of using the proceeds without gaining the consent, but I think it's a little open ended as to, you know, what the possibilities would be if they were to go ahead and use those proceeds without getting the bank's consent first.

Q. And if -- if HCC were to not get the consent and transfer or sell assets, the banks could call the notes -- the loans

due, correct?

A. Yes. I mean, obviously, if they were not happy, it would not be prudent to proceed and do things without waiting for the banks to take whatever remedies they can under Chinese law.

Q. It would be -- it would be a breach of the agreement, correct?

A. Yes.

Q. And it would be a breach of the rights of the bank?

A. Yes.

Q. Do these notice and consent provisions also limit HCC's ability to increase debt financing?

A. Yes. I mean, they essentially, in one or two examples, I know, want to make sure that there's prior consent before taking on additional indebtedness because the additional indebtedness might also diminish the bank's ability to get repaid.

Q. And that would include the issuance of new bonds, correct?

A. Yes.

Q. If HCC defaults on one of its loans, what rights do the banks have?

A. Well, the banks usually have the rights that would be typical in any, you know, commercial circumstance. They can have the choice of either declaring an event of default, accelerating the payments that were due beyond the usual

repayment schedule or, in cases of other debtors to the borrower, declare a cross-default and make all of their other borrowings immediately pay and due.

Q.  I wanted to talk just for a minute.  Do the banks have an ability to monitor the use of proceeds to ensure compliance?

A.  Yes, they do.

Q.  And have you pulled together some of those provisions in your demonstrative?

A.  I have.  They're on the next page, page 6.

Q.  Okay.  Is that page 6 or page 5?

A.  Sorry, page 5.

Q.  And are these representative of monitoring-type provisions that you've seen in the bank agreements?

A.  Yes, they are.

Q.  So if there's a default, the banks can exercise their rights and I believe you mentioned accelerate.  What is an acceleration clause?

A.  An acceleration clause means that a loan or a debt that is due over a period of time becomes immediately due.

Q.  And do the bank agreements have acceleration clauses?

A.  Yes, they do.

Q.  Have you included those in your demonstrative?

A.  Yes.  There are some examples of them on the following page, page 6.

Q.  And are those representative of the acceleration

provisions in the bank agreements that you reviewed?

A. I believe they are.

Q. What rights do the banks have to deduct and/or freeze cash in bank accounts?

A. They also have various provisions in their loan agreements to do that.

Q. So if there's a default, a bank could take the money that's in HCC's bank accounts?

A. Yes. It could also freeze those accounts in order to make sure that the accounts aren't misused and just make everything stand still until they decide what's going to be done.

Q. Did you include some representative provisions regarding deduction and freezing in your demonstrative?

A. Yes. They're on page 7 of this.

Q. And are these representative of such freezing and deduction provisions?

A. Yes, I believe they are. They're examples of both, deduction and freezing.

Q. Okay. So under Chinese law, what rights and remedies do the banks have to -- to exercise rights upon a default with respect to the assets of HCC?

A. Well, they can accelerate the repayment. They can declare a default. They can use that declaration of default to make a cross-default with respect to other lenders who are worried about their loans being repaid, and they can take these other

steps that we've just discussed with regard to things like deduction and freezing.

Q. Can they reduce the lines of credit or terminate them?

A. Yes, and that seems to be a fairly common remedy that they pursue. As they become more fearful of being repaid, they may pull down a previous line of credit and lessen what's available in the future.

Q. And can they refuse to renew the loans?

A. Yes.

Q. If the banks are concerned about HCC's financial condition or a material change in its financial condition, do they have any rights?

A. Yes. Well, they can, you know, take the steps that we've discussed just now and basically try and make themselves whole using the provisions that they have in their loan agreements and also in other ways bringing civil action in Chinese courts.

Q. And did you include some representative financial condition provisions in your demonstrative?

A. Yes.

Q. Where are they?

A. I believe they're on the following page, page 8.

Q. All right. And are those representative of the types of provisions in the bank agreements that you reviewed?

A. Yes, they are.

Q. You mentioned cross-default provisions. Is that a common provision in these agreements?

A. Yes, and it's a common provision in lending globally.

Q. And so one -- a default under one loan, just under one provision under one loan can lead to a default under other loans, correct?

A. Yes.

Q. And then those cross-defaults can lead to further cross-defaults, correct?

A. Correct.

Q. Did you include representative provisions concerning cross-defaults in your demonstrative?

A. Yes, I did.

Q. And where are those located?

A. They're on the following page, page 9.

Q. And are those representative of the types of provisions in the bank agreements that you reviewed?

A. Yes. They're drawn from bank agreements with credit lines in the Bank of China, working capital loans from the Agricultural Bank of China, which are two of those four largest banks in China, and also with the Pudong Development Bank in Shanghai.

Q. Mr. Feinerman, what would happen if -- what would have to happen for HCC to be able to pay the royalty amount in compliance with the bank's agreements under Chinese law?

A. They would have to get the consent of the majority of banks or perhaps almost every bank to be able to make those payments, if, depending on the terms of the individual loans they have with particular banks, that was going to trigger any of these other provisions and make their banks' debts due and payable and then require prepayment of all of those before any payments could be made on this.

Q. Mr. Feinerman, were you here in the courtroom earlier when Mr. Wang testified?

A. Yes.

Q. In your expert opinion under Chinese law, does the existence of a court order provide a basis for HCC to violate its agreements with its commercial lenders?

A. It does not allow them to violate their agreements with commercial lenders.

Q. If HCC doesn't comply with the provisions in its agreements and, for instance, transferred an asset without consent, could there be civil or criminal liability for HCC's directors, supervisors, or senior managers?

A. Yes. There are both provisions for civil and criminal liability for that.

Q. What -- what provision of Chinese law deals with criminal aspects for such violation?

A. Well, the provision of Criminal Law 169a, criminal law of the People's Republic of China has, among various other

provisions, a provision that provides for criminal penalties for senior managers and others who are financial concerns for breaking those laws.

Q. And specifically for relinquishing a creditor's rights --

A. Right.

Q. -- correct?

And so if HCC took action to ignore, for instance, Article 40 I believe you heard earlier today --

A. Yes, I did.

Q. -- that bars a transfer of assets, if HCC violated that provision, it could -- the directors, supervisors, or managers could be subject to criminal liability, couldn't they?

A. That's exactly what's said in Article 169a of the criminal law.

Q. Because it would be a version of relinquishing a creditor's rights, wouldn't it?

A. That's correct.

Q. And what are the punishments for that?

A. Well, they have punishments in two tranches. There's a lesser and a greater violation. For a lesser violation, the penalties are up to three years of imprisonment and fines, and then for a greater more serious violation, it's up to seven years' imprisonment and heavier fines.

Q. Mr. Feinerman, in your opinion, I think you heard Mr. Wang's belief regarding the -- this law and whether it

would actually be enforced.

Do you have an opinion on that?

A. Yes. I believe it would be enforced. There might be some possibility of a discussion beforehand, but I believe if they thought that the loan was going to be violated, that they could certainly seek imposition of a criminal penalty.

MR. TAYLOR: Thank you.

CROSS-EXAMINATION

BY MS. BEELER:

Q. All right. Good afternoon, Dr. Feinerman. I think you may have already heard, but my name is Yvonne Beeler, and I'm going to ask you some follow-up questions about your testimony.

A. Yes.

Q. Okay. Now, Hytera's counsel asked you if Hytera's banks, if its lenders have priority over Motorola, and you said yes.

Do lenders have priority over this Court?

A. No.

Q. Okay. And you understand that the $49 million royalty payment that Hytera was supposed to pay over a year ago is to be paid into a court-ordered escrow account, right?

A. I understand that.

Q. Okay. And on direct examination, you discussed the provisions of several bank agreements, right?

A. Yes.

Q. And you provided your opinions regarding those bank agreements at various provisions, right?

A. Correct.

Q. You gave all of your opinions during your direct examination, right?

A. Yes.

Q. And you never opined that you looked at all of Hytera's assets and all of Hytera's accounts and determined that it would be impossible for Hytera to pay the royalty, right?

A. I was only asked to comment on legal issues and not on anything related to financial matters.

Q. Okay. And you also never opined that it would be impossible for Hytera to pay some smaller amount of the royalty, right?

A. No, again, because I have no access to that information.

Q. Okay. You -- you also did not testify that Hytera ever actually asked a bank for consent to sell any specific asset, right?

A. No. I have no knowledge of that.

Q. Okay.

A. Except for the one thing that was put up during the testimony today. That was the first I had seen.

Q. I'm sorry, what --

A. The -- the image that was put up today, where it seemed like there was a bank in China which was responding to what

was looking like a drawdown request for Hytera.

Q. Oh, I see, okay. I recall what you're talking about.

You never opined that Hytera actually tried to sell any specific asset, right?

A. No.

Q. And you also did not provide an opinion regarding any Hytera liquidity crisis, correct?

A. No, again, because I really wasn't looking at Hytera's finances. I was only looking at these legal obligations.

Q. Okay. And so is it your opinion that Hytera should not have to pay the $49 million royalty?

A. Well, I don't know if I can give that opinion. I think that they may be stopped by operation of Chinese law from paying that ahead of the obligations that they have under Chinese law to pay prior creditors.

Q. I see. And so in your opinion -- is it your opinion that, you know, certain PRC law provisions in these bank agreements are designed to prevent borrowers like Hytera from paying U.S. court-ordered royalty payments?

A. I don't know that they're designed to do that. I think that they may have the effect, depending on the priority of the loan agreements that they have as a result of the timing of when the loans were taken out and what the provisions of those loan agreements are.

Q. Okay. But you would agree that Hytera should pay the

royalty payment, right?

A. When they are able to, given the prior obligations that they have.

Q. Okay. And at the beginning of your direct examination, your counsel asked you some questions about your background. I think you testified that you've served as an expert witness before; is that right?

A. Yes.

Q. About how many times have you served as an expert witness?

A. Probably nine or ten times.

Q. And you also testified that you were an expert for the United States government a few times; is that right?

A. Yes.

Q. Okay. I'd like to pull up a case. The case is *United States v. Walter Liew* --

MS. BEELER: Oh, do we have to switch the control back to Mr. Schlaifer?

Thank you very much.

And I know we're short on time here so I'll be very quick, but let me just -- the case is *United States v. Walter Liew*. The cite is 2013 Westlaw 6441259, and it's dated December 9, 2013.

Dr. Feinerman, is this one of the cases that you served as an expert witness in?

A. Yes.

Q. And this was a trade secret theft case brought by the United States government, right?

A. That's correct.

Q. And I'm paraphrasing here, but the defendants were -- it was alleged that they, you know, conspired to and did obtain trade secrets and transmit the trade secret information to China; is that right?

A. That's right.

Q. Okay. And, Dr. Feinerman, in *U.S. v. Liew*, and for the record, I'm drawing your attention to page 2, in the second column, third paragraph down, second sentence of that paragraph --

A. Yes.

Q. -- Dr. Feinerman, in *U.S. v. Liew*, you opined that "National industry policy goals in China encourage intellectual property theft, and an extraordinary number of Chinese in business and government are engaged in this practice."

You've provided that opinion, right?

A. Yes.

MS. BEELER: Thank you.

MR. TAYLOR: Nothing, your Honor.

THE COURT: Okay.

MR. TAYLOR: Just going to grab my water, however.

THE COURT: All right. Thank you very much.

THE WITNESS:  Thank you, your Honor.

MR. CLOERN:  May he be excused, your Honor?

THE COURT:  Yes.  Thank you.

MR. CLOERN:  Your Honor, we're prepared to call our next witness.  I just noticed the time is 3:20, so I don't know if you want us to start or --

THE COURT:  Okay.  Maybe we should just break here. So we'll come back here in 30 minutes, so that will be 3:50.

MR. CLOERN:  Thank you, your Honor.

THE COURT:  Thanks everyone.

(Recess from 3:20 to 3:52 p.m.)

THE COURT:  Thanks, everyone.  We can proceed with the next witness.

MR. CLOERN:  Thank you, your Honor.

HCC calls Mr. Ouyang Le remotely from Hong Kong.

THE INTERPRETER:  Last name O-U-Y-A-N-G, first name L-E.

MR. CLOERN:  May we proceed?

THE COURT:  Yes.

LE OUYANG, DEFENDANTS' WITNESS

DIRECT EXAMINATION

BY MR. CLOERN:

Q.  Please state your name.

A.  Ouyang, Le.

Q.  Okay.  Where are you employed?

I'm sorry, you're going to need to speak way up.  We can't hear anything that you're saying.

Where are you employed?

A.  Grant Thornton, China, Shenzhen branch.

Q.  And that's Grant Thornton, the global accounting firm; is that right?

A.  Yes.

Q.  Are you a CPA?

A.  Yes.

Q.  What do you do at Grant Thornton?

A.  I'm currently an auditing manager.  My responsibility including preparing for -- working with the auditing companies with my team to conduct an auditing job and prepare and submit an auditing report.

Q.  And is Hytera Communications Corp publicly traded, if you know?

A.  Yes.

Q.  And is Grant Thornton HCC's auditor?

A.  Yes.

Q.  In connection with this case, did you review HCC financial data and write a report involving HCC's current cash, debt, and cash flows?

A.  Yes.  I participated in this specific auditing job.  That include cash, debt and cash flow.

MR. CLOERN:  Your Honor, at this time, we'd like to

offer Mr. Ouyang as an expert on Hytera's financials and Chinese accounting.

THE COURT: Sorry.

MR. DEORAS: I was just going to object. It sounds like this is a percipient witness, not necessarily an expert witness. We don't object --

MR. CLOERN: You know what, I think he is an expert, but we can maybe cover that at the end. He is a fact witness for sure, percipient witness. He also happens to be a CPA, and this is kind of expert area, but we're not really -- we're asking him really for facts, not his opinions, so I'm happy to move on.

THE COURT: Okay.

MR. CLOERN: All right.

Your Honor, we are going to talk about some demonstrative exhibits that Mr. Ouyang prepared. It is HCC Demonstrative Exhibit 3, pages 2, 3, 4, 5 and 6. They've all been pre-admitted as evidence summaries under 1006.

So I'm not going to -- I'm going to dispense with the formalities and go straight to it, if that's okay.

THE COURT: That's fine.

MR. CLOERN: Thank you, your Honor.

BY MR. CLOERN:

Q. Let's bring up page 2 of HCC Demonstrative Exhibit 3.

Mr. Ouyang, did you prepare this chart?

A. Which one specifically?

Q. Page 2, start on page 2.

A. Yes, we prepared this one.

Q. Okay. And the -- what does this chart show?

A. It shows the exchange rate of Chinese currency and U.S. dollars.

Q. And does the chart also show the amount of restricted and unrestricted cash that Hytera has as of June 30, 2023?

A. Are you referring to the statement of monetary funds? That should be page 3 here.

Q. I'm sorry. I am referring to the statement of monetary funds. So it says -- I'm sorry, can he not see the screen?

MR. MONTGOMERY: They're sharing the wrong --

MR. CLOERN: There's an issue with the IT. This should be coming up -- Ms. Wang, is this not coming up on the screen that you guys have?

MS. WANG: No, nothing is showing on the screen. It's blank.

MR. CLOERN: Okay. We need to be able to show the witness the exhibits.

Madame Interpreter, can you just inform the witness to rely on the screen and not the document in his binder, please.

THE WITNESS: I'm not seeing anything on the screen.

BY MR. CLOERN:

Q. All right, well, how about we do it this way, as my good friend Mr. De Vries suggests.

Do you see now?

A. Yes.

Q. Okay. So please let's let the record reflect that we are looking at HCC Demonstrative Exhibit 3, page 2.

Is this a statement, Mr. Ouyang, of monetary funds for HCC as of June 30, 2023?

A. Correct.

Q. And this $16 million, is that the unrestricted cash HCC has as of June 30, 2023?

A. Yes, but if you wanted -- if you're referring to unrestricted fund, you should also add the cash on hand here, the 3,029 -- $290 listed above.

Q. Okay. But totaling up, that's still $16.2 million, right?

A. Correct.

Q. Okay. And this 46 million below it, is that restricted cash?

A. Yes. Yes, this is the restricted fund.

Q. Okay. And would that be cash that is -- that's been held as collateral for bank loans by banks?

A. Yes. Yes. This fund is used as a guaranteed deposit in order to borrow loans.

Q. And, Mr. Ouyang --

CHECK INTERPRETER: Check. Sorry. For taking out

loans or for financing purposes.

MR. CLOERN: It's a check interpreter.

INTERPRETER ZHANG: I'm sorry, was the question for me?

CHECK INTERPRETER: Did that come through? I'm sorry.

MR. CLOERN: It's okay. Yeah, it's all right. We'll stick with the primary interpretation. It's okay.

BY MR. CLOERN:

Q. Mr. Ouyang, do you see page 3 of HCC Demonstrative Exhibit 3 on your screen?

A. Yes, I can see it.

Q. And does this chart, was this chart prepared by you?

A. Yes.

Q. And does this chart show $113 million of outstanding bank loans currently as of June 30, 2023?

A. Yes.

Q. And is just over a hundred million of that due to be repaid within a year?

A. Yes.

Q. And do you now see page 4 of HCC Demonstrative Exhibit 3 on your screen?

INTERPRETER ZHANG: Interpreter speaking. I'm still looking at page 3 here.

MR. CLOERN: What?

INTERPRETER ZHANG:  My screen still shows page 3.

MR. CLOERN:  Page 4.

May I approach, your Honor, to look at her screen?  I don't know what she's talking about.

MR. DE VRIES:  I think if it helps, previously you were displaying on the defense camera the slide.  I think that would probably be helpful for everyone, and I think that might help the interpreter hopefully.

MR. CLOERN:  Yeah, but that looks like it is what's --

MR. DE VRIES:  I just mean, like, we're using two different screens, which is not a problem.  There's the document camera.

MR. CLOERN:  Oh, I see.  So the Elmo is up on WebEx, but in the courtroom, the slides are up.

MR. DE VRIES:  Exactly.

THE COURT:  Right.

MR. DE VRIES:  Which is not a problem, to be clear.

THE COURT:  Okay.  Is everyone fine with that?

MR. DE VRIES:  Yes.

THE COURT:  Okay.

THE LAW CLERK:  I can switch it to the doc cam.

THE COURT:  There are two options.  Either we have the slides up in the screens in the courtroom, or everyone is looking at the Elmo.

MR. CLOERN: Let's all look at the Elmo since that seems to be all we can show the witness.

THE COURT: Okay.

BY MR. CLOERN:

Q. Okay, Mr. Ouyang, do you see on your screen now page 4 of HCC Demonstrative Exhibit 3?

A. Yes, I can see that.

Q. And was this chart prepared by you?

A. Yes.

Q. And does this chart show HCC's outstanding bonds?

A. Yes.

Q. And is the total value of those bonds to be repaid 68 million?

MS. WANG: Could you be able to move it slightly above, move up a little bit. We're not seeing the -- yes, yes. A little bit more. A little bit more.

Great. Thank you.

BY THE WITNESS:

A. Yes.

BY MR. CLOERN:

Q. Okay. And the first bond, is that due to be repaid December 28, 2023, for $18 million?

A. Yes.

Q. And the second bond for $49 million, is that due to be repaid April 20, 2024?

A. Yes.

Q. And so taken together with page 3, the loans, and page 4, the bonds, is that about $180 million of outstanding bank debt and bonds for HCC as of June 30, 2023?

A. Yes.

Q. Do you see on your screen page 5 of HCC Demonstrative Exhibit 3?

A. Yes, I can see it.

Q. And is this a cash flow chart showing receipts of cash, inflows of cash, from January 2020 to June 2023?

A. Yes, the inflow cash.

Q. And is it split up for each year, '20, '21, '22, and then the first half of '23?

A. Yes.

Q. Okay. Please -- do you see page 6 of HCC Demonstrative Exhibit 3 on your screen?

A. Yes.

Q. And is this the same chart only now showing the cash outflows at HCC?

A. Yes. Outflow of cash.

Q. And the first few rows are related to operations, and the next few -- and the last few rows are related to financing activities; is that right?

A. Yes.

Q. Okay. And if you compare the totals, please, for -- if

you compare the totals, please, for 2020, for 2021 and 2022, was HCC cash negative in all three of those years?

A. Yes. Yes. Yes, the cash flow is negative throughout all three years from 2020 to 2022.

Q. And for the first half of 2023, is the cash flow slightly positive?

A. Yes.

Q. And that's about $13 million?

A. I'll say $12 million.

Q. Okay. Fair enough. 12.

Okay. Now, does HCC have the funds to pay for its upcoming debt obligations from bank loans and bonds?

A. Currently, this company's nonrestricted fund is actually less than the debt they owed, so, no, it's unable to pay all the debts.

Q. And the cash flow charts on pages 5 and 6, do they show the cash HCC generates from operations? Yes?

A. Yes.

Q. And they also -- they also show the cash HCC receives from asset sales?

A. Yes, it also includes that.

Q. And does it show that HC -- does the cash outflow chart show that HCC used cash to maintain its operations?

A. Yes.

Q. And are you able to determine from your cash flow analysis

whether HCC is using its cash from operations to repay its debt?

A. Yes. Yes. The company's operation inflow is increasing, and the debt -- we can see the outflow of the cash is going to the debt, so I can determine that the cash from the operation is used to pay debt.

MR. CLOERN: No further questions, your Honor.

THE COURT: Okay. Cross.

MR. DEORAS: Yes, your Honor.

CROSS-EXAMINATION

BY MR. DEORAS:

Q. Good afternoon, Mr. Ouyang. Can you hear me?

A. Yes.

Q. I want to talk a little bit about the work that you did in this case.

Grant Thornton served three declarations in this case, correct?

A. I'm not sure. I know we submitted one report.

Q. Grant Thornton submitted three reports. That's correct, right?

A. No, one report.

Q. You're not aware of the other two reports if they were or weren't submitted by Grant Thornton?

A. I'm not sure which three reports are you referring to.

Q. You're only aware of one report, is that fair?

A. Correct. We only submitted one report for the case concerning Hytera.

Q. Okay. We'll get into that in a second.

The report that you are aware of, was that submitted on Tuesday of this week, August 15th?

A. Yes.

Q. Okay. Now, in the reports, you compiled certain information about Hytera; is that correct? Information about funds, debts, and cash flow?

A. Correct.

Q. You did not do an audit in this case, correct?

A. We didn't provide auditing service for this case. Why are you saying that? We did not do any auditing for this.

Q. Okay. Let me -- I'll show you a document, and that might help.

Can you see the document I have on the screen?

A. Yes.

Q. Okay. Is this the report that you are aware of?

A. Yes. Yes. This is a translation.

Q. Okay. If I -- I'm going to turn to the end of the report, the translated version.

Actually, so let me just start at the beginning. The title says Report of CPA on Performance of Agreed-Upon Procedures. Do you see that?

A. Yes.

Q. It says, "Our responsibility is to perform the agreed-upon procedures in accordance with the requirements of the Chinese standards."

Do you see that?

A. Yes.

Q. Now, if we turn to the end of the report, the second-to-last paragraph says, "The agreed-upon procedures performed above constitute no audit or review, so we express no audit or review opinion."

Do you see that?

A. Yes, I see that.

Q. Okay. So you agree that the agreed-upon procedures that you and Grant Thornton entered into with Hytera for this case did not constitute an audit, right?

A. That's not how I understand this. As I mentioned, we provided our auditing service as an accounting firm, the -- so that -- our auditing actually includes auditing as well as agreed-upon procedures. So we did provide -- we provide the agreed-upon procedures. So my understanding that that can be accounted for as an auditing service.

Q. You agree, Mr. Ouyang, that in the report that you prepared for this litigation for Hytera, your firm said that the agreed-upon procedures that you performed constitute no audit or review, so we express no audit or review opinions, right?

A. I like to point out that the auditing is not the same as the auditing service. So here, we listed that statement here in compliance with the Chinese auditing standards. So this report is the agreed-upon procedure we performed, so it's not for -- it's not to be used as -- for as auditing or review.

Q. Okay. I think I understand.

This report that you prepared is not to be used for auditing purposes, is that fair?

A. Correct. Actually, you should be able to find the purpose of this report on the first page of this report. It says that the purpose of this is only to assist Hytera in recognizing the monetary funds and borrowings, as well as payment and receipts of the cash flow as of June 30, 2023.

Q. Right, and I'll point you to that in a second.

Now, Grant Thornton does serve as Hytera's auditors generally, right?

A. Yes.

Q. But here, the report, the purpose of the report here is not an audit, right?

A. Yes. The purpose of this report is to help verify the company's measure of fund, borrowing as well as cash flow, and we conduct this report according to the agreed-upon procedures and which is in compliance with the Chinese auditing standards, and the conclusion of this report actually was shown earlier by Attorney Boyd, those charts.

Q.  If we look at the beginning of the report, it refers to the agreed-upon procedures and says, "These procedures are agreed by Hytera Communications Corporation, Ltd., who shall be responsible for the adequacy and appropriateness thereof," right?

A.  Yes.

Q.  It's Hytera that's responsible for the adequacy and appropriateness of the procedures in this report, right, not Grant Thornton?

A.  If there is an inaccuracy of data, then, yes, Hytera is responsible for that.  But after we conducted the procedures, it shows that all the information provided is true, accurate, and appropriate.

Q.  Are you aware that Hytera --

A.  Can I add?

Q.  Sure.

A.  I think I understand what you are getting at.  I just want to add that this report, we put this language in there in compliance with the Chinese auditing standards, and it cannot be used for editing or review opinions, but we did follow the procedures to verify all the information, so it doesn't mean that this report is inaccurate or inappropriate.

Q.  So I want to move on to a slightly different topic.

Mr. Ouyang, are you aware that Hytera was required to pay a $49 million royalty payment to Motorola on July 31,

2022?

A.  I'm not sure about that.

Q.  Okay.  So you didn't offer any opinion as to whether Hytera was able to make that $49 million royalty payment to Motorola on July 31st, 2022, right?

A.  Correct, because this is not included in the service for this report.

Q.  Right.  And your role here today in front of the Court is not to tell the Court that Hytera cannot possibly pay that $49 million royalty payment to Motorola, right?

A.  So the purpose of my report is -- is to show, as of June 30, 2023, the monetary fund, borrowing and cash flow of HCC.

Q.  I'm going to put another document on the screen, and tell me if you are familiar with this.

For the record, it's PX 47.

A.  This report was not audited by us.

Q.  Have you ever seen this report before?

A.  Yes.  We -- we can have access to this report in public information, but the report was not developed by us.

Q.  Okay.  I'm going to move on then just in the interests of time.

I want to show you this report, and tell me if you've seen this.  This is one of the other Grant Thornton reports I referred to earlier.

A.  Okay.  What report is this?  Is it a report from last year?

Q.  Yes.

A.  Okay.  Proceed.

Q.  So this report is Docket 1382-6, Exhibit F, for the record.

Mr. Ouyang, have you ever seen this report dated for the period ending July 31, 2022?

A.  Yes.  Yes, it was prepared by us.

Q.  Okay.  I want to just take a look at this.

Now, July 31st, 2022, like we just discussed, that was the date that Hytera was required to pay that $49 million royalty payment to Motorola.  Do you see that?

A.  Yes, I'm aware of that.

Q.  And July 31st, 2022 is the base date that this report uses for its compilation, right?

A.  Yes.

Q.  Okay.  Now, in this report, just like in the report that we looked at earlier, you looked at monetary funds, borrowings, and cash receipts and cash payments; is that correct?

A.  Yes.

Q.  Okay.  I want to focus on the cash payments, and these are payments Hytera made for the period from January to July 2022, okay?

Now, in this report on page 6 to 7, there's a table that lists out the cash payments from January to July 2022. Do you see that?

A.  Yes, I can see it.

Q.  Okay.  And your -- it's not your role here today to say whether or not Hytera had to make any of these payments, right?

A.  Can you repeat to help me better understand your question?

Q.  Sure.

It's not your role here today to say whether or not Hytera had to make any of these payments, right?  You're just listing out the payments that were made.

A.  Yes.  The information listed here that actually already occurred, the payment has already occurred, so we list it here.

When you say "had to make," what are you specifically referring to?

Q.  That Hytera was required to make the payments that are listed out in these cash payments.

A.  If you're referring to the payment that had to make, that Hytera had no other choice, then, yes, like the payment for daily operation, that's something that they had to make.

Q.  Okay.  So for, for example, for the cash paid for debt repayment, Grant Thornton isn't here to offer an opinion that Hytera was required to make -- to pay this much in RMB from

January to July 2022, correct?

A. We cannot draw that conclusion simply from this table. This only show the information that the payment that's actually already occurred.

Q. So I want to focus on one row, the row that says "Other cash paid relating to operating activities," and there's a note here. Do you see that?

A. Yes.

Q. Now, on the next page is the note. And there's a table that lists out subcategories of the other cash paid to operating activities. Do you see that?

A. Yes.

Q. And so here, you list out a number of items that Hytera -- expenses that Hytera made from January to July 2022. Do you see that?

A. Yes, I see that.

Q. So subcontracting costs, accommodation, transportation expenses, office expenses. Do you see that?

A. Yes, I see that.

Q. And then if we go down even further, R&D expenses, publicity and training expenses. Do you see those?

A. Yes, I see that.

Q. These are all expenses that Hytera decided to make during the period of January to July 2022, right?

A. So to make it more accurate, these are the payments that's

being made in reality.

Q. Right. And so Hytera in reality made all of these payments totaling 262 million RMB from January to July 2022, right?

A. I can't see. Can you move up the document?

Yes.

Q. This period also covers the end of July 2022, that July 31st, 2022 royalty payment, that July 31st, 2022 royalty payment that Hytera was required to make, right?

A. I actually just learned the date from you not long ago that Hytera was supposed to pay the royalty by July 31st, 2022. Earlier than that, I wasn't aware of the Hytera royalty.

Q. Right. So when you were getting information from Hytera to prepare this report, Hytera didn't tell Grant Thornton, hey, there's another line item here. There's another line item, it's the Motorola royalty that's also due within this period. They didn't say that, right?

A. The company did mention that they very likely would need to make royalty payment, but whether they provided the date information at this point, I -- I do not know whether I -- did it slip out of my memory? Very likely that I forgot about that detail.

Q. Okay. Well, what we do know is that between the period of January to July 2022, Hytera spent approximately 262 million

RMB on all of these expenses, but they spent zero on the Motorola royalty, right?

A. At that time, they -- probably they didn't make that payment.

MR. DEORAS: No further questions.

MR. CLOERN: Your Honor, I have no further questions for this witness.

I would like to raise a housekeeping matter, though. I note that it's 4:54 p.m., and the Court I think had forecasted that we would end at 5:30. However, by our count, Hytera has 48 minutes left, and I think Motorola has 15.

So we have more time left than would take us past 5:30, and I just wanted to get a sense of how we might organize ourselves.

MR. DE VRIES: We definitely don't agree with that calculation, but we should be able to figure that out. I think understanding from the Court how we should navigate things towards 5:30 will allow us to do that.

MR. CLOERN: Well, let's be clear. They've used a lot more time than us, so I don't think we're going to work it out because I need -- we have to put on our finance director, and they can't run us out of time by using up all their time and I've got time left. I haven't run out of my time. They ran out, so -- I have the finance director and reserve some time to close which I can do in the 48 minutes I have left.

MR. DE VRIES: All I'm saying is I don't think your calculations are correct, but I'm happy to share with you mine, but I think we can -- I have no doubt we'll be able to work this out because we will work within the time that we have, so --

THE COURT: Okay, so, you know, my approximate calculations are Motorola has around 37 minutes left, Hytera has around 42 minutes left. That, of course, includes, you know, time that you would be using crossing the remaining -- on direct and cross, so -- and any kind of closing you would like to do.

So how many other witnesses do you have? So there is the finance director?

MR. CLOERN: Yes, your Honor. That's it. Mr. Kang, the finance director, and then I have some closing remarks prepared.

THE COURT: Okay. So why don't we just move forward then, and, you know, I guess cross the bridge when we come to it when we run out of time.

MR. CLOERN: Thank you, your Honor.

THE COURT: Okay.

MR. CLOERN: All right. May we excuse this witness, your Honor?

THE COURT: Yes. Thank you very much, sir. You may be excused.

MR. CLOERN: And is it possible to try to fix the screen? Because we have a native file, too, that we need to show.

THE LAW CLERK: Counsel, if you can use the HDMI plug at the cart desk. I'm about 90 percent sure that that's going to work because I can just change the source on that. The problem is that what goes outbound is only just evidence on my end, and I think that means the evidence cart.

MR. CLOERN: Ah, can we do that?

THE LAW CLERK: Sorry about that.

MR. CLOERN: However we need to fix it.

(Witness sworn.)

THE WITNESS: Yes, I swear that all my testimony will be the truth and nothing but the truth.

MR. CLOERN: Thank you.

May we approach, your Honor?

THE COURT: Yes, thanks.

MR. CLOERN: May we proceed, your Honor? I think the IT is hooked up now.

THE COURT: Yes.

MR. CLOERN: Thank you, your Honor.

JILIANG KANG, DEFENDANTS' WITNESS, DULY SWORN,

DIRECT EXAMINATION

BY MR. CLOERN:

Q. Can you state your name for the record, please.

A.  My name is Jiliang Kang.  Last name K-A-N-G.  First name J-I-L-I-A-N-G.  Currently, I'm employed by Hytera Communications Corporate, Ltd.  I've been working for Hytera for 17 years.

Q.  And do you report to the CEO?

A.  Yes.

Q.  Did HCC make the $49 million royalty payment due on July 31, 2022?

A.  No.  We -- the company does not have sufficient cash in our accounts to pay that amount.

Q.  Has HCC made all subsequent royalty payments?

A.  Yes.

Yes.  Ever since July 2022, the company has been -- made those payments on a quarterly basis.

Q.  So you've paid part of the royalty HCC owes into escrow, correct?

A.  Yes.

Q.  How much cash right now does HCC have, unrestricted cash?

A.  Currently, the company has about 100 million RMB.

Q.  About how much in U.S. dollars, please.

A.  About 13 million U.S. dollars.

Q.  And is HCC able to use that cash to make at least an additional payment to the royalty?

A.  Currently, no.  The company needs this amount of money to maintain a normal daily operations, as well as repay the bank

debts that's due.

If the company were to use this fund to pay the royalty payment, that would seriously affect our daily operations, and it will also make the company unable to pay the bank and other financial institution debts, which will result in the company being in breach.

Q. And what happens if the company breaches its debt agreements with its banks?

A. In that scenario, the bank could -- could use the power provided by the contract to freeze and deduct our funds in the accounts that -- and will refuse to renew loans to the company, which will result in bankruptcy or even liquidation of the company.

Q. And does that include both your unrestricted funds and your restricted funds?

A. Yes.

Q. Do the banks have the right to seize your cash in the event of a default or breach under the agreements?

A. Yes, as agreed in our debt agreement.

Q. Do the banks' loans have seniority over -- over the debt to Motorola?

A. Yes. That's our understanding. Our relationship with the banks was established before the court order, and the later relationships also was based upon the prior loan relationships.

Q. Does HCC have sufficient funds to pay the loans and bonds that are coming due in the second half of 2023?

A. So for the second half of 2023, there's a -- there will be the following loans and bonds that are due.

First, 430 million yuan for loans, 135 million yuan for bonds, and by April of next year, there will be another 360 million yuan bonds due.

Among these, the 135 million yuan bonds and the 360 million bonds as total of 495 million yuan bonds cannot be renewed.

Q. Okay. Thank you. So, yes -- sorry. I'm sorry, we need to hurry. Yes or no, does Hytera have the ability with its current cash to pay the bonds and notes that are due in the second half of this year?

A. No.

Q. Has HCC asked its -- let me back up.

So what is HCC planning to do about that shortfall of cash to pay its existing bank debt this year?

A. First of all, we need to try hard in our operations so that we can obtain as much as possible the cash flow.

Secondly, we also need to make effort to communicate, negotiate with the banks so that the bank will agree to either renew our 430 million loans or reduce.

Besides those two points, we also need to -- we also projected more shortfall of funds. Therefore, we need to work

hard with some -- at least some of the banks to come up with some plans where the banks that they agree to increase the credit line for the company.

Q. Has HCC asked its lenders whether they would loan it additional money to pay the royalty?

A. Yes. We did ask the banks, but the bank rejected that. They disagree that we should get new loan to pay for royalty or use our current loan to pay for the royalty.

Q. Could HCC generate cash to pay the royalty by selling assets?

A. We did ask the banks about that, but in order for us to either sell or dispose of the assets, we need to first get consent from the banks, and any proceeds from the disposing of the assets needs to go to the -- to pay for the bank debt first.

MR. CLOERN: Okay. Can you look, please, can you bring up, Mr. Montgomery, DCX 71, please. And then we're just going to go here, okay?

BY MR. CLOERN:

Q. And do you see on the screen a response from Bank of China?

A. Yes. No, I can't see it now.

Q. You can't see anything?

A. I see that --

MR. CLOERN: Ms. Wang, can you see anything on the

screen?

MS. WANG: Yes, yes, it's back again. We can see it.

MR. CLOERN: Will you tell the witness to look at the screen.

You can put your witness binder away. Put that away. Take that away. Look at the screen, and can you put up the Chinese, please?

BY MR. CLOERN:

Q. Do you see that, Mr. Kang?

A. Yes.

Q. Okay. And so there should be at the top a response from Bank of China and below an email request from Hytera. Do you see that?

A. Yes.

Q. Now, very briefly, please, very briefly and quickly, what did Hytera request, and what did Bank of China respond?

A. We requested that we either use our loans or to dispose some assets in order to pay the royalty payment, but the bank rejected that request.

Q. And did the bank specifically point to their agreements and stating that HCC was not allowed to use loan proceeds or sell assets?

A. Yes.

Q. And did Bank of China specifically state that any proceeds from any asset sale should first be used to pay down Bank of

China loans?

A. Yes.

Q. And did Bank of China specifically warn HCC that regarding any of the company's material assets, the company must notify Bank of China or else be found in default?

A. Yes.

Q. And did you get these kind -- and you contacted all your banks and made this request; is that right?

A. Yes.

Q. And did any of your banks agree to allow HCC more borrowing in order to pay the royalty?

A. No.

Q. And did any banks allow or give consent to sell assets?

A. The bank replied that if we were to sell or dispose of any assets, the proceeds shall go to the bank for repayment of loans and interest first.

Q. And you made these requests of the banks in 2022, is that -- is that correct?

A. Yes.

Q. And did you make these requests again of the bank in July of 2023?

A. Yes.

Q. When did HCC's banks start requiring HCC to pay down the principal and stop issuing new loans? When did that first start to happen?

Quickly, please.

A. So it first started since the beginning of 2020 after the court order was signed for the case of Hytera and Motorola and also the beginning of 2020 since the starting of pandemic.

Q. And since then, have the banks required HCC to use all of their excess cash in order to pay off and pay down the bank loans?

A. Yes. The bank required that the HCC try its best to pay down the debts.

Q. And did the banks require HCC to sell its Houhai office building and Sepura in 2020 and 2022, respectively, in order to pay down bank debt?

A. Yes. In the year of 2021, 2022, the banks required the company to pay down the due loans, and the bank required us to dispose of some of the assets. Therefore, the company sold the Houhai headquarter buildings and also Sepura.

Q. And please take a look on the screen. You should see DCX 65. Is this a spreadsheet prepared, Mr. Kang, by your finance department that shows the bank debt over time?

A. Yes.

Q. And is this chart prepared in the ordinary course of business?

A. Yes.

Q. And then has this chart been updated since 2019 contemporaneous with the data in the chart?

A.   Yes.   Yes, it been updated the basis until the end of July.

MR. CLOERN:  Your Honor, we'd like to offer DCX 65 into evidence.

THE COURT:  Okay.  It's admitted.

(Said exhibit was received in evidence.)

MR. CLOERN:  Mr. Montgomery, please bring up the HCC Demonstrative Exhibit 1.

BY MR. CLOERN:

Q.   Mr. Kang, did you prepare this chart based on the data in DCX 65?

A.   Yes.

Q.   And does this show Hytera's debt going from roughly 800 million in 2020 down to around 180 million today?

A.   Are you talking about U.S. dollars?

Q.   Yes.

A.   Yes.

Q.   And is this -- and is this nearly 600 -- is this $600 million debt reduction why Hytera doesn't have the money to pay the royalty?  I'm sorry -- why Hytera doesn't have the money to make that first royalty payment?

A.   Because HCC's cash inflow were mostly used to repay the bank loans.

Q.   And do you have an estimate when Hytera will have paid off the banks and then be free to pay other creditors?

A.  As long as the company can maintain the normal operation business, we are confident that the company is able to pay off all the bank loans in -- within the following two years so that we should be able to pay the debts of other creditors.

MR. CLOERN:  Okay.  Your Honor, I think I'm done -- I'm done, and I think I've got about 14 minutes left, I hope, for closing.

THE COURT:  Okay.  Cross?

MR. ALPER:  Yes, your Honor.  If I could have the Elmo, all the various --

THE LAW CLERK:  Counsel, my tech person got back to me.  Let me try it from the Prosecution PC really quickly. You're sure?  All right.

MR. ALPER:  I have a binder with some exhibits.  May I hand these up?

THE COURT:  Yes.

MR. ALPER:  Would you like one or two?

THE COURT:  Two, please.  Thanks.

CROSS-EXAMINATION

BY MR. ALPER:

Q.  Okay.  Good afternoon -- it's afternoon here, but good day, Mr. Kang.  My name is Adam Alper.  It's good to meet you.

I'd like to ask you a couple questions about your prior testimony about Norsat.

You previously offered a declaration in this case in

which you explained that one of Hytera's subsidiaries had pledged its equity in Norsat to secure the company's obligations in paying the royalty that we're talking about here, correct?

A. Yes. Actually, it's our subsidiary called Hytera Project Corporate, HPC in short, offered to use its equity for this obligation in lieu of cash payment for royalty.

Q. And based on an assessment that you had done, the market value of those shares was about $56 million, correct?

A. The $56 million assessment actually was made by the third-party agency.

Q. Okay. And at that time, your company was willing to put $56 million worth of Norsat shares into an escrow to be transferred to Motorola if Motorola is successful on appeal, correct?

A. It's used as a pledge instead of a cash deposit.

Q. Right. You were going to transfer the shares into escrow, correct?

A. As a pledge into the escrow account.

Q. Right. And then those shares would go to Motorola if Hytera is unsuccessful on appeal, correct?

A. No.

Q. Okay. But you were willing to transfer the shares into escrow, correct?

A. As a pledge into the escrow account.

Q. Did you get consent from any of your banks to transfer those shares into escrow?

A. I'd like to emphasize again it's a pledge, not a transfer.

Q. Did you get consent from any of your banks to pledge $56 million worth of Norsat shares to Motorola?

A. We did inquire the bank, and the bank did not say that we could not pledge this share into the escrow account.

Q. Did any bank affirmatively give you consent to pledge $56 million worth of Norsat stock to Motorola?

A. Yes.

Q. Okay. So you were able to get consent to pledge $56 million to Motorola worth -- I'm sorry. Let me start that again.

You were able to get consent from your banks to pledge $56 million of Norsat shares to Motorola, correct?

A. The bank did not say no.

Q. Okay. And since -- now -- withdrawn.

Now we know based on the Court's order that pledging shares is insufficient to satisfy the royalty order, correct?

A. What do you want me to answer for this question?

Q. Let me ask a different question.

A. Is that a question?

Q. You did not provide any evidence here today that anyone at Hytera has attempted to sell the Norsat shares to raise cash, correct?

A. We need to first get consent from bank for us to be able to sell any stock share.

Q. And you haven't made any attempts to sell the Norsat shares to raise cash to pay the royalty, correct?

A. We did make oral inquiry to the banks, but bank did not agree.

Q. You did not take any steps to sell the Norsat share -- withdrawn.

But you agree that when you asked the banks about whether you could pledge the Norsat shares to Motorola, they didn't say no.

A. Correct.

Q. Now, it's your testimony that Hytera is in a severe liquidity crisis, correct?

A. So our current situation has been better compared with our crisis in the year of 2020, but, yes, we are still facing liquidity crisis.

Q. And you testified on your direct examination that if you were to pay the royalty, you would default on your loans, and that would result in liquidation of the company, correct?

A. If we were to pay the royalty which made us unable to pay the bank loans and the bank had rights to, according to the agreement to cause us face -- to cause us to face the consequence of bankruptcy or liquidation.

Q. Okay. I'm going to show you PCX 41 on the screen, and

this is a transcript from an investor conference dated --

there it is on the front -- May 12, 2023.  Do you see that?

A.  Please show me the Chinese version so I can verify.

Yes, I see that.

Q.  And you were present at that conference, correct?

A.  Yes.

Q.  Okay.  And just so everyone else can see, your name is

Kang Jiliang, correct?

A.  Please show me the Chinese.

Q.  Your name is Kang Jiliang, correct, sir?

A.  My name is Kang Jiliang.

Q.  Okay.  And if we go to Question 14 --

A.  Please show me the Chinese.

Q.  Okay.  Were you at this conference?

A.  Yes.  The Chinese name here is correct.

Q.  Okay.  You were asked at the conference whether the

company is still entangled with the Motorola incident,

correct?

And I'm going to switch over to the Chinese version.

We'll just flip back and forth.

A.  It does not show that we're entangled with Motorola.

Q.  Okay.  I'm going to use the official translation, and just

given the amount of time that I have, I'm going to move

forward this way, and if you could please translate the

English for him.

Were you asked at the conference about the Motorola incident?

MR. CLOERN: Objection, your Honor. I think the witness is entitled, if there's a Chinese version, to look at it and say he doesn't agree with the translation. I don't think we can prevent that.

THE COURT: Can you just --

MR. ALPER: Flip back and forth?

THE COURT: Can you take off the staple and put them side by side?

MR. ALPER: Yeah, I can definitely do that.

There we go. Here. I'll just put them one next to the other here.

BY MR. ALPER:

Q. Okay. The issue of the Motorola incident came up at the conference, correct?

A. We brought the issue in order to address that how to replace the lawsuit-related products with the new generation products. That's the only reason we brought up -- brought up this issue.

Q. And what you said was that the litigation had been eliminated, correct?

A. It's stating here that our new generation products will not violate any other company's trade secret or intellectual property.

Q. But when it came to the Motorola incident, what you didn't say to your investors just a couple of months ago was that you'd been ordered to pay a $49 million royalty, but due to a severe liquidity crisis, you couldn't comply?

A. The purpose of our communication at this conference was to let the investor know that our current situation with the operation business and the -- how it improve the situation.

Q. And wouldn't that be something really important for your investors to know?

A. First of all, the judgment concerning our lawsuit with Motorola had been signed in the year of 2020, so our investors were aware of this judgment.

MR. ALPER: Nothing further. Thank you.

THE COURT: Any further questions?

MR. CLOERN: No further questions, your Honor.

THE COURT: Okay. Thank you very much, sir. You may be excused.

THE WITNESS: Thank you.

THE COURT: Okay. Any further evidence?

So none from Hytera?

MR. CLOERN: Your Honor, I was going to let them say first. We don't have any further evidence.

MR. DE VRIES: We also do not intend to put on any additional evidence, your Honor.

THE COURT: Okay. So then we just need to do

closings, and I -- so we can just turn to those.

And I think at this point, you know, I have 13 minutes left for Motorola, 14 minutes for Hytera, so it's close enough. Each side can have around 15 minutes, and then we'll be good.

MR. CLOERN: Crazy how that worked out.

MR. DE VRIES: Crazy is one way to put it, that's for sure.

CLOSING ARGUMENT ON BEHALF OF PLAINTIFFS

MR. DE VRIES: Well, I guess I've summed up in rebuttal in closing argument in 15 minutes in really long jury trials, so I think I should be able to do a one-day, and hopefully I can make some comments, your Honor, that will be helpful. If I could please get my slides, although I'm not going to wait to start.

I think that where we've landed after all of the evidence that came in today and the evidence that's been submitted before is that we have clearly carried our burden that Hytera has failed -- should be found in contempt of court and that coercive contempt sanctions will be and should be issued.

Sorry, is it up? Okay.

Hytera has conceded on the first three factors, and I just wanted to pause for one moment to reflect on the significance of that. They concede that there was a clear

order that they violated and that the violation was significant.

Should this be working?

Okay. And that's a really startling concession, and what it calls into question is whether the Court ought to do something about it, a clear order that they have violated and it's a substantial violation per their own admission.

And the sole issue that was really argued today was whether or not the -- they were able to pay and whether they made significant efforts to pay, did they do the reasonable thing?

We bear the burden on the first issue. On their defense of inability to pay, they bear the burden. I'll say one note about the standard that applies.

We think that the correct standard is an impossible to pay because they have not made even partial compliance with the $49 million royalty order. However, under even the standard that Mr. Cloern articulated, they have not met their burden of establishing an inability to pay. And on that point, I cited to a case earlier in the process, which I unfortunately don't know if I'll be able to show you, your Honor -- or, actually, can you take me to slide 35, please, Mr. Schlaifer.

Perhaps that can't work either.

So it's the *SEC v. Faulkner* decision, and it -- what

it says is that when a party is absolutely unable to comply due to poverty or insolvency, inability to comply is a complete defense. Otherwise, the party must pay what he or she can, and there has been absolutely no showing today by Hytera of a complete and total inability to pay any part of that $49 million amount that was owed last July.

If we could go to slides -- slide 57, please, this is the analysis that was provided by our forensic accountant, Mr. Westerman. And I'll take a moment to note something.

Both Professor Feinerman and the Grant Thornton accountant who were presented here today, the third parties that were presented by Hytera, neither of them, your Honor, had an opinion that it would have been impossible for Hytera to make the payment, let alone a partial payment. So they didn't say that.

Our expert, a forensic accountant, came in and explained that they absolutely did. He pointed in this slide to unrestricted cash, unrestricted cash, when you look across the organization of nearly $60 million. And there was some vague suggestions at times, but I want to talk about that very specifically, that, well, maybe that there's some kind of a restriction that's there. Professor Feinerman certainly didn't say that clearly. The Grant Thornton accountant said the opposite. He said that is cash that could be used.

But I don't think you have to look further than

Hytera's own public financial reports which said that this cash is available for payment.

So what did we just hear Mr. Kang testify to? He said that they couldn't use it. And what he said was, no, they couldn't use the unrestricted cash because the company needs the money to maintain its normal operations and repay bank debts that are due.

If you could please go, Mr. Schlaifer, to slide 40. In the *Voso* opinion from this court, your Honor, that is precisely the test that the contemnor in that case tried to give, and what the Court held was that simply prioritizing other debt obligations as well as operations costs provides a clear indication that the contemptor has not been diligent and energetic in their efforts.

If we go back to slide 57, there was nearly $60 million in unrestricted cash. It could have been used to make payments towards the entire amount of the $49 million owed. They have not made a contrary showing.

If we can go to the next slide, slide 58. This is Mr. Westerman's slide about unrestricted assets in general, okay?

And as you'll recall, there was categories of both restricted assets and unrestricted assets, and the amount of unrestricted assets that the Hytera group has is -- ranges from over 1.4 billion to $1.7 billion in the time period.

And, again, it's in their own public financials where they explain that those unrestricted assets are just that. They're unrestricted and could be put towards complying with the Court's order if that's what Hytera chose to do.

You'll recall, your Honor, that we showed you that if you take a look at the total assets that Hytera has and you subtract the liabilities that it has at either the group level or at the consolidated level, we're looking at numbers that range between about $600 million to $900 million in net assets, and that's not even taking into account the market value of those assets. It's just the booked value of those assets.

So after Hytera pays off all of its other debts, it has between 6 and $900 million in assets that it could have used to comply with your Honor's order if it wanted to do that.

It didn't do that, of course, and that's why we're here, but I think that when we go to what their primary excuse throughout today has been, which is that these bank agreements somehow stopped them from complying with your Honor's order and this Court's directive. If you think about what they said at the end, which is they only have left about $180 million in loans, 180 to 200 million -- I heard a couple of different numbers -- that number is actually accounted for when you get to those net asset values.

But beyond that, you can see that they could sell all -- half of their unrestricted assets, pay off all of that debt, and have plenty of money left over to pay the Court's royalty order if it chose to do that.

And so in that sense, the bank agreements are a red herring because they don't say that Hytera is precluded from selling any assets whatsoever. That's not what they say. They say consent must be sought.

And you heard Professor Feinerman. He said, well, if that had happened, if they had made a good-faith attempt to try to sell one of their many, many assets to satisfy this judgment, what would have happened, according to Professor Feinerman, was a negotiation would have happened. The lender wouldn't have demanded complete repayment, he said. This is all speculation, of course, because they didn't actually attempt to do this, but instead, they would have come to some negotiation.

And, of course, they would have, because Hytera has assets that far, far, far exceed the liabilities held by this bank. And so the very thought and argument that these bank agreements are going -- for roughly $180 million worth of debt when they have hundreds upon hundreds of million dollars of free assets means they don't have to comply with your Honor's order is wrong.

And I'll say a couple of other things on that point.

One -- the next is they have not shown any good-faith attempt to make that kind of an asset sale. The only thing I heard about it today was in response to Mr. Alper's question. There was some vague reference by Mr. Kang that he said, well, you know, we talked to some -- we had an oral conversation with some unidentified banker at some unidentified time about potentially selling the Norsat shares, but there's been no credible evidence of when that occurred, and the only documentary evidence that we've seen about any efforts to try to sell assets or inquiries about that were from literally last week.

And this is a debt that they knew was coming from the end of 2021 on, and I think it is crystal clear on this record that had they wanted to, they could have engaged in efforts to sell assets. Maybe they had to go talk to certain banks about it, just as they did apparently with Sepura and with their headquarters, and they could have satisfied the Court's royalty order and dealt with those banks.

But then in terms of Norsat, I come back to that, your Honor, because even if you put aside the unrestricted cash, which itself is more than enough to pay the royalty, the Norsat stock they say was worth $56 million. My colleague, Mr. Alper, asked Mr. Kang did you get consent from the banks to be able to pledge that into escrow?

And what he said was, well, we told them about it,

and they didn't object. And why didn't they object? Because if you look at that asset in relation to all the other assets that Hytera has and the relatively limited amount of the bank debt, they didn't have a basis to object. They can't just object to any and all attempts to transfer funds or sell assets. And they -- had they done that, if instead of pledging them into escrow they had sold those shares last year, under their valuation, they could have very easily complied with the Court's directive, and they didn't do it.

And so I'll then turn to, briefly, to the China law point. They, I suppose, are attempting to suggest that there's some aspect of China law that prohibits your Honor from enforcing this Court's orders. That's not right on the merits because what they're talking about are these bank agreements, and as I explained, you know, they don't actually keep them from making a sale of assets to satisfy the royalty obligation.

But also Professor Feinerman said something pretty telling. He admitted that the lenders do not have priority over this Court. And to the extent that what counsel is trying to argue is that this Court's authority and power is subject to contractual rights in China and limited by that, and that they get to preference lenders in China based on private agreements with those lenders instead of obeying this Court's order, that is fundamentally wrong. Putting aside

that it's also offensive, it is fundamentally wrong.

And when you think about how much time they've spent looking at bank agreements and saying look at how this keeps us from doing certain things that we might otherwise want to do, they didn't ever talk, again, even though I put it up in the beginning, about this Court's citation order that says that they are prohibited from making asset transfers without getting approval of the Court.

And so somehow they are absolutely preferencing private agreements with lenders in China who have liabilities that are way less than their total assets, in favor of disobeying your Honor and this Court.

And so I think that where we're at is that they have failed to meet their burden under any of the standards of an inability to pay. We have proven that their attempts -- sending emails literally this week, last week, asking to use loan proceeds, referring in some vague way to some unidentified asset -- is fundamentally unreasonable and not a reasonable attempt to satisfy the Court's royalty order.

And they were given another chance. Your Honor gave them a chance to just make the payment, to do the right thing, and they didn't do it again. They chose not to do it. They decided to flaunt the Court's orders one more time.

And so I think that not only have we established that contempt is appropriate here, that we have more than satisfied

the standard, but it is crystal clear that unless the Court holds Hytera in contempt and forces them, through coercive sanctions, to do the things that the Court has ordered it to do, it will continue to ignore that apparently for years while they continue to pay off lenders in China, improve their business, put it into a better spot.

And who's going to be left holding the bag? Motorola Solutions, its investors, its employers that live here and all over the world -- employees, they're going to be the ones holding the bag, and more than that, it's going to be a lesson to anyone who looks at this case -- and I guarantee you there are people all around the world who are looking at this case for many reasons -- and their takeaway will be we don't have to obey the court -- the U.S. court orders. We can just engage in these same kind of tactics and just come and try to make an excuse, and the answer will be you can get away with it.

Thank you, your Honor. I think I'm right at 15 minutes.

THE COURT: Okay. Thank you.

All right. You may proceed.

CLOSING ARGUMENT ON BEHALF OF DEFENDANTS

MR. CLOERN: Thank you, your Honor.

Okay. I may do a bit of reading, full disclosure, simply because I want to not wander off and stay tight.

Okay. So Motorola seeks to have HCC held in contempt of this Court's royalty order from July 5, 2022. Now, that order importantly requires HCC to make quarterly royalty payments, so not just the first royalty payment, but every quarter after that. That's the obligation.

The Court -- there is no court order that says make a single payment on July 31st, 2022 and then some other orders ordering additional payments. It is one court order, and what that means is that there has been partial payment. And that's important because it changes the way the law looks at what's going on here.

There is no complete and utter disregard. There has been attempts at compliance, and there has been compliance. Money has been paid into escrow, and additional security has been offered into escrow. And, again, we understand and respect the Court's decision on that, but they do very much go to efforts that the Seventh Circuit requires to be considered reasonable and diligent efforts, and if those were made, then contempt cannot be found.

So I understand that Motorola would like to ignore that fourth effort -- that fourth requirement. But the Seventh Circuit multiple times, first in *SEC v. Hyatt*, 621 F.3d 687, that's in 2010, and then again in *Ohio ex rel. NLRB v. Latino Express*, 776 F.3d 469, Seventh Circuit 2015, they've reaffirmed these four factors.

And the fourth factor is there. The alleged contemnor failed to make reasonable and diligent efforts to comply. If Motorola doesn't prove that, then there can be no contempt, at least not according to the Seventh Circuit.

Now, these factors have to be proved by, not a preponderance, but clear and convincing evidence. Clear and convincing evidence is, and this is from *Colorado v. New Mexico*, 467 U.S. 310, 1984. Clear and convincing evidence is evidence that places in the ultimate fact-finder an abiding conviction that the truth of the relevant factual contentions are highly probable. So that's what we've got to get to here.

So let's talk about -- and just sign posting, I'm going to pick up the ability-to-pay defense which only applies and we only talk about it if Goodyear -- I'm sorry -- if Motorola meets its burden. If Motorola meets its burden and shows by clear and convincing evidence that it is highly probable that HCC failed to take reasonable and diligent efforts, not all efforts, not every, but reasonable and diligent efforts, if Motorola meets its burden to show clear and convincing evidence that that was a failure, then the next question is does Hytera have an inability to pay?

And it's not the complete inability law that's *In re Res. Tech* -- I'll give the cite for that in a minute -- but it's got to be the weight of the evidence.

So, now, Motorola certainly did not provide evidence

that it's highly probable that HCC failed to make reasonable and diligent efforts. The weight of the evidence shows that it did. HCC's assets are subject to the prior interests of their lenders, and while HCC's efforts have resulted in the lenders allowing current payments and an offer of security for the 49 million retroactive payment, that first payment that goes back even before the trial started, HCC's not been able to persuade its lenders to subordinate their interests in 45 million of HCC's cash.

So we've heard a little bit about this restricted versus unrestricted. That's an accounting term. That's a term that accountants use, and it is defined in a very narrow way. So restricted cash is some specific thing for public disclosures for publicly listed companies in China.

The banks' agreements don't care. The bank -- we didn't hear anything about that from either of the Chinese legal witnesses. The banks' agreements have the rights to seize cash in the event of a default, and all of Hytera's cash is at accounts at these banks.

So if there's a default, all that cash is gone. It's gone. And then any further cash that might be produced is gone.

Account receivables, so when Hytera gets paid for the radios it sells around the world, the account receivables go into accounts at these banks. That's how it works. So the

banks have possession of all of Hytera's cash, and if there's a problem, they take it.

And so this is not a fight. We're not talking about America defending Taiwan or something, but that's what you'd think listening to the closing argument. This is not some existential battle between China and this Court.

This is simply a priority fight among two creditors. Hytera is not keeping the money. It all goes to the banks. Motorola thinks a portion of it should go into an escrow account so Motorola can be paid once the appeal is over.

Motorola is not going to get the money until the appeal is over anyway, right, so that's years down the road. The real question here is one of security, is there something that's going to be in that account when it comes time to pay.

So the banks have the rights that they have that Professor Feinerman talked about, and it would be improper to strip the banks who are bona fide purchasers. They are in financing. They loaned Hytera the money. They took an interest in Hytera's collateral to ensure they get paid back, in Hytera's assets, and first and foremost, the cash, which is on account in their own premises, the banks' own premises. And the Motorola debt comes on later.

And so it is still a battle even though the Court's involved, it's still a battle between the priority of those two creditors, and we've gone to great lengths to sort of give

the big picture about, you know, when this impediment will be gone and there will be additional cash.

We think that helps explain why HCC can't get cash over here, but it could get Norsat over here because those shares are just going to sit around to make everybody feel better that when it comes time to actually pay the cash and judgment, then that it's going to be paid.

So -- and, again, I'm not second guessing the decision on the order. The point is this illustrates what HCC's thinking is with reasonable and diligent efforts, and understanding the picture with the bank and the rights that the banks has shows that they really have not just taken reasonable efforts or diligent efforts but all possible efforts.

They said, you know, can we -- they don't have the existing cash because as the evidence today as shown, that existing cash, and I think that's in agreement with everybody that has been up here today, HCC has paid down its debt $600 million in three years. That is substantial. That is crazy. What company could do that?

And so there's nothing nefarious going on. No Chinese billionaire has a yacht with a bunch of millions of, you know, dollars stuffed in it somewhere. There's nothing like that going on. It's all going to the banks who have senior rights in that cash as collateral.

All right.  So then the question really becomes understanding that that financial relationship and the rights that the banks have, has Hytera done everything that it can do?  And so what are those things?

Hytera doesn't have any cash because it's all gone to the bank, right?  And what little it has, which 13 million probably sounds like a lot to most folks, but for a company that has a billion dollars rolling through all the time, 1 percent is super thin.  So that's like if you make $100,000 a year, you've got, you know, I think a hundred bucks in your bank account or something, or maybe a thousand bucks in your bank account.  It's not a lot, right?  You'd be bouncing checks all the time if that's all you had.  That's liquidity problems.

So they don't have the present cash because it all goes to the banks because there's constantly loans that have to be repaid, so they've got to raise it.  And the question is did they do everything they could to raise it, and the answer I think from the evidence today is absolutely.

They sent banks to all the letters.  We've submitted those.  Unfortunately, we didn't have time to go through each one.  I would have loved to have done that, but we have submitted evidence.  It's in those exhibit binders of correspondence with the banks in 2022.  You can look back in the briefing, and Mr. Kang has declarations there, he talked

about it today, about that they -- most of this is done orally with the banks, and there's two or three people at the Hytera finance department who's on the phone with the banks all the time managing all this.

And they did follow up with some writings, some emails, some letters. Those have been submitted. Again in 2023 they went back, and they're getting the answer, which is you can't use the loans that we've already loaned you. You can't use that cash. We're not giving you any new loans. We're actually ratcheting down our exposure to you, and we have rights on your assets.

And if you sell them, you've got to let us know, and then all the proceeds go to pay off our loans first. And then if you have anything left, I suppose do whatever you want to do with it.

Hytera's not in a position where it can pay off that 180 -- last $180 million right now. It thinks it can get it done in the next two or three years. And there's a great Middle District of Florida case that has a -- it's from out of the circuit, but it has a great quote that says, "Defendant is not required to bankrupt himself in order to show that he's made all reasonable efforts to comply with the court order."

And that's what would happen. Until HCC has got -- is no longer in hock to the banks, until that happens, right, that started after the Motorola judgment because if there

really was a 7- or $800 million judgment, because it's not on the balance sheet. When these guys point out all those financials saying Hytera has all this money, that's only because under Chinese accounting, that Motorola judgment for -- which is now almost $700 million doesn't hit the balance sheet. If it did, they would -- they wouldn't -- there would be no net anything. It's not on there yet because the appeal is not done.

And that's what the banks are saying. The banks are saying once that appeal is done and that's final, you guys are in a big problem, so they're trying to get out before that happens. And the great thing is, as we've seen from the numbers, Hytera's going to have -- Hytera's making money from operations. The banks will be off its back soon, and then it can continue as a business, which is good for paying creditors like Motorola. Not only Motorola, but everybody else.

So, again, has -- has HCC done all it could do? It asked to borrow money. It was denied. It asked to sell assets, and it was denied. And the law certainly, and the Florida case that I just pointed out -- by the way, that is *Liberty Mutual v. Aventura*, 2009 Westlaw 3190962, and then report and recommendation adopted, 2009 Westlaw 10697338.

So you don't have to put yourself into bankruptcy, and that's what Mr. Kang testified would happen, and there's no contrary testimony to that.

What's more, it's worse, Professor Feinerman pointed out and gave everyone the actual law, Article 169a that there's -- that if you -- if a director, supervisor, or senior manager of a listed company -- so this is one of these public company laws -- but of a listed company commits any of the following acts, and that's relinquishing creditor's rights, then you've got three to seven years in prison.

And believe me, this notion that China doesn't enforce its criminal laws, that's not where I want to be if I'm ever subject to some kind of criminal liability.

So the U.S. courts here say to do reasonable diligent efforts, you don't have to put yourself in bankruptcy, but Motorola is suggesting that you do. And beyond that, you have to put yourself in prison, and that's just not what the law is.

All right. Well, I'm about out of time, and so I'll take one more second to talk about inability to pay.

So inability to pay, that is, the cite there I think the best case is *In re Res. Tech.*, 624 F.3d 376, Seventh Circuit 2010, and that goes through the standard, that there's one standard for when there's been no compliance whatsoever and a different standard when a party has made at least a partial payment, which Hytera has certainly done here.

And so if we prove -- even if Hytera, HCC didn't undertake some efforts that the Court felt would have needed

to have been taken to satisfy the reasonable and diligent standard, contempt would still not be proper because of HCC's inability to pay, given the banks' rights and control.

Where we get here is all the cases that say civil contempt is coercive, and so there's no point in holding a party in contempt if they actually cannot comply, if they simply cannot, cannot pay. And here the only way Hytera can or HCC could pay is through putting themselves -- taking actions that would result in their bankruptcy or liquidation, as well as criminal liability, and that's just not what's required. I think that's certainly the definition of inability to pay.

And then putting aside those sort of legal points, there's a practical aspect, which is the banks have all of HCC's cash, and they're not -- so there's just no way to get it over here. If the banks decide to declare a default, then the banks can seize it. So there's also a practical aspect of the inability to pay.

Well, I think I'm out of time, and I appreciate the Court. We've stayed past 5:30, kept you late, and we thank you.

THE COURT: Well, thank you, everyone, for all of your time today, and thank you for making your presentation work with the time limits. I know it's a tight time frame because there was a lot that you had to present, so I

appreciate that very much.

MR. CLOERN: Would the Court care for any of the cases or -- we have copies if you'd like them.

THE COURT: Sure, yeah. I think I caught the citations, but it can't hurt. Thank you.

MR. CLOERN: Thank you.

(Tendered.)

THE COURT: So then in terms of where we go from here, obviously I need to get you a ruling.

One issue that I wondered whether -- I mean, I'm sorry to ask on a pretty tight time frame, but I just -- it would be helpful to get some maybe short supplemental briefs on if I do find Hytera in contempt, what would be the appropriate remedy, because under the case law, there -- I mean, it's a discretionary call on what is the appropriate remedy.

One common -- one common remedy in civil contempt, it is coercive, so one common remedy is, you know, fines. But I'm -- you know, given that there's already -- the issue is a failure to pay money, I'm sure people have arguments about the appropriateness of a fine, and especially given that the purpose of civil contempt is coercive, just adding fines, a daily fine, I don't know that that, you know, would necessarily be effective.

So I would -- and today, I think because people were

234

appropriately focused on the factors for just the contempt holding and whether or not a contempt holding would be appropriate, people spent less time on what would be the appropriate remedy if there were a contempt finding, so I would like some additional information on that front.

I would like to request that, I'm sorry for the short time frame, but would it be feasible by next Tuesday to do some short briefs on that?

MR. DE VRIES: Absolutely, your Honor.

MR. CLOERN: Yes, your Honor. We would do that.

THE COURT: Okay. Great. So that would be August 22nd.

And I think it would make sense to make those simultaneous as -- or just in the interests of time. So if we could put those -- let's pick a time on August 22nd. I mean, just whatever time you would like for simultaneous briefs and maybe a 10-page limit.

MR. CLOERN: That sounds great.

MR. DE VRIES: I'm totally --

MR. CLOERN: 5:00, 6:00 Central time sound good?

MR. DE VRIES: You know, can we maybe do like 7:00 Central, just since most of our team is on the West Coast?

MR. CLOERN: We have no problem with that.

THE COURT: Okay. So 7:00 Central for simultaneous 10-page briefs on that issue of what would be the appropriate

remedy.

Now, I also -- you know, I don't mean to telegraph what the result will be. I just want to gather all the arguments, and I also just didn't hear as much today on that front. And I think it's understandable, given that there was a lot to cover just on the -- I mean, if you think about it, it's sort of like liability and damages, I would need to -- I just would like all the info in front of me before making a decision on either one, and people were rightly focused more on the liability issues.

MR. DE VRIES: Understood, your Honor. That makes sense.

MR. CLOERN: Absolutely, your Honor.

Since this is sort of like a bench trial, we'd also be happy to do whatever sort of post-trial briefing that you would like that might assist the Court. If it was findings of fact, conclusions of law, whatever might be helpful, or not depending on the Court's preference.

THE COURT: Okay. Why don't I give that some thought, and if I do need something on that, I will send a minute entry tomorrow or soon about that.

MR. CLOERN: Certainly, your Honor.

THE COURT: Unless does anyone have other thoughts on that?

MR. DE VRIES: I mean, having litigated this case and

issues for almost a decade and knowing how much ability there is to kind of proliferate lots and lots and lots and lots of briefing and sort of objected to that.

So obviously, if it would help your Honor, we're happy to do it. We're happy to provide whatever is of assistance to the Court. The only observation I'd make is, you know, in my experience in this case, more briefing begets more briefing -- I have, like, a specific memory about, like, competing proposed findings of fact, and that led to, like, months of disputes.

And so we're, again, my message is if it will help your Honor, we are happy to do anything. I probably feel -- sound scarred from some experiences in this case that where things tend to take a while.

THE COURT: Okay. Well, I've obviously not been --

MR. DE VRIES: I know. That was all before your time, your Honor.

THE COURT: Yeah. I -- but I understand the point in general, and I've had, you know, experience with that in other cases, too. So I think that it does make sense to limit it to things that would actually be helpful. Otherwise, it can just drag out.

So I will think about that. Let me just think about that overnight. I'll let you know tomorrow one way or another about that.

237

I guess right now, I would lean towards not doing that, just doing the supplemental brief on the remedy issue, and then just going from there.

MR. DE VRIES: Yes, your Honor.

THE COURT: Okay.

MR. CLOERN: Thank you, your Honor.

THE COURT: Well, thank you all very much. I really appreciate everyone's time and all the major efforts that went into this. I can tell it's a lot of work, and so everyone did a very, very fine job.

So thank you.

MR. CLOERN: Thank you, your Honor.

MR. DE VRIES: Thank you, your Honor. We really appreciate all the Court's time.

(Which were all the proceedings heard.)

CERTIFICATE

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

*/s/Kathleen M. Fennell*          *August 19, 2023*

Kathleen M. Fennell                    Date
Official Court Reporter

**CERTIFICATE OF SERVICE**

I hereby certify that on June 11, 2024, a copy of the foregoing separate appendix was filed electronically. Service of this filing will be made on all ECF-registered counsel by operation of the court's electronic filing system. Parties may access this filing through the court's system.

*s/* John C. O'Quinn, P.C.
John C. O'Quinn, P.C.

No. 24-1531

# In The United States Court of Appeals for The Seventh Circuit

MOTOROLA SOLUTIONS, INC. AND
MOTOROLA SOLUTIONS MALAYSIA SDN. BHD.,
*Plaintiffs-Appellees*

v.

HYTERA COMMUNICATIONS CORPORATION LTD.,
*Defendant-Appellant.*

On Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division
Case No. 1:17-cv-01973
Honorable Martha M. Pacold

**APPENDIX FOR PLAINTIFFS-APPELLEES
VOLUME III OF III**

Michael W. De Vries
Kirkland & Ellis LLP
555 South Flower Street, 3700
Los Angeles, CA 90071

Adam R. Alper
Kirkland & Ellis LLP
555 California Street, 27th Floor
San Francisco, CA 94104

Leslie Schmidt
Kirkland & Ellis LLP
601 Lexington Ave.
New York, NY 10022

John C. O'Quinn, P.C.
*Counsel of Record*
Jason M. Wilcox
KIRKLAND & ELLIS LLP
1301 Pennsylvania Avenue NW
Washington, DC 20004

*Counsel for Plaintiffs-Appellees*

June 11, 2024

**MOTOROLA'S SEPARATE APPENDIX**
**TABLE OF CONTENTS**

**VOLUME I OF III**

**DOCUMENT**                                                                **PAGE**

Complaint, dated March 14, 2017 (R.1) ................................................. MSA0001-34

Amended Complaint, dated August 2, 2018 (R.266) ................................MSA0035-73

Trial Transcript Excerpts Volume 2A (pgs. 19-24)
November 7, 2019 (R.783)....................................................................MSA0074-82
    Opening Statement by A. Alper (Motorola)

Trial Transcript Excerpts Volume 2B (pgs. 203-206)
November 7, 2019 (R.783)...................................................................... MSA0083-89-
    Direct Examination of Russ Lund (Motorola Witness)

Trial Transcript Excerpts Volume 3B (pgs. 395-401)
November 12, 2019 (R.784)...................................................................MSA0090-99
    Direct Examination of Scott Shepard (Motorola Witness)

Trial Transcript Excerpts Volume 5B (pgs. 722-725)
November 14, 2019 (R.786)..................................................................MSA0100-106
    Direct Examination of Jesus Corretjer (Motorola Witness)

Trial Transcript Excerpts Volume 8B (pgs. 1153-1160, 1203-1208, 1233-1240)
November 20, 2019 (R.789)..................................................................MSA0107-0131
    Direct Examination of Stephen Wicker (Motorola Witness)

Trial Transcript Excerpts Volume 9A (pgs. 1297-1299, 1330-1332)
November 21, 2019 (R.790)..................................................................MSA0132-140
    Direct Examination of Stephen Wicker (Motorola Witness)

Trial Transcript Excerpts Volume 9B (pgs. 1480-1486)
November 21, 2019 (R.790)..................................................................MSA0141-150
    Cross Examination of Stephen Wicker (Motorola Witness)

Trial Transcript Excerpts Volume 10A (pgs. 1548-1550)
November 25, 2019 (R.791)..................................................................MSA0151-156
    Cross Examination of Stephen Wicker (Motorola Witness)

Trial Transcript Excerpts Volume 11B (pgs. 1838-1842, 1884-1894, 1907-1910, 1924-1927)
November 27, 2019 (R.792)......................................................................MSA0157-183
 Direct Examination of Sandeep Rangan (Motorola Witness)

Trial Transcript Excerpts Volume 13B (pgs. 2158-2161)
December 2, 2019 (R.794) ........................................................................MSA0184-190
 Direct Examination of James Malackowski (Motorola Witness)

Trial Transcript Excerpts Volume 22A (pgs. 3258-3262)
December 17, 2019 (R.803) ......................................................................MSA0191-198
 Re-Cross Examination of Luo Junping (Hytera Witness)

Trial Transcript Excerpts Volume 30A (pgs. 4405-4407)
January 28, 2020 (R.924)..........................................................................MSA0199-204
 Direct Examination of Andy Grimmett (Hytera Witness)

Trial Transcript Excerpts Volume 30B (pgs. 4591-4594, 4624-4626)
January 28, 2020 (R.924)..........................................................................MSA0205-214
 Direct Examination of Andy Grimmett (Hytera Witness)
 Cross Examination of Andy Grimmett (Hytera Witness)

Trial Transcript Excerpts Volume 33B (pgs. 5093-5098, 5131-5137)
February 4, 2020 (R.927) ..........................................................................MSA0215-230
 Direct Examination of Stephen Wicker [Rebuttal] (Motorola Witness)

Trial Transcript Excerpts Volume 34A (pgs. 5220-5223)
February 5, 2020 (R.928) ..........................................................................MSA0231-236
 Cross Examination of Stephen Wicker [Rebuttal] (Motorola Witness)

Trial Transcript Excerpts Volume 34B (pgs. 5279-5283)
February 5, 2020 (R.928) ..........................................................................MSA0237-244
 Re-Direct Examination of Stephen Wicker [Rebuttal] (Motorola Witness)

Trial Transcript Excerpts Volume 35A (pgs. 5355-5362)
February 10, 2020 (R.929) ........................................................................MSA0245-254
 Direct Examination of James Malackowski [Rebuttal] (Motorola Witness)

Trial Transcript Excerpts Volume 35B (pgs. 5409-5412, 5466-5469)
February 10, 2020 (R.929) ........................................................................MSA0255-264
 Cross Examination of James Malackowski [Rebuttal] (Motorola Witness)

Trial Transcript Excerpts Volume 37A (pgs. 5557-5560)
February 12, 2020 (R.931) ...............................................................MSA0265-271
    Cross Examination of James Malackowski [Rebuttal] (Motorola Witness)

Final Jury Instructions, dated February 14, 2020 (R. 895) ....................MSA0272-326

Plaintiffs' Motion For Permanent Injunction, dated April 2, 2020 (R.961) ..................
        ...............................................................................................MSA0327-355

Opposition to Plaintiffs' Motion For a Permanent Injunction, dated June 9, 2020
(R.987).........................................................................................MSA0356-388

# VOLUME II OF III

Motorola's Reply in Support of its Motion for a Permanent Injunction, dated June 23,
2020 (R.996)...................................................................................MSA0389-423

Order re Pending Motions, dated December 17, 2020 (R.1097)............MSA0424-0430

Findings of Fact and Conclusion of Law in Relation to the Court's October 19 and
November 10, 2020 Orders, dated January 8, 2021 (R.1100) ...............MSA0431-0469

Motorola's Submission Regarding and Ongoing Royalty, dated January 28, 2021
(R.1118)........................................................................................MSA0470-0491

Hytera's Submission Regarding a Reasonable Royalty, dated February 17, 2021
(R.1130)........................................................................................MSA0492-511

Order re Motion for Instructions and Supplemental Motion For Attorneys' Fees,
dated October 15, 2021 (R.1250)......................................................MSA0512-524

Order re Embedded Motion to Reconsider in its Submission on the Parties' Disputes
as to the Court-Ordered Royalties, dated April 12, 2022 (R.1338) .........MSA0525-548

Motorola's Motion that Hytera be Held in Contempt for Violating Court Orders and
Request For Hearing, dated August 3, 2022 (R.1359)...........................MSA0549-552

Memorandum Opinion and Order (*Motorola v. Hytera*, Case No. 17-cv-1972, N.D.
Ill.), dated January 5, 2023(R.275).....................................................MSA0553-566

Minute Entry Regarding Joint Status Report on Discovery (*Motorola v. Hytera*, Case
No. 17-cv-1972, N.D. Ill.), Dated March 29, 2023(R.291)..............................MSA0567

Hearing Transcript, dated August 17, 2023 .............................................MSA0568-804

**VOLUME III OF III**

Memorandum Opinion and Order (R.1461), dated August 26,2023)......MSA0805-823

Joint Status Report Regarding Royalty Order (R.1463), dated September 1, 2023) .... ..............................................................................................................MSA824-828

Memorandum Opinion and Order (*Motorola v. Hytera*, Case No. 17-cv-1972, N.D. Ill.), (R.324) dated September 12, 2023 .................................................MSA0829-845

Motorola's Memorandum in Support of Motion to Hold Hytera in Contempt for Violating Order to Produce Source Code (*Motorola v. Hytera*, Case No. 17-cv-1972, N.D. Ill.), (R.352-1) dated January 16, 2024 .........................................MSA0846-866

Plaintiffs' Memorandum in Support of Their Motion to Open Contempt Proceedings and Enter an Anti-Suit Injunction to Protect this Court's Jurisdiction (R1482-1) dated February 20, 2024.................................................................................MSA0867-893

Defendant Hytera Communications Corporation Ltd.'s Opposition to Motorola's Motion to Open Contempt Proceedings and Enter and Anti-Suit Injunction, (R.1486) dated March 6, 2024...................................................................................MSA0894-923

Plaintiffs' Emergency Motion for a Temporary Restraining Order, (R1491) dated March 11, 2024.......................................................................................MSA0924-939

Plaintiffs' Memorandum in Support of their Motion to Open Contempt Proceedings and Enter and Anti-Suit Injunction to Protect this Court's Jurisdiction (R.1500) dated March 22, 2024......................................................................................MSA0940-966

Defendant Hytera Communications Ltd.'s Notice Regarding Shenzhen Litigation, (R.1507) dated March 28, 2024............................................................MSA0967-969

Spreadsheet - Diff. of H-end and L-end, Apportionment, Business Terminal, Item Attribute, (Not Dated)
**Trial Ex. DTX-5502** (Admitted February 3, 2020, Tr. pg. 4843) ........MSA0970-1004

Email from S. Chia Han Siong to G. Zhang re FPGA Analysis, (dated June 25, 2008)
**Trial Ex. PTX-19** (Admitted November 20, 2019, Tr. pg. 1195)..........MSA1005-1008

Spreadsheet Task Tracking, (Not Dated)

**Trial Ex. PTX-263**
(Admitted November 20, 2019, Tr. pg. 1204).........................................MSA1009-1032

Email from Guoyxiang to Chanqingzhou et al. re Weekly Updates, (dated February 26, 2008)
**Trial Ex. PTX-421**
(Admitted November 26, 2019, Tr. pg. 1885).........................................MSA1033-1034

Email from zhangjun 02973 to tangjiyue 04081, et al., re Notice about welcome Penang Visitors on March 3, 9:00 a.m., (dated February 29, 2008)
**Trial Ex. PTX-422**
(Admitted December 5, 2019, Tr. pg. 2542) .........................................MSA1035-1041

Presentation: HYT DMR Protocol Introduction, (Not Dated)
**Trial Ex. PTX-1129**
(Admitted November 13, 2019, Tr. pgs. 569) .........................................MSA1042-1089

Spreadsheet, Summary, Sharing Calculation Table, Commercial Terminal Codes, DRM item code-Product type, (Not Dated)
**Trial Ex. PTX-2352**
(Admitted February 10, 2019, Tr. pgs. 5357) .........................................MSA1090-1122

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

|  |  |
|---|---|
| MOTOROLA SOLUTIONS, INC, et al, <br><br> Plaintiffs, <br><br> v. <br><br> HYTERA COMMUNICATIONS CORPORATION LTD., <br><br> Defendant. | Case No. 17-cv-01973 <br><br> Judge Martha M. Pacold |

## MEMORANDUM OPINION AND ORDER

Defendant Hytera Communications Corporation, Ltd. ("Hytera") has not paid approximately $49 million that it owes into an escrow account under the terms of a court order ("the royalty order"). [1349].[1]

The day after the escrow payment was due, Hytera moved to modify or stay the royalty order pending appeal. [1351]; [1381] (renewed motion). In response, the plaintiffs in this case ("Motorola") moved to hold Hytera in contempt of court for failing to comply. [1359]; [1384] (renewed motion). The court denied Hytera's motion to modify or stay, concluding that it lacked jurisdiction to modify the royalty order and that Hytera had not made the requisite showing for a stay. [1429].

The court held Motorola's contempt motion in abeyance, giving Hytera a final opportunity to satisfy its obligations. *Id.* at 8. Hytera failed to do so, so the court held a contempt hearing. [1453]. Reviewing the briefs and evidence filed in support of and in opposition to the motion, and weighing the testimony and evidence presented at the hearing, the court holds Hytera in contempt of court for its noncompliance with the royalty order. Motorola's motion to hold Hytera in contempt, [1384], is granted.

In light of Hytera's recalcitrance, fines or other monetary sanctions would be ineffective. Thus, to coerce compliance with the royalty order, the appropriate course is to enjoin Hytera from selling any products containing two-way radio technology anywhere in the world until its obligations under the royalty order are satisfied. Motorola has met the four-factor test for the issuance of an injunction. Once the process set forth below is complete, the court will issue the injunction as a

---

[1] Bracketed numbers refer to docket entries and are followed by page and / or paragraph number citations. Page numbers refer to the ECF page number.

MSA0805

separate document under Rule 65(d)(1)(C) ("Every order granting an injunction and every restraining order must: (A) state the reasons why it issued; (B) state its terms specifically; and (C) describe in reasonable detail—and not by referring to the complaint or other document—the act or acts restrained or required."). *See Auto Driveway Franchise Sys., LLC v. Auto Driveway Richmond, LLC*, 928 F.3d 670, 676 (7th Cir. 2019). Motorola is directed to submit a proposed injunction, and Hytera is directed to submit proposed edits to Motorola's proposed injunction, on the schedule set forth at the end of this opinion. After that process is complete and after the court issues the injunction, the parties should file a joint status report once Hytera has fully complied with its obligations under the royalty order so that the court can formally lift the injunction.

I

The following are the court's findings of fact and conclusions of law. Fed. R. Civ. P. 52(a)(1). In February 2020, a jury in this district concluded that Hytera perpetrated a massive theft of Motorola's intellectual property. Later reduced, the jury award totaled approximately $765 million in compensatory and exemplary damages. [898] at 5; [1100] at 39.

The parties had a post-trial dispute about how to compensate Motorola for products sold during the pendency of the case, and into the future, that incorporated Motorola's stolen intellectual property. Motorola suggested an injunction [961], and Hytera suggested an ongoing royalty, [987] at 26. Ultimately, the judge then presiding over this case sided with Hytera, reasoning that "the market share and pricing injuries suffered by Motorola can be compensated by monetary damages." [1097] at 4. After soliciting the parties' proposals, the court entered a royalty order requiring Hytera to deposit into escrow $80.32 per terminal and $378.16 per repeater on a quarterly basis. [1349] at 3 § 4.1. To cover units sold between July 1, 2019 and June 30, 2022, Hytera was required to make its first royalty payment of approximately $49 million into the escrow account on July 31, 2022. *Id.* §§ 5.4–5.5. It did not do so.

Though Hytera was the progenitor and expositor of the royalty-order concept, it has not complied with the very order it sought. Hytera now claims that it has made reasonable and diligent efforts to comply with the royalty order and that in the alternative, it is unable to pay. Neither is true. Hytera's supposed efforts to comply have been neither reasonable nor diligent. And Hytera can pay—it has simply chosen to prioritize its operations and other creditors over its obligation to Motorola and its obligation to obey the court's order. Hytera's failure to comply leaves the court with no choice but to hold Hytera in contempt.[2]

---

[2] In its response brief, Hytera argues that the court lacks jurisdiction to enforce the royalty order through contempt sanctions while it is on appeal. [1395] at 3. Hytera did not raise this point during the contempt hearing, so it has likely been abandoned. But in any event,

## II

A party seeking to hold its opponent in civil contempt must make four showings by clear and convincing evidence:  (1) A court order that sets forth an unambiguous command; (2) the alleged contemnor violated that command; (3) the violation was significant, meaning that the alleged contemnor did not substantially comply with the order; and (4) the alleged contemnor did not make a reasonable and diligent effort to comply.  *SEC v. Hyatt*, 621 F.3d 687, 692 (7th Cir. 2010).[3]

Hytera does not challenge any of the first three prongs; it argues only that it has made reasonable and diligent efforts to comply.  Hr'g Tr. 49:17–50:5.

Hytera makes an additional argument, one on which it bears the burden: inability to pay.  *In re Res. Tech. Corp.*, 624 F.3d 376, 387 (7th Cir. 2010).  "Where there has been no effort at even partial compliance with the court's order, the inability-to-pay defense requires a showing of 'complete inability' to pay[.]"  *Id.*  The nonmovant must establish "'clearly, *plainly*, and *unmistakably*' that 'compliance is *impossible.*'"  *Id.* (quoting *Huber v. Marine Midland Bank*, 51 F.3d 5, 10 (2d Cir. 1995)).

## III

Hytera has not made reasonable and diligent efforts to satisfy its reverse-looking royalty obligation.  Hytera has not paid a single cent of what it owes, and Motorola has shown clearly and convincingly that Hytera's efforts described in the written documents and at the contempt hearing were neither reasonable nor diligent.

Hytera's efforts to pay the royalty order fall into two categories: (1) the "pledge" of Norsat stock and (2) lender outreach.  Motorola has shown by clear and convincing evidence that these efforts were not reasonable, nor were they diligent.  In addition, Hytera's technical argument that its compliance with its *ongoing* royalty obligation shows that it has made reasonable efforts to comply with its *reverse-looking* obligation is supported by neither law nor logic, so it too does not save Hytera from a contempt finding.

---

the argument is incorrect because the court always retains jurisdiction to enforce its own orders even when those orders are on appeal.  *See Blue Cross & Blue Shield Ass'n v. Am. Express Co.*, 467 F.3d 634, 638 (7th Cir. 2006).

[3] A later Seventh Circuit case questioned whether the clear and convincing standard of proof was appropriate in civil contempt motions as opposed to the general preponderance standard.  *SEC v. First Choice Mgmt. Servs., Inc.*, 678 F.3d 538, 544–45 (7th Cir. 2012).  But the court declined to overrule its prior cases establishing that the movant must prove the contempt criteria by clear and convincing evidence, and no later Seventh Circuit or Supreme Court decision has overruled this aspect of *Hyatt* or the line of cases predating it.

MSA0807

A

Hytera's failure to make reasonable and diligent efforts to meet its royalty obligation is best illustrated by what it has not done. Despite holding itself out to investors as a stable and healthy company, Hytera has made no effort to access any unrestricted cash or assets to make the lump sum deposit. It has made no plan to put aside the significant revenue it has derived from operations. And it has not chosen to cut any expenses.

Hytera has not tried to negotiate any sort of a payment plan to pay down the royalty obligation over time. Despite having months of advance warning, Hytera did not attempt to secure financing to make the first royalty payment until at most four weeks before it was due. Motorola has shown by clear and convincing evidence that the only efforts Hytera made were through its subsidiary offering to pledge shares of another company (but not relinquish the voting rights tied to those shares). Hytera made no attempt to make even a small payment as a show of good faith. Instead, Hytera gave vague assurances at the contempt hearing that potentially in two years, once its lenders were repaid, then it "should be able to pay the debts of other creditors." Hr'g Tr. 206:3–4. Neither Hytera's counsel nor its witnesses stated even once that the company *ever* intended to make the royalty payment or pay any part of the judgment in this case. This clear flaunting of the court's authority and disregard for Hytera's obligations to comply with court orders evinces the lack of reasonable and diligent efforts that Hytera has made to pay what it owes into escrow.

Last, Hytera has not made any efforts to cut discretionary spending to raise funds to comply with the royalty order. The court credits Motorola's accounting expert, Ed Westerman, who explained that Hytera has engaged in significant discretionary spending over the past year since the payment was due. Hr'g Tr. 79:23–80:06. Hytera's choice to prioritize discretionary aspects of its operations above complying with the royalty order clearly and convincingly shows that it has not made the kind of energetic effort to comply that would allow it to avoid a civil contempt sanction.

B

The minimal efforts Hytera has taken to comply with the royalty order do little to rebut Motorola's showing.

Take the Norsat stock pledge first. Hytera moved to modify the royalty order to permit its Canadian subsidiary to pledge approximately $55 million worth of Norsat stock into escrow. The royalty order only allows payment in U.S. dollars. [1349] at 4 § 5.6. The court held that it lacked jurisdiction to modify the royalty order while it was on appeal and that Hytera's subsidiary's pledge of the shares into escrow (without giving up its voting rights) was not an adequate security that could

4

protect Motorola's rights to permit waiving a bond requirement while the royalty order was on appeal. [1429] at 3–7.

Two aspects of this pledge demonstrate clearly and convincingly that this effort was neither reasonable nor diligent. First, the royalty order clearly requires all payment into the escrow account to be in U.S. dollars. [1349] at 4 § 5.6. Thus, Hytera's subsidiary's pledge was, in fact, not an effort to comply with the royalty order at all, let alone a reasonable and diligent one.

Second, the efforts related to pledging the Norsat shares were not Hytera's own. Taking Hytera at its word, the "money and other assets of its non-party subsidiaries simply do not belong to the parent HCC." [1413] at 3. The Norsat shares held by Hytera Project Corp., an "indirect subsidiar[y]," did not belong to Hytera at all, and the alleged "efforts" to comply with the royalty order by pledging those shares were taken by Hytera Project Corp. [1395] at 7. The court declines to separate Hytera from its subsidiaries for the purpose of calculating assets and liabilities, but credit Hytera for decisions it claims its subsidiaries made on their own. Hytera cannot have it both ways.

C

Hytera also points to lender outreach that—it argues—illustrates Motorola's failure to show clearly and convincingly that Hytera has not made reasonable and diligent efforts to comply with the court's order. Hytera spoke to its lenders about three types of transactions that might have led to Hytera's compliance with the royalty order. First, Hytera points to evidence that it sought lender approval for additional financing to cover its royalty obligations. Second, Hytera points to it seeking approval to use proceeds from existing loans to cover the lump sum royalty obligation. Third, it mentions in passing efforts to obtain consent to selling assets. None of these efforts were reasonable or diligent efforts to comply.

1

In the four weeks leading up to the lump-sum-payment due date, Hytera reached out to contacts at its bank to obtain financing to pay the royalty obligation. Hytera provided written and oral evidence of limited outreach to its banks to seek their approval to obtain financing to pay the royalty obligation. *See* [1382-1] ¶¶ 13–21; Hr'g Tr. 201:4–8, 203:17–19. This limited effort was not a reasonable effort at compliance nor was it diligent. As Motorola correctly notes, Hytera *came up with the idea* for the royalty order, and Hytera knew that its first lump-sum payment was due on July 31, 2022 by the end of 2021. Hr'g Tr. 219:12–13. This gave Hytera nearly eight months to secure funds to pay its royalty obligation on time. Instead, Hytera waited until four weeks before the payment was due to begin making calls to its lenders to seek additional capital to pay what it owed.

MSA0809

This recitation of the facts takes the declaration of Hytera's finance director, Jiliang Kang, at face value. [1382-1]. His declaration states that he made oral outreach to the banks to attempt to obtain additional capital at least four weeks in advance of the royalty payment being due, and that he attached written "confirmation" of this outreach. *Id.* ¶¶ 13–20. The attached written communication reads not as "confirmation" that any outreach occurred, but instead, as the *first* outreach Hytera made to these prospective lenders to obtain financing for the lump-sum royalty payment due July 31, 2022. *Id.* at 28–55. In fact, the identical email that Hytera sent to each of the lenders in the week immediately preceding the payment due date did not mention any phone calls or oral outreach at all, and instead, referenced only a July 8, 2022 public announcement. *E.g.*, *id.* at 55–56. The court finds Kang's declaration not credible in light of the written evidence attached to the declaration. But in all events, outreach to lenders to obtain additional financing even four weeks before a $49 million payment is due, despite having eight months of notice, does not constitute a reasonable and diligent effort.

2

Hytera also sought the approval of its lenders to use proceeds from existing loans to cover the lump-sum royalty obligation. Hytera has presented evidence that it must seek its lenders' approvals to use proceeds of loans they had provided to Hytera to pay the royalty order. Hytera's expert on Chinese law, Professor James Feinerman, explained that Hytera's loan agreements generally require their banks' approval before making certain kinds of transactions. Hr'g Tr. 159:11–163:19. One type of transaction that generally requires giving notice to the banks, and also requires their consent, is an effort to use loan proceeds for activities other than those for which the loan agreement has provisions. For example, a loan agreement for a specific construction project might have a term limiting the use of the loan proceeds to only that project absent notice to the lender and the lender's consent.

In the week leading up to the payment due date, Hytera reached out to two of its existing lenders, seeking to use loan proceeds to make the lump-sum royalty payment. Both declined. [1382-1] at 61–68. Hytera's effort on the use of loan proceeds runs into a similar problem as its purported effort with respect to obtaining new financing—the extreme delay, compared to the amount of notice it had, evinces a lack of diligence. Further, as Professor Feinerman noted, Hytera has between 30 and 40 loan agreements that he reviewed. Hr'g Tr. 155:12. Hytera reaching out to only two of its several dozen existing lenders does not show a reasonable effort to use existing loan proceeds to make the lump-sum royalty payment.

On this count, Hytera runs into an additional problem as well: it artificially backs itself into a corner with respect to what money it can use for what purposes. While Professor Feinerman detailed the significant restrictions that Hytera's bank

6

agreements impose on it making certain asset sales and capital expenditures, at no time during the contempt hearing nor in any briefing did Hytera present evidence that its banks prohibit it from using for the royalty payment unrestricted cash, revenue from operations, or savings from cost cutting in discretionary areas. Hytera instead appears to have looked for money only in the places it knew it could not be found. As Motorola's accounting expert explained, all companies have significant discretionary spending in marketing and R&D that can be cut when needed to make other payments. Hr'g Tr. 99:19–100:5; *see also* Hr'g Tr. 193:17–194:6. No evidence shows that Hytera would be prohibited by any bank agreement from using revenue from its operations or money saved in discretionary expenses to make the lump-sum royalty payment. *See* Hr'g Tr. 78:1–9. The clear and convincing evidence—coming from Hytera's own publicly available financial disclosures—shows that Hytera has "simply prioritized other debt obligations as well as operations costs" over its obligation to Motorola. *Voso v. Ewton*, No. 16-cv-190, 2017 WL 2653143, at \*3 (N.D. Ill. June 20, 2017). This choice in priorities is a "clear indication that [Hytera] ha[s] not been diligent and energetic in [its] efforts to make the [royalty] payment as ordered by the Court." *Id.*

3

Last, Hytera provided further evidence that it reengaged its lenders in 2023 after the court issued its order denying Hytera's motion to modify or stay the royalty order on July 11, 2023. [1429]. But these efforts likewise were not reasonable and diligent. Hytera's finance director, Kang, testified that he made requests to Hytera's banks in 2023 like those he had in 2022. Hr'g Tr. 203:20–22; *see* Kang Direct Binder, DCX-66–108. Kang's cross-examination revealed that in May 2023, while the parties' motions remained pending, Kang told investors that the Motorola litigation had been "eliminated," despite much of the case being on appeal and the $49 million royalty payment outstanding. Hr'g Tr. 211:21–212:12. This juxtaposition undercuts the notion that Hytera sees the royalty payment as a genuine obligation, and also indicates that Hytera's 2023 outreach was not undertaken with any serious intent to obtain its banks' consent to use loan proceeds or assets to make the royalty deposit.

A closer review of Hytera's documentation of its outreach in 2023 also shows that its efforts were not reasonable. Hytera's July and August 2023 outreach to its lenders and subsidiaries, like its 2022 outreach, largely used stock language. Depending on the specific document, Hytera's requests generally used the language, "tak[ing] maintaining normal daily operations into consideration, Hytera does not have sufficient cash on hand available to pay the . . . royalty." *E.g.*, Kang Direct Binder, DCX-75 at 2. But alleged contemnors cannot prioritize operations over compliance with a court order. *Voso*, 2017 WL 2653143, at \*3. Even Hytera's supposed diligent efforts to obtain financing or consent to use loan proceeds and sell assets presupposed a condition that the law does not permit. To show reasonable

7

and diligent efforts to comply, Hytera must prioritize making the royalty payment over its operations. *Id.*

D

Hytera raises two other counterarguments unrelated to the specific measures it took (or in fact, did not take) to make the July 31, 2022 deposit. First, Hytera claims that finding it in contempt based on these facts would, in effect, amount to requiring Hytera to go into insolvency to make reasonable efforts to comply. Second, Hytera claims that because it has been making the ongoing (much smaller) quarterly deposits required under the Royalty Order, that compliance shows reasonable and diligent efforts to comply with the order as a whole. Both arguments are unavailing.

1

Taking the insolvency point first: For the first time at the contempt hearing, Hytera argued that the requirement to make reasonable and diligent efforts does not mean that an alleged contemnor must put itself into insolvency. Hr'g Tr. 230:17–22 (citing *Liberty Mut. Ins. Co. v. Aventura Eng'g & Constr. Corp.*, No. 06-cv-22494, 2009 WL 3190962 (S.D. Fla. Sept. 15, 2009), *report and recommendation adopted*, 2009 WL 10697338). In fact, Hytera raised the specter of criminal punishment in China for Hytera's officers and directors were they to violate the notice and consent provisions in Hytera's loan agreements. Hr'g Tr. 231:1–10.

The court is not holding that Hytera must put itself at risk of insolvency to show reasonable efforts to comply with the court's order. Motorola showed through clear and convincing evidence that Hytera (the parent) is a healthy and stable company, with strong revenue, rapidly declining debt burdens, and significant assets. Hr'g Tr. 81:7–83:1. The parent company in the corporate family alone has $16 million in unrestricted cash and $700 million in net assets as of its most recent public filing. Hr'g Tr. 74:4–8; 93:5–7; 179:15–16. Hytera has not made *any* effort to use *any* of its own cash or assets to comply with the court order. That is not diligent, and it is unreasonable.

In *Aventura Engineering*, the alleged contemnors were individuals of fairly modest means. *See* 2009 WL 3190962, at *3–4. The judgment in the case required the defendants to post over $1 million in collateral. *Id.* at *1. One defendant made strenuous efforts to secure a collateral bond, he tendered equity in the value of his apartments and the value of his personal property, and he also turned over his rental income. *Id.* at *4. The only effort he did not undertake was not to liquidate his retirement accounts; under Florida law, qualified retirement accounts were generally protected from creditors, and the amount in the accounts would not have come close to satisfying the collateral requirement in the order. *Id.* The other alleged contemnor was of even more modest means. She offered to pay the plaintiff

8

the entire value of her personal possessions to avoid their seizure, and she had no other assets save for a small retirement account less than 10% of the size of the collateral requirement. *Id.*

Hytera's efforts were nothing like these—to put it mildly. Hytera is a large, profitable corporation with hundreds of millions in annual revenue, and net assets (meaning with liabilities subtracted) of roughly $700 million. Hr'g Tr. 78:1–6 (revenue); 74:4–8 (net assets). Unlike the alleged contemnors in *Aventura Engineering*, Hytera has not offered to tender anything at all, let alone something akin to personal possessions or equity in real property. It made last-second outreach to a few lenders and convinced a subsidiary to "pledge" shares of another company, but the subsidiary would not even give up its voting rights. The *Aventura Engineering* court simply held that the defendants did not have to liquidate their retirement accounts to try to comply with its order. Hytera is nowhere near that point.

Second, Hytera did not rebut Motorola's showing with any evidence that its lenders would not permit it to use unrestricted cash to pay the royalty order, nor did it rebut Motorola's showing that it could cut discretionary expenditures and use those savings to comply with the royalty order. While Hytera's counsel suggested that the phrase "unrestricted cash" has a different meaning to Hytera's banks than its standard meaning in accounting literature, Hr'g Tr. 225:10–19, an attorney's argument is not evidence, *see Bell v. Hepp*, 70 F.4th 385, 387–88 (7th Cir. 2023) (describing this jury instruction in a state criminal case as proper). Neither of Hytera's financial witnesses—its accountant from Grant Thornton nor its internal finance director—testified that the company's bank agreements would prohibit it from using income from operations or savings from cutting discretionary expenditures to make the escrow deposit. Mr. Kang, the finance director, did testify that Hytera cannot use its unrestricted cash to make the escrow deposit because "the company needs this amount of money to maintain a [sic] normal daily operations, as well as repay the bank debts that [are] due." Hr'g Tr. 198:22–199:1. Notably, however, Kang phrased this in terms of practicalities, not any Chinese legal obligations created by Hytera's bank agreements. And as described in *Voso*, an alleged contemnor cannot escape a contempt finding while prioritizing daily operations and obligations to other creditors over its obligation to comply with the court's order. 2017 WL 2653143, at *3

Professor Feinerman, Hytera's expert on Chinese law, who testified about its bank agreements, likewise did not testify that the bank agreements would prohibit using unrestricted cash, revenue from operations, or savings from cuts to discretionary items to make the royalty payment absent notice and consent. Professor Feinerman put further color on what the plain text of the agreements already states: the use of loan proceeds would require notice and consent as would

making major asset sales, and the Chinese banks have "priority over Motorola under Chinese law." Hr'g Tr. 157:8–:21.[4]

But third, and perhaps most importantly, what Hytera's private agreements with Chinese banks require has very limited relevance in this proceeding. Hytera's arguments take the bank agreements as a constant, arguing that *given* the back agreements, Hytera's last-second attempts to (1) secure financing and (2) obtain consent to sell assets or use loan proceeds were reasonable and diligent efforts. But this argument itself assumes a critical and unwarranted conclusion: Hytera's obligations to its private, Chinese lenders under the terms of their contracts somehow supersede its obligation to follow an American court's order.

Even assuming the truth of Hytera's argument that it would be unable to pay any of what it owes on the lump sum royalty payment absent the consent of its lenders (and for clarity, the court does not), Hytera cites no case for the proposition that it can avoid a contempt finding by prioritizing repayment of private creditors instead of this court's order. Another court in this district has held the exact opposite: an alleged contemnor cannot prioritize *other debt obligations* over its obligation to comply with a court order. *Voso*, 2017 WL 2653143, at *3. The limitations Hytera imposed on itself by signing restrictive loan agreements are not an excuse for noncompliance. Making efforts to comply with the court order solely within the confines of those agreements likewise does not constitute a reasonable and diligent effort. The choice to comply with those loan agreements instead of the court's order is the exact kind of choice an alleged contemnor is not permitted to make when claiming that it has made reasonable efforts. *Id.*

---

[4] Professor Feinerman testified on direct that it was his opinion that Hytera could not make the royalty payment without obtaining consent from "the majority of banks or perhaps every bank to be able to make those payments." Hr'g Tr. 168:1–3. However, Professor Feinerman added a qualifier: the consent would only be necessary "if, depending on the terms of the individual loans they have with particular banks, [making the royalty payment] was going to trigger any of these other provisions and make their banks' debts due and payable and then require prepayment of all of those before any payments could be made on this." Hr'g Tr. 168:3–7. Feinerman added a further caveat on cross, noting that he "was only asked to comment on legal matters and not on anything related to financial matters" in response to a question asking whether it was his opinion that it would be impossible for Hytera to pay the royalty. Hr'g Tr. 171:7–11. So the court does not take Professor Feinerman's opinion to be that Hytera absolutely *cannot* make the royalty payment without running afoul of its obligations to its private creditors. Instead, his opinion is simply that Chinese law estops Hytera from making the royalty payment *if* making that royalty payment would run afoul of one of Hytera's credit agreements. *Compare* Hr'g Tr. 168:1–7, *with* 171:12–15, *and* Hr'g Tr. 172:10–15. Motorola has shown clearly and convincingly that Hytera can make at least a partial deposit without violating any loan agreement.

MSA0814

2

Hytera's technical argument that its compliance with the ongoing aspects of the royalty order shows reasonable and diligent efforts to comply with the rear-looking aspects of the royalty order is unpersuasive.

First, the very fact that Hytera has found a way to comply with its ongoing royalty obligations, but not its past ones, underscores how circumspect its efforts have been. As discussed previously, Hytera has made no efforts to negotiate a payment plan, make a small, good-faith payment, or show Motorola or the court that it has any intention of making the payment it owes. It has purportedly convinced its lenders that the ongoing royalty payments are normal, course-of-business expenses, but not the past royalty payment (which is dozens of times larger than each quarterly payment). This undercuts Hytera's assertions as to its banks' inflexibility and as to its inability to use existing cash flows to make royalty payments.

Second, though all the royalty order's components are in one order, the order neatly and naturally divides into two parts. As the court discussed in its previous decision, the rear-looking aspect of the royalty order is effectively a money judgment that grants Motorola legal relief for selling radios that incorporated Motorola's stolen IP for a three-year period while the case was pending. [1429] at 3. In contrast, the royalty order's requirement of ongoing, quarterly payments directs "a prospective duty" with "undetermined" costs, as those costs depend on how many radios Hytera sells that continue to incorporate Motorola's stolen intellectual property. *Id.* (quoting *USA Gymnastics v. Liberty Ins. Underwriters, Inc.*, 27 F.4th 499, 511 (7th Cir. 2022)). The order recognizes this distinction in its text, as the rear-looking aspect of the order is set out in separate sections from the rest. [1349] at 4 §§ 5.4–5.5 (separate sections for past royalty payment).

Last, Hytera has cited no case holding that compliance with one aspect of a court order shows reasonable and diligent efforts to comply with a different aspect of the order.

IV

For many of the same reasons that Hytera has not rebutted Motorola's clear and convincing showing that Hytera did not make reasonable and diligent efforts to comply, Hytera also did not meet its burden to show that it is unable to pay. *See In re Res. Tech. Corp.*, 624 F.3d at 388 (alleged contemnor had not demonstrated reasonable and energetic efforts to accomplish what was ordered, so it had not met its burden to establish inability to pay).

11

A

Staring with the legal standard: Under *In re Resource Technology*, Hytera must show a "complete inability to pay." 624 F.3d at 387. Hytera argued that some lower standard applied at the contempt hearing, *see* Hr'g Tr. 231:18–23, but that attempt is unpersuasive for two reasons. Hytera argues that *In re Resource Technology* sets out two standards—(1) complete inability where there has been no compliance, and (2) a lower standard where there has been partial compliance. The case sets out the standard applied in the event "there has been no effort at even partial compliance." *In re Res. Tech. Corp.*, 624 F.3d at 387. It does not create any lower standard to be applied where an alleged contemnor made efforts at partial compliance. But even if it did, as this court described above, Hytera has *not* partially paid. Its compliance with its ongoing obligations under the royalty order does not count as partial compliance with a separate aspect of the order covering a different period of time. *See* Part III.D, *supra*. So the "complete inability" standard applies. Hytera must show "clearly, *plainly*, and *unmistakably* that compliance is *impossible*." *Id.* (internal marks and citation omitted); *see also SEC v. Faulkner*, No. 16-cv-1735, 2019 WL 277621, at \*4–5 (N.D. Tex. Jan. 22, 2019) (unless alleged contemnor is unable to pay anything at all, court can hold her in contempt).

B

Hytera does not have a "complete inability to pay." *Id.* Hytera has strong revenue, declining debt burdens, hundreds of millions of dollars in net assets, and $16 million in unrestricted cash. *See* Part III.A, *supra*. As Motorola's expert also explained, Hytera has tens of millions of dollars per year in discretionary expenses. *See* Hr'g Tr. 79:13–80:6. From any of these sources, Hytera could at least partially comply with the royalty order.

C

Hytera's primary counterargument is that its loan agreements with its Chinese lenders prohibit it from making the royalty payment and that if it violated those loan agreements by making the payment, Hytera would face cascading default declarations by its lenders, and its officers and directors could be subject to criminal penalties. But Hytera put on no credible evidence that its bank agreements prohibit it from using cash flow from operations, unrestricted cash, or savings from discretionary spending cuts to comply with the royalty order. The only evidence in Hytera's written submissions or that it put on at the hearing is that its loan agreements prohibit it from making certain kinds of other transactions absent notice and consent of its banks. These include major asset sales, using loan proceeds, or taking on additional debt. Even if this court approached the ability-to-pay issue from the premise that Hytera's alleged indigence could be assessed only assuming full compliance with the restrictions in its loan agreements, Hytera has not met its burden to show that it could pay absolutely nothing to remain in

12

compliance with those restrictions and that *any* partial payment would cause the parade of horribles outlined at the contempt hearing. *See, e.g.*, Hr'g Tr. 58:7–59:3.

In any event, as the court previously discussed when analyzing the reasonable-and-diligent-efforts question, Hytera has provided no authority for the proposition that compliance with restrictions in its private loan agreements supersedes its obligation to comply with this court's orders. *See* Part III.D.1, *supra*. Hytera's $700 million in net assets alone demonstrate that it is more than able to make the entire royalty payment. Being required to use those assets to comply with a court order is an ordinary consequence of being a civil litigant, a consequence from which Hytera is not excused because it signed restrictive loan agreements.

V

Civil contempt sanctions can "be employed for either or both of two purposes; to coerce the defendant into compliance with the court's order, and to compensate the complainant for losses sustained." *United States v. United Mine Workers of Am.*, 330 U.S. 258, 303–04 (1947). Choosing among civil contempt sanctions is a matter of the court's discretion where, as here, the only issue is coercing compliance. *See id.* at 304. The court must "consider the character and magnitude of the harm threatened by continued contumacy, and the probable effectiveness of any suggested sanction in bringing about the result desired." *Id.*; *see also FTC v. Trudeau*, 579 F.3d 754, 771 (7th Cir. 2013) ("[T]he particular remedy chosen should be based on the nature of the harm and the probable effect of alternative sanctions." (internal marks and citation omitted)). "When considering an appropriate sanction for a party in contempt, the guiding principle is proportionality." *United States v. Sherard*, No. 05-cv-486, 2015 WL 1840050, at \*2 (E.D. Wis. Apr. 22, 2015) (citation omitted).

As the court sees this issue, it has four options: (1) Impose fines; (2) allow the seizure of Hytera's assets in the United States; (3) choose from or combine a series of half measures proposed by Hytera, [1456] at 12–14; or (4) temporarily enjoin Hytera from taking certain actions, up to and including an injunction against all two-way radio sales worldwide as proposed by Motorola, [1454] at 7–11.

A

The court can dispense with the first two options rather quickly, but with one key caveat.

Regarding fines or monetary sanctions, Motorola does not seek them, and as the court discussed during the contempt hearing itself, Hytera already has not paid what it owes, so additional fines appear unlikely to coerce compliance. Hr'g Tr. 233:17–24; *see United Mine Workers*, 330 U.S. at 304 (directing courts to choose remedy based on its "probable effectiveness" of coercing the desired action).

13

As to the seizure of assets, Motorola no longer seeks this sanction. [1454] at 11–12. In addition, to this point, the court has focused exclusively on the assets and liabilities of Hytera itself because it is the only remaining defendant in this case. *See* [1395] at 8–9. The court has not held one way or the other on the propriety of piercing the corporate veil. Ordering the seizure of assets of an entity separate from Hytera (the defendant in this case) would require reaching the veil-piercing question, and the court declines to do so at this time.

The one caveat comes from the royalty order itself. It imposes a late-payment penalty of 1% on the unpaid balance until paid. [1349] at 4 § 5.8. To discharge its obligation, Hytera must make this late payment along with the balance it already owes. The court's declining to issue *separate* fines should not be read to override or otherwise excuse Hytera from this obligation under the royalty order.

B

The third potential option, proposed by Hytera, is an assortment of half measures. After the court sought briefing on the appropriate remedy should it find Hytera in contempt, Hytera responded that the court's sanction should be to give Hytera additional time to comply, or potentially, additional direction as to what other steps the court thinks it should take to attempt to comply with the order. [1456] at 12–14. In particular, Hytera suggested that the court could order additional discovery, order Hytera to search for alternatives, or order Hytera to deposit an asset into escrow pending payment. *Id.* at 12–13. As a final option, Hytera suggested ordering a payment plan that might be approved by its lenders, but the order would have to build in "sufficient time for [Hytera] to undertake those efforts, including follow-up discussions and negotiations." *Id.*

The court finds that these proposed sanctions would not be commensurate with the character of the harm, nor would it bring about the result desired. *See United Mine Workers*, 330 U.S. at 304. On one hand, the harm to Motorola from the noncompliance is relatively low at this point; these funds are going into escrow and will be unavailable to Motorola until after the appeals have finally concluded. On the other hand, as the court has detailed both in its past order and this one, Hytera has threatened repeatedly not to comply with this court's order, and it has never committed to ever complying. So the harm to Motorola from Hytera's noncompliance at this moment is the uncertainty that it can ever obtain what it is owed should it succeed on appeal. That security is the very purpose of having the royalty money in escrow pending appeal.

Hytera's proposed measures will not likely result in compliance. Directing Hytera to make specific efforts to be able to make the deposit has no more coercive effect than the existing order that Hytera has been in violation of for over one year. The court concludes that Hytera's continued recalcitrance shows that it would not likely comply with the court's order to make specific efforts to make the royalty

14

payment, just as it has not made the royalty payment to date. Excuses have abounded; Hytera has not shown that it would stop making them now.

As to using an asset as security until Hytera can make payment, this proposal runs into a few problems. Hytera says in its supplemental brief regarding remedy, filed (in accordance with the court's request) *after* the contempt hearing, that "HCC's senior lenders are already willing to permit HCC to provide non-cash assets as security for the royalty payment until such time as it can generate the necessary cash to place into escrow." [1456] at 13. The court never heard about such an agreement until Hytera submitted its supplemental brief after the contempt hearing; Hytera did not mention the possibility either in the briefing on Motorola's motion for contempt before the hearing or at the contempt hearing itself. On Hytera's view (up until the supplemental brief after the hearing), the only possibility in this area was through Norsat, the shares of which are completely controlled by an indirect subsidiary. If Hytera can direct the disposition of the assets of Hytera Project Corp., or any of its other subsidiaries, that is information Hytera must disclose immediately under the citation order entered by Judge Norgle, who was then presiding, and the court may ultimately have to confront the veil-piercing issue Hytera has repeatedly sought to avoid.

Another problem is the one the court identified in its previous order: "pledging" an asset as security without Hytera divesting itself of control over the asset does not provide Motorola any true security at all. *See* [1429] at 6–7. The court relies on the testimony of Hytera's finance director, Mr. Kang, for the proposition that actual transfer of an asset into escrow is not Hytera's plan. At the contempt hearing, Kang was adamant that, had the court accepted the Norsat shares as an alternative to making the royalty payment, Motorola *would not* have taken possession of the shares were Motorola (in this hypothetical) to succeed on appeal. Hr'g Tr. 207:12–208:3. It is unclear what value the shares would have to Motorola at all if they were simply "pledged" into escrow and could never be transferred. Without any detail in Hytera's supplemental briefing about what the assets are that it now envisions providing other than Norsat shares, and how those assets would give Motorola an equivalent amount of security as $49 million in cash in an escrow account, the court finds that this asset-provision option would not fit the *United Mine Workers* test for crafting an appropriate civil contempt sanction.

Last, Hytera seeks a payment plan. However, the court finds that in light of the procedural history and Hytera's litigating positions, this alternative will only lead to further delays, and it is unlikely to coerce compliance with the royalty order. As discussed with respect to Hytera's first option (court-directed specific efforts to make payment), an order crafting a payment plan has no more coercive effect than the royalty order itself. It is just as likely that Hytera will make payments on time and in full as it is that Hytera will continue to claim inability to pay, and the court and parties will be right back where they started. In addition, Hytera had no fewer than 20 months to make good-faith efforts at a payment plan for the lump sum

deposit. The evidence presented does not show any effort to do so. The time to negotiate a payment plan passed long ago.

The same is true of efforts described in a new filing that Hytera submitted *after* the supplemental briefing and more than one week *after* the contempt hearing. [1459]. In that filing, Hytera described recent developments in its efforts to obtain a bond to secure the $49 million royalty payment pursuant to Rule 62(b), which provides that "[a]t any time after judgment is entered, a party may obtain a stay by providing a bond or other security." Hytera describes efforts to obtain from its lenders a supersedeas bond that would secure the $49 million royalty payment and explains that two major lenders in China have informed Hytera that they are willing to issue guarantees or standby letters of credit on Hytera's behalf, under various conditions, and that the process of issuing the letter of credit will take 60 days. [1459] at 2–3. Hytera requests that the court hold any contempt finding in abeyance pending Hytera's undertaking any further diligent steps the court deems appropriate, including waiting for 60 days so that Hytera can obtain a supersedeas bond. [1459] at 3.

This effort has come too late. Hytera has had over one year to seek a bond under Rule 62(b) to stay the royalty order pending appeal. Its attempts to do so after the contempt hearing do not counsel in favor of further delay. The correspondence with Hytera's lender attached to Hytera's notice does not indicate a strong likelihood that Hytera will be able to obtain a bond, let alone one that the court would recognize as valid. *See* [1459-2] at 3. The letter outlines a sizable number of further hoops through which Hytera must jump to obtain this letter of credit. And like the court in *Aero Products International, Inc. v. Intex Recreation Corp.*, No. 02-cv-2590, 2005 WL 4954238 (N.D. Ill. Dec. 8, 2005), this court has serious concerns about whether an unconditional letter of credit from a financial institution over which the court lacks personal jurisdiction is a strong enough provision of security that the court would consider the letter of credit a valid bond under Local Rule 65.1(b)(4).

C

That leaves Motorola's proposal of a temporary injunction. Motorola seeks an injunction prohibiting Hytera from "selling any Two-Way Radio Products worldwide until it fully complies with the Royalty Order." [1454] at 7. The court grants Motorola's request.

Hytera raises a jurisdictional challenge to the imposition of this sanction, which the court must address before turning to whether the sanction is appropriate on the merits. *See Tenet v. Doe*, 544 U.S. 1, 6 n.4 (2005).

1

16

MSA0820

Hytera argues that the court lacks jurisdiction to impose an injunction because Judge Norgle held that he lacked jurisdiction to impose an injunction when Motorola sought one in a motion for reconsideration; that is the law of the case; and the reasons he held so remain true now. [1456] at 10–11 (citing [1348]).

However, the situation that Judge Norgle addressed and this situation are not analogous. Judge Norgle held that he lacked jurisdiction to impose an injunction on the motion for reconsideration because Motorola had already appealed his order denying a permanent injunction. [1348] at 2. This is a different motion, and the court is in a different posture. Motorola does not seek a modification of the royalty order or a reconsideration of Judge Norgle's denial of the motion for a permanent injunction. Instead, Motorola seeks the temporary injunction as a contempt sanction for Hytera's failure to comply with the royalty order. Imposing an injunction here would not violate the principle that the court lacks jurisdiction to modify an order that is on appeal because the court intends to impose a temporary injunction to coerce compliance with the royalty order, not as a modification of that order.

2

Turning to the propriety of issuing an injunction: the court finds that it is a proportionate and reasonable step considering Hytera's recalcitrance and the court finds that it is likely that an injunction will coerce Hytera's compliance. Hytera is a leading manufacturer of radio equipment. *See* Response at 2, No. 20-cr-688, *United States v. Hytera Commc'ns Corp., Ltd., et al.* (N.D. Ill. Oct. 27, 2022), ECF No. 67. A worldwide injunction halting the sales of a major driver of revenues is likely to induce Hytera to use its existing assets to immediately make the deposit along with the required late-payment fee. In addition, unlike some of Hytera's proposed alternatives that have no more coercive force than the royalty order itself, the injunction Motorola seeks could help to coerce compliance as customers would likely avoid the possibility of purchasing products sold in violation of a court order, even if the order itself may have no direct effect on Hytera's behavior. Last, Hytera's own conduct in this case indicates a strong possibility that the injunction will induce compliance. Hytera sought an ongoing royalty as opposed to an injunction, and it litigated forcefully against a permanent injunction. *See* [987]. An injunction is clearly something Hytera does not want. If Hytera's plan was not to comply with an injunction, the court concludes that Hytera likely would not have so forcefully opposed its application for the past three years.

3

Motorola has met its burden on all four factors required for the issuance of an injunction. To obtain an injunction, the movant must show that (1) it has suffered an irreparable injury; (2) legal remedies are inadequate to compensate that injury; (3) the balance of hardships favors the movant; and (4) an injunction would not

17

MSA0821

disserve the public interest. *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006).

*Irreparable harm.* Motorola has suffered—and is continuing to suffer—an irreparable injury. Without Hytera's compliance with the royalty order, Motorola remains in limbo as to whether it will ever obtain the funds owed to it should Motorola prevail on appeal. Absent compliance, Motorola will continue to suffer this injury, and the court has already concluded that an injunction is a proportionate sanction to obtain compliance. Thus, Motorola has met its burden on irreparable harm.

*Adequate remedy at law.* Hytera's continued recalcitrance shows that Motorola lacks an adequate legal remedy. Hytera effectively concedes this point, asking the court not to impose further fines because the issue in this contempt motion is that Hytera has not paid the amount it already owes, and making it pay more would be ineffective in achieving compliance. [1456] at 4–6.

*Balance of hardships.* The balance of hardships is a close question, but favors Motorola. Undoubtedly, Hytera will be harmed by this temporary injunction. As discussed, Hytera has significant two-way radio sales, significant (though declining) debt burdens, and low cash reserves as compared to the size of the company. *See* Hr'g Tr. 228:5–14. The combination of these factors means that stopping Hytera from selling a prime driver of revenue could cause serious operational problems for the company.

Though these harms are significant, in the court's judgment they are outweighed by the harm to Motorola that has come, and will remain, from Hytera's contumacious conduct. Motorola is counting on the funds in the escrow account being available to it should it prevail on appeal in this case to compensate it for damage caused by Hytera selling radios with stolen Motorola technology for three years. Absent compliance, Motorola may never be able to recover what it is owed. Further, Hytera's continued recalcitrance has forced Motorola to continue litigating this issue on top of the complex appeal currently before the Seventh Circuit. The harms to Hytera from the injunction—which it can have lifted any time by complying with the royalty order—are outweighed by the continued uncertainty faced by Motorola.

*The public interest.* The public interest would not be disserved by an injunction. As Motorola's post-hearing brief on remedy explains, there is significant supply for two-way radio technology in the market such that Hytera being forced to cease its sales will not disrupt any customers whose operations serve the public

MSA0822

interest. [1454] at 9–10.[5] For that reason alone, the injunction will not harm the public interest.

VI

Motorola's motion to hold Hytera in contempt [1384] is granted. In light of Hytera's recalcitrance, fines, other monetary sanctions, and other options would be ineffective. To coerce compliance with the royalty order, the appropriate course is to enjoin Hytera from selling any products containing two-way radio technology anywhere in the world until its obligations under the royalty order are satisfied. Motorola has met the four-factor test for the issuance of an injunction. Once the process set forth below is complete, a separate injunction document will issue pursuant to Rule 65(d)(1)(C) ("Every order granting an injunction and every restraining order must: (A) state the reasons why it issued; (B) state its terms specifically; and (C) describe in reasonable detail—and not by referring to the complaint or other document—the act or acts restrained or required."). Motorola should file and send to the court's proposed order box by 8/30/2023, a proposed injunction. Hytera should file and send to the court's proposed order box by 9/1/2023 any proposed edits to Motorola's proposed injunction, tracking any proposed changes. After that process is complete and after the court issues the injunction, the parties should file a joint status report once Hytera has fully complied with its obligations under the royalty order so that the court can formally lift the injunction.

Dated: August 26, 2023 /s/ Martha M. Pacold

---

[5] For clarity, the court declines to adopt—and does not agree with—Motorola's separate argument that the public interest favors injunctive relief because of the interest in punishing theft and discouraging unethical behavior. *See* [1454] at 11. These reasons are inappropriate bases on which to grant a civil contempt sanction. Civil contempt sanctions cannot be imposed for punitive reasons or to vindicate the court's authority; otherwise, they transform the motion into one for criminal contempt. *Matter of Crededio*, 759 F.2d 589, 590 (7th Cir. 1985).

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

MOTOROLA SOLUTIONS, INC., and
MOTOROLA SOLUTIONS MALAYSIA
SDN. BHD.,

             Plaintiffs,

        v.

HYTERA COMMUNICATIONS
CORPORATION LTD.,
HYTERA AMERICA, INC., and
HYTERA COMMUNICATIONS
AMERICA (WEST), INC.,

             Defendants.

Case No. 1:17-CV-01973

Honorable Martha M. Pacold

**JOINT STATUS REPORT**
**REGARDING ROYALTY ORDER**

MSA0824

Pursuant to the Court's contempt order (Dkt. 1461), Plaintiffs Motorola Solutions, Inc., and Motorola Solutions Malaysia SDN. BHD ("Motorola") and Defendant Hytera Communications Corporation, Ltd., ("HCC") hereby submit the following joint status update regarding the Court's Royalty Order (Dkt. 1349).

**Hytera's Statement:** HCC informs the Court that HCC has, today, wired funds to the escrow account in the amount required in the Court's order of August 26, 2023 and is now in full compliance with its obligations under the royalty order, as modified by the August 26 order. The wired sum amounts to $56,342,968.96, which comprises the principal royalty of $49,861,034.48 plus $6,481,934.48 (1% of the principal x 13 for 13 months). HCC asks that the Court consider HCC's contempt purged and lift or decline to enter any injunction sanction.

**Motorola's Statement:** Earlier today, shortly after 12 pm CT, Hytera informed Motorola for the first time that Hytera made an additional deposit into the escrow account, which Hytera contends satisfies its outstanding obligations under the Royalty Order. Given the timing of Hytera's disclosure, Motorola is still considering its position concerning whether the amount is sufficient to satisfy the Royalty Order (in that regard, Motorola notes that the amount deposited does not appear to compound the 1% monthly interest amount) and what Motorola believes are the appropriate next steps in view of Hytera's disclosure today. Accordingly, Motorola respectfully requests that it be permitted more time to consider these issues and given permission to submit Motorola's positions on them by no later than next <u>Wednesday, September 6, 2023</u>. This modest period of time (two business days from now, in light of the Labor Day holiday) is necessary in order for Motorola to fully consider and evaluate the import of these developments, which were raised to Motorola for the first time with only a handful of hours before the close of business today remaining.

1

MSA0825

Date: September 1, 2023        Respectfully submitted,

/s/ Adam Alper

Adam Alper (*admitted pro hac vice*)
adam.alper@kirkland.com
Akshay S. Deoras (*admitted pro hac vice)*
akshay.deoras@kirkland.com
Brandon H. Brown (IL Bar No. 266347 CA)
brandon.brown@kirkland.com
KIRKLAND & ELLIS LLP
555 California Street
San Francisco, CA 94104
Telephone: (415) 439-1400
Facsimile: (415) 439-1500

Michael W. De Vries (*admitted pro hac vice*)
michael.devries@kirkland.com
Christopher Lawless (*admitted pro hac vice*)
christopher.lawless@kirkland.com
Justin Singh (*admitted pro hac vice*)
justin.singh@kirkland.com
KIRKLAND & ELLIS LLP
555 South Flower Street
Los Angeles, CA 90071
Telephone: (213) 680-8400
Facsimile: (213) 680-8500

Ali-Reza Boloori (*admitted pro hac vice)*
ali-reza.boloori@kirkland.com
KIRKLAND & ELLIS LLP
2049 Century Park East, Suite 3700
Los Angeles, CA 90067
Telephone: (310) 552-4200
Facsimile: (310) 552-5900

David Rokach (IL SBN: 6279703)
david.rokach@kirkland.com
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, IL 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200

Leslie M. Schmidt (*admitted pro hac vice*)

/s/ Boyd Cloern

Boyd Cloern (*admitted pro hac vice*)
bcloern@steptoe.com
Michael Allan (*admitted pro hac vice*)
mallan@steptoe.com
John William Toth (*admitted pro hac vice*)
btoth@steptoe.com
STEPTOE & JOHNSON LLP
1330 Connecticut Avenue NW
Washington, DC 20036
Telephone: (202) 429-3000
Facsimile: (202) 429-3902

Tron Fu
tfu@steptoe.com
STEPTOE & JOHNSON LLP
227 West Monroe Street, Suite 4700
Chicago, IL 60606
Telephone: (312) 577-1300
Facsimile: (312) 577-1370

Attorneys for Defendant
*Hytera Communications Corporation, Ltd.*

MSA0826

leslie.schmidt@kirkland.com
Joshua L. Simmons (*admitted pro hac vice*)
Joshua.simmons@kirkland.com
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900

Attorneys for Plaintiffs
*Motorola Solutions, Inc. and Motorola
Solutions Malaysia SDN. BHD.*

3

**CERTIFICATE OF SERVICE**

I, Boyd Cloern, an attorney, hereby certify that on September 1, 2023, I caused a true and correct copy of the foregoing submission to be served via the Court's ECF system upon all counsel of record.

/s/ Boyd Cloern
Boyd Cloern

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| MOTOROLA SOLUTIONS, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 1:17-cv-01972 |
| v. | ) | |
| | ) | District Judge Franklin U. Valderrama |
| HYTERA COMMUNICATIONS | ) | |
| CORPORATION LTD., | ) | Magistrate Judge Jeffrey I. Cummings |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

Before the Court is defendant Hytera Communications Corporation Ltd.'s ("Hytera")

motion for extension of time to produce source code related to its H-Series products, (Dckt.

#295), which implicates the application of Chinese law to discovery in this matter. For the

reasons set forth below, Hytera's motion for extension of time is denied.

**I.      RELEVANT BACKGROUND[1]**

Motorola filed this lawsuit in 2017 alleging that Hytera had infringed on seven patents

related to digital, two-way radio technologies. Hytera subsequently brought a counterclaim

against Motorola, seeking declarations of invalidity and noninfringement. (Dckt. #105).

Motorola served its final infringement contentions on August 5, 2020. These contentions

included the redesigned 2019 "i-Series" digital mobile radios ("DMR radios"), for which Hytera

had previously produced the source code to Motorola. (Dckt. #254 at 4). On or around October

29, 2021, Hytera announced the launch of the "H-Series," yet another line of DMR radios. (*Id*.).

On January 5, 2023, this Court granted Motorola's opposed motion to amend its final

---

[1] The Court presumes familiarity with the facts of this case and includes only those facts that are relevant
to the discovery dispute before the Court.

infringement contentions to include the H-Series and to compel Hytera to produce discovery related to those radios, including source code. (Dckt. #275 at 13). Over Hytera's pending objections to that ruling before the District Court, on March 29, 2023, the Court ordered the parties to proceed with H-Series discovery, including the exchange of technical documents, the production of source code, and Rule 30(b)(6) deposition(s). (Dckt. #291). However, to "minimize the burden and any arguable prejudice to defendant pending the resolution of its objections," the Court directed the parties to proceed with H-Series discovery in a sequenced matter, beginning first with the exchange of technical documents by May 17, 2023. (Dckt. #289 & #291). With respect to the H-Series source code, the Court directed Hytera to "make its source code available by 6/7/23 for six weeks (through 7/19/23)." (Dckt. #291).

The parties proceeded with H-Series discovery as directed and, as of May 10, 2023, Hytera intended to make the source code related to the H-Series products available. (Dckt. #294). On May 24, 2023, Motorola's counsel e-mailed defense counsel to discuss the logistics of the source code production so that Motorola's source code reviewers could make necessary travel plans. (Dckt. #298-1 at 8-9). On June 2, 2023, defense counsel confirmed that the source code would be made available from June 7 through July 19, 2023 at counsel's Cleveland office. (*Id*. at 7-8).

However, on June 7, 2023 – the deadline for production of the H-Series source code – Hytera filed its motion for extension of time to produce the code, asserting, for the first time, that despite its diligent efforts to prepare the code "for inspection in the United States," it had not yet received "authorization from the government of the People's Republic of China" to do so.

MSA0830

(Dckt. #295 at 2). In its motion, Hytera sought an indefinite extension of time to produce the code while it continued to work to obtain the necessary permission under Chinese law.[2]

Recognizing the potential dispute regarding the application of Chinese law, the Court ordered the parties to file simultaneous briefs (and response briefs) "addressing whether provisions of Chinese law should impact this Court's order regarding the production of the source code given that discovery in this case is governed by the Federal Rules of Civil Procedure." (Dckt. #296). The Court specifically directed the parties to this Court's prior decision in *Inventus Power v. Shenzhen Ace Battery*, 339 F.R.D. 487 (N.D.Ill. 2021). In that case, this Court addressed whether discovery should proceed under the Federal Rules of Civil Procedure or – as the Chinese corporate defendant requested – under the Hague Convention to protect the defendant from violating various Chinese cyber security laws. Ultimately, the Court concluded that the defendant failed to show "that the sovereignty issues at stake and the principles of comity favor[ed] the application of the Hague Convention," and directed the parties to proceed with discovery under the Federal Rules, notwithstanding any potential violation of Chinese law or any potential sanctions that might result from such a violation. *Inventus*, 339 F.R.D. at 498.

As directed, the parties reviewed this Court's opinion in *Inventus* and have since submitted simultaneous briefs, (Dckt. #297 & #298), response briefs (Dckt. #303 & #304), a sur-reply, (Dckt. #314-1), and a response thereto, (Dckt. #320). For its part, throughout its submissions, Hytera attempts to distinguish this matter from this Court's ruling in *Inventus* and

---

[2]  Attached to Hytera's motion is a Chinese version of Hytera's "application to the Chinese government for the required security assessment and permissions to export those specific code files to the United States." (Dckt. #295 at 3 & #295-1). Motorola has since submitted an English translation of that application, which reveals that Hytera submitted the application to the "Guangdong Provincial Internet Information Office" on May 31, 2023. (Dckt. #298-1 at 12-14).

MSA0831

asks the Court to postpone its production of the "marginally relevant" H-Series source code until it is "authorized by the Chinese government so that Hytera is not unfairly forced to choose between being sanctioned by this Court or by the Chinese government." (Dckt. #297 at 5, 13). Motorola, on the other hand, asserts that this Court's reasoning in *Inventus* "controls, and confirms that the Federal Rules of Civil Procedure – not Chinese laws – apply to discovery in this case." (Dckt. #298 at 7). For the reasons set forth below, the Court agrees with Motorola.

## II.    ANALYSIS

### A.    Standard to determine whether Chinese law precludes Hytera's production of the H-Series source code.[3]

"Foreign laws that block the production of discoverable material do not automatically excuse a party from its Rule 26 obligations." *Philips Medical Systems (Cleveland), Inc. v. Buan*, No. 19 CV 2648, 2022 WL 602485, at *2 (N.D.Ill. Mar. 1, 2022). Indeed, as this Court addressed in detail in *Inventus*, "[i]t is well settled that [foreign] statutes do not deprive an American court of the power to order a party subject to its jurisdiction to produce evidence even though the act of production may violate that statute." *Inventus*, 339 F.R.D. at 500, *quoting Société Nationale Industrielle Aérospatiale v. U.S. Dist. Ct. for S. Dist. of Iowa*, 482 U.S. 522, 544 n.29 (1987). However, in "recognition of the potential liability a party fulfilling its discovery obligations could face for violating foreign law, courts 'should exercise special vigilance to protect foreign litigants from the danger that unnecessary, or unduly burdensome, discovery may place them in a disadvantageous position.'" *Philips*, 2022 WL 602485, at *2, *quoting Aérospatiale*, 482 U.S. at 546.

---

[3] Hytera contends that "it is not asking the Court to choose between one set of rules or another," but rather to simply "postpone" the production of the source code. (Dckt. #297 at 13). However, Hytera's request for an indefinite extension of time and the positions asserted in its submissions reveal that the underlying nature of its request is to essentially avoid production of the H-Series source code entirely. As such, to avoid further delay in this 2017 case, the Court proceeds accordingly.

MSA0832

In exercising this vigilance, courts apply a two-step process. First, the party seeking to block discovery – here, Hytera – must show that foreign law "actually bars the production at issue." *Republic Techs. (NA), LCC v. BBK Tobacco & Foods*, No. 16 CV 3401, 2017 WL 4287205, at *1 (N.D.Ill. Sept. 27, 2017). If the court determines that the foreign law in question blocks production of the discovery, the Court moves to the second step and must weigh the interests of the United States and those of the foreign state. *Inventus*, 339 F.R.D. at 501. To do so, district courts are tasked with balancing the following five factors "relevant to any comity analysis," and drawn from the Supreme Court in *Aérospatiale*:

> (1) the importance to the investigation or litigation of the documents or other information requested;
>
> (2) the degree of specificity of the request;
>
> (3) whether the information originated in the United States;
>
> (4) the availability of alternative means of securing the information; and
>
> (5) the extent to which noncompliance with the request would undermine important interests of the United States, or compliance with the request would undermine the important interests of the state where the information is located.

482 U.S. at 544 n.28 (citing Restatement (Third) of the Law of Foreign Relations §442 (1987)); *see also Reinsurance Co. of America, Inc. v. Administratia Asigurarilor de Stat,* 902 F.2d 1275, 1281-83 (7th Cir. 1990) (relying on the same factors to determine whether Romanian law barred production of discovery). Some courts, including this Court in *Inventus*, also consider two additional factors: "[6] the hardship of compliance on the party or witness from whom discovery is sought; and [7] the good faith of the party resisting discovery." *Inventus*, 339 F.R.D. at 505 (citing *Laydon v. Mizuho Bank, Ltd.*, 183 F.Supp.3d 409, 419-20 (S.D.N.Y. 2016) and *Sun Grp.*

5

MSA0833

*U.S.A. Harmony City, Inc. v. CRRC Corp. Ltd.*, No. 17-CV-02191-SK, 2019 WL 6134958, at \*4 (N.D.Cal. Nov. 19, 2019)).

Applying this two-step analysis here, the Court concludes – as in *Inventus* – that Hytera has satisfied the first step but has failed to show at the second step "that the sovereignty issues at stake and the principles of comity" weigh in favor of barring the production of the source code. *Inventus*, 339 F.R.D. at 498.

> **B.      Hytera has met its burden to show that Chinese law – particularly, Article 37 of the Cybersecurity Law – blocks the production of the H-Series source code absent approval by Chinese authorities.**

Under the governing test, Hytera must first show that Chinese law "actually bars" the discovery at issue, i.e., the production of the H-Series source code for review in the United States. *Inventus*, 339 F.R.D. at 499 (citing *Wultz v. Bank of China Ltd.*, 942 F.Supp.2d 452, 460 (S.D.N.Y. 2013)). To do so, Hytera "must provide the Court with information of sufficient particularity and specificity to allow the Court to determine whether the discovery sought is indeed prohibited by foreign law." *Inventus*, 339 F.R.D. at 499 (citation omitted). The party must describe, among other things, "the provisions of the foreign law, the basis for its relevance, and the application of the foreign law to the facts of the case." *Id.* In determining whether foreign law bars the discovery, courts may "consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence." *Philips*, 2022 WL 602485, at \*3; Fed.R.Civ.P. 44.1; *see also Bodum USA, Inc. v. La Cafetiere, Inc.*, 621 F.3d 624, 628 (7th Cir. 2010) (directing trial courts to "use the best of the available sources").

6

Here, Hytera argues that two Chinese data security laws preclude the production of the H-Series source code without approval from the Chinese authorities, namely: (1) Article 36 of the Data Security Law ("DSL"); and (2) Article 37 of the Cybersecurity Law ("CSL").[4]

Article 36 of the DSL provides, in relevant part:

> The competent authorities of the People's Republic of China shall handle requests for data *made by foreign judicial or law enforcement authorities*, in accordance with the relevant laws and international treaties or agreements concluded or acceded to by the People's Republic of China, or in accordance with the principles of equality and reciprocity. Without the approval of the competent authorities of the People's Republic of China, organizations or individuals in the People's Republic of China *shall not provide data stored within the territory of the People's Republic of China to any overseas judicial or law enforcement body.*

Art. 36, Data Security Law of the PRC, June 10, 2021 (Dckt. #297-2 at 48) (emphasis added).

Article 37 of the CSL provides:

> Critical information infrastructure operators that gather or produce personal information or important data during operations within the mainland territory of the People's Republic of China, shall store it within mainland China. Where due to business requirements it is truly necessary to provide it outside the mainland, they shall follow the measures jointly formulated by the State cybersecurity and informatization departments and the relevant departments of the State Council to conduct a security assessment; where laws and administrative regulations provide otherwise, follow those provisions.

Art. 37, Cybersecurity Law of the PRC, June 1, 2017. (Dckt. #297-2 at 14). Even more recently, in 2022, China issued additional guidelines for complying with its data security laws, including the DSL and the CSL, titled "Outbound Data Transfer Security Assessment Measures," (Dckt. #297-2 at 69-76), and "Guidelines for Identification of Critical Data," (Dckt. #297-2 at 84-90).

According to Hytera, it has met its burden to show that both Article 36 of the DSL and Article 37 of the CSL – as further clarified by the updated guidelines – preclude it from

---

[4] Throughout its submissions, Hytera also cites to the "Personal Protection Law of the People's Republic of China," but, as Motorola argues, Hytera has not substantively addressed the application of that law to the source code here.

7

producing the H-Series source code without prior approval from Chinese authorities. The Court

agrees, but only with respect to Article 37 of the CSL.

> **1.      Hytera has *not* met its burden to show that Article 36 of the DSL blocks the production of the H-Series source code.**

Again, under Article 36 of the DSL, a Chinese company must obtain approval from the

appropriate Chinese authorities before it produces data stored in China in response to requests

"*made by foreign judicial or law enforcement authorities*." (Dckt. #297-2 at 48). However, as

recently explained by a court in this District which reviewed Article 36 of the DSL:

> Unlike in civil law jurisdictions where the judge takes a leading role in collecting evidence, discovery requests and responses thereto in the American common law system are traded between the parties. While the court oversees the process, it does not make the request and is not involved in the stewardship or use of the exchanged information – in other words, the data is not provided to the U.S. court. On its own terms, therefore, the DSL's review and approval requirements [of Article 36] do not appear to apply to the American civil discovery process.

*Philips*, 2022 WL 602485, at *6 (internal citations and quotations omitted). Although other

district court opinions are not binding on this Court, the Court finds this reasoning persuasive

and reaches the same result here. *Beezley v. Fenix Parts, Inc.*, 328 F.R.D. 198, 204 (N.D.Ill.

2018) ("Even decisions of other district courts in the same district are not 'binding,' although

they may be persuasive.").

Indeed, it is not the Court that requested the production of the H-Series source code, nor

will the Court be reviewing that source code upon its production.[5] More importantly, Hytera has

not directed the Court to any case where a court has held that Article 36 of the DSL blocks the

production of Chinese data in the context of the exchange of discovery between the parties. As

---

[5] Hytera's attempt to turn an order from this Court compelling production of the source code into a "judicially-initiated request" that would fall under the purview of Article 36 is disingenuous at best. (Dckt. #303 at 4-5). At bottom, Motorola – which initially requested the production of the H-Series source code – only now requires assistance from the Court after Hytera refused, yet again, to produce the source code.

MSA0836

such, Hytera has not met its burden to show that Article 36 of the DSL bars the production of H-Series source code.

### 2. Hytera *has* met its burden to show that Article 37 of the CSL blocks the production of the H-Series source code.

With respect to Article 37 of the CSL, however, the Court reaches the opposite result. Again, Article 37 requires "critical information infrastructure operators that gather or produce . . . important data" to follow certain guidelines, including conducting a security assessment, before providing that data outside of mainland China. In support of its position that Article 37 applies to the production of the source code, Hytera has submitted: (1) the declaration of Chinese attorney Jiajie Huang, who specializes in cybersecurity and data security laws, (Dckt. #297-1 at 1-6); and (2) a recent letter from the "Commerce Bureau of Shenzhen Municipality on Alert of Risk of Outbound Data Transfer," (Dckt. #314-2 at 3-4).

The Court finds – over Motorola's objections – that Hytera's submissions are sufficient to meet its burden that Article 37 and the subsequent guidelines block the production of source code absent express permission. Specifically, Huang's declaration and the Commerce Bureau's letter confirm that "source code in respect of DMR-two way radios and base stations constitutes critical data affecting national security," within the meaning of the recent guidelines and thereby potentially implicating Chinese data laws, including the CSL. (Dckt. #314-3 at 3). The letter further warns that the transfer of such data "involves significant risks." (*Id.*).

Although the Court is not required to adopt China's interpretation of its own laws, *see Animal Sci. Prod., Inc. v. Hebei Welcome Pharm. Co.*, 138 S. Ct. 1865, 1873 (2018), it may "consider any relevant material or source." Fed.R.Civ.P. 44.1. Having reviewed Hytera's evidence here, the Court concludes, as in *Inventus*, that the declaration and letter from Chinese authorities regarding the source code at issue satisfies its burden to show Article 37 is a blocking

9

statute.  *See Sun Grp.*, 2019 WL 6134958, at *6 ("In light of Wei's declaration and the letter by the Chinese Ministry of Justice on this specific issue, the Court finds that Defendant has demonstrated that producing documents located in the PRC in response to Plaintiff's discovery requests would violate [Chinese Law].").

This finding does not, however, end the inquiry.  "Instead, the Court must turn to the second step of the analysis to balance the interests of the United States and those of the foreign state."  *Inventus*, 339 F.R.D. at 501.

### C. Hytera has failed to show that the comity factors weigh in favor of withholding the source code.

After arguing that Chinese law serves to block the production of the H-Series code, Hytera walks through each of the comity factors, attempting to demonstrate that – unlike in *Inventus* – they weigh against the production of the code.  Respectfully, the Court disagrees.

### 1. The importance to the investigation or litigation of the documents/information requested

This factor warrants little attention as the importance and relevance of the H-Series source code to Motorola's infringement contentions has already been firmly established in this litigation.  As explained above, *supra* at Section I(A), this Court has now *twice* directed Hytera to produce the H-Series source code: first, in granting Motorola's motion to amend its final infringement contentions and permitting relevant discovery, including source code, (Dckt. #275 & #309); and second, in directing the parties to proceed with H-Series discovery in a sequenced matter, which included the production of the source code as the second step.  The Court finds no reason to reconsider its prior orders and Hytera's attempts to now "moot" the relevance of the H-Series code fall short for the following reasons.

MSA0838

First, Hytera's assertion – made in its June 6, 2023 submission – that it "intends to file shortly a motion for summary judgment of non-infringement by the H-Series products," (Dckt. #297 at 15), does not serve as a basis to further delay the twice-ordered source code. Not only is there no such motion on file – now, over three months later – but even if such a motion had been filed, this Court would be highly unlikely to exercise its discretion to grant a stay of H-Series discovery pending the motion's resolution in this 2017 case. *Cent. States, Se. & Sw. Areas Pension Fund v. Waste Mgmt. of Michigan, Inc.*, 674 F.3d 630, 636 (7th Cir. 2012) (noting that "district courts enjoy broad discretion in controlling discovery.").

Second, Hytera's subsequent production of technical documents related to the H-Series products does not excuse it from producing the source code. Not only does Motorola dispute that Hytera has produced responsive H-Series technical documents, (*see* Dckt. # 304 at 11, n.4), but this Court's orders permitting H-Series discovery did not include a permissive option for Hytera to pick and choose between one category of H-Series discovery or the other. Instead, this Court ordered sequenced H-Series discovery to include documents, source code, *and* depositions. (Dckt. #289 & #291). Similarly, Hytera's offer to permit an inspection of the radio itself does not moot this Court's ruling that the H-Series source code is discoverable in this matter, which – following the District Court Judge's recent order overruling Hytera's objections – undoubtedly includes the H-Series products. (Dckt. #309 (overruling Hytera's objections to this Court's order allowing Motorola to amend its infringement contentions to include the H-Series and to take discovery related thereto)).

Finally, Hytera's representation that there is no functional difference between its i-Series products – for which it previously produced the source code – and its H-Series products is an insufficient basis to withhold the H-Series code. Not only did Hytera previously refuse to make

MSA0839

such a representation, (*see* Dckt. #254 at 6), but Motorola should not be forced to simply rely on Hytera's representations regarding the functionality of the H-Series. And in fact, Hytera's prior production of the i-Series source code – without objection – and its recent offer to produce the H-Series code in *China* with certain parameters, (*see* Dckt. #315-4),[6] further undermine its effort to now deem irrelevant the H-Series source code – which Hytera now asserts is functionally equivalent to the previously produced i-Series code.

In sum: having already ruled that the H-Series source code is relevant, it is not for Hytera to now serve as the arbiter as to just *how* relevant the source code is. The source code is important to this litigation, and this factor weighs in favor of production. *See Inventus*, 339 F.R.D. at 501; *Richmark Corp. v. Timber Falling Consultants*, 959 F.2d 1468, 1475 (9th Cir. 1992) ("Where the evidence is directly relevant . . . we have found this factor to weigh in favor of disclosure.") (internal quotation and citation omitted).

### 2. The degree of specificity of the request

Contrary to Hytera's unsupported assertion otherwise, the specificity of Motorola's request is undeniable.[7] Because the request for source code at issue is limited to the H-Series products – now plainly at issue in this litigation – this factor favors production of the code. *Inventus*, 339 F.R.D. at 502; *Trueposition, Inc. v. LM Ericsson Tel. Co.*, No. CIV.A. 11-4574,

---

[6] In particular, Hytera offered to make the H-series source code available for review in China by an expert with Chinese citizenship so long as the review followed Chinese data export laws. (Dckt. #315-4 at 2). Motorola rejected this proposal on the grounds that it is "fundamentally unworkable" and "unduly prejudice to Motorola." (Dckt. #320 at 9-10). Furthermore, as Motorola notes, this Court rejected the *Inventus* defendant's analogous proposal to have its source code reviewed in China as opposed to in the United States as the plaintiff sought. *See Inventus Power, Inc. v. Shenzhen Ace Battery Co.*, No. 20-cv-3375 (N.D.Ill.) (2/17/22 hearing transcript) (Dckt. #259 at 15-19).

[7] Although in its objections before the District Court Judge, Hytera argued that the source code should be "narrowly tailored to the modules that are truly relevant to the accused features' functionality," (Dckt. #276 at 16), it did not further elaborate on that position here and – more importantly – the District Court Judge has since overruled Hytera's objections, (Dckt. #309).

MSA0840

2012 WL 707012, at *5 (E.D.Pa. Mar. 6, 2012) ("The discovery requests are specific and adequately tailored to the jurisdictional issue at hand.").

### 3. Whether the information originated in the United States

Hytera maintains that the "source code was created in China and is securely stored in China," which weighs in its favor. In response, Motorola does not concede this factor, instead arguing that the code *could* have originated elsewhere to the extent it is based on *Motorola's* code. Nonetheless, to the extent that the source code for the H-Series products – infringing or not – was created in and is currently maintained in China (hence the instant dispute), this factor weighs slightly against production of the code. *See Inventus*, 339 F.R.D. at 502.

### 4. The availability of alternative means of securing the information

As the Court explained in *Inventus*, under this factor "if the information sought can easily be obtained elsewhere, there is little or no reason to require a party to violate foreign law." *Inventus*, 339 F.R.D. at 502 (citing *Milliken & Co. v. Bank of China*, 758 F.Supp.2d 238, 247 (S.D.N.Y. 2010)). "Conversely, if the information cannot be easily obtained through alternative means, this factor is said to counterbalance the previous factor – the location of the documents and information – and weighs in favor of disclosure." *Inventus*, 339 F.R.D. at 502 (internal quotations and citation omitted).

Here, Hytera again argues that it should not be required to produce the code because Motorola can obtain the same information through the previously produced technical documents and source code for the i-Series products. For the same reasons as described above, *supra* at Section II(C)(1), the Court rejects this rationale. To reiterate, not only is it still in dispute whether all of the responsive documents have been produced, but the Court has already determined that the appropriate scope of H-Series discovery includes the source code, which is

13

solely in Hytera's possession.  As there is no alternative means to obtain the source code, this factor weighs in Motorola's favor.

**5.      The extent to which noncompliance with the request would undermine important interests of the United States, or compliance with the request would undermine the important interests of the state where the information is located. !**

The last factor – the balancing of the national interests of the United States and China – "is the most important, as it directly addresses the relations between sovereign nations." *Inventus*, 339 F.R.D at 504, *quoting Wultz*, 910 F.Supp.2d at 558 (citation omitted).  When examining this factor, courts should engage in a "particularized analysis of the respective interests of the foreign nation and the requesting nation."  *Inventus*, 339 F.R.D at 504, *quoting Nike, Inc. v. Wu*, 349 F.Supp.3d 310, 335 (S.D.N.Y. Sept. 25, 2018), *aff'd*, 349 F.Supp.3d 346 (S.D.N.Y. 2018).  Doing so here clearly tips this factor in Motorola's favor, despite Hytera's attempt to otherwise distinguish the Chinese interests at issue.

First, the Court's reasoning in *Inventus* applies firmly to this case, which, like *Inventus*, involves the United States, China, and the protection of intellectual property.  As the Court explained in *Inventus,* the United States "has a substantial interest in vindicating the rights of American plaintiffs," "an overriding interest in the just, speedy, and inexpensive determination of litigation in its courts," an "obvious interest in having its own procedural rules applied to discovery," and a "significant interest in protecting its own trade secrets and intellectual property."  *Inventus*, 339 F.R.D. at 504 (internal quotations and citations omitted).  On the other hand, China "has a significant national interest in ensuring that its citizens abide by its laws."  *Id*.

Upon balance of these interests, as in *Inventus*, this factor weighs in Motorola's favor. First, the United States's interest in protecting its intellectual property outweighs China's interest

MSA0842

in preventing its corporations from violating its data security laws. Indeed, as a court in this District recently elaborated, at least with respect to Article 36 of the DSL:

> Defendants' "understanding" of the DSL would give the Chinese Supreme People's Court broad power to delay or prevent discovery in American courts. Such an interpretation would in essence permit the Chinese judiciary to oversee discovery decisions made by American courts regarding the responsibilities of Chinese litigants. The DSL therefore would not represent a Chinese sovereign interest in the nondisclosure of specific material, but rather an attempt to insert a Chinese court into the American legal process for the potential benefit of Chinese litigants. Not only would such a law infringe upon the sovereignty of the United States, see U.S. CONST. art. III; 28 U.S.C. § 1331, but it would also severely disadvantage parties opposing Chinese litigants in American courts. As a result, the United States has a strong interest in not limiting discovery because of the DSL.

*Philips*, 2022 WL 602485, at *6.

Moreover, Hytera's attempt to distinguish this matter from *Inventus* because the source code here includes technology also used in critical infrastructure in China – thus implicating national security concerns – is not persuasive on the record before the Court for two reasons. First, Hytera has previously produced the i-Series source code, which – *by its own representation* – is functionally equivalent to the H-Series code. Consequently, it is difficult to understand how Hytera's production of the H-Series source code will pose a different risk – let alone, a greater risk – to China's national security than has already been created by Hytera's production of the i-Series source code. Second, Hytera's offer to voluntarily produce the H-series source code for inspection, albeit in China, (*supra*, at n.6), further belies Hytera's contention that allowing Motorola to access the code will damage China's national security.

### 6.      Two additional factors regularly considered in other Circuits

As the parties acknowledge, courts – including this one – also consider two additional factors: namely, the hardship of compliance on the party or witness from whom discovery is sought; and the good faith of the party resisting discovery. *Inventus*, 339 F.R.D. at 505; *Laydon*,

MSA0843

183 F.Supp.3d at 419-20; *Sun Grp.*, 2019 WL 6134958, at \*4.  These factors also weigh against Hytera's position.

With respect to the hardship of compliance "this factor is concerned primarily with any sanctions or criminal penalties a foreign defendant may suffer in its own country for complying with a discovery request in a United States court." *Inventus*, 339 F.R.D. at 505.  Here, Hytera cites to China's recent $1.2 billion sanction on ride share company Didi for violation of Chinese data security laws and implies that it too could face steep sanctions.  However, by its own admission, the Chinese laws used to sanction Didi "are *not* the same as those at issue here." (Dckt. #297 at 18 (emphasis added)).  Furthermore, Hytera has not provided any evidence of a Chinese individual or company being penalized for the production of documents or data for use in discovery in U.S. litigation.  *See Inventus*, 339 F.R.D. at 505.

As for Hytera's "good faith," it is notable that Hytera waited until the eleventh hour to first raise *any* concern regarding the application of Chinese data security laws.  Indeed, despite having applied for permission from the Chinese authorities on May 31, 2023 (two months after the Court first ordered production of the code), Hytera informed Motorola on June 2 that the code would be produced in Cleveland by the June 7 deadline.  In doing so, Hytera made *no* mention of its pending request for permission from the Chinese government.  Instead, Hytera waited until the deadline itself to first raise this issue with Hytera and the Court.  At a minimum, Hytera's inexplicable delay in raising what it now asserts is an impenetrable barrier to producing the H-Series source code in the United States tilts this final factor in Motorola's favor.

In sum:  upon review of all of the factors, only one of which weighs in Hytera's favor, the Court will adhere to its prior ruling in *Inventus* and it finds, over Hytera's objections, that the

16

Federal Rules of Civil Procedure require Hytera to produce the H-Series source code to Motorola in the United States.

## CONCLUSION

For the foregoing reasons, Hytera's motion for extension of time to produce H-Series source code, (Dckt. #295), is denied. Hytera is directed to make the H-Series source code available for Motorola's review in the United States for a six-week period beginning on September 26, 2023. The Court expects that the parties will meet and confer regarding the location and logistics of the source code production and review. By October 12, 2023, the parties shall file a joint status report confirming that Hytera has made the source code available for review and proposing an agreed deadline for the completion of the remaining H-Series discovery.

**DATE: September 12, 2023**

**Jeffrey I. Cummings**
**United States Magistrate Judge**

17

MSA0845

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| MOTOROLA SOLUTIONS, INC., | ) | Civil Action No. 1:17-cv-01972 |
| | ) | |
| Plaintiff | ) | Hon. District Judge Franklin U. Valderrama |
| | ) | |
| v. | ) | |
| | ) | Hon. Magistrate Judge Jeannice W. Appenteng |
| HYTERA COMMUNICATIONS | ) | |
| CORPORATION LTD. | ) | |
| | ) | **PUBLIC – REDACTED VERSION** |
| | ) | |
| Defendant | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |

**<u>MOTOROLA'S MEMORANDUM IN SUPPORT OF MOTION TO HOLD HYTERA IN
CONTEMPT FOR VIOLATING ORDER TO PRODUCE SOURCE CODE</u>**

MSA0846

## <u>TABLE OF CONTENTS</u>

**Page**

I.     INTRODUCTION ...................................................................................................1

II.    FACTUAL BACKGROUND..................................................................................3

     A.    Hytera's Repeated Attempts to Avoid Producing H-Series Source Code ..............4

     B.    Hytera's Grossly Deficient Production of Source Code .........................................6

III.   HYTERA SHOULD BE HELD IN CONTEMPT.............................................................7

     A.    The Court's Commands to Produce the H-Series Code Were
             Unambiguous ...................................................................................................8

     B.    Hytera Violated the Court's Orders and Those Violations Are Significant ...........9

     C.    Hytera Failed to Make Any Reasonable or Diligent Effort to Comply .................13

IV.   A WORLDWIDE INJUNCTION IS NECESSARY TO COERCE
      COMPLIANCE..................................................................................................14

V.    CONCLUSION..................................................................................................15

MSA0847

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Brocade Commc'ns Sys., Inc. v. A10 Networks, Inc.*,
  No. 10-CV-03428-LHK, 2011 WL 13397353 (N.D. Cal. Sept. 6, 2011)...............................12

*e360 Insight, Inc. v. Spamhaus Project*,
  658 F.3d 637 (7th Cir. 2011) ..............................................................................................7

*eBay Inc. v. MercExchange, L.L.C.*,
  547 U.S. 388 (2006).............................................................................................................14

*Motorola Sols., Inc. v. Hytera Commc'ns Corp. Ltd.*,
  2023 WL 5509321 (N.D. Ill. Aug. 26, 2023) .......................................................................8

*Nat'l Lab. Rels. Bd. v. Neises Constr. Corp.*,
  62 F.4th 1040 (7th Cir. 2023) ............................................................................................15

*Radio One, Inc. v. Direct Media Power, Inc.*,
  No. 16 C 1867, 2018 WL 4685470 (N.D. Ill. Sept. 28, 2018)..........................................10, 14

*U.S. S.E.C. v. Hyatt*,
  621 F.3d 687 (7th Cir. 2010) ...............................................................................................8

*U.S. v. Melgar*,
  227 F.3d 1038 (7th Cir. 2000) .............................................................................................9

*United States v. Funds in the Amount of $574,840*,
  109 F. Supp. 3d 1043 (N.D. Ill. 2015) ..............................................................................9, 10

*Wachovia Sec., LLC v. Nola*,
  LLC, No. 05 C 7213 2008 WL 4866333 (N.D. Ill. June 5, 2008).........................................14

**Rules**

Fed. R. Civ. P. 37(b)(2)(A) ........................................................................................................8

MSA0848

## I.     INTRODUCTION

Plaintiff Motorola respectfully moves the Court for an order (1) holding defendant Hytera in contempt for its ongoing violations of the Court's January 5, March 29, and September 12, 2023 orders compelling it to produce the source code for its H-Series products accused of patent infringement in this case and (2) as a sanction for its contempt, enjoining Hytera from selling any two-way radio equipment worldwide, unless and until Hytera complies with its court-ordered obligation to produce the source code, along with other appropriate relief.  Hytera's longstanding failure to comply with the Court's orders regarding its H-Series source code production reflects its ongoing blatant disregard of its discovery obligations and wholesale disrespect for the Court's orders.  It has been over two years since Hytera introduced its H-Series products in the U.S., and over a year since Judge Cummings first ordered Hytera to produce its H-Series source code—an order that was followed by two others making it crystal clear that the H-Series source code must be produced.  Yet, Hytera simply will not comply, such that only severe contempt sanctions will be sufficient—a fact Judge Pacold recognized when she recently held Hytera in contempt and ordered a worldwide injunction on Hytera's sales for its refusal to comply with an order in the co-pending trade secret case between the parties.  Ex. 1 (Dkt. 1461, No. 17-cv-01973).

This patent infringement case, in which Motorola accuses Hytera of infringing seven United States patents through sales and other activities related to its two-way radio products, was filed over six years ago.  And while nearly all of fact discovery has been completed for some time, one aspect of fact discovery that remains open is Hytera's production of source code and documents relating to its "H-series" product line, which it launched while this litigation was pending, approximately two years ago.  The H-series is critically important to Motorola's claims in this case:  Hytera uses its H-Series products to directly compete against Motorola, taking Motorola's customers away.  It is also important to the progress of this matter:  Hytera's refusal to

produce H-Series source code has prevented the case from moving past fact discovery for the last *two years* while Hytera continues to sell competing, infringing products, severely prejudicing Motorola. In addition to a delay strategy, this is also severely impactful on the merits, as Hytera purports to be replacing its other product lines with its H-series products.

Now, after having been ordered to produce its H-Series source code no less than *three separate times,* Hytera still will not comply. Dkt. 324 at 10 (9/12/23 Order compelling Hytera to produce its H-Series source code stating "***this Court has now twice directed Hytera to produce the H-Series source code***"). Specifically, as an act of overt defiance—and a mockery of the substantial efforts invested in this issue by Judge Cummings, the Court generally, and Motorola— Hytera produced less than *30 files* for each of two versions of the H-Series source code, out of ***thousands of source code files it authored*** that make up the H-Series code for each version, in addition to a handful of third-party open source code files. This is a knowing violation of the Court's orders: Hytera was to produce its H-Series source code—not 30 Hytera files out of thousands—just as it has for prior versions of its products in connection with this case and a previously pending patent infringement case before the International Trade Commission ("ITC"). Dkt. 324 at 12 (9/12/23 Order finding the specificity of Motorola's request for the entirety of the source code "undeniable" because it was "limited to the H-Series products"). While Hytera may wish to take another run at avoiding its discovery obligations and further delaying these proceedings by narrowing what it must produce, as Judge Cummings found in the September 12 Order, Hytera's objections to the scope of source code for production were already overruled:

> Although in its objections before the District Court Judge, Hytera argued that the source code should be "narrowly tailored to the modules that are truly relevant to the accused features' functionality," (Dkt. 276 at 16), it did not further elaborate on that position here and–more importantly–***the District Court Judge has since overruled Hytera's objections, (Dkt. 309).***

MSA0850

Dkt. 324 at 12 n.7;[1] *see also* Dkt. 309 at 3-4 n.2.  And even if production of only some of the code involved in carrying out the accused functionality would be sufficient to comply, Hytera has not come close to good-faith compliance: as evidenced by Hytera's code production for its earlier generations of products, which Hytera produced in its entirety, the accused functionality in this case implicates substantial portions of Hytera's source code, including header and library files necessary to understand the rest of the code.  Yet Hytera refuses to produce those files, even though it had no problem doing that before.  At bottom, Hytera has no good-faith justification for refusing to produce the H-series source code in its entirety, and has provided no assurances that it will actually comply in good faith without further, lengthy, and expensive proceedings geared to taking advantage of the Court's busy docket, exhausting the Court's resources, and evading its Court-ordered obligations.  As Hytera has repeatedly confirmed, only severe contempt sanctions will secure Hytera's compliance.  Indeed, in the co-pending trade secret case, after over a year of recalcitrance and dozens of briefs, expert declarations, and other filings in which Hytera adamantly insisted in could not comply with the court's order and raised new argument after new argument, Hytera immediately complied with the court's order after Judge Pacold held Hytera in contempt and issued a worldwide injunction as a contempt sanction.  Ex. 1.  Similar relief is needed here, to enforce this Court's orders, allow this case to move forward, and halt Hytera's continued sale of infringing H-Series products throughout the U.S. while causing irreparable harm to Motorola.

## II.     FACTUAL BACKGROUND

Motorola filed this case against Hytera more than six years ago on March 14, 2017, accusing Hytera of infringing seven patents directed to communication and audio technologies used in its two-way radios using the Digital Mobile Radio ("DMR") standard.  Dkt. 1.  On March

---

[1] Emphases supplied except where noted otherwise.

MSA0851

29, 2017, Motorola filed a parallel complaint at the ITC asserting the same patents against Hytera. After the ITC instituted an investigation (Inv. No. 337-TA-1053), the Court stayed this case pending the resolution of that ITC investigation. Dkts. 32–35. Motorola withdrew three patents (the '972, '169, and '111 Patents) from consideration by the ITC purely to streamline the proceedings before trial. Following trial, the ITC ruled that Hytera infringed the remaining four patents (the '869, '701, '991, and '284 Patents), found they are all valid, and issued exclusion and cease and desist orders against Hytera's infringement of three patents (the '869, '701, and '991 Patents), blocking importation of the infringing Hytera DMR radios into the U.S. The ITC ALJ also found that Hytera had intentionally copied Motorola's patented technologies. Ex. 2 (ITC ID) at 204-205 (Hytera "wrongfully copied certain of Motorola's patented technologies."). After expiration of the appeal period during which neither party appealed, in February 2019, this case resumed and proceeded to fact discovery.

Contemporaneously with the filing of this case, Motorola sued Hytera in this District for misappropriation of trade secrets and source code copyright infringement. In February 2020, a U.S. jury found that Hytera's theft was willful and malicious—findings confirmed in post-trial orders. Hytera has only appealed damages issues; all liability findings will remain undisturbed. Ex. 3 (12/14/23 7th Cir. Hr'g Tr. at 15:24-16:9, No. 22-2370 and 22-2413).

**A.      Hytera's Repeated Attempts to Avoid Producing H-Series Source Code**

During fact discovery in this case—after the ITC found that Hytera had copied Motorola's patented technology—Hytera introduced the H-Series in the United States in October 2021[2] to continue competing against Motorola and taking away Motorola's customers through, Motorola

---

[2] The H-Series is not Hytera's first alleged redesign: at trial in the trade secret case, Hytera asserted that it redesigned its products in its "i-Series" products to avoid Motorola's intellectual property. Based on extensive evidence, the jury rejected Hytera's contentions. Dkt. 898, No. 17-cv-01973.

MSA0852

suspects, Hytera's ongoing use of Motorola's intellectual property. But tellingly, Hytera has steadfastly resisted providing the most key discovery concerning its H-Series—its source code— which has frustrated Motorola's efforts to stop Hytera's infringement, and entirely stalled this case.

The history of Motorola's (and the Court's) efforts to compel Hytera to produce its H-Series source code are lengthy. When Hytera launched the H-Series in the United States in late 2021, Hytera both refused to agree (1) that the H-Series could be added to this case as an accused product; and (2) that Hytera would provide any discovery on it. Motorola therefore had to resort to motion to practice to add the H-Series to this case and obtain discovery about those products. Dkt. 254 at 2; Dkt. 246 at 3–4. Over a year ago now, on January 5, 2023, Magistrate Judge Cummings (now District Judge Cummings) granted Motorola's motion and ordered H-series discovery, including "***the source code*** for the soon-to-be-accused H-Series products." Dkt. 275 ("January 5 Order"). While that should have ended the dispute, Hytera flatly refused to produce any H-series source code despite the Court's clear order, taking the position that it need not comply before exhausting its objections to the January 5 Order. Dkts. 276, 278. On March 29, 2023, Judge Cummings rejected Hytera's attempt to defer compliance with the January 5 Order, and for a ***second time,*** ordered that "Hytera shall make its source code [for its H-Series DMR radios] available by 6/7/23 for six weeks (through 7/19/23)." Dkt. 291. But Hytera was still unphased by that direct order. Although Hytera represented to the Court in a joint status report filed on May 10, 2023 that "beginning on June 7, 2023, Hytera will make the source code related to the accused features on the H-Series products available for review….," Dkt. 293 at 1, on the day it was to make the H-Series source code available, Hytera reversed course and informed Motorola for the first time that it would not provide its code due to a purported pending "cybersecurity/data security review by Chinese government authorities." Dkt. 298 at 4. Hytera filed a motion after business

5

hours on June 7 to extend the Court-ordered June 7 deadline, stating that it "will be unable to meet the June 7 start date due to a lack of authorization from the government of the People's Republic of China in view of a pending security assessment." Dkt. 295 at 1. Judge Cumming subsequently ordered a full briefing on the Hytera motion, which once fully presented, addressed Hytera's request that the Court allow the Chinese authorities to decide whether Hytera should produce its source code, instead of the judges of this District. Dkts. 295, 297, 298, 303.

Meanwhile, Judge Valderrama ruled on Hytera's objections in which, in addition to arguing that no source code should be produced at all, Hytera contended that, if a code production is ordered, it "[should] be narrowly tailored to the modules that are truly relevant to the accused features' functionality, as opposed to a review of the entire source code database, and limited to use in this case as opposed to the Trade Secret Case." Dkt. 276 at 13. On July 18, 2023, Judge Valderrama overruled Hytera's objections in full (Dkt. 309) and declined to order that the source code discovery be "narrowly tailor[ed]" to limited modules (*id.* at 4 n.2). Then, in a highly detailed opinion addressing the numerous international law and comity issues raised by Hytera in backtracking on its promise to produce source code by June 7, 2023, Judge Cummings overruled Hytera's additional objections on September 12, 2023 and ***once again***—for a third time—ordered Hytera to make the H-Series source code available. Dkt. 323; Dkt. 324 at 10 (stating that "this Court has now *twice* directed Hytera to produce the H-Series source code…"). Judge Cummings also noted that the "District Court Judge has since overruled Hytera's objections…." *Id.* at 12 n.7.

### B. Hytera's Grossly Deficient Production of Source Code

On September 26, 2023, Hytera finally purported to produce H-Series source code for review on computers at its U.S. counsel's office. But when Motorola's experts attempted to review Hytera's H-Series source code, they found that Hytera had produced only 17 source code files for each of the two versions of the H-Series code, out of thousands of files for that code. Dkt. 339 at

6

1–2; Dkt. 339-1 at 5. Motorola informed Hytera that this production was deficient and violated Judge Cummings' orders, which require production of the complete H-Series source code. Dkt. 339-1 at 5. Motorola explained, *inter alia*, that Hytera was not entitled to withhold source code because its objections had been overruled by the District Judge Valderrama, and at minimum Hytera failed to produce header and library source code files needed to understand even the 17 files that were produced. *Id*. Hytera initially refused to produce more, stating that the scope of its production is limited to the "H-Series source code involved in carrying out the accused functionality" and that it had already produced what it deemed to be the relevant code. *Id*. at 4.

Even though the Court's orders clearly obligate Hytera to produce the entire H-Series code base, as a compromise, Motorola identified a subset of the code that Hytera could produce to resolve the parties' dispute, including certain specific directories (based on Motorola's knowledge of the code from prior generations). Ex. 5 (10/31/23 Boloori Ltr.). But even then, Hytera only agreed to produce a minuscule subset of those directories (*i.e.*, only the ▮▮▮▮▮▮▮▮ ▮▮▮▮), resulting in production of only an additional 81 files, even though the complete source code has thousands. Dkt. 343-2 (11/9/23 Alexander Ltr.). In confirmation of Hytera's bad faith, even what Hytera did produce is a complete dodge: no less than 70 of the 81 additional files are ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, with no more than 11 additional files that were actually developed by Hytera to implement accused functionalities, for a total production of less than 30 Hytera source code files to date, out of thousands. Ex. 6 ("Nielson Decl.") ¶¶ 22-23, 28. And while Motorola expressed its intent to make this motion, Hytera still has not budged.

## III. HYTERA SHOULD BE HELD IN CONTEMPT

Hytera should be held in contempt for blatantly violating multiple Court orders to produce the entire H-series series source code. *See e360 Insight, Inc. v. Spamhaus Project*, 658 F.3d 637, 642 (7th Cir. 2011) (Rule 37(b)(2)(A) "grants the district courts the power to impose appropriate

7

sanctions for violations of discovery orders"). Each of the four factors for establishing civil contempt are satisfied here: "(1) a court order sets forth an unambiguous command; (2) [Hytera] violated that command; (3) the violation was significant, meaning [Hytera] did not substantially comply with the order; and (4) [Hytera] failed to make a reasonable and diligent effort to comply." *See U.S. S.E.C. v. Hyatt*, 621 F.3d 687, 692 (7th Cir. 2010); *Motorola Sols., Inc. v. Hytera Commc'ns Corp. Ltd.*, 2023 WL 5509321, at *2 (N.D. Ill. Aug. 26, 2023).

### A. The Court's Commands to Produce the H-Series Code Were Unambiguous

Hytera was ordered on *three* separate occasions to produce the H-series source code:

| Court Order | Terms of Order | Hytera's Violation |
|---|---|---|
| **(1)** January 5, 2023 order compelling Hytera to provide H-series source code. Dkt. 275. | "Hytera shall: (1) provide Motorola with **the source code** for the soon-to-be-accused H-Series products." Dkt. 275 at 13. | No code produced. |
| **(2)** March 29, 2023 order directing Hytera to comply with January 5, 2023 order even while Valderrama's ruling on its objection was pending. Dkt. 291. | "As agreed by the parties, Hytera shall make **its source code available** by 6/7/23 for six weeks (through 7/19/23)." Dkt. 291. | No code produced. |
| **(3)** Sept. 12, 2023 order overruling Hytera's Chinese law objections. Dkt. 324. | "Hytera is directed to make **the H-Series source code** available for Motorola's review in the United States for a six-week period beginning on September 26, 2023." Dkt. 324 at 17. | Initially only 17 files out thousands of Hytera H-Series source code files, followed by ███████ ███████. |

None of the three orders above, by their plain terms, permitted Hytera to limit the scope of the H-series source code it was to provide in any way, or to unilaterally decide which portions of its H-series source code should be provided.[3] Nor were any of the orders subsequently vacated or modified, making them the law of the case that must be followed. *See United States v. Funds in*

---

[3] The March 29, 2023 order allowed Hytera to interpose scope objections to Motorola's document requests but **not** to Hytera's source code. Dkt. 291.

MSA0856

*the Amount of $574,840*, 109 F. Supp. 3d 1043, 1047 (N.D. Ill. 2015) (discovery order constituted law of the case that, if not followed, would place claimants at the risk of contempt).

Removing any doubt about the scope of these orders, both Judge Valderrama and Judge Cummings expressly rejected Hytera's belated attempts to limit the scope of what it was required to produce. For example, Hytera waited until after Judge Cummings' January 5, 2023 order (when objecting to that order) to request for the first time that "Motorola's source code review be narrowly tailored to the modules that are truly relevant to the accused features' functionality, as opposed to a review of the entire source code database," Dkt. 276 at 13, confirming that it understood that the order was not so limited.[4] In overruling Hytera's objections, Judge Valderrama rejected Hytera's belated request. Dkt. 309 at 4 n.2 ("***[T]o the extent Hytera asks the Court to narrowly tailor the discovery requests of Motorola relating to the H-Series through its Objections***, the Court declines to interfere with discovery management which has been referred to Judge Cummings, and which ***is not a proper subject of the Objections to the Order***."). Judge Cummings likewise rejected Hytera's attempts to limit the scope of its code production in overruling Hytera's Chinese law objections. Hytera had argued that "Motorola's source code requests for the H-Series were not targeted at all" and that the alleged lack of specificity favored its foreign law comity arguments. Dkt. 297 at 13. Judge Cummings disagreed, stating that "the specificity of Motorola's request is undeniable . . .[b]ecause the request for source code at issue is limited to the H-Series," Dkt. 324 at 12, and expressly noted that Hytera's previous arguments to Judge Valderrama that the production of source code should be "***narrowly tailored***" to only require production of a subset of code modules were already "***overruled***," *id.* n.7.

**B.      Hytera Violated the Court's Orders and Those Violations Are Significant**

---

[4] Hytera's scope arguments are waived. *U.S. v. Melgar*, 227 F.3d 1038, 1040 (7th Cir. 2000) ("[A]rguments not made before a magistrate judge are normally waived.").

9

There is no question the second and third elements of contempt are satisfied: Hytera undisputedly failed to produce its H-series source code, even though it previously produced the whole source code for other products in this litigation, thus clearly violating the Court's orders, and its violation is significant. *Radio One, Inc. v. Direct Media Power, Inc.*, No. 16 C 1867, 2018 WL 4685470, at *9 (N.D. Ill. Sept. 28, 2018) (a violation is significant where the "alleged contemnor did not substantially comply with the order"). Hytera's production of a handful of files does not come close to compliance, let alone allow Motorola to assess the accused H-Series functionalities. To date, for each of the two versions of the H-series products, Hytera has only produced fewer than 30 files of its own creation, which stands in stark contrast to the thousands of files that make up the entire code base. Dkt. 343 at 5, 9; Dkt. 339-1 at 1 ("The H-Series code contains thousands of files…."). The 98 total source code files Hytera has produced for each H-series version do not come close to showing how the accused functionalities operate. ***First***, Hytera's production is missing volumes of code that Motorola already has reason to know is necessary and relevant, such as missing code relating to ████████████████████ ████████ (relevant at least to the '991 Patent), and ████████████████ (key to the '284 Patent). Nielson Decl. ¶¶ 25-27, 33, 38, 40, 42. There is also code missing for the ████████████████████████████████████ ████████████████████████ (relevant to at least the '869 and '284 Patents). *Id.* ¶¶ 42-49 (also addressing missing code for functions relating to the asserted '169, '701, and '972 Patents).

***Second***, Hytera has not produced entire directories of highly relevant source code, such as the source code in the radios' protocol stacks or physical layers, which is necessary for Motorola to understand how the accused radios perform basic functions relevant to the asserted patent

10

claims, such as facilitating communications between repeaters and radios (at least the '284, '701, and the '169 Patents cover features of repeaters), and how the radios perform relevant functions related to synchronization, timeslot, channel operations, transmissions, receptions, radio frequency control, and radio applications (at least the '869, '991, and '972 Patents cover features of radios). *Id.* ¶¶ 23, 25-30; Dkt. 342 at 5-7. **Third,** Hytera has failed to produce the H-Series "header files." Nielson Decl. ¶ 31. These files are variously incorporated by reference into essentially all of the other individual source code files, which list header files at the top of that source code file, and are executed as part of that source code file. As such, the header files are crucial for understanding how the remaining source code files operate, what data structures they use and how those data structures are defined, and what additional source code makes use of the data structures and functions defined in the missing header files. *Id.* ¶¶ 31-34. For example, without the header files, it is impossible to discern how Hytera's radios operate through ████████████████████████ ████████████████████████████████████. *Id.* ¶ 33. Also, the criticality of the header files can be seen even in the limited files Hytera has produced so far. For instance, Hytera produced the source code file named ████████████████████ That file incorporates by reference at least one header file that ████████████████████ ████████████████████████████████████ *Id.* ¶ 33. That ████ ████████████████████████████ Pseudo trunking—a feature accused under the '284 and '991 Patents. Without the header files, Motorola also cannot determine which mode the radios are operating under (*e.g.,* ████████████████████████ ████████), which functions are enabled or disabled, and which accused features are turned on or off. *Id.* ¶¶ 3, 31-33. **Fourth,** Hytera also refuses to produce any library files—common functions which, like header files, are incorporated by reference across the source code as a

11

MSA0859

whole—which themselves implement functions related to the patented features and are critical to understanding how those features operate. *Id.* ¶ 35. These library files include the ███████ ████████████████████████████████████████████████████████ (which are parts of functionalities accused under the '991 and '284 Patents), and the ████████████ ████████████████████████████████████████████████████████ (accused under the '869, '284, and '972 Patents), among others. *Id.* ¶¶ 33, 35, 42, 46.

*Fifth*, the produced H-Series files contain indications they were created for litigation and may not even be used in actual products: (1) the H-Series code ████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ███████████████████████████████; (2) the files include ███████████████████ ████████████████████████████████; and (3) the lack of header files renders it impossible to ascertain what mode the code operates under, such that the code could be a special mode just for litigation and not for actual use. *Id.* ¶ 38. Due to these deficiencies, Hytera's production also thus lacks information to let Motorola ascertain whether the produced code is used in products sold in the U.S. (or if the code was created only for litigation purposes). At bottom, Hytera's violations deprive Motorola of any real ability to assess Hytera's infringement with reference to its H-Series source code, and as such are highly significant. *See, e.g.*, *Brocade Commc'ns Sys., Inc. v. A10 Networks, Inc.*, No. 10-CV-03428-LHK, 2011 WL 13397353, at *3 (N.D. Cal. Sept. 6, 2011) ("A10's claim that it has produced **some** of its code is not sufficient to establish that it has substantially complied with the Court's order in light of the purpose for which Brocade requests the source code," i.e., "in order to evaluate its claims.") (emphasis in original).

**C.** **Hytera Failed to Make Any Reasonable or Diligent Effort to Comply**

With respect to the fourth contempt factor, there is no question Hytera has failed to make any reasonable or diligent attempt to comply. Hytera outright refused to produce any code in response to the Court's January 5 and March 29, 2023 Orders. § III.A. (summary chart), *supra*. Instead, in each instance, it filed more motions, all of which were rejected. Specifically, after Judge Cummings' January 5 order compelling Hytera to produce the H-Series code, Hytera refused to comply pending its objections. Dkts. 275, 278. And when Judge Cummings ordered Hytera to do so a second time, by June 7, 2023 (Dkt. 291), Hytera attempted another round of non-compliance ***on the day its code production was due*** by demanding that the Court allow Chinese authorities to decide what could be produced. Dkts. 291, 295. As Judge Cummings recognized in his September 12, 2023 Order, Hytera had never raised this objection in its prior motions, and waited until the "eleventh hour" to raise at that time, despite having known about its obligation to produce the H-series source code for over six months. *See* Dkt. 324 at 16.

When Hytera's Chinese law motion was denied and its new September 26, 2023 deadline arrived, it made a production of only 17 source code files, making a mockery of the Court's orders and a clear statement by Hytera that it will not comply with the Court's orders unless held in contempt and subjected to severe sanctions. § III.B., *supra*. And even if production of a subset of Hytera's code is sufficient, Hytera has not come close to good faith compliance. As evidenced by Hytera's code for its earlier generations of products, which Hytera ***did*** produce in its entirety, the accused functionality in this case implicates at least substantial portions of Hytera's source code, including its source code's header and library files, which are necessary to understand the rest of the code. None of those files were produced, and Hytera is still refusing to produce those clearly relevant files and many others identified by Motorola that are necessary for Motorola to understand the innerworkings of the accused technologies beyond the additional ▮▮▮▮▮▮▮▮▮ files

13

that shed no light on Hytera's specific implementation. While Hytera has not articulated a legitimate objection to producing its entire code here, any such objection would be unsupportable, as Hytera ***did*** produce the entire code for earlier accused products without objections.

## IV. A WORLDWIDE INJUNCTION IS NECESSARY TO COERCE COMPLIANCE

Hytera's willful violation of this Court's orders makes a finding of contempt and imposition of contempt sanctions necessary and appropriate.[5] The only contempt sanctions sufficient to coerce Hytera to do so involve enjoining Hytera from selling two-way radio equipment worldwide until it complies. As Judge Pacold recognized in holding Hytera in contempt for failing to pay past-due royalties, "fines or other monetary sanctions would be ineffective. Thus, to coerce compliance with the royalty order, the appropriate course is to enjoin Hytera from selling any products containing two-way radio technology anywhere in the world until its obligations under the royalty order are satisfied." Ex. 1 (Dkt. 1461 at 1, No. 17-cv-01973). Once Judge Pacold indicated that she would enjoin Hytera from selling such products, despite having claimed it could not pay the money into escrow for well over a year, Hytera was suddenly able to make the payment in less than a week, *before* the injunction even went into effect. *Id.*, Ex. 4 (Dkt. 1463, No. 17-cv-01973). An injunction would be similarly effective here.

All four elements that courts consider in issuing an injunction are satisfied here.[6] ***First***, this case has been pending since 2017, while Hytera continues to sell competitive products that

---

[5] *Wachovia Sec., LLC v. Nola*, LLC, No. 05 C 7213 2008 WL 4866333, at *3 (N.D. Ill. June 5, 2008) (courts have "broad discretion to fashion an appropriate coercive remedy in a case of civil contempt, based on the nature of the harm and the probable effect of alternative sanctions"); *Radio One, Inc.*, 2018 WL 4685470, at *9 ("Coercive sanctions, which are really the essence of civil contempt, seek to induce future behavior by attempting to coerce a recalcitrant party or witness to comply with an express directive from the court.").

[6] Ex. 1 (Dkt. 1461 at 17-18, No. 17-cv-01973) ("To obtain an injunction, the movant must show that (1) it has suffered an irreparable injury; (2) legal remedies are inadequate to compensate that injury; (3) the balance of hardships favors the movant; and (4) an injunction would not disserve the public interest. *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006).").

MSA0862

incorporate Motorola's technology and allow Hytera to steal Motorola's customers, causing Motorola permanent business harm. As Judge Cummings recognized in overruling Hytera's Chinese law objections, the H-series "source code is important to this litigation," "there is no alternative means to obtain" it, and the U.S. has a significant "interest in protecting its intellectual property." Dkt. 324 at 12, 14. Without this discovery, Motorola will be severely prejudiced in vindicating its rights. **Second**, Motorola has no other adequate remedy at law. Hytera will continue taking Motorola's customers away with long term contracts for its devices, irreparably depriving Motorola of market share. As Judge Pacold recognized, monetary sanctions will not coerce Hytera to comply. Ex. 1 (Dkt. 1461 at 18, No. 17-cv-01973). **Third**, the balance of hardships favors Motorola, which is severely prejudiced without compliance with this order. By contrast, as Judge Pacold recognized, any of the harm to Hytera from an injunction is mitigated by the fact that it can have it "lifted" at "any time by complying" with the order. *Id.* This is particularly true here, where it only need produce its H-Series source code. **Fourth**, "[t]he public interest would not be disserved by an injunction" because "there is significant supply for two-way radio technology in the market such that Hytera being forced to cease its sales will not disrupt any customers whose operations serve the public." *Id.* at 18-19. Finally, Motorola respectfully requests that Hytera reimburse Motorola's attorneys' fees and costs that it has been forced to incur to bring this motion. *Nat'l Lab. Rels. Bd. v. Neises Constr. Corp.*, 62 F.4th 1040, 1057-58 (7th Cir. 2023) ("[Attorneys'] fees are regularly awarded in contempt cases" and "are not duplicative of the contempt penalty."). That is a small additional price to pay given the lengthy and expensive proceedings Hytera has forced Motorola to pursue to obtain routine technical discovery.

## V.     CONCLUSION

For the foregoing reasons, Hytera should be held in contempt, enjoined from selling two-way radios worldwide until it complies, and should reimburse Motorola's attorneys' fees.

MSA0863

DATED: January 16, 2024

Respectfully submitted,

*/s/ Adam Alper*

Adam Alper (admitted *pro hac vice*)
adam.alper@kirkland.com
Akshay S. Deoras (admitted *pro hac vice*)
akshay.deoras@kirkland.com
Brandon H. Brown (IL Bar No. 266347 CA)
brandon.brown@kirkland.com
KIRKLAND & ELLIS LLP
555 California Street
San Francisco, CA 94104
Telephone: (415) 439-1400
Facsimile: (415) 439-1500

Michael De Vries (admitted *pro hac vice*)
michael.devries@kirkland.com
Christopher M. Lawless (admitted *pro hac vice)*
christopher.lawless@kirkland.com
Jiaxiao Zhang (admitted *pro hac vice)*
jiaxiao.zhang@kirkland.com
Ingrid Petersen (admitted *pro hac vice*)
ingrid.petersen@kirkland.com
KIRKLAND & ELLIS LLP
555 South Flower Street
Los Angeles, CA 90071
Telephone: (213) 680-8400
Facsimile: (213) 680-8500

Ali-Reza Boloori (admitted *pro hac vice*)
ali-reza.boloori@kirkland.com
KIRKLAND & ELLIS LLP
2049 Century Park East, Suite 3700
Los Angeles, CA 90067
Telephone: (310) 552-4200
Facsimile: (310) 552-5900

David Rokach (IL Bar No. 6279703)
david.rokach@kirkland.com
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, IL 60654

16

Facsimile: (312) 862-2200

Joshua L. Simmons (admitted *pro hac vice*)
joshua.simmons@kirkland.com
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY 10022-4611
Telephone: (212) 446-4800
Facsimile: (212) 446-4900

*Attorneys for Plaintiff*
Motorola Solutions, Inc.

17

MSA0865

## CERTIFICATE OF SERVICE

I, Adam Alper, an attorney, hereby certify that on January 16, 2024, I caused a true and correct copy of the foregoing document to be served via the Court's ECF system upon all counsel of record.

DATED: January 16, 2024

/s/ *Adam Alper*
Adam Alper

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| MOTOROLA SOLUTIONS, INC., and MOTOROLA SOLUTIONS MALAYSIA SDN. BHD., | ) ) ) ) | Civil Action No.: 1:17-cv-01973 |
| Plaintiffs, | ) ) ) | Honorable Martha M. Pacold |
| v. | ) ) | **REDACTED – PUBLIC VERSION** |
| HYTERA COMMUNICATIONS CORPORATION LTD., HYTERA AMERICA, INC., AND HYTERA COMMUNICATIONS AMERICA (WEST), INC., | ) ) ) ) ) ) | |
| Defendants. | ) ) ) ) | |

**PLAINTIFFS' MEMORANDUM IN SUPPORT OF THEIR MOTION TO OPEN CONTEMPT PROCEEDINGS AND ENTER AN ANTI-SUIT INJUNCTION TO PROTECT THIS COURT'S JURISDICTION**

MSA0867

**TABLE OF CONTENTS**

**Page**

I.     INTRODUCTION ...........................................................................................................1

II.    FACTUAL BACKGROUND ..........................................................................................3

      A.    Despite Hytera's Undisputed Guilt, It Continues to Avoid Taking
           Responsibility for Its Unlawful Conduct ..................................................................3

      B.    The Royalty Order and the Court's Enforcement of that Order ..............................3

      C.    Discovery Into Hytera's H-Series in the Patent Case ............................................4

      D.    Hytera Filed an Action in China Seeking Adjudication of Whether Its H-
           Series Products Utilizes the Trade Secrets and Copyrights that Motorola
           Asserted During Trial in This Action ......................................................................4

III.    ARGUMENT ..................................................................................................................5

      A.    The Court Should Initiate Contempt Proceedings and Open Discovery
           Regarding the H-Series Products ............................................................................5

           1.    The H-Series Products Are Within the Purview of the Royalty
                 Order ...........................................................................................................6

           2.    The Evidence Suggests the H-Series Products Are Not More Than
                 Colorably Different from the Adjudicated Products....................................7

      B.    The Court Should Protect Its Jurisdiction By Issuing An Anti-Suit
           Injunction Against Hytera While This Motion Is Pending ....................................12

           1.    The Parties in Both Actions Are the Same ................................................13

           2.    The Issues in Both Actions Are the Same and This Action Is
                 Dispositive of the Foreign Action...............................................................13

           3.    Hytera's Foreign Action Is Oppressive and Vexatious..............................15

           4.    International Comity Concerns Favor Granting the Injunction .................18

           5.    The Chinese Court's April Deadlines for Discovery and a Hearing
                 Make The Need for Relief Immediate ........................................................19

IV.    CONCLUSION.............................................................................................................20

MSA0868

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*1st Source Bank v. Neto*,
 861 F.3d 607 ......................................................................................................12, 13, 20

*Affymax, Inc. v. Johnson &Johnson*,
 420 F.Supp.2d 876 (N. D. Ill. 2006) ...................................................................12, 16

*Allendale Mutual Insurance Co. v. Bull Data Systems, Inc.*,
 10 F.3d 425 (7th Cir. 1993) ..............................................................................16, 18, 19

*Apple Inc. v. Samsung Elecs. Co.*,
 No. 12-CV-00630-LHK, 2018 WL 905943 (N.D. Cal. Feb. 15, 2018)...................................6

*AU New Haven, LLC v. YKK Corp.*,
 No. 15-CV-3411-GHW-SN, 2018 WL 2128373 (S.D.N.Y. May 8, 2018) ......................13, 15

*Bianco v. Globus Med., Inc.*,
 53 F. Supp. 3d 929 (E.D. Tex. 2014)...............................................................6, 7, 14

*Blackberry Ltd. v. Typo Prod. LLC*,
 2014 WL 4136586 (N.D. Cal. Aug. 21, 2014) ...........................................................6

*Cal. Dept. of Soc. Services v. Leavitt*,
 523 F.3d 1025 (9th Cir. 2008) ...................................................................................6

*California Expanded Metal Prod. Co. v. Klein*,
 2020 WL 9182723 (W.D. Wash. Oct. 19, 2020) ....................................................5

*Commercializadora Portimex, S.A. de CV v. Zen-Noh Grain Corp.*,
 373 F. Supp. 2d 645 (E.D. La. 2005).....................................................................16

*Eagle View Techs., Inc. v. Xactware Sols., Inc.*,
 2021 WL 4206291 (D.N.J. Sept. 16, 2021) ......................................................5, 15

*H-D Mich., LLC v. Hellenic Duty Free Shops S.A.*,
 694 F.3d 827 (7th Cir. 2012) ...................................................................................18

*MacNeil Auto. Prod., Ltd. v. Cannon Auto. Ltd.*,
 2013 WL 12155279 (N.D. Ill. Feb. 4, 2013), *aff'd*, 542 F. App'x 515 (7th Cir.
 2013) ..............................................................................................................18, 19

*Microsoft v. Motorola*,
 696 F.3d 872 (9th Cir. 2012) ..............................................................................13, 15

MSA0869

*Motorola Sols., Inc. v. Hytera Commc'ns Corp.*,
365 F. Supp. 3d 916 (N.D. Ill. 2019) .......................................................................13

*Parasoft Corp. v. Parasoft S.A*,
2015 WL 12645754 (C.D. Cal. Feb. 19, 2015)........................................................16

*Proveris Sci. Corp. v. Innovasystems, Inc.*,
739 F.3d 1367 (Fed. Cir. 2014)............................................................................6, 7

*Rosenbloom v. Barclays Bank PLC*,
No. 13-CV-04087, 2014 WL 2726136 (N.D. Ill. June 16, 2014)............................13

*Shure Inc. v. ClearOne, Inc.*,
2020 WL 5214647 (N.D. Ill. Sept. 1, 2020) .........................................................1, 5

*Sing Fuels Pte Ltd. v. M/V Lila Shanghai*s,
2023 WL 3506466 (E.D. Va. May 17, 2023) ...........................................................16

*TiVo Inc. v. EchoStar Corp.*,
646 F.3d 869 (Fed. Cir. 2011). Dkt. 1131................................................2, 5, 6, 14

*Vanoil Completion Sys., LLC v. PTC Do Brasil Tecnologia Em Petroleo LTDA*,
2020 WL 6878769 (W.D. La. Nov. 20, 2020)...........................................................19

*Weyerhaeuser Co. v. Hiscox Dedicated Corp. Members Ltd.*,
2019 WL 4082976 (W.D. Wash. Aug. 29, 2019).....................................................16

**Other Authorities**

H.R. Rep. No. 114-529 (2016)..............................................................................19, 20

MSA0870

## I. INTRODUCTION

Motorola respectfully requests that the Court (i) open contempt proceedings based on Hytera's failure to pay royalties for its H-Series products and initiate discovery into whether those allegedly redesigned products continue to use Motorola's trade secrets and copyrights; and (ii) protect its jurisdiction by issuing an anti-suit injunction ("ASI") to prevent Hytera from advancing an action it brought in Shenzhen, China (the "China Action") that seeks a determination that those same products do not use the trade secrets and copyrights that are the subject of this case.

First, the Court's Royalty Order requires that Hytera pay royalties for the identified products and those not more than colorably different. Dkt. 1349. Hytera has paid no royalties for its H-Series products. There is, however, compelling evidence that Hytera's H-Series products are not more than colorably different from the products subject to that order, i.e., those the jury found improperly incorporated Motorola's intellectual property. In accordance with well-established law in such circumstances, contempt discovery should be opened. *See Shure Inc. v. ClearOne, Inc.*, 2020 WL 5214647, at *13-*14 (N.D. Ill. Sept. 1, 2020). For example, recently discovered evidence shows that Hytera's compiled code for the H-Series products contains express references to the same code strings and architecture that was found to use Motorola's intellectual property. This compelling evidence seriously undermines Hytera's claim that the H-Series is a redesign, justifying contempt-related discovery into Hytera's source code and whether it developed the H-Series in a clean room environment. In these circumstances, the Court should open contempt discovery to confirm Hytera has continued using Motorola's trade secrets and copyrights without paying an ongoing royalty for that use, as the evidence strongly suggests.

Both Hytera and the Court previously agreed contempt proceedings are the appropriate vehicle to analyze products Hytera claims are outside the scope of the Royalty Order. As part of the parties' disputes over the terms of the Court's Royalty Order, Hytera argued that any redesign

issues should be handled via contempt proceedings under the "not more than colorably different" framework from *TiVo Inc. v. EchoStar Corp.*, 646 F.3d 869, 879 (Fed. Cir. 2011). Dkt. 1131 at 15. Under that framework, if the differences between the adjudicated product and alleged redesign "are merely colorable, then the Court proceeds to the traditional contempt analysis." *Id*. Judge Norgle agreed that contempt was the appropriate mechanism for addressing alleged redesigns, such as the H-Series. Dkt. 1289 at 40 ("Hytera acknowledges Motorola's ability to initiate contempt proceedings against Hytera for willful violations of court orders, including this one, [which] provide[s] Motorola an adequate remedy.").

Second, despite telling this Court that contempt proceedings were the appropriate mechanism in its February 2021 brief, Hytera prepared its China Action, which it filed in Shenzhen in June 2022. In the China Action, Hytera seeks a determination that the very same H-Series products do not use the Motorola's intellectual property ("IP") that is the subject of this case. Hytera hid the existence of the China Action from this Court and Motorola until Motorola was served in late 2023. Hytera's duplicity must be stopped.

As such, Motorola requests that the Court issue an ASI requiring Hytera to withdraw its China Action by no later than ***April 1, 2024***, when Motorola was requested to provide its trade secrets to the Chinese court, with trial proceedings to commence shortly thereafter. An ASI is appropriate to prevent Motorola from being unjustly forced to re-litigate claims that have already been decided at trial—including by re-producing its source code and other voluminous discovery records, producing witnesses, etc.—in a duplicative action in China. Hytera's continued prosecution of the China Action represents precisely the type of oppressive and vexatious action that ASIs are designed to prevent, especially here, where Hytera itself previously agreed that redesign issues should be addressed in this Court. Hytera's effort to evade this Court's jurisdiction

by attempting to seek a preemptive ruling from a different court should not be countenanced.

## II. FACTUAL BACKGROUND

### A. Despite Hytera's Undisputed Guilt, It Continues to Avoid Taking Responsibility for Its Unlawful Conduct

This case was filed on March 14, 2017. Dkt. 1. The jury trial commenced on November 6, 2019 and ended on February 14, 2020. Dkts. 739, 898. During those four months, the jury heard from over 40 witnesses on issues such as Motorola's development of the trade secrets, evidence of Hytera's theft, Hytera's alleged independent development, and the amount of damages. Dkt. 1088 at 2-5. Ultimately, the jury "found all [Motorola] trade secrets misappropriated and all copyrights infringed" (Dkt. 1097 at 3), including with respect to Hytera's allegedly re-designed I-series products (Dkt. 898), and that Hytera's trade secret misappropriation was willful and malicious (*id.*). Judge Norgle entered Final Judgment on March 5, 2020 (Dkt. 947), recognizing the evidence confirming that Hytera perpetrated a willful and malicious theft. Judge Norgle's denial of Hytera's post-trial motions also recognized that Motorola had proven the existence of protectable trade secrets, that Motorola had proven its copyright claims, and that evidence of Hytera's conduct supported a spoliation jury instruction, among many other rejections of Hytera's arguments. Dkt. 1088. Hytera no longer disputes its theft or that it acted willfully and maliciously. During oral argument in response to Judge Hamilton's comment that "[t]his is one of the most outrageous cases of trade secret theft I've even seen," Hytera's counsel confirmed that Hytera was "not defending the conduct at all here" and "not challenging liability . . . [n]or the fact of punitive damages." Ex. 1 (Dec. 5, 2023 Oral Argument Tr.) at 15:24-16:9.

### B. The Royalty Order and the Court's Enforcement of that Order

After the jury verdict, the Court denied Motorola's motion for a permanent injunction and instead ordered Hytera "to pay a reasonable royalty to Motorola for the future use of Motorola's

trade secrets." Dkt. 1097 at 1. Although Motorola sought to include the H-Series products in the royalty order, the Court declined to do so, and instead held that with respect to "alleged redesigns," "Hytera acknowledges Motorola's ability to initiate contempt proceedings," which would provide "Motorola an adequate remedy." Dkt. 1289 at 40; *see also* Dkt. 1131 at 15 (Hytera acknowledging contempt proceedings). The final royalty order was entered on July 5, 2022, and it lists specific prior models of Hytera's products under the definition of "Covered Products." Dkts. 1348, 1349.

### C. Discovery Into Hytera's H-Series in the Patent Case

In late 2021, after Motorola's injunction was denied, Hytera launched its H-Series DMR products, which it billed as the "next generation" of radios released after those that were adjudicated to utilize Motorola's intellectual property. Ex. 2. Soon thereafter, Motorola sought discovery regarding the H-Series in the patent infringement action that Motorola brought against Hytera in this district. Ex. 3 (Case No. 1:17-cv-01972, Dkt. 254); Ex. 4 (Case No. 1:17-cv-01972, Dkt 275). Hytera was ordered to produce its H-Series source code three separate times in that case, yet it refused to fully comply with any of those Court orders, instead producing only a subset of code files. Ex. 5 (Case No. 1:17-cv-01972, Dkt 348); Ex. 6 (Case No. 1:17-cv-01972, Dkt 362). Because Hytera continues to flout U.S. court orders, Motorola was forced to move for contempt in that case too, and its motion is still pending. *Id*. Yet even Hytera's deficient source code production strongly evidences that the H-Series is not a redesign at all, but continues to use the trade secrets and copyrights Hytera stole from Motorola as explained in Section III.A.2., *infra*.

### D. Hytera Filed an Action in China Seeking Adjudication of Whether Its H-Series Products Utilizes the Trade Secrets and Copyrights that Motorola Asserted During Trial in This Action

At the same time this Court was finalizing the Royalty Order, in June 2022, Hytera filed its China Action in a Shenzhen, China court, seeking a determination that the Motorola trade secrets and U.S. copyrights at issue in this case are not used in its H-Series products. *See* Ex. 7

4

(Statement of Claim) at 1-2 (Claim 1 is "[t]o declare that" Hytera's "source code of the DMR industry radio series products and their software newly designed by [Hytera], does not infringe the trade secrets and copyrights of [Motorola]."); *id.* at 5 ("no longer involve[] the trade secrets and copyrights accused by [Motorola] in the US case"); Ex. 8 ¶¶ 7-8. Motorola did not learn of Hytera's China Action until November 2023, when the complaint was mailed to Motorola's Chicago headquarters. *Id.* ¶¶ 7-8, 10. During a January 25-26, 2024 hearing in the China Action, Motorola attempted to raise due process objections regarding improper service pursuant to the Hague Convention and that the Shenzhen court lacks jurisdiction to hear the case, but the court declined to entertain those objections and ruled that the case should proceed. *Id.* ¶ 14.

During the same January 25-26, 2024 hearing, the Chinese court permitted Hytera to begin presenting evidence in support of its claims. *Id.* ¶ 15. By April 1, 2024, the Chinese court requested that Motorola provide its rebuttal evidence in Hytera's China Action, including by producing its source code and trade secrets. *Id.* ¶ 16.

## III. ARGUMENT

### A. The Court Should Initiate Contempt Proceedings and Open Discovery Regarding the H-Series Products

District courts have "broad discretion" to initiate contempt proceedings "based on the facts presented." *TiVo Inc.*, 646 F.3d at 881. All that is "required for a district court to hold a contempt proceeding is a detailed accusation from the injured party setting forth the alleged facts constituting the contempt." *Id.*; *California Expanded Metal Prod. Co. v. Klein*, 2020 WL 9182723 (W.D. Wash. Oct. 19, 2020) (requiring only a "detailed accusation" and not proving contempt).

Courts have also held that to obtain discovery, a party must only make a *prima facie* showing that a court order has been disobeyed. *Shure Inc.*, 2020 WL 5214647 at *13-14; *Eagle View Techs., Inc. v. Xactware Sols., Inc.*, 2021 WL 4206291, at *2 (D.N.J. Sept. 16, 2021).

Similarly, courts have granted discovery when a party has "raised significant questions" of noncompliance. *Blackberry Ltd. v. Typo Prod. LLC*, 2014 WL 4136586, at *1 (N.D. Cal. Aug. 21, 2014); *Cal. Dept. of Soc. Services v. Leavitt*, 523 F.3d 1025, 1034 (9th Cir. 2008).

The determination of whether an alleged redesigned product violates a royalty order or injunction is addressed by applying the two-step "colorably different" framework. *TiVo Inc.*, 646 F.3d at 881 (en banc); *Apple Inc. v. Samsung Elecs. Co.*, 2018 WL 905943, (N.D. Cal. Feb. 15, 2018) ("[D]istrict courts have applied the 'colorably different' standard in the ongoing royalty context."); *Bianco v. Globus Med., Inc.*, 53 F. Supp. 3d 929, 942 (E.D. Tex. 2014) (applying this framework in trade secrets context). First, a party must show that the alleged redesigned product "is not more than colorably different from the product found to infringe." *Proveris Sci. Corp. v. Innovasystems, Inc.*, 739 F.3d 1367, 1370 (Fed. Cir. 2014) (quoting *TiVo Inc.*, 646 F.3d at 882). "Where one or more of the elements previously found to infringe has been modified or removed, the court must determine whether that modification is significant." *Id*. at 1370-71. If "the court concludes that the differences are not more than colorable, the court must then go on to the second step and determine whether the newly accused product in fact infringes the relevant claims." *Id*.

As discussed below, the evidence makes at least a *prima facie* showing that Hytera's alleged redesigned H-Series products are not more than colorably different from the products adjudicated at trial. Thus, the Court should order Hytera to produce all its H-Series source code and allow a brief period for H-Series discovery, to determine if contempt sanctions are warranted.

### 1. The H-Series Products Are Within the Purview of the Royalty Order

As discussed above, an ongoing royalty order "implicitly extends to any products that are not colorably different from those products." *Bianco*, 53 F. Supp. 3d at 942. That is to ensure that a party found liable of trade secret misappropriation "cannot avoid its royalty obligations simply by renaming its products or making some trivial and immaterial change in the products." *Id.*

Accordingly, the Court's Royalty Order (Dkt. 1349) covers not just the products enumerated in the definition of "Covered Products," but also any alleged redesigned products that are not more than colorably different.

Hytera agreed with *Bianco's* reasoning, arguing that Motorola's proposed provision requiring notice and disclosure of alleged redesigns "circumvents the Court's exercise of its contempt power." Dkt. 1131 at 14-15. Hytera explained that contempt proceedings here are the appropriate vehicle for determining whether alleged redesigned products are "not more than colorably different" from the adjudicated products. *Id*. (citing *Tivo*, *Proveris*, and *Bianco*). The Court agreed too, ruling "Motorola's request that the Court require Hytera to provide notice to Motorola of alleged redesigns [is] unnecessary and inappropriate," including because "Hytera acknowledges Motorola's ability to initiate contempt proceedings against Hytera for willful violations of court orders, including this one, [which] provide[s] Motorola an adequate remedy." Dkt. 1289 at 40; *see also* Dkt. 1338 at 7. Thus, the Royalty Order reaches products that are not more than colorably different from those specifically adjudicated and contempt proceedings are the proper mechanism for determining whether any allegedly redesigned products incorporate Motorola's trade secrets and copyrights.

### 2. The Evidence Suggests the H-Series Products Are Not More Than Colorably Different from the Adjudicated Products

By all indications, Hytera's H-Series products are not more than colorably different from the products that were adjudicated to use Motorola's trade secrets and copyrights. The H-Series compiled code references the same source code strings (like function names and mechanisms) that Motorola relied on at trial to establish Hytera's misappropriation and infringement in the adjudicated products. Ex. 9 ¶¶ 39-106. Hytera's actions likewise strongly suggest that it knows the H-Series is not more than colorably different. To date, in the patent case, Hytera has produced

7

MSA0877

only H-Series compiled firmware that is largely non-human-readable and not most of the underlying source code files, despite three Court orders requiring it to produce that code. Ex. 5. And while Hytera's refusal strongly indicates it is hiding its ongoing theft, even the compiled H-Series code includes small readable portions that reference the same underlying Motorola trade secrets, including the *very* same Motorola data structure, application layer architecture, function names, and mechanisms that Motorola presented at trial as critical parts of its trade secrets that were misappropriated by Hytera. Ex. 9 ¶¶ 39-106. The exact same code strings and mechanisms show up *repeatedly* in Hytera's H-Series firmware, confirming that Hytera's H-Series appears to still be using the underlying code files from the adjudicated products that used Motorola's trade secrets and copyrights. *Id*. At minimum, the readable portions of compiled code establish a *prima facie* case and raise substantial questions as to the ongoing use of Motorola's trade secrets and copyrights.

For example, at trial, Motorola established that its Application Layer Trade Secret included Motorola's confidential and "unique approach to how [it] did applications." Trial Tr. 876:10-877:8. It also includes specific Motorola source code files, such as a file named "app_powerup.c" that Motorola presented during the jury trial to show that Hytera had used as Motorola's "app_powerup.c" as a "template" when writing Hytera's applications. Trial Tr. at 1300:7-1302:24. The adjudicated products similarly included a file named "app.powerup.cpp" that was heavily copied from Motorola's code—including *even Motorola's typos*. Trial Tr. at 1302:17-1305:3. Here, the H-Series compiled firmware still appears to use Motorola's Application Layer Trade Secret because the same application messaging and user input translation architecture, the very core of Motorola's Application Layer Trade Secret, appears in the H-Series binary firmware. Ex. 9 ¶¶ 41-56. This is apparent as the H-Series binary firmware includes the data structure such as

8

MSA0878

"application.MessageTo**AppPowerUp**,"                "ApplicationMessageTo**AppPowerUp**,"

"**AppPowerUp**," "MessageTo**AppPowerUp**," and "**powerUp**SuccessHndl," which confirms that

Hytera is still using Motorola's Application Layer trade secret to create its applications. *Id*.

Similar to the Application Layer Trade Secret, during trial, Motorola established that

Hytera's Radio Application Framework ("RAF") layer copied Motorola's confidential documents

and source code from Motorola's Ergonomics Layer (a/k/a "Darwin Layer") Trade Secret to

manage how applications interact with each other, send messages to each other, and translate user

inputs. Trial Tr. 1281:16-1282:24. Hytera's previous so-called redesign merely changed the word

"RAF" to "AFP" or "AMF," which, as Motorola pointed out at trial, is insufficient. Trial Tr.

1438:2-1439:12; Ex. 10. The H-Series firmware shows that the H-Series code not only still uses

the application messaging and translation mechanism that Hytera copied from Motorola, Hytera

also uses the same AFP and AMF components that were based on Motorola's trade secrets, as

Motorola proved at trial. Ex. 9 ¶¶ 57-82.

Worse still, despite Motorola's specific accusation that Hytera's HRCP mechanism,

including underlying source code, was copied from Motorola's XCMP source code and

documentation—including even a side-by-side comparison presented at trial and a jury verdict

finding that Hytera had misappropriated Motorola's XCMP trade secret—Hytera's H-Series

source code still uses *the same* HRCP opcode. *Id*. ¶¶ 83-95; Trial Tr. 1409:5-1411:13; Ex. 11 (Dr.

Wicker's trial demonstrative showing that HRCP copied Motorola's XCMP and including source

code copying example). Today, the limited human-readable portion of Hytera's H-Series firmware

still uses the very same HRCP opcode data structure accused and adjudicated as using Motorola's

intellectual property. Ex. 9 ¶¶ 83-95.

Further example H-Series similarities to the adjudicated products are summarized below:

9

MSA0879

| Motorola Trade Secret | Adjudicated Products | H-Series Binary Firmware |
|---|---|---|
| Application Layer | app_**powerup**.cpp; **appPowerUP** | application.MessageTo**AppPowerUp** |
| | App_**Scan**.cpp; **AppScan** | application.MessageTo**AppScan** |
| Darwin/ Ergonomic Layer | cor_**emt**_application_manager.cpp ("porting Darwin EMT"); HYT1973-07224142 (changing EMT to "RAF" to "**AMF**") | APP_**AMF**_MSG_TRANSLATE APP_**AMF**_CONTROL |
| XCMP | **Hrcp**_common.h; **HRCP** message header; **hrcp_msg**_hdr; **HRCPP**_RESULT_**OPCODE** | **HRCP;** **HRCP_MSG;** **HRCPOpcode; HrcppOpcode** |
| HAL | **Hal**SerialBuffer.cpp; **Hal**SerialBuffer | **HAL; HAL**_BSP; DSP**HAL**_Reset |

*Id*. ¶¶ 39-106; *see also* Wicker Decl., Ex. G (file showing numerous similarities). These are not mere coincidences that Hytera's alleged redesign uses the same exact file names, code strings, and mechanisms, structured in a similar way to the adjudicated products that used Motorola's trade secrets and copyrights. *E.g.*, Ex. 9, ¶¶ 94, 104. The fact that the same source code strings, architecture, and mechanisms (e.g., application messaging) appear in the H-Series that also appeared in the adjudicated products evidences that Motorola's source code still exists in the H-Series code and functions the same way as the adjudicated products did based on Motorola's trade secrets. *Id*. ¶¶ 39-106. Thus, the evidence confirms that the H-Series is not more than colorably different from the adjudicated products with respect to at least the Application Layer, Darwin/Ergonomic Layer, XCMP, and HAL trade secrets.

Further, many of the same features from the adjudicated products that used Motorola's trade secrets continue to be offered in the H-Series. For example, the H-Series has the "[s]ame functionality as the i-Series" with respect to the "IP Multi-Site Connect" functionality and the "Pseudo Trunk (direct mode and repeater mode); Extended Pseudo Trunk (XPT)" functionality. Ex. 12 (Rog 11 Resp.). Indeed, Hytera has affirmatively stated that the H-Series source code is identical to the i-series code adjudicated by the jury for many features. Ex. 13 at 1 ("Motorola can

10

determine if the radios practice the asserted claims using older i-Series code, which Hytera has stated has the same functionality (or lack thereof) for the accused features as the H-Series[.]").

The substantial overlap between the H-Series and the older i-Series products adjudicated at trial is not surprising, given how quickly Hytera brought its H-Series products to market. The jury trial ended on February 14, 2020 and Hytera launched its purported redesign about a year and a half later, in late 2021. Motorola's trade secrets took many years to develop, *e.g.* Trial Tr. 877:6-13 ("it took 40 engineers 2,700 staff months" to develop the Application Layer Trade Secret), and it is highly unlikely that Hytera independently developed an entirely new product without use of Motorola's trade secrets in less than two years.

Finally, there is no evidence that Hytera used a "clean room" to create its H-Series code to ensure that persons who had exposure to Motorola's trade secrets and/or the adjudicated products were not involved in creating the H-Series code. Without strict clean room procedures, it is impossible or nearly so to ensure that development of the H-Series code was not based on or influenced by Motorola's trade secrets. Ex. 9 ¶¶ 29-31. In fact, the H-Series code that has been produced points to the lack of clean room procedures. For example, as Dr. Nielson described in his declaration regarding contempt in the patent case, the "H-Series files produced by Hytera include copyright dates that appear extended into the past, e.g., 1993 and 2009." Ex. 14 ¶ 38. Further, the H-Series code produced to date in the patent case appears to "have been sanitized for purposes of litigation" and "many comments in the source code have been stripped" such that there is no "authorship information" as was included in the code for previous versions of the products. *Id.* Thus, there is no way of knowing, without the code and correct metadata, whether the same person worked on both legacy code and H-Series code. *Id.* This evidence also strongly suggests the Hytera H-Series products are not more than colorably different than the adjudicated products.

Moreover, Hytera's recently filed brief opposing contempt in the patent case further confirms there were no clean room procedures. For example, Hytera attached a declaration from Mr. Hanjie Ou stating that he is involved with H-Series source code development. Ex. 15 (Dkt. 363, Ex. C). But Mr. Ou worked with Mr. Yingzhe (Roger) Zhang, who is a key culprit directly involved in the development of the adjudicated products. Mr. Ou and Mr. Zhang are co-inventors on a Hytera base station patent application. *See, e.g.*, Ex. 16 (Chinese Patent No. CN113055953B). Thus, this evidence also strongly suggests Hytera did not use adequate clean room procedures.

### B. The Court Should Protect Its Jurisdiction By Issuing An Anti-Suit Injunction Against Hytera While This Motion Is Pending

In addition to initiating contempt proceedings, the Court should also enjoin Hytera from continuing to pursue its China Action while this motion is pending, and continue that injunction if and when contempt proceedings are initiated. Hytera's China Action involves the same parties and issues as this action, is vexatious and oppressive, and would cause irreparable harm to Motorola if Hytera is not enjoined at this stage in the proceedings. With the court in the China Action requesting that Motorola lodge its trade secrets and source code with the Chinese court by April 1, 2024, and a hearing on the merits to follow shortly thereafter, this Court must urgently act to stop Hytera's blatant attempt to skirt this Court's jurisdiction.

"A federal court's power to enjoin a party from litigating in another country is well established." *Affymax, Inc. v. Johnson &Johnson,* 420 F.Supp.2d 876, 883 (N. D. Ill. 2006). In determining whether an ASI is warranted, the district court first considers "whether or not the parties and the issues are the same, and whether or not the first action is dispositive of the action to be enjoined." *1st Source Bank v. Neto*, 861 F.3d 607, 613. If both factors are met, the district court considers whether "letting the two suits proceed would be gratuitously duplicative, or as the cases sometimes say 'vexatious and oppressive.'" *Id.* Seventh Circuit courts grant an ASI "when

12

MSA0882

necessary to prevent duplicative and vexatious foreign litigation and to avoid inconsistent judgments." *Rosenbloom v. Barclays Bank PLC*, No. 13-CV-04087, 2014 WL 2726136, *2 (N.D. Ill. June 16, 2014); *1st Source Banko*, 861 F.3d at 615 n.2. Each of these factors are satisfied.

### 1. The Parties in Both Actions Are the Same

The parties in both actions are the same. In both cases, Motorola Solutions Inc. and Motorola Solutions Malaysia Sdn. Bhd. are counter-parties to Hytera Communications Corporation Ltd. Compare *Motorola Sols., Inc. v. Hytera Commc'ns Corp.*, 365 F. Supp. 3d 916, 919 (N.D. Ill. 2019) *with* Ex. 7 (Statement of Claim) at 1.

### 2. The Issues in Both Actions Are the Same and This Action Is Dispositive of the Foreign Action

This case is dispositive of the China Action because "the claims in the foreign and domestic actions [are] . . . based on the same underlying dispute." *AU New Haven, LLC v. YKK Corp.*, 2018 WL 2128373, at *3 (S.D.N.Y. May 8, 2018). "The relevant inquiry is whether the substance of the claims and arguments raised in the two actions is the same." *Id*. "Thus, the dispositive criterion may be satisfied when a foreign proceeding will necessarily render a determination of the core issue at the heart of a claim appropriately decided only in a pending domestic action." *Id*. This test asks "whether the issues are the same not in a technical or formal sense, but in the sense that all the issues in the foreign action . . . can be resolved in the local action," but the issues need not be "precisely and verbally identical." *Microsoft v. Motorola,* 696 F.3d 872, 882-83 (9th Cir. 2012).

Hytera's China Action blatantly attempts to evade this Court's jurisdiction by raising issues that are already part of this case, but in a forum it believes will be more favorable to it. Specifically, Hytera seeks a determination that the Motorola trade secrets and copyrighted works that were at issue in this case are not used in its H-Series products. *See* Ex. 7 at 1-2 (Claim 1 is "[t]o declare that" Hytera's "source code of the DMR industry radio series products and their software newly

13
MSA0883

designed by [Hytera], does not infringe the trade secrets and copyrights of [Motorola]."), 5 ("no longer involve[] the trade secrets and copyrights accused by [Motorola] in the US case"). And that issue is already part of this Court's Royalty Order which as a matter of law encompasses products that are not more than colorably different from the those specifically adjudicated.[1]

As discussed above, the Royalty Order already encompasses Hytera products that continue to use the trade secrets and copyrights that Hytera previously stole. And it is for this Court, not the second-filed China Action, to decide if Hytera is violating that order by failing to pay royalties on the H-Series. As this Court has recognized in previously holding Hytera in contempt, "the court always retains jurisdiction to enforce its own orders even when those orders are on appeal." Dkt. 1461 at 2-3 n.2. As part of that enforcement jurisdiction, the Royalty Order also permits the Court to hold contempt proceedings to determine whether the H-Series still uses Motorola's trade secrets and copyrights. *See TiVo*, 646 F.3d at 882 (contempt proceedings appropriate if new product is "not more than colorably different" with "focus on those elements of the adjudged infringing products" proven to infringe); *Bianco*, 53 F. Supp. 3d at 942 (royalty order "implicitly extends to any products that are not colorably different from those products").

Again, Hytera already acknowledged that contempt proceedings in this Court are the appropriate avenue to litigate whether any allegedly redesigned products still use Motorola's trade secrets, proposing that precise mechanism to this Court and citing the case law discussed above in briefing its positions regarding the Royalty Order's form. Dkt. 1131 at 14-15 (Hytera arguing that Motorola's proposed redesign notice provision "circumvents the Court's exercise of its contempt power" and that contempt proceedings are appropriate for products that are "not more than

---

[1] It is also already part of Motorola's pending appeal to the Seventh Circuit of Judge Norgle's denial of a permanent injunction.

colorably different" from the adjudicated products).  And Judge Norgle endorsed that view in ruling that "the Court finds that Motorola's request that the Court require Hytera to provide notice to Motorola of alleged redesigns unnecessary and inappropriate," including because "Hytera acknowledges Motorola's ability to initiate contempt proceedings against Hytera for willful violations of court orders, including this one, [which] provide[s] Motorola an adequate remedy." Dkt. 1289 at 40.  Hytera cannot now circumvent this Court by dragging Motorola into foreign proceedings in which Hytera seeks to adjudicate the same thing in a second-filed action.

Accordingly, because enforcement of the Royalty Order is "based on the same underlying dispute" of whether Hytera's H-Series products use Motorola's trade secrets and copyrighted material, both actions substantively raise the same claim and arguments, and this ASI factor is satisfied.  *AU New Haven*, 2018 WL 2128373 at *3.  Indeed, once the Court resolves those enforcement issues, Hytera's foreign action would also be resolved.  *Microsoft*, 696 F.3d at 882-83 (upholding injunction where domestic action would resolve foreign action).[2]

### 3. Hytera's Foreign Action Is Oppressive and Vexatious

Hytera's China Action is also vexatious and oppressive because it is a blatant attempt to evade this Court's jurisdiction and subjects Motorola to a duplicative proceeding in a foreign court that is ill-equipped to make determinations regarding Motorola's trade secrets and U.S. copyrights. *First*, a judgment by Shenzhen court would usurp this Court's jurisdiction over whether the H-Series uses Motorola's *U.S.* trade secrets and copyrights and thus whether Hytera must pay Motorola additional ongoing royalties under this Court's order.  Indeed, Hytera itself proposed

---

[2] Motorola's pending appeal to the 7th Circuit regarding Judge Norgle's denial of a permanent injunction provides an independent basis to find that the issues in this case are the same as those in the foreign action. *See* Case No. 22-2413, Dkt. 27 at 24.  If the 7th Circuit overturns that denial, then just like with respect to the Royalty Order, injunction contempt proceedings would address redesigns under the same "not more than colorably different" framework. *See Eagle View*, 2021 WL 4206291, at *1.

MSA0885

contempt proceedings *in this Court* as the appropriate way to address whether any of its redesigned products (such as the H-Series) still use Motorola's trade secrets and copyrights—a view that Judge Norgle endorsed. *See* Dkt. 1131 at 14-15; Dkt. 1289 at 40.

*Second*, the second-filed China Action raises serious forum shopping concerns, which renders it vexatious and oppressive. *See, e.g.*, *Parasoft Corp. v. Parasoft S.A*, 2015 WL 12645754, at *7 (C.D. Cal. Feb. 19, 2015); *Weyerhaeuser Co. v. Hiscox Dedicated Corp. Members Ltd.*, 2019 WL 4082976, at *2 (W.D. Wash. Aug. 29, 2019) ("The filing of the UK action raises serious concerns regarding duplicative litigation and forum shopping, a combination which the Court finds to be 'vexatious and oppressive.'"); *Sing Fuels Pte Ltd. v. M/V Lila Shanghai*s, 2023 WL 3506466, at *5 (E.D. Va. May 17, 2023) (party's attempt to relitigate in a more favorable jurisdiction would lead to "absurd duplication of effort" and "unwarranted inconvenience, expense, and vexation").

For example, if this Court does not enjoin Hytera from proceeding with the China Action, Motorola must litigate both cases simultaneously. *Allendale Mutual Insurance Co. v. Bull Data Systems, Inc.*, 10 F.3d 425, 430 (7th Cir. 1993) (duplicate litigation would be unduly prejudicial); *Affymax*, 420 F. Supp. at 883–884 (ruling that injunction would avoid in the "unfair burden" of simultaneously litigating the same issue in two courts); *Commercializadora Portimex, S.A. de CV v. Zen-Noh Grain Corp.*, 373 F. Supp. 2d 645, 649–50 (E.D. La. 2005) (finding inequitable hardship to defend against same claims in foreign action where party did not initiate that action). In China, the court requests that Motorola engage in discovery, including production of Motorola's source code that an Illinois jury found to comprise trade secrets, all over again. Ex. 8 ¶ 16. And there is currently no safeguard in place to prevent inappropriate disclosure of Motorola's trade secrets and source code, nor any guarantee that the Shenzhen court would impose restrictions on access to such materials to adequately protect Motorola. *Id.* ¶¶ 17-18. Hytera's duplicative China

MSA0886

Action therefore holds the real potential to compromise Motorola's technology.

Hytera's China Action is also a clear attempt at forum shopping. There is no reason why Hytera cannot litigate the H-Series question in this Court, which already has considerable experience with the issues involved. And the Shenzhen court offers inadequate procedural protections and discovery tools for Motorola, such as the failure to properly serve Motorola under the Hague Convention and refusal to reconsider its decision. *Supra* § II.D.; Ex. 8 ¶ 14. The improper service was especially prejudicial to Motorola because it resulted in Motorola's jurisdictional objections being lodged later than the deadline imposed by the Shenzhen court. Ex. 8 ¶¶ 7-8, 10-13. Motorola also lacks the proper discovery tools in the China Action, as the court's rules of evidence do not allow Motorola to use compulsory discovery tools (requests to produce, depositions, etc.) that it is entitled to use in the United States. *Id.* ¶ 19. There is no guarantee that the Shenzhen court would order Hytera to go beyond the hand-selected evidence that it has provided, let alone order Hytera to provide the same level of discovery that Motorola is entitled to receive in the United States (including depositions, which are disallowed in China) about H-Series development and the sources accessed and used by Hytera. *Id.*

***Fourth***, because this action and Hytera's China Action seek rulings on identical issues— whether the H-Series source code uses Motorola's U.S. trade secrets and infringes its U.S. copyrights—there is a significant risk of inconsistent judgments that Hytera may leverage to interfere with this Court's jurisdiction. For example, while this Court may rule that the H-Series misuses Motorola's intellectual property and thus is covered under the Royalty Order,[3] the Shenzhen Court may rule it does not. Or if the Shenzhen Court rules first (as it is expected to do

---

[3] Along the same lines, if the Seventh Circuit reverses Judge Norgle's denial of an injunction, the question of whether Hytera's H-Series sales are covered by such an injunction must be resolved by this Court.

MSA0887

in April or May 2024) and purports to absolve Hytera of wrongdoing with respect to the H-Series, Hytera will likely seek to leverage the ruling to estop Motorola from vindicating its rights under the Royalty Order with respect to the products in this case. Hytera's Statement of Claim in the China Action clearly says as much, stating that Hytera seeks a "credible ruling … so as to eliminate the risk of infringement claims to the maximum extent and ensure the stability of the law." Ex. 7 at 8; Ex. 8 ¶ 8. Inconsistent judgments are particularly likely here because the Chinese court would be ruling on misappropriation of U.S. trade secrets and copyrights—matters over which the Chinese court has no expertise. *See Allendale,* 10 F.3d at 430 (affirming finding of vexatiousness in part because the foreign tribunal was ill equipped to address main issue).

*Fifth*, the sequence of Hytera's actions show bad faith. Hytera's Statement of Claim shows that Hytera prepared and filed its China Action more than a year and a half ago in June 2022 to "eliminate the risk of infringement" posed by this Court's proceedings that would involve the H-Series. Ex. 7 (Statement of Claim) at 8; Ex. 8 ¶ 8. Yet Hytera never informed this Court or Motorola of that filing. Worse, Hytera was simultaneously telling this Court not to include H-Series in the Royalty Order because it should be addressed in contempt proceedings. Dkt. 1131 at 14-15. Hytera then hid what it was doing for nearly a year and a half before Motorola was served in late 2023. This is precisely the type of conduct viewed as vexatious. *See MacNeil Auto. Prod., Ltd. v. Cannon Auto. Ltd.*, 2013 WL 12155279 (N.D. Ill. Feb. 4, 2013), *aff'd*, 542 F. App'x 515 (7th Cir. 2013) (finding foreign proceeding duplicative after defendant failed to inform court or plaintiff of foreign lawsuit as domestic case proceeded).

### 4. International Comity Concerns Favor Granting the Injunction

Comity concerns carry little weight here because Hytera's China Action is indeed vexatious and oppressive, and this is a dispute between private parties. *See H-D Mich., LLC v. Hellenic Duty Free Shops S.A.*, 694 F.3d 827, 848 (7th Cir. 2012) ("Even if we had some sense

18

that international comity could become an issue, our court ordinarily allows an injunction against litigating in a foreign forum 'upon a finding that letting the two suits proceed would be gratuitously duplicative, or as the cases sometimes say vexatious and oppressive.'"); *MacNeil*, 2013 WL 12155279 at \*2; *Vanoil Completion Sys., LLC v. PTC Do Brasil Tecnologia Em Petroleo LTDA*, 2020 WL 6878769, at \*3 (W.D. La. Nov. 20, 2020).

If considered at all, comity is Hytera's burden to establish, which it cannot do. *See Allendale*, 10 F.3d at 431. Instead, comity compels that this Court has the primary ability to enforce its own orders. Specifically, comity considerations must include the substantial U.S. interests involved. *Id.* at 432. Here, the U.S. has a strong interest in enforcing the judgment of its courts and deciding issues related to IP rights protected under U.S. law. If allowed to proceed, Hytera's China Action would effectively usurp this Court's role in policing its order that Hytera pay for products that continue to use Motorola's misappropriated trade secrets and copyrights. Further, Hytera's China Action directly harms this interest by threatening to interfere with laws enacted by Congress to protect U.S. IP rights. H.R. Rep. No. 114-529, at 6 (2016) (The DTSA "will equip companies with the additional tools they need to protect their proprietary information, to preserve and increase jobs and promote growth in the United States, and to continue to lead the world in creating new and innovative products, technologies, and services."); Dkt. 834 at 12. The Shenzhen court, by contrast, provides inadequate procedural and evidentiary safeguards for Motorola to fully litigate its defense to Hytera's claim. *See supra* § III.B.3; *Allendale*, 10 F.3d at 430 (foreign court did not provide insurer ability to establish defenses available under U.S. law).

### 5. The Chinese Court's April Deadlines for Discovery and a Hearing Make The Need for Relief Immediate

Motorola needs immediate relief from this Court to prevent imminent irreparable harm. Although Motorola need not meet the traditional preliminary injunction test for an ASI (*1st Source*

19

*Bank*, 861 F.3d at 613), those factors confirm the need for an ASI here.

Motorola will imminently suffer irreparable harm if Hytera is permitted to press forward with its China Action: Motorola has been asked to provide evidence in less than two months (by April 1, 2024), and the Chinese court is expected to rule shortly thereafter. Ex. 8 ¶ 20. ***First***, in Hytera's China Action, Motorola lacks access to the discovery tools it is entitled to in this Court. *Id.* ¶ 19. Consequently, Motorola must make do with Hytera's hand-selected evidence and whatever the Shenzhen Court decides to permit. ***Second***, the China Action court asks Motorola to disclose its highly confidential and valuable trade secrets. *Id.* ¶ 16. This is especially harmful as there are presently no adequate safeguards in that case to protect against inadvertent disclosure. *Id.* ¶¶ 17-18. ***Third***, Hytera will likely try to leverage a favorable ruling to shut down litigation in the U.S. Hytera has already alluded to this goal, stating to the Shenzhen Court that it seeks a "credible ruling . . . so as to eliminate the risk of infringement claims to the maximum extent and ensure the stability of the law." Ex. 7 (Statement of Claim) at 8; Ex. 8 ¶ 8.

The balance of harms overwhelmingly favors an injunction. Against the harm faced by Motorola, Hytera stands to lose nothing under the *status quo*. There is no urgency in the relief it seeks, as that case has been pending an extended period with no action and Hytera is well within its rights to seek a voluntary stay of its China Action from the Shenzhen Court. Ex. 8 ¶ 21. Finally, the public interest favors entry of an ASI here, as there is a strong public interest in the enforcement of U.S. laws and protection of U.S. IP rights. H.R. Rep. No. 114-529, at 6 (2016); Dkt. 834 at 12.

## IV. CONCLUSION

For the reasons above, Motorola requests that contempt proceedings be initiated (including opening H-Series discovery) and that Hytera be enjoined from pursuing the China Action.

MSA0890

DATED: February 20, 2024

Respectfully submitted,

/s/ *Adam Alper*
Adam Alper (admitted *pro hac vice*)
adam.alper@kirkland.com
Akshay S. Deoras (admitted *pro hac vice)*
akshay.deoras@kirkland.com
Brandon H. Brown (IL Bar No. 266347 CA)
brandon.brown@kirkland.com
KIRKLAND & ELLIS LLP
555 California Street
San Francisco, CA 94104
Telephone: (415) 439-1400
Facsimile: (415) 439-1500

Michael W. De Vries (admitted *pro hac vice*)
michael.devries@kirkland.com
Christopher Lawless (admitted *pro hac vice*)
christopher.lawless@kirkland.com
Justin Singh (admitted *pro hac vice*)
justin.singh@kirkland.com
KIRKLAND & ELLIS LLP
555 South Flower Street
Los Angeles, CA 90071
Telephone: (213) 680-8400
Facsimile: (213) 680-8500

Ali-Reza Boloori (admitted *pro hac vice)*
ali-reza.boloori@kirkland.com
2049 Century Park East, Suite 3700
Los Angeles, CA 90067
Telephone: (213) 680-8127
Facsimile: (310) 552-5900

David Rokach (IL SBN: 6279703)
david.rokach@kirkland.com
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, IL 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200

Leslie M. Schmidt (admitted *pro hac vice*)
leslie.schmidt@kirkland.com
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900

Attorneys for Plaintiffs

21

*Motorola Solutions, Inc. and Motorola Solutions Malaysia SDN. BHD.*

MSA0892

**CERTIFICATE OF SERVICE**

I, Adam Alper, an attorney, hereby certify that on February 20, 2024, I caused a true and correct copy of the foregoing document to be served via the Court's ECF system upon all counsel of record.


DATED:  February 20, 2024

/s/ Adam Alper

Adam Alper

MSA0893

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

|  |  |
|---|---|
| MOTOROLA SOLUTIONS, INC., and MOTOROLA SOLUTIONS MALAYSIA SDN. BHD., <br><br>                Plaintiffs, <br><br>      v. <br><br> HYTERA COMMUNICATIONS CORPORATION LTD., HYTERA AMERICA, INC., and HYTERA COMMUNICATIONS AMERICA (WEST), INC., <br><br>                Defendants. | Case No. 1:17-CV-01973 <br><br> Honorable Martha M. Pacold |

**DEFENDANT HYTERA COMMUNICATIONS CORPORATION LTD.'S OPPOSITION TO MOTOROLA'S MOTION TO OPEN CONTEMPT PROCEEDINGS AND ENTER AN ANTI-SUIT INJUNCTION (Dkt. 1482)**

MSA0894

**Table of Contents**

I.   Factual Background ........................................................................................... 2

    A.  Trial & Judgment .................................................................................... 2

    B.  Royalty ................................................................................................... 3

    C.  Prior Royalty Order Contempt Proceedings .................................................. 6

    D.  Seventh Circuit Appeal ............................................................................ 7

    E.  Proceedings in China ............................................................................... 8

II.  Argument ...................................................................................................... 9

    A.  There Is No Basis to Open Contempt Proceedings Regarding Hytera's H-Series Products ................................................................................................. 9

        1.  It is Motorola's Burden to Make a *Prima Facie* Showing that the H-Series Products Fall Within the Scope of the Royalty Order ...........................11

        2.  Motorola Has Failed to Make a *Prima Facie* Case that the H-Series Products Lack Colorable Differences From the Adjudicated Products ........................13

    B.  There is No Basis for This Court to Grant an Anti-Suit Injunction ......................... 19

        1.  The Parties Are Not Litigating the Same Issues in China, Nor is the US Suit Dispositive of the Chinese Action ........................................................19

        2.  Nothing about the Chinese Action is "vexatious" or "oppressive" ......................21

MSA0895

**<u>TABLE OF AUTHORITIES</u>**

**Page(s)**

**Cases**

*1st Source Bank v. Neto*,
    861 F.3d 607 (7th Cir. 2017) ................................................................................19, 22

*Allied Van Lines, Inc. v. Beaman*,
    No. 07C2407, 2008 WL 4866052 (N.D. Ill. July 21, 2008) .......................................21

*Am. Can Co. v. Mansukhani*,
    742 F.2d 314 (7th Cir. 1984) .....................................................................................12

*Arbek Mfg., Inc. v. Moazzam*,
    55 F.3d 1567 (Fed. Cir. 1995)...............................................................................10, 12

*AU New Haven, LLC v. YKK Corp.*,
    No. 15-CV-3411, 2018 WL 2128373 (S.D.N.Y May 8, 2018) ..................................20

*Bianco v. Globus Med., Inc.*,
    No. 2:12-CV-00147-WCB, 2017 WL 3895921 (E.D. Tex. Sept. 6, 2017) ........................9, 10

*Cal. Artificial Stone Paving Co. v. Molitor*,
    113 U.S. 609 (1885)......................................................................................................9

*Cal. Expanded Metal v. Klein*,
    No. C18-0659JLR, 2020 WL 9182723 (W.D. Wash. Oct. 19, 2020).........................11

*China Trade and Dev. Corp. v. M.V. Choong Yong*,
    837 F.2d 33 (2d Cir. 1987)..........................................................................................23

*Computer Associates Int'l., Inc. v. Altai, Inc.*,
    950 F. Supp. 48 (E.D.N.Y. 1996), *aff'd*, 126 F.3d 365 (2d Cir. 1997).....................19

*DSC Commc'ns Corp. v. DGI Techs., Inc.*,
    898 F. Supp. 1183 (N.D. Tex. 1995), *aff'd*, 81 F.3d 597 (5th Cir. 1996)................12

*Eagle View Techs., Inc. v. Xactware Sols., Inc.*,
    No. CV 15-7025, 2021 WL 4206291 (D.N.J. Sept. 16, 2021) ..................................11

*H. K. Porter Co. v. Nat'l Friction Prod. Corp.*,
    568 F.2d 24 (7th Cir. 1977) ........................................................................................12

*H-D Michigan, LLC v. Hellenic Duty Free Shops S.A.*,
    694 F.3d 827 (7th Cir. 2012) ......................................................................................25

ii

MSA0896

*Ingersoll Mill. Mach. Co. v. Granger*,
833 F.2d 680 (7th Cir. 1987) ...........................................................................................23

*Laker Airways Ltd. v. Sabena, Belgian World Airlines*,
731 F.2d 909 (D.C. Cir. 1984) ....................................................................................22, 23

*N.W. Controls, Inc. v. Outboard Marine Corp.*,
349 F. Supp. 1254 (D. Del. 1972).....................................................................................11

*Parasoft Corp. v. Parasoft S.A*,
No. CV 14-9166 DMG, 2015 WL 12645754 (C.D. Cal. Feb. 19, 2015) ...............................22

*Proveris Sci. Corp. v. Innovasystems, Inc.*,
739 F.3d 1367 (Fed. Cir. 2014)...........................................................................................4

*Rosenbloom v. Barclays Bank PLC*,
No. 13-CV-04087, 2014 WL 2726136 (N.D. Ill. June 16, 2014)...........................................23

*Sing Fuels Pte Ltd. v. M/V Lila Shanghai*,
No. 4:20-CV-58, 2023 WL 3506466 (E.D. Va. May 17, 2023) .............................................22

*TiVo Inc. v. EchoStar Corp.*,
646 F.3d 869 (Fed. Cir. 2011)...............................................................4, 9, 10, 11, 12, 18, 21

*Wal-Mart Stores, Inc. v. Cuker Interactive, LLC*,
No. 5:14-CV-5262, 2020 WL 6498655 (W.D. Ark. Sept. 21, 2020), *aff'd*, 27
F.4th 662 (8th Cir. 2022) ..................................................................................................11

*Weyerhaeuser Co. v. Hiscox Dedicated Corp. Members Ltd.*,
No. C19-1277RSL, 2019 WL 4082976 (W.D. Wash. Aug. 29, 2019)...................................22

*Zokaites v. Land-Cellular Corp.*,
424 F. Supp. 2d 824 (W.D. Pa. 2006).................................................................................22

**Other Authorities**

Fed. R. Civ. P. 7(b)(1)......................................................................................................6, 7

Fed. R. Civ. P. 65(d) ....................................................................................................11, 12

iii

MSA0897

There is but one reason Motorola filed a joint motion to re-open discovery in support of contempt proceedings at the same time as it filed its motion for an antisuit injunction: because without this Court initiating a new proceeding, Motorola has no grounds for an antisuit injunction.

At base, Motorola is a party in search of a reason to reopen a closed case that is pending appeal, so as to evade the legitimate jurisdiction of a Chinese court. The "urgency" in Motorola's motion is tied to its obligations in that other case. There is no new information that has suddenly come to light supporting US contempt proceedings now.

If the issues in the two cases truly overlapped, Motorola would not need to gin up a reason to be back in front of this Court. It could simply point to this existing US case and seek an antisuit injunction based on that. But that is not possible here, where this Court already expressly held that this case does *not* concern the H-Series products that are the subject of Hytera's declaration of non-infringement action in China.

Hytera launched the H-Series products in October 2021—well over two years ago, and long before the Royalty Order was finalized. This Court's Royalty Order does not cover Hytera's H-Series products. Dkt. 1338 at 8; Dkt. 1349 § 1.2. Indeed, Motorola expressly asked this Court to include the H-Series products within the scope of that Order, and this Court refused. Dkt. 1338 at 8. Hytera is thus not in contempt of the Royalty Order by failing to pay a royalty on products it does not cover.

After this Court's April 2022 order (Dkt. 1338) excluding the H-Series from the definition of "Covered Products," Hytera filed a declaratory judgment of non-infringement suit in China, in the town where Hytera is based and its products are developed, for a formal determination that its H-Series redesigned products do not infringe Motorola's trade secrets. There is nothing inappropriate or vexatious about Hytera seeking a judicial determination in its home country about

1

the propriety of its conduct.

What is vexatious is the present motion. The parties and this Court spent nearly a year litigating Motorola's allegation of contempt under the Royalty Order, and Motorola never raised applying it to the H-Series. Last fall, after conducting a full-scale evidentiary proceeding on issues related to the Royalty Order, this Court admonished the parties against further proceedings. Dkt. 1474 at 2. The case remains closed and on appeal.

Motorola's actual remedy, which was potentially available upon the launch of Hytera's H-Series products if Motorola really had grounds to pursue it, was to file a new lawsuit and allege trade secret misappropriation based on the H-Series products. Where, as here, Hytera redesigned those products to modify, remove, or replace every single allegedly offending module that Motorola had identified as infringing during the prior trial, there is no question that any further allegations of misappropriation belong in a new trial for a new jury to decide—or a new Court to dismiss.

For all of the reasons discussed herein, Motorola offers no legitimate basis to open discovery in support of contempt proceedings or to obtain an anti-suit injunction. Its motion should be denied.

## I.     FACTUAL BACKGROUND

### A.     Trial & Judgment

Motorola's trade secret allegations were a moving target in discovery and at trial—ultimately presenting only 21 to the jury, with significant testimony elicited on cross-examination required to distinguish the trade secrets from readily ascertainable, well-known information. The trial evidence on alleged misappropriation of those trade secrets was necessarily tied to certain accused products. Hytera's H-Series products were not among those adjudicated at trial—because

MSA0899

they did not yet exist. *E.g.*, Ex. 1[1] (Trial Tr. 1431:5–13 (Wicker), 5383:4–9 (Malackowski)).

After a four-month trial, the jury rendered a verdict on February 14, 2020. Dkt. 894.[2] *See* Ex. 2. The jury was not asked to determine the existence of specific alleged trade secrets, whether Hytera had misappropriated specific trade secrets, or how Hytera's products had benefited from specific trade secrets. *See* Ex. 2. Instead, the only question on the jury's verdict form on misappropriation was whether the jury found that Hytera had misappropriated "one or more" of Motorola's trade secrets. *Id.* at 1.



**B.     Royalty**

Following the verdict, the Court denied Motorola's request for a permanent injunction and instead granted an ongoing royalty. Dkt. 1097. The Court then ordered the parties to submit proposals regarding the terms of that ongoing royalty (*id.* at 6), which terms the parties heavily disputed. As relevant here, Motorola sought to require Hytera to provide advanced notice of alleged redesigns, with a 180-day waiting period before Hytera could launch a new product. Dkt. 1119 at 14.

---

[1] For the Court's convenience, Exhibit 1 hereto is a collection of the excerpts from the trial transcript cited herein and in the McDonald Declaration. References to Trial Tr., therefore, are references to Exhibit 1.

[2] The jury's damages verdict, however, was deemed advisory, because it concerned equitable issues properly tried to the Court. Dkts. 1088, 1100. The extent to which Hytera's radios actually benefited from protectable aspects of Motorola's trade secrets is at the heart of Hytera's arguments concerning apportionment on appeal.

3

Hytera objected, explaining that Motorola's proposal for prior restraint regarding redesigns circumvented the proper procedures for challenging a redesign, namely, "contempt or a 'future suit'" Dkt. 1131 at 14–15. Hytera explained that in the context of patent infringement, the law provides two paths for challenging redesigns. *Id.* at 15. For products that are essentially identical to the products that have already been adjudicated, contempt may be an appropriate remedy. *Id.* (quoting *TiVo Inc. v. EchoStar Corp.*, 646 F.3d 869, 879 (Fed. Cir. 2011)). But for products that have been meaningfully redesigned, such that their differences are more than merely colorable, contempt is "*not* the appropriate remedy." *Id.* (quoting *Proveris Sci. Corp. v. Innovasystems, Inc.*, 739 F.3d 1367, 1371 (Fed. Cir. 2014)) (emphasis added). Rather, in that circumstance, the redesigned product may only be challenged in a new lawsuit. *Proveris*, 739 F.3d at 1371.

The Court ultimately denied Motorola's request for prior notice regarding redesigns, noting it would "transform the reasonable royalty into an injunction." Dkt. 1289 at 40. The Court also noted that Motorola was not without recourse, as the royalty license would "include dispute resolution procedures," and Motorola had the "ability to initiate contempt proceedings against Hytera for willful violations of court orders, including this one . . . ." Dkt. 1289 at 40.

Contrary to Motorola's misstatements in its present motion, Mot. at 4, nothing in the Court's December 14, 2021 Order (Dkt. 1289) remotely suggests that disputes over a redesign should automatically be resolved by way of contempt proceedings, nor did Hytera advocate for contempt proceedings as the appropriate vehicle to resolve all redesign disputes (which Motorola wrongly alleges numerous times in its Motion). Indeed, this initial order was not even the final word on the royalty.

The parties filed subsequent briefs, outlining additional disputes over defined terms, including, notably, the term, "Covered Products." Motorola argued that "the definition should

MSA0901

reference an appendix and specify, 'which for the avoidance of doubt, [includes] *any product* based in whole or in part, on or from or incorporating any of the Motorola Trade Secret Information or Motorola Copyrighted Works (or any portion thereof) in any manner whatsoever, as defined in Appendix A to this Agreement.'" Dkt. 1338 at 7 (quoting Motorola's brief) (emphasis added). Hytera objected to this proposal because the proposed appendix was "meaningfully different from Motorola's list of 'Accused Products' from its previous submissions," and because this was an "improper attempt to prejudge new Hytera products that *have not been adjudicated* to incorporate Motorola's trade secrets or copyrights." Dkt. 1338 at 7 (emphasis added).

In its April 2022 Order (Dkt. 1338), the Court agreed with Hytera, explaining that "the royalty applies to the products specifically identified by Motorola" and that "Motorola identified those products by product number." *Id.* at 7. Motorola had argued that Hytera would be able to evade its royalty obligations by renaming or renumbering its products (*see* Dkt. 1318 at 3), but the Court held that "Hytera cannot avoid its royalty obligations merely by renumbering its products: if a renumbered product *is identical to* a product for which Hytera owes royalties, Hytera owes royalties all the same." Dkt. 1138 at 7 (emphasis added). The Court also rejected Motorola's specific request to include the H-Series products in the definition of Covered Products, finding the request an improper effort "to shift the burden to Hytera to disprove that its products that have not been adjudicated in this case incorporate Motorola's trade secrets or copyrights . . . ." *Id.* at 8.

In other words, the end result was a defined list of accused products that are within the scope of the Royalty Order. And that defined list does *not* include the H-Series products (over Motorola's objection) and does *not* include amorphous language expanding Covered Products to include any product that incorporated Motorola's alleged trade secrets (also over Motorola's objection).

5

## C.      Prior Royalty Order Contempt Proceedings

In November 2022, nearly a year after the H-Series products were launched, and while Hytera's motion to modify or stay the royalty was pending (Dkt. 1352), Motorola filed a motion for contempt against Hytera for failure to pay all amounts due under the Royalty Order. The Court "conducted a comprehensive process" to resolve that motion. Dkt. 1474 at 1. Specifically:

> The process on the motion included extensive prehearing briefing, a full−day evidentiary hearing and argument, and supplemental briefing requested by the court after the hearing. **The process gave the parties more than enough opportunity to ventilate all issues surrounding the motion for contempt.** With the 7/11/23 order [1429], 8/26/23 opinion [1461], and 9/8/23 minute entry [1470], the court addressed the motion [1384] in full. See Fed. R. Civ. P. 7(b)(1).

*Id.* at 1 (emphasis added).

Thereafter:

> In a series of filings between 8/30/23 and 9/8/23, the parties litigated the terms of the proposed injunction, but also informed the court of various payments that HCC had made into escrow. [1462], [1463], [1464], [1466], [1467], [1468], [1469]. Ultimately, on 9/8/23, the parties informed the court that HCC had fully complied with its obligations under the royalty order to make the royalty payment due July 31, 2022, together with interest, such that the injunction need not be entered at that time. [1469]. Thus, in the 9/8/23 minute entry, the court concluded that Hytera had purged the civil contempt and declined to enter the injunction. [1470]. The court thereby fully resolved the motion for contempt."

*Id.* Nevertheless, in subsequent filings, "the parties raised additional requests for relief not previously raised in the extensive process already conducted on the motion. [1466], [1467], [1469]." Dkt. 1474 at 1–2. In response, this Court specifically stated that:

> [T]o the extent that these filings attempted to raise new requests for relief−requests that (1) went beyond the specific information the parties were directed to provide (i.e., whether Hytera had fully complied with the royalty order, which was information necessary for the court to determine whether to enter the injunction contemplated in the 8/26/23 opinion) and (2) had not been

6

MSA0903

previously raised in the substantial process already conducted on the motion−these requests for relief were untethered to any pending motion, see Fed. R. Civ. P. 7(b)(1), and were not properly raised. Motorola's motion requested specific relief, see Rule 7(b)(1), and the process on the motion afforded plentiful opportunities to raise both Motorola's specific requests for relief raised in the motion and Hytera's arguments raised in response to the motion. **Again, the process on the motion (in terms of both briefing and argument) was considerable and gave the parties ample opportunity to ventilate all issues surrounding the motion; and the court fully resolved all issues properly and timely raised in that process.** There is no pending motion or need for a status report. **Further, the fact that this case remains closed and on appeal (as at the time of reassignment), as well as the amount of judicial resources that both the prior judge and this judge have devoted to the matter, counsel strongly against further proceedings.**

*Id.* at 2 (emphasis added).

Notably, at no point during any of the nearly year-long contempt-related briefing (pre- and post-evidentiary hearing), or during the evidentiary hearing before the Court, did Motorola ever seek to include the H-Series products within the scope of the Royalty Order, or argue that discovery was needed to determine *whether* to include the H-Series within that Order.[3]

**D.      Seventh Circuit Appeal**

Hytera appealed various aspects of this case, and Motorola cross-appealed. *See* Dkts. 1356, 1365. Motorola did not argue to the Seventh Circuit that Judge Norgle erred in excluding the H-Series from the royalty order or otherwise suggest that the H-Series should have been part of this case.[4] And at oral argument before the Seventh Circuit in December, Motorola's counsel

---

[3] Motorola and Dr. Wicker could have analyzed the binary files included in Hytera's H-Series radios—the same analysis it relies on now—at any point once those radios became publicly available in late 2021. *See* McDonald Decl. ¶ 12; *see also infra* at 17–18.

[4] To that end, Motorola's suggestion that the H-Series is "already part of Motorola's pending appeal to the Seventh Circuit" is demonstrably false. Mot. at 14 n.1.

MSA0904

confirmed to the Panel that Motorola "ha[d] not yet brought [a dispute about the H-Series] to the court's attention." *Id.*, Hr'g. Tr. at 43:21–44:3.

## E. Proceedings in China

In June 2022, Hytera filed a statement of claim in Shenzhen, China, seeking a determination to confirm that its redesigned products did not use Motorola's intellectual property. *See* Dkt. 1482-6. This was six months after Judge Norgle determined that the ongoing royalty would apply only to the products "specifically identified by Motorola," which did not include the H-Series radios. Dkt. 1289 at 2, 5; *see also* Dkt. 1338 (April 2022) at 8 (confirming the Royalty Order would not include the H-Series). Hytera's statement of claim stated, among other things, that Hytera is a company headquartered in Shenzhen, China, and that its redesigned products are developed, manufactured, and sold in China. Dkt. 1482-6 at 6. It also stated that Motorola had repeatedly tried to take "shortcuts" to avoid a full examination of Hytera's new product, and delayed in bringing a new suit. *Id.* at 7.

The Shenzhen Court accepted Hytera's claim on February 28th, 2023 and subsequently served Motorola Malaysia and Motorola US in November, 2023. Chen Decl. ¶ 21. The Shenzhen Court has also issued two protective orders to guard the confidentiality of the parties' materials produced in the case, and discovery is now under way. Chen Decl. ¶¶ 9–10. On January 25, 2024, Hytera submitted evidence to the Shenzhen Court regarding its H-Series redesign, including the underlying source code. Chen Decl. ¶ 20.[5] Motorola was ordered to produce evidence of its accusation that the H-Series radios use its trade secrets by April 1, 2024. Chen Decl. ¶ 21.

---

[5] Some of Hytera's submission was provided under seal. Motorola has had the opportunity to examine and analyze all of the information not filed under seal. Motorola's attorneys will have the opportunity to examine all of the sealed information as soon as Motorola authorizes them to do so. Chen Decl. ¶ 10.

MSA0905

Normally, the Shenzhen Court would give Motorola one week or less to respond, but Motorola sought and received an unusually long extension of more than two months to April 1. Chen Decl. ¶ 21 and Ex. C.

## II.    ARGUMENT

Rank speculation—even when spouted by an expert—does not convert falsehoods into facts. As discussed below, Motorola presents no legitimate basis to open discovery supporting contempt proceedings or grounds for an antisuit injunction. For all of the reasons discussed herein, the motion should be denied.

### A.    There Is No Basis to Open Contempt Proceedings Regarding Hytera's H-Series Products

Motorola does not yet seek a finding of contempt, because it cannot. Contempt requires clear and convincing evidence of a violation of an unambiguous order, and this Court has already ruled that the H-Series products *do not fall* within the scope of the Royalty Order. Dkt. 1338 at 8. So there is no basis for finding Hytera in contempt of that Order for failing to pay a royalty on products it does not cover. That alone should be dispositive.

Contempt is only appropriate with regard to sales of new products where there is *no* "fair ground of doubt" as to the wrongfulness of those sales. *TiVo*, 646 F.3d at 882 (quoting *Cal. Artificial Stone Paving Co. v. Molitor*, 113 U.S. 609, 618 (1885)). Where there are no "colorable differences"[6] between the expressly enjoined products and the new product, contempt may be appropriate. *TiVo*, 646 F.3d at 882. But where there *are* colorable differences, such as

---

[6] Courts have used various verbal formulations of the test, though they generally "capture the same concept," namely, looking for whether the products are "meaningfully different," rather than merely "trivially different." *Bianco v. Globus Med., Inc.*, No. 2:12-CV-00147-WCB, 2017 WL 3895921, at *2 n.1, *5 (E.D. Tex. Sept. 6, 2017) (Bryson, J., sitting by designation).

MSA0906

differences that require "expert and other testimony subject to cross-examination" in order to evaluate whether they still infringe, "the modifying party generally deserves the opportunity to litigate" the disputed issue "at a new trial . . . ." *Arbek Mfg., Inc. v. Moazzam*, 55 F.3d 1567, 1570 (Fed. Cir. 1995) (citation omitted) ("Contempt . . . is not a sword for wounding a former infringer who has made a good-faith effort to modify a previously adjudged or admitted infringing device to remain in the marketplace.").

Whether the new product "would have given rise to liability if it had been at issue at the trial" is irrelevant to the inquiry of contempt. *Bianco*, 2017 WL 3895921, at *3; *TiVo*, 646 F.3d at 884 (noting the ultimate question of liability is "irrelevant" to the question of contempt); *see also Ultimate Combustion Co. v. Fuecotech, Inc.*, No. 1260545CIVDIMITROULE, 2014 WL 12493339, at *7 (S.D. Fla. May 6, 2014) (Even if "it is possible [that] a fact finder could conclude that a redesigned device continues to infringe . . . that is not something that should be decided in a contempt proceeding."), *report & recommendation adopted*, No. 12-60545-CV, 2014 WL 12495257 (S.D. Fla. June 13, 2014).

Here, Motorola seeks to open *discovery* to find a reason to claim contempt—a reason that it cannot otherwise substantiate—five months after this Court concluded extensive contempt proceedings related to the Royalty Order (and during which Motorola never once raised this issue). Indeed, Motorola is only now seeking this relief at this exact juncture because it faces an April 1st deadline in a Chinese proceeding in which Hytera appropriately seeks declaratory relief about its H-Series products.

As outlined below, Motorola has failed to meet its burden to warrant opening discovery in support of contempt proceedings, and the motion should accordingly be denied.

1. **It is Motorola's Burden to Make a *Prima Facie* Showing that the H-Series Products Fall Within the Scope of the Royalty Order**

To support re-opening discovery in this presently closed case that is pending on appeal, Motorola must make a "detailed accusation . . . setting forth the alleged facts constituting the contempt." *TiVo*, 646 F.3d at 881; *see also Wal-Mart Stores, Inc. v. Cuker Interactive, LLC*, No. 5:14-CV-5262, 2020 WL 6498655, at \*2 (W.D. Ark. Sept. 21, 2020) (not reported) (citing *N.W. Controls, Inc. v. Outboard Marine Corp.*, 349 F. Supp. 1254, 1256 (D. Del. 1972) ("[B]efore a court initiates a contempt proceeding or permits extensive discovery of suspected violations of its judgment, there should be at least a *prima facie* showing by the aggrieved party of disobedience of the order."), *aff'd*, 27 F.4th 662 (8th Cir. 2022)). It is not sufficient to state a *prima facie* case by showing that a new product has some similarities to a previously adjudicated product, since the question on contempt is whether there are *no colorable differences* between the products. *See Wal-Mart Stores*, 2020 WL 6498655, at \*1–\*2 (declining to open discovery for contempt proceedings based on an expert's "hunch" that "proprietary source code *might* still be embedded somewhere in [plaintiff's] website" even though he had "not yet had the opportunity to analyze the underlying code").[7]

Here, the Royalty Order was appropriately very specific as to which products it covered. Rule 65(d) requires a court to expressly delineate "the act or acts sought to be restrained" in an

---

[7] Motorola's cited decisions (*see* Mot. at 5–6) set forth an exacting standard that Motorola plainly has not met here. *Eagle View Techs., Inc. v. Xactware Sols., Inc.*, No. CV 15-7025 (RMB/SAK), 2021 WL 4206291 (D.N.J. Sept. 16, 2021), opened contempt proceedings based on the infringer's detailed "descriptions of the functions and technical processes" underlying the redesigned products, which matched the accused functionality. *Cal. Expanded Metal v. Klein*, No. C18-0659JLR, 2020 WL 9182723, at \*4 (W.D. Wash. Oct. 19, 2020), involved evidence that the defendant told customers its redesign was the "same product" and "nothing more than a 'rebrand.'"). Motorola's other cited decisions, *Shure*, *Blackberry*, and *Leavitt*, do not involve new products or redesigns at all.

MSA0908

injunctive order, including a royalty order. Fed. R. Civ. P 65(d). This specificity is an "indispensable" element of due process. *H. K. Porter Co. v. Nat'l Friction Prod. Corp.*, 568 F.2d 24, 27 (7th Cir. 1977); *see also Am. Can Co. v. Mansukhani*, 742 F.2d 314, 321, 324–25 (7th Cir. 1984). The Royalty Order applies only to an enumerated set of Hytera's products, identified by product numbers, that were presented to the jury, as well as any product that is "identical" to one adjudicated by the jury, but merely "renumbered." Dkt. 1338 at 7. As noted above, at the time the Royalty Order was issued, the parties specifically litigated whether the H-Series products were covered by that Order, and the Court expressly held that they were not. Dkt. 1338 at 8. Motorola's continued failure to show that the H-Series radios are not merely "renumbered" alone defeats Motorola's *prima facie* case.

Even past that threshold issue, Motorola's submission falls far short of stating a *prima facie* case of contempt. At this stage, whether the H-Series actually infringes Motorola's trade secrets is not at issue. Instead, Motorola must make a *prima facie* showing that the H-Series products *lack colorable differences* from the accused products, and the inquiry must be focused on that purported evidence. *TiVo*, 646 F.3d at 882 (requiring comparison between aspects of accused products that were the basis for infringement and modifications in newly accused products).[8] If the H-Series products *are* more than colorably different, due process requires that Hytera be permitted to litigate those issues before a jury. *Arbek Mfg., Inc.*, 55 F.3d at 1570.

---

[8] To that end, Motorola's arguments about the lack of evidence that Hytera used a "clean room" to develop its H-Series code has no relevance here. Mot. at 11. The use of a clean room is one way in which a developer can demonstrate that it did not misappropriate another's trade secrets— because use of a clean room (with engineers walled off from stolen technology) prevents misappropriation. *DSC Commc'ns Corp. v. DGI Techs., Inc.*, 898 F. Supp. 1183, 1189 n.3 (N.D. Tex. 1995) (describing a cleanroom as an evidentiary tool to disprove "access" to the intellectual property at issue, but holding plaintiff to the burden to show actual infringement), *aff'd*, 81 F.3d

MSA0909

For the reasons discussed below, Motorola has failed to meet that burden here.

### 2. Motorola Has Failed to Make a *Prima Facie* Case that the H-Series Products Lack Colorable Differences From the Adjudicated Products

Motorola attempts to make a *prima facie* showing in support of discovery for contempt proceedings through a flawed and belated expert analysis, and a gross mischaracterization of a separate patent litigation. Its evidence is both incomplete and irrelevant and falls far short of its burden.

Dr. Wicker opines that the "H-Series code files that Hytera produced show that the H-Series products are using Motorola's trade secrets and copyrights in the same and/or similar ways that the products that were adjudicated at trial used Motorola's trade secrets and copyrights." Wicker Decl. ¶ 4. But Dr. Wicker never reviewed the H-series source code, much less compared it to the source code he identified in the adjudicated products as using Motorola trade secrets and copyrights. Indeed, a careful review of his opinion makes crystal clear that his conclusion is nothing but a guess—and an incorrect one.

Dr. Wicker does not have and did not review, H-Series source code. Instead, Dr. Wicker reviewed so-called "binary files." A binary file contains the 1s and 0s that source code is "compiled" into so that a computer can read it. McDonald Decl. ¶ 8. Dr. Wicker used a text editor to open the binary files, but that does not reproduce the human readable "source" code. *See* McDonald Decl. ¶ 9. In fact, most of the binary code cannot be rendered in text at all and appears as "NUL." McDonald Decl. ¶ 9. Text that is rendered is mostly meaningless and unreadable symbols and characters. McDonald Decl. ¶¶ 9–10. And what little readable text there

---

597 (5th Cir. 1996). Here, actual misappropriation (and thus any evidence about a clean room) would be for a jury to decide (if ever), because the inquiry in a contempt proceeding involves only a comparison between the adjudicated products and the redesigned products.

13

is tends to relate to the names of files in the source code for the binary file, with no information about how they work. McDonald Decl. ¶¶ 10. The below is an example of an H-Series binary file viewed with a text editor, where the only human readable text refers to sending a message to another file—the "AppPowerUp" file.

```
 NUL NUL NUL      NUL NUL NUL      NUL NUL NUL      NUL NUL NUL      NU
UL NUL NUL NUL NUL NUL NUL NUL —4§À | < `À NUL NUL NUL NUL NUL NUL NU
NUL NUL NUL NUL NUL NUL STX NUL NUL NUL SOH NUL NUL NUL BS NUL NUL

isÀBSüsÀRüsÀdüsÀDüsÀVüsÀ NUL NUL NUL NUL ( NUL NUL NUL NUL NUL
UL N11Application19MessageToAppPowerUpE NUL NUL NUL NUL N

UL NUL NUL NUL NUL NUL FF 0©À€"wÀ  Y`À@"wÀFFîsÀ`"wÀ€wÀ  G`ÀN

UL NUL NUL NUL NUL NUL NUL | Ž¨À NUL NUL NUL NUL NUL NUL NUL NUL NUL
e_Command NUL NUL NUL NUL NUL NUL NUL 31XPT_Recv_PS2PS_DATA_
```

*See also* McDonald Decl. ¶ 9.

It is undisputed that one cannot see the source code from the binary files.[9] And it is undisputed that Dr. Wicker—who did not have the H-Series source code, but only had H-Series binary files—never compared the actual source code of the adjudicated products to the source code of the H-Series to find that they are the same, much less that any changes are not more than colorably different.

Instead, Dr. Wicker did word searches of the binary files to locate superficial references to names of files and other modules that are the same or similar to the names of accused source code files in the adjudicated products (such as the reference to the "AppPowerUp" file in the

---

[9] Indeed, Motorola's expert in the patent case testified that with a binary file, "reviewing and understanding how Hytera's accused features work [is] impossible." Ex. 3 at 9.

above example). Based on this, Dr. Wicker concluded that "Hytera's H-Series products appear to contain" and are "still using the same files from the adjudicated products that copied Motorola's trade secrets and copyrights." Wicker Decl. ¶¶ 52, 55.

Of course, that is no more than a guess. It is true that the H-Series contains source code files with the same name as source code files in the adjudicated products. But that says nothing about whether the actual source code in those named files has been redesigned, which cannot be determined from simply seeing a superficial reference to a file name in a binary file, which, as Dr. Wicker admits, is largely unreadable by humans. Thus, Dr. Wicker does not (and cannot) render any opinion on whether the actual source code files (beyond their names) have been redesigned. Again, his opinion to the contrary is no more than a guess based on the file's name, not that file's content.

In fact, Dr. Wicker's guess is dead wrong. In developing the H-Series, Hytera modified, redesigned, or outright replaced every component of its code that Motorola had identified at trial as benefitting from Motorola's trade secrets, and much more. Da Decl. ¶ 4. Hytera formed new teams with engineers from other departments, hired new engineers, licensed new third-party solutions, and otherwise incurred millions of dollars in R&D expenses. Da Decl. ¶ 5. Hytera's H-Series product is the result of that significant and good faith effort to launch a product that was not derived from Motorola's trade secrets. Da Decl. ¶ 5. And, in fact, for *each* file or module that Dr. Wicker speculates is unchanged between the adjudicated products and the H-Series radios, the underlying code has been substantially redesigned. *See* McDonald Decl. ¶¶ 16–36. Examples of these changes are described in significant detail in the declaration of Hytera's expert, Cameron McDonald,[10] and described briefly below.

---

[10] HAL (¶¶ 16–20); Applications & Framework (¶¶ 21–28); Peripheral Protocol (¶¶ 29–36).

15

Dr. Wicker observed that Hytera's H-Series binaries include references to a module called "HAL," which was also the name of a module in the adjudicated products. Wicker Decl. ¶¶ 103–104. Hytera has entirely replaced its implementation of HAL in the H-Series, replacing it with a public, open-source[11] solution. McDonald Decl. ¶ 20. Dr. Wicker's superficial references to the term "HAL" ignore these substantial differences in the underlying code compared to the adjudicated products. Dr. Wicker's references show nothing more than that Hytera's H-Series include the general concept of a HAL, which Motorola acknowledges is not its trade secret. *See* McDonald Decl. ¶ 19 (citing Trial Tr. at 791:16–20 (Corretjer)).

Similarly, Dr. Wicker observed that Hytera's H-Series binaries include references to "applications" with names like AppPowerUp or AppScan, which are names that also appeared in the adjudicated products. Wicker Decl. ¶¶ 52–55. And he observed that the binaries included a reference to "AMF" which was the name of an "application framework" module in one model of the adjudicated products. Wicker Decl. ¶¶ 80–81. The version of AMF in Hytera's H-Series radios, however, has been completely overhauled and rearchitected, including by adopting a completely different design principle that was not available in the programming language that Motorola used in its code. McDonald Decl. ¶ 28. And Hytera's applications have similarly been overhauled and rearchitected to work with that new framework. McDonald Decl. ¶ 22. Dr. Wicker's superficial references to the names of applications and to a module called "AMF" ignore these substantial differences too. They show nothing more than that Hytera's H-Series radios include the general concepts of applications and a framework for those applications,

---

[11] "Open source" means that the full source code for the project is available for review by the public. Many open source projects include permissive licenses that allow even wholesale copying of that code, free-of-charge.

MSA0913

which Motorola disclaimed as its trade secret. McDonald Decl. ¶¶ 23–27 (citing Trial Tr. at 866:2–10, 936:4–9 (Zetzl)).

Finally, Dr. Wicker observed that Hytera's H-Series binaries include references to a module called "HRCP," which was also the name of a module in the adjudicated products. Wicker Decl. ¶ 87. And he observed references to generic terms like "msg" and "opcode" (common abbreviations for "message" and "operational code"). *Id.* The version of HRCP in Hytera's H-Series radios, however, has been completely overhauled and rearchitected too, including by removing entirely the "hrcp_msg_hdr" that drew the focus of Dr. Wicker's accusations at trial relating to HRCP. McDonald Decl. ¶ 36. And Hytera has completely changed its structure for routing messages via HRCP. McDonald Decl. ¶ 36. Dr. Wicker's superficial references to the generic terms "msg" and "opcode"—which are used even in public literature about Motorola's XCMP—and the simple name "HRCP," yet again ignore these substantial differences. McDonald Decl. ¶¶ 35–36. They show nothing more than that Hytera's H-Series radios include a general peripheral protocol, which Motorola acknowledged is not a trade secret. McDonald Decl. ¶¶ 35–36.

In short, Hytera has substantially redesigned *every* module Dr. Wicker described in his declaration herein. Moreover, it has addressed *the very same* aspects of the adjudicated products that Dr. Wicker cites now as evidencing Hytera's use of the trade secrets. *Compare* McDonald Decl. ¶¶ 20, 28, 35 (describing redesigns of application template, messaging, HAL "complete replacement," and HRCP message header), *with* Wicker Decl. ¶¶ 44, 75, 87, 96–101 (reciting evidence on application template, messaging, HAL, and HRCP message header). The H-Series radios are *far more* than colorably different from the radios adjudicated at trial.

17

MSA0914

Motorola also presents Dr. Wicker's findings as though they are new revelations that were just made available through hard-fought discovery in the patent case. That is wrong. As a Motorola engineer has previously testified, binary code is available by taking apart the physical radio—and thus, Motorola has had this information available to it since the H-Series launched in December 2021. McDonald Decl. ¶ 12 (citing Trial Tr. at 589:7–14 (Boerger)). If Motorola believed this data was remotely probative of contempt (which it plainly is not), it could have brought this to the Court's attention at any point over the last two years by simply examining the binary in Hytera's H-Series radios that were available for sale.

Finally, Motorola relies on drive-by allegations about discovery disputes in a different pending patent case—where another fully qualified federal judge sits ready to decide those disputes before him. Motorola's blatant mischaracterizations of Hytera's conduct in that patent case and its development of the H-Series products (including, inter alia, the baseless suggestion that "Hytera's refusal [to produce certain discovery in the patent case] strongly indicates it is hiding its ongoing theft," Mot. at 8, and that "Hytera's recently filed brief opposing contempt in the patent case further confirms there were no clean room procedures," Mot. at 12)—are not "evidence" of anything but its own gross overreaching.

***

Contempt is "inappropriate," and "the inquiry into whether the newly accused product actually infringes is irrelevant," where, as here, "one or more of the elements previously found to infringe ha[ve] been modified, or removed," and "that modification is significant." *TiVo*, 646 F.3d at 882. The evidence Motorola submits shows no more than that the H-Series radios include generic technologies that Motorola has already disclaimed as constituting its trade secrets. Motorola does nothing to show that the underlying implementations are materially the same as

18

the adjudicated products; in fact, they have been completely overhauled. Motorola's motion should be denied.

**B.      There is No Basis for This Court to Grant an Anti-Suit Injunction**

Motorola's request for an antisuit injunction ("ASI") is premised on a proceeding that does not yet exist—*i.e.*, this Court agreeing to open discovery in support of contempt proceedings related to Hytera's purported failure to pay a royalty on the H-Series products, that are not covered by the Royalty Order. That alone is grounds to deny the motion.

In seeking an ASI, Motorola must show that: (1) the same parties are litigating the same issues in China as they are in this Court, and (2) the U.S. action is dispositive of the Chinese Action. *See 1st Source Bank v. Neto*, 861 F.3d 607, 613 (7th Cir. 2017). Only if both of those factors are met does the Court proceed to the second inquiry—whether letting the two suits proceed would be "vexatious and oppressive." *Id.* (citations omitted). Motorola has failed to satisfy all of those factors here.

**1.      The Parties Are Not Litigating the Same Issues in China, Nor is the US Suit Dispositive of the Chinese Action**

Hytera seeks a declaratory judgment in the Chinese Action that its H-Series products do not use Motorola's trade secrets or copyrights. The existing US suit (now closed and pending appeal) does not cover the H-Series products because they did not exist at the time of the trial— they were never adjudicated and are not part of the case. Indeed, this Court previously ruled that even the post-trial Royalty Order does not cover them. Dkt. 1338 at 8. As such, the issues between the two suits are not the same, and the US suit will not be dispositive of the Chinese Action. *Computer Associates Int'l., Inc. v. Altai, Inc.*, 950 F. Supp. 48, 54 (E.D.N.Y. 1996) (a "U.S. action cannot be deemed dispositive of [the foreign] action [when] the latter action involves issues that were neither raised, nor could have been raised, in the U.S. action"), *aff'd*,

19

126 F.3d 365 (2d Cir. 1997). Indeed, the Chinese Action is the first-filed lawsuit to address whether the H-Series uses Motorola's trade secrets or copyrights.[12]

That is why in the same breath as its request for an antisuit injunction, Motorola asks this Court to open discovery in support of contempt proceedings—because it has no other grounds to claim that a pending matter in the US currently litigates the same issues in the Chinese Action. As outlined above, it now seeks to expand the scope of the Royalty Order to cover the H-Series products. Notably, the discovery Motorola seeks, and the facts on which it relies to support that current motion, were all available to it since Hytera launched its H-Series products at the end of 2021—but it chose not to pursue them. McDonald Decl. ¶ 12; *see also supra* at 17–18.

Motorola contends that Hytera's Chinese Action "blatantly attempts to evade this Court's jurisdiction by raising issues that are already part of this case" (Mot. at 13)—but that is wrong. Hytera filed the Chinese Action only after this Court squarely held in April 2022 that the H-Series products were not within the scope of the Royalty Order. Dkt 1338 at 8. And even after that ruling came down, until now, Motorola never sought discovery through contempt proceedings to challenge the H-Series redesign, and never filed a new lawsuit alleging trade secret misappropriation.

Moreover, even if this Court were to grant Motorola's request for discovery in support of contempt proceedings, the outcome of that dispute would still not necessarily be dispositive of the Chinese Action. If this Court ultimately held contempt proceedings and determined that the

---

[12] *Compare AU New Haven, LLC v. YKK Corp.*, No. 15-CV-3411, 2018 WL 2128373, at *3 (S.D.N.Y May 8, 2018) (cited by Motorola, Mot. at 13) (finding that "[r]esolution of the present action will require the Court to decide the same underlying dispute" as the foreign action, where the court was asked to address whether the *same* products were covered by a specific patent and a specific licensing agreement). In contrast, here, the US action and the Chinese Action concern *different* products and thus the issues between the two suits are not the same.

20

H-Series products were more than colorably different than the adjudicated products, the inquiry would stop there and no infringement analysis would take place. *TiVo*, 646 F.3d at 882 (where the differences between the old and new products are significant, "whether the newly accused product actually infringes is irrelevant"). In that instance, Motorola would have to file a new lawsuit if it believed that the redesigned H-Series products misappropriated its trade secrets. In contrast, the issue squarely before the Chinese Action now is exactly that: whether the H-Series products infringe Motorola's trade secrets, which necessarily involves an analysis of intellectual property and not just a comparison of changes made to specific products.

**2. Nothing about the Chinese Action is "Vexatious" or "Oppressive"**

Motorola further argues that the Chinese Action is both "oppressive and vexatious." Although the Court need not reach these allegations at all—because an ASI is inappropriate where, as here, the suits do not concern the same issues—Motorola's protests fall flat. Apart from facially raising every textbook argument against participating in a foreign proceeding, Dkt. 1483 at 15–18, Motorola fails to articulate specifically how it is vexed or oppressed by the Chinese Action. *See Allied Van Lines, Inc. v. Beaman*, No. 07C2407, 2008 WL 4866052, at \*4 (N.D. Ill. July 21, 2008) ("a party's characterization of a foreign suit as frivolous does not necessarily entitle it to an anti-suit injunction").

To be clear, as a Shenzhen-based, publicly traded Chinese company, Hytera has good reason to file suit there, where a Chinese court will apply the Chinese law that governs a substantial portion of Hytera's business. Shenzhen, as the third-largest city in China, is a geographic hub for technology companies, and the H-Series is a marquee product line. Chen Decl. ¶ 24. The Shenzhen Court routinely hears complex disputes regarding trade secrets and other intellectual property cases. Chen Decl. ¶ 25. If issues of international law were to arise, the Shenzhen Court is well-equipped to deal with them. Chen Decl. ¶ 25. As such, an ASI is not

21

MSA0918

appropriate here. *See 1st Source Bank*, 861 F.3d at 614–15 (finding "antisuit injunctive relief was not appropriate" where the filer of the foreign action had "legitimate reasons" for filing the foreign suit).

Motorola's arguments against the Chinese Action moving forward universally lack merit. It cites the risk of inconsistent judgments, Mot. at 18, but there is no such risk as things currently stand—because no US proceeding is actively reviewing whether the H-Series products infringe Motorola's trade secrets. Moreover, the Shenzhen Court has already determined that the Chinese Action is proper there. Chen Decl. ¶¶ 8, 21. Motorola accuses Hytera of forum shopping, Mot. at 16–17, but that also presumes duplicative litigation, which is not the case here. Nor has Motorola identified anything about Chinese law or the Shenzhen Court that is more favorable to Hytera (other than geography[13]), much less outcome-determinative, in a dispute regarding the provenance of the H-Series source code. *See* Chen Decl. ¶¶ 25–26; *see also Laker Airways Ltd. v. Sabena, Belgian World Airlines*, 731 F.2d 909, 932 n.73 (D.C. Cir. 1984) ("slight advantages in the substantive or procedural law to be applied in the foreign court" do not justify an ASI).[14]

---

[13] Selecting a forum due to geographical convenience is not "forum shopping." *See generally Zokaites v. Land-Cellular Corp.*, 424 F. Supp. 2d 824, 839 (W.D. Pa. 2006) ("The act of forum shopping is the selection of a court with an eye towards gaining an advantage based on the forum's favorable substantive law or the avoidance of unfavorable law in an alternative forum. Selecting a forum for convenience is not a form of forum shopping.") (internal citations omitted).

[14] Motorola's citations on this point all contain clear examples of litigants filing foreign suits in search of more favorable law, and only further illustrate that there are no similar "forum shopping" concerns here that would justify an ASI. *Parasoft Corp. v. Parasoft S.A*, No. CV 14-9166 DMG, 2015 WL 12645754 (C.D. Cal. Feb. 19, 2015) (defendant sought to circumvent a California forum selection clause by first filing suit in Paris, France to declare the clause unenforceable); *Weyerhaeuser Co. v. Hiscox Dedicated Corp. Members Ltd.*, No. C19-1277RSL, 2019 WL 4082976 (W.D. Wash. Aug. 29, 2019) (insurer filed second suit in the U.K. court, where it identified favorable precedent); *Sing Fuels Pte Ltd. v. M/V Lila Shanghai*, No. 4:20-CV-58, 2023 WL 3506466, at *5 (E.D. Va. May 17, 2023) (plaintiff "engaged in extensive discovery," "went to trial; lost the trial; lost an appeal and only then, threatened to bring identical claims in a more favorable jurisdiction.").

MSA0919

Motorola's instant motion is what seeks to manufacture the jurisdictional tension of which it warns—tension which currently does not exist. Nothing about the Chinese Action could possibly interfere with this Court's jurisdiction. *Laker Airways Ltd. v. Sabena, Belgian World Airlines*, 731 F.2d 909, 927 (D.C. Cir. 1984) ("The mere filing of a suit in one forum does not cut off the preexisting right of an independent forum to regulate matters subject to its prescriptive jurisdiction."); *see also China Trade and Dev. Corp. v. M.V. Choong Yong*, 837 F.2d 33, 37 (2d Cir. 1987) (finding issuance of an ASI an abuse of discretion where there was "no threat to the jurisdiction of the district court").

As a result, even if this Court were to initiate contempt discovery regarding the H-Series, there is no need to issue an ASI. *See Rosenbloom v. Barclays Bank PLC*, No. 13-CV-04087, 2014 WL 2726136, at *4 (N.D. Ill. June 16, 2014) ("the Seventh Circuit has explicitly recognized the possibility of a United States court and a foreign court simultaneously exercising concurrent jurisdiction."); *Ingersoll Mill. Mach. Co. v. Granger*, 833 F.2d 680, 684 (7th Cir. 1987) (noting that it is usually proper for United States district court and foreign court to exercise concurrent jurisdiction until there is a preclusive judgment).[15]

Motorola also raises the specter of its inability to safeguard its trade secrets in the context of the Chinese Action or to defend itself procedurally and through access to discovery mechanisms. Mot. at 17. But Motorola has litigated in Chinese dozens of times, as both plaintiff

---

[15] To that end, on March 4, 2024, Hytera sought relief from the Shenzhen Court by asking it to enjoin Motorola from pursuing the present ASI in this Court, so that Hytera's Chinese Action could proceed. Because Motorola seeks immediate relief in the form of an ASI from this Court, Hytera followed procedures in China to seek immediate relief there. To be clear, Hytera's request applies only to Motorola's request for an ASI; it does not ask the Shenzhen Court for any relief relating to Motorola's request to open contempt proceedings, which, for the reasons stated above, this Court should deny.

23

and defendant, with a very high success rate of 90%. Chen Decl. ¶ 26. Having itself made ample use of the Chinese court system, its concerns are both duplicitous and unfounded.

Here, the Shenzhen Court has already entered protective orders, as is required practice in China for trade secret disputes, that largely mirrors the type of protections afforded to the parties in this Court. Chen Decl. ¶¶ 9–11 and Ex. B. For example, confidential information is provided to the court (rather than directly to the other party) and maintained under seal where only attorneys and technical experts (but not the parties) will be allowed to view it. Chen Decl. ¶ 17 and Ex. B. Alleged differences in discovery tools are likewise form over substance. In China, discovery is requested and retained by the court, rather than the parties. Chen Decl. ¶¶ 16–18. Motorola is perfectly able to obtain oral, written, and documentary evidence to support its claims (or refute those made by Hytera). Chen Decl. ¶¶ 16–18.[16] Indeed, for all of these reasons, Motorola's express plea for immediate relief in light of imminent harm—for being required to comply with legitimate court-ordered discovery covered by protective orders—is simply wrong. Mot. at 19–20.

Finally, Motorola's accusation of bad faith is similarly baseless. Mot. at 18. Hytera did not initiate the Chinese Action until *after* this Court expressly ruled that the H-Series products were not within the scope of the Royalty Order. And Hytera never suggested that this Court should exclude the H-Series products in the Royalty Order because those products should instead be the subject of contempt proceedings. *Contra* Mot. at 18; *see supra* at § I.B (describing two paths to addressing new products: contempt for mere "renumbering" and a new case for products with colorable differences). That mischaracterization is truly absurd. Nor did Hytera lie in wait to

---

[16] Motorola also fails to acknowledge that the Chinese Action is akin to a declaratory judgment action which, even in the U.S., do not typically involve extensive discovery.

MSA0921

serve Motorola a year and a half after filing the Chinese Action. The timing of service on Motorola was entirely dependent on the Chinese court—which must first accept the case and then effect service of process. Decl. ¶ 8.

Contrary to Motorola's dismissal of comity concerns, they are very much at stake here. *See H-D Michigan, LLC v. Hellenic Duty Free Shops S.A.*, 694 F.3d 827, 848 (7th Cir. 2012) ("International comity (the mutual respect of sovereigns) requires the courts of one nation to avoid, where possible, interfering with the courts of another."). Motorola has raised no valid ground for seeking to block this legitimate foreign proceeding. For all of the foregoing reasons, its motion should be dismissed.

Date: March 6, 2024

Respectfully submitted,

/s/ Boyd Cloern

Boyd Cloern (*pro hac vice*)
bcloern@steptoe.com
Chris Suarez
csuarez@steptoe.com
John William Toth (*pro hac vice*)
btoth@steptoe.com
STEPTOE & JOHNSON LLP
1330 Connecticut Avenue NW
Washington, DC 20036
Telephone: (202) 429-3000
Facsimile: (202) 429-3902

25

**CERTIFICATE OF SERVICE**

I, Boyd Cloern, an attorney, hereby certify that on March 6, 2024, I caused a true and correct copy of the foregoing submission to be served via the Court's ECF system upon all counsel of record.

/s/ Boyd Cloern
Boyd Cloern

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| MOTOROLA SOLUTIONS, INC., and MOTOROLA SOLUTIONS MALAYSIA SDN. BHD., <br><br> Plaintiffs, <br><br> v. <br><br> HYTERA COMMUNICATIONS CORPORATION LTD., HYTERA AMERICA, INC., AND HYTERA COMMUNICATIONS AMERICA (WEST), INC., <br><br> Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) Civil Action No. 1:17-cv-01973 <br><br> Honorable Martha M. Pacold |

**<u>PLAINTIFFS' EMERGENCY MOTION FOR A TEMPORARY RESTRAINING ORDER</u>**

MSA0924

## TABLE OF CONTENTS

**Page**

I.     INTRODUCTION ........................................................................................................2

II.    LEGAL STANDARD.................................................................................................3

III.   ALL FOUR FACTORS FAVOR GRANTING A TRO......................................................4

      A.     Motorola Will Suffer Irreparable Harm Absent a TRO...........................................4

      B.     Motorola Is Likely to Succeed on the Merits of Its Anti-Suit Injunction Motion.................................................................................................................5

      C.     The Balance of Equities Favors Motorola ................................................................6

      D.     A TRO Is in the Public Interest.................................................................................7

      E.     No Bond Should Be Required...................................................................................8

IV.   CONCLUSION..........................................................................................................9

MSA0925

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Dish Network L.L.C. v. Ramirez*,
No. 15–CV–04712–BLF, 2016 WL 3092184 (N.D. Cal. June 2, 2016) ..................................7

*Ericsson Inc. v. Samsung Elecs. Co. Ltd.*,
No. 2:20-cv-00380-JRG, Dkt. 14 (E.D. Tex. Dec. 28, 2020) ..........................................4, 5, 9

*Hakkasan LV, LLC v. Tsang Hang Wang*,
No. 2:13-CV-01122-GMN-CWH, 2013 WL 3944175 (D. Nev. July 30, 2013) ......................5

*Henry Schein, Inc. v. Cook*,
191 F. Supp. 3d 1072 (N.D. Cal. 2016) ...................................................................................7

*Inventus Power v. Shenzhen Ace Battery*,
339 F.R.D. 487 (N.D. Ill. 2021) ...............................................................................................8

*Kaepa, Inc. v. Achilles Corp.*,
76 F.3d 624 (5th Cir. 1996) .....................................................................................................9

*Laker Airways Ltd. v. Sabena, Belgian World Airlines*,
731 F.2d 909 (D.C. Cir. 1984) .................................................................................................4

*Mays v. Dart*,
974 F.3d 810 (7th Cir. 2020) ...................................................................................................4

*Mazak Optonics Corp. v. Marlette*,
No. 17 C 1023, 2017 WL 3394727 (N.D. Ill. Aug. 8, 2017) ....................................................7

*Medcor, Inc. v. Garcia*,
No. 21 CV 2164, 2022 WL 124163 (N.D. Ill. Jan. 13, 2022) ..................................................3

*Motorola Sols., Inc. v. Hytera Commc'ns Corp. Ltd.*,
No. 1:17-CV-01972, 2023 WL 5956992 (N.D. Ill. Sept. 12, 2023) .........................................8

*Nike, Inc. v. Wu*,
349 F. Supp. 3d 310 (S.D.N.Y.), *aff'd*, 349 F. Supp. 3d 346 (S.D.N.Y. 2018) .........................7

*Pashby v. Delia*,
709 F.3d 307 (4th Cir. 2013) ...................................................................................................8

*Protect Our Parks, Inc. v. Buttigieg*,
10 F.4th 758 (7th Cir. 2021) ....................................................................................................3

MSA0926

*Republic Techs. (NA), LLC v. BBK Tobacco & Foods, LLP*,
 No. 16 C 3401, 2017 WL 4287205 (N.D. Ill. Sept. 27, 2017)....................................................8

*Richmark Corp. v. Timber Falling Consultants*,
 959 F.2d 1468 (9th Cir. 1992) ............................................................................................4, 8

*Tansey v. Cochlear Ltd.*,
 No. 13-CV-4628 SJF SIL, 2014 WL 4676588 (E.D.N.Y. Sept. 18, 2014) ...............................7

*Wayne Chem., Inc. v. Columbus Agency Serv. Corp.*,
 567 F.2d 692 (7th Cir. 1977) ...................................................................................................8

MSA0927

Motorola has learned that, in response to Motorola's motion for an anti-suit injunction ("ASI motion") pending before this Court,[1] Hytera filed an emergency "*anti*-anti-suit injunction" motion in the China Action to immediately restrain Motorola from pursuing its ASI motion here. Although Hytera's request could be granted by the Shenzhen court on an *ex parte* basis at any moment, Hytera did not alert Motorola or this Court of that filing, waiting to reference it in a single footnote buried deep in its March 6 response to Motorola's ASI motion and supporting materials. Dkt. 1486 at 23 n.15. And critically, Hytera could have simply relied on its opposition to Motorola's ASI here, rather than seek an emergency order from the Chinese court to effectively restrain this Court from adjudicating Hytera's compliance with this Court's **own** orders in a case that has been pending here for seven years. To address Hytera's latest blatant attempt to evade the jurisdiction of this Court, Motorola respectfully moves for an immediate temporary restraining order ("TRO") on an emergency basis against Hytera to stop it from prosecuting its *anti*-anti-suit injunction motion, to preserve the status quo at least pending this Court's ruling on Motorola's ASI. To further protect Motorola from immediate, irreparable harm in China, Motorola further requests that the Court order Hytera responsible for indemnifying any fines, penalties, or sanctions against Motorola or its affiliates by the Chinese court, based on or related to Hytera's *anti*-anti-suit injunction motion, within five business days of their entry, and likewise order Hytera to provide Motorola, by email, a copy of all filings made or received in Hytera's China Action within 24 hours of their filing or receipt.

---

[1] As the Court is aware, on February 20, 2024, as part of the proceeding pending in this Court since 2017, Motorola moved for this Court to initiate discovery into whether Hytera's allegedly redesigned H-Series products continue to use Motorola's stolen trade secrets and copyrights and conduct contempt proceedings if they do, and also to protect its jurisdiction by issuing an ASI to prevent Hytera from advancing a declaratory judgment claim it asserted in Shenzhen's Intermediate People's Court that the H-Series products do not use Motorola's trade secrets and copyrights that have long been the subject of this case (the "China Action"). Dkt. 1482.

## I.    INTRODUCTION

In furtherance of its plan to evade this Court's orders and the U.S. justice system, two days before responding to Motorola's ASI motion, Hytera filed an ***anti***-anti-suit-injunction application in the China Action ("anti-ASI"), seeking an order for Motorola to "immediately withdraw, and [be] enjoin[ed] [] from pursuing" its ASI request in this Court.  Dkt. 1486-8, Ex. D at 1.  Although Hytera asked for a ruling within "forty-eight hours," Hytera did not immediately serve Motorola with a copy of this filing—which can be adjudicated immediately by the Chinese courts secretly on an *ex parte* basis without hearing from Motorola.  *Id.* at 7.  Instead, despite the pending ASI proceedings before this Court, Hytera's first notice of its demand to halt the ASI proceedings here is buried in footnote 15 on page 23 of its March 6 opposition to Motorola's ASI request (served after the 48-hour period in which it asked for a ruling).  *Id.*; Dkt. 1486 at 23, n.15.  This is by design: the Shenzhen court is expected to issue an order on this motion quickly, without first notifying Motorola of Hytera's anti-ASI request or providing Motorola an opportunity to respond.  And, once ordered, the Shenzhen court can issue monetary and other sanctions against Motorola for non-compliance.

Hytera's latest step in its years-long plan to avoid justice should not be permitted.  By seeking to preclude adjudication of the H-Series by this Court, which has jurisdiction over Hytera relating to Motorola's trade secret and copyright claims brought here years ago, Hytera's anti-ASI motion threatens to deprive the Court of its ability to adjudicate Hytera's ongoing liability under this Court's ***own*** Royalty Order in favor of a foreign proceeding before a foreign court that has no experience with the application of U.S. trade secret and copyright law, let alone the many facts and orders of this Court that led to Hytera's liability in this case—and, where there is no actual expectation that Motorola's trade secrets and copyrighted code will be adequately protected or that its rights to its to those items under U.S. law will be honored.  If anything, Hytera's anti-ASI

2

motion is further confirmation of Hytera's playbook, which, if not stopped now, will become the playbook for trade secret thieves around the world: (1) try to get away with an "outrageous" theft;[2] (2) if caught, spend years fighting that in the U.S. courts even though there is no good faith challenge to liability; (3) if unsuccessful, attempt to erase all those years by filing a stealth proceeding in China to deprive the U.S. of its authority altogether, using the threat of serious sanctions to force aggrieved parties such as Motorola to give up if the U.S. courts do not act fast enough. That is not what Congress intended when enacting the Defend Trade Secrets Act or copyright laws, nor is it consistent with the years of proceedings and many orders by this Court adjudicating Hytera's liability for its use of Motorola's trade secret and copyright rights—none of which Hytera challenges in its appeal before the 7th Circuit, making them confirmed facts and law of this case, despite Hytera's attempt in China for a redo.

Although Motorola desires to minimize burdens on the Court, Motorola respectfully submits that Hytera's request for an anti-ASI necessitates immediate action. As set forth below, all requirements for a TRO are clearly met, and one should be granted to preserve the status quo before Hytera's latest measure to avoid justice takes effect.

## II.     LEGAL STANDARD

"A plaintiff seeking a TRO or preliminary injunction 'must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest.'" *Medcor, Inc. v. Garcia*, No. 21 CV 2164, 2022 WL 124163, at *1 (N.D. Ill. Jan. 13, 2022) (quoting *Protect Our Parks, Inc. v. Buttigieg*, 10 F.4th 758, 763 (7th Cir. 2021)). Regarding likelihood of success, the movant need only show "it has 'some likelihood' of succeeding on the merits." *Id.*

---

[2] *See* Ex. 1 (12/14/23 7th Cir. Hr'g Tr. at 15:24-16:9, No. 22-2370 and 22-2413) (court finding that "This is one of the most outrageous cases of trade secret theft I've ever seen….").

(quoting *Mays v. Dart*, 974 F.3d 810, 822 (7th Cir. 2020)).

"Courts have a duty to protect their legitimately conferred jurisdiction to the extent necessary to provide full justice to litigants. Thus, when the action of a litigant in another forum threatens to paralyze the jurisdiction of the court, the court may consider the effectiveness and propriety of issuing an injunction against the litigant's participation in the foreign proceedings." *Laker Airways Ltd. v. Sabena, Belgian World Airlines*, 731 F.2d 909, 927 (D.C. Cir. 1984). "[T]he United States' interests in vindicating the rights of American plaintiffs and in enforcing the judgments of its courts" are "substantial" and "vital." *Richmark Corp. v. Timber Falling Consultants*, 959 F.2d 1468, 1477 (9th Cir. 1992). And where a party attempts to enforce or pursue an antisuit injunction in a foreign jurisdiction, there is a "substantial risk of irreparable harm" to the non-moving party and to the jurisdiction of the U.S. court. *Ericsson Inc. v. Samsung Elecs. Co. Ltd.*, No. 2:20-cv-00380-JRG, Dkt. 14 at 1 (E.D. Tex. Dec. 28, 2020).

## III.   ALL FOUR FACTORS FAVOR GRANTING A TRO

### A.   Motorola Will Suffer Irreparable Harm Absent a TRO

According to Hytera's footnote 19 in its ASI opposition brief, Hytera's March 4 filing asked the Chinese court to order Motorola to "immediately withdraw, and enjoin [Motorola] from pursuing" Motorola's ASI, and requests such "a ruling within forty-eight hours." Dkt. 1486-8, Ex. D at 1, 7. This would obviously harm Motorola by precluding this Court from deciding that this Court alone should resolve disputes about the scope and meaning of this Court's ***own*** orders ***under U.S. laws*** and whether they apply to Hytera's H-Series products. The threat to Motorola (and this Court's authority) is imminent, because Hytera's requested deadline has already passed since Hytera filed that motion, and thus a ruling from the Chinese court could be imminent (or could have been entered without notice to Motorola or this Court). If the Chinese court grants Hytera's anti-ASI motion, that would purport to require Motorola to withdraw its ASI motion in this Court

or face sanctions or penalties for non-compliance in China, thereby permitting the Chinese court to decide issues relating to this Court's order and U.S. law. This is the definition of irreparable harm. *Hakkasan LV, LLC v. Tsang Hang Wang*, No. 2:13-CV-01122-GMN-CWH, 2013 WL 3944175, at *3 (D. Nev. July 30, 2013) (finding irreparable harm where defendant's actions "would deprive the Court of jurisdiction and require Plaintiffs to file additional suits to recover their intellectual property"); *Ericsson Inc. v. Samsung Elecs. Co. Ltd.*, No. 2:20-cv-00380-JRG, Dkt. 14 at 1 (E.D. Tex. Dec. 28, 2020) (finding "a substantial risk of irreparable harm to Ericsson, and to the jurisdiction of this Court, if Samsung were to attempt to enforce or further pursue its antisuit injunction against Ericsson"). The threat to Motorola and to the integrity of this Court's prior rulings and ongoing proceedings is real and imminent, as Hytera seeks to evade the consequences of its rampant trade secret theft and copyright infringement.

### B. Motorola Is Likely to Succeed on the Merits of Its Anti-Suit Injunction Motion

As described in Motorola's ASI motion and its forthcoming reply, Motorola is likely to succeed on the merits of its ASI motion, including because: (1) the parties (Motorola and Hytera) are the same in both cases and this Court's grant of contempt against Hytera for the sale of H-Series products would resolve Hytera's declaratory judgment claim in Shenzhen (Dkt. 1482 at 13-15); (2) Hytera's China Action is oppressive and vexatious since it is an attempt to evade this Court's jurisdiction and force Motorola to waste resources litigating duplicative issues in China regarding Motorola's *U.S.* trade secrets and copyrights (*id.* at 15-18); (3) Hytera concedes that contempt is a proper vehicle to determine whether the H-Series is using Motorola's trade secrets and copyrights (having previously told Judge Norgle that it "advised [the court] that the Respondents could seek relief [regarding Hytera's H-Series products] through separate actions or contempt proceedings") (Dkt. 1486-8 at Ex. D, 4); and (4) Hytera admits that the relief currently

MSA0932

sought by Motorola's contempt motion—further review of the H-Series source code—is required to determine whether it is in contempt (Dkt. 1486 at 14-15) (Hytera arguing that determining whether the H-Series source code files were redesigned "cannot be determined from simply seeing a superficial reference to a file name in a binary file" and instead requires review of H-Series source code).

### C.     The Balance of Equities Favors Motorola

Hytera has identified no reason why it would suffer harm by letting this Court, as opposed to the Chinese court, rule on Motorola's ASI motion. The issues pending in this Court arise from claims dating back to 2017, and Hytera itself previously successfully urged this Court to resolve the H-Series dispute through contempt proceedings. Because the issues in this long-pending case and the Chinese court are the same—namely, whether Hytera's H-Series products incorporate Motorola's trade secrets and copyrighted materials—a TRO here enjoining Hytera from pursuing its anti-ASI motion in China is appropriate to preserve the status quo, providing this Court with enough time to rule on Motorola's ASI motion, which, if granted, would allow this Court to decide issues impacting is own orders—such as the Royalty Order and the many other orders concerning the scope and content of Motorola's trade secrets and copyrights, and Hytera's prior liability for illicit use—as well as underlying issues of U.S. law and enforcement of its prior order, *i.e.*, whether Hytera's H-Series products incorporate Motorola's trade secrets and copyrighted materials without payments, in violation of the Royalty Order.

Motorola, by contrast, would suffer significant and irreparable harm should the Shenzhen court enjoin it from continuing with its ASI motion. It would be fundamentally unfair to force Motorola to relitigate the subject of this Court's Royalty Order in China, by a Court that lacks familiarity with the voluminous record in this case and the underlying facts, much less with U.S. laws and policy. *Cf*. S. Rept. 114-220 at 1-2 ("The growing importance of trade secrets as a form

of intellectual property makes their theft a particularly economically damaging crime."); Ex. 2 (Trump statement that "Protecting the innovations, creations, and inventions that power our country are vital to our economic prosperity and national security."); Ex. 3 (Biden committing to "Confront foreign efforts to steal American intellectual property" with "a coordinated and effective strategy").[3]

### D. A TRO Is in the Public Interest

As laid out in its ASI and contempt motion (Dkt. 1482), despite Hytera's recalcitrance, Motorola has now discovered compelling evidence that Hytera's H-Series products are not more than colorably different from the products subject to the Royalty Order, *i.e.*, those the jury found improperly used Motorola's intellectual property. "[I]t has been repeatedly recognized that the United States has an obvious interest in having its own procedural rules applied to discovery." *Tansey v. Cochlear Ltd.*, No. 13-CV-4628 SJF SIL, 2014 WL 4676588, at *4 (E.D.N.Y. Sept. 18, 2014) (internal citation omitted). And "[t]he public interest is supported by upholding the sanctity of confidential information such as trade secrets and preventing others from the unauthorized use of such confidential information for their own benefit." *Mazak Optonics Corp. v. Marlette*, No. 17 C 1023, 2017 WL 3394727, at *3 (N.D. Ill. Aug. 8, 2017). The United States also has a strong interest in adjudicating issues of U.S. trade secret and copyright law and enforcing orders of U.S. courts. *See, e.g.*, *Nike, Inc. v. Wu*, 349 F. Supp. 3d 310, 339 (S.D.N.Y.), *aff'd*, 349 F. Supp. 3d 346 (S.D.N.Y. 2018) ("the United States has a 'powerful interest in enforcing the acts of Congress,

---

[3] Particularly, having argued contempt in this Court was the proper vehicle for the H-Series dispute, Hytera should not be allowed to skirt this Court's jurisdiction by asking a Chinese court to adjudicate that issue first and in turn to facilitate Hytera's continued use of Motorola's trade secrets and copyrighted code. *See, e.g.*, *Henry Schein, Inc. v. Cook*, 191 F. Supp. 3d 1072, 1077 (N.D. Cal. 2016) (citing *Dish Network L.L.C. v. Ramirez*, No. 15–CV–04712–BLF, 2016 WL 3092184, at *7 (N.D. Cal. June 2, 2016) (balance of hardships favored plaintiff seeking injunction when it would "do no more than require Defendant to comply with federal and state ... laws" ).

MSA0934

especially those, such as the Lanham Act, that are designed to protect intellectual property rights….'") (internal citation omitted); *Motorola Sols., Inc. v. Hytera Commc'ns Corp. Ltd.*, No. 1:17-CV-01972, 2023 WL 5956992, at *8 (N.D. Ill. Sept. 12, 2023) ("[T]he United States 'has a substantial interest in vindicating the rights of American plaintiffs,' 'an overriding interest in the just, speedy, and inexpensive determination of litigation in its courts,' an 'obvious interest in having its own procedural rules applied to discovery,' and a 'significant interest in protecting its own trade secrets and intellectual property.'") (quoting *Inventus Power v. Shenzhen Ace Battery*, 339 F.R.D. 487, 504 (N.D. Ill. 2021)). And the public has a particularly strong interest in U.S. courts being able to enforce their own orders without parties seeking to preempt such enforcement by seeking a refuting order from a friendly jurisdiction. *Richmark Corp.,* 959 F.2d at 1477 ("the United States' interests in vindicating the rights of American plaintiffs and in enforcing the judgments of its courts" are "substantial" and "vital" respectively); *Republic Techs. (NA), LLC v. BBK Tobacco & Foods, LLP*, No. 16 C 3401, 2017 WL 4287205, at *5 (N.D. Ill. Sept. 27, 2017) ("[T]he courts of the United States undoubtedly have a vital interest in providing a forum for the final resolution of disputes."). Thus, it is in the public interest for this Court to protect its jurisdiction to decide Motorola's ASI by issuing a TRO preventing Hytera from forum shopping to obtain a ruling from a Chinese court first. If the Chinese court grants Hytera's anti-ASI motion before this Court could rule on Motorola's ASI motion, Hytera will have effectively usurped this Court's role in policing its order that Hytera pay for products that continue to use Motorola's misappropriated trade secrets and copyrights.

### E.    No Bond Should Be Required

"Under appropriate circumstances bond may be excused, notwithstanding the literal language of Rule 65(c)." *Wayne Chem., Inc. v. Columbus Agency Serv. Corp.*, 567 F.2d 692, 701 (7th Cir. 1977); *see also Pashby v. Delia*, 709 F.3d 307, 332 (4th Cir. 2013) ("[T]he district court

retains the discretion to set the bond amount as it sees fit or waive the security requirement" under Rule 65(c)). Here, the security requirement should be waived, as Motorola is only seeking to enjoin Hytera from pursuing injunctive relief, and it was Hytera and not Motorola that "created any risk of damages for delay or duplication by filing" lawsuits in foreign jurisdictions that interfere with this Court's jurisdiction. *Kaepa, Inc. v. Achilles Corp.*, 76 F.3d 624, 628 (5th Cir. 1996) (affirming anti-suit injunction where district court found no bond was necessary).

## IV.    CONCLUSION

To prevent great and irreparable harm to Motorola via Hytera's attempt to prevent this Court from deciding Motorola's ASI motion, and for all of the aforementioned reasons, the Court should impose a TRO enjoining Hytera from pursuing its anti-ASI motion filed in the China Action until this Court rules on Motorola's ASI motion (Dkt. 1482), and require Hytera to withdraw its anti-ASI motion in the China Action. Motorola further requests that the Court order Hytera to indemnify Motorola for any fines, penalties, or sanctions against Motorola or its affiliates by the Chinese court, based on or related to Hytera's anti-ASI motion, within five business days of their entry, and order Hytera to provide Motorola, by email, a copy of all filings made or received in the China Action with 24 hours of their filing or receipt. *See, e.g.*, *Ericsson*, No. 2:20-cv-00380-JRG, Dkt. 14 (enjoining defendant from pursuing an injunction in a Chinese court that would prohibit or limit plaintiffs' ability to enforce its U.S. patent rights, and requiring defendant to indemnify plaintiffs for fines imposed by the Chinese court and to email plaintiffs all filings in the Chinese action).

MSA0936

DATED: March 11, 2024

Respectfully submitted,

/s/ *Adam Alper*
Adam Alper (admitted *pro hac vice*)
adam.alper@kirkland.com
Akshay S. Deoras (admitted *pro hac vice)*
akshay.deoras@kirkland.com
Brandon H. Brown (IL Bar No. 266347 CA)
brandon.brown@kirkland.com
KIRKLAND & ELLIS LLP
555 California Street
San Francisco, CA 94104
Telephone: (415) 439-1400
Facsimile: (415) 439-1500

Michael W. De Vries (admitted *pro hac vice*)
michael.devries@kirkland.com
Christopher Lawless (admitted *pro hac vice*)
christopher.lawless@kirkland.com
Justin Singh (admitted *pro hac vice*)
justin.singh@kirkland.com
KIRKLAND & ELLIS LLP
555 South Flower Street
Los Angeles, CA 90071
Telephone: (213) 680-8400
Facsimile: (213) 680-8500

Ali-Reza Boloori (admitted *pro hac vice)*
ali-reza.boloori@kirkland.com
2049 Century Park East, Suite 3700
Los Angeles, CA 90067
Telephone: (213) 680-8127
Facsimile: (310) 552-5900

David Rokach (IL SBN: 6279703)
david.rokach@kirkland.com
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, IL 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200

Leslie M. Schmidt (admitted *pro hac vice*)
leslie.schmidt@kirkland.com
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900

10

MSA0937

Attorneys for Plaintiffs
*Motorola Solutions, Inc. and Motorola*
*Solutions Malaysia SDN. BHD.*

11

MSA0938

## CERTIFICATE OF SERVICE

I, Adam Alper, an attorney, hereby certify that on March 11, 2024, I caused a true and correct copy of the foregoing document to be served via the Court's ECF system upon all counsel of record.

DATED: March 11, 2024

*/s/ Adam Alper*
Adam Alper

MSA0939

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| MOTOROLA SOLUTIONS, INC., and MOTOROLA SOLUTIONS MALAYSIA SDN. BHD., | ) ) ) ) | |
| Plaintiffs, | ) ) | Civil Action No.: 1:17-cv-01973 |
| v. | ) ) ) | Honorable Martha M. Pacold |
| HYTERA COMMUNICATIONS CORPORATION LTD., HYTERA AMERICA, INC., AND HYTERA COMMUNICATIONS AMERICA (WEST), INC., | ) ) ) ) ) ) ) | **REDACTED – PUBLIC VERSION** |
| Defendants. | ) ) ) | |

<u>**PLAINTIFFS' MEMORANDUM IN SUPPORT OF THEIR MOTION TO OPEN CONTEMPT PROCEEDINGS AND ENTER AN ANTI-SUIT INJUNCTION TO PROTECT THIS COURT'S JURISDICTION**</u>

MSA0940

## TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ............................................................................................1

II.    FACTUAL BACKGROUND ...........................................................................3

      A.     Despite Hytera's Undisputed Guilt, It Continues to Avoid Taking Responsibility for Its Unlawful Conduct .................................................3

      B.     The Royalty Order and the Court's Enforcement of that Order .............................3

      C.     Discovery Into Hytera's H-Series in the Patent Case ..............................................4

      D.     Hytera Filed an Action in China Seeking Adjudication of Whether Its H-Series Products Utilizes the Trade Secrets and Copyrights that Motorola Asserted During Trial in This Action ......................................................4

III.   ARGUMENT ...................................................................................................5

      A.     The Court Should Initiate Contempt Proceedings and Open Discovery Regarding the H-Series Products ............................................................5

            1.     The H-Series Products Are Within the Purview of the Royalty Order ..................................................................................6

            2.     The Evidence Suggests the H-Series Products Are Not More Than Colorably Different from the Adjudicated Products ..................................7

      B.     The Court Should Protect Its Jurisdiction By Issuing An Anti-Suit Injunction Against Hytera While This Motion Is Pending ....................................12

            1.     The Parties in Both Actions Are the Same ................................................13

            2.     The Issues in Both Actions Are the Same and This Action Is Dispositive of the Foreign Action ..................................................13

             3.     Hytera's Foreign Action Is Oppressive and Vexatious ..............................15

            4.     International Comity Concerns Favor Granting the Injunction .................18

             5.     The Chinese Court's April Deadlines for Discovery and a Hearing Make The Need for Relief Immediate ......................................................19

IV.   CONCLUSION...............................................................................................20

MSA0941

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*1st Source Bank v. Neto*,
    861 F.3d 607 ...............................................................................................12, 13, 20

*Affymax, Inc. v. Johnson &Johnson*,
    420 F.Supp.2d 876 (N. D. Ill. 2006) ...................................................................12, 16

*Allendale Mutual Insurance Co. v. Bull Data Systems, Inc.*,
    10 F.3d 425 (7th Cir. 1993) ..............................................................................16, 18, 19

*Apple Inc. v. Samsung Elecs. Co.*,
    No. 12-CV-00630-LHK, 2018 WL 905943 (N.D. Cal. Feb. 15, 2018)...................................6

*AU New Haven, LLC v. YKK Corp.*,
    No. 15-CV-3411-GHW-SN, 2018 WL 2128373 (S.D.N.Y. May 8, 2018) .......................13, 15

*Bianco v. Globus Med., Inc.*,
    53 F. Supp. 3d 929 (E.D. Tex. 2014)...............................................................6, 7, 14

*Blackberry Ltd. v. Typo Prod. LLC*,
    2014 WL 4136586 (N.D. Cal. Aug. 21, 2014) ...........................................................6

*Cal. Dept. of Soc. Services v. Leavitt*,
    523 F.3d 1025 (9th Cir. 2008) ...........................................................................6

*California Expanded Metal Prod. Co. v. Klein*,
    2020 WL 9182723 (W.D. Wash. Oct. 19, 2020) .......................................................5

*Commercializadora Portimex, S.A. de CV v. Zen-Noh Grain Corp.*,
    373 F. Supp. 2d 645 (E.D. La. 2005)....................................................................16

*Eagle View Techs., Inc. v. Xactware Sols., Inc.*,
    2021 WL 4206291 (D.N.J. Sept. 16, 2021) .........................................................5, 15

*H-D Mich., LLC v. Hellenic Duty Free Shops S.A.*,
    694 F.3d 827 (7th Cir. 2012) .............................................................................18

*MacNeil Auto. Prod., Ltd. v. Cannon Auto. Ltd.*,
    2013 WL 12155279 (N.D. Ill. Feb. 4, 2013), *aff'd*, 542 F. App'x 515 (7th Cir.
    2013) ...................................................................................................18, 19

*Microsoft v. Motorola*,
    696 F.3d 872 (9th Cir. 2012) ...........................................................................13, 15

MSA0942

*Motorola Sols., Inc. v. Hytera Commc'ns Corp.*,
 365 F. Supp. 3d 916 (N.D. Ill. 2019) ....................................................................13

*Parasoft Corp. v. Parasoft S.A*,
 2015 WL 12645754 (C.D. Cal. Feb. 19, 2015).......................................................16

*Proveris Sci. Corp. v. Innovasystems, Inc.*,
 739 F.3d 1367 (Fed. Cir. 2014)..........................................................................6, 7

*Rosenbloom v. Barclays Bank PLC*,
 No. 13-CV-04087, 2014 WL 2726136 (N.D. Ill. June 16, 2014)...........................13

*Shure Inc. v. ClearOne, Inc.*,
 2020 WL 5214647 (N.D. Ill. Sept. 1, 2020) ........................................................1, 5

*Sing Fuels Pte Ltd. v. M/V Lila Shanghai*s,
 2023 WL 3506466 (E.D. Va. May 17, 2023) ..........................................................16

*TiVo Inc. v. EchoStar Corp.*,
 646 F.3d 869 (Fed. Cir. 2011). Dkt. 1131...................................................2, 5, 6, 14

*Vanoil Completion Sys., LLC v. PTC Do Brasil Tecnologia Em Petroleo LTDA*,
 2020 WL 6878769 (W.D. La. Nov. 20, 2020)..........................................................19

*Weyerhaeuser Co. v. Hiscox Dedicated Corp. Members Ltd.*,
 2019 WL 4082976 (W.D. Wash. Aug. 29, 2019)....................................................16

**Other Authorities**

H.R. Rep. No. 114-529 (2016)...........................................................................19, 20

MSA0943

## I.    INTRODUCTION

Motorola respectfully requests that the Court (i) open contempt proceedings based on Hytera's failure to pay royalties for its H-Series products and initiate discovery into whether those allegedly redesigned products continue to use Motorola's trade secrets and copyrights; and (ii) protect its jurisdiction by issuing an anti-suit injunction ("ASI") to prevent Hytera from advancing an action it brought in Shenzhen, China (the "China Action") that seeks a determination that those same products do not use the trade secrets and copyrights that are the subject of this case.

First, the Court's Royalty Order requires that Hytera pay royalties for the identified products and those not more than colorably different. Dkt. 1349. Hytera has paid no royalties for its H-Series products. There is, however, compelling evidence that Hytera's H-Series products are not more than colorably different from the products subject to that order, i.e., those the jury found improperly incorporated Motorola's intellectual property. In accordance with well-established law in such circumstances, contempt discovery should be opened. *See Shure Inc. v. ClearOne, Inc.*, 2020 WL 5214647, at \*13-\*14 (N.D. Ill. Sept. 1, 2020). For example, recently discovered evidence shows that Hytera's compiled code for the H-Series products contains express references to the same code strings and architecture that was found to use Motorola's intellectual property. This compelling evidence seriously undermines Hytera's claim that the H-Series is a redesign, justifying contempt-related discovery into Hytera's source code and whether it developed the H-Series in a clean room environment. In these circumstances, the Court should open contempt discovery to confirm Hytera has continued using Motorola's trade secrets and copyrights without paying an ongoing royalty for that use, as the evidence strongly suggests.

Both Hytera and the Court previously agreed contempt proceedings are the appropriate vehicle to analyze products Hytera claims are outside the scope of the Royalty Order. As part of the parties' disputes over the terms of the Court's Royalty Order, Hytera argued that any redesign

1

issues should be handled via contempt proceedings under the "not more than colorably different" framework from *TiVo Inc. v. EchoStar Corp.*, 646 F.3d 869, 879 (Fed. Cir. 2011). Dkt. 1131 at 15. Under that framework, if the differences between the adjudicated product and alleged redesign "are merely colorable, then the Court proceeds to the traditional contempt analysis." *Id*. Judge Norgle agreed that contempt was the appropriate mechanism for addressing alleged redesigns, such as the H-Series. Dkt. 1289 at 40 ("Hytera acknowledges Motorola's ability to initiate contempt proceedings against Hytera for willful violations of court orders, including this one, [which] provide[s] Motorola an adequate remedy.").

Second, despite telling this Court that contempt proceedings were the appropriate mechanism in its February 2021 brief, Hytera prepared its China Action, which it filed in Shenzhen in June 2022. In the China Action, Hytera seeks a determination that the very same H-Series products do not use the Motorola's intellectual property ("IP") that is the subject of this case. Hytera hid the existence of the China Action from this Court and Motorola until Motorola was served in late 2023. Hytera's duplicity must be stopped.

As such, Motorola requests that the Court issue an ASI requiring Hytera to withdraw its China Action by no later than ***April 1, 2024***, when Motorola was requested to provide its trade secrets to the Chinese court, with trial proceedings to commence shortly thereafter. An ASI is appropriate to prevent Motorola from being unjustly forced to re-litigate claims that have already been decided at trial—including by re-producing its source code and other voluminous discovery records, producing witnesses, etc.—in a duplicative action in China. Hytera's continued prosecution of the China Action represents precisely the type of oppressive and vexatious action that ASIs are designed to prevent, especially here, where Hytera itself previously agreed that redesign issues should be addressed in this Court. Hytera's effort to evade this Court's jurisdiction

MSA0945

by attempting to seek a preemptive ruling from a different court should not be countenanced.

II.      FACTUAL BACKGROUND

     **A.      Despite Hytera's Undisputed Guilt, It Continues to Avoid Taking Responsibility for Its Unlawful Conduct**

This case was filed on March 14, 2017. Dkt. 1. The jury trial commenced on November 6, 2019 and ended on February 14, 2020. Dkts. 739, 898. During those four months, the jury heard from over 40 witnesses on issues such as Motorola's development of the trade secrets, evidence of Hytera's theft, Hytera's alleged independent development, and the amount of damages. Dkt. 1088 at 2-5. Ultimately, the jury "found all [Motorola] trade secrets misappropriated and all copyrights infringed" (Dkt. 1097 at 3), including with respect to Hytera's allegedly re-designed I-series products (Dkt. 898), and that Hytera's trade secret misappropriation was willful and malicious (*id.*). Judge Norgle entered Final Judgment on March 5, 2020 (Dkt. 947), recognizing the evidence confirming that Hytera perpetrated a willful and malicious theft. Judge Norgle's denial of Hytera's post-trial motions also recognized that Motorola had proven the existence of protectable trade secrets, that Motorola had proven its copyright claims, and that evidence of Hytera's conduct supported a spoliation jury instruction, among many other rejections of Hytera's arguments. Dkt. 1088. Hytera no longer disputes its theft or that it acted willfully and maliciously. During oral argument in response to Judge Hamilton's comment that "[t]his is one of the most outrageous cases of trade secret theft I've even seen," Hytera's counsel confirmed that Hytera was "not defending the conduct at all here" and "not challenging liability . . . [n]or the fact of punitive damages." Ex. 1 (Dec. 5, 2023 Oral Argument Tr.) at 15:24-16:9.

     **B.      The Royalty Order and the Court's Enforcement of that Order**

After the jury verdict, the Court denied Motorola's motion for a permanent injunction and instead ordered Hytera "to pay a reasonable royalty to Motorola for the future use of Motorola's

3

trade secrets." Dkt. 1097 at 1. Although Motorola sought to include the H-Series products in the royalty order, the Court declined to do so, and instead held that with respect to "alleged redesigns," "Hytera acknowledges Motorola's ability to initiate contempt proceedings," which would provide "Motorola an adequate remedy." Dkt. 1289 at 40; *see also* Dkt. 1131 at 15 (Hytera acknowledging contempt proceedings). The final royalty order was entered on July 5, 2022, and it lists specific prior models of Hytera's products under the definition of "Covered Products." Dkts. 1348, 1349.

### C. Discovery Into Hytera's H-Series in the Patent Case

In late 2021, after Motorola's injunction was denied, Hytera launched its H-Series DMR products, which it billed as the "next generation" of radios released after those that were adjudicated to utilize Motorola's intellectual property. Ex. 2. Soon thereafter, Motorola sought discovery regarding the H-Series in the patent infringement action that Motorola brought against Hytera in this district. Ex. 3 (Case No. 1:17-cv-01972, Dkt. 254); Ex. 4 (Case No. 1:17-cv-01972, Dkt 275). Hytera was ordered to produce its H-Series source code three separate times in that case, yet it refused to fully comply with any of those Court orders, instead producing only a subset of code files. Ex. 5 (Case No. 1:17-cv-01972, Dkt 348); Ex. 6 (Case No. 1:17-cv-01972, Dkt 362). Because Hytera continues to flout U.S. court orders, Motorola was forced to move for contempt in that case too, and its motion is still pending. *Id*. Yet even Hytera's deficient source code production strongly evidences that the H-Series is not a redesign at all, but continues to use the trade secrets and copyrights Hytera stole from Motorola as explained in Section III.A.2., *infra*.

### D. Hytera Filed an Action in China Seeking Adjudication of Whether Its H-Series Products Utilizes the Trade Secrets and Copyrights that Motorola Asserted During Trial in This Action

At the same time this Court was finalizing the Royalty Order, in June 2022, Hytera filed its China Action in a Shenzhen, China court, seeking a determination that the Motorola trade secrets and U.S. copyrights at issue in this case are not used in its H-Series products. *See* Ex. 7

(Statement of Claim) at 1-2 (Claim 1 is "[t]o declare that" Hytera's "source code of the DMR industry radio series products and their software newly designed by [Hytera], does not infringe the trade secrets and copyrights of [Motorola]."); *id.* at 5 ("no longer involve[] the trade secrets and copyrights accused by [Motorola] in the US case"); Ex. 8 ¶¶ 7-8. Motorola did not learn of Hytera's China Action until November 2023, when the complaint was mailed to Motorola's Chicago headquarters. *Id.* ¶¶ 7-8, 10. During a January 25-26, 2024 hearing in the China Action, Motorola attempted to raise due process objections regarding improper service pursuant to the Hague Convention and that the Shenzhen court lacks jurisdiction to hear the case, but the court declined to entertain those objections and ruled that the case should proceed. *Id.* ¶ 14.

During the same January 25-26, 2024 hearing, the Chinese court permitted Hytera to begin presenting evidence in support of its claims. *Id.* ¶ 15. By April 1, 2024, the Chinese court requested that Motorola provide its rebuttal evidence in Hytera's China Action, including by producing its source code and trade secrets. *Id.* ¶ 16.

## III.    ARGUMENT

### A.    The Court Should Initiate Contempt Proceedings and Open Discovery Regarding the H-Series Products

District courts have "broad discretion" to initiate contempt proceedings "based on the facts presented." *TiVo Inc.*, 646 F.3d at 881. All that is "required for a district court to hold a contempt proceeding is a detailed accusation from the injured party setting forth the alleged facts constituting the contempt." *Id.*; *California Expanded Metal Prod. Co. v. Klein*, 2020 WL 9182723 (W.D. Wash. Oct. 19, 2020) (requiring only a "detailed accusation" and not proving contempt).

Courts have also held that to obtain discovery, a party must only make a *prima facie* showing that a court order has been disobeyed. *Shure Inc.*, 2020 WL 5214647 at *13-14; *Eagle View Techs., Inc. v. Xactware Sols., Inc.*, 2021 WL 4206291, at *2 (D.N.J. Sept. 16, 2021).

Similarly, courts have granted discovery when a party has "raised significant questions" of noncompliance. *Blackberry Ltd. v. Typo Prod. LLC*, 2014 WL 4136586, at *1 (N.D. Cal. Aug. 21, 2014); *Cal. Dept. of Soc. Services v. Leavitt*, 523 F.3d 1025, 1034 (9th Cir. 2008).

The determination of whether an alleged redesigned product violates a royalty order or injunction is addressed by applying the two-step "colorably different" framework. *TiVo Inc.*, 646 F.3d at 881 (en banc); *Apple Inc. v. Samsung Elecs. Co.*, 2018 WL 905943, (N.D. Cal. Feb. 15, 2018) ("[D]istrict courts have applied the 'colorably different' standard in the ongoing royalty context."); *Bianco v. Globus Med., Inc.*, 53 F. Supp. 3d 929, 942 (E.D. Tex. 2014) (applying this framework in trade secrets context). First, a party must show that the alleged redesigned product "is not more than colorably different from the product found to infringe." *Proveris Sci. Corp. v. Innovasystems, Inc.*, 739 F.3d 1367, 1370 (Fed. Cir. 2014) (quoting *TiVo Inc.*, 646 F.3d at 882). "Where one or more of the elements previously found to infringe has been modified or removed, the court must determine whether that modification is significant." *Id*. at 1370-71. If "the court concludes that the differences are not more than colorable, the court must then go on to the second step and determine whether the newly accused product in fact infringes the relevant claims." *Id*.

As discussed below, the evidence makes at least a *prima facie* showing that Hytera's alleged redesigned H-Series products are not more than colorably different from the products adjudicated at trial. Thus, the Court should order Hytera to produce all its H-Series source code and allow a brief period for H-Series discovery, to determine if contempt sanctions are warranted.

**1.      The H-Series Products Are Within the Purview of the Royalty Order**

As discussed above, an ongoing royalty order "implicitly extends to any products that are not colorably different from those products." *Bianco*, 53 F. Supp. 3d at 942. That is to ensure that a party found liable of trade secret misapropriation "cannot avoid its royalty obligations simply by renaming its products or making some trivial and immaterial change in the products." *Id.*

Accordingly, the Court's Royalty Order (Dkt. 1349) covers not just the products enumerated in the definition of "Covered Products," but also any alleged redesigned products that are not more than colorably different.

Hytera agreed with *Bianco's* reasoning, arguing that Motorola's proposed provision requiring notice and disclosure of alleged redesigns "circumvents the Court's exercise of its contempt power." Dkt. 1131 at 14-15. Hytera explained that contempt proceedings here are the appropriate vehicle for determining whether alleged redesigned products are "not more than colorably different" from the adjudicated products. *Id.* (citing *Tivo*, *Proveris*, and *Bianco*). The Court agreed too, ruling "Motorola's request that the Court require Hytera to provide notice to Motorola of alleged redesigns [is] unnecessary and inappropriate," including because "Hytera acknowledges Motorola's ability to initiate contempt proceedings against Hytera for willful violations of court orders, including this one, [which] provide[s] Motorola an adequate remedy." Dkt. 1289 at 40; *see also* Dkt. 1338 at 7. Thus, the Royalty Order reaches products that are not more than colorably different from those specifically adjudicated and contempt proceedings are the proper mechanism for determining whether any allegedly redesigned products incorporate Motorola's trade secrets and copyrights.

### 2. The Evidence Suggests the H-Series Products Are Not More Than Colorably Different from the Adjudicated Products

By all indications, Hytera's H-Series products are not more than colorably different from the products that were adjudicated to use Motorola's trade secrets and copyrights. The H-Series compiled code references the same source code strings (like function names and mechanisms) that Motorola relied on at trial to establish Hytera's misappropriation and infringement in the adjudicated products. Ex. 9 ¶¶ 39-106. Hytera's actions likewise strongly suggest that it knows the H-Series is not more than colorably different. To date, in the patent case, Hytera has produced

7

only H-Series compiled firmware that is largely non-human-readable and not most of the underlying source code files, despite three Court orders requiring it to produce that code. Ex. 5. And while Hytera's refusal strongly indicates it is hiding its ongoing theft, even the compiled H-Series code includes small readable portions that reference the same underlying Motorola trade secrets, including the *very* same Motorola data structure, application layer architecture, function names, and mechanisms that Motorola presented at trial as critical parts of its trade secrets that were misappropriated by Hytera. Ex. 9 ¶¶ 39-106. The exact same code strings and mechanisms show up *repeatedly* in Hytera's H-Series firmware, confirming that Hytera's H-Series appears to still be using the underlying code files from the adjudicated products that used Motorola's trade secrets and copyrights. *Id.* At minimum, the readable portions of compiled code establish a *prima facie* case and raise substantial questions as to the ongoing use of Motorola's trade secrets and copyrights.

For example, at trial, Motorola established that its Application Layer Trade Secret included Motorola's confidential and "unique approach to how [it] did applications." Trial Tr. 876:10-877:8. It also includes specific Motorola source code files, such as a file named "app_powerup.c" that Motorola presented during the jury trial to show that Hytera had used as Motorola's "app_powerup.c" as a "template" when writing Hytera's applications. Trial Tr. at 1300:7-1302:24. The adjudicated products similarly included a file named "app.powerup.cpp" that was heavily copied from Motorola's code—including *even Motorola's typos*. Trial Tr. at 1302:17-1305:3. Here, the H-Series compiled firmware still appears to use Motorola's Application Layer Trade Secret because the same application messaging and user input translation architecture, the very core of Motorola's Application Layer Trade Secret, appears in the H-Series binary firmware. Ex. 9 ¶¶ 41-56. This is apparent as the H-Series binary firmware includes the data structure such as

8

"application.MessageTo**AppPowerUp**,"       "ApplicationMessageTo**AppPowerUp**," "███████," "MessageTo**AppPowerUp**," and "███████████," which confirms that Hytera is still using Motorola's Application Layer trade secret to create its applications. *Id*.

Similar to the Application Layer Trade Secret, during trial, Motorola established that Hytera's Radio Application Framework ("RAF") layer copied Motorola's confidential documents and source code from Motorola's Ergonomics Layer (a/k/a "Darwin Layer") Trade Secret to manage how applications interact with each other, send messages to each other, and translate user inputs. Trial Tr. 1281:16-1282:24. Hytera's previous so-called redesign merely changed the word "RAF" to "AFP" or "AMF," which, as Motorola pointed out at trial, is insufficient. Trial Tr. 1438:2-1439:12; Ex. 10. The H-Series firmware shows that the H-Series code not only still uses the application messaging and translation mechanism that Hytera copied from Motorola, Hytera also uses the same AFP and AMF components that were based on Motorola's trade secrets, as Motorola proved at trial. Ex. 9 ¶¶ 57-82.

Worse still, despite Motorola's specific accusation that Hytera's HRCP mechanism, including underlying source code, was copied from Motorola's XCMP source code and documentation—including even a side-by-side comparison presented at trial and a jury verdict finding that Hytera had misappropriated Motorola's XCMP trade secret—Hytera's H-Series source code still uses *the same* HRCP opcode. *Id*. ¶¶ 83-95; Trial Tr. 1409:5-1411:13; Ex. 11 (Dr. Wicker's trial demonstrative showing that HRCP copied Motorola's XCMP and including source code copying example). Today, the limited human-readable portion of Hytera's H-Series firmware still uses the very same HRCP opcode data structure accused and adjudicated as using Motorola's intellectual property. Ex. 9 ¶¶ 83-95.

Further example H-Series similarities to the adjudicated products are summarized below:

| Motorola Trade Secret | Adjudicated Products | | H-Series Binary Firmware |
|---|---|---|---|
| Application Layer | ███████ | | application.MessageTo**AppPowerUp** |
| Darwin/ Ergonomic Layer | ███████ | | ███████ |
| XCMP | ███████ | | ███████ |
| HAL | ███████ | | ███████ |

*Id*. ¶¶ 39-106; *see also* Wicker Decl., Ex. G (file showing numerous similarities). These are not mere coincidences that Hytera's alleged redesign uses the same exact file names, code strings, and mechanisms, structured in a similar way to the adjudicated products that used Motorola's trade secrets and copyrights. *E.g.*, Ex. 9, ¶¶ 94, 104. The fact that the same source code strings, architecture, and mechanisms (e.g., application messaging) appear in the H-Series that also appeared in the adjudicated products evidences that Motorola's source code still exists in the H-Series code and functions the same way as the adjudicated products did based on Motorola's trade secrets. *Id*. ¶¶ 39-106. Thus, the evidence confirms that the H-Series is not more than colorably different from the adjudicated products with respect to at least the Application Layer, Darwin/Ergonomic Layer, XCMP, and HAL trade secrets.

Further, many of the same features from the adjudicated products that used Motorola's trade secrets continue to be offered in the H-Series. For example, the H-Series has the ████

███████████████████████████████████████████████████

███████████████████████████████████████████████████.

Ex. 12 (Rog 11 Resp.). Indeed, Hytera has affirmatively stated that the H-Series source code is

███████████████ adjudicated by the jury for many features. Ex. 13 at 1 ("████████

10

MSA0953

██████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

The substantial overlap between the H-Series and the older i-Series products adjudicated at trial is not surprising, given how quickly Hytera brought its H-Series products to market. The jury trial ended on February 14, 2020 and Hytera launched its purported redesign about a year and a half later, in late 2021. Motorola's trade secrets took many years to develop, *e.g.* Trial Tr. 877:6-13 ("it took 40 engineers 2,700 staff months" to develop the Application Layer Trade Secret), and it is highly unlikely that Hytera independently developed an entirely new product without use of Motorola's trade secrets in less than two years.

Finally, there is no evidence that Hytera used a "clean room" to create its H-Series code to ensure that persons who had exposure to Motorola's trade secrets and/or the adjudicated products were not involved in creating the H-Series code. Without strict clean room procedures, it is impossible or nearly so to ensure that development of the H-Series code was not based on or influenced by Motorola's trade secrets. Ex. 9 ¶¶ 29-31. In fact, the H-Series code that has been produced points to the lack of clean room procedures. For example, as Dr. Nielson described in his declaration regarding contempt in the patent case, the "█████████████████████

██████████████████████████████████████████████████ Ex. 14 ¶ 38.

Further, the H-Series code produced to date in the patent case appears to "████████████

███████████████" and "████████████████████████████████████████" such that there

is no ████████████████████████████████████████████████████████████.

*Id.* Thus, there is no way of knowing, ████████████████████████ whether the same person worked on both legacy code and H-Series code. *Id.* This evidence also strongly suggests the Hytera H-Series products are not more than colorably different than the adjudicated products.

11

Moreover, Hytera's recently filed brief opposing contempt in the patent case further confirms there were no clean room procedures. For example, Hytera attached a declaration from Mr. Hanjie Ou stating that he ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. Ex. 15 (Dkt. 363, Ex. C). But Mr. Ou worked with Mr. Yingzhe (Roger) Zhang, ▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮. Mr. Ou and Mr. Zhang are co-inventors on a Hytera base station patent application. *See, e.g.*, Ex. 16 (Chinese Patent No. CN113055953B). Thus, this evidence also strongly suggests Hytera did not use adequate clean room procedures.

### B. The Court Should Protect Its Jurisdiction By Issuing An Anti-Suit Injunction Against Hytera While This Motion Is Pending

In addition to initiating contempt proceedings, the Court should also enjoin Hytera from continuing to pursue its China Action while this motion is pending, and continue that injunction if and when contempt proceedings are initiated. Hytera's China Action involves the same parties and issues as this action, is vexatious and oppressive, and would cause irreparable harm to Motorola if Hytera is not enjoined at this stage in the proceedings. With the court in the China Action requesting that Motorola lodge its trade secrets and source code with the Chinese court by April 1, 2024, and a hearing on the merits to follow shortly thereafter, this Court must urgently act to stop Hytera's blatant attempt to skirt this Court's jurisdiction.

"A federal court's power to enjoin a party from litigating in another country is well established." *Affymax, Inc. v. Johnson &Johnson,* 420 F.Supp.2d 876, 883 (N. D. Ill. 2006). In determining whether an ASI is warranted, the district court first considers "whether or not the parties and the issues are the same, and whether or not the first action is dispositive of the action to be enjoined." *1st Source Bank v. Neto*, 861 F.3d 607, 613. If both factors are met, the district court considers whether "letting the two suits proceed would be gratuitously duplicative, or as the cases sometimes say 'vexatious and oppressive.'" *Id.* Seventh Circuit courts grant an ASI "when

necessary to prevent duplicative and vexatious foreign litigation and to avoid inconsistent judgments." *Rosenbloom v. Barclays Bank PLC*, No. 13-CV-04087, 2014 WL 2726136, *2 (N.D. Ill. June 16, 2014); *1st Source Banko*, 861 F.3d at 615 n.2. Each of these factors are satisfied.

### 1. The Parties in Both Actions Are the Same

The parties in both actions are the same. In both cases, Motorola Solutions Inc. and Motorola Solutions Malaysia Sdn. Bhd. are counter-parties to Hytera Communications Corporation Ltd. Compare *Motorola Sols., Inc. v. Hytera Commc'ns Corp.*, 365 F. Supp. 3d 916, 919 (N.D. Ill. 2019) *with* Ex. 7 (Statement of Claim) at 1.

### 2. The Issues in Both Actions Are the Same and This Action Is Dispositive of the Foreign Action

This case is dispositive of the China Action because "the claims in the foreign and domestic actions [are] . . . based on the same underlying dispute." *AU New Haven, LLC v. YKK Corp.*, 2018 WL 2128373, at *3 (S.D.N.Y. May 8, 2018). "The relevant inquiry is whether the substance of the claims and arguments raised in the two actions is the same." *Id*. "Thus, the dispositive criterion may be satisfied when a foreign proceeding will necessarily render a determination of the core issue at the heart of a claim appropriately decided only in a pending domestic action." *Id*. This test asks "whether the issues are the same not in a technical or formal sense, but in the sense that all the issues in the foreign action . . . can be resolved in the local action," but the issues need not be "precisely and verbally identical." *Microsoft v. Motorola,* 696 F.3d 872, 882-83 (9th Cir. 2012).

Hytera's China Action blatantly attempts to evade this Court's jurisdiction by raising issues that are already part of this case, but in a forum it believes will be more favorable to it. Specifically, Hytera seeks a determination that the Motorola trade secrets and copyrighted works that were at issue in this case are not used in its H-Series products. *See* Ex. 7 at 1-2 (Claim 1 is "[t]o declare that" Hytera's "source code of the DMR industry radio series products and their software newly

MSA0956

designed by [Hytera], does not infringe the trade secrets and copyrights of [Motorola].”), 5 (“no longer involve[] the trade secrets and copyrights accused by [Motorola] in the US case”). And that issue is already part of this Court's Royalty Order which as a matter of law encompasses products that are not more than colorably different from the those specifically adjudicated.[1]

As discussed above, the Royalty Order already encompasses Hytera products that continue to use the trade secrets and copyrights that Hytera previously stole. And it is for this Court, not the second-filed China Action, to decide if Hytera is violating that order by failing to pay royalties on the H-Series. As this Court has recognized in previously holding Hytera in contempt, “the court always retains jurisdiction to enforce its own orders even when those orders are on appeal.” Dkt. 1461 at 2-3 n.2. As part of that enforcement jurisdiction, the Royalty Order also permits the Court to hold contempt proceedings to determine whether the H-Series still uses Motorola's trade secrets and copyrights. *See TiVo*, 646 F.3d at 882 (contempt proceedings appropriate if new product is “not more than colorably different” with “focus on those elements of the adjudged infringing products” proven to infringe); *Bianco*, 53 F. Supp. 3d at 942 (royalty order “implicitly extends to any products that are not colorably different from those products”).

Again, Hytera already acknowledged that contempt proceedings in this Court are the appropriate avenue to litigate whether any allegedly redesigned products still use Motorola's trade secrets, proposing that precise mechanism to this Court and citing the case law discussed above in briefing its positions regarding the Royalty Order's form. Dkt. 1131 at 14-15 (Hytera arguing that Motorola's proposed redesign notice provision “circumvents the Court's exercise of its contempt power” and that contempt proceedings are appropriate for products that are “not more than

---

[1] It is also already part of Motorola's pending appeal to the Seventh Circuit of Judge Norgle's denial of a permanent injunction.

colorably different" from the adjudicated products). And Judge Norgle endorsed that view in ruling that "the Court finds that Motorola's request that the Court require Hytera to provide notice to Motorola of alleged redesigns unnecessary and inappropriate," including because "Hytera acknowledges Motorola's ability to initiate contempt proceedings against Hytera for willful violations of court orders, including this one, [which] provide[s] Motorola an adequate remedy." Dkt. 1289 at 40. Hytera cannot now circumvent this Court by dragging Motorola into foreign proceedings in which Hytera seeks to adjudicate the same thing in a second-filed action.

Accordingly, because enforcement of the Royalty Order is "based on the same underlying dispute" of whether Hytera's H-Series products use Motorola's trade secrets and copyrighted material, both actions substantively raise the same claim and arguments, and this ASI factor is satisfied. *AU New Haven*, 2018 WL 2128373 at \*3. Indeed, once the Court resolves those enforcement issues, Hytera's foreign action would also be resolved. *Microsoft*, 696 F.3d at 882-83 (upholding injunction where domestic action would resolve foreign action).[2]

### 3. Hytera's Foreign Action Is Oppressive and Vexatious

Hytera's China Action is also vexatious and oppressive because it is a blatant attempt to evade this Court's jurisdiction and subjects Motorola to a duplicative proceeding in a foreign court that is ill-equipped to make determinations regarding Motorola's trade secrets and U.S. copyrights. *First*, a judgment by Shenzhen court would usurp this Court's jurisdiction over whether the H-Series uses Motorola's *U.S.* trade secrets and copyrights and thus whether Hytera must pay Motorola additional ongoing royalties under this Court's order. Indeed, Hytera itself proposed

---

[2] Motorola's pending appeal to the 7th Circuit regarding Judge Norgle's denial of a permanent injunction provides an independent basis to find that the issues in this case are the same as those in the foreign action. *See* Case No. 22-2413, Dkt. 27 at 24. If the 7th Circuit overturns that denial, then just like with respect to the Royalty Order, injunction contempt proceedings would address redesigns under the same "not more than colorably different" framework. *See Eagle View*, 2021 WL 4206291, at \*1.

MSA0958

contempt proceedings *in this Court* as the appropriate way to address whether any of its redesigned products (such as the H-Series) still use Motorola's trade secrets and copyrights—a view that Judge Norgle endorsed. *See* Dkt. 1131 at 14-15; Dkt. 1289 at 40.

*Second*, the second-filed China Action raises serious forum shopping concerns, which renders it vexatious and oppressive. *See, e.g.*, *Parasoft Corp. v. Parasoft S.A*, 2015 WL 12645754, at *7 (C.D. Cal. Feb. 19, 2015); *Weyerhaeuser Co. v. Hiscox Dedicated Corp. Members Ltd.*, 2019 WL 4082976, at *2 (W.D. Wash. Aug. 29, 2019) ("The filing of the UK action raises serious concerns regarding duplicative litigation and forum shopping, a combination which the Court finds to be 'vexatious and oppressive.'"); *Sing Fuels Pte Ltd. v. M/V Lila Shanghai*s, 2023 WL 3506466, at *5 (E.D. Va. May 17, 2023) (party's attempt to relitigate in a more favorable jurisdiction would lead to "absurd duplication of effort" and "unwarranted inconvenience, expense, and vexation").

For example, if this Court does not enjoin Hytera from proceeding with the China Action, Motorola must litigate both cases simultaneously. *Allendale Mutual Insurance Co. v. Bull Data Systems, Inc.*, 10 F.3d 425, 430 (7th Cir. 1993) (duplicate litigation would be unduly prejudicial); *Affymax*, 420 F. Supp. at 883–884 (ruling that injunction would avoid in the "unfair burden" of simultaneously litigating the same issue in two courts); *Commercializadora Portimex, S.A. de CV v. Zen-Noh Grain Corp.*, 373 F. Supp. 2d 645, 649–50 (E.D. La. 2005) (finding inequitable hardship to defend against same claims in foreign action where party did not initiate that action). In China, the court requests that Motorola engage in discovery, including production of Motorola's source code that an Illinois jury found to comprise trade secrets, all over again. Ex. 8 ¶ 16. And there is currently no safeguard in place to prevent inappropriate disclosure of Motorola's trade secrets and source code, nor any guarantee that the Shenzhen court would impose restrictions on access to such materials to adequately protect Motorola. *Id.* ¶¶ 17-18. Hytera's duplicative China

Action therefore holds the real potential to compromise Motorola's technology.

Hytera's China Action is also a clear attempt at forum shopping. There is no reason why Hytera cannot litigate the H-Series question in this Court, which already has considerable experience with the issues involved. And the Shenzhen court offers inadequate procedural protections and discovery tools for Motorola, such as the failure to properly serve Motorola under the Hague Convention and refusal to reconsider its decision. *Supra* § II.D.; Ex. 8 ¶ 14. The improper service was especially prejudicial to Motorola because it resulted in Motorola's jurisdictional objections being lodged later than the deadline imposed by the Shenzhen court. Ex. 8 ¶¶ 7-8, 10-13. Motorola also lacks the proper discovery tools in the China Action, as the court's rules of evidence do not allow Motorola to use compulsory discovery tools (requests to produce, depositions, etc.) that it is entitled to use in the United States. *Id.* ¶ 19. There is no guarantee that the Shenzhen court would order Hytera to go beyond the hand-selected evidence that it has provided, let alone order Hytera to provide the same level of discovery that Motorola is entitled to receive in the United States (including depositions, which are disallowed in China) about H-Series development and the sources accessed and used by Hytera. *Id.*

*Fourth*, because this action and Hytera's China Action seek rulings on identical issues— whether the H-Series source code uses Motorola's U.S. trade secrets and infringes its U.S. copyrights—there is a significant risk of inconsistent judgments that Hytera may leverage to interfere with this Court's jurisdiction. For example, while this Court may rule that the H-Series misuses Motorola's intellectual property and thus is covered under the Royalty Order,[3] the Shenzhen Court may rule it does not. Or if the Shenzhen Court rules first (as it is expected to do

---

[3] Along the same lines, if the Seventh Circuit reverses Judge Norgle's denial of an injunction, the question of whether Hytera's H-Series sales are covered by such an injunction must be resolved by this Court.

in April or May 2024) and purports to absolve Hytera of wrongdoing with respect to the H-Series, Hytera will likely seek to leverage the ruling to estop Motorola from vindicating its rights under the Royalty Order with respect to the products in this case. Hytera's Statement of Claim in the China Action clearly says as much, stating that Hytera seeks a "credible ruling … so as to eliminate the risk of infringement claims to the maximum extent and ensure the stability of the law." Ex. 7 at 8; Ex. 8 ¶ 8. Inconsistent judgments are particularly likely here because the Chinese court would be ruling on misappropriation of U.S. trade secrets and copyrights—matters over which the Chinese court has no expertise. *See Allendale,* 10 F.3d at 430 (affirming finding of vexatiousness in part because the foreign tribunal was ill equipped to address main issue).

*Fifth*, the sequence of Hytera's actions show bad faith. Hytera's Statement of Claim shows that Hytera prepared and filed its China Action more than a year and a half ago in June 2022 to "eliminate the risk of infringement" posed by this Court's proceedings that would involve the H-Series. Ex. 7 (Statement of Claim) at 8; Ex. 8 ¶ 8. Yet Hytera never informed this Court or Motorola of that filing. Worse, Hytera was simultaneously telling this Court not to include H-Series in the Royalty Order because it should be addressed in contempt proceedings. Dkt. 1131 at 14-15. Hytera then hid what it was doing for nearly a year and a half before Motorola was served in late 2023. This is precisely the type of conduct viewed as vexatious. *See MacNeil Auto. Prod., Ltd. v. Cannon Auto. Ltd.*, 2013 WL 12155279 (N.D. Ill. Feb. 4, 2013), *aff'd*, 542 F. App'x 515 (7th Cir. 2013) (finding foreign proceeding duplicative after defendant failed to inform court or plaintiff of foreign lawsuit as domestic case proceeded).

### 4. International Comity Concerns Favor Granting the Injunction

Comity concerns carry little weight here because Hytera's China Action is indeed vexatious and oppressive, and this is a dispute between private parties. *See H-D Mich., LLC v. Hellenic Duty Free Shops S.A.*, 694 F.3d 827, 848 (7th Cir. 2012) ("Even if we had some sense

that international comity could become an issue, our court ordinarily allows an injunction against litigating in a foreign forum 'upon a finding that letting the two suits proceed would be gratuitously duplicative, or as the cases sometimes say vexatious and oppressive.'"); *MacNeil*, 2013 WL 12155279 at *2; *Vanoil Completion Sys., LLC v. PTC Do Brasil Tecnologia Em Petroleo LTDA*, 2020 WL 6878769, at *3 (W.D. La. Nov. 20, 2020).

If considered at all, comity is Hytera's burden to establish, which it cannot do. *See Allendale*, 10 F.3d at 431. Instead, comity compels that this Court has the primary ability to enforce its own orders. Specifically, comity considerations must include the substantial U.S. interests involved. *Id.* at 432. Here, the U.S. has a strong interest in enforcing the judgment of its courts and deciding issues related to IP rights protected under U.S. law. If allowed to proceed, Hytera's China Action would effectively usurp this Court's role in policing its order that Hytera pay for products that continue to use Motorola's misappropriated trade secrets and copyrights. Further, Hytera's China Action directly harms this interest by threatening to interfere with laws enacted by Congress to protect U.S. IP rights. H.R. Rep. No. 114-529, at 6 (2016) (The DTSA "will equip companies with the additional tools they need to protect their proprietary information, to preserve and increase jobs and promote growth in the United States, and to continue to lead the world in creating new and innovative products, technologies, and services."); Dkt. 834 at 12. The Shenzhen court, by contrast, provides inadequate procedural and evidentiary safeguards for Motorola to fully litigate its defense to Hytera's claim. *See supra* § III.B.3; *Allendale*, 10 F.3d at 430 (foreign court did not provide insurer ability to establish defenses available under U.S. law).

### 5. The Chinese Court's April Deadlines for Discovery and a Hearing Make The Need for Relief Immediate

Motorola needs immediate relief from this Court to prevent imminent irreparable harm. Although Motorola need not meet the traditional preliminary injunction test for an ASI (*1st Source*

19

MSA0962

*Bank*, 861 F.3d at 613), those factors confirm the need for an ASI here.

Motorola will imminently suffer irreparable harm if Hytera is permitted to press forward with its China Action: Motorola has been asked to provide evidence in less than two months (by April 1, 2024), and the Chinese court is expected to rule shortly thereafter. Ex. 8 ¶ 20. *First*, in Hytera's China Action, Motorola lacks access to the discovery tools it is entitled to in this Court. *Id.* ¶ 19. Consequently, Motorola must make do with Hytera's hand-selected evidence and whatever the Shenzhen Court decides to permit. *Second*, the China Action court asks Motorola to disclose its highly confidential and valuable trade secrets. *Id.* ¶ 16. This is especially harmful as there are presently no adequate safeguards in that case to protect against inadvertent disclosure. *Id.* ¶¶ 17-18. *Third*, Hytera will likely try to leverage a favorable ruling to shut down litigation in the U.S. Hytera has already alluded to this goal, stating to the Shenzhen Court that it seeks a "credible ruling . . . so as to eliminate the risk of infringement claims to the maximum extent and ensure the stability of the law." Ex. 7 (Statement of Claim) at 8; Ex. 8 ¶ 8.

The balance of harms overwhelmingly favors an injunction. Against the harm faced by Motorola, Hytera stands to lose nothing under the *status quo*. There is no urgency in the relief it seeks, as that case has been pending an extended period with no action and Hytera is well within its rights to seek a voluntary stay of its China Action from the Shenzhen Court. Ex. 8 ¶ 21. Finally, the public interest favors entry of an ASI here, as there is a strong public interest in the enforcement of U.S. laws and protection of U.S. IP rights. H.R. Rep. No. 114-529, at 6 (2016); Dkt. 834 at 12.

## IV. CONCLUSION

For the reasons above, Motorola requests that contempt proceedings be initiated (including opening H-Series discovery) and that Hytera be enjoined from pursuing the China Action.

MSA0963

DATED: February 20, 2024     Respectfully submitted,


          */s/ Adam Alper*
          Adam Alper (admitted *pro hac vice*)
          adam.alper@kirkland.com
          Akshay S. Deoras (admitted *pro hac vice)*
          akshay.deoras@kirkland.com
          Brandon H. Brown (IL Bar No. 266347 CA)
          brandon.brown@kirkland.com
          KIRKLAND & ELLIS LLP
          555 California Street
          San Francisco, CA 94104
          Telephone: (415) 439-1400
          Facsimile: (415) 439-1500

          Michael W. De Vries (admitted *pro hac vice*)
          michael.devries@kirkland.com
          Christopher Lawless (admitted *pro hac vice*)
          christopher.lawless@kirkland.com
          Justin Singh (admitted *pro hac vice*)
          justin.singh@kirkland.com
          KIRKLAND & ELLIS LLP
          555 South Flower Street
          Los Angeles, CA 90071
          Telephone: (213) 680-8400
          Facsimile: (213) 680-8500

          Ali-Reza Boloori (admitted *pro hac vice)*
          ali-reza.boloori@kirkland.com
          2049 Century Park East, Suite 3700
          Los Angeles, CA 90067
          Telephone: (213) 680-8127
          Facsimile: (310) 552-5900

          David Rokach (IL SBN: 6279703)
          david.rokach@kirkland.com
          KIRKLAND & ELLIS LLP
          300 North LaSalle
          Chicago, IL 60654
          Telephone: (312) 862-2000
          Facsimile: (312) 862-2200

          Leslie M. Schmidt (admitted *pro hac vice*)
          leslie.schmidt@kirkland.com
          KIRKLAND & ELLIS LLP
          601 Lexington Avenue
          New York, NY 10022
          Telephone: (212) 446-4800
          Facsimile: (212) 446-4900

          Attorneys for Plaintiffs

21

*Motorola Solutions, Inc. and Motorola
Solutions Malaysia SDN. BHD.*

**CERTIFICATE OF SERVICE**

I, Adam Alper, an attorney, hereby certify that on February 20, 2024, I caused a true and correct copy of the foregoing document to be served via the Court's ECF system upon all counsel of record.

DATED:  February 20, 2024

/s/ *Adam Alper*
Adam Alper

MSA0966

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| MOTOROLA SOLUTIONS, INC., and MOTOROLA SOLUTIONS MALAYSIA SDN. BHD., <br><br> Plaintiffs, <br><br> v. <br><br> HYTERA COMMUNICATIONS CORPORATION LTD., HYTERA AMERICA, INC., and HYTERA COMMUNICATIONS AMERICA (WEST), INC., <br><br> Defendants. | Case No. 1:17-CV-01973 <br><br> Honorable Martha M. Pacold |

**DEFENDANT HYTERA COMMUNICATIONS CORPORATION LTD.'S
NOTICE REGARDING SHENZHEN LITIGATION**

MSA0967

As Hytera noted in its previous filing (Dkt. 1506), Hytera filed an Application for Suspension of Litigation in the Shenzhen Intermediate People's Court on March 26, promptly following the Court's issuance of the anti-suit injunction. Hytera files this notice to inform the court that today, March 28, Hytera received three summonses issued by the Shenzhen Court. These summonses require Hytera to exchange evidence with Motorola on April 1 and to attend hearings on April 2, 3, 7, 8, and 9. The summonses are attached hereto as Exhibits 1, 2, and 3.

Date: March 28, 2024

Respectfully submitted,

/s/ *Boyd Cloern*

Boyd Cloern (*pro hac vice*)
bcloern@steptoe.com
Chris Suarez
csuarez@steptoe.com
John William Toth (*pro hac vice*)
btoth@steptoe.com
STEPTOE & JOHNSON LLP
1330 Connecticut Avenue NW
Washington, DC 20036
Telephone: (202) 429-3000
Facsimile: (202) 429-3902

MSA0968

**CERTIFICATE OF SERVICE**

I, Boyd Cloern, an attorney, hereby certify that on March 28, 2024, I caused a true and correct copy of the foregoing submission to be served via the Court's ECF system upon all counsel of record.

/s/ Boyd Cloern
Boyd Cloern

MSA0969

DOCUMENT PRODUCED IN NATIVE FORMAT

DEFENDANTS' EXHIBIT
17-cv-1973

DTX-5502

CONFIDENTIAL BUSINESS INFORMATION, SUBJECT TO PROTECTIVE ORDER

HYT1973-23497468

# TRANSLATION CERTIFICATION

Date: December 2, 2019

To whom it may concern:

This is to certify that the attached translation is an accurate representation of the documents received by this office. The translation was completed from:

- Chinese

To:

- English

The documents are designated as:
- HYT1973-22050083
- HYT1973-22363917
- HYT1973-23247281
- HYT1973-23349620
- HYT1973-23349621
- HYT1973-23445150
- HYT1973-23445152
- HYT1973-23497456
- HYT1973-23497457
- HYT1973-23497458
- HYT1973-23497459
- HYT1973-23497460
- HYT1973-23497461
- HYT1973-23497462
- HYT1973-23497463
- HYT1973-23497464
- HYT1973-23497465
- HYT1973-23497466
- HYT1973-23497467
- HYT1973-23497468
- HYT1973-23497469
- HYT1973-23497470
- HYT1973-23497471
- HYT1973-23497472

- HYT1973-23497473
- HYT1973-23497474
- HYT1973-23497475
- HYT1973-23497476
- HYT1973-23497477
- HYT1973-23497478

Eugene Li, Project Manager in this company, attests to the following:

"To the best of my knowledge, the aforementioned documents are a true, full and accurate translation of the specified documents."

_____
Signature of Eugene Li

MSA0972

| | A | B | C | D | E | F | G | H | I | J | K | L | M |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | **Item/Year**<br>**项目/年份** | **2005-2009** | **2010** | **2011** | **2012** | **2013** | **2014** | **2015** | **2016** | **2017** | **2018** | **2019H1** | **总计** |
| 2 | 商业低端机型研发费<br>（含DMR公共项目费用分摊） | - | - | - | - | 365 | 1,063 | 1,240 | 1,720 | 2,959 | 2,279 | 1,254 | 10,880 |
| 3 | 其中：低端机直接研发费 | - | - | - | - | 312 | 970 | 1,140 | 1,590 | 2,950 | 2,237 | 1,117 | 10,317 |
| 4 | 行业中高端机型研发费 | 8,894 | 4,176 | 6,423 | 7,066 | 7,183 | 7,107 | 8,545 | 8,156 | 8,746 | 8,476 | 3,621 | 78,393 |
| 5 | DMR研发总投入 | 8,894 | 4,176 | 6,423 | 7,066 | 7,548 | 8,170 | 9,784 | 9,877 | 11,704 | 10,755 | 4,875 | 89,272 |
| 6 | 单位:万元 | | | | | | | | | | | | |

分摊计算表

| 项目区分\年份 | 2005-2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019H1 | 总计 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 商业低端机型直接研发费 | | - | - | - | 3,119,534 | 9,704,535 | 11,396,439 | 15,904,962 | 29,502,954 | 22,373,533 | 11,167,915 | 103,169,873 |
| 商业低端机型直接投入占比 | 0.00% | 0.00% | 0.00% | 0.00% | 4.84% | 13.01% | 12.67% | 17.42% | 25.28% | 21.19% | 25.73% | 12.59% |
| 商业低端机型研发费分摊 | | - | - | - | 532,641 | 926,696 | 1,001,752 | 1,296,360 | 82,780 | 413,915 | 1,372,783 | 5,626,927 |
| 商业低端研发费用合计 | | - | - | - | 3,652,176 | 10,631,231 | 12,398,192 | 17,201,322 | 29,585,734 | 22,787,448 | 12,540,698 | 108,796,800 |
| 单位:元 | | | | | | | | | | | | |
| | | | | | | | | | | | | |
| 公共项目及公共配件研发费 | 149,991.03 | 10,117,061 | 10,993,549 | 11,098,462 | 11,007,756 | 7,121,512 | 7,905,680 | 7,443,377 | 327,488 | 1,953,553 | 5,336,043 | 73,454,471 |
| | | | | | | | | | | | | |
| 行业中高端机型研发费-直接 | 88,791,970 | 31,642,421 | 53,239,283 | 59,562,423 | 61,349,903 | 64,873,249 | 78,542,552 | 75,417,389 | 87,214,228 | 83,222,798 | 32,242,070 | 716,098,286 |
| 行业中高端机型研发费-间接分摊 | 149,991 | 10,117,061 | 10,993,549 | 11,098,462 | 10,475,115 | 6,194,815 | 6,903,927 | 6,147,018 | 244,708 | 1,539,638 | 3,963,260 | 67,827,544 |
| DMR研发投入合计 | 88,941,960.93 | 41,759,481.82 | 64,232,832.41 | 70,660,884.16 | 75,477,193.67 | 81,699,295.59 | 97,844,670.63 | 98,765,728.75 | 117,044,669.08 | 107,549,884.33 | 48,746,028.37 | 892,722,630 |
| | | | | | | | | | | | | |
| | | | | | | | | | | | | |
| DMR直接项目研发投入合计 | 88,791,970 | 31,642,421 | 53,239,283 | 59,562,423 | 64,469,437 | 74,577,784 | 89,938,991 | 91,322,351 | 116,717,181 | 105,596,332 | 43,409,985 | 819,268,158 |

CONFIDENTIAL BUSINESS INFORMATION, SUBJECT TO PROTECTIVE ORDER

HYT1973-23497468

MSA0974

# 区分商业终端机型

| No. | 产品分类 | 产品族 | 产品系列 | 产品名称 | 机型 | 产品线 |
|---|---|---|---|---|---|---|
| 1 | 终端标准 | DMR终端 | BD3 | BD300 | BD300 | 商业终端&智能配件产品线 |
| 2 | 终端标准 | DMR终端 | BD3 | BD300 | BD302 | 商业终端&智能配件产品线 |
| 3 | 终端标准 | DMR终端 | BD3 | BD300 | BD305 | 商业终端&智能配件产品线 |
| 4 | 终端标准 | DMR终端 | BD3 | BD300 | BD306 | 商业终端&智能配件产品线 |
| 5 | 终端标准 | DMR终端 | BD3 | BD300 | BD308 | 商业终端&智能配件产品线 |
| 6 | 终端标准 | DMR终端 | BD3 | BD300, | BD305LF | 商业终端&智能配件产品线 |
| 7 | 终端标准 | DMR终端 | BD3 | BD350 | BD350 | 商业终端&智能配件产品线 |
| 8 | 终端标准 | DMR终端 | BD3 | BD350 | BD352 | 商业终端&智能配件产品线 |
| 9 | 终端标准 | DMR终端 | BD3 | BD350 | BD355 | 商业终端&智能配件产品线 |
| 10 | 终端标准 | DMR终端 | BD3 | BD350 | BD356 | 商业终端&智能配件产品线 |
| 11 | 终端标准 | DMR终端 | BD3 | BD350 | BD358 | 商业终端&智能配件产品线 |
| 12 | 终端定制 | DMR终端 | BD3 | BD350 | TR2Xi(BD350) | 商业终端&智能配件产品线 |
| 13 | 终端标准 | DMR终端 | BD5/TD5 | BD500 | BD500 | 商业终端&智能配件产品线 |
| 14 | 终端标准 | DMR终端 | BD5/TD5 | BD500 | BD502 | 商业终端&智能配件产品线 |
| 15 | 终端标准 | DMR终端 | BD5/TD5 | BD500 | BD505 | 商业终端&智能配件产品线 |
| 16 | 终端标准 | DMR终端 | BD5/TD5 | BD500 | BD506 | 商业终端&智能配件产品线 |
| 17 | 终端标准 | DMR终端 | BD5/TD5 | BD500 | BD508 | 商业终端&智能配件产品线 |
| 18 | 终端定制 | DMR终端 | BD5/TD5 | BD500 | BD505LF(BD505) | 商业终端&智能配件产品线 |
| 19 | 终端标准 | DMR终端 | BD5/TD5 | BD510 | BD510 | 商业终端&智能配件产品线 |
| 20 | 终端标准 | DMR终端 | BD5/TD5 | BD510 | BD512 | 商业终端&智能配件产品线 |
| 21 | 终端标准 | DMR终端 | BD5/TD5 | BD510 | BD515 | 商业终端&智能配件产品线 |
| 22 | 终端标准 | DMR终端 | BD5/TD5 | BD510 | BD516 | 商业终端&智能配件产品线 |
| 23 | 终端标准 | DMR终端 | BD5/TD5 | BD510 | BD518 | 商业终端&智能配件产品线 |
| 24 | 终端标准 | DMR终端 | BD5/TD5 | BD550 | BD550 | 商业终端&智能配件产品线 |
| 25 | 终端标准 | DMR终端 | BD5/TD5 | BD550 | BD552 | 商业终端&智能配件产品线 |
| 26 | 终端标准 | DMR终端 | BD5/TD5 | BD550 | BD555 | 商业终端&智能配件产品线 |
| 27 | 终端标准 | DMR终端 | BD5/TD5 | BD550 | BD556 | 商业终端&智能配件产品线 |

# 区分商业终端机型

| No. | 产品分类 | 产品族 | 产品系列 | 产品名称 | 机型 | 产品线 |
|---|---|---|---|---|---|---|
| 28 | 终端标准 | DMR终端 | BD5/TD5 | BD550 | BD558 | 商业终端&智能配件产品线 |
| 29 | 终端标准 | DMR终端 | BD5/TD5 | BD610 | BD610 | 商业终端&智能配件产品线 |
| 30 | 终端标准 | DMR终端 | BD5/TD5 | BD610 | BD612 | 商业终端&智能配件产品线 |
| 31 | 终端标准 | DMR终端 | BD5/TD5 | BD610 | BD615 | 商业终端&智能配件产品线 |
| 32 | 终端标准 | DMR终端 | BD5/TD5 | BD610 | BD616 | 商业终端&智能配件产品线 |
| 33 | 终端标准 | DMR终端 | BD5/TD5 | BD610 | BD618 | 商业终端&智能配件产品线 |
| 34 | 终端标准 | DMR终端 | MD6 | MD610 | MD610 | 商业终端&智能配件产品线 |
| 35 | 终端标准 | DMR终端 | MD6 | MD610 | MD612 | 商业终端&智能配件产品线 |
| 36 | 终端标准 | DMR终端 | MD6 | MD610 | MD615 | 商业终端&智能配件产品线 |
| 37 | 终端标准 | DMR终端 | MD6 | MD610 | MD616 | 商业终端&智能配件产品线 |
| 38 | 终端标准 | DMR终端 | MD6 | MD610 | MD618 | 商业终端&智能配件产品线 |
| 39 | 终端标准 | DMR终端 | MD6 | MD620 | MD620 | 商业终端&智能配件产品线 |
| 40 | 终端标准 | DMR终端 | MD6 | MD620 | MD622 | 商业终端&智能配件产品线 |
| 41 | 终端标准 | DMR终端 | MD6 | MD620 | MD625 | 商业终端&智能配件产品线 |
| 42 | 终端标准 | DMR终端 | MD6 | MD620 | MD626 | 商业终端&智能配件产品线 |
| 43 | 终端标准 | DMR终端 | MD6 | MD620 | MD628 | 商业终端&智能配件产品线 |
| 44 | 终端标准 | DMR终端 | PD3/TD3 | PD350 | PD352 | 商业终端&智能配件产品线 |
| 45 | 终端标准 | DMR终端 | PD3/TD3 | PD350 | PD355 | 商业终端&智能配件产品线 |
| 46 | 终端标准 | DMR终端 | PD3/TD3 | PD350 | PD355LF | 商业终端&智能配件产品线 |
| 47 | 终端标准 | DMR终端 | PD3/TD3 | PD350 | PD356 | 商业终端&智能配件产品线 |
| 48 | 终端标准 | DMR终端 | PD3/TD3 | PD350 | PD358 | 商业终端&智能配件产品线 |
| 49 | 终端标准 | DMR终端 | PD3/TD3 | PD360 | PD362 | 商业终端&智能配件产品线 |
| 50 | 终端标准 | DMR终端 | PD3/TD3 | PD360 | PD365 | 商业终端&智能配件产品线 |
| 51 | 终端标准 | DMR终端 | PD3/TD3 | PD360 | PD365LF | 商业终端&智能配件产品线 |
| 52 | 终端标准 | DMR终端 | PD3/TD3 | PD360 | PD366 | 商业终端&智能配件产品线 |
| 53 | 终端标准 | DMR终端 | PD3/TD3 | PD360 | PD368 | 商业终端&智能配件产品线 |
| 54 | 终端标准 | DMR终端 | PD3/TD3 | PD370 | PD372 | 商业终端&智能配件产品线 |

# 区分商业终端机型

| No. | 产品分类 | 产品族 | 产品系列 | 产品名称 | 机型 | 产品线 |
|---|---|---|---|---|---|---|
| 55 | 终端标准 | DMR终端 | PD3/TD3 | PD370 | PD375 | 商业终端&智能配件产品线 |
| 56 | 终端标准 | DMR终端 | PD3/TD3 | PD370 | PD376 | 商业终端&智能配件产品线 |
| 57 | 终端标准 | DMR终端 | PD3/TD3 | PD370 | PD378 | 商业终端&智能配件产品线 |
| 58 | 终端标准 | DMR终端 | PD4/TD5 | PD400 | PD402 | 商业终端&智能配件产品线 |
| 59 | 终端标准 | DMR终端 | PD4/TD5 | PD400 | PD405 | 商业终端&智能配件产品线 |
| 60 | 终端标准 | DMR终端 | PD4/TD5 | PD400 | PD406 | 商业终端&智能配件产品线 |
| 61 | 终端标准 | DMR终端 | PD4/TD5 | PD400 | PD408 | 商业终端&智能配件产品线 |
| 62 | 终端定制 | DMR终端 | PD4/TD5 | PD400 | PD385(PD405) | 商业终端&智能配件产品线 |
| 63 | 终端标准 | DMR终端 | PD4/TD5 | PD410 | PD412 | 商业终端&智能配件产品线 |
| 64 | 终端标准 | DMR终端 | PD4/TD5 | PD410 | PD415 | 商业终端&智能配件产品线 |
| 65 | 终端标准 | DMR终端 | PD4/TD5 | PD410 | PD416 | 商业终端&智能配件产品线 |
| 66 | 终端标准 | DMR终端 | PD4/TD5 | PD410 | PD418 | 商业终端&智能配件产品线 |
| 67 | 终端标准 | DMR终端 | PD4/TD5 | PD460 | PD462 | 商业终端&智能配件产品线 |
| 68 | 终端标准 | DMR终端 | PD4/TD5 | PD460 | PD465 | 商业终端&智能配件产品线 |
| 69 | 终端标准 | DMR终端 | PD4/TD5 | PD460 | PD466 | 商业终端&智能配件产品线 |
| 70 | 终端标准 | DMR终端 | PD4/TD5 | PD460 | PD468 | 商业终端&智能配件产品线 |
| 71 | 终端标准 | DMR终端 | PD4/TD5 | PD480 | PD482 | 商业终端&智能配件产品线 |
| 72 | 终端标准 | DMR终端 | PD4/TD5 | PD480 | PD485 | 商业终端&智能配件产品线 |
| 73 | 终端标准 | DMR终端 | PD4/TD5 | PD480 | PD486 | 商业终端&智能配件产品线 |
| 74 | 终端标准 | DMR终端 | PD4/TD5 | PD480 | PD488 | 商业终端&智能配件产品线 |
| 75 | 终端定制 | DMR终端 | PD4/TD5 | PD480 | AR482G(PD482) | 商业终端&智能配件产品线 |
| 76 | 终端定制 | DMR终端 | PD4/TD5 | PD480 | PD395(PD485) | 商业终端&智能配件产品线 |
| 77 | 终端标准 | DMR终端 | PD4/TD5 | PD530 | PD530 | 商业终端&智能配件产品线 |
| 78 | 终端定制 | DMR终端 | PD4/TD5 | PD530 | DS-800(PD530) | 商业终端&智能配件产品线 |
| 79 | 终端标准 | DMR终端 | PD4/TD5 | PD530L | PD530L | 商业终端&智能配件产品线 |
| 80 | 终端标准 | DMR终端 | PD4/TD5 | PD530S | PD530S | 商业终端&智能配件产品线 |
| 81 | 终端标准 | DMR终端 | PD3/TD3 | TD350 | TD350 | 商业终端&智能配件产品线 |

**区分商业终端机型**

| No. | 产品分类 | 产品族 | 产品系列 | 产品名称 | 机型 | 产品线 |
|---|---|---|---|---|---|---|
| 82 | 终端标准 | DMR终端 | PD3/TD3 | TD360 | TD360 | 商业终端&智能配件产品线 |
| 83 | 终端标准 | DMR终端 | PD3/TD3 | TD370 | TD370 | 商业终端&智能配件产品线 |
| 84 | 终端标准 | DMR终端 | PD4/TD5 | TD500 | TD500 | 商业终端&智能配件产品线 |
| 85 | 终端定制 | DMR终端 | PD4/TD5 | TD500 | TD530(TD500) | 商业终端&智能配件产品线 |
| 86 | 终端定制 | DMR终端 | PD4/TD5 | TD500 | TR4X(TD500) | 商业终端&智能配件产品线 |
| 87 | 终端标准 | DMR终端 | PD4/TD5 | TD510 | TD510 | 商业终端&智能配件产品线 |
| 88 | 终端标准 | DMR终端 | PD4/TD5 | TD520 | TD520 | 商业终端&智能配件产品线 |
| 89 | 终端定制 | DMR终端 | BD5/TD5 | TD550 | TD550(TD550) | 商业终端&智能配件产品线 |
| 90 | 终端标准 | DMR终端 | PD4/TD5 | TD560 | Super246 | 商业终端&智能配件产品线 |
| 91 | 终端标准 | DMR终端 | PD4/TD5 | TD560 | TD560 | 商业终端&智能配件产品线 |
| 92 | 终端标准 | DMR终端 | PD4/TD5 | TD580 | TD580 | 商业终端&智能配件产品线 |

项目属性

|    | A | B |
| --- | --- | --- |
| 1 | 项目代码 | 项目归属 |
| 2 | 17070003 | 商业低端机型 |
| 3 | 400006 | 行业中高端机型 |
| 4 | 400007 | 行业中高端机型 |
| 5 | 400008 | 行业中高端机型 |
| 6 | 400009 | 行业中高端机型 |
| 7 | 400029 | 行业中高端机型 |
| 8 | 400044 | 行业中高端机型 |
| 9 | 400057 | 行业中高端机型 |
| 10 | 400060 | 行业中高端机型 |
| 11 | 400061 | 行业中高端机型 |
| 12 | 400062 | 行业中高端机型 |
| 13 | 400063 | 行业中高端机型 |
| 14 | 400064 | 行业中高端机型 |
| 15 | 400072 | 商业低端机型 |
| 16 | 400073 | 商业低端机型 |
| 17 | 400084 | 行业中高端机型 |
| 18 | 400098 | 行业中高端机型 |
| 19 | 400109 | 行业中高端机型 |
| 20 | 400116 | 商业低端机型 |
| 21 | 400117 | 行业中高端机型 |
| 22 | 400119 | 商业低端机型 |
| 23 | 400166 | 行业中高端机型 |
| 24 | 400171 | 商业低端机型 |
| 25 | 400177 | 行业中高端机型 |
| 26 | 400185 | 行业中高端机型 |
| 27 | 400194 | 行业中高端机型 |
| 28 | 400195 | 行业中高端机型 |
| 29 | 400196 | 行业中高端机型 |
| 30 | 400201 | 商业低端机型 |
| 31 | 400202 | 行业中高端机型 |
| 32 | 400210 | 行业中高端机型 |
| 33 | 400211 | 行业中高端机型 |
| 34 | 400212 | 行业中高端机型 |
| 35 | 400215 | 行业中高端机型 |
| 36 | 400216 | 行业中高端机型 |
| 37 | 400225 | 商业低端机型 |
| 38 | 400226 | 行业中高端机型 |
| 39 | 400231 | 商业低端机型 |
| 40 | 400232 | 商业低端机型 |
| 41 | 400233 | 商业低端机型 |
| 42 | 400234 | 商业低端机型 |
| 43 | 400235 | 商业低端机型 |
| 44 | 400236 | 商业低端机型 |
| 45 | 400237 | 商业低端机型 |
| 46 | 400238 | 行业中高端机型 |

项目属性

| | A | B |
|---|---|---|
| 1 | 项目代码 | 项目归属 |
| 47 | 400239 | 商业低端机型 |
| 48 | 400240 | 商业低端机型 |
| 49 | 400243 | 行业中高端机型 |
| 50 | 400251 | 行业中高端机型 |
| 51 | 400252 | 行业中高端机型 |
| 52 | 400253 | 行业中高端机型 |
| 53 | 400255 | 商业低端机型 |
| 54 | 400259 | 行业中高端机型 |
| 55 | 400273 | 行业中高端机型 |
| 56 | 400275 | 商业低端机型 |
| 57 | 400290 | 商业低端机型 |
| 58 | 400291 | 行业中高端机型 |
| 59 | 900000 | 商业低端机型 |
| 60 | CPC0341 | 行业中高端机型 |
| 61 | CPC1401 | 行业中高端机型 |
| 62 | CR00001 | 公共项目 |
| 63 | CR01201 | 行业中高端机型 |
| 64 | CYZX001 | 公共项目 |
| 65 | D613011 | 行业中高端机型 |
| 66 | D613012 | 行业中高端机型 |
| 67 | D613113 | 行业中高端机型 |
| 68 | D613114 | 行业中高端机型 |
| 69 | D71E361 | 行业中高端机型 |
| 70 | D781401 | 行业中高端机型 |
| 71 | D79EX31 | 行业中高端机型 |
| 72 | D79EX32 | 行业中高端机型 |
| 73 | D79EX33 | 行业中高端机型 |
| 74 | DM01101 | 行业中高端机型 |
| 75 | DM01102 | 行业中高端机型 |
| 76 | DM01103 | 行业中高端机型 |
| 77 | DM01201 | 行业中高端机型 |
| 78 | DM01202 | 行业中高端机型 |
| 79 | DM01301 | 行业中高端机型 |
| 80 | DM01302 | 行业中高端机型 |
| 81 | DM01303 | 行业中高端机型 |
| 82 | DM01401 | 行业中高端机型 |
| 83 | DM01402 | 行业中高端机型 |
| 84 | DM01403 | 行业中高端机型 |
| 85 | DM01501 | 行业中高端机型 |
| 86 | DM02101 | 行业中高端机型 |
| 87 | DM02201 | 行业中高端机型 |
| 88 | DM13011 | 行业中高端机型 |
| 89 | DM13041 | 行业中高端机型 |
| 90 | DM13042 | 行业中高端机型 |
| 91 | DM14001 | 行业中高端机型 |

项目属性

| | A | B |
|---|---|---|
| 1 | 项目代码 | 项目归属 |
| 92 | DM14002 | 行业中高端机型 |
| 93 | DP00000 | 行业中高端机型 |
| 94 | DP01101 | 行业中高端机型 |
| 95 | DP01201 | 行业中高端机型 |
| 96 | DP01202 | 行业中高端机型 |
| 97 | DP01203 | 行业中高端机型 |
| 98 | DP01204 | 行业中高端机型 |
| 99 | DP02101 | 行业中高端机型 |
| 100 | DP02102 | 行业中高端机型 |
| 101 | DP02103 | 行业中高端机型 |
| 102 | DP02104 | 行业中高端机型 |
| 103 | DP02201 | 行业中高端机型 |
| 104 | DP02202 | 行业中高端机型 |
| 105 | DP02203 | 行业中高端机型 |
| 106 | DP02204 | 行业中高端机型 |
| 107 | DP02300 | 行业中高端机型 |
| 108 | DP03101 | 行业中高端机型 |
| 109 | DP03401 | 行业中高端机型 |
| 110 | DP04001 | 行业中高端机型 |
| 111 | DP04002 | 行业中高端机型 |
| 112 | DP05001 | 行业中高端机型 |
| 113 | DP05002 | 行业中高端机型 |
| 114 | DPO1203 | 行业中高端机型 |
| 115 | DPR1401 | 行业中高端机型 |
| 116 | DR13011 | 行业中高端机型 |
| 117 | DXP1301 | 行业中高端机型 |
| 118 | DXP1302 | 行业中高端机型 |
| 119 | DZ00003 | 行业中高端机型 |
| 120 | DZ00012 | 行业中高端机型 |
| 121 | DZ00052 | 行业中高端机型 |
| 122 | DZ00056 | 行业中高端机型 |
| 123 | DZ00063 | 行业中高端机型 |
| 124 | DZ00070 | 行业中高端机型 |
| 125 | DZ00091 | 行业中高端机型 |
| 126 | DZ00092 | 行业中高端机型 |
| 127 | DZ00096 | 行业中高端机型 |
| 128 | DZ00106 | 行业中高端机型 |
| 129 | DZ00110 | 行业中高端机型 |
| 130 | DZ00121 | 行业中高端机型 |
| 131 | DZ00122 | 行业中高端机型 |
| 132 | DZ00123 | 行业中高端机型 |
| 133 | DZ00124 | 行业中高端机型 |
| 134 | DZ00129 | 行业中高端机型 |
| 135 | DZ00132 | 行业中高端机型 |
| 136 | DZ00133 | 行业中高端机型 |

項目属性

| | A | B |
|---|---|---|
| 1 | 项目代码 | 项目归属 |
| 137 | DZ00135 | 行业中高端机型 |
| 138 | DZ00136 | 行业中高端机型 |
| 139 | DZ00137 | 行业中高端机型 |
| 140 | DZ00138 | 行业中高端机型 |
| 141 | DZ00140 | 行业中高端机型 |
| 142 | DZ00141 | 行业中高端机型 |
| 143 | DZ00143 | 行业中高端机型 |
| 144 | DZ00144 | 行业中高端机型 |
| 145 | DZ00145 | 行业中高端机型 |
| 146 | DZ00147 | 行业中高端机型 |
| 147 | DZ00151 | 行业中高端机型 |
| 148 | DZ00153 | 行业中高端机型 |
| 149 | DZ00157 | 行业中高端机型 |
| 150 | DZ00172 | 商业低端机型 |
| 151 | DZ00173 | 商业低端机型 |
| 152 | DZ00176 | 商业低端机型 |
| 153 | DZ00180 | 商业低端机型 |
| 154 | DZ00186 | 行业中高端机型 |
| 155 | DZ00188 | 行业中高端机型 |
| 156 | DZ00191 | 行业中高端机型 |
| 157 | DZ00192 | 商业低端机型 |
| 158 | DZ00195 | 行业中高端机型 |
| 159 | DZ00202 | 行业中高端机型 |
| 160 | DZ00204 | 行业中高端机型 |
| 161 | DZ00206 | 行业中高端机型 |
| 162 | DZ00208 | 行业中高端机型 |
| 163 | DZ00211 | 商业低端机型 |
| 164 | DZ00212 | 商业低端机型 |
| 165 | DZ00214 | 行业中高端机型 |
| 166 | DZ00215 | 行业中高端机型 |
| 167 | DZ00216 | 行业中高端机型 |
| 168 | DZ00217 | 行业中高端机型 |
| 169 | DZ00218 | 行业中高端机型 |
| 170 | DZ00219 | 行业中高端机型 |
| 171 | DZ00221 | 行业中高端机型 |
| 172 | DZ00223 | 行业中高端机型 |
| 173 | DZ00224 | 行业中高端机型 |
| 174 | DZ00226 | 行业中高端机型 |
| 175 | DZ00227 | 行业中高端机型 |
| 176 | DZ00228 | 商业低端机型 |
| 177 | DZ00234 | 行业中高端机型 |
| 178 | DZ00235 | 行业中高端机型 |
| 179 | DZ00239 | 行业中高端机型 |
| 180 | DZ00240 | 行业中高端机型 |
| 181 | DZ00242 | 行业中高端机型 |

CONFIDENTIAL BUSINESS INFORMATION, SUBJECT TO PROTECTIVE ORDER   4

项目属性

| | A | B |
|---|---|---|
| 1 | 项目代码 | 项目归属 |
| 182 | DZ00245 | 商业低端机型 |
| 183 | DZ00246 | 行业中高端机型 |
| 184 | DZ00248 | 行业中高端机型 |
| 185 | DZ00250 | 行业中高端机型 |
| 186 | DZ00251 | 行业中高端机型 |
| 187 | DZ00254 | 行业中高端机型 |
| 188 | DZ00256 | 商业低端机型 |
| 189 | GE01100 | 行业中高端机型 |
| 190 | GE01101 | 行业中高端机型 |
| 191 | GT00001 | 公共项目 |
| 192 | HDS1102 | 行业中高端机型 |
| 193 | HDS1306 | 行业中高端机型 |
| 194 | PD31460 | 商业低端机型 |
| 195 | PD51460 | 商业低端机型 |
| 196 | PJ00001 | 公共项目 |
| 197 | PJ01001 | 行业中高端机型 |
| 198 | PJF3100 | 行业中高端机型 |
| 199 | PJP3100 | 行业中高端机型 |
| 200 | R100090001 | 行业中高端机型 |
| 201 | R100100001 | 行业中高端机型 |
| 202 | R100100012 | 行业中高端机型 |
| 203 | R100110001 | 行业中高端机型 |
| 204 | R100110002 | 行业中高端机型 |
| 205 | R100110003 | 行业中高端机型 |
| 206 | R100110004 | 行业中高端机型 |
| 207 | R100110042 | 行业中高端机型 |
| 208 | R100120003 | 行业中高端机型 |
| 209 | R100120019 | 行业中高端机型 |
| 210 | R100120023 | 行业中高端机型 |
| 211 | R100120027 | 行业中高端机型 |
| 212 | R100130002 | 商业低端机型 |
| 213 | R100130004 | 行业中高端机型 |
| 214 | R100130016 | 行业中高端机型 |
| 215 | R100130024 | 行业中高端机型 |
| 216 | R100130029 | 商业低端机型 |
| 217 | R100130033 | 商业低端机型 |
| 218 | R100140019 | 行业中高端机型 |
| 219 | R100140026 | 商业低端机型 |
| 220 | R100140030 | 商业低端机型 |
| 221 | R100140031 | 商业低端机型 |
| 222 | R100140032 | 行业中高端机型 |
| 223 | R100140038 | 行业中高端机型 |
| 224 | R100140041 | 行业中高端机型 |
| 225 | R100150007 | 商业低端机型 |
| 226 | R100150011 | 行业中高端机型 |

CONFIDENTIAL BUSINESS INFORMATION, SUBJECT TO PROTECTIVE ORDER   5

项目属性

| | A | B |
|---|---|---|
| 1 | 项目代码 | 项目归属 |
| 227 | R100150026 | 行业中高端机型 |
| 228 | R100150027 | 行业中高端机型 |
| 229 | R100150029 | 行业中高端机型 |
| 230 | R100150043 | 行业中高端机型 |
| 231 | R100160003 | 行业中高端机型 |
| 232 | R100160011 | 商业低端机型 |
| 233 | R100160012 | 商业低端机型 |
| 234 | R100160018 | 商业低端机型 |
| 235 | R100160033 | 商业低端机型 |
| 236 | R100160035 | 商业低端机型 |
| 237 | R100160061 | 行业中高端机型 |
| 238 | R100160069 | 行业中高端机型 |
| 239 | R100160081 | 商业低端机型 |
| 240 | R100160092 | 行业中高端机型 |
| 241 | R100170001 | 行业中高端机型 |
| 242 | R100170002 | 行业中高端机型 |
| 243 | R100170008 | 行业中高端机型 |
| 244 | R100170011 | 行业中高端机型 |
| 245 | R100170012 | 行业中高端机型 |
| 246 | R100170020 | 商业低端机型 |
| 247 | R100170025 | 商业低端机型 |
| 248 | R100170026 | 商业低端机型 |
| 249 | R100170027 | 商业低端机型 |
| 250 | R100170029 | 商业低端机型 |
| 251 | R100170031 | 行业中高端机型 |
| 252 | R100170032 | 商业低端机型 |
| 253 | R100170037 | 行业中高端机型 |
| 254 | R100170038 | 行业中高端机型 |
| 255 | R100170048 | 商业低端机型 |
| 256 | R100170049 | 商业低端机型 |
| 257 | R100170052 | 行业中高端机型 |
| 258 | R100170059 | 行业中高端机型 |
| 259 | R100170073 | 商业低端机型 |
| 260 | R100170081 | 行业中高端机型 |
| 261 | R100170084 | 行业中高端机型 |
| 262 | R100170085 | 行业中高端机型 |
| 263 | R100170089 | 商业低端机型 |
| 264 | R100170091 | 行业中高端机型 |
| 265 | R100170097 | 行业中高端机型 |
| 266 | R100170099 | 行业中高端机型 |
| 267 | R100170100 | 行业中高端机型 |
| 268 | R100170101 | 行业中高端机型 |
| 269 | R100170104 | 行业中高端机型 |
| 270 | R100170112 | 行业中高端机型 |
| 271 | R100170113 | 行业中高端机型 |

CONFIDENTIAL BUSINESS INFORMATION, SUBJECT TO PROTECTIVE ORDER   6          HYT1973-23497468

MSA0984

项目属性

| | A | B |
|---|---|---|
| 1 | 项目代码 | 项目归属 |
| 272 | R100170119 | 行业中高端机型 |
| 273 | R100180002 | 行业中高端机型 |
| 274 | R100180003 | 行业中高端机型 |
| 275 | R100180026 | 行业中高端机型 |
| 276 | R100180031 | 行业中高端机型 |
| 277 | R100180036 | 行业中高端机型 |
| 278 | R100180057 | 行业中高端机型 |
| 279 | R100180086 | 行业中高端机型 |
| 280 | R100180087 | 行业中高端机型 |
| 281 | R100180088 | 行业中高端机型 |
| 282 | R100193010 | 行业中高端机型 |
| 283 | R100193021 | 商业低端机型 |
| 284 | R100193023 | 商业低端机型 |
| 285 | R104180019 | 行业中高端机型 |
| 286 | R104180021 | 行业中高端机型 |
| 287 | R107150001 | 行业中高端机型 |
| 288 | R109170004 | 商业低端机型 |
| 289 | R109170005 | 商业低端机型 |
| 290 | R109170006 | 行业中高端机型 |
| 291 | RHCL170003 | 行业中高端机型 |
| 292 | RHCL170006 | 行业中高端机型 |
| 293 | RJ00005 | 行业中高端机型 |
| 294 | RJ00006 | 行业中高端机型 |
| 295 | RJ00007 | 行业中高端机型 |
| 296 | RJ00008 | 行业中高端机型 |
| 297 | RJ00013 | 行业中高端机型 |
| 298 | RJ00014 | 行业中高端机型 |
| 299 | RJ00014-1 | 行业中高端机型 |
| 300 | RJ00014-2 | 行业中高端机型 |
| 301 | RJ00014-3 | 行业中高端机型 |
| 302 | RJ00014-4 | 行业中高端机型 |
| 303 | RJ00014-5 | 行业中高端机型 |
| 304 | RJ00015 | 行业中高端机型 |
| 305 | RJ00015-1 | 行业中高端机型 |
| 306 | RJ00015-2 | 行业中高端机型 |
| 307 | RJ00015-3 | 行业中高端机型 |
| 308 | RJ00015-4 | 行业中高端机型 |
| 309 | RJ00016 | 行业中高端机型 |
| 310 | RJ00020-1 | 行业中高端机型 |
| 311 | RJ00020-2 | 行业中高端机型 |
| 312 | RJ00020-3 | 行业中高端机型 |
| 313 | RJ00020-4 | 行业中高端机型 |
| 314 | RJ00021-1 | 行业中高端机型 |
| 315 | RJ00021-2 | 行业中高端机型 |
| 316 | RJ00021-3 | 行业中高端机型 |

项目属性

| | A | B |
|---|---|---|
| 1 | 项目代码 | 项目归属 |
| 317 | RJ00022-1 | 行业中高端机型 |
| 318 | RJ00022-3 | 行业中高端机型 |
| 319 | RS00001 | 公共项目 |
| 320 | RSG1101 | 公共项目 |
| 321 | RST1101 | 公共项目 |
| 322 | S-CN442-170934 | 行业中高端机型 |
| 323 | SN00001 | 行业中高端机型 |
| 324 | TD14001 | 商业低端机型 |
| 325 | TD14002 | 商业低端机型 |
| 326 | TD21401 | 商业低端机型 |
| 327 | TD30341 | 商业低端机型 |
| 328 | TD30342 | 商业低端机型 |
| 329 | TD50341 | 行业中高端机型 |
| 330 | TD50342 | 商业低端机型 |
| 331 | TD50343 | 行业中高端机型 |
| 332 | TD56341 | 行业中高端机型 |
| 333 | TD56342 | 行业中高端机型 |
| 334 | XEX1401 | 行业中高端机型 |
| 335 | XT00003 | 行业中高端机型 |
| 336 | XTP0701 | 行业中高端机型 |
| 337 | YPP0001 | 公共项目 |
| 338 | ZDM1380 | 商业低端机型 |
| 339 | ZDZX005 | 行业中高端机型 |
| 340 | ZDZX011 | 行业中高端机型 |
| 341 | ZF00001 | 行业中高端机型 |
| 342 | ZF03108 | 行业中高端机型 |
| 343 | ZF07102 | 行业中高端机型 |
| 344 | ZF09202 | 行业中高端机型 |
| 345 | ZFD0001 | 行业中高端机型 |
| 346 | ZFD0002 | 行业中高端机型 |
| 347 | ZFD0002 | 行业中高端机型 |
| 348 | ZFD0003 | 行业中高端机型 |
| 349 | ZFD0004 | 行业中高端机型 |
| 350 | ZFD0005 | 行业中高端机型 |
| 351 | ZFD0301 | 行业中高端机型 |
| 352 | ZFD3202 | 行业中高端机型 |
| 353 | ZFD3203 | 行业中高端机型 |
| 354 | ZFD3204 | 行业中高端机型 |
| 355 | ZFD3205 | 行业中高端机型 |
| 356 | ZFD3206 | 行业中高端机型 |
| 357 | ZFD3207 | 行业中高端机型 |
| 358 | ZFD3208 | 行业中高端机型 |
| 359 | ZFD3209 | 行业中高端机型 |
| 360 | ZFD3210 | 行业中高端机型 |
| 361 | ZFD3211 | 行业中高端机型 |

项目属性

| | A | B |
|---|---|---|
| 1 | 项目代码 | 项目归属 |
| 362 | ZFD3212 | 行业中高端机型 |
| 363 | ZFD3213 | 行业中高端机型 |
| 364 | ZFD3214 | 行业中高端机型 |
| 365 | ZFD3215 | 行业中高端机型 |
| 366 | ZFD3216 | 行业中高端机型 |
| 367 | ZFD3217 | 行业中高端机型 |
| 368 | ZFD3301 | 行业中高端机型 |
| 369 | ZFD3302 | 行业中高端机型 |
| 370 | ZFD4201 | 行业中高端机型 |
| 371 | ZFD5101 | 行业中高端机型 |
| 372 | ZFD5102 | 行业中高端机型 |
| 373 | ZFM2101 | 行业中高端机型 |
| 374 | ZFM2103 | 行业中高端机型 |
| 375 | ZFYY001 | 行业中高端机型 |
| 376 | ZFYY002 | 行业中高端机型 |
| 377 | ZHD0001 | 行业中高端机型 |
| 378 | ZHD0101 | 行业中高端机型 |
| 379 | ZHD0104 | 行业中高端机型 |
| 380 | ZHD0105 | 行业中高端机型 |
| 381 | ZHD0106 | 行业中高端机型 |
| 382 | ZHD0107 | 行业中高端机型 |
| 383 | ZHD0108 | 行业中高端机型 |
| 384 | ZHD0109 | 行业中高端机型 |
| 385 | ZHD0201 | 行业中高端机型 |
| 386 | ZHD0301 | 行业中高端机型 |
| 387 | ZHD0601 | 行业中高端机型 |
| 388 | ZHD0602 | 行业中高端机型 |
| 389 | ZHD1101 | 行业中高端机型 |
| 390 | ZHD603 | 行业中高端机型 |

CONFIDENTIAL BUSINESS INFORMATION, SUBJECT TO PROTECTIVE ORDER 9

HYT1973-23497468

| | A | B | C | D | E | F | G | H | I | J | K | L | M |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | Item/Year<br>Project/year | 2005-2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019H1 | Total |
| 2 | R&D expenses of commercial low-end models (including cost allocation of DMR public projects) | - | - | - | - | 365 | 1,063 | 1,240 | 1,720 | 2,959 | 2,279 | 1,254 | 10,880 |
| 3 | Including: Direct R&D expenses of low-end models | - | - | - | - | 312 | 970 | 1,140 | 1,590 | 2,950 | 2,237 | 1,117 | 10,317 |
| 4 | R&D expenses of middle and high-end mode | 8,894 | 4,176 | 6,423 | 7,066 | 7,183 | 7,107 | 8,545 | 8,156 | 8,746 | 8,476 | 3,621 | 78,393 |
| 5 | Total investment of DMR R&D | 8,894 | 4,176 | 6,423 | 7,066 | 7,548 | 8,170 | 9,784 | 9,877 | 11,704 | 10,755 | 4,875 | 89,272 |
| 6 | Unit: 10,000 yuan | | | | | | | | | | | | |

CONFIDENTIAL BUSINESS INFORMATION, SUBJECT TO PROTECTIVE ORDER

HYT1973-23497468

MSA0988

| Project differentiation\year | 2005-2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019H1 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Direct R&D expenses of commercial low-end models | | - | - | - | 3,119,534 | 9,704,535 | 11,396,439 | 15,904,962 | 29,502,954 | 22,373,533 | 11,167,915 | 103,169,873 |
| Ratio of direct investment in commercial low-end models | 0.00% | 0.00% | 0.00% | 0.00% | 4.84% | 13.01% | 12.67% | 17.42% | 25.28% | 21.19% | 25.73% | 12.59% |
| Allocation of R&D expenses of commercial low-end models | | - | - | - | 532,641 | 926,696 | 1,001,752 | 1,296,360 | 82,780 | 413,915 | 1,372,783 | 5,626,927 |
| Total R&D expenses of commercial low-end models | | - | - | - | 3,652,176 | 10,631,231 | 12,398,192 | 17,201,322 | 29,585,734 | 22,787,448 | 12,540,698 | 108,796,800 |
| Unit: yuan | | | | | | | | | | | | |
| R&D expenses of public projects and public accessories | 149,991.03 | 10,117,061 | 10,993,549 | 11,098,462 | 11,007,756 | 7,121,512 | 7,905,680 | 7,443,377 | 327,488 | 1,953,553 | 5,336,043 | 73,454,471 |
| R&D expenses of middle and high-end models in the industry - direct | 88,791,970 | 31,642,421 | 53,239,283 | 59,562,423 | 61,349,903 | 64,873,249 | 78,542,552 | 75,417,389 | 87,214,228 | 83,222,798 | 32,242,070 | 716,098,286 |
| R&D expenses of middle and high-end models in the industry – indirect allocation | 149,991 | 10,117,061 | 10,993,549 | 11,098,462 | 10,475,115 | 6,194,815 | 6,903,927 | 6,147,018 | 244,708 | 1,539,638 | 3,963,260 | 67,827,544 |
| **Total DMR R&D investment** | **88,941,960.93** | **41,759,481.82** | **64,232,832.41** | **70,660,884.16** | **75,477,193.67** | **81,699,295.59** | **97,844,670.63** | **98,765,728.75** | **117,044,669.08** | **107,549,884.33** | **48,746,028.37** | **892,722,630** |
| **Total R&D investment of direct DMR projects** | **88,791,970** | **31,642,421** | **53,239,283** | **59,562,423** | **64,469,437** | **74,577,784** | **89,938,991** | **91,322,351** | **116,717,181** | **105,596,332** | **43,409,985** | **819,268,158** |

CONFIDENTIAL BUSINESS INFORMATION, SUBJECT TO PROTECTIVE ORDER

MSA0989

HYT1973-23497468

| No. | Product classification | Product family | Product series | Product name | Model | Product line |
|---|---|---|---|---|---|---|
| 1 | Terminal standard | DMR terminal | BD3 | BD300 | BD300 | Business terminal & intelligent accessory product line |
| 2 | Terminal standard | DMR terminal | BD3 | BD300 | BD302 | Business terminal & intelligent accessory product line |
| 3 | Terminal standard | DMR terminal | BD3 | BD300 | BD305 | Business terminal & intelligent accessory product line |
| 4 | Terminal standard | DMR terminal | BD3 | BD300 | BD306 | Business terminal & intelligent accessory product line |
| 5 | Terminal standard | DMR terminal | BD3 | BD300 | BD308 | Business terminal & intelligent accessory product line |
| 6 | Terminal standard | DMR terminal | BD3 | BD300, | BD305LF | Business terminal & intelligent accessory product line |
| 7 | Terminal standard | DMR terminal | BD3 | BD350 | BD350 | Business terminal & intelligent accessory product line |
| 8 | Terminal standard | DMR terminal | BD3 | BD350 | BD352 | Business terminal & intelligent accessory product line |
| 9 | Terminal standard | DMR terminal | BD3 | BD350 | BD355 | Business terminal & intelligent accessory product line |
| 10 | Terminal standard | DMR terminal | BD3 | BD350 | BD356 | Business terminal & intelligent accessory product line |
| 11 | Terminal standard | DMR terminal | BD3 | BD350 | BD358 | Business terminal & intelligent accessory product line |
| 12 | Terminal customizing | DMR terminal | BD3 | BD350 | TR2Xi(BD350) | Business terminal & intelligent accessory product line |
| 13 | Terminal standard | DMR terminal | BD5/TD5 | BD500 | BD500 | Business terminal & intelligent accessory product line |
| 14 | Terminal standard | DMR terminal | BD5/TD5 | BD500 | BD502 | Business terminal & intelligent accessory product line |
| 15 | Terminal standard | DMR terminal | BD5/TD5 | BD500 | BD505 | Business terminal & intelligent accessory product line |
| 16 | Terminal standard | DMR terminal | BD5/TD5 | BD500 | BD506 | Business terminal & intelligent accessory product line |

Business terminal

| No. | Product classification | Product family | Product series | Product name | Model | Product line |
|---|---|---|---|---|---|---|
| 17 | Terminal standard | DMR terminal | BD5/TD5 | BD500 | BD508 | Business terminal & intelligent accessory product line |
| 18 | Terminal customizing | DMR terminal | BD5/TD5 | BD500 | BD505LF(BD505) | Business terminal & intelligent accessory product line |
| 19 | Terminal standard | DMR terminal | BD5/TD5 | BD510 | BD510 | Business terminal & intelligent accessory product line |
| 20 | Terminal standard | DMR terminal | BD5/TD5 | BD510 | BD512 | Business terminal & intelligent accessory product line |
| 21 | Terminal standard | DMR terminal | BD5/TD5 | BD510 | BD515 | Business terminal & intelligent accessory product line |
| 22 | Terminal standard | DMR terminal | BD5/TD5 | BD510 | BD516 | Business terminal & intelligent accessory product line |
| 23 | Terminal standard | DMR terminal | BD5/TD5 | BD510 | BD518 | Business terminal & intelligent accessory product line |
| 24 | Terminal standard | DMR terminal | BD5/TD5 | BD550 | BD550 | Business terminal & intelligent accessory product line |
| 25 | Terminal standard | DMR terminal | BD5/TD5 | BD550 | BD552 | Business terminal & intelligent accessory product line |
| 26 | Terminal standard | DMR terminal | BD5/TD5 | BD550 | BD555 | Business terminal & intelligent accessory product line |
| 27 | Terminal standard | DMR terminal | BD5/TD5 | BD550 | BD556 | Business terminal & intelligent accessory product line |
| 28 | Terminal standard | DMR terminal | BD5/TD5 | BD550 | BD558 | Business terminal & intelligent accessory product line |
| 29 | Terminal standard | DMR terminal | BD5/TD5 | BD610 | BD610 | Business terminal & intelligent accessory product line |
| 30 | Terminal standard | DMR terminal | BD5/TD5 | BD610 | BD612 | Business terminal & intelligent accessory product line |
| 31 | Terminal standard | DMR terminal | BD5/TD5 | BD610 | BD615 | Business terminal & intelligent accessory product line |
| 32 | Terminal standard | DMR terminal | BD5/TD5 | BD610 | BD616 | Business terminal & intelligent accessory product line |

| No. | Product classification | Product family | Product series | Product name | Model | Product line |
|-----|----------------------|----------------|----------------|--------------|-------|--------------|
| 33 | Terminal standard | DMR terminal | BD5/TD5 | BD610 | BD618 | Business terminal & intelligent accessory product line |
| 34 | Terminal standard | DMR terminal | MD6 | MD610 | MD610 | Business terminal & intelligent accessory product line |
| 35 | Terminal standard | DMR terminal | MD6 | MD610 | MD612 | Business terminal & intelligent accessory product line |
| 36 | Terminal standard | DMR terminal | MD6 | MD610 | MD615 | Business terminal & intelligent accessory product line |
| 37 | Terminal standard | DMR terminal | MD6 | MD610 | MD616 | Business terminal & intelligent accessory product line |
| 38 | Terminal standard | DMR terminal | MD6 | MD610 | MD618 | Business terminal & intelligent accessory product line |
| 39 | Terminal standard | DMR terminal | MD6 | MD620 | MD620 | Business terminal & intelligent accessory product line |
| 40 | Terminal standard | DMR terminal | MD6 | MD620 | MD622 | Business terminal & intelligent accessory product line |
| 41 | Terminal standard | DMR terminal | MD6 | MD620 | MD625 | Business terminal & intelligent accessory product line |
| 42 | Terminal standard | DMR terminal | MD6 | MD620 | MD626 | Business terminal & intelligent accessory product line |
| 43 | Terminal standard | DMR terminal | MD6 | MD620 | MD628 | Business terminal & intelligent accessory product line |
| 44 | Terminal standard | DMR terminal | PD3/TD3 | PD350 | PD352 | Business terminal & intelligent accessory product line |
| 45 | Terminal standard | DMR terminal | PD3/TD3 | PD350 | PD355 | Business terminal & intelligent accessory product line |
| 46 | Terminal standard | DMR terminal | PD3/TD3 | PD350 | PD355LF | Business terminal & intelligent accessory product line |
| 47 | Terminal standard | DMR terminal | PD3/TD3 | PD350 | PD356 | Business terminal & intelligent accessory product line |
| 48 | Terminal standard | DMR terminal | PD3/TD3 | PD350 | PD358 | Business terminal & intelligent accessory product line |

Business terminal

| No. | Product classification | Product family | Product series | Product name | Model | Product line |
|---|---|---|---|---|---|---|
| 49 | Terminal standard | DMR terminal | PD3/TD3 | PD360 | PD362 | Business terminal & intelligent accessory product line |
| 50 | Terminal standard | DMR terminal | PD3/TD3 | PD360 | PD365 | Business terminal & intelligent accessory product line |
| 51 | Terminal standard | DMR terminal | PD3/TD3 | PD360 | PD365LF | Business terminal & intelligent accessory product line |
| 52 | Terminal standard | DMR terminal | PD3/TD3 | PD360 | PD366 | Business terminal & intelligent accessory product line |
| 53 | Terminal standard | DMR terminal | PD3/TD3 | PD360 | PD368 | Business terminal & intelligent accessory product line |
| 54 | Terminal standard | DMR terminal | PD3/TD3 | PD370 | PD372 | Business terminal & intelligent accessory product line |
| 55 | Terminal standard | DMR terminal | PD3/TD3 | PD370 | PD375 | Business terminal & intelligent accessory product line |
| 56 | Terminal standard | DMR terminal | PD3/TD3 | PD370 | PD376 | Business terminal & intelligent accessory product line |
| 57 | Terminal standard | DMR terminal | PD3/TD3 | PD370 | PD378 | Business terminal & intelligent accessory product line |
| 58 | Terminal standard | DMR terminal | PD4/TD5 | PD400 | PD402 | Business terminal & intelligent accessory product line |
| 59 | Terminal standard | DMR terminal | PD4/TD5 | PD400 | PD405 | Business terminal & intelligent accessory product line |
| 60 | Terminal standard | DMR terminal | PD4/TD5 | PD400 | PD406 | Business terminal & intelligent accessory product line |
| 61 | Terminal standard | DMR terminal | PD4/TD5 | PD400 | PD408 | Business terminal & intelligent accessory product line |
| 62 | Terminal customizing | DMR terminal | PD4/TD5 | PD400 | PD385(PD405) | Business terminal & intelligent accessory product line |
| 63 | Terminal standard | DMR terminal | PD4/TD5 | PD410 | PD412 | Business terminal & intelligent accessory product line |
| 64 | Terminal standard | DMR terminal | PD4/TD5 | PD410 | PD415 | Business terminal & intelligent accessory product line |

| No. | Product classification | Product family | Product series | Product name | Model | Product line |
|---|---|---|---|---|---|---|
| 65 | Terminal standard | DMR terminal | PD4/TD5 | PD410 | PD416 | Business terminal & intelligent accessory product line |
| 66 | Terminal standard | DMR terminal | PD4/TD5 | PD410 | PD418 | Business terminal & intelligent accessory product line |
| 67 | Terminal standard | DMR terminal | PD4/TD5 | PD460 | PD462 | Business terminal & intelligent accessory product line |
| 68 | Terminal standard | DMR terminal | PD4/TD5 | PD460 | PD465 | Business terminal & intelligent accessory product line |
| 69 | Terminal standard | DMR terminal | PD4/TD5 | PD460 | PD466 | Business terminal & intelligent accessory product line |
| 70 | Terminal standard | DMR terminal | PD4/TD5 | PD460 | PD468 | Business terminal & intelligent accessory product line |
| 71 | Terminal standard | DMR terminal | PD4/TD5 | PD480 | PD482 | Business terminal & intelligent accessory product line |
| 72 | Terminal standard | DMR terminal | PD4/TD5 | PD480 | PD485 | Business terminal & intelligent accessory product line |
| 73 | Terminal standard | DMR terminal | PD4/TD5 | PD480 | PD486 | Business terminal & intelligent accessory product line |
| 74 | Terminal standard | DMR terminal | PD4/TD5 | PD480 | PD488 | Business terminal & intelligent accessory product line |
| 75 | Terminal customizing | DMR terminal | PD4/TD5 | PD480 | AR482G(PD482) | Business terminal & intelligent accessory product line |
| 76 | Terminal customizing | DMR terminal | PD4/TD5 | PD480 | PD395(PD485) | Business terminal & intelligent accessory product line |
| 77 | Terminal standard | DMR terminal | PD4/TD5 | PD530 | PD530 | Business terminal & intelligent accessory product line |
| 78 | Terminal customizing | DMR terminal | PD4/TD5 | PD530 | DS-800(PD530) | Business terminal & intelligent accessory product line |
| 79 | Terminal standard | DMR terminal | PD4/TD5 | PD530L | PD530L | Business terminal & intelligent accessory product line |
| 80 | Terminal standard | DMR terminal | PD4/TD5 | PD530S | PD530S | Business terminal & intelligent accessory product line |

| No. | Product classification | Product family | Product series | Product name | Model | Product line |
|---|---|---|---|---|---|---|
| 81 | Terminal standard | DMR terminal | PD3/TD3 | TD350 | TD350 | Business terminal & intelligent accessory product line |
| 82 | Terminal standard | DMR terminal | PD3/TD3 | TD360 | TD360 | Business terminal & intelligent accessory product line |
| 83 | Terminal standard | DMR terminal | PD3/TD3 | TD370 | TD370 | Business terminal & intelligent accessory product line |
| 84 | Terminal standard | DMR terminal | PD4/TD5 | TD500 | TD500 | Business terminal & intelligent accessory product line |
| 85 | Terminal customizing | DMR terminal | PD4/TD5 | TD500 | TD530(TD500) | Business terminal & intelligent accessory product line |
| 86 | Terminal customizing | DMR terminal | PD4/TD5 | TD500 | TR4X(TD500) | Business terminal & intelligent accessory product line |
| 87 | Terminal standard | DMR terminal | PD4/TD5 | TD510 | TD510 | Business terminal & intelligent accessory product line |
| 88 | Terminal standard | DMR terminal | PD4/TD5 | TD520 | TD520 | Business terminal & intelligent accessory product line |
| 89 | Terminal customizing | DMR terminal | BD5/TD5 | TD550 | TD550(TD550) | Business terminal & intelligent accessory product line |
| 90 | Terminal standard | DMR terminal | PD4/TD5 | TD560 | Super246 | Business terminal & intelligent accessory product line |
| 91 | Terminal standard | DMR terminal | PD4/TD5 | TD560 | TD560 | Business terminal & intelligent accessory product line |
| 92 | Terminal standard | DMR terminal | PD4/TD5 | TD580 | TD580 | Business terminal & intelligent accessory product line |

Item attribute

| Project code | Project affiliation |
|---|---|
| 17070003 | Commercial low-end models |
| 400006 | Middle and high-end models in the  industry |
| 400007 | Middle and high-end models in the  industry |
| 400008 | Middle and high-end models in the  industry |
| 400009 | Middle and high-end models in the  industry |
| 400029 | Middle and high-end models in the  industry |
| 400044 | Middle and high-end models in the  industry |
| 400057 | Middle and high-end models in the  industry |
| 400060 | Middle and high-end models in the  industry |
| 400061 | Middle and high-end models in the  industry |
| 400062 | Middle and high-end models in the  industry |
| 400063 | Middle and high-end models in the  industry |
| 400064 | Middle and high-end models in the  industry |
| 400072 | Commercial low-end models |
| 400073 | Commercial low-end models |
| 400084 | Middle and high-end models in the  industry |
| 400098 | Middle and high-end models in the  industry |
| 400109 | Middle and high-end models in the  industry |
| 400116 | Commercial low-end models |
| 400117 | Middle and high-end models in the  industry |
| 400119 | Commercial low-end models |
| 400166 | Middle and high-end models in the  industry |
| 400171 | Commercial low-end models |
| 400177 | Middle and high-end models in the  industry |
| 400185 | Middle and high-end models in the  industry |
| 400194 | Middle and high-end models in the  industry |
| 400195 | Middle and high-end models in the  industry |
| 400196 | Middle and high-end models in the  industry |
| 400201 | Commercial low-end models |
| 400202 | Middle and high-end models in the  industry |
| 400210 | Middle and high-end models in the  industry |
| 400211 | Middle and high-end models in the  industry |
| 400212 | Middle and high-end models in the  industry |
| 400215 | Middle and high-end models in the  industry |
| 400216 | Middle and high-end models in the  industry |
| 400225 | Commercial low-end models |
| 400226 | Middle and high-end models in the  industry |
| 400231 | Commercial low-end models |
| 400232 | Commercial low-end models |
| 400233 | Commercial low-end models |
| 400234 | Commercial low-end models |
| 400235 | Commercial low-end models |
| 400236 | Commercial low-end models |
| 400237 | Commercial low-end models |
| 400238 | Middle and high-end models in the  industry |
| 400239 | Commercial low-end models |

Item attribute

| Project code | Project affiliation |
|---|---|
| 400240 | Commercial low-end models |
| 400243 | Middle and high-end models in the  industry |
| 400251 | Middle and high-end models in the  industry |
| 400252 | Middle and high-end models in the  industry |
| 400253 | Middle and high-end models in the  industry |
| 400255 | Commercial low-end models |
| 400259 | Middle and high-end models in the  industry |
| 400273 | Middle and high-end models in the  industry |
| 400275 | Commercial low-end models |
| 400290 | Commercial low-end models |
| 400291 | Middle and high-end models in the  industry |
| 900000 | Commercial low-end models |
| CPC0341 | Middle and high-end models in the  industry |
| CPC1401 | Middle and high-end models in the  industry |
| CR00001 | Public project |
| CR01201 | Middle and high-end models in the  industry |
| CYZX001 | Public project |
| D613011 | Middle and high-end models in the  industry |
| D613012 | Middle and high-end models in the  industry |
| D613113 | Middle and high-end models in the  industry |
| D613114 | Middle and high-end models in the  industry |
| D71E361 | Middle and high-end models in the  industry |
| D781401 | Middle and high-end models in the  industry |
| D79EX31 | Middle and high-end models in the  industry |
| D79EX32 | Middle and high-end models in the  industry |
| D79EX33 | Middle and high-end models in the  industry |
| DM01101 | Middle and high-end models in the  industry |
| DM01102 | Middle and high-end models in the  industry |
| DM01103 | Middle and high-end models in the  industry |
| DM01201 | Middle and high-end models in the  industry |
| DM01202 | Middle and high-end models in the  industry |
| DM01301 | Middle and high-end models in the  industry |
| DM01302 | Middle and high-end models in the  industry |
| DM01303 | Middle and high-end models in the  industry |
| DM01401 | Middle and high-end models in the  industry |
| DM01402 | Middle and high-end models in the  industry |
| DM01403 | Middle and high-end models in the  industry |
| DM01501 | Middle and high-end models in the  industry |
| DM02101 | Middle and high-end models in the  industry |
| DM02201 | Middle and high-end models in the  industry |
| DM13011 | Middle and high-end models in the  industry |
| DM13041 | Middle and high-end models in the  industry |
| DM13042 | Middle and high-end models in the  industry |
| DM14001 | Middle and high-end models in the  industry |
| DM14002 | Middle and high-end models in the  industry |
| DP00000 | Middle and high-end models in the  industry |

CONFIDENTIAL BUSINESS INFORMATION, SUBJECT TO PROTECTIVE ORDER  2

Item attribute

| Project code | Project affiliation |
|---|---|
| DP01101 | Middle and high-end models in the industry |
| DP01201 | Middle and high-end models in the industry |
| DP01202 | Middle and high-end models in the industry |
| DP01203 | Middle and high-end models in the industry |
| DP01204 | Middle and high-end models in the industry |
| DP02101 | Middle and high-end models in the industry |
| DP02102 | Middle and high-end models in the industry |
| DP02103 | Middle and high-end models in the industry |
| DP02104 | Middle and high-end models in the industry |
| DP02201 | Middle and high-end models in the industry |
| DP02202 | Middle and high-end models in the industry |
| DP02203 | Middle and high-end models in the industry |
| DP02204 | Middle and high-end models in the industry |
| DP02300 | Middle and high-end models in the industry |
| DP03101 | Middle and high-end models in the industry |
| DP03401 | Middle and high-end models in the industry |
| DP04001 | Middle and high-end models in the industry |
| DP04002 | Middle and high-end models in the industry |
| DP05001 | Middle and high-end models in the industry |
| DP05002 | Middle and high-end models in the industry |
| DPO1203 | Middle and high-end models in the industry |
| DPR1401 | Middle and high-end models in the industry |
| DR13011 | Middle and high-end models in the industry |
| DXP1301 | Middle and high-end models in the industry |
| DXP1302 | Middle and high-end models in the industry |
| DZ00003 | Middle and high-end models in the industry |
| DZ00012 | Middle and high-end models in the industry |
| DZ00052 | Middle and high-end models in the industry |
| DZ00056 | Middle and high-end models in the industry |
| DZ00063 | Middle and high-end models in the industry |
| DZ00070 | Middle and high-end models in the industry |
| DZ00091 | Middle and high-end models in the industry |
| DZ00092 | Middle and high-end models in the industry |
| DZ00096 | Middle and high-end models in the industry |
| DZ00106 | Middle and high-end models in the industry |
| DZ00110 | Middle and high-end models in the industry |
| DZ00121 | Middle and high-end models in the industry |
| DZ00122 | Middle and high-end models in the industry |
| DZ00123 | Middle and high-end models in the industry |
| DZ00124 | Middle and high-end models in the industry |
| DZ00129 | Middle and high-end models in the industry |
| DZ00132 | Middle and high-end models in the industry |
| DZ00133 | Middle and high-end models in the industry |
| DZ00135 | Middle and high-end models in the industry |
| DZ00136 | Middle and high-end models in the industry |
| DZ00137 | Middle and high-end models in the industry |

CONFIDENTIAL BUSINESS INFORMATION, SUBJECT TO PROTECTIVE ORDER  3

HYT1973-23497468

Item attribute

| Project code | Project affiliation |
|---|---|
| DZ00138 | Middle and high-end models in the  industry |
| DZ00140 | Middle and high-end models in the  industry |
| DZ00141 | Middle and high-end models in the  industry |
| DZ00143 | Middle and high-end models in the  industry |
| DZ00144 | Middle and high-end models in the  industry |
| DZ00145 | Middle and high-end models in the  industry |
| DZ00147 | Middle and high-end models in the  industry |
| DZ00151 | Middle and high-end models in the  industry |
| DZ00153 | Middle and high-end models in the  industry |
| DZ00157 | Middle and high-end models in the  industry |
| DZ00172 | Commercial low-end models |
| DZ00173 | Commercial low-end models |
| DZ00176 | Commercial low-end models |
| DZ00180 | Commercial low-end models |
| DZ00186 | Middle and high-end models in the  industry |
| DZ00188 | Middle and high-end models in the  industry |
| DZ00191 | Middle and high-end models in the  industry |
| DZ00192 | Commercial low-end models |
| DZ00195 | Middle and high-end models in the  industry |
| DZ00202 | Middle and high-end models in the  industry |
| DZ00204 | Middle and high-end models in the  industry |
| DZ00206 | Middle and high-end models in the  industry |
| DZ00208 | Middle and high-end models in the  industry |
| DZ00211 | Commercial low-end models |
| DZ00212 | Commercial low-end models |
| DZ00214 | Middle and high-end models in the  industry |
| DZ00215 | Middle and high-end models in the  industry |
| DZ00216 | Middle and high-end models in the  industry |
| DZ00217 | Middle and high-end models in the  industry |
| DZ00218 | Middle and high-end models in the  industry |
| DZ00219 | Middle and high-end models in the  industry |
| DZ00221 | Middle and high-end models in the  industry |
| DZ00223 | Middle and high-end models in the  industry |
| DZ00224 | Middle and high-end models in the  industry |
| DZ00226 | Middle and high-end models in the  industry |
| DZ00227 | Middle and high-end models in the  industry |
| DZ00228 | Commercial low-end models |
| DZ00234 | Middle and high-end models in the  industry |
| DZ00235 | Middle and high-end models in the  industry |
| DZ00239 | Middle and high-end models in the  industry |
| DZ00240 | Middle and high-end models in the  industry |
| DZ00242 | Middle and high-end models in the  industry |
| DZ00245 | Commercial low-end models |
| DZ00246 | Middle and high-end models in the  industry |
| DZ00248 | Middle and high-end models in the  industry |
| DZ00250 | Middle and high-end models in the  industry |

CONFIDENTIAL BUSINESS INFORMATION, SUBJECT TO PROTECTIVE ORDER  4         HYT1973-23497468

Item attribute

| Project code | Project affiliation |
| --- | --- |
| DZ00251 | Middle and high-end models in the  industry |
| DZ00254 | Middle and high-end models in the  industry |
| DZ00256 | Commercial low-end models |
| GE01100 | Middle and high-end models in the  industry |
| GE01101 | Middle and high-end models in the  industry |
| GT00001 | Public project |
| HDS1102 | Middle and high-end models in the  industry |
| HDS1306 | Middle and high-end models in the  industry |
| PD31460 | Commercial low-end models |
| PD51460 | Commercial low-end models |
| PJ00001 | Public project |
| PJ01001 | Middle and high-end models in the  industry |
| PJF3100 | Middle and high-end models in the  industry |
| PJP3100 | Middle and high-end models in the  industry |
| R100090001 | Middle and high-end models in the  industry |
| R100100001 | Middle and high-end models in the  industry |
| R100100012 | Middle and high-end models in the  industry |
| R100110001 | Middle and high-end models in the  industry |
| R100110002 | Middle and high-end models in the  industry |
| R100110003 | Middle and high-end models in the  industry |
| R100110004 | Middle and high-end models in the  industry |
| R100110042 | Middle and high-end models in the  industry |
| R100120003 | Middle and high-end models in the  industry |
| R100120019 | Middle and high-end models in the  industry |
| R100120023 | Middle and high-end models in the  industry |
| R100120027 | Middle and high-end models in the  industry |
| R100130002 | Commercial low-end models |
| R100130004 | Middle and high-end models in the  industry |
| R100130016 | Middle and high-end models in the  industry |
| R100130024 | Middle and high-end models in the  industry |
| R100130029 | Commercial low-end models |
| R100130033 | Commercial low-end models |
| R100140019 | Middle and high-end models in the  industry |
| R100140026 | Commercial low-end models |
| R100140030 | Commercial low-end models |
| R100140031 | Commercial low-end models |
| R100140032 | Middle and high-end models in the  industry |
| R100140038 | Middle and high-end models in the  industry |
| R100140041 | Middle and high-end models in the  industry |
| R100150007 | Commercial low-end models |
| R100150011 | Middle and high-end models in the  industry |
| R100150026 | Middle and high-end models in the  industry |
| R100150027 | Middle and high-end models in the  industry |
| R100150029 | Middle and high-end models in the  industry |
| R100150043 | Middle and high-end models in the  industry |
| R100160003 | Middle and high-end models in the  industry |

Item attribute

| Project code | Project affiliation |
|---|---|
| R100160011 | Commercial low-end models |
| R100160012 | Commercial low-end models |
| R100160018 | Commercial low-end models |
| R100160033 | Commercial low-end models |
| R100160035 | Commercial low-end models |
| R100160061 | Middle and high-end models in the  industry |
| R100160069 | Middle and high-end models in the  industry |
| R100160081 | Commercial low-end models |
| R100160092 | Middle and high-end models in the  industry |
| R100170001 | Middle and high-end models in the  industry |
| R100170002 | Middle and high-end models in the  industry |
| R100170008 | Middle and high-end models in the  industry |
| R100170011 | Middle and high-end models in the  industry |
| R100170012 | Middle and high-end models in the  industry |
| R100170020 | Commercial low-end models |
| R100170025 | Commercial low-end models |
| R100170026 | Commercial low-end models |
| R100170027 | Commercial low-end models |
| R100170029 | Commercial low-end models |
| R100170031 | Middle and high-end models in the  industry |
| R100170032 | Commercial low-end models |
| R100170037 | Middle and high-end models in the  industry |
| R100170038 | Middle and high-end models in the  industry |
| R100170048 | Commercial low-end models |
| R100170049 | Commercial low-end models |
| R100170052 | Middle and high-end models in the  industry |
| R100170059 | Middle and high-end models in the  industry |
| R100170073 | Commercial low-end models |
| R100170081 | Middle and high-end models in the  industry |
| R100170084 | Middle and high-end models in the  industry |
| R100170085 | Middle and high-end models in the  industry |
| R100170089 | Commercial low-end models |
| R100170091 | Middle and high-end models in the  industry |
| R100170097 | Middle and high-end models in the  industry |
| R100170099 | Middle and high-end models in the  industry |
| R100170100 | Middle and high-end models in the  industry |
| R100170101 | Middle and high-end models in the  industry |
| R100170104 | Middle and high-end models in the  industry |
| R100170112 | Middle and high-end models in the  industry |
| R100170113 | Middle and high-end models in the  industry |
| R100170119 | Middle and high-end models in the  industry |
| R100180002 | Middle and high-end models in the  industry |
| R100180003 | Middle and high-end models in the  industry |
| R100180026 | Middle and high-end models in the  industry |
| R100180031 | Middle and high-end models in the  industry |
| R100180036 | Middle and high-end models in the  industry |

Item attribute

| Project code | Project affiliation |
|---|---|
| R100180057 | Middle and high-end models in the  industry |
| R100180086 | Middle and high-end models in the  industry |
| R100180087 | Middle and high-end models in the  industry |
| R100180088 | Middle and high-end models in the  industry |
| R100193010 | Middle and high-end models in the  industry |
| R100193021 | Commercial low-end models |
| R100193023 | Commercial low-end models |
| R104180019 | Middle and high-end models in the  industry |
| R104180021 | Middle and high-end models in the  industry |
| R107150001 | Middle and high-end models in the  industry |
| R109170004 | Commercial low-end models |
| R109170005 | Commercial low-end models |
| R109170006 | Middle and high-end models in the  industry |
| RHCL170003 | Middle and high-end models in the  industry |
| RHCL170006 | Middle and high-end models in the  industry |
| RJ00005 | Middle and high-end models in the  industry |
| RJ00006 | Middle and high-end models in the  industry |
| RJ00007 | Middle and high-end models in the  industry |
| RJ00008 | Middle and high-end models in the  industry |
| RJ00013 | Middle and high-end models in the  industry |
| RJ00014 | Middle and high-end models in the  industry |
| RJ00014-1 | Middle and high-end models in the  industry |
| RJ00014-2 | Middle and high-end models in the  industry |
| RJ00014-3 | Middle and high-end models in the  industry |
| RJ00014-4 | Middle and high-end models in the  industry |
| RJ00014-5 | Middle and high-end models in the  industry |
| RJ00015 | Middle and high-end models in the  industry |
| RJ00015-1 | Middle and high-end models in the  industry |
| RJ00015-2 | Middle and high-end models in the  industry |
| RJ00015-3 | Middle and high-end models in the  industry |
| RJ00015-4 | Middle and high-end models in the  industry |
| RJ00016 | Middle and high-end models in the  industry |
| RJ00020-1 | Middle and high-end models in the  industry |
| RJ00020-2 | Middle and high-end models in the  industry |
| RJ00020-3 | Middle and high-end models in the  industry |
| RJ00020-4 | Middle and high-end models in the  industry |
| RJ00021-1 | Middle and high-end models in the  industry |
| RJ00021-2 | Middle and high-end models in the  industry |
| RJ00021-3 | Middle and high-end models in the  industry |
| RJ00022-1 | Middle and high-end models in the  industry |
| RJ00022-3 | Middle and high-end models in the  industry |
| RS00001 | Public project |
| RSG1101 | Public project |
| RST1101 | Public project |
| S-CN442-170934 | Middle and high-end models in the  industry |
| SN00001 | Middle and high-end models in the  industry |

Item attribute

| Project code | Project affiliation |
|---|---|
| TD14001 | Commercial low-end models |
| TD14002 | Commercial low-end models |
| TD21401 | Commercial low-end models |
| TD30341 | Commercial low-end models |
| TD30342 | Commercial low-end models |
| TD50341 | Middle and high-end models in the  industry |
| TD50342 | Commercial low-end models |
| TD50343 | Middle and high-end models in the  industry |
| TD56341 | Middle and high-end models in the  industry |
| TD56342 | Middle and high-end models in the  industry |
| XEX1401 | Middle and high-end models in the  industry |
| XT00003 | Middle and high-end models in the  industry |
| XTP0701 | Middle and high-end models in the  industry |
| YPP0001 | Public project |
| ZDM1380 | Commercial low-end models |
| ZDZX005 | Middle and high-end models in the  industry |
| ZDZX011 | Middle and high-end models in the  industry |
| ZF00001 | Middle and high-end models in the  industry |
| ZF03108 | Middle and high-end models in the  industry |
| ZF07102 | Middle and high-end models in the  industry |
| ZF09202 | Middle and high-end models in the  industry |
| ZFD0001 | Middle and high-end models in the  industry |
| ZFD0002 | Middle and high-end models in the  industry |
| ZFD0002 | Middle and high-end models in the  industry |
| ZFD0003 | Middle and high-end models in the  industry |
| ZFD0004 | Middle and high-end models in the  industry |
| ZFD0005 | Middle and high-end models in the  industry |
| ZFD0301 | Middle and high-end models in the  industry |
| ZFD3202 | Middle and high-end models in the  industry |
| ZFD3203 | Middle and high-end models in the  industry |
| ZFD3204 | Middle and high-end models in the  industry |
| ZFD3205 | Middle and high-end models in the  industry |
| ZFD3206 | Middle and high-end models in the  industry |
| ZFD3207 | Middle and high-end models in the  industry |
| ZFD3208 | Middle and high-end models in the  industry |
| ZFD3209 | Middle and high-end models in the  industry |
| ZFD3210 | Middle and high-end models in the  industry |
| ZFD3211 | Middle and high-end models in the  industry |
| ZFD3212 | Middle and high-end models in the  industry |
| ZFD3213 | Middle and high-end models in the  industry |
| ZFD3214 | Middle and high-end models in the  industry |
| ZFD3215 | Middle and high-end models in the  industry |
| ZFD3216 | Middle and high-end models in the  industry |
| ZFD3217 | Middle and high-end models in the  industry |
| ZFD3301 | Middle and high-end models in the  industry |
| ZFD3302 | Middle and high-end models in the  industry |

Item attribute

| Project code | Project affiliation |
|---|---|
| ZFD4201 | Middle and high-end models in the  industry |
| ZFD5101 | Middle and high-end models in the  industry |
| ZFD5102 | Middle and high-end models in the  industry |
| ZFM2101 | Middle and high-end models in the  industry |
| ZFM2103 | Middle and high-end models in the  industry |
| ZFYY001 | Middle and high-end models in the  industry |
| ZFYY002 | Middle and high-end models in the  industry |
| ZHD0001 | Middle and high-end models in the  industry |
| ZHD0101 | Middle and high-end models in the  industry |
| ZHD0104 | Middle and high-end models in the  industry |
| ZHD0105 | Middle and high-end models in the  industry |
| ZHD0106 | Middle and high-end models in the  industry |
| ZHD0107 | Middle and high-end models in the  industry |
| ZHD0108 | Middle and high-end models in the  industry |
| ZHD0109 | Middle and high-end models in the  industry |
| ZHD0201 | Middle and high-end models in the  industry |
| ZHD0301 | Middle and high-end models in the  industry |
| ZHD0601 | Middle and high-end models in the  industry |
| ZHD0602 | Middle and high-end models in the  industry |
| ZHD1101 | Middle and high-end models in the  industry |
| ZHD603 | Middle and high-end models in the  industry |

CONFIDENTIAL BUSINESS INFORMATION, SUBJECT TO PROTECTIVE ORDER  9  HYT1973-23497468

| | |
|---|---|
| **From:** | SamuelChiaHanSiong 04725 <cn=samuelchiahansiong 04725/o=hyt> on behalf of SamuelChiaHanSiong 04725 |
| **Sent:** | Wednesday, June 25, 2008 3:01 AM |
| **To:** | guoyixiang04120@sz.hyt |
| **Cc:** | eunicechuasiewwei04727@sz.hyt; guoyijie04708@sz.hyt; samuelchiahansiong04725 @sz.hyt; wongkiathoe04726@sz.hyt |
| **Subject:** | 答复: FPGA Analysis Report |
| **Attachments:** | FPGA Analysis.ppt |

United States District Court
Northern District of Illinois

**PTX-19**

Case No. 1:17-cv-01973

GS,

Updated spreadsheet with the effort on modifying the codes. I also listed out the likely algorithms to be re-used.

FPGA Analysis.ppt

As for the Harmonized TDMA, YangFan thinks that all can be done in the DSP as well and thus do not need the FPGA. I will look into the protocol as well. Will come by and discuss it with you.

rgds,

Sam

guoyixiang 04120/HYT

1

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

guoyixiang 04120/HYT

06/25/2008 08:45 AM

收
件 SamuelChiaHanSiong 04725/HYT@HYT
人
抄 EuniceChuaSiewWei 04727/HYT@HYT, guoyijie 04708/HYT@HYT, SamuelChiaHan
送 04725/HYT@HYT, WongKiatHoe 04726/HYT@HYT, YuKokHoong 04728/HYT@H\
主 答复: FPGA Analysis Report{doclink : document = 'CB67712480684D2E48257473000
题 'F642F2D152FB45B248256C52004478D5' database = '4825746700381841' }

Sam,

Interesting! I understand where you are coming from and this is going to be a tough decission to make. either way will means a lot of work for the team, but the important one is protect the company from impending law suits! I need a cost estimation of how much additional hardware is needed to make the software version works plus the resource effort, man months, to re-write softwares to look different from Motorola.

I don't think we can look for a cheaper FPGA. I need you to work with Yan Fan to see what FPGA does she really need for the hardware to support Harmonized TDMA?

Best regards,

GS

SamuelChiaHanSiong 04725/HYT

SamuelChiaHanSiong 04725/HYT

06/25/2008 08:23 AM

收
件 SamuelChiaHanSiong 04725/HYT@HYT
人
抄 EuniceChuaSiewWei 04727/HYT@HYT, guoyijie 04708/HYT@HYT, guoyi:
送 WongKiatHoe 04726/HYT@HYT, YuKokHoong 04728/HYT@HYT
主 答复: FPGA Analysis Report{doclink : document = '4C4B76145911ED40482
题 'F642F2D152FB45B248256C52004478D5' database = '482573F40021597C' }

GS,

2

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

HYT1973-00061161

**PTX-19.2**
MSA1006

Here is an updated report with an initial estimation of work to be done to move the components from FPGA to C55.

[attachment "FPGA Analysis.ppt" deleted by SamuelChiaHanSiong 04725/HYT]

NOTE: One thing that Wong mentioned to me yesterday is the need to have a power ramping profile. Previously this was configured and controlled in the Mako. The ramp profile need to be set and then it will go through a D/A converter to control the TDMA ramp up and down profile. Since there is no equivalent of this in the current HW design, there is likely a need to have an additional D/A converter controlled by either the FPGA or DSP to get this done.

rgds,

Sam

SamuelChiaHanSiong 04725/HYT

**SamuelChiaHanSiong 04725/HYT**

06/23/2008 02:50 PM

收件 guoyixiang 04120/HYT, guoyijie 04708/HYT, EuniceChuaSiewWei 04727/H 人 04726/HYT, YuKokHoong 04728/HYT

抄送 [       ]

主题 FPGA Analysis Report

All,

Here is a report on my Analysis of the FPGA. You can look at the last 3 slides if you are not too interested in what the FPGA actually does.

GS, YT,

I would like to discuss them with you to see your point of view on some of the items.

[attachment "FPGA Analysis.ppt" deleted by SamuelChiaHanSiong 04725/HYT]

3

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

**PTX-19.3**
MSA1007

rgds,

Sam

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

HYT1973-00061163

**PTX-19.4**
MSA1008

United States District Court
Northern District of Illinois

**PTX-263_TR**

Case No. 1:17-cv-01973

# This Document Produced Natively

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

HYT1973-02180813

**PTX-263_TR.1**

MSA1009

**This Document Produced Natively**

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER
HYT1973-02180813

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
HYT1973-02180813_TR

**PTX-263_TR.2**
MSA1010

| | A | B | C | D | E |
|---|---|---|---|---|---|
| 1 | Task | Date Opened | Date Closed | Status | Comments |
| 2 | OMAP 5910 and 5912 processor comparsion and software estimation | 20-Jun-08 | 24-Jun-08 | DONE | |
| 3 | FPGA removal analysis | 20-Jun-08 | 25-Jun-08 | DONE | Initial work estimation done on 6/25. To be reviewed with team |
| 4 | Answer Rogers Questions | 23-Jun-08 | 23-Jun-08 | DONE | |
| 5 | Discuss RSSI and Squelch with YangFan | 23-Jun-08 | 24-Jun-08 | DONE | Discussion done. Confirmed the way to calculated RSSI. What she has done is correct. As for the Squelch, the plan is to use the currently algorithm which analyzes the out of band noise. If there is a need for reuse, it shall be looked at in the future. |
| 6 | Search for Mack roadmap and send to GS. Also check for newer DMR roadmap. | 24-Jun-08 | 25-Jun-08 | DONE | Not found. YT is to try and get it from his brother. |
| 7 | Cost estimation of how much additional hardware is needed to make the software version works plus the resource effort, man months, to re-write softwares to look different from Motorola. | 25-Jun-08 | 25-Jun-08 | DONE | No cost will be incured. The FPGA can be directly removed without adding additional components. |
| 8 | Review Arch task breakdown from YT | 25-Jun-08 | 26-Jun-08 | DONE | Provided a feedback that test arch is missing. Will need to continue to review and strategize the arch tasks. |
| 9 | Come up with a list of TETRA software guidelines:<br>1) Gain Lineup. Need to ensure that -22dBm0 input to the ACELP at 94dBSPL at the mic input level.<br>2) Audio quality (AGC, Noise Suppressor)<br>2) L1 Timing (What is the accuracy of timing corrections, can it achieve 1/4symbol?)<br>3) Buffer Underrun/Overrun (Handover processing with no/minimal audio hole)<br>4) MIPS and Memory analysis. Optimize code now if necessary. | 27-Jun-08 | 30-Jun-08 | DONE | |
| 10 | Look at AIC document to determine if the tone generation would work. | 30-Jun-08 | 1-Jul-08 | DONE | 7/1: The AIC coded does not support tone generation. The BUZZ pin is just an input to mix the signal with the speaker signal. One feature that is in this IC is the Mic AGC. This is planned to be used. |
| 11 | Read Yu Yang's patent | 23-Jun-08 | 7-Jul-08 | DONE | 7/7: Two patents were submitted.<br>1) Remote MMI. Kind of like a Mobile radio which has a remote control head. This allows the Transiver section to be simple.<br>2) DGNA in direct mode of operation. |
| 12 | Train team on Fagan inspection method | 11-Jul-08 | 11-Jul | DONE | 7/11: The training will be provided by the quality team. They will use the inspection process which they have defined. |
| 13 | Write Up patent for Direct Mode pseudo Trunk | 17-Jul-08 | 21-Jul-08 | DONE | 7/21: Patent drafted and sent to GS for review. |
| 14 | Read up on Simulcast operation | 18-Jul-08 | 22-Jul-08 | DONE | |
| 15 | Come up with rough timeline estimate | 18-Jul-08 | 28-Jul-08 | DONE | |
| 16 | Write Up patent for Direct Mode True 2-Slot operation | 17-Jul-08 | 23-Jul-08 | DONE | |
| 17 | Prepare presentation chart for Tuesday Team meeting | 1-Aug-08 | 4-Aug-08 | DONE | |
| 18 | Talk to YuYang on the following:<br>1) 2 - Slot operation (DONE)<br>2) Features (What is his concerns) (DONE)<br>3) Schedule (DONE)<br>4) Development Process (DONE) | 7-Jul-08 | 28-Jul-08 | DONE | |

Confidential - Subject to Protective Order

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER        HYT1973-02180813.1_TR

PTX-263_TR.3
MSA1011

| | A | B | C | D | E |
|---|---|---|---|---|---|
| 1 | Task | Date Opened | Date Closed | Status | Comments |
| 19 | Investigate possibility of 2 slot operation in direct mode | 26-Jun-08 | 28-Jul-08 | DONE | 6/26: Discussed and came to a conclusion that pseudo trunk cannot be employed. It would need to be able to be able to support 2 slot operation like it is in repeater mode. 6/27: Suggestion is to first patent and standardize the 2 slot pseudo trunk operation and then only look for ways to get actual independent 2 slot operation. 7/5: Solution identified. Need to get buy off from team. 7/21: Current plan is to implement pseudo trunk operation in direct mode of operation. A patent has been drafted which is pending review by the submitter team. |
| 20 | Prepare Patent presentation slide | 1-Aug-08 | 4-Aug-08 | DONE | |
| 21 | Determine POC Tasks to be done and people to be assigned to it | 8-Aug-08 | 11-Aug-08 | DONE | |
| 22 | Read Trunking document | 18-Jul-08 | 31-Jul-08 | DONE | did a brief study of the document. |
| 23 | Read DMR protocol document | 26-Jun-08 | 11-Jul-08 | DONE | |
| 24 | Get AGC parameters and provide to WuHongCheng | 14-Aug-08 | 15-Aug-08 | DONE | 8/15: The following values were provided to WuHongCheng Minimum Gain Level = -12dB Maximum Gain Level = +6dB Attack Rate = 4dB/sec (This can be set to be faster but is a good start to see if it performs well) Decay Rate = 2dB/sec Target Level = -20dBm0 or 23dbLHR or 59.98mvRMS or -24.44dBV (I am providing various level formats. You can pick one that is most familar to you). |
| 25 | Draft requirements for features. Get YuYang or Roy to own feature requirements. | 1-Aug-08 | 8-Aug-08 | DONE | 8/8: Roy has assigned someone to work on the Requirements. |
| 26 | Check on DMR schedule from YouYu and add in DSP team activities. | 22-Aug-08 | 25-Aug-08 | DONE | This is only the POC plan. There is no mainline schedule. |
| 27 | Problem with using external Vocoder IC. Result in too much traffic. Send to vocode voice samples and the return to C55 then encrypt and then send it again for FEC. This functionality may not be supported by the IC. | 15-Jul-08 | 17-Jul | DONE | Communicated to GS |
| 28 | Review Feature list and finalize it | 11-Jul-08 | 21-Jul | DONE | |
| 29 | Determine connections if FPGA is removed | 8-Aug-08 | 14-Aug-08 | DONE | |
| 30 | Prepare diagrams for the 2-slot patents | 22-Aug-08 | 28-Aug-08 | DONE | Document sent to patent lawyer |
| 31 | Read ETSI Minutes from Roger | 22-Aug-08 | 23-Aug-08 | DONE | Not much info gained. There is not much talk on Trunking |
| 32 | Determine Possible Repeater Architecture | 16-Sep-08 | 17-Sep-08 | DONE | |
| 33 | Check Patent from Laywer | 11-Sep-08 | 16-Sep-08 | DONE | Roger sent some reply to the laywer |
| 34 | BER Measurement on the FPGA IC. | 1-Aug-08 | 1-Sep-08 | DONE | Done and inidicated some data bits in error. Will code it to C55 and then re-verify. |
| 35 | Get data flow processing from YuYang (Roger) | 13-Aug-08 | 19-Sep-08 | DONE | 9/19: YangFan and Roger have dertermined the initial lineup. |
| 36 | Talk to Roger on the following: 1) 2 - Slot Operation 2) Task at hand and what is his interest. 3) Opinion about the team members. 4) Concerns about the project. 5) Opinion about what is still remaining to be done and how much people is needed. 6) Data services. What is required for confirmed and unconfirmed text msg. 7) Interfaces to the IP services. | 11-Jul-08 | 11-Aug-08 | DONE | 7/15: -Roger said Phy Layer is difficult to implement, Requirements not defined, Future task plan. These are the concerns from him. -He indicated that he is interested in developing the signalling layer and in the future would like to be an architect for radio products in this company. -Is wandering how to implement the IP services. (fed back to him that it will be handled by the MMI team. The PS will only need to provide interfaces to send data) |

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER     HYT1973-02180813.2_TR

PTX-263_TR.4
MSA1012

| | A | B | C | D | E |
|---|---|---|---|---|---|
| 1 | Task | Date Opened | Date Closed | Status | Comments |
| 37 | Check on Test team progress to test the code. What are the focus areas to find issues? | 1-Aug-08 | 12-Aug-08 | DONE | 8/12: Had a meeting with the team. Items checked during the test are:<br>- Memory Leak (Created a tool which is used to measure it)<br>- Memory Usage (Used the CCS tool to do it)<br>- Code Coverage (Used the CCS tool)<br>- Boundary Conditions (Creates various test cases and had it documented)<br>- Coding Standard (Checked for consistency)<br>- Code Logic Error (This is not done so much as it requires and indepth understanding)<br>YuYang to further follow up to see what else can be sent to the team for test. To identify reuse code in the PS. |
| 38 | Determine how to create libraries | 1-Aug-08 | 12-Sep-08 | DONE | 8/1: Discussed with YT and the decision is to<br>1) Reuse entire GCISS subscriber library. Requires all components to use the connection interface.<br>2) Extract only required component and change interface to own interface.<br>3) Convert required library to C<br>Out of the selection, option 2 is the best one due to the fact that the effort to migrate is the lowest among the 3. It also has a low chance of detection if the code was disassembled by Mot.<br>9/26: Create code wrappers and only provide 1 header and 1 lib file. |
| 39 | Write proposal on what need to be done to achieve SELP evaluation on the DMR product. Also proposal for future work to be done to finalize in a product.<br>Send to GS | 13-Oct-08 | 14-Oct-08 | DONE | |
| 40 | Read OSAL user guide doucment | 9-Oct-08 | 14-Oct-08 | DONE | |
| 41 | Get Logic Analyzer purchased | 10-Oct-08 | | DONE | 10/17: Have decided to purchase the LA which cost about RMB11k |
| 42 | Create Noise Suppressor Library | 23-Sep-08 | | DONE | 10/16: Library created and supplied to LiuZhongWen |
| 43 | Come up with list of activities for the evaluation of RALCWI and SELP on PC platform | 21-Oct-08 | | DONE | 10/22: Drafted and snet to GS. |
| 44 | Schedule meeting to track overall status to align SW teams | 27-Oct-08 | 27-Oct-08 | DONE | Meeting scheduled to be held on every Tuesday |
| 45 | Check and see how the DSP Lineup adds TPL/DPL and audio samples together | 3-Nov-08 | 3-Nov-08 | DONE | 11/3: The Mod Limiter will need to be scaled down. This is where the deviation level is fed into the component. After that only add the audio to the DPL signal. |
| 46 | Prepare competency spreadsheet | 24-Oct-08 | 29-Oct-08 | DONE | 10/29: YuYang rated the competency and sent it to me. |
| 47 | Create Mod Limit library with PL deviation config | 3-Nov-08 | 5-Nov-08 | DONE | Modifications done |
| 48 | Create Library that combines (Noise Suppressor, CD, Squelch, Mod Limit) | 3-Nov-08 | 5-Nov-08 | DONE | Create the library |
| 49 | Find out how to determine the audio max deviation and then map it to the max deviation | 5-Nov-08 | 6-Nov-08 | DONE | Created a spreadsheet named HYTGainLineupAnalysis.xls |
| 50 | Check Noise Suppressor memory allocation issue | 7-Nov-08 | 10-Nov-08 | DONE | Created a library with all mudules included. It also solves the memory leak issue. |
| 51 | Resolve issue on Noise Suppressor | 18-Nov-08 | 26-Nov-08 | Done | |
| 52 | Check on Filter before doing symbol recovery | 10-Dec-08 | 11-Dec-08 | DONE | 1) Provided YangFan with the RRC Filter used for the Rx side. |
| 53 | Check on symbol DC and Time tracking after the Sync has been recovered. Get back to YangFan | 21-Nov-08 | 27-Nov-08 | Done | Provided Yang Fand with the ideas on how to track it. |
| 54 | Get IF Filter and Test sample data for Digital lineup | 28-Nov-08 | 28-Nov-08 | DONE | Provide all IF Filter coefficients and some test sample data to Yang Fan. |
| 55 | SW Timeline vs Resource for next year. | 11-Dec-08 | 12-Dec-08 | DONE | Initial version sent to GS |
| 56 | Look into what needs to be done for repeater (resources and architecture) | 9-Sep-08 | | DONE | |
| 57 | Complete schedule by adding in feature sets (YuYang, Roy) | 10-Sep-08 | | DONE | First review to be held on 7-Oct |
| 58 | How is digital/analog mode change done? | 17-Dec-08 | 17-Dec-08 | DONE | A message will be sent to change mode and the initialization parameters for things like where the data is suppose to flow will be done. |

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER        HYT1973-02180813.3_TR

**PTX-263_TR.5**
MSA1013

| | A | B | C | D | E |
|---|---|---|---|---|---|
| 1 | Task | Date Opened | Date Closed | Status | Comments |
| 59 | Check Map file | 17-Dec-08 | 17-Dec-08 | DONE | See a lot of .txt section in the SARAM section. Provided an example file to create obj sections. |
| 60 | Read up on MPT1327 Trunking | 12-Dec-08 | 17-Dec-08 | DONE | Also had a training provided by the marketing team on the product operation and configuration. |
| 61 | Check on how to use Skyworks to communicate with the DSP. | 11-Dec-08 | 16-Dec-08 | DONE | This will be controlled by the MCSI. The current plan is to whip up a board connected to the Sky modulation IC and test it out. |
| 62 | Read up on encryption operation | 23-Dec-08 | 12/23/2008 | DONE | Created notes |
| 63 | Draft work scope of all tasks and advice GS on what should the work allocation be done. | 26-Dec-08 | 27-Dec-08 | DONE | |
| 64 | Review P25 requirements and determine whether it can be done by DMR Tier III | 26-Dec-08 | 27-Dec-08 | DONE | |
| 65 | Write up key highlight points about team and send to GS | 26-Dec-08 | 31-Dec-08 | DONE | Send a new year mail summarizing the teams achievemt for the year. |
| 66 | Read up P25 Trunking Protocol from Phillipe Deavous. He will be visiting on Jan13-14 | 4-Jan-09 | 4-Jan-09 | DONE | Documents is about the EADS Network Site controller device and is probably intending to discuss about how to integrate it to the DMR system. |
| 67 | Read Protocol Stack / BaseBand documents from Yu Yang. One of the PS document has been translated. | 24-Jun-08 | | | |
| 68 | Study Signaling stack from Mot (Go though a couple of examples like Group Call, Call Alert. Find out the exact bit information used in the LC, CSDK) | 26-Jun-08 | | | |
| 69 | Work with Yan Fan to see what FPGA does she really need for the hardware to support Harmonized TDMA | 25-Jun-08 | | | |
| 70 | Read Harmonized ETSI document | 25-Jun-08 | | | |
| 71 | Read Harmonized TDMA report from YangFan | 25-Jun-08 | | | |
| 72 | Estimate amount of enginner and lobby to have them hired. | 27-Jun-08 | | | |
| 73 | Get team to do the following:<br>1) Document all Embedded Signalling and show burst structure. | 3-Jul-08 | | | |
| 74 | Come up with process plan<br>Execute plan from CMMi and access what need to be implemented for the team. | 11-Jul-08 | | | 7/11: A process has already been defined by the CMMi team (YangHuaZhong). Need to have the team follow some of the processes.<br>7/18: Met the comsultant and asked for the minimum todos for all KPAs in order to obtain CMMi certification. |
| 75 | Read BB Symbol Recovery Document | 17-Jul-08 | | | |
| 76 | TETRA has their own test department of 12 people. Out of that 7 person will do white box test. Looks into the possibility of increasing test team. | 21-Jul-08 | | | |
| 77 | Check the SNR needed for the IQ samples going into the DSP. What is the specification required by the DSP. | 21-Jul-08 | | | |
| 78 | Place schedule in MS Project | 1-Aug-08 | | | 9/22: First initial phase (R0) schedule for IWCE was created. Will need to proceed to create the next phase schedule R1. |
| 79 | Do a WBD estimate on the activities identified. | 1-Aug-08 | | | |
| 80 | Find Trunking Patents | 13-Aug-08 | | | |
| 81 | Look at lineup data flow processing examples | 13-Aug-08 | | | |
| 82 | Check on items to train the team.<br>- Product Features<br>- Audio Training<br>- Acoustic Testing<br>- Analog Stack Processing<br>- RF Performance Measurement (DONE)<br>- Digital Stack Processing<br>- MESH Technology | 14-Aug-08 | | | |

Sheet 1    4    Confidential - Subject to Protective Order

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER    HYT1973-02180813.4_TR

PTX-263_TR.6
MSA1014

| | A | B | C | D | E |
|---|---|---|---|---|---|
| 1 | Task | Date Opened | Date Closed | Status | Comments |
| 83 | Come up with Audio gain lineup | 14-Aug-08 | | | |
| 84 | Read PS Document from Roger | 11-Sep-08 | | | |
| 85 | Read DMR POC codes | 11-Sep-08 | | | |
| 86 | Feature list for Trunking and Repeater | 19-Sep-08 | | | |
| 87 | Roadmap for Trunking and Repeater | 19-Sep-08 | | | |
| 88 | Resources for Truking and Repeater | 19-Sep-08 | | | |
| 89 | Check on DC removal for Digital Symbol recovery | 24-Sep-08 | | | |
| 90 | Determine Items to be reviewed. Talk to YuYang about it | 24-Sep-08 | | | 9/25: Will target to have the documentation sent out by 26-Sep. Review is to be held after the holidays. |
| 91 | Schedule meetings to talk about various topics. This is to ensure that teams talk to each other. | 25-Sep-08 | | | |
| 92 | Ramp profile calculation | 26-Sep-08 | | | Investigate Ramp profile implementation and get someone to work on it. There is a NEO ramp profile in the Mot folder |
| 93 | Values for DAC voltages. Need to get engineers to work on it. | 26-Sep-08 | | | APC - 1W = 0.4V, 40W = 4.xV<br>Max deviation for HP and LP is 8kHz<br>Plan to use 10-bit DAC (1024 levels). This seems too low. So, only 512 levels is used for get 4kHz dev and this will cause high noise for low level input signal. |
| 94 | Create schedule for activites to be done till Jun-08 | 14-Oct-08 | | | |
| 95 | Check on CPS team as to how they are aligned | 22-Oct-08 | | | |
| 96 | Create a list of activities to be done for Post R1 | 27-Oct-08 | | | |
| 97 | Provide Signaling interfaces to Host. | 27-Oct-08 | | | 10/30: Communicated to Roger that he needs to work with APP team on getting this ready so that his code can be modified accordingly. |
| 98 | Get Low Level interfaces for Signaling task | 27-Oct-08 | | | 10/30: Communicated to Roger that he needs to work with APP team on getting this ready so that his code can be modified accordingly. |
| 99 | Determine resources needed for next year | 27-Oct-08 | | | |
| 100 | Read TRS. Specifically on channel access. | 4-Nov-08 | | | |
| 101 | Read about how to do DC removal for the Symbol Recovery | 5-Nov-08 | | | 11/6: First it finds the sync location. Then it averages the samples (24 sync symbol = 100 samples) to find the DC offset. This is then compared against the default DC average of a ideal sync pattern to get the DC offset. |
| 102 | Determine schedule going forward now that Analog Stack baseline is ready. | 10-Nov-08 | | | |
| 103 | Discuss Repeater plan and how to get it off the ground. (Create Schedule) | 10-Nov-08 | | | |
| 104 | Check on Carrier Offset Synchronization for Digital (What is the 1kHz offset BER spec needed? | 11-Nov-08 | | | This max offset achieved by Mot is about 2.1kHz. This data is in the PQE doc. However, the BER/dropping the signal is not known. |
| 105 | Create R2 schedule | 11-Nov-08 | | | |
| 106 | Read up on ARS | 12-Nov-08 | | | |
| 107 | Eason is pushing to have all SW features delivered by a specific time. We know that SW will be features that will always be later than HW. However this does not give him the right to decide and push for everything like he owns the SW team. Need to have an independent SW team to decide and manage the deliverables like Smart Control Head. | 14-Nov-08 | | | |
| 108 | Animation for 2-slot pseudo trunk operation and DGNA | 21-Nov-08 | | | 12/12: 2-slot operation was already created by GS. |
| 109 | Determine test method for audio quality | 21-Nov-08 | | | A test methodology from ITU standard was sent by Tsinghua |
| 110 | Make the DSP Platform and DSP Stack libraries buidable. Need to divide up the functionalities | 27-Nov-08 | | | Sunny is doing the portion on the DSP Stack. ChenMinJun is doing the portion on the DSP Platform |
| 111 | Resolve issue on getting Program memory to run from external RAM. | 27-Nov-08 | | | |
| 112 | Resolve issue with Noise Suppressor not being able to process the samples properly | 27-Nov-08 | | | |

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER      HYT1973-02180813.5_TR

PTX-263_TR.7
MSA1015

| | A | B | C | D | E |
|---|---|---|---|---|---|
| 1 | Task | Date Opened | Date Closed | Status | Comments |
| 113 | Determine simulation for Symbol recovery to be sent to Yang Fan | 28-Nov-08 | | | |
| 114 | Read APCO P25 and DMR Tier Trunking. Will need to discuss with EADS person on 10-Dec | 28-Nov-08 | | | This discussion is postponed. Will still need to read up APCO and TETRA to know what is missing so as to know what additional improvements are required for Tier III protocol. |
| 115 | Read codes in HYT DSP_pjt folder | 11-Dec-08 | | | |
| 116 | Fedback to YangFan on Symbol Recovery 1) Do the DC calculation after the symbol time is determined. Do it for the entire 24 symbols. | 15-Dec-08 | | | |
| 117 | Find out the next best item to be integrated to a C55 mainline. | 17-Dec-08 | | | |
| 118 | How are the multiple base station units suppose to time synchronize with each other. The Central Control Unit is the one allocation the channels in the BS. | 19-Dec-08 | | | |
| 119 | Get release done and start tracking issues | 19-Dec-08 | | | |
| 120 | Read up LTD system white paper to get an idea on how to design the Trunking System | 24-Dec-08 | | | |
| 121 | Determine Base station system architecture proposal | 26-Dec-08 | | | |
| 122 | Determine proposed release phases (Phase 1: Single Site....) | 31-Dec-08 | | | |
| 123 | The threshold value is calculated as 65% of the sync pattern signal energy. If the correlator has any scaling, it will need to be done also scaled down. Mot used 256 to scale the values. | 6-Jan-09 | | | |
| 124 | Provide assessment of YuYang and submit it | 6-Jan-09 | | | |
| 125 | Check on the Tx and Rx RRC Filters. | 8-Jan-08 | | | |
| 126 | Increase RX ABACUS SSI to 48kHz | 8-Jan-08 | | | |
| 127 | Perform symbol tracking/gain/DC on samples after sync is detected. Stop sync detection which is considered high MIPS | 8-Jan-08 | | | |
| 128 | Thigs to do: 1) Have code debugged with source codes. Do not try to restrict too much if there is a need to access the code. 2) Is the HW team controlling the team. How can that be changed so that the focus is clearer. May need to talk to GS about the difficulties faced when HW team is pressuring them. 3) Identify issues faced by the team and see what can be done. Have a more agressive team working on Memory optimization as well as MIPS. 4) Get more headcount. 5) Baseline C55 software. Determine items to be done and obtain a schedule. 6) Work on further stage of schedule (Repeater, Audio, RF Quality) 7) Reassignment of task based on what is being seen today. 8) Repeater POC and Mainline Scheudle. Get status and determine plan going forward. 9) Solve equipment problem 10) Resolve memory issue with one CPA team member. 11) Replan R1 schedule 12) Replan Repeater POC and Mainline Schedule. | | | | |
| 129 | Talk to GS on all the issues and the current risk and outlook of the program. | | | | |
| 130 | Repeater resources will need to be moved to subscriber developmet. Expecially Wang Fei to be moved to do Subscriber Repeater Access code and test. | | | | |

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER                          HYT1973-02180813.6_TR

PTX-263_TR.8
MSA1016

| | A | B | C | D | E |
|---|---|---|---|---|---|
| 1 | Task | Date Opened | Date Closed | Status | Comments |
| 131 | Talk to YuYang on the following: 1) Team Meetings (Include Telling team about overall status and delivery.) 2) Team Building for Feb | | | | |
| 132 | How to avoid paying royalty to Mot. Or even remove the clause to say Mot can use HYT patents | | | | |
| 133 | Determine DSP Library risk and where to store the files. | | | | 3/09: YuYang is to talk to SCM and get the FEC and Symbol Recovery files stored in a specific folder. |
| 134 | Discuss on the status of the Repeater Access, TPL, Channel Blocking, ..... | | | | |
| 135 | Check with ZhengZhi on how scan works for Repeater, Analog, Digital | | | | |
| 136 | Board issues: 1) Use 2 types of TXCO (1 big and 1 small) 2) Use 2 types of DAC (10bit and 12bit) These are supplied to all the enginners. | | | | |
| 137 | Add in Test/debug capability for PS and Phy layer | | | | |
| 138 | | | | | |
| 139 | | | | | |
| 140 | LLR (Log Likelihood Ratio). This is a new algorithm to be coded. 3 months assuming reuse and performance test. Study what needs to be done in order to support LLR | 25-Jun-08 | | | 7/4: Previous Mot data shows that it does not improve audio range. It was only seen to improve confirmed data operation (Trellis). |
| 141 | The following features are not defined in ETSI protocol. There is no LC opcode defined for it. Motorola uses the reserved opcodes to get this features implemented: Radio Disable, Radio Enable, Remote Monitor, Radio Check, Call Alert, Digital Emergency, PC Call, ARS Monitor this status from time to time. | 1-Jul-08 | | | |
| 142 | | | | | |
| 143 | | | | | |
| 144 | | | | | |
| 145 | | 512 | 182.8571429 | 25.6 | 1 | |
| 146 | | | | | 2 | |
| 147 | | | | | 4 | |
| 148 | | | | | 8 | |
| 149 | | | | | 16 | |
| 150 | | | | | 32 | |
| 151 | | | | | 64 | |
| 152 | | | | | 128 | |
| 153 | | | | | 256 | |
| 154 | | | | | 512 | |
| 155 | | | | | 1024 | |

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER      HYT1973-02180813.7_TR

**PTX-263_TR.9**
MSA1017

CPA Login

xhanxiong/111111

Please change your password and address in time: http://sw-server/cgi-bin/ApachePasswd.cgi
http://192.168.12.2/cgi-bin/ApachePasswd.cgi

http://sw-server/src/CPA/cpa_release/V01.00.00.001

DMR Login
xhanxiong/Cam1978May
xhanxiong/123456

Server Locations:
http://svn-pdmr/repos/DMR_SW_Configuration
http://svn-pdmr/repos/cpa/cpa_release

Web Access
http://192.168.0.7/svn/DMR_SW_Configuration

Change Password:
http://192.168.0.7/cgi-bin/Apache20Passwd.cgi

Sheet:  SVN Access

Confidential - Subject to Protective Order

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

HYT1973-02180813.8_TR

**PTX-263_TR.10**
MSA1018

ETSI Login
ETSI username : XINJUN
password : zyz01743

Change Windows / Internet Proxy Password
http://192.168.240.10/iisadmpwd

| Internet Pass | Old | 1970 |
| --- | --- | --- |
| | New | 1975 |

Printer Setup at Bessie's place. Run the setup.exe file

\\ Glb management department 2\hp1022n installation manual and driver\driver

Internal Login
Website: http
: //192.168.
0.189:800
0

External Login
Website: http
//finance.h
ytera.com.
cn:8000

| Finance Pass | | xxx1975xxx |
| --- | --- | --- |
| ETSI | Login | xinjun |
| | Pass | zyz01743 |

Sheet: SVN Access

Confidential - Subject to Protective Order

PTX-263_TR.11
MSA1019



**TRANSPERFECT**

City of New York, State of New York, County of New York

I, Osayimwen Odia, hereby certify that the document "HYT1973-02180813" is to the best of my knowledge and belief, a true and accurate translation from Chinese into English.

Osayimwen Odia

Sworn to before me this
December 13, 2018

Signature, Notary Public

ANDERS MIKAEL EKHOLM
NOTARY PUBLIC-STATE OF NEW YORK
No. 01EK6378373
Qualified in New York County
My Commission Expires 07-23-2022

Stamp, Notary Public

LANGUAGE AND TECHNOLOGY SOLUTIONS FOR GLOBAL BUSINESS

THREE PARK AVENUE, 40TH FLOOR, NEW YORK, NY 10016 | T 212.689.5555 | F 212.689.1059 | WWW.TRANSPERFECT.COM
OFFICES IN 90 CITIES WORLDWIDE

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

机密 – 受保护令保护

本文件由本语言人员编写

# 本文件由本语言人员编写

机密 – 受保护令保护

HYT1973-02180813

机密 – 受保护令保护

HYT1973-02180813_TR

**PTX-263_TR.14**

| | 任务 (A) | 启动日期 (B) | 关闭日期 (C) | 身份 (D) | 意见 (E) |
|---|---|---|---|---|---|
| 2 | OMAP 5910 和 5912 处理器对照和软件估算 | 2008 年 6 | 2008 年 6 月 24 | 已完成 | |
| 3 | FPGA 移除分析 | 2008 年 6 | 2008 年 6 月 25 | 已完成 | 初步工作预估已在 6 月 25 日完成。待团队审议 |
| 4 | 回答 Rogers 问题 | 2008 年 6 | 2008 年 6 月 23 | 已完成 | |
| 5 | 与 YangFan 讨论 RSSI 和 Squelch | 2008 年 6 月 23 日 | 2008 年 6 月 24 日 | 已完成 | 讨论已完成 确认 Io 计算 RSSI 的方式。她做的是正确的。对于 Squelch，计划是使用当前的算法，该算法可分析带内噪声。如果需要重用，应在未来加以考虑。 |
| 6 | 搜索 Mack 路线图并发送给 GS。并查找更新的 DMR 路线图。 | 2008 年 6 | 2008 年 6 月 25 | 已完成 | 未找到。YT 将尝试从他哥哥那里获取 |
| 7 | 关于需要多少额外的硬件才能使该软件版本正常工作，再加上资源投入和需要的人工月数，使软件看起来与摩托罗拉不同的成本估算。 | 2008 年 6 月 25 日 | 2008 年 6 月 25 日 | 已完成 | 不会产生任何成本。FPGA 可以直接删除，不必添加其他组件。 |
| 8 | 审议 YT 的架构任务分配 | 2008 年 6 月 25 日 | 2008 年 6 月 26 日 | 已完成 | 提供反馈，测试架构缺失。需要继续审议并为架构任务制定战略。 |
| 9 | 提出 TETRA 软件指南列表：<br>1) 获取阵列。需要确保 -22dBmO 在 94dBSPL 对 ACELP 的输入保持最低麦克风输入水平。<br>2) 音频质量（AGC、噪声抑制器）<br>2) L1 定时（定时修正的准确性如何，能否达到 1/4 信号）<br>3) 缓冲区欠载运行/过载运行（交接处理，无最低音频孔）<br>4) MIPS 结束内存分析。如有必要，优化代码。 | 2008 年 6 月 27 日 | 2008 年 6 月 30 日 | 已完成 | |
| 10 | 查看 AiC 文件以确定拨号音生成是否正常 | 2008 年 6 月 30 日 | 2008 年 7 月 1 日 | 已完成 | 7 月 1 日：已编码的 AIC 不支持拨号音生成 BUZZ pin 码只是一种用于将信号与扬声器信号混合的输入。该 IC 中的一个功能是麦克风 AGC。计划使用。 |
| 11 | 阅读 Yu Yang 的专利 | 2008 年 6 月 23 日 | 2008 年 7 月 7 日 | 已完成 | 7 月 7 日：已经提交两项专利。<br>1) 远程 MMI。有点像手机广播，有远程控制接头。这使收发器部分变得简单。<br>2) 动态重组 (DGNA) 处于直接运行模式。 |
| 12 | 为团队提供有关 Fagan 检查方法的培训 | 2008 年 7 月 11 日 | 7 月 11 日 | 已完成 | 7 月 11 日：该培训将由质量团队提供。他们将使用他们已经否定的检查流程。 |
| 13 | 为直接模式伪 Trank 编写专利信息 | 2008 年 7 | 2008 年 7 月 21 | 已完成 | 7 月 21 日：已经起草并发送给 GS 审议的专利。 |
| 14 | 输入同步广播操作 | 2008 年 7 | 2008 年 7 月 22 | 已完成 | |
| 15 | 提出大致的时间表预估 | 2008 年 7 | 2008 年 7 月 28 | 已完成 | |
| 16 | 为直接模式真实 2 槽操作撰写专利 | 2008 年 7 | 2008 年 7 月 23 | 已完成 | |
| 17 | 为周二的团队会议准备演示报告表格 | 2008 年 8 | 2008 年 8 | 已完成 | |
| 18 | 与 YuYang 讨论以下问题：<br>1) 2 槽操作（已完成）<br>2) 功能（他的顾虑是什么）（已完成）<br>3) 时间表（已完成）<br>4) 开发流程（已完成） | 2008 年 7 月 7 日 | 2008 年 7 月 28 日 | 已完成 | |

表 1

1

机密 – 受保护令保护

机密 – 受保护令保护

HYT1973-02180813_TR

**PTX-263_TR.15**

MSA1023

| | A | B | C | D | E |
|---|---|---|---|---|---|
| | 任务 | 启动日期 | 关闭日期 | 身份 | 意见 |
| | 调查 2 槽操作在直接模式下运行的可能性 | 2008 年 6 月 26 日 | 2008 年 7 月 28 日 | 已完成 | 6 月 26 日：讨论并得出结论，伪中继线无法部署，它需要能够支持 2 槽操作，就像是在中继器模式下一样。2 6 月 27 日：建议是，给第一个专利，将 2 槽伪中继操作标准化，然后只寻找能实现实际独立 2 槽操作的方法。2<br>7 月 5 日：已找到解决方案。需要获得团队的认可。<br>7 月 21 日：目前的计划是在直接操作模式下实现伪中继线操作。专利已经提交，等待提交者团队审议。 |
| | 准备专利演示报告幻灯片 | 2008 年 8 | 2008 年 8 月 4 日 | 已完成 | |
| | 确定需要完成的 POC 任务以及需要分配给任务的人员 | 2008 年 8 | 2008 年 8 | 已完成 | |
| | 阅读中继文件 | 2008 年 7 | 2008 年 7 | 已完成 | 对文件进行了简短研究。 |
| | 阅读 DMR 协议文件 | 2008 年 6 | 2008 年 7 | 已完成 | |
| | 获取 AGC 参数并提供给 WuHong Cheng | 2008 年 8 月 14 日 | 2008 年 8 月 15 日 | 已完成 | 8 月 1 日 5：将以下值提供给 WuHong Cheng<br>最小增益级 = -12dB<br>最大增益级 = +6dB<br>攻击速率= 4dB/秒 （可设置为更快，但如果表现良好，是一个良好的开始）<br>衰减率 = 2dB/秒<br>目标水平= -20dBmO 或 23dbHR 或 59.98mvRMS 或 -24.44dBV（我会提交不同水平的格式。你可以选择你最熟悉的一种）。f |
| | 起草对各项功能的要求。让 YuYang 或 Roy 负责功能要求。 | 2008 年 8 | 2008 年 8 | 已完成 | 8 月 8 日：Roy 已经分配人员去处理这些要求。 |
| | 查看 Youyu 的 DMR 计划并添加数字信号处理器 (DSP) 团队活动。 | 2008 年 8 | 8 月 25 日 | 已完成 | 这只是 POC 计划。没有主线时间表。 |
| | 使用外部 Vocoder IC 遇到的问题。导致流量过高。发送至 vocode 语音示例，然后返回到 C55，然后加密并再次发送用于前向纠错 (FEC)。IC 可能不支持该功能。 | 2008 年 7 | 7 月 17 日 | 已完成 | 与 GS 沟通 |
| | 查看功能列表并最终确定 | 2008 年 7 | 7 月 21 日 | 已完成 | |
| | 确定连接（如果现场可编程门阵列 (FPGA) 已被删除） | 2008 年 8 | 2008 年 8 | 已完成 | |
| | 为 2 槽专利准备图表 | 2008 年 8 | 2008 年 8 | 已完成 | 文档发送给专利律师 |
| | 阅读来自 Roger 的欧洲电信标准协会 (ETSI) 会议记录 | 2008 年 8 | 2008 年 8 | 已完成 | 未获得多少信息。关于中继没有讨论太多 |
| | 确定可能的中继器架构 | 2008 年 9 | 2008 年 9 | 已完成 | |
| | 查看律师发送的专利信息 | 2008 年 9 | 2008 年 9 | 已完成 | Roger 发送了一些回复给律师 |
| | 对 FPGA IC 的误码率 (BER) 测量。 | 2008 年 8 | 2008 年 9 | 已完成 | 已完成，显示一些数据字节错误。将编码至 C55 然后重新验证。 |
| | 从 YuYang (Roger) 获取数据流处理 | 2008 年 8 | 2008 年 9 | 已完成 | 9 月 19 日：YangFan 和 Roger 已经确定了首个序列。 |
| | 与 Roger 沟通以下问题：<br>1) 2 槽运行情况<br>2) 手头的任务以及对什么感兴趣。<br>3) 对团队成员的看法。<br>4) 对项目的担忧。<br>5) 关于尚未完成的工作和需要多少人手的看法。<br>6) 数据服务。已确认和未确认的文本信息需要什么。<br>7) IP 服务界面。 | 2008 年 7 月 11 日 | 2008 年 8 月 11 日 | 已完成 | 7 月 15 日：<br>-Roger 说物理层很难实现，要求未确定。未来任务计划。这些是他的顾虑。<br>-他表示有兴趣开发信令层，未来希望成为本公司无线电产品的架构师。<br>- 正在考虑如何实现 IP 服务。（反馈给他，这将由人机接口 (MMI) 团队处理。PS 只需要提供发送数据的接口） |

表 1                                           2                                        机密 - 受保护令保护

| | A | B | C | D | E |
|---|---|---|---|---|---|
| 1 | 任务 | 启动日期 | 关闭日期 | 状态 | 意见 |
| 37 | 查看测试团队测试代码的进展。查找问题的重点领域是什么？ | 2008 年 8 月 1 日 | 2008 年 8 月 12 日 | 已完成 | 8 月 12 日：与团队开会。在测试期间检查的项目：<br>- 内存泄漏（创建工具用于衡量该问题）<br>- 内存使用（使用 CCS 工具完成）<br>- 代码覆盖（使用 CCS 工具）<br>- 边界条件（创建各种测试案例并记录）<br>- 编码标准（检查一致性）<br>- 代码逻辑错误（没有按照要求的那么多来完成，需要深度理解）YuYang 到 Turmer 跟进以确定还可以向团队发送其他可以测试的内容 确定在 PS 中使用的重用代码。 |
| 38 | 确定如何创建文库 | 2008 年 8 月 1 日 | 2008 年 9 月 12 日 | 已完成 | 8 月 1 日：与 YT 讨论，决定是：<br>1) 重用整个 GCISS 用户库。要求所有组件使用连接接口。<br>2) 仅提取要求的组件并更改接口为自有接口。<br>3) 将要求的库转换为 C<br>在上述选择中，选项 2 是最好的，因为在这 3 个选项中，迁移的工作量最小。如果代码被 Mot 拆解，它的检测几率也很低<br>9 月 26 日：创建代码包装器，并且只提供一个数据头和一个库文件。 |
| 39 | 为实现对 DMR 产品的正弦激励线性预测 (SELP) 评估撰写行动方案。此外需制定未来工作方案，以便在产品中最终确定。<br>发送给 GS | 2008 年 10 月 13 日 | 2008 年 10 月 14 日 | 已完成 | |
| 40 | 阅读操作系统抽象层 (OSAL) 用户指南文件 | 2008 年 | 2008 年 10 | 已完成 | |
| 41 | 购买逻辑分析器 (Logic Analyzer) | 2008 年 10 | | 已完成 | 10 月 17 日：决定购买 LA，大概需要花费 1.1 万元人民币。 |
| 42 | 创建噪声抑制器库 | 2008 年 9 | | 已完成 | 10 月 16 日：库已创建并提供给 LiuZhongWen |
| 43 | 提出在 PC 平台上评估 RALCWI 和 SELP 的活动列表 | 2008 年 10 | | 已完成 | 10 月 22 日：起草并发送给 GS。 |
| 44 | 安排会议跟踪整体状态，协调软件团队 | 2008 年 10 | 2008 年 10 月 27 | 已完成 | 计划每周二召开会议 |
| 45 | 检查 DSP 队列如何将 TPL/DPL 和音频示例加到一起 | 2008 年 11 月 3 日 | 2008 年 11 月 3 日 | 已完成 | 11 月 3 日：调制限幅器需要按比例缩小。偏差水平在这里输入组件。在此之后，仅添加音频至数字私线 (DPL) 信号。 |
| 46 | 制作能力电子表格 | 2008 年 10 | 2008 年 10 月 29 | 已完成 | 10 月 29 日：YuYang 评估能力并发送给我。 |
| 47 | 创建 Mod Limit 库并设置 PL 偏差配置 | 2008 年 | 2008 年 11 月 5 | 已完成 | 修改完成 |
| 48 | 创建融合了噪声抑制器 (Noise Suppressor)、CD、Squelch、Mod Limit 的库 | 2008 年 | 2008 年 11 月 3 | 已完成 | 创建库 |
| 49 | 找出如何确定音频最大偏差并将其映射到最大偏差 | 11 月 5 日 | 2008 年 11 月 6 | 已完成 | 创建电子表格，名称为 HYTGainLineupAnalysis.xls |
| 50 | 检查噪音抑制器存储分配问题 | 2008 年 | 2008 年 11 | 已完成 | 创建包含所有模块的库。这也解决了内存泄漏的问题。 |
| 51 | 解决有关噪音抑制器的问题 | 2008 年 11 | 2008 年 11 | 已完成 | |
| 52 | 在开始域恢复之前检查过滤器 | 2008 年 12 | 2008 年 12 | 已完成 | 1) 向 YangFan 提供 RRC 过滤器，用于 Rx 侧。 |
| 53 | 在同步恢复后检查信号 DC 和时间跟踪。返回给 YangFan | 2008 年 11 月 21 日 | 2008 年 11 月 27 日 | 已完成 | 向 Yang Fand 提供如何跟踪它的想法 |
| 54 | 从数字序列中获取 IF 过滤器和测试样本数据 | 2008 年 11 | 2008 年 11 | 已完成 | 向 Yang Fan 提供全部 IF 滤波系数和部分测试样本数据。 |
| 55 | 下一年的软件时间线与资源。 | 2008 年 12 | 2008 年 12 | 已完成 | 初始版本发送给 GS |
| 56 | 查看需要为中继器做什么（资源和架构） | 2008 年 9 | | 已完成 | |
| 57 | 通过添加功能集来完成计划（YuYang、Roy） | 2008 年 9 | | 已完成 | 第一次审核在 10 月 7 日举行 |
| 58 | 数字/模拟模式更改是如何完成的？ | 2008 年 12 月 17 日 | 2008 年 12 月 17 日 | 已完成 | 将发送一条消息来更改模式，并完成诸如数据应该流向何处之类的初始化参数。 |

表 1

3

机密 - 受保护令保护

机密 - 受保护令保护

HYT1973-02180813_TR

**PTX-263_TR.17**
MSA1025

| | A 任务 | B 启动日期 | C 关闭日期 | D 身份 | E 意见 |
|---|---|---|---|---|---|
| 59 | 查看映射文件 | 2008 年 12 月 17 日 | 2008 年 12 月 17 日 | 已完成 | 在 SARAM 部分看到很多 .txt 部分。提供示例文件创建 obj 部分。 |
| 60 | 仔细阅读 MPT1327 集群 | 2008 年 12 月 12 日 | 2008 年 12 月 17 日 | 已完成 | 还接受了市场营销团队进行的有关产品操作和配置的培训。 |
| 61 | 检查如何使用 Skyworks 与 DSP 通信。 | 2008 年 12 月 11 日 | 2008 年 12 月 16 日 | 已完成 | 这将由 MCSI 控制。目前的计划是制作一块连接到 Sky 调制 IC 的板并予以测试。 |
| 62 | 仔细阅读加密操作 | 2008 年 12 | 2008 年 12 月 23 日 | 已完成 | 创建备注 |
| 63 | 起草所有任务的工作范围，并就应当如何分配工作向 GS 提建议。 | 2008 年 12 | 2008 年 12 | 已完成 | |
| 64 | 查看 P25 要求并确定是否能由 DMR Tier III 完成 | 2008 年 12 | 2008 年 12 | 已完成 | |
| 65 | 写出关于团队的关键重点并发送给 GS | 2008 年 12 | 2008 年 12 | 已完成 | 发一封新年邮件，总结团队这一年的成就。 |
| 66 | 阅读来自 Phillipe Deavous 的 P25 干线协议。他将于 1 月 13 至 14 日到访 | 2009 年 1 月 4 日 | 2009 年 1 月 4 日 | 已完成 | 文档是关于 EADS 网络站点控制器设备的，并计划讨论如何将其集成到 DMR 系统中。 |
| 67 | 阅读来自 Yu Yang 的协议栈/基带文件。其中一个 PS 文件已翻译。 | 2008 年 6 月 24 日 | | | |
| 60 | 学习来自 Mot 的信号堆栈（查看两个示例，如 Group Call 和 Call Alert。找出 LC、CSBK 中使用的准确的位信息） | 2008 年 6 月 26 日 | | | |
| 69 | 与 Yan Fan 合作，确定她需要什么 FPGA 来确保硬件支持调和的时分多址 (TDMA) | 2008 年 6 月 25 日 | | | |
| I/(J | 阅读调和的 ETSI 文件 | 2008 年 6 | | | |
| 71 | 阅读 Yang Fan 提供的调和的 TDMA 报告 | 2008 年 6 | | | |
| 11 | 预估需要的工程师和招聘人员的数量。 | 2008 年 6 | | | |
| 73 | 让团队成员做以下工作：<br>1) 记录所有的嵌入式信号并显示突发数据结构。 | 2008 年 7 月 3 日 | | | |
| 74 | 提出流程计划<br>执行 CMMi 的计划，并确定需要为团队执行什么。 | n-jui-08 | | | 7 月 11 日：CMMi 团队已经确定了流程 (YangHuaZhong)。需要让团队遵循一些流程。<br>7 月 18 日：与顾问会面，要求所有 KPA 的最低待办事项，以获得 CMMi 认证。 |
| 75 | 阅读 BB 信号恢复文件 | 2008 年 7 | | | |
| 76 | TETRA 拥有自己的测试部门，共有 12 人。其中有 7 人将进行白盒测试 调查增加测试团队的可能性。 | 2008 年 7 月 21 日 | | | |
| 77 | 检查进入 DSP 的 IQ 样本所需的信噪比 (SNR)。DSP 需要什么规格。 | 2008 年 7 月 21 日 | | | |
| 78 | 将计划放入 MS 项目 | 2008 年 8 月 1 日 | | | 9 月 22 日：针对国际无线通讯展 (IWCE) 的第一个初始阶段 (R0) 时间表制定。需要继续创建下一个阶段的时间表 R1。 |
| 79 | 对确定的活动进行宽带数据 (WBD) 预估。 | 2008 年 8 | | | |
| 80 | 查找中继专利 | 2008 年 8 | | | |
| 81 | 查看队列数据流处理示例 | 2008 年 8 | | | |
| 82 | 查看需要培训团队的项目。<br>- 产品功能<br>- 音频培训<br>- 声学检测<br>- 模拟栈处理<br>- 射频 (RF) 运行测试（已完成）<br>- 数字栈处理<br>- MESH 技术 | 2008 年 8 月 14 日 | | | |

表 1        4        机密 - 受保护令保护

| | A 任务 | B 启动日期 | C 关闭日期 | D 身份 | E 评论 |
|---|---|---|---|---|---|
| 83 | 提出音频增益序列 | 2008 年 8 | | | |
| 84 | 阅读 Roger 提供的 PS 文件 | 2008 年 9 | | | |
| 85 | 阅读 DMR POC 代码 | 2008 年 9 | | | |
| 86 | 中继和中继器的功能列表 | 2008 年 9 | | | |
| 87 | 中继和中继器路线图 | 2008 年 9 | | | |
| 88 | 中继和中继器资源 | 2008 年 9 | | | |
| 89 | 检查 DC 移除以实现数字信号恢复 | 2008 年 9 | | | |
| 90 | 确定需要检查的项目。与 YuYang 沟通此事 | 2008 年 9 月 24 日 | | | 9 月 25 日：目标是将文件在 9 月 26 日之前发出。审核将在假期后进行。 |
| 91 | 安排会议讨论多个议题。这是为了确保不同的团队之间彼此沟通。 | 2008 年 9 月 25 日 | | | |
| 92 | 斜坡曲线参数计算 | 2008 年 9 月 26 日 | | | 调查 Ramp 文件部署并安排人员完成该工作。Mot 文件夹中有一个新的 Ramp 文件 |
| 93 | DAC 电压值。需要工程师来处理。 | 2008 年 9 月 26 日 | | | A PC - 1W = 0.4V, 40W = 4.xV HP 和 LP 的最大偏差是 8kHz 计划是使用 10-bit DAC（1024 级）。看起来太低了。因此，只有 512 级是用于获取 4kHz 开发，这将导致较低频输入信号存在高噪声。 |
| 94 | 为活动制定时间表，在 6 月 8 日之前完成 | 10 月 14 日 | | | |
| 95 | 查看 CPS 团队是如何协调的 | 10 月 22 日 | | | |
| 96 | 创建 R1 之后需要完成的活动列表 | 2008 年 10 | | | |
| 97 | 提供到主机的信号接口 | 2008 年 10 月 27 日 | | | 10 月 30 日：与 Roger 沟通，他需要与 APP 团队合作把这些准备好，这样他的代码就可以做相应修改了。 |
| 98 | 获取用于信号发送任务的低级接口 | 2008 年 10 月 27 日 | | | 10 月 30 日：与 Roger 沟通，他需要与 APP 团队合作把这些准备好，这样他的代码就可以做相应修改了。 |
| 99 | 确定下一年所需的资源 | 10 月 27 日 | | | |
| 100 | 阅读试验技术规范 (TRS)。特别是关于信道接入。 | 11 月 4 日 | | | |
| 101 | 阅读如何为信号恢复进行 DC 删除 | 11 月 5 日 -OS | | | 11 月 6 日：首先是发现同步位置。然后将样本平均（24 个同步信号= 100 个样本）以寻找 DC 偏差 然后与理想同步模式的默认 DC 平均值对比，以获得 DC 偏移量。 |
| 102 | 在模拟栈基线准备好后确定后续计划。 | 2008 年 11 | | | |
| 103 | 讨论中继器计划以及如何开始行动（创建时间表） | 2008 年 11 | | | |
| 104 | 检查数字载波偏移同步（所需的 1 kHz 偏移 BER 参数是什么？） | 2008 年 11 月 11 日 | | | Mot 实现的最大偏差大约是 2.1kHz。该数据在 PQE 文档中。但是，BER/下降的信号未知。 |
| 105 | 创建 R2 方案 | 2008 年 11 | | | |
| 106 | 阅读 ARS | 2008 年 11 | | | |
| 107 | Eason 正在推动所有的软件功能在一个特定的时间交付。我们知道软件的功能总是比硬件晚。但是，这并不表示他有权利决定和推动每一项共工作，就好像是他负责软件团队一样。需要有一个独立的软件团队来决定和管理可交付结果，比如智能控制主管。 | 2008 年 11 月 14 日 | | | |
| 108 | 2 插槽伪中继操作和动态重组 (DGNA) 的动画 | 2008 年 11 | | | 12 月 12 日：2 槽操作已经由 GS 创建。 |
| 109 | 确定音频质量的测试方法 | 2008 年 11 | | | 来自 ITU 标准的测试方法由清华大学发送 |
| 110 | 使 DSP 平台和 DSP 栈库可建构。需要划分功能 | 2008 年 11 月 27 日 | | | Sunny 正在进行 DSP 栈的部分 ChenMinJun 正在进行 DSP 平台的部分 |
| 111 | 解决让程序内存从外部 RAM 运行的问题。 | 2008 年 11 | | | |
| 112 | 解决噪声抑制器不能不能正确处理样本的问题 | 2008 年 11 | | | |

表 1

5

机密 - 受保护令保护

| | A | B | C | D | E |
|---|---|---|---|---|---|
| | 任务 | 启动日期 | 关闭日期 | 身份 | 意见 |
| 113 | 确定要发送给 Yang Fan 的信号恢复模拟 | 2008 年 11 | | | |
| 114 | 阅读 APCO P25 和 DMR 分层中继。需要在 12 月 10 日和 EADS 人员讨论 | 2008 年 11 月 28 日 | | | 此次讨论推迟。仍然需要仔细阅读 APCO 和 TETRA，以了解缺少什么，从而了解第三层协议需要哪些额外的改进。 |
| 115 | 阅读海能达 (HYT) DSP_pjt 文件夹中的代码 | 2008 年 12 | | | |
| 116 | 给 YangFan 的有关信号恢复的反馈<br>1) 信号时间确定后进行 DC 计算。对所有 24 个信号进行计算。 | 2008 年 12 月 15 日 | | | |
| 117 | 找出下一个集成到 C55 的最佳项目。 | 2008 年 12 | | | |
| 118 | 多个基站单元彼此之间如何进行时间同步。中央控制单元是在 BS 中分配信道的单元。 | 2008 年 12 月 19 日 | | | |
| 119 | 完成发布并开始跟踪问题 | 2008 年 12 | | | |
| 120 | 仔细阅读长时程抑制 (LTD) 系统白皮书，了解如何设计中继系统 | 2008 年 12 | | | |
| 121 | 确定基站系统架构方案 | 2008 年 12 | | | |
| 122 | 确定拟定的发布阶段（阶段 1：单个站点……） | 2008 年 12 | | | |
| 123 | 阈值按同步模式信号能量的 65% 计算。如果相关器有任何缩放，它也需要按比例缩小。Mot 使用 256 来缩小相关值。 | 2009 年 1 月 6 日 | | | |
| 124 | 提供 YuYang 的评估并提交 | 2009 年 1 | | | |
| 125 | 检查 Tx 和 Rx RRC 过滤器。 | 2008 年 1 | | | |
| 126 | 将 RX ABACUS SSI 提高至 48kHz | 2008 年 1 | | | |
| 127 | 在检测到同步后，对样本进行标记追踪/获取/DC。停止被视为高每秒百万条指令 (MIPS) 的同步检测 | 2008 年 1 月 8 日 | | | |
| 128 | 需要做的事：<br>1) 用源代码调试代码。如果需要获取代码，不要试图设置太多限制。<br>2) 硬件团队是否在掌控整个团队。要如何更改 Ise 以使重点更清晰。可能需要与 GS 讨论当硬件团队给他们施压时遇到的困难。<br>3) 确定团队遇到的困难，看看能做些什么。由一支更积极的团队来从事内存优化和 MIPS。<br>4) 获得更多人员。<br>5) 基线 C55 软件。确定要做的事项并获取时间表。<br>6) 完成时间表的更多阶段（中继器、音频、RF 质量）<br>7) 基于今天看到的重新分配任务。<br>8) 中继器概念验证 (POC) 和主线时间表。获取状态并确定推进计划。<br>9) 解决设备问题<br>10) 与一名 CPA 团队成员解决存储问题。<br>11) 重新计划 R1 时间表<br>12) 重新计划中继器 POC 和主线时间表。 | | | | |
| 129 | 与 GS 讨论所有的问题以及当前的风险和项目展望。 | | | | |
| 130 | 中继器资源需要转移给用户开发 特别是将 Wang Fei 调去做用户中继器访问代码和测试。 | | | | |

表 1

机密 - 受保护令保护

| | A<br>任务 | B<br>启动日期 | c 关闭日期 | D<br>身份 | E 评论 |
|---|---|---|---|---|---|
| 131 | 与 YuYang 讨论以下问题：<br>1) 团队会议（包括告诉团队成员整体状态和交付情况。）<br>2) 二月团队建设 | | | | |
| 132 | 如何避免向 Mot 支付版税。<br>或者甚至可以删除条款，称 Mot 可以使用 HYT 专利 | | | | |
| 133 | 确定 DSP 库风险以及将文件存储在哪里。 | | | | 3 月 9 日：YuYang 将和 SCM 讨论，获得存储在特定文件夹中的 FEC 和信号恢复文件。 |
| 134 | 讨论 Repeater Access、TPL、Channel Blocking 等的状态............................... | | | | |
| 135 | 向 ZhengZhi 确认扫描对中继器 (Repeater)、模拟 (Analog) 和数字 (Digital) 的 效果如何 | | | | |
| 136 | 董事会问题：<br>1) 使用两种类型的温度补偿晶体振荡器 (TXCO)（一大一小）<br>2) 使用 2 种类型的 DAC（1 比特和 12 比特）<br>3) 将这些提供给所有工程师 | | | | |
| 137 | 为 PS 和物理层添加测试/调试能力 | | | | |
| 138 | | | | | |
| 139 | | | | | |
| 140 | LLR（对数似然比）。这是一个需要编码的新算法。重新使用和运行测试需要 3 个月。研究需要做些什么来支持 LLR | 2008 年 6 月 25 日 | | | 7 月 4 日：此前的 Mot 数据显示没有提升音频范围。只看到改进已确认的数据操作 (Trellis)。 |
| 141 | 以下功能未在 ETSI 协议中定义。没有定义给它的 LC 开放代码 摩托罗拉使用保留的开放代码以实现该功能：<br>广播禁用、广播启用、远程监视器。广播检查、呼叫提醒、数字应急。PC 呼叫、ARS<br>不时监督该状态 | 2008 年 7 月 1 日 | | | |
| 142 | | | | | |
| 143 | | | | | |
| 144 | | | | | |
| 145 | | | | | |
| 146 | | | | | |
| 147 | | | | | |
| 148 | | 512 182.8571429 | 25.6 | 1 | |
| 149 | | | | 2 | |
| 150 | | | | 4 | |
| 151 | | | | 8 | |
| 152 | | | | 16 | |
| 153 | | | | 32 | |
| 154 | | | | 64 | |
| 155 | | | | 128 | |
| | | | | 256 | |
| | | | | 512 | |
| | | | | 1024 | |

表 1   7   机密 - 受保护令保护

**PTX-263_TR.21**
MSA1029

CPA 登录

xhanxiong/111111

请及时更改您的密码和地址： http://sw-server/cgi-bin/ApachePasswd.Ggi
http://192.168.12.2/cgi-bin/ApachePasswd.cgi

http://sw-server/src/CPA/cpa releaseA/01.00.00.001

DMR 登录
xhanxiong/Cam 1978May
xhanxiong/123456

服务器位置：
http://svn-pdmr/repos/DMR_SW_Configurationhttp://svn-pdmr/repos/cpa/cpa_release

Web 访问
http://192.168.0.7/svn/DMR SW Configuration

更改密码：
http://192.168.0.7/cgi-bin/Apache20Passwd.cgi

表：SVN 访问

机密 - 受保护令保护

ETSI 登录

ETSI 用户名：XINJUN 密码：zyz01743


更改 Windows / 互联网代理密码 http://192.168.240.10/iisadmpwd

| 互联网通行证 | 旧 | 1970 |
| --- | --- | --- |
| | 新 | **1975** |


Bessie 那里的打印机设置。运行 setup.exe 文件

\\ Gib management department 2\hp1022n installation manual and driver\driver


互联网登录网站：http://192.168.0.189:8000

外部登录

网站：http //finance.hytera.com.cn:8000

财务通行证　xxx1975xxx

ETSI 登录　xinjun

名　　　　　zyz01743

　　　　密码


表：SVN 访问　　　　　　　　机密 - 受保护令保护

机密 － 受保护令保护　　　　　　　　　　HYT1973-02180813_TR



**TRANSPERFECT**

City of New York, State of New York, County of New York

I, Alyssa Mullally, hereby certify that the document "**HYT1973-02180813-CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER (PTX 263)_ZH**" is, to the best of my knowledge and belief, a true and accurate translation from English into Chinese (Simplified).

_Alyssa Mullally_ (signature)

Alyssa Mullally

Sworn to before me this
December 2, 2019

_(signature)_

Signature, Notary Public

WENDY POON
NOTARY
NO. 01PO6356754
QUALIFIED IN
QUEENS COUNTY
COMM. EXP.
04-03-2021
PUBLIC
STATE OF NEW YORK

Stamp, Notary Public

LANGUAGE AND TECHNOLOGY SOLUTIONS FOR GLOBAL BUSINESS
1250 BROADWAY, 6TH FLOOR, NEW YORK, NY 10001 | T 212.400.8840 | F 212.689.1059 | WWW.TRANSPERFECT.COM
OFFICES IN 90 CITIES WORLDWIDE

**PTX-263_TR.24**
MSA1032

United States District Court
Northern District of Illinois

**PTX-421**

Case No. 1:17-cv-01973

Message

**From:** guoyixiang04120@sz.hyt [guoyixiang04120@sz.hyt]
**Sent:** 2/26/2008 8:04:07 AM
**To:** chenqingzhou 00001 ["cn=chenqingzhou 00001/o=hyt"]; tangjiyue 04081 ["cn=tangjiyue 04081/o=hyt@hyt"]; wumei 00294 ["cn=wumei 00294/o=hyt"]; zhengyuanfu 03780 ["cn=zhengyuanfu 03780/o=hyt@hyt"]
**Subject:** Weekly Updates.

Dear Mr Chen,

Thanks you for giving me the oppurtunity to work in your HYT organization. In the shiort 2 weeks that I have been here in Shenzhen I have meet many friends and HYT family members. First of all I would like to thank; Wumei who had gone out of his way to make sure that my stay in Shenzhen is as comfortable as possible. I would also like to that Mr Xu, Zhao Jian Jun and Zhu Guo Ping, who came to Shenzhen airport on the 11th Feb 2008 at 11:00pm to fetch me and my family to the hotel. I am also indepthed to Zhengyuanfu, who had help me during my 1st week in office.

At the present moment, it looks like my accommodations is fixed and my eldest boy schooling is being arranged by "Maya" as we speaks. There are still outstanding school arrangement that I hope will be resolved very soon! I trust HYT will take care of this matters as promised prior to my trip here.

As for the DMR project I am pleased to hear that there had been a team working on this project for the past 3 years. This should means that there are people familiar with the DMR requirements. However in my 1st review with them, I was shocked to find out that the radio part count was > 1,100 parts. This is extremely large part count and this need to be reduced further. I was informed that it used to be 1,275 parts. I am surprise also to find out that we do not have a proto-type radio after 3 years. In order to understand interfacing and integrating problems, each circuit blocks need to be merged and a board layout! Without this we do not have any idea about the problems that we are going to face for the project. Currently I had instructed the team to do the following:

1] Compile and release the technical requirement documents; TRD.

2] Consolidate and update all sub-sections schematic into a single Proto board schematic with OMAP processor.

3] Re-organize the whole DMR group to focus on the smaller DMR models and mobiles for Uhf1 bands.

4] Source a new Frac-N Synthesizers IC. As the current one with only 3.6V tuning range is not sufficient to meet the stringent ETSI specifications. Current Motorola uses ~5V tuning range and this year they have re-designed and migrating to the 9V tuning range. The higher control voltage is desired to enable superior SNBR performance to meet European specifications.

5] There is a separate FM models? In Motorola, the FM and non-FM models are the same. The only different is the sticker and the FM battery. The rf boards are the same. So we should also look into the possibility of having the same rf to meet FM requirements. This will require the team to focus on getting the radio total capacitance to be <350uF, including worst case tolerance.

6] The team will need injection of Subject Matter Expert; (SME) from Motorola Penang and Motorola Chengdu. This will be most important if we want to leap frog onto the DMR business.

7] I will forward to you my resource proposal when you are back from your business trip.

8] The team feels that we will require 24 months to work on the DMR radio before we can move into production.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

HYT1973-03670953

Other items that the team is working on are:

1] Marketing Requirements documents (Completed)

2] Technical Requirements documents.(Completed this week need to be reviewed)

3] Hardware Management System (Pending)

4] Hardware Software Interface document. (Pending)

5] Factory Test Document (Pending)

6] Project Milestone (In progress)

7] Resource loading Plan (Under Review)

8] Organization Chart for DMR (Completed & Being Review)

9] Detail Parts and Cost Listing (Pending)

10] Engineering Capability Mapping (Done, last week)

11] Alpha & Beta test Plans and requirements (Need Sales & Marketing feedback)

12] Complete feasibility study Reports.(In Progress)

13] Accessories List and test Plan (Pending)

14] Current Conceptual Issues List and mitigation Plans (Pending)


Best regards,

GS Kok

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

HYT1973-03670954

**PTX-421.2**
MSA1034

Message

| | |
|---|---|
| From: | zhangjun 02973 ["cn=zhangjun 02973/o=hyt"] |
| Sent: | 2/29/2008 6:55:18 AM |
| To: | tangjiyue 04081 ["cn=tangjiyue 04081/o=hyt@hyt"]; lincuixiang 01444 ["cn=lincuixiang 01444/o=hyt"]; sunpengfei 01512 ["cn=sunpengfei 01512/o=hyt"]; gouzhongquan 01350 ["cn=gouzhongquan 01350/o=hyt"]; yanghaibo 01028 ["cn=yanghaibo 01028/o=hyt"]; guoyixiang 04120 ["cn=guoyixiang 04120/o=hyt@hyt"]; zhuguofu 00976 ["cn=zhuguofu 00976/o=hyt"] |
| CC: | chenqingzhou 00001 ["cn=chenqingzhou 00001/o=hyt"]; guoyang 03705 ["cn=guoyang 03705/o=hyt@hyt"]; wumei 00294 ["cn=wumei 00294/o=hyt"]; libaoan 01973 ["cn=libaoan 01973/o=hyt"]; liyong 01335 ["cn=liyong 01335/o=hyt"]; xuqiong 00795 ["cn=xuqiong 00795/o=hyt@hyt"]; liuyan 01514 ["cn=liuyan 01514/o=hyt"]; liangyinying 02408 ["cn=liangyinying 02408/o=hyt"]; heyajuan 00222 ["cn=heyajuan 00222/o=hyt"]; xionglei 00207 ["cn=xionglei 00207/o=hyt"]; liuyiran 01893 ["cn=liuyiran 01893/o=hyt"]; xuzhuan 02986 ["cn=xuzhuan 02986/o=hyt@hyt"]; zhaoyan 03778 ["cn=zhaoyan 03778/o=hyt@hyt"]; tanxuezhi 01511 ["cn=tanxuezhi 01511/o=hyt"]; zhouxiaoling 02589 ["cn=zhouxiaoling 02589/o=hyt@hyt"] |
| Subject: | 关于3月3日上午9：00接待Penang Visitors的通知 |
| Attachments: | Visit Schedule.xls; Untitled attachment 00011.jpg |
| Importance: | High |

**Dear All,**

3月3日（周一）9：00 am，将有4位来自Penang的访客，请各位协助此次接待。

请 **林翠香** 协助此次"副总裁接待"与"面谈"环节的翻译工作，请 **杨海波** 协助下午"HYT Introduction Tour"环节的英文

讲解工作（重点为一楼展厅），具体分工详见如下"参观日程表"（文末的附件也为此表，方便各位打印）：

D☐P☐ Exhibit _5_
Deponent _Sun_
Date _3/11/19_ Rptr _BW_

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

HYT1973-03670955

# Visit Schedule
## 参观日程表

Visitor list :  Ms. Eunice Chua Siew Wei    Mr.Kok Yih Tzye
Mr. Samuel Chia Han Siong    Mr.YU Kok Hoong

| Date 日期 | Time 时间 | Agenda 具体内容 | Resp 责任人 |
|---|---|---|---|
| 3rd Mar Monday 3月3日 星期一 | 8:30am | HYT pick up Visitor from Hotel 海景酒店接车服务 | Xu Zhirong 许志荣 |
| | 9:00am | Arrive At HYT 抵达 HYT | Stephanie 张 君 |
| | 9:30am | Welcome by HYT VP 副总裁接待 | Tang Jiyue 唐继跃 Interpreter: Iris 随行翻译: 林翠香 |
| | 10:00am | Interview (1) 面试 | Tang Jiyue & Sun Pengfei & Gou Zhongquan 唐继跃 & 孙鹏飞 & 苟仲蕰 |
| | 12:00am | Lunch at Level 8 8楼就餐 | Stephanie 张 君 |
| | 1:00pm | Free and Easy in meeting room 自由活动 | |
| | 2:00pm | Interview (2) 面试 | Tang Jiyue & Sun Pengfei & Gou Zhongquan 唐继跃 & 孙鹏飞 & 苟仲蕰 |
| | 3:00pm | HYT Introduction Tour HYT介绍 | Bruce / GS Kok / Eason 杨海波 / 郭義祥 / 朱国富 |
| | 4:00pm — 5:30pm | DMR Organization Review & Schematic Review | GS Kok / Eason 郭義祥 / 朱国富 |

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

HYT1973-03670956

感谢上述各位的合作！如有不明事宜，请尽快与 各环节责任人 或 张君 (Ext:1362) 联系！

**P.S,** 访客的休息会议室为一楼亚洲厅。 参观日程表**Excel**打印版： Visit Schedule.xls

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

HYT1973-03670957

PTX-422.3
MSA1037

Message

From:       zhangjun 02973 ["cn=zhangjun 02973/o=hyt"]
Sent:       2/29/2008 6:55:19 AM
To:         tangjiyue 04081 ["cn=tangjiyue 04081/o=hyt@hyt"]; lincuixiang 01444 ["cn=lincu xiang 01444/o=hyt"]; sunpengfei 01512 ["cn=sunpengfei 01512/o=hyt"]; gouzhongquan 03350 ["cn=gouzhongquan 03350/o=hyt"]; yanghaibo 01028 ["cn=yanghaibo 01028/o=hyt"]; guoyixiang 04120 ["cn=guoyixiang 04120/o=hyt@hyt"]; zhuguofu 00976 ["cn=zhuguofu 00976/o=hyt"]
CC:         chengqingzhou 00001 ["cn=chengqingzhou 00001/o=hyt"]; guoyang 03705 ["cn=guoyang 03705/o=hyt@hyt"]; wumei 00294 ["cn=wumei 00294/o=hyt"]; libaoan 01973 ["cn=libaoan 01973/o=hyt"]; liyong 01335 ["cn=liyong 01335/o=hyt"]; xuqiong 00795 ["cn=xuqiong 00795/o=hyt"]; liuyan 01514 ["cn=liuyan 01514/o=hyt"]; liangyinying 02408 ["cn=liangyinying 02408/o=hyt"]; heyajuan 00222 ["cn=heyajuan 00222/o=hyt"]; xianglei 00207 ["cn=xianglei 00207/o=hyt"]; liuyiran 01893 ["cn=liuyiran 01893/o=hyt"]; xuzhuan 02986 ["cn=xuzhuan 02986/o=hyt"]; zhaoyan 03778 ["cn=zhaoyan 03778/o=hyt@hyt"]; tanxuezbi 01511 ["cn=tanxuezbi 01511/o=hyt"]; zhouxiaoling 02589 ["cn=zhouxiaoling 02589/o=hyt@hyt"]

**Subject:**   Notice about welcome Penang Visitors on March 3, 9:00 a.m.

**Attachments:**   Visit Schedule.xls; Untitled attachment 00011.jpg

**Importance:**   High

## Dear All,

On Monday, March 3, 9:00 a.m., there will be 4 visitors from Penang, everyone, please help with this reception. **Lin Cuixiang,** Please help with the translation in this "welcome by vice president" and "interview" sections, **Yang Haibo,** Please help with the English introduction of the "HYT Induction Tour" section in the afternoon (especially the exhibition hall in the first floor); Please see the following "Visit Schedule" for the detailed division of work (the attachment at the end of the message is also this Schedule, to facilitate the print):

CONFIDENTIAL -- SUBJECT TO PROTECTIVE ORDER                    HYT1973-03670955

# Visit Schedule

Visit list:    Ms. Eunice Chua Siew Wei    Mr.Kok Yih Tzye

              Mr. Samuel Chia Han Siong    Mr.YU Kok Hoong

| Date | Time | Agenda | Resp |
|---|---|---|---|
| Mar 3rd Monday | 8:30 am | HYT pickup Visitor from Hotel | Xu Zhirong |
| | 9:00 am | Arrive at HYT | Stephanie |
| | 9:30 am | Welcome by HYT VP | Tang Jiyue<br>Interpreter: Iris |
| | 10:00 am | ▪ Interview (1) | Tang Jiyue &<br>Sun Pengfei &<br>Gou Zhongquan& |
| | 12:00 am | Lunch at Level 8 | Stephanie |
| | 1:00 pm | Free and Easy in meeting room | |
| | 2:00 pm | Interview (2) | Tang Jiyue &<br>Sun Pengfei &<br>Gou Zhongquan& |
| | 3:00 pm | HYT Introduction Tour | Bruce / GS Kok / Eason |
| | 4:00 pm - 5:30 pm | DMR Organization Review & Schematic Review | GS Kok / Eason |

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER    HYT1973-03670956

**PTX-422.5**
MSA1039

Thank you for the cooperation of above persons! If there is anything unclear, please contact with the responsible person of each section or Zhang Jun (Ext: 1362) as soon as possible!

P.S. the meeting room for rest of visitors is Asian room at first floor. Visit Schedule Excel for print:

Visit Schedule.xls

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER          HYT1973-03670957

**PTX-422.6**
MSA1040



**TRANSPERFECT**

City of New York, State of New York, County of New York

I, Wendy Poon, hereby certify that the document "HYT1973-03670955 - HYT1973-03670957" is to the best of my knowledge and belief, a true and accurate translation from Chinese into English.

Wendy Poon

Sworn to before me this
January 15, 2019

Signature, Notary Public

ANDERS MIKAEL EKHOLM
NOTARY PUBLIC-STATE OF NEW YORK
No. 01EK6078073
Qualified in New York County
My Commission Expires 07-23-2022

Stamp, Notary Public

LANGUAGE AND TECHNOLOGY SOLUTIONS FOR GLOBAL BUSINESS

THREE PARK AVENUE, 40TH FLOOR, NEW YORK, NY 10016 | T 212.689.5555 | F 212.689.1059 | WWW.TRANSPERFECT.COM
OFFICES IN 90 CITIES WORLDWIDE

**PTX-422.7**
MSA1041

United States District Court
Northern District of Illinois

**PTX-1129**

Case No. 1:17-cv-01973



DMR Protoc

www.hyt.com.cn

**PTX-1129.1**
MSA1042

D☐ P☐ Exhibit ___10___
Deponent ___Chia___
Date _9/26/17_ Rptr _KS_



col Introduction

Prepared by: Samuel Chia
Date: 08-Apr-2009

Moto-1053-00002771

**PTX-1129.2**
MSA1043

# Content

1) Introduction

2) Benefits of DMR Protocol

3) System Configuration

4) Channel Structure

5) Modulation

6) Operational scenarios

7) Burst Format

8) Protocol specs

9) Possible improvements



Moto-1053-00002772

**PTX-1129.4**
MSA1045

# Introduction
# Why DMR was pursued?

1)Declining Indirect market business. Create new business to churn analog based systems.

2)Mandate by FCC that non frequency efficient (>= 12.5kHz equipment) will not be approved after 2005 due to congestion. However we now know that it has been postponed to 2011. And all Public safety equipment has to be migrated by 2013.

Moto-1053-00002773

**PTX-1129.5**
MSA1046

# Introduction
# Protocol Development History

**2001 – Evaluation of DIIS (intended ETSI DMR protocol).**

**2002 – Draft a new 4FSK TDMA  protocol (F2) for APCO P25 and DMR. Goal is to use for both products.**

**2003 – Protocol Prototyping start.**

**2004 – Start Product Development.**

- **Start F2 protocol standardization with ETSI**
  (Goal: Define the air interface. Define minimum set of voice and data features)

**2005 – F2 Approved by ETSI and included in DMR First Version**

**2007 – First DMR Product Ship Accepted**

Moto-1053-00002774

PTX-1129.6
MSA1047

# Benefits of DMR Protocol

www.hyt.com.cn

1. **Spectrum efficiency via TDMA**

    1. 2X users, capacity and throughput

    2. Allows 2 simultaneous calls through 1 repeater

Slot 1                    Slot 2



2. **Improved basic capabilities**

    1. Range improvement

    2. Increased audio quality – "Noise Cancellation and Digital Voice"

    3. Improved battery life (Improve from 8 hours to 12 hours)

    4. Enhanced Features (Test Messaging and Better Call handling)

Moto-1053-00002775

# Spectrum Efficiency via TDMA




## 12.5kHz FDMA

- Today, Analog
- 1 voice for each 12.5kHz channel
- 1 repeater for each channel

## 12.5kHz TDMA

- Divides existing channel into two timeslots
- Delivers twice the capacity through the repeater
- Performance is same or better than 12.5kHz FDMA
- 1 repeater does work of 2; also reduces combining equipment
- ETSI Tier 2 Standard for licensed bands
- Enables 40% increase in radio battery life

## 6.25kHz FDMA

- *Could* squeeze into 12.5kHz channels but with reduced power.
- Performance degraded
  - reduced range
  - more interference
- Need 1 repeater for each sub-channel; cannot combine repeaters to share antenna site
- ETSI Tier 1 Standard for licensed bands

Moto-1053-00002776

PTX-1129.8
MSA1049

# Improved Digital Audio Quality and Range



- Clearer voice over a greater range

  Digital error-correction technology permits audio and digital communications with no loss

- Improved range

  Improved audio above min acceptable quality provide better range performance.

- Static and noise rejection

  Digital receivers reject any error signals, permitting improved audio in loud environments

Moto-1053-00002777

**PTX-1129.9**
MSA1050

# Increased Audio Quality

www.hyt.com.cn

1) AMBE++ is a proven vocoder to have significant improved audio quality compared to Analog 25kHz channel. For a 12.5kHz channel, the MOS would be expected to be lower.

2) Noise Suppression technology is built into the vocoder which will improve audio quality in noisy environment. This gives significantly better background noise immunity compared to analog systems which has limited noise suppression capability.



MOS Score Comparison

MOS – Mean Opinion Score

Moto-1053-00002778

# Improved Battery Life

- 5/5/90 Duty Cycle

| FDMA MODE | | | | TDMA MODE | | |
|---|---|---|---|---|---|---|
| TX | 5 | % | | TX | 5 | % |
| RX | 5 | % | | RX | 5 | % |
| Standby | 90 | % | | Standby | 90 | % |
| | | | | | | |
| Battery | 1200 | mA-hr | | Battery | 1200 | mA-hr |
| Battery Voltage | 7.5 | V | | Battery Voltage | 7.5 | V |
| | | | | | | |
| TDMA Ratio | 1 | | | TDMA Ratio | 2 | |
| TX Current | 1700 | mA | | TX Current | 1700 | mA |
| RX Current | 200 | mA | | RX Current | 200 | mA |
| Standby Current | 60 | mA | | Standby Current | 60 | mA |
| Current | 149 | mA | | Current | 107 | mA |
| | | | | | | |
| Battery Life | 8.05 | | | Battery Life | 11.27 | |

- TDMA Tx is 30ms ON and 30ms OFF. This means that Tx current is about half of what it is in FDMA
- 40% Battery Life Improvement with TDMA

Moto-1053-00002779

**PTX-1129.11**
MSA1052

# Enhanced Features –
# Digital Calling and Signaling



One-to-One
Call and talk privately with a
specific user's radio

One-to-Many
Enables communication with
specific sets of group members

One-to-All
Allows all on the same channel to
hear communications

NOTE: This also applies to Text Messaging where a user can type a message and send to the intended recipients.

Moto-1053-00002780

PTX-1129.12
MSA1053

# System Configurations





Up-link          Up-link

Down-link       Down-link

To other systems      To PSTN/Intranet/Internet

**PTX-1129.13**
MSA1054

www.hyt.com.cn

Direct Mode Configuration

Repeater Mode Configuration

Moto-1053-00002781

**PTX-1129.14**
MSA1055

# System Configurations

**DMR uses a 2:1 TDMA protocol, allows more conventional system configurations than a FDMA protocol. The following modes being used:-**

1. 12.5e repeater mode - Slot 1 use for voice, Slot 2 use for data

2. 6.25e repeater mode - Both slot 1 & 2 use for voice or data (Slot 1 user cannot use Slo2 and vice versa)

3. 12.5kHz direct mode – Only one slot is being used. One call per 12.5kHz bandwidth.

(There are future intended operations which I will discuss in later slides)

12

Moto-1053-00002782

**PTX-1129.15**
**MSA1056**

# Channel Structure (Repeater)

www.hyt.com.cn

1. **Example of 2 simultaneous voice call on one repeater**

2. **Outbound signaling is labeled "BS Tx" and inbound signaling is labeled "MS Tx".**

3. **As shown figure the outbound channel contain a CACH (Common Announcement Channel)**





Moto-1053-00002783

# Channel Structure (Direct Mode)

www.hyt.com.cn



1. **Example of 1 subscriber calling another in direct mode**

Subscriber 1
Slot 1 Freq 1

Subscriber 2
Slot 1 Freq 1

| LC Hdr | Voice | Voice | Voice | Voice | Voice | Voice | Voice | Voice |

**Time**

Moto-1053-00002784

**PTX-1129.17**
MSA1058

# Modulation

- 4FSK Modulation for 12.5 kHz Channel Bandwidth

  - Modulation Type: 4 FSK, 4 level Frequency Shift Keying

  - Bit Rate: 9600 bits/second

  - Deviation index h=0.27
    - Symbol 01 = 1.944 kHz
    - Symbol 00 = 0.648 kHz
    - Symbol 10 = - 0.648 kHz
    - Symbol 11 = -1.944 kHz



Moto-1053-00002785

**PTX-1129.18**
MSA1059

# Modulation (Power Profile)



Moto-1053-00002786

PTX-1129.19
MSA1060

# Modulation (Power Profile)

www.hyt.com.cn

1) This is a transmission of 2 radios in repeater mode.
2) The guard time specified is for slots power ramping and also Time Advance scenarios.



Moto-1053-00002787

**PTX-1129.20**
MSA1061

# Voice Call Scenario

## Super Frame with Header & Terminator

1 Super Frame



- Voice calls start with a Voice Header to allow the receiving party to sync and determine if the call is to the intended recipient.
- Then the voice data is transmitted in the superframes.
- Voice Terminator indicated end of voice call. It must be sent after a voice superframe is complete.

Moto-1053-00002788

**PTX-1129.21**
MSA1062

# Voice Call Scenario

**Voice Super Frame (Direct mode)**



48 bit sync pattern     Emb LC (32 x 4 bit)     Null(32 bit)

- The first burst of a superframe contain a sync burst. This allows late entry calls.
- Embedded LC is sent in the next 4 burst. This LC contains the source ID, destination ID and call type.
- The null burst does not contain any embedded signaling data.

Moto-1053-00002789

# Voice Call Scenario



**Each Voice Frame (VF) = 20 ms (72 bits)**

**Each Slot will contain 3 VF**

Moto-1053-00002790

PTX-1129.23
MSA1064

# Data Call Scenario



Time

- Data transmissions do not carry embedded LC information (always sync)
- Confirmed and Unconfirmed data send
  - Header
  - Data Blocks
  - Last Data Block
- Confirmed Data Response
  - Header
  - Data Blocks (Only if destination requests retransmission of blocks that failed block CRC)

Moto-1053-00002791

**PTX-1129.24**
MSA1065

# Data Call Scenario



**Data Message Decomposition**

- Message broken up into fragments
- Data Packet composed of
  - Data Header
  - Message/Fragment data

Moto-1053-00002792

PTX-1129.25
MSA1066

# Repeater Voice Call Scenario

www.hyt.com.cn



**Individual Call via repeater**

- This is a case of one subscriber making an individual call to another subscriber.
- Request and ACK are Data Bursts (Data Slot Type = Control)
- Voice Header is a Data Burst (Data Slot Type = Voice LC Header)

Moto-1053-00002793

PTX-1129.26
MSA1067

# Burst Structure (Generic)



Moto-1053-00002794

**PTX-1129.27**
MSA1068

# Burst Structure (Rptr Inbound)

www.hyt.com.cn



Subscriber Inbound TX TDMA Frame in Repeater Mode

Moto-1053-00002795

# Burst Structure (Rptr Outbound)

www.hyt.com.cn



Repeater Outbound TX TDMA Frame

Moto-1053-00002796

PTX-1129.29
MSA1070

# Burst Structure (Generic Sync)

www.hyt.com.cn



48 bits

| Payload | Sync | Payload |

5.0 msec

27.5 msec

**Generic Burst With Sync**

- Inbound/outbound sync patterns
- Voice/data sync patterns
- Reverse channel sync pattern



- Inbound Voice Sync Pattern
- Outbound Voice Sync Pattern
- Inbound Data Sync Pattern
- Outbound Data Sync Pattern
- Reverse Channel Sync Pattern

- Direct Mode uses only Inbound Sync Patterns
- This is one of the essential Patents by Motorola.

Moto-1053-00002797

**PTX-1129.30**
MSA1071

# Burst Structure (Voice w/ Sync)

www.hyt.com.cn



**Voice Burst with Sync**

- Vocoder DVSI AMBE+2 (Enhanced Half Rate)
  - 3600 bps for voice + FEC
    - 2450 bps voice
    - 1150 bps FEC
  - Three 20 msec vocoder frames per Voice Burst
    - 60 ms audio per burst

Moto-1053-00002798

**PTX-1129.31**
MSA1072

# Burst Structure (Voice w/ Emb)

www.hyt.com.cn



**Voice Burst With Embedded Signaling**

- EMB (Embedded Framing)
  - CC (Color Code) – Differentiates signaling that originates at another site
  - PI (Privacy Indicator) – Status of scrambling/encryption
  - LCSS (LC Start Stop) – Indicates that this burst contains the beginning, end, or continuation of embedded signaling
  - Parity – FEC Parity bits for EMB field

- Embedded Signaling - Call type, Source and Destination IDs (Link Control information)

Moto-1053-00002799

**PTX-1129.32**
MSA1073

# Burst Structure (Data/Control)

www.hyt.com.cn



Data/Control Burst

- Info – Data or control payload + FEC
- CC (Color Code) – Differentiates signaling that originates at another site
- Data Type – Indicates the type of control or data that is being carried
- FEC Parity – Golay (20,8) FEC Parity bits for Slot Type field

Moto-1053-00002800

**PTX-1129.33**
MSA1074

# Burst Structure (CSBK)



- 96 bit CSBK (80 bits of signaling + 16 bits of CRC) can be carried in a single data/control
- Use for radio command such as Radio Check, Radio Uninhibit/Inhibit, Call Alert and Radio Unit Monitor.

Moto-1053-00002801

PTX-1129.34
MSA1075

# Burst Structure (CACH)



- AT (Access Type) – Indicate whether slot is busy or idle
- TC (TDMA Channel) – Indicates whether inbound and outbound burst is channel 1 or 2
- LCSS (LC Start Stop)– Indicates that this burst contains the beginning, end, or continuation of CACH signaling
- CACH Signaling (4 CACH) – This contains a Short LC burst for scan time improvement.
- FEC – FEC Parity bits for CACH Burst

Moto-1053-00002802

**PTX-1129.35**
MSA1076

# Protocol Specifications

1. Bandwidth: 12.5kHz
2. Modulation Type: 4FSK (4 level Frequency Shift Keying)
3. Channel Type: 2-Slot TDMA.
4. Data rate: 9600 bits/second
5. Single slot protocol data rate outbound: 4800 bits/second
6. Single slot protocol data rate inbound: 4400 bits/second
7. Single slot voice data rate (Voice with FEC data rate): 3600 bits/second
8. Single slot raw data payload rate: 1600 bits/second.
9. Audio Throughput Delay: ~400ms
10. System Access Time:
    - Group Call, Direct Mode, With TPT = ~600ms
    - Group Call, Repeater Mode, With TPT = ~1000ms
    - Individual Call, Direct Mode, With TPT = ~1100ms
    - Individual Call, Direct Mode, With TPT = ~1500ms

Moto-1053-00002803

# Audio Throughput Delay



1. The cause of the delays is purely in the software. It can be due to buffering delays and encoding and decoding delays due to the chosen protocol. The DMR protocol is expected to have a much longer audio throughput delay compared to Analog systems.

2. The Analog System Delays can be in the order to 20 to 40ms. However the Digital System Delays can be in the order of 300ms to 500ms. This large delays is mainly due to the slotting of the voice and also the voice compression adaptation time.

Moto-1053-00002804

**PTX-1129.37**
MSA1078

# System access time



Moto-1053-00002805

**PTX-1129.38**
MSA1079

# Possible Future Improvements

**PTX-1129.39**
MSA1080



www.hyt.com.cn



Moto-1053-00002806
**PTX-1129.40**
MSA1081

# Reverse Burst Transmission

www.hyt.com.cn



1. Rx radio is able to Tx a short burst of control information to the Tx radio.
2. This burst can be used for feature like Tx interrupt, Rx Ack, Power control.....

Moto-1053-00002807

**PTX-1129.41**
MSA1082

# Reverse Burst Power



**PTX-1129.42**
MSA1083

- The instantaneous power must be contained within the mask

- Since the slot is only 10ms, there will not be any risk of inter-slot interference.



Moto-1053-00002808

**PTX-1129.43**
MSA1084

# Single Frequency Repeater System

www.hyt.com.cn

Only one 12.5kHz B W channel for inbound and outbound traffic



Tx on one slot, repeated on other slot

Moto-1053-00002809

**PTX-1129.44**
MSA1085

# Full Duplex Calls

1. Full duplex calls is where it operates like a hand-phone where the Tx and Rx audio is going on simultaneously.
2. This will require Slot 1 to be used as Tx and Slot 2 to b used as RX.
3. However in doing this, the Tx to Rx time is only 2.5ms and thus is too short to allow the HW locking to happen. This is currently not possible with current HW technology.



Moto-1053-00002810

PTX-1129.45

MSA1086

# Direct Mode 2-Slot operation

www.hyt.com.cn



1. The DMR protocol does support 2 simultaneous calls in direct mode operation.

2. This new operational feature is an addition to the DMR protocol to overcome this limitation.

3. Basically, when A is transmitting to B, Radio C will also be able to transmit to D after locking on to radio A's timing.

Moto-1053-00002811

PTX-1129.46
MSA1087

# Pseudo Trunk Operation



1. In the defined DMR protocol, the radios will be allocated to a specific repeater slot and only use that slot even-though the other slot is not busy.
2. This new protocol is to allow radios to utilize any slot number if it is idle (No Activity).
3. Imagine Radio A is transmitting a private call to radio B.
4. Radios in the vicinity of the repeater (C and D) will see that there is a Idle slot and can decide to use it.

Moto-1053-00002812

PTX-1129.47
MSA1088

# Conference Call (DGNA)

1. Another feature that is planned to be included in future products is a new calling mode.

2. This new calling mode will allow a use to specifically select a couple of radio users to be re-allocated to a temporary group ID to have a call.

3. This mode of operation is like a Skype conference call when you can select a couple of people to join a voice call.



Send temporary regrouping to selected target radios.

Moto-1053-00002813

United States District Court
Northern District of Illinois

**PTX-2352**

Case No. 1:17-cv-01973

DOCUMENT PRODUCED IN NATIVE FORMAT

**PTX-2352.1**

CONFIDENTIAL BUSINESS INFORMATION, SUBJECT TO PROTECTIVE ORDER          HYT1973-23349621

MSA1090

| | A | B | C | D | E | F | G | H | I | J | K | L |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | **Item/Year<br>项目/年份** | **2005-2009** | **2010** | **2011** | **2012** | **2013** | **2014** | **2015** | **2016** | **2017** | **2018** | **总计** |
| 2 | 商业低端机型研发费<br>（含DMR公共项目费用分摊） | 0 | 0.27 | 695 | 63 | 1,542 | 2,003 | 1,983 | 1,998 | 3,397 | 5,193 | 16,875 |
| 3 | 其中：低端机直接研发费 | | 0.10 | 329 | 34 | 979 | 1,130 | 1,140 | 1,590 | 3,086 | 4,390 | 12,679 |
| 4 | 行业中高端机型研发费 | 9,159 | 4,455 | 6,860 | 7,532 | 6,276 | 6,400 | 8,249 | 14,311 | 19,991 | 19,966 | 103,198 |
| 5 | DMR研发总投入 | 9,159 | 4,456 | 7,555 | 7,595 | 7,818 | 8,403 | 10,232 | 16,308 | 23,388 | 25,160 | 120,073 |
| 6 | 单位:万元 | | | | | | | | | | | |

**PTX-2352.2**

CONFIDENTIAL BUSINESS INFORMATION, SUBJECT TO PROTECTIVE ORDER
MSA1091

HYT1973-23349621

分摊计算表

| | A | B | C | D | E | F | G | H | I | J | K |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 项目区分\年份 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 总计 |
| 2 | 商业低端机型研发费 | 984 | 3,290,951 | 343,932 | 9,794,730 | 11,301,097 | 11,396,439 | 15,904,962 | 30,860,647 | 43,899,577 | 126,793,319 |
| 3 | 行业中高端机型研发费 | 15,977,029 | 32,458,760 | 40,828,240 | 39,856,061 | 36,111,383 | 47,416,841 | 113,939,065 | 181,606,857 | 168,775,166 | 676,969,401 |
| 4 | **DMR直接项目研发投入合计** | **15,978,013** | **35,749,710** | **41,172,172** | **49,650,792** | **47,412,480** | **58,813,280** | **129,844,027** | **212,467,504** | **212,674,743** | **803,762,720** |
| 5 | 公共项目及公共配件研发费 | 28,577,663 | 39,801,451 | 34,777,556 | 28,529,017 | 36,613,017 | 43,504,269 | 33,238,237 | 21,413,512 | 38,922,130 | 305,376,852 |
| 6 | **DMR研发投入合计** | **44,555,676** | **75,551,161** | **75,949,728** | **78,179,809** | **84,025,497** | **102,317,549** | **163,082,264** | **233,881,016** | **251,596,873** | **1,109,139,572** |
| 7 | | | | | | | | | | | |
| 8 | 商业低端机型直接投入占比 | 0.01% | 9.21% | 0.84% | 19.73% | 23.84% | 19.38% | 12.25% | 14.52% | 20.64% | 15.77% |
| 9 | 商业低端机型研发费分摊 | 1,759.15 | 3,663,934.96 | 290,514.82 | 5,627,987.39 | 8,726,969.31 | 8,429,962.71 | 4,071,445.60 | 3,110,286.64 | 8,034,170.04 | 41,957,031 |

**PTX-2352.3**

CONFIDENTIAL BUSINESS INFORMATION, SUBJECT TO PROTECTIVE ORDER
MSA1092

HYT1973-23349621

区分商业终端机型

| | A | B | C | D | E | F | G |
|---|---|---|---|---|---|---|---|
| 1 | No. | 产品分类 | 产品族 | 产品系列 | 产品名称 | **机型** | 产品线 |
| 2 | 1 | 终端标准 | DMR终端 | BD3 | BD300 | BD300 | 商业终端&智能配件产品线 |
| 3 | 2 | 终端标准 | DMR终端 | BD3 | BD300 | BD302 | 商业终端&智能配件产品线 |
| 4 | 3 | 终端标准 | DMR终端 | BD3 | BD300 | BD305 | 商业终端&智能配件产品线 |
| 5 | 4 | 终端标准 | DMR终端 | BD3 | BD300 | BD306 | 商业终端&智能配件产品线 |
| 6 | 5 | 终端标准 | DMR终端 | BD3 | BD300 | BD308 | 商业终端&智能配件产品线 |
| 7 | 6 | 终端标准 | DMR终端 | BD3 | BD300, | BD305LF | 商业终端&智能配件产品线 |
| 8 | 7 | 终端标准 | DMR终端 | BD3 | BD350 | BD350 | 商业终端&智能配件产品线 |
| 9 | 8 | 终端标准 | DMR终端 | BD3 | BD350 | BD352 | 商业终端&智能配件产品线 |
| 10 | 9 | 终端标准 | DMR终端 | BD3 | BD350 | BD355 | 商业终端&智能配件产品线 |
| 11 | 10 | 终端标准 | DMR终端 | BD3 | BD350 | BD356 | 商业终端&智能配件产品线 |
| 12 | 11 | 终端标准 | DMR终端 | BD3 | BD350 | BD358 | 商业终端&智能配件产品线 |
| 13 | 92 | 终端定制 | DMR终端 | BD3 | BD350 | TR2Xi(BD350) | 商业终端&智能配件产品线 |
| 14 | 12 | 终端标准 | DMR终端 | BD5/TD5 | BD500 | BD500 | 商业终端&智能配件产品线 |
| 15 | 13 | 终端标准 | DMR终端 | BD5/TD5 | BD500 | BD502 | 商业终端&智能配件产品线 |
| 16 | 14 | 终端标准 | DMR终端 | BD5/TD5 | BD500 | BD505 | 商业终端&智能配件产品线 |
| 17 | 15 | 终端标准 | DMR终端 | BD5/TD5 | BD500 | BD506 | 商业终端&智能配件产品线 |
| 18 | 16 | 终端标准 | DMR终端 | BD5/TD5 | BD500 | BD508 | 商业终端&智能配件产品线 |
| 19 | 84 | 终端定制 | DMR终端 | BD5/TD5 | BD500 | BD505LF(BD505) | 商业终端&智能配件产品线 |
| 20 | 17 | 终端标准 | DMR终端 | BD5/TD5 | BD510 | BD510 | 商业终端&智能配件产品线 |
| 21 | 18 | 终端标准 | DMR终端 | BD5/TD5 | BD510 | BD512 | 商业终端&智能配件产品线 |
| 22 | 19 | 终端标准 | DMR终端 | BD5/TD5 | BD510 | BD515 | 商业终端&智能配件产品线 |
| 23 | 20 | 终端标准 | DMR终端 | BD5/TD5 | BD510 | BD516 | 商业终端&智能配件产品线 |
| 24 | 21 | 终端标准 | DMR终端 | BD5/TD5 | BD510 | BD518 | 商业终端&智能配件产品线 |
| 25 | 22 | 终端标准 | DMR终端 | BD5/TD5 | BD550 | BD550 | 商业终端&智能配件产品线 |
| 26 | 23 | 终端标准 | DMR终端 | BD5/TD5 | BD550 | BD552 | 商业终端&智能配件产品线 |
| 27 | 24 | 终端标准 | DMR终端 | BD5/TD5 | BD550 | BD555 | 商业终端&智能配件产品线 |
| 28 | 25 | 终端标准 | DMR终端 | BD5/TD5 | BD550 | BD556 | 商业终端&智能配件产品线 |
| 29 | 26 | 终端标准 | DMR终端 | BD5/TD5 | BD550 | BD558 | 商业终端&智能配件产品线 |
| 30 | 27 | 终端标准 | DMR终端 | BD5/TD5 | BD610 | BD610 | 商业终端&智能配件产品线 |
| 31 | 28 | 终端标准 | DMR终端 | BD5/TD5 | BD610 | BD612 | 商业终端&智能配件产品线 |
| 32 | 29 | 终端标准 | DMR终端 | BD5/TD5 | BD610 | BD615 | 商业终端&智能配件产品线 |
| 33 | 30 | 终端标准 | DMR终端 | BD5/TD5 | BD610 | BD616 | 商业终端&智能配件产品线 |

**PTX-2352.4**

CONFIDENTIAL BUSINESS INFORMATION, SUBJECT TO PROTECTIVE ORDER
MSA1093

HYT1973-23349621

区分商业终端机型

| | A | B | C | D | E | F | G |
|---|---|---|---|---|---|---|---|
| 1 | No. | 产品分类 | 产品族 | 产品系列 | 产品名称 | **机型** | 产品线 |
| 34 | 31 | 终端标准 | DMR终端 | BD5/TD5 | BD610 | BD618 | 商业终端&智能配件产品线 |
| 35 | 32 | 终端标准 | DMR终端 | MD6 | MD610 | MD610 | 商业终端&智能配件产品线 |
| 36 | 33 | 终端标准 | DMR终端 | MD6 | MD610 | MD612 | 商业终端&智能配件产品线 |
| 37 | 34 | 终端标准 | DMR终端 | MD6 | MD610 | MD615 | 商业终端&智能配件产品线 |
| 38 | 35 | 终端标准 | DMR终端 | MD6 | MD610 | MD616 | 商业终端&智能配件产品线 |
| 39 | 36 | 终端标准 | DMR终端 | MD6 | MD610 | MD618 | 商业终端&智能配件产品线 |
| 40 | 37 | 终端标准 | DMR终端 | MD6 | MD620 | MD620 | 商业终端&智能配件产品线 |
| 41 | 38 | 终端标准 | DMR终端 | MD6 | MD620 | MD622 | 商业终端&智能配件产品线 |
| 42 | 39 | 终端标准 | DMR终端 | MD6 | MD620 | MD625 | 商业终端&智能配件产品线 |
| 43 | 40 | 终端标准 | DMR终端 | MD6 | MD620 | MD626 | 商业终端&智能配件产品线 |
| 44 | 41 | 终端标准 | DMR终端 | MD6 | MD620 | MD628 | 商业终端&智能配件产品线 |
| 45 | 42 | 终端标准 | DMR终端 | PD3/TD3 | PD350 | PD352 | 商业终端&智能配件产品线 |
| 46 | 43 | 终端标准 | DMR终端 | PD3/TD3 | PD350 | PD355 | 商业终端&智能配件产品线 |
| 47 | 44 | 终端标准 | DMR终端 | PD3/TD3 | PD350 | PD355LF | 商业终端&智能配件产品线 |
| 48 | 45 | 终端标准 | DMR终端 | PD3/TD3 | PD350 | PD356 | 商业终端&智能配件产品线 |
| 49 | 46 | 终端标准 | DMR终端 | PD3/TD3 | PD350 | PD358 | 商业终端&智能配件产品线 |
| 50 | 47 | 终端标准 | DMR终端 | PD3/TD3 | PD360 | PD362 | 商业终端&智能配件产品线 |
| 51 | 48 | 终端标准 | DMR终端 | PD3/TD3 | PD360 | PD365 | 商业终端&智能配件产品线 |
| 52 | 49 | 终端标准 | DMR终端 | PD3/TD3 | PD360 | PD365LF | 商业终端&智能配件产品线 |
| 53 | 50 | 终端标准 | DMR终端 | PD3/TD3 | PD360 | PD366 | 商业终端&智能配件产品线 |
| 54 | 51 | 终端标准 | DMR终端 | PD3/TD3 | PD360 | PD368 | 商业终端&智能配件产品线 |
| 55 | 52 | 终端标准 | DMR终端 | PD3/TD3 | PD370 | PD372 | 商业终端&智能配件产品线 |
| 56 | 53 | 终端标准 | DMR终端 | PD3/TD3 | PD370 | PD375 | 商业终端&智能配件产品线 |
| 57 | 54 | 终端标准 | DMR终端 | PD3/TD3 | PD370 | PD376 | 商业终端&智能配件产品线 |
| 58 | 55 | 终端标准 | DMR终端 | PD3/TD3 | PD370 | PD378 | 商业终端&智能配件产品线 |
| 59 | 59 | 终端标准 | DMR终端 | PD4/TD5 | PD400 | PD402 | 商业终端&智能配件产品线 |
| 60 | 60 | 终端标准 | DMR终端 | PD4/TD5 | PD400 | PD405 | 商业终端&智能配件产品线 |
| 61 | 61 | 终端标准 | DMR终端 | PD4/TD5 | PD400 | PD406 | 商业终端&智能配件产品线 |
| 62 | 62 | 终端标准 | DMR终端 | PD4/TD5 | PD400 | PD408 | 商业终端&智能配件产品线 |
| 63 | 86 | 终端定制 | DMR终端 | PD4/TD5 | PD400 | PD385(PD405) | 商业终端&智能配件产品线 |
| 64 | 63 | 终端标准 | DMR终端 | PD4/TD5 | PD410 | PD412 | 商业终端&智能配件产品线 |
| 65 | 64 | 终端标准 | DMR终端 | PD4/TD5 | PD410 | PD415 | 商业终端&智能配件产品线 |

**PTX-2352.5**

CONFIDENTIAL BUSINESS INFORMATION, SUBJECT TO PROTECTIVE ORDER
MSA1094

HYT1973-23349621

区分商业终端机型

| | A | B | C | D | E | F | G |
|---|---|---|---|---|---|---|---|
| 1 | No. | 产品分类 | 产品族 | 产品系列 | 产品名称 | **机型** | 产品线 |
| 66 | 65 | 终端标准 | DMR终端 | PD4/TD5 | PD410 | PD416 | 商业终端&智能配件产品线 |
| 67 | 66 | 终端标准 | DMR终端 | PD4/TD5 | PD410 | PD418 | 商业终端&智能配件产品线 |
| 68 | 67 | 终端标准 | DMR终端 | PD4/TD5 | PD460 | PD462 | 商业终端&智能配件产品线 |
| 69 | 68 | 终端标准 | DMR终端 | PD4/TD5 | PD460 | PD465 | 商业终端&智能配件产品线 |
| 70 | 69 | 终端标准 | DMR终端 | PD4/TD5 | PD460 | PD466 | 商业终端&智能配件产品线 |
| 71 | 70 | 终端标准 | DMR终端 | PD4/TD5 | PD460 | PD468 | 商业终端&智能配件产品线 |
| 72 | 71 | 终端标准 | DMR终端 | PD4/TD5 | PD480 | PD482 | 商业终端&智能配件产品线 |
| 73 | 72 | 终端标准 | DMR终端 | PD4/TD5 | PD480 | PD485 | 商业终端&智能配件产品线 |
| 74 | 73 | 终端标准 | DMR终端 | PD4/TD5 | PD480 | PD486 | 商业终端&智能配件产品线 |
| 75 | 74 | 终端标准 | DMR终端 | PD4/TD5 | PD480 | PD488 | 商业终端&智能配件产品线 |
| 76 | 87 | 终端定制 | DMR终端 | PD4/TD5 | PD480 | AR482G(PD482) | 商业终端&智能配件产品线 |
| 77 | 88 | 终端定制 | DMR终端 | PD4/TD5 | PD480 | PD395(PD485) | 商业终端&智能配件产品线 |
| 78 | 75 | 终端标准 | DMR终端 | PD4/TD5 | PD530 | PD530 | 商业终端&智能配件产品线 |
| 79 | 89 | 终端定制 | DMR终端 | PD4/TD5 | PD530 | DS-800(PD530) | 商业终端&智能配件产品线 |
| 80 | 76 | 终端标准 | DMR终端 | PD4/TD5 | PD530L | PD530L | 商业终端&智能配件产品线 |
| 81 | 77 | 终端标准 | DMR终端 | PD4/TD5 | PD530S | PD530S | 商业终端&智能配件产品线 |
| 82 | 56 | 终端标准 | DMR终端 | PD3/TD3 | TD350 | TD350 | 商业终端&智能配件产品线 |
| 83 | 57 | 终端标准 | DMR终端 | PD3/TD3 | TD360 | TD360 | 商业终端&智能配件产品线 |
| 84 | 58 | 终端标准 | DMR终端 | PD3/TD3 | TD370 | TD370 | 商业终端&智能配件产品线 |
| 85 | 78 | 终端标准 | DMR终端 | PD4/TD5 | TD500 | TD500 | 商业终端&智能配件产品线 |
| 86 | 90 | 终端定制 | DMR终端 | PD4/TD5 | TD500 | TD530(TD500) | 商业终端&智能配件产品线 |
| 87 | 91 | 终端定制 | DMR终端 | PD4/TD5 | TD500 | TR4X(TD500) | 商业终端&智能配件产品线 |
| 88 | 79 | 终端标准 | DMR终端 | PD4/TD5 | TD510 | TD510 | 商业终端&智能配件产品线 |
| 89 | 80 | 终端标准 | DMR终端 | PD4/TD5 | TD520 | TD520 | 商业终端&智能配件产品线 |
| 90 | 85 | 终端定制 | DMR终端 | BD5/TD5 | TD550 | TD550(TD550) | 商业终端&智能配件产品线 |
| 91 | 81 | 终端标准 | DMR终端 | PD4/TD5 | TD560 | Super246 | 商业终端&智能配件产品线 |
| 92 | 82 | 终端标准 | DMR终端 | PD4/TD5 | TD560 | TD560 | 商业终端&智能配件产品线 |
| 93 | 83 | 终端标准 | DMR终端 | PD4/TD5 | TD580 | TD580 | 商业终端&智能配件产品线 |

**PTX-2352.6**

CONFIDENTIAL BUSINESS INFORMATION, SUBJECT TO PROTECTIVE ORDER
MSA1095

HYT1973-23349621

| | A | B |
|---|---|---|
| 1 | 项目代码 | 项目产品归属 |
| 2 | 400006 | 行业中高端机型 |
| 3 | 400007 | 行业中高端机型 |
| 4 | 400008 | 行业中高端机型 |
| 5 | 400009 | 行业中高端机型 |
| 6 | 400029 | 公共项目及公共配件 |
| 7 | 400044 | 行业中高端机型 |
| 8 | 400057 | 行业中高端机型 |
| 9 | 400060 | 行业中高端机型 |
| 10 | 400061 | 行业中高端机型 |
| 11 | 400062 | 行业中高端机型 |
| 12 | 400063 | 行业中高端机型 |
| 13 | 400064 | 行业中高端机型 |
| 14 | 400072 | 商业低端机型 |
| 15 | 400073 | 商业低端机型 |
| 16 | 400076 | 行业中高端机型 |
| 17 | 400084 | 公共项目及公共配件 |
| 18 | 400106 | 行业中高端机型 |
| 19 | 400107 | 行业中高端机型 |
| 20 | 400108 | 行业中高端机型 |
| 21 | 400109 | 行业中高端机型 |
| 22 | 400110 | 行业中高端机型 |
| 23 | 400111 | 行业中高端机型 |
| 24 | 400112 | 行业中高端机型 |
| 25 | 400113 | 行业中高端机型 |
| 26 | 400116 | 商业低端机型 |
| 27 | 400117 | 行业中高端机型 |
| 28 | 400119 | 商业低端机型 |
| 29 | 400166 | 公共项目及公共配件 |
| 30 | 400171 | 商业低端机型 |
| 31 | 400177 | 行业中高端机型 |
| 32 | 400182 | 行业中高端机型 |
| 33 | 400185 | 行业中高端机型 |
| 34 | 400194 | 行业中高端机型 |
| 35 | 400195 | 行业中高端机型 |
| 36 | 400196 | 行业中高端机型 |
| 37 | 400201 | 商业低端机型 |
| 38 | 400202 | 行业中高端机型 |
| 39 | 400210 | 行业中高端机型 |
| 40 | 400211 | 行业中高端机型 |
| 41 | 400212 | 行业中高端机型 |
| 42 | 400215 | 行业中高端机型 |
| 43 | 400216 | 行业中高端机型 |
| 44 | 400225 | 商业低端机型 |
| 45 | 400226 | 商业低端机型 |
| 46 | 400231 | 商业低端机型 |
| 47 | 400232 | 商业低端机型 |
| 48 | 400233 | 商业低端机型 |
| 49 | 400234 | 商业低端机型 |
| 50 | 400235 | 商业低端机型 |
| 51 | 400236 | 商业低端机型 |
| 52 | 400237 | 商业低端机型 |
| 53 | 400238 | 商业低端机型 |
| 54 | 400239 | 商业低端机型 |

**PTX-2352.7**

CONFIDENTIAL BUSINESS INFORMATION, SUBJECT TO PROTECTIVE ORDER      HYT1973-23349621
MSA1096

| | A | B |
|---|---|---|
| 1 | 项目代码 | 项目产品归属 |
| 55 | 400240 | 商业低端机型 |
| 56 | 400241 | 行业中高端机型 |
| 57 | 400243 | 行业中高端机型 |
| 58 | 400251 | 行业中高端机型 |
| 59 | 400252 | 行业中高端机型 |
| 60 | 400253 | 行业中高端机型 |
| 61 | 400256 | 行业中高端机型 |
| 62 | 400259 | 行业中高端机型 |
| 63 | 400273 | 行业中高端机型 |
| 64 | 400275 | 商业低端机型 |
| 65 | 400289 | 商业低端机型 |
| 66 | 400290 | 商业低端机型 |
| 67 | 400291 | 行业中高端机型 |
| 68 | 900000 | 商业低端机型 |
| 69 | 170005 | 行业中高端机型 |
| 70 | 17070003 | 商业低端机型 |
| 71 | 400061 | 行业中高端机型 |
| 72 | 400084 | 商业低端机型 |
| 73 | 400106 | 行业中高端机型 |
| 74 | 400107 | 行业中高端机型 |
| 75 | 400109 | 行业中高端机型 |
| 76 | 400110 | 行业中高端机型 |
| 77 | 400111 | 行业中高端机型 |
| 78 | 400112 | 行业中高端机型 |
| 79 | 400166 | 公共项目及公共配件 |
| 80 | 400177 | 行业中高端机型 |
| 81 | 400182 | 行业中高端机型 |
| 82 | 400185 | 行业中高端机型 |
| 83 | 400196 | 行业中高端机型 |
| 84 | 400201 | 商业低端机型 |
| 85 | 400202 | 行业中高端机型 |
| 86 | 400210 | 行业中高端机型 |
| 87 | 400211 | 行业中高端机型 |
| 88 | 400212 | 行业中高端机型 |
| 89 | 400215 | 行业中高端机型 |
| 90 | 400216 | 行业中高端机型 |
| 91 | 400225 | 商业低端机型 |
| 92 | 400226 | 行业中高端机型 |
| 93 | 400231 | 商业低端机型 |
| 94 | 400232 | 商业低端机型 |
| 95 | 400233 | 商业低端机型 |
| 96 | 400234 | 商业低端机型 |
| 97 | 400235 | 商业低端机型 |
| 98 | 400236 | 商业低端机型 |
| 99 | 400237 | 商业低端机型 |
| 100 | 400238 | 行业中高端机型 |
| 101 | 400239 | 商业低端机型 |
| 102 | 400240 | 商业低端机型 |
| 103 | 400243 | 行业中高端机型 |
| 104 | 400251 | 行业中高端机型 |
| 105 | 400252 | 行业中高端机型 |
| 106 | 400253 | 行业中高端机型 |
| 107 | 400255 | 商业低端机型 |

**PTX-2352.8**

CONFIDENTIAL BUSINESS INFORMATION, SUBJECT TO PROTECTIVE ORDER　　HYT1973-23349621
MSA1097

|   | A | B |
|---|---|---|
| 1 | 项目代码 | 项目产品归属 |
| 108 | 400256 | 行业中高端机型 |
| 109 | 400259 | 行业中高端机型 |
| 110 | 400266 | 行业中高端机型 |
| 111 | 400273 | 行业中高端机型 |
| 112 | 400275 | 商业低端机型 |
| 113 | 400290 | 商业低端机型 |
| 114 | 400291 | 行业中高端机型 |
| 115 | CPC0341 | 行业中高端机型 |
| 116 | CPC1401 | 行业中高端机型 |
| 117 | CR00001 | 公共项目及公共配件 |
| 118 | CR01201 | 公共项目及公共配件 |
| 119 | CYZX001 | 公共项目及公共配件 |
| 120 | D613011 | 行业中高端机型 |
| 121 | D613012 | 行业中高端机型 |
| 122 | D613113 | 行业中高端机型 |
| 123 | D613113 | 行业中高端机型 |
| 124 | D613114 | 行业中高端机型 |
| 125 | D71E361 | 行业中高端机型 |
| 126 | D781401 | 行业中高端机型 |
| 127 | D79EX31 | 行业中高端机型 |
| 128 | D79EX32 | 行业中高端机型 |
| 129 | D79EX33 | 行业中高端机型 |
| 130 | DM01101 | 行业中高端机型 |
| 131 | DM01102 | 行业中高端机型 |
| 132 | DM01103 | 行业中高端机型 |
| 133 | DM01201 | 行业中高端机型 |
| 134 | DM01202 | 行业中高端机型 |
| 135 | DM01301 | 行业中高端机型 |
| 136 | DM01302 | 行业中高端机型 |
| 137 | DM01303 | 行业中高端机型 |
| 138 | DM01401 | 行业中高端机型 |
| 139 | DM01402 | 行业中高端机型 |
| 140 | DM01403 | 行业中高端机型 |
| 141 | DM01501 | 行业中高端机型 |
| 142 | DM02101 | 行业中高端机型 |
| 143 | DM02201 | 行业中高端机型 |
| 144 | DM13011 | 商业低端机型 |
| 145 | DM13041 | 行业中高端机型 |
| 146 | DM13042 | 行业中高端机型 |
| 147 | DM14001 | 行业中高端机型 |
| 148 | DM14002 | 行业中高端机型 |
| 149 | DP00000 | 公共项目及公共配件 |
| 150 | DP01201 | 行业中高端机型 |
| 151 | DP01202 | 行业中高端机型 |
| 152 | DP01203 | 行业中高端机型 |
| 153 | DP01204 | 行业中高端机型 |
| 154 | DP02101 | 行业中高端机型 |
| 155 | DP02102 | 行业中高端机型 |
| 156 | DP02103 | 行业中高端机型 |
| 157 | DP02104 | 行业中高端机型 |
| 158 | DP02201 | 行业中高端机型 |
| 159 | DP02202 | 行业中高端机型 |
| 160 | DP02203 | 行业中高端机型 |

**PTX-2352.9**

CONFIDENTIAL BUSINESS INFORMATION, SUBJECT TO PROTECTIVE ORDER       HYT1973-23349621
MSA1098

| | A | B |
|---|---|---|
| 1 | 项目代码 | 项目产品归属 |
| 161 | DP02204 | 行业中高端机型 |
| 162 | DP02300 | 行业中高端机型 |
| 163 | DP03101 | 公共项目及公共配件 |
| 164 | DP03401 | 行业中高端机型 |
| 165 | DP04001 | 行业中高端机型 |
| 166 | DP04002 | 行业中高端机型 |
| 167 | DP05001 | 行业中高端机型 |
| 168 | DP05002 | 行业中高端机型 |
| 169 | DPR1401 | 行业中高端机型 |
| 170 | DR00000 | 商业低端机型 |
| 171 | DR13011 | 行业中高端机型 |
| 172 | DW13071 | 行业中高端机型 |
| 173 | DXP1301 | 行业中高端机型 |
| 174 | DXP1302 | 行业中高端机型 |
| 175 | DZ00003 | 行业中高端机型 |
| 176 | DZ00008 | 行业中高端机型 |
| 177 | DZ00009 | 行业中高端机型 |
| 178 | DZ00010 | 行业中高端机型 |
| 179 | DZ00012 | 行业中高端机型 |
| 180 | DZ00021 | 公共项目及公共配件 |
| 181 | DZ00052 | 行业中高端机型 |
| 182 | DZ00056 | 行业中高端机型 |
| 183 | DZ00063 | 行业中高端机型 |
| 184 | DZ00070 | 行业中高端机型 |
| 185 | DZ00091 | 行业中高端机型 |
| 186 | DZ00092 | 行业中高端机型 |
| 187 | DZ00096 | 行业中高端机型 |
| 188 | DZ00106 | 行业中高端机型 |
| 189 | DZ00110 | 行业中高端机型 |
| 190 | DZ00121 | 行业中高端机型 |
| 191 | DZ00122 | 行业中高端机型 |
| 192 | DZ00123 | 行业中高端机型 |
| 193 | DZ00124 | 行业中高端机型 |
| 194 | DZ00129 | 行业中高端机型 |
| 195 | DZ00132 | 行业中高端机型 |
| 196 | DZ00133 | 行业中高端机型 |
| 197 | DZ00135 | 行业中高端机型 |
| 198 | DZ00136 | 行业中高端机型 |
| 199 | DZ00137 | 行业中高端机型 |
| 200 | DZ00138 | 行业中高端机型 |
| 201 | DZ00140 | 行业中高端机型 |
| 202 | DZ00141 | 行业中高端机型 |
| 203 | DZ00143 | 行业中高端机型 |
| 204 | DZ00144 | 行业中高端机型 |
| 205 | DZ00145 | 行业中高端机型 |
| 206 | DZ00147 | 行业中高端机型 |
| 207 | DZ00151 | 行业中高端机型 |
| 208 | DZ00153 | 行业中高端机型 |
| 209 | DZ00157 | 行业中高端机型 |
| 210 | DZ00172 | 商业低端机型 |
| 211 | DZ00173 | 商业低端机型 |
| 212 | DZ00176 | 商业低端机型 |
| 213 | DZ00180 | 商业低端机型 |

**PTX-2352.10**

CONFIDENTIAL BUSINESS INFORMATION, SUBJECT TO PROTECTIVE ORDER       HYT1973-23349621
MSA1099

| | A | B |
|---|---|---|
| 1 | 项目代码 | 项目产品归属 |
| 214 | DZ00186 | 行业中高端机型 |
| 215 | DZ00188 | 行业中高端机型 |
| 216 | DZ00191 | 行业中高端机型 |
| 217 | DZ00192 | 商业低端机型 |
| 218 | DZ00195 | 行业中高端机型 |
| 219 | DZ00202 | 行业中高端机型 |
| 220 | DZ00204 | 行业中高端机型 |
| 221 | DZ00206 | 行业中高端机型 |
| 222 | DZ00208 | 行业中高端机型 |
| 223 | DZ00211 | 商业低端机型 |
| 224 | DZ00212 | 商业低端机型 |
| 225 | DZ00214 | 行业中高端机型 |
| 226 | DZ00215 | 行业中高端机型 |
| 227 | DZ00216 | 行业中高端机型 |
| 228 | DZ00217 | 行业中高端机型 |
| 229 | DZ00218 | 行业中高端机型 |
| 230 | DZ00219 | 行业中高端机型 |
| 231 | DZ00221 | 行业中高端机型 |
| 232 | DZ00223 | 行业中高端机型 |
| 233 | DZ00224 | 行业中高端机型 |
| 234 | DZ00226 | 行业中高端机型 |
| 235 | DZ00227 | 行业中高端机型 |
| 236 | DZ00228 | 商业低端机型 |
| 237 | DZ00234 | 行业中高端机型 |
| 238 | DZ00235 | 行业中高端机型 |
| 239 | DZ00239 | 行业中高端机型 |
| 240 | DZ00240 | 行业中高端机型 |
| 241 | DZ00242 | 行业中高端机型 |
| 242 | DZ00245 | 商业低端机型 |
| 243 | DZ00246 | 行业中高端机型 |
| 244 | DZ00248 | 行业中高端机型 |
| 245 | DZ00250 | 行业中高端机型 |
| 246 | DZ00251 | 行业中高端机型 |
| 247 | DZ00254 | 行业中高端机型 |
| 248 | DZ00256 | 商业低端机型 |
| 249 | GT00001 | 公共项目及公共配件 |
| 250 | HDS1102 | 行业中高端机型 |
| 251 | HDS1306 | 行业中高端机型 |
| 252 | LTE1401 | 行业中高端机型 |
| 253 | LTE1402 | 行业中高端机型 |
| 254 | MY01107 | 行业中高端机型 |
| 255 | PD31460 | 商业低端机型 |
| 256 | PD31460 | 商业低端机型 |
| 257 | PD51460 | 商业低端机型 |
| 258 | PJ00001 | 公共项目及公共配件 |
| 259 | PJ01001 | 行业中高端机型 |
| 260 | PJ04003 | 行业中高端机型 |
| 261 | PJ06001 | 行业中高端机型 |
| 262 | PJ07101 | 行业中高端机型 |
| 263 | PJ08201 | 行业中高端机型 |
| 264 | PJ08202 | 行业中高端机型 |
| 265 | PJE3100 | 行业中高端机型 |
| 266 | PJF3100 | 公共项目及公共配件 |

**PTX-2352.11**

CONFIDENTIAL BUSINESS INFORMATION, SUBJECT TO PROTECTIVE ORDER     HYT1973-23349621
MSA1100

| | A | B |
|---|---|---|
| 1 | 项目代码 | 项目产品归属 |
| 267 | PJF3101 | 行业中高端机型 |
| 268 | PJP3100 | 公共项目及公共配件 |
| 269 | R100090001 | 公共项目及公共配件 |
| 270 | R100100001 | 行业中高端机型 |
| 271 | R100100012 | 行业中高端机型 |
| 272 | R100110001 | 公共项目及公共配件 |
| 273 | R100110002 | 公共项目及公共配件 |
| 274 | R100110003 | 行业中高端机型 |
| 275 | R100110004 | 公共项目及公共配件 |
| 276 | R100110042 | 行业中高端机型 |
| 277 | R100120003 | 公共项目及公共配件 |
| 278 | R100120019 | 行业中高端机型 |
| 279 | R100120023 | 行业中高端机型 |
| 280 | R100120027 | 行业中高端机型 |
| 281 | R100130002 | 商业低端机型 |
| 282 | R100130004 | 行业中高端机型 |
| 283 | R100130016 | 行业中高端机型 |
| 284 | R100130024 | 行业中高端机型 |
| 285 | R100130029 | 商业低端机型 |
| 286 | R100130033 | 商业低端机型 |
| 287 | R100140019 | 行业中高端机型 |
| 288 | R100140026 | 商业低端机型 |
| 289 | R100140030 | 商业低端机型 |
| 290 | R100140031 | 商业低端机型 |
| 291 | R100140032 | 行业中高端机型 |
| 292 | R100140038 | 行业中高端机型 |
| 293 | R100140041 | 行业中高端机型 |
| 294 | R100140050 | 行业中高端机型 |
| 295 | R100150007 | 商业低端机型 |
| 296 | R100150011 | 行业中高端机型 |
| 297 | R100150022 | 公共项目及公共配件 |
| 298 | R100150026 | 行业中高端机型 |
| 299 | R100150027 | 行业中高端机型 |
| 300 | R100150029 | 行业中高端机型 |
| 301 | R100150035 | 行业中高端机型 |
| 302 | R100150043 | 公共项目及公共配件 |
| 303 | R100150049 | 公共项目及公共配件 |
| 304 | R100160003 | 行业中高端机型 |
| 305 | R100160011 | 商业低端机型 |
| 306 | R100160012 | 商业低端机型 |
| 307 | R100160018 | 商业低端机型 |
| 308 | R100160023 | 行业中高端机型 |
| 309 | R100160025 | 行业中高端机型 |
| 310 | R100160027 | 行业中高端机型 |
| 311 | R100160028 | 行业中高端机型 |
| 312 | R100160029 | 公共项目及公共配件 |
| 313 | R100160030 | 公共项目及公共配件 |
| 314 | R100160033 | 商业低端机型 |
| 315 | R100160035 | 商业低端机型 |
| 316 | R100160061 | 公共项目及公共配件 |
| 317 | R100160068 | 行业中高端机型 |
| 318 | R100160069 | 行业中高端机型 |
| 319 | R100160081 | 商业低端机型 |

**PTX-2352.12**

CONFIDENTIAL BUSINESS INFORMATION, SUBJECT TO PROTECTIVE ORDER      HYT1973-23349621
MSA1101

| | A | B |
|---|---|---|
| 1 | 项目代码 | 项目产品归属 |
| 320 | R100160092 | 行业中高端机型 |
| 321 | R100170001 | 行业中高端机型 |
| 322 | R100170002 | 行业中高端机型 |
| 323 | R100170008 | 行业中高端机型 |
| 324 | R100170011 | 行业中高端机型 |
| 325 | R100170012 | 行业中高端机型 |
| 326 | R100170020 | 商业低端机型 |
| 327 | R100170025 | 商业低端机型 |
| 328 | R100170026 | 商业低端机型 |
| 329 | R100170027 | 商业低端机型 |
| 330 | R100170029 | 商业低端机型 |
| 331 | R100170031 | 行业中高端机型 |
| 332 | R100170032 | 商业低端机型 |
| 333 | R100170033 | 行业中高端机型 |
| 334 | R100170037 | 行业中高端机型 |
| 335 | R100170038 | 行业中高端机型 |
| 336 | R100170041 | 行业中高端机型 |
| 337 | R100170048 | 商业低端机型 |
| 338 | R100170049 | 商业低端机型 |
| 339 | R100170052 | 行业中高端机型 |
| 340 | R100170059 | 行业中高端机型 |
| 341 | R100170073 | 商业低端机型 |
| 342 | R100170081 | 行业中高端机型 |
| 343 | R100170084 | 行业中高端机型 |
| 344 | R100170085 | 行业中高端机型 |
| 345 | R100170089 | 商业低端机型 |
| 346 | R100170091 | 行业中高端机型 |
| 347 | R100170097 | 行业中高端机型 |
| 348 | R100170099 | 公共项目及公共配件 |
| 349 | R100170100 | 行业中高端机型 |
| 350 | R100170101 | 行业中高端机型 |
| 351 | R100170103 | 行业中高端机型 |
| 352 | R100170104 | 行业中高端机型 |
| 353 | R100170108 | 行业中高端机型 |
| 354 | R100170109 | 行业中高端机型 |
| 355 | R100170112 | 行业中高端机型 |
| 356 | R100170113 | 行业中高端机型 |
| 357 | R100170121 | 行业中高端机型 |
| 358 | R100180001 | 商业低端机型 |
| 359 | R100180002 | 行业中高端机型 |
| 360 | R100180003 | 行业中高端机型 |
| 361 | R100180012 | 公共项目及公共配件 |
| 362 | R100180016 | 公共项目及公共配件 |
| 363 | R100180023 | 行业中高端机型 |
| 364 | R100180024 | 行业中高端机型 |
| 365 | R100180026 | 公共项目及公共配件 |
| 366 | R100180030 | 商业低端机型 |
| 367 | R100180031 | 公共项目及公共配件 |
| 368 | R100180036 | 公共项目及公共配件 |
| 369 | R100180039 | 行业中高端机型 |
| 370 | R100180057 | 行业中高端机型 |
| 371 | R100180087 | 行业中高端机型 |
| 372 | R100180088 | 行业中高端机型 |

**PTX-2352.13**

CONFIDENTIAL BUSINESS INFORMATION, SUBJECT TO PROTECTIVE ORDER    HYT1973-23349621
MSA1102

| | A | B |
|---|---|---|
| 1 | 项目代码 | 项目产品归属 |
| 373 | R104170005 | 公共项目及公共配件 |
| 374 | R104180002 | 公共项目及公共配件 |
| 375 | R104180021 | 行业中高端机型 |
| 376 | R107150001 | 行业中高端机型 |
| 377 | R109170004 | 商业低端机型 |
| 378 | R109170005 | 商业低端机型 |
| 379 | R109170006 | 行业中高端机型 |
| 380 | R109180001 | 行业中高端机型 |
| 381 | R114170001 | 行业中高端机型 |
| 382 | RHCL170003 | 行业中高端机型 |
| 383 | RHCL170004 | 行业中高端机型 |
| 384 | RHCL170005 | 行业中高端机型 |
| 385 | RHCL170006 | 行业中高端机型 |
| 386 | RHCL170007 | 行业中高端机型 |
| 387 | RHCL170008 | 行业中高端机型 |
| 388 | RJ00003 | 行业中高端机型 |
| 389 | RJ00004 | 行业中高端机型 |
| 390 | RJ00005 | 行业中高端机型 |
| 391 | RJ00006 | 行业中高端机型 |
| 392 | RJ00007 | 行业中高端机型 |
| 393 | RJ00008 | 行业中高端机型 |
| 394 | RJ00013 | 行业中高端机型 |
| 395 | RJ00014 | 行业中高端机型 |
| 396 | RJ00014-1 | 行业中高端机型 |
| 397 | RJ00014-2 | 行业中高端机型 |
| 398 | RJ00014-3 | 行业中高端机型 |
| 399 | RJ00014-4 | 行业中高端机型 |
| 400 | RJ00014-5 | 行业中高端机型 |
| 401 | RJ00015 | 行业中高端机型 |
| 402 | RJ00015-1 | 行业中高端机型 |
| 403 | RJ00015-2 | 行业中高端机型 |
| 404 | RJ00015-3 | 行业中高端机型 |
| 405 | RJ00015-4 | 行业中高端机型 |
| 406 | RJ00016 | 公共项目及公共配件 |
| 407 | RJ00020-1 | 行业中高端机型 |
| 408 | RJ00020-2 | 行业中高端机型 |
| 409 | RJ00020-3 | 行业中高端机型 |
| 410 | RJ00020-4 | 行业中高端机型 |
| 411 | RJ00021-1 | 行业中高端机型 |
| 412 | RJ00021-2 | 行业中高端机型 |
| 413 | RJ00021-3 | 行业中高端机型 |
| 414 | RJ00022-1 | 行业中高端机型 |
| 415 | RJ00022-3 | 行业中高端机型 |
| 416 | RS00001 | 公共项目及公共配件 |
| 417 | RSG1101 | 公共项目及公共配件 |
| 418 | RST1101 | 公共项目及公共配件 |
| 419 | S-CN44-161122-D01 | 行业中高端机型 |
| 420 | S-CN442-170934 | 行业中高端机型 |
| 421 | S-CN442-170934-D01 | 行业中高端机型 |
| 422 | SN00001 | 公共项目及公共配件 |
| 423 | SYD0002 | 商业低端机型 |
| 424 | SYR0000 | 商业低端机型 |
| 425 | SYR0003 | 公共项目及公共配件 |

**PTX-2352.14**

CONFIDENTIAL BUSINESS INFORMATION, SUBJECT TO PROTECTIVE ORDER     HYT1973-23349621
MSA1103

| | A | B |
|---|---|---|
| 1 | 项目代码 | 项目产品归属 |
| 426 | SYR0004 | 公共项目及公共配件 |
| 427 | SYR0301 | 公共项目及公共配件 |
| 428 | TB01102 | 行业中高端机型 |
| 429 | TD14001 | 商业低端机型 |
| 430 | TD14002 | 商业低端机型 |
| 431 | TD21401 | 商业低端机型 |
| 432 | TD30341 | 商业低端机型 |
| 433 | TD30342 | 商业低端机型 |
| 434 | TD50341 | 商业低端机型 |
| 435 | TD50342 | 商业低端机型 |
| 436 | TD50343 | 行业中高端机型 |
| 437 | TD56341 | 行业中高端机型 |
| 438 | TD56342 | 行业中高端机型 |
| 439 | XEX1401 | 行业中高端机型 |
| 440 | XT00003 | 行业中高端机型 |
| 441 | XTP0701 | 行业中高端机型 |
| 442 | YPP0001 | 公共项目及公共配件 |
| 443 | YPX1801 | 公共项目及公共配件 |
| 444 | ZDM1380 | 商业低端机型 |
| 445 | ZDZX005 | 行业中高端机型 |
| 446 | ZDZX011 | 行业中高端机型 |
| 447 | ZF00001 | 公共项目及公共配件 |
| 448 | ZF03108 | 行业中高端机型 |
| 449 | ZF04205 | 行业中高端机型 |
| 450 | ZF07102 | 行业中高端机型 |
| 451 | ZF08102 | 行业中高端机型 |
| 452 | ZF08105 | 行业中高端机型 |
| 453 | ZF09202 | 行业中高端机型 |
| 454 | ZF09301 | 行业中高端机型 |
| 455 | ZFD0001 | 公共项目及公共配件 |
| 456 | ZFD0002 | 公共项目及公共配件 |
| 457 | ZFD0002 | 公共项目及公共配件 |
| 458 | ZFD0003 | 公共项目及公共配件 |
| 459 | ZFD0004 | 行业中高端机型 |
| 460 | ZFD0005 | 公共项目及公共配件 |
| 461 | ZFD0301 | 行业中高端机型 |
| 462 | ZFD3202 | 行业中高端机型 |
| 463 | ZFD3203 | 行业中高端机型 |
| 464 | ZFD3204 | 行业中高端机型 |
| 465 | ZFD3205 | 行业中高端机型 |
| 466 | ZFD3206 | 行业中高端机型 |
| 467 | ZFD3207 | 行业中高端机型 |
| 468 | ZFD3208 | 行业中高端机型 |
| 469 | ZFD3209 | 公共项目及公共配件 |
| 470 | ZFD3210 | 行业中高端机型 |
| 471 | ZFD3211 | 行业中高端机型 |
| 472 | ZFD3212 | 行业中高端机型 |
| 473 | ZFD3213 | 行业中高端机型 |
| 474 | ZFD3214 | 行业中高端机型 |
| 475 | ZFD3215 | 行业中高端机型 |
| 476 | ZFD3216 | 公共项目及公共配件 |
| 477 | ZFD3217 | 行业中高端机型 |
| 478 | ZFD3301 | 行业中高端机型 |

**PTX-2352.15**

CONFIDENTIAL BUSINESS INFORMATION, SUBJECT TO PROTECTIVE ORDER    HYT1973-23349621
MSA1104

|   | A | B |
|---|---|---|
| 1 | **项目代码** | **项目产品归属** |
| 479 | ZFD3302 | 行业中高端机型 |
| 480 | ZFD4201 | 行业中高端机型 |
| 481 | ZFD5101 | 行业中高端机型 |
| 482 | ZFD5102 | 行业中高端机型 |
| 483 | ZFM2101 | 行业中高端机型 |
| 484 | ZFM2103 | 行业中高端机型 |
| 485 | ZFYY001 | 行业中高端机型 |
| 486 | ZFYY002 | 行业中高端机型 |
| 487 | ZGS0002 | 公共项目及公共配件 |
| 488 | ZHD0001 | 行业中高端机型 |
| 489 | ZHD0101 | 行业中高端机型 |
| 490 | ZHD0102 | 行业中高端机型 |
| 491 | ZHD0103 | 行业中高端机型 |
| 492 | ZHD0104 | 行业中高端机型 |
| 493 | ZHD0105 | 行业中高端机型 |
| 494 | ZHD0106 | 行业中高端机型 |
| 495 | ZHD0107 | 行业中高端机型 |
| 496 | ZHD0108 | 行业中高端机型 |
| 497 | ZHD0109 | 行业中高端机型 |
| 498 | ZHD0201 | 行业中高端机型 |
| 499 | ZHD0301 | 行业中高端机型 |
| 500 | ZHD0601 | 行业中高端机型 |
| 501 | ZHD0602 | 行业中高端机型 |
| 502 | ZHD1101 | 行业中高端机型 |
| 503 | ZHD603 | 行业中高端机型 |
| 504 | ZHM0101 | 公共项目及公共配件 |
| 505 | PJ02101 | 公共项目及公共配件 |
| 506 | ZF08101 | 行业中高端机型 |

**PTX-2352.16**

CONFIDENTIAL BUSINESS INFORMATION, SUBJECT TO PROTECTIVE ORDER    HYT1973-23349621
MSA1105

Summary

| | A | B | C | D | E | F | G | H | I | J | K | L |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | **Item/Year**<br>**Item/Year** | **2005-2009** | **2010** | **2011** | **2012** | **2013** | **2014** | **2015** | **2016** | **2017** | **2018** | **Total** |
| 2 | R&D expenses for low-end commercial models (Including DMR public item cost sharing) | 0 | 0.27 | 695 | 63 | 1,542 | 2,003 | 1,983 | 1,998 | 3,397 | 5,193 | 16,875 |
| 3 | Among which: Direct R&D expenses for low-end models | | 0.10 | 329 | 34 | 979 | 1,130 | 1,140 | 1,590 | 3,086 | 4,390 | 12,679 |
| 4 | R&D expenses for mid- & high-end industry models | 9,159 | 4,455 | 6,860 | 7,532 | 6,276 | 6,400 | 8,249 | 14,311 | 19,991 | 19,966 | 103,198 |
| 5 | DMR R&D total investment | 9,159 | 4,456 | 7,555 | 7,595 | 7,818 | 8,403 | 10,232 | 16,308 | 23,388 | 25,160 | 120,073 |
| 6 | Unit: RMB 10,000 | | | | | | | | | | | |

**PTX-2352.17**

CONFIDENTIAL BUSINESS INFORMATION, SUBJECT TO PROTECTIVE ORDER
MSA1106

HYT1973-23349621

Sharing calculation table

| | A | B | C | D | E | F | G | H | I | J | K |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | Item/Year | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | Total |
| 2 | R&D expenses for low-end commercial models | 984 | 3,290,951 | 343,932 | 9,794,730 | 11,301,097 | 11,396,439 | 15,904,962 | 30,860,647 | 43,899,577 | 126,793,319 |
| 3 | R&D expenses for mid- & high-end industry models | 15,977,029 | 32,458,760 | 40,828,240 | 39,856,061 | 36,111,383 | 47,416,841 | 113,939,065 | 181,606,857 | 168,775,166 | 676,969,401 |
| 4 | **Total DMR direct item R&D investments** | **15,978,013** | **35,749,710** | **41,172,172** | **49,650,792** | **47,412,480** | **58,813,280** | **129,844,027** | **212,467,504** | **212,674,743** | **803,762,720** |
| 5 | R&D expenses for public items and public accessories | 28,577,663 | 39,801,451 | 34,777,556 | 28,529,017 | 36,613,017 | 43,504,269 | 33,238,237 | 21,413,512 | 38,922,130 | 305,376,852 |
| 6 | **Total DMR R&D investments** | **44,555,676** | **75,551,161** | **75,949,728** | **78,179,809** | **84,025,497** | **102,317,549** | **163,082,264** | **233,881,016** | **251,596,873** | **1,109,139,572** |
| 7 | | | | | | | | | | | |
| 8 | Proportion of direct investment in low-end commercial models | 0.01% | 9.21% | 0.84% | 19.73% | 23.84% | 19.38% | 12.25% | 14.52% | 20.64% | 15.77% |
| 9 | Cost sharing for low-end commercial model R&D | 1,759.15 | 3,663,934.96 | 290,514.82 | 5,627,987.39 | 8,726,969.31 | 8,429,962.71 | 4,071,445.60 | 3,110,286.64 | 8,034,170.04 | 41,957,031 |

**PTX-2352.18**

CONFIDENTIAL BUSINESS INFORMATION, SUBJECT TO PROTECTIVE ORDER
MSA1107

HYT1973-23349621

Commercial terminal models

| | A | B | C | D | E | F | G |
|---|---|---|---|---|---|---|---|
| 1 | No. | Product type | Product family | Product series | Product name | Model | Product line |
| 2 | 1 | Terminal standard | DMR terminal | BD3 | BD300 | BD300 | Commercial terminal & smart accessories product line |
| 3 | 2 | Terminal standard | DMR terminal | BD3 | BD300 | BD302 | Commercial terminal & smart accessories product line |
| 4 | 3 | Terminal standard | DMR terminal | BD3 | BD300 | BD305 | Commercial terminal & smart accessories product line |
| 5 | 4 | Terminal standard | DMR terminal | BD3 | BD300 | BD306 | Commercial terminal & smart accessories product line |
| 6 | 5 | Terminal standard | DMR terminal | BD3 | BD300 | BD308 | Commercial terminal & smart accessories product line |
| 7 | 6 | Terminal standard | DMR terminal | BD3 | BD300, | BD305LF | Commercial terminal & smart accessories product line |
| 8 | 7 | Terminal standard | DMR terminal | BD3 | BD350 | BD350 | Commercial terminal & smart accessories product line |
| 9 | 8 | Terminal standard | DMR terminal | BD3 | BD350 | BD352 | Commercial terminal & smart accessories product line |
| 10 | 9 | Terminal standard | DMR terminal | BD3 | BD350 | BD355 | Commercial terminal & smart accessories product line |
| 11 | 10 | Terminal standard | DMR terminal | BD3 | BD350 | BD356 | Commercial terminal & smart accessories product line |
| 12 | 11 | Terminal standard | DMR terminal | BD3 | BD350 | BD358 | Commercial terminal & smart accessories product line |
| 13 | 92 | Terminal customization | DMR terminal | BD3 | BD350 | TR2Xi(BD350) | Commercial terminal & smart accessories product line |
| 14 | 12 | Terminal standard | DMR terminal | BD5/TD5 | BD500 | BD500 | Commercial terminal & smart accessories product line |
| 15 | 13 | Terminal standard | DMR terminal | BD5/TD5 | BD500 | BD502 | Commercial terminal & smart accessories product line |
| 16 | 14 | Terminal standard | DMR terminal | BD5/TD5 | BD500 | BD505 | Commercial terminal & smart accessories product line |
| 17 | 15 | Terminal standard | DMR terminal | BD5/TD5 | BD500 | BD506 | Commercial terminal & smart accessories product line |
| 18 | 16 | Terminal standard | DMR terminal | BD5/TD5 | BD500 | BD508 | Commercial terminal & smart accessories product line |
| 19 | 84 | Terminal customization | DMR terminal | BD5/TD5 | BD500 | BD505LF(BD505) | Commercial terminal & smart accessories product line |
| 20 | 17 | Terminal standard | DMR terminal | BD5/TD5 | BD510 | BD510 | Commercial terminal & smart accessories product line |
| 21 | 18 | Terminal standard | DMR terminal | BD5/TD5 | BD510 | BD512 | Commercial terminal & smart accessories product line |

**PTX-2352.19**

CONFIDENTIAL BUSINESS INFORMATION, SUBJECT TO PROTECTIVE ORDER
MSA1108

Commercial terminal models

| | A | B | C | D | E | F | G |
|---|---|---|---|---|---|---|---|
| 1 | No. | Product type | Product family | Product series | Product name | Model | Product line |
| 22 | 19 | Terminal standard | DMR terminal | BD5/TD5 | BD510 | BD515 | Commercial terminal & smart accessories product line |
| 23 | 20 | Terminal standard | DMR terminal | BD5/TD5 | BD510 | BD516 | Commercial terminal & smart accessories product line |
| 24 | 21 | Terminal standard | DMR terminal | BD5/TD5 | BD510 | BD518 | Commercial terminal & smart accessories product line |
| 25 | 22 | Terminal standard | DMR terminal | BD5/TD5 | BD550 | BD550 | Commercial terminal & smart accessories product line |
| 26 | 23 | Terminal standard | DMR terminal | BD5/TD5 | BD550 | BD552 | Commercial terminal & smart accessories product line |
| 27 | 24 | Terminal standard | DMR terminal | BD5/TD5 | BD550 | BD555 | Commercial terminal & smart accessories product line |
| 28 | 25 | Terminal standard | DMR terminal | BD5/TD5 | BD550 | BD556 | Commercial terminal & smart accessories product line |
| 29 | 26 | Terminal standard | DMR terminal | BD5/TD5 | BD550 | BD558 | Commercial terminal & smart accessories product line |
| 30 | 27 | Terminal standard | DMR terminal | BD5/TD5 | BD610 | BD610 | Commercial terminal & smart accessories product line |
| 31 | 28 | Terminal standard | DMR terminal | BD5/TD5 | BD610 | BD612 | Commercial terminal & smart accessories product line |
| 32 | 29 | Terminal standard | DMR terminal | BD5/TD5 | BD610 | BD615 | Commercial terminal & smart accessories product line |
| 33 | 30 | Terminal standard | DMR terminal | BD5/TD5 | BD610 | BD616 | Commercial terminal & smart accessories product line |
| 34 | 31 | Terminal standard | DMR terminal | BD5/TD5 | BD610 | BD618 | Commercial terminal & smart accessories product line |
| 35 | 32 | Terminal standard | DMR terminal | MD6 | MD610 | MD610 | Commercial terminal & smart accessories product line |
| 36 | 33 | Terminal standard | DMR terminal | MD6 | MD610 | MD612 | Commercial terminal & smart accessories product line |
| 37 | 34 | Terminal standard | DMR terminal | MD6 | MD610 | MD615 | Commercial terminal & smart accessories product line |
| 38 | 35 | Terminal standard | DMR terminal | MD6 | MD610 | MD616 | Commercial terminal & smart accessories product line |
| 39 | 36 | Terminal standard | DMR terminal | MD6 | MD610 | MD618 | Commercial terminal & smart accessories product line |
| 40 | 37 | Terminal standard | DMR terminal | MD6 | MD620 | MD620 | Commercial terminal & smart accessories product line |
| 41 | 38 | Terminal standard | DMR terminal | MD6 | MD620 | MD622 | Commercial terminal & smart accessories product line |

**PTX-2352.20**

CONFIDENTIAL BUSINESS INFORMATION, SUBJECT TO PROTECTIVE ORDER        HYT1973-23349621
MSA1109

Commercial terminal models

| | A | B | C | D | E | F | G |
|---|---|---|---|---|---|---|---|
| 1 | No. | Product type | Product family | Product series | Product name | Model | Product line |
| 42 | 39 | Terminal standard | DMR terminal | MD6 | MD620 | MD625 | Commercial terminal & smart accessories product line |
| 43 | 40 | Terminal standard | DMR terminal | MD6 | MD620 | MD626 | Commercial terminal & smart accessories product line |
| 44 | 41 | Terminal standard | DMR terminal | MD6 | MD620 | MD628 | Commercial terminal & smart accessories product line |
| 45 | 42 | Terminal standard | DMR terminal | PD3/TD3 | PD350 | PD352 | Commercial terminal & smart accessories product line |
| 46 | 43 | Terminal standard | DMR terminal | PD3/TD3 | PD350 | PD355 | Commercial terminal & smart accessories product line |
| 47 | 44 | Terminal standard | DMR terminal | PD3/TD3 | PD350 | PD355LF | Commercial terminal & smart accessories product line |
| 48 | 45 | Terminal standard | DMR terminal | PD3/TD3 | PD350 | PD356 | Commercial terminal & smart accessories product line |
| 49 | 46 | Terminal standard | DMR terminal | PD3/TD3 | PD350 | PD358 | Commercial terminal & smart accessories product line |
| 50 | 47 | Terminal standard | DMR terminal | PD3/TD3 | PD360 | PD362 | Commercial terminal & smart accessories product line |
| 51 | 48 | Terminal standard | DMR terminal | PD3/TD3 | PD360 | PD365 | Commercial terminal & smart accessories product line |
| 52 | 49 | Terminal standard | DMR terminal | PD3/TD3 | PD360 | PD365LF | Commercial terminal & smart accessories product line |
| 53 | 50 | Terminal standard | DMR terminal | PD3/TD3 | PD360 | PD366 | Commercial terminal & smart accessories product line |
| 54 | 51 | Terminal standard | DMR terminal | PD3/TD3 | PD360 | PD368 | Commercial terminal & smart accessories product line |
| 55 | 52 | Terminal standard | DMR terminal | PD3/TD3 | PD370 | PD372 | Commercial terminal & smart accessories product line |
| 56 | 53 | Terminal standard | DMR terminal | PD3/TD3 | PD370 | PD375 | Commercial terminal & smart accessories product line |
| 57 | 54 | Terminal standard | DMR terminal | PD3/TD3 | PD370 | PD376 | Commercial terminal & smart accessories product line |
| 58 | 55 | Terminal standard | DMR terminal | PD3/TD3 | PD370 | PD378 | Commercial terminal & smart accessories product line |
| 59 | 59 | Terminal standard | DMR terminal | PD4/TD5 | PD400 | PD402 | Commercial terminal & smart accessories product line |
| 60 | 60 | Terminal standard | DMR terminal | PD4/TD5 | PD400 | PD405 | Commercial terminal & smart accessories product line |
| 61 | 61 | Terminal standard | DMR terminal | PD4/TD5 | PD400 | PD406 | Commercial terminal & smart accessories product line |

**PTX-2352.21**

CONFIDENTIAL BUSINESS INFORMATION, SUBJECT TO PROTECTIVE ORDER        HYT1973-23349621
MSA1110

Commercial terminal models

| | A | B | C | D | E | F | G |
|---|---|---|---|---|---|---|---|
| 1 | No. | Product type | Product family | Product series | Product name | Model | Product line |
| 62 | 62 | Terminal standard | DMR terminal | PD4/TD5 | PD400 | PD408 | Commercial terminal & smart accessories product line |
| 63 | 86 | Terminal customization | DMR terminal | PD4/TD5 | PD400 | PD385(PD405) | Commercial terminal & smart accessories product line |
| 64 | 63 | Terminal standard | DMR terminal | PD4/TD5 | PD410 | PD412 | Commercial terminal & smart accessories product line |
| 65 | 64 | Terminal standard | DMR terminal | PD4/TD5 | PD410 | PD415 | Commercial terminal & smart accessories product line |
| 66 | 65 | Terminal standard | DMR terminal | PD4/TD5 | PD410 | PD416 | Commercial terminal & smart accessories product line |
| 67 | 66 | Terminal standard | DMR terminal | PD4/TD5 | PD410 | PD418 | Commercial terminal & smart accessories product line |
| 68 | 67 | Terminal standard | DMR terminal | PD4/TD5 | PD460 | PD462 | Commercial terminal & smart accessories product line |
| 69 | 68 | Terminal standard | DMR terminal | PD4/TD5 | PD460 | PD465 | Commercial terminal & smart accessories product line |
| 70 | 69 | Terminal standard | DMR terminal | PD4/TD5 | PD460 | PD466 | Commercial terminal & smart accessories product line |
| 71 | 70 | Terminal standard | DMR terminal | PD4/TD5 | PD460 | PD468 | Commercial terminal & smart accessories product line |
| 72 | 71 | Terminal standard | DMR terminal | PD4/TD5 | PD480 | PD482 | Commercial terminal & smart accessories product line |
| 73 | 72 | Terminal standard | DMR terminal | PD4/TD5 | PD480 | PD485 | Commercial terminal & smart accessories product line |
| 74 | 73 | Terminal standard | DMR terminal | PD4/TD5 | PD480 | PD486 | Commercial terminal & smart accessories product line |
| 75 | 74 | Terminal standard | DMR terminal | PD4/TD5 | PD480 | PD488 | Commercial terminal & smart accessories product line |
| 76 | 87 | Terminal customization | DMR terminal | PD4/TD5 | PD480 | AR482G(PD482) | Commercial terminal & smart accessories product line |
| 77 | 88 | Terminal customization | DMR terminal | PD4/TD5 | PD480 | PD395(PD485) | Commercial terminal & smart accessories product line |
| 78 | 75 | Terminal standard | DMR terminal | PD4/TD5 | PD530 | PD530 | Commercial terminal & smart accessories product line |
| 79 | 89 | Terminal customization | DMR terminal | PD4/TD5 | PD530 | DS-800(PD530) | Commercial terminal & smart accessories product line |
| 80 | 76 | Terminal standard | DMR terminal | PD4/TD5 | PD530L | PD530L | Commercial terminal & smart accessories product line |
| 81 | 77 | Terminal standard | DMR terminal | PD4/TD5 | PD530S | PD530S | Commercial terminal & smart accessories product line |

**PTX-2352.22**

CONFIDENTIAL BUSINESS INFORMATION, SUBJECT TO PROTECTIVE ORDER      HYT1973-23349621
MSA1111

Commercial terminal models

| | A | B | C | D | E | F | G |
|---|---|---|---|---|---|---|---|
| 1 | No. | Product type | Product family | Product series | Product name | Model | Product line |
| 82 | 56 | Terminal standard | DMR terminal | PD3/TD3 | TD350 | TD350 | Commercial terminal & smart accessories product line |
| 83 | 57 | Terminal standard | DMR terminal | PD3/TD3 | TD360 | TD360 | Commercial terminal & smart accessories product line |
| 84 | 58 | Terminal standard | DMR terminal | PD3/TD3 | TD370 | TD370 | Commercial terminal & smart accessories product line |
| 85 | 78 | Terminal standard | DMR terminal | PD4/TD5 | TD500 | TD500 | Commercial terminal & smart accessories product line |
| 86 | 90 | Terminal customization | DMR terminal | PD4/TD5 | TD500 | TD530(TD500) | Commercial terminal & smart accessories product line |
| 87 | 91 | Terminal customization | DMR terminal | PD4/TD5 | TD500 | TR4X(TD500) | Commercial terminal & smart accessories product line |
| 88 | 79 | Terminal standard | DMR terminal | PD4/TD5 | TD510 | TD510 | Commercial terminal & smart accessories product line |
| 89 | 80 | Terminal standard | DMR terminal | PD4/TD5 | TD520 | TD520 | Commercial terminal & smart accessories product line |
| 90 | 85 | Terminal customization | DMR terminal | BD5/TD5 | TD550 | TD550(TD550) | Commercial terminal & smart accessories product line |
| 91 | 81 | Terminal standard | DMR terminal | PD4/TD5 | TD560 | Super246 | Commercial terminal & smart accessories product line |
| 92 | 82 | Terminal standard | DMR terminal | PD4/TD5 | TD560 | TD560 | Commercial terminal & smart accessories product line |
| 93 | 83 | Terminal standard | DMR terminal | PD4/TD5 | TD580 | TD580 | Commercial terminal & smart accessories product line |

**PTX-2352.23**

CONFIDENTIAL BUSINESS INFORMATION, SUBJECT TO PROTECTIVE ORDER      HYT1973-23349621
MSA1112

DMR item code-Product type

| | A | B |
|---|---|---|
| 1 | **Item code** | **Product type** |
| 2 | 400006 | Mid- & high-end industry model |
| 3 | 400007 | Mid- & high-end industry model |
| 4 | 400008 | Mid- & high-end industry model |
| 5 | 400009 | Mid- & high-end industry model |
| 6 | 400029 | Public item and public accessory |
| 7 | 400044 | Mid- & high-end industry model |
| 8 | 400057 | Mid- & high-end industry model |
| 9 | 400060 | Mid- & high-end industry model |
| 10 | 400061 | Mid- & high-end industry model |
| 11 | 400062 | Mid- & high-end industry model |
| 12 | 400063 | Mid- & high-end industry model |
| 13 | 400064 | Mid- & high-end industry model |
| 14 | 400072 | Low-end commercial model |
| 15 | 400073 | Low-end commercial model |
| 16 | 400076 | Mid- & high-end industry model |
| 17 | 400084 | Public item and public accessory |
| 18 | 400106 | Mid- & high-end industry model |
| 19 | 400107 | Mid- & high-end industry model |
| 20 | 400108 | Mid- & high-end industry model |
| 21 | 400109 | Mid- & high-end industry model |
| 22 | 400110 | Mid- & high-end industry model |
| 23 | 400111 | Mid- & high-end industry model |
| 24 | 400112 | Mid- & high-end industry model |
| 25 | 400113 | Mid- & high-end industry model |
| 26 | 400116 | Low-end commercial model |
| 27 | 400117 | Mid- & high-end industry model |
| 28 | 400119 | Low-end commercial model |
| 29 | 400166 | Public item and public accessory |
| 30 | 400171 | Low-end commercial model |
| 31 | 400177 | Mid- & high-end industry model |
| 32 | 400182 | Mid- & high-end industry model |
| 33 | 400185 | Mid- & high-end industry model |
| 34 | 400194 | Mid- & high-end industry model |
| 35 | 400195 | Mid- & high-end industry model |
| 36 | 400196 | Mid- & high-end industry model |
| 37 | 400201 | Low-end commercial model |
| 38 | 400202 | Mid- & high-end industry model |
| 39 | 400210 | Mid- & high-end industry model |
| 40 | 400211 | Mid- & high-end industry model |
| 41 | 400212 | Mid- & high-end industry model |
| 42 | 400215 | Mid- & high-end industry model |
| 43 | 400216 | Mid- & high-end industry model |
| 44 | 400225 | Low-end commercial model |
| 45 | 400226 | Low-end commercial model |
| 46 | 400231 | Low-end commercial model |
| 47 | 400232 | Low-end commercial model |
| 48 | 400233 | Low-end commercial model |
| 49 | 400234 | Low-end commercial model |
| 50 | 400235 | Low-end commercial model |
| 51 | 400236 | Low-end commercial model |
| 52 | 400237 | Low-end commercial model |
| 53 | 400238 | Low-end commercial model |
| 54 | 400239 | Low-end commercial model |
| 55 | 400240 | Low-end commercial model |
| 56 | 400241 | Mid- & high-end industry model |
| 57 | 400243 | Mid- & high-end industry model |
| 58 | 400251 | Mid- & high-end industry model |
| 59 | 400252 | Mid- & high-end industry model |

**PTX-2352.24**

CONFIDENTIAL BUSINESS INFORMATION, SUBJECT TO PROTECTIVE ORDER     HYT1973-23349621
MSA1113

DMR item code-Product type

| | A | B |
|---|---|---|
| 1 | **Item code** | **Product type** |
| 60 | 400253 | Mid- & high-end industry model |
| 61 | 400256 | Mid- & high-end industry model |
| 62 | 400259 | Mid- & high-end industry model |
| 63 | 400273 | Mid- & high-end industry model |
| 64 | 400275 | Low-end commercial model |
| 65 | 400289 | Low-end commercial model |
| 66 | 400290 | Low-end commercial model |
| 67 | 400291 | Mid- & high-end industry model |
| 68 | 900000 | Low-end commercial model |
| 69 | 170005 | Mid- & high-end industry model |
| 70 | 17070003 | Low-end commercial model |
| 71 | 400061 | Mid- & high-end industry model |
| 72 | 400084 | Low-end commercial model |
| 73 | 400106 | Mid- & high-end industry model |
| 74 | 400107 | Mid- & high-end industry model |
| 75 | 400109 | Mid- & high-end industry model |
| 76 | 400110 | Mid- & high-end industry model |
| 77 | 400111 | Mid- & high-end industry model |
| 78 | 400112 | Mid- & high-end industry model |
| 79 | 400166 | Public item and public accessory |
| 80 | 400177 | Mid- & high-end industry model |
| 81 | 400182 | Mid- & high-end industry model |
| 82 | 400185 | Mid- & high-end industry model |
| 83 | 400196 | Mid- & high-end industry model |
| 84 | 400201 | Low-end commercial model |
| 85 | 400202 | Mid- & high-end industry model |
| 86 | 400210 | Mid- & high-end industry model |
| 87 | 400211 | Mid- & high-end industry model |
| 88 | 400212 | Mid- & high-end industry model |
| 89 | 400215 | Mid- & high-end industry model |
| 90 | 400216 | Mid- & high-end industry model |
| 91 | 400225 | Low-end commercial model |
| 92 | 400226 | Mid- & high-end industry model |
| 93 | 400231 | Low-end commercial model |
| 94 | 400232 | Low-end commercial model |
| 95 | 400233 | Low-end commercial model |
| 96 | 400234 | Low-end commercial model |
| 97 | 400235 | Low-end commercial model |
| 98 | 400236 | Low-end commercial model |
| 99 | 400237 | Low-end commercial model |
| 100 | 400238 | Mid- & high-end industry model |
| 101 | 400239 | Low-end commercial model |
| 102 | 400240 | Low-end commercial model |
| 103 | 400243 | Mid- & high-end industry model |
| 104 | 400251 | Mid- & high-end industry model |
| 105 | 400252 | Mid- & high-end industry model |
| 106 | 400253 | Mid- & high-end industry model |
| 107 | 400255 | Low-end commercial model |
| 108 | 400256 | Mid- & high-end industry model |
| 109 | 400259 | Mid- & high-end industry model |
| 110 | 400266 | Mid- & high-end industry model |
| 111 | 400273 | Mid- & high-end industry model |
| 112 | 400275 | Low-end commercial model |
| 113 | 400290 | Low-end commercial model |
| 114 | 400291 | Mid- & high-end industry model |
| 115 | CPC0341 | Mid- & high-end industry model |
| 116 | CPC1401 | Mid- & high-end industry model |
| 117 | CR00001 | Public item and public accessory |

**PTX-2352.25**

CONFIDENTIAL BUSINESS INFORMATION, SUBJECT TO PROTECTIVE ORDER      HYT1973-23349621
MSA1114

DMR item code-Product type

| | A | B |
|---|---|---|
| 1 | **Item code** | **Product type** |
| 118 | CR01201 | Public item and public accessory |
| 119 | CYZX001 | Public item and public accessory |
| 120 | D613011 | Mid- & high-end industry model |
| 121 | D613012 | Mid- & high-end industry model |
| 122 | D613113 | Mid- & high-end industry model |
| 123 | D613113 | Mid- & high-end industry model |
| 124 | D613114 | Mid- & high-end industry model |
| 125 | D71E361 | Mid- & high-end industry model |
| 126 | D781401 | Mid- & high-end industry model |
| 127 | D79EX31 | Mid- & high-end industry model |
| 128 | D79EX32 | Mid- & high-end industry model |
| 129 | D79EX33 | Mid- & high-end industry model |
| 130 | DM01101 | Mid- & high-end industry model |
| 131 | DM01102 | Mid- & high-end industry model |
| 132 | DM01103 | Mid- & high-end industry model |
| 133 | DM01201 | Mid- & high-end industry model |
| 134 | DM01202 | Mid- & high-end industry model |
| 135 | DM01301 | Mid- & high-end industry model |
| 136 | DM01302 | Mid- & high-end industry model |
| 137 | DM01303 | Mid- & high-end industry model |
| 138 | DM01401 | Mid- & high-end industry model |
| 139 | DM01402 | Mid- & high-end industry model |
| 140 | DM01403 | Mid- & high-end industry model |
| 141 | DM01501 | Mid- & high-end industry model |
| 142 | DM02101 | Mid- & high-end industry model |
| 143 | DM02201 | Mid- & high-end industry model |
| 144 | DM13011 | Low-end commercial model |
| 145 | DM13041 | Mid- & high-end industry model |
| 146 | DM13042 | Mid- & high-end industry model |
| 147 | DM14001 | Mid- & high-end industry model |
| 148 | DM14002 | Mid- & high-end industry model |
| 149 | DP00000 | Public item and public accessory |
| 150 | DP01201 | Mid- & high-end industry model |
| 151 | DP01202 | Mid- & high-end industry model |
| 152 | DP01203 | Mid- & high-end industry model |
| 153 | DP01204 | Mid- & high-end industry model |
| 154 | DP02101 | Mid- & high-end industry model |
| 155 | DP02102 | Mid- & high-end industry model |
| 156 | DP02103 | Mid- & high-end industry model |
| 157 | DP02104 | Mid- & high-end industry model |
| 158 | DP02201 | Mid- & high-end industry model |
| 159 | DP02202 | Mid- & high-end industry model |
| 160 | DP02203 | Mid- & high-end industry model |
| 161 | DP02204 | Mid- & high-end industry model |
| 162 | DP02300 | Mid- & high-end industry model |
| 163 | DP03101 | Public item and public accessory |
| 164 | DP03401 | Mid- & high-end industry model |
| 165 | DP04001 | Mid- & high-end industry model |
| 166 | DP04002 | Mid- & high-end industry model |
| 167 | DP05001 | Mid- & high-end industry model |
| 168 | DP05002 | Mid- & high-end industry model |
| 169 | DPR1401 | Mid- & high-end industry model |
| 170 | DR00000 | Low-end commercial model |
| 171 | DR13011 | Mid- & high-end industry model |
| 172 | DW13071 | Mid- & high-end industry model |
| 173 | DXP1301 | Mid- & high-end industry model |
| 174 | DXP1302 | Mid- & high-end industry model |
| 175 | DZ00003 | Mid- & high-end industry model |

**PTX-2352.26**

CONFIDENTIAL BUSINESS INFORMATION, SUBJECT TO PROTECTIVE ORDER    HYT1973-23349621
MSA1115

| | A | B |
|---|---|---|
| 1 | **Item code** | **Product type** |
| 176 | DZ00008 | Mid- & high-end industry model |
| 177 | DZ00009 | Mid- & high-end industry model |
| 178 | DZ00010 | Mid- & high-end industry model |
| 179 | DZ00012 | Mid- & high-end industry model |
| 180 | DZ00021 | Public item and public accessory |
| 181 | DZ00052 | Mid- & high-end industry model |
| 182 | DZ00056 | Mid- & high-end industry model |
| 183 | DZ00063 | Mid- & high-end industry model |
| 184 | DZ00070 | Mid- & high-end industry model |
| 185 | DZ00091 | Mid- & high-end industry model |
| 186 | DZ00092 | Mid- & high-end industry model |
| 187 | DZ00096 | Mid- & high-end industry model |
| 188 | DZ00106 | Mid- & high-end industry model |
| 189 | DZ00110 | Mid- & high-end industry model |
| 190 | DZ00121 | Mid- & high-end industry model |
| 191 | DZ00122 | Mid- & high-end industry model |
| 192 | DZ00123 | Mid- & high-end industry model |
| 193 | DZ00124 | Mid- & high-end industry model |
| 194 | DZ00129 | Mid- & high-end industry model |
| 195 | DZ00132 | Mid- & high-end industry model |
| 196 | DZ00133 | Mid- & high-end industry model |
| 197 | DZ00135 | Mid- & high-end industry model |
| 198 | DZ00136 | Mid- & high-end industry model |
| 199 | DZ00137 | Mid- & high-end industry model |
| 200 | DZ00138 | Mid- & high-end industry model |
| 201 | DZ00140 | Mid- & high-end industry model |
| 202 | DZ00141 | Mid- & high-end industry model |
| 203 | DZ00143 | Mid- & high-end industry model |
| 204 | DZ00144 | Mid- & high-end industry model |
| 205 | DZ00145 | Mid- & high-end industry model |
| 206 | DZ00147 | Mid- & high-end industry model |
| 207 | DZ00151 | Mid- & high-end industry model |
| 208 | DZ00153 | Mid- & high-end industry model |
| 209 | DZ00157 | Mid- & high-end industry model |
| 210 | DZ00172 | Low-end commercial model |
| 211 | DZ00173 | Low-end commercial model |
| 212 | DZ00176 | Low-end commercial model |
| 213 | DZ00180 | Low-end commercial model |
| 214 | DZ00186 | Mid- & high-end industry model |
| 215 | DZ00188 | Mid- & high-end industry model |
| 216 | DZ00191 | Mid- & high-end industry model |
| 217 | DZ00192 | Low-end commercial model |
| 218 | DZ00195 | Mid- & high-end industry model |
| 219 | DZ00202 | Mid- & high-end industry model |
| 220 | DZ00204 | Mid- & high-end industry model |
| 221 | DZ00206 | Mid- & high-end industry model |
| 222 | DZ00208 | Mid- & high-end industry model |
| 223 | DZ00211 | Low-end commercial model |
| 224 | DZ00212 | Low-end commercial model |
| 225 | DZ00214 | Mid- & high-end industry model |
| 226 | DZ00215 | Mid- & high-end industry model |
| 227 | DZ00216 | Mid- & high-end industry model |
| 228 | DZ00217 | Mid- & high-end industry model |
| 229 | DZ00218 | Mid- & high-end industry model |
| 230 | DZ00219 | Mid- & high-end industry model |
| 231 | DZ00221 | Mid- & high-end industry model |
| 232 | DZ00223 | Mid- & high-end industry model |
| 233 | DZ00224 | Mid- & high-end industry model |

**PTX-2352.27**

CONFIDENTIAL BUSINESS INFORMATION, SUBJECT TO PROTECTIVE ORDER     HYT1973-23349621
MSA1116

DMR item code-Product type

| | A | B |
|---|---|---|
| 1 | **Item code** | **Product type** |
| 234 | DZ00226 | Mid- & high-end industry model |
| 235 | DZ00227 | Mid- & high-end industry model |
| 236 | DZ00228 | Low-end commercial model |
| 237 | DZ00234 | Mid- & high-end industry model |
| 238 | DZ00235 | Mid- & high-end industry model |
| 239 | DZ00239 | Mid- & high-end industry model |
| 240 | DZ00240 | Mid- & high-end industry model |
| 241 | DZ00242 | Mid- & high-end industry model |
| 242 | DZ00245 | Low-end commercial model |
| 243 | DZ00246 | Mid- & high-end industry model |
| 244 | DZ00248 | Mid- & high-end industry model |
| 245 | DZ00250 | Mid- & high-end industry model |
| 246 | DZ00251 | Mid- & high-end industry model |
| 247 | DZ00254 | Mid- & high-end industry model |
| 248 | DZ00256 | Low-end commercial model |
| 249 | GT00001 | Public item and public accessory |
| 250 | HDS1102 | Mid- & high-end industry model |
| 251 | HDS1306 | Mid- & high-end industry model |
| 252 | LTE1401 | Mid- & high-end industry model |
| 253 | LTE1402 | Mid- & high-end industry model |
| 254 | MY01107 | Mid- & high-end industry model |
| 255 | PD31460 | Low-end commercial model |
| 256 | PD31460 | Low-end commercial model |
| 257 | PD51460 | Low-end commercial model |
| 258 | PJ00001 | Public item and public accessory |
| 259 | PJ01001 | Mid- & high-end industry model |
| 260 | PJ04003 | Mid- & high-end industry model |
| 261 | PJ06001 | Mid- & high-end industry model |
| 262 | PJ07101 | Mid- & high-end industry model |
| 263 | PJ08201 | Mid- & high-end industry model |
| 264 | PJ08202 | Mid- & high-end industry model |
| 265 | PJE3100 | Mid- & high-end industry model |
| 266 | PJF3100 | Public item and public accessory |
| 267 | PJF3101 | Mid- & high-end industry model |
| 268 | PJP3100 | Public item and public accessory |
| 269 | R100090001 | Public item and public accessory |
| 270 | R100100001 | Mid- & high-end industry model |
| 271 | R100100012 | Mid- & high-end industry model |
| 272 | R100110001 | Public item and public accessory |
| 273 | R100110002 | Public item and public accessory |
| 274 | R100110003 | Mid- & high-end industry model |
| 275 | R100110004 | Public item and public accessory |
| 276 | R100110042 | Mid- & high-end industry model |
| 277 | R100120003 | Public item and public accessory |
| 278 | R100120019 | Mid- & high-end industry model |
| 279 | R100120023 | Mid- & high-end industry model |
| 280 | R100120027 | Mid- & high-end industry model |
| 281 | R100130002 | Low-end commercial model |
| 282 | R100130004 | Mid- & high-end industry model |
| 283 | R100130016 | Mid- & high-end industry model |
| 284 | R100130024 | Mid- & high-end industry model |
| 285 | R100130029 | Low-end commercial model |
| 286 | R100130033 | Low-end commercial model |
| 287 | R100140019 | Mid- & high-end industry model |
| 288 | R100140026 | Low-end commercial model |
| 289 | R100140030 | Low-end commercial model |
| 290 | R100140031 | Low-end commercial model |
| 291 | R100140032 | Mid- & high-end industry model |

**PTX-2352.28**

CONFIDENTIAL BUSINESS INFORMATION, SUBJECT TO PROTECTIVE ORDER     HYT1973-23349621
MSA1117

DMR item code-Product type

| | A | B |
|---|---|---|
| 1 | **Item code** | **Product type** |
| 292 | R100140038 | Mid- & high-end industry model |
| 293 | R100140041 | Mid- & high-end industry model |
| 294 | R100140050 | Mid- & high-end industry model |
| 295 | R100150007 | Low-end commercial model |
| 296 | R100150011 | Mid- & high-end industry model |
| 297 | R100150022 | Public item and public accessory |
| 298 | R100150026 | Mid- & high-end industry model |
| 299 | R100150027 | Mid- & high-end industry model |
| 300 | R100150029 | Mid- & high-end industry model |
| 301 | R100150035 | Mid- & high-end industry model |
| 302 | R100150043 | Public item and public accessory |
| 303 | R100150049 | Public item and public accessory |
| 304 | R100160003 | Mid- & high-end industry model |
| 305 | R100160011 | Low-end commercial model |
| 306 | R100160012 | Low-end commercial model |
| 307 | R100160018 | Low-end commercial model |
| 308 | R100160023 | Mid- & high-end industry model |
| 309 | R100160025 | Mid- & high-end industry model |
| 310 | R100160027 | Mid- & high-end industry model |
| 311 | R100160028 | Mid- & high-end industry model |
| 312 | R100160029 | Public item and public accessory |
| 313 | R100160030 | Public item and public accessory |
| 314 | R100160033 | Low-end commercial model |
| 315 | R100160035 | Low-end commercial model |
| 316 | R100160061 | Public item and public accessory |
| 317 | R100160068 | Mid- & high-end industry model |
| 318 | R100160069 | Mid- & high-end industry model |
| 319 | R100160081 | Low-end commercial model |
| 320 | R100160092 | Mid- & high-end industry model |
| 321 | R100170001 | Mid- & high-end industry model |
| 322 | R100170002 | Mid- & high-end industry model |
| 323 | R100170008 | Mid- & high-end industry model |
| 324 | R100170011 | Mid- & high-end industry model |
| 325 | R100170012 | Mid- & high-end industry model |
| 326 | R100170020 | Low-end commercial model |
| 327 | R100170025 | Low-end commercial model |
| 328 | R100170026 | Low-end commercial model |
| 329 | R100170027 | Low-end commercial model |
| 330 | R100170029 | Low-end commercial model |
| 331 | R100170031 | Mid- & high-end industry model |
| 332 | R100170032 | Low-end commercial model |
| 333 | R100170033 | Mid- & high-end industry model |
| 334 | R100170037 | Mid- & high-end industry model |
| 335 | R100170038 | Mid- & high-end industry model |
| 336 | R100170041 | Mid- & high-end industry model |
| 337 | R100170048 | Low-end commercial model |
| 338 | R100170049 | Low-end commercial model |
| 339 | R100170052 | Mid- & high-end industry model |
| 340 | R100170059 | Mid- & high-end industry model |
| 341 | R100170073 | Low-end commercial model |
| 342 | R100170081 | Mid- & high-end industry model |
| 343 | R100170084 | Mid- & high-end industry model |
| 344 | R100170085 | Mid- & high-end industry model |
| 345 | R100170089 | Low-end commercial model |
| 346 | R100170091 | Mid- & high-end industry model |
| 347 | R100170097 | Mid- & high-end industry model |
| 348 | R100170099 | Public item and public accessory |
| 349 | R100170100 | Mid- & high-end industry model |

**PTX-2352.29**

CONFIDENTIAL BUSINESS INFORMATION, SUBJECT TO PROTECTIVE ORDER    HYT1973-23349621
MSA1118

DMR item code-Product type

| | A | B |
|---|---|---|
| 1 | **Item code** | **Product type** |
| 350 | R100170101 | Mid- & high-end industry model |
| 351 | R100170103 | Mid- & high-end industry model |
| 352 | R100170104 | Mid- & high-end industry model |
| 353 | R100170108 | Mid- & high-end industry model |
| 354 | R100170109 | Mid- & high-end industry model |
| 355 | R100170112 | Mid- & high-end industry model |
| 356 | R100170113 | Mid- & high-end industry model |
| 357 | R100170121 | Mid- & high-end industry model |
| 358 | R100180001 | Low-end commercial model |
| 359 | R100180002 | Mid- & high-end industry model |
| 360 | R100180003 | Mid- & high-end industry model |
| 361 | R100180012 | Public item and public accessory |
| 362 | R100180016 | Public item and public accessory |
| 363 | R100180023 | Mid- & high-end industry model |
| 364 | R100180024 | Mid- & high-end industry model |
| 365 | R100180026 | Public item and public accessory |
| 366 | R100180030 | Low-end commercial model |
| 367 | R100180031 | Public item and public accessory |
| 368 | R100180036 | Public item and public accessory |
| 369 | R100180039 | Mid- & high-end industry model |
| 370 | R100180057 | Mid- & high-end industry model |
| 371 | R100180087 | Mid- & high-end industry model |
| 372 | R100180088 | Mid- & high-end industry model |
| 373 | R104170005 | Public item and public accessory |
| 374 | R104180002 | Public item and public accessory |
| 375 | R104180021 | Mid- & high-end industry model |
| 376 | R107150001 | Mid- & high-end industry model |
| 377 | R109170004 | Low-end commercial model |
| 378 | R109170005 | Low-end commercial model |
| 379 | R109170006 | Mid- & high-end industry model |
| 380 | R109180001 | Mid- & high-end industry model |
| 381 | R114170001 | Mid- & high-end industry model |
| 382 | RHCL170003 | Mid- & high-end industry model |
| 383 | RHCL170004 | Mid- & high-end industry model |
| 384 | RHCL170005 | Mid- & high-end industry model |
| 385 | RHCL170006 | Mid- & high-end industry model |
| 386 | RHCL170007 | Mid- & high-end industry model |
| 387 | RHCL170008 | Mid- & high-end industry model |
| 388 | RJ00003 | Mid- & high-end industry model |
| 389 | RJ00004 | Mid- & high-end industry model |
| 390 | RJ00005 | Mid- & high-end industry model |
| 391 | RJ00006 | Mid- & high-end industry model |
| 392 | RJ00007 | Mid- & high-end industry model |
| 393 | RJ00008 | Mid- & high-end industry model |
| 394 | RJ00013 | Mid- & high-end industry model |
| 395 | RJ00014 | Mid- & high-end industry model |
| 396 | RJ00014-1 | Mid- & high-end industry model |
| 397 | RJ00014-2 | Mid- & high-end industry model |
| 398 | RJ00014-3 | Mid- & high-end industry model |
| 399 | RJ00014-4 | Mid- & high-end industry model |
| 400 | RJ00014-5 | Mid- & high-end industry model |
| 401 | RJ00015 | Mid- & high-end industry model |
| 402 | RJ00015-1 | Mid- & high-end industry model |
| 403 | RJ00015-2 | Mid- & high-end industry model |
| 404 | RJ00015-3 | Mid- & high-end industry model |
| 405 | RJ00015-4 | Mid- & high-end industry model |
| 406 | RJ00016 | Public item and public accessory |
| 407 | RJ00020-1 | Mid- & high-end industry model |

**PTX-2352.30**

CONFIDENTIAL BUSINESS INFORMATION, SUBJECT TO PROTECTIVE ORDER     HYT1973-23349621
MSA1119

DMR item code-Product type

| | A | B |
|---|---|---|
| 1 | **Item code** | **Product type** |
| 408 | RJ00020-2 | Mid- & high-end industry model |
| 409 | RJ00020-3 | Mid- & high-end industry model |
| 410 | RJ00020-4 | Mid- & high-end industry model |
| 411 | RJ00021-1 | Mid- & high-end industry model |
| 412 | RJ00021-2 | Mid- & high-end industry model |
| 413 | RJ00021-3 | Mid- & high-end industry model |
| 414 | RJ00022-1 | Mid- & high-end industry model |
| 415 | RJ00022-3 | Mid- & high-end industry model |
| 416 | RS00001 | Public item and public accessory |
| 417 | RSG1101 | Public item and public accessory |
| 418 | RST1101 | Public item and public accessory |
| 419 | S-CN44-161122-D01 | Mid- & high-end industry model |
| 420 | S-CN442-170934 | Mid- & high-end industry model |
| 421 | S-CN442-170934-D01 | Mid- & high-end industry model |
| 422 | SN00001 | Public item and public accessory |
| 423 | SYD0002 | Low-end commercial model |
| 424 | SYR0000 | Low-end commercial model |
| 425 | SYR0003 | Public item and public accessory |
| 426 | SYR0004 | Public item and public accessory |
| 427 | SYR0301 | Public item and public accessory |
| 428 | TB01102 | Mid- & high-end industry model |
| 429 | TD14001 | Low-end commercial model |
| 430 | TD14002 | Low-end commercial model |
| 431 | TD21401 | Low-end commercial model |
| 432 | TD30341 | Low-end commercial model |
| 433 | TD30342 | Low-end commercial model |
| 434 | TD50341 | Low-end commercial model |
| 435 | TD50342 | Low-end commercial model |
| 436 | TD50343 | Mid- & high-end industry model |
| 437 | TD56341 | Mid- & high-end industry model |
| 438 | TD56342 | Mid- & high-end industry model |
| 439 | XEX1401 | Mid- & high-end industry model |
| 440 | XT00003 | Mid- & high-end industry model |
| 441 | XTP0701 | Mid- & high-end industry model |
| 442 | YPP0001 | Public item and public accessory |
| 443 | YPX1801 | Public item and public accessory |
| 444 | ZDM1380 | Low-end commercial model |
| 445 | ZDZX005 | Mid- & high-end industry model |
| 446 | ZDZX011 | Mid- & high-end industry model |
| 447 | ZF00001 | Public item and public accessory |
| 448 | ZF03108 | Mid- & high-end industry model |
| 449 | ZF04205 | Mid- & high-end industry model |
| 450 | ZF07102 | Mid- & high-end industry model |
| 451 | ZF08102 | Mid- & high-end industry model |
| 452 | ZF08105 | Mid- & high-end industry model |
| 453 | ZF09202 | Mid- & high-end industry model |
| 454 | ZF09301 | Mid- & high-end industry model |
| 455 | ZFD0001 | Public item and public accessory |
| 456 | ZFD0002 | Public item and public accessory |
| 457 | ZFD0002 | Public item and public accessory |
| 458 | ZFD0003 | Public item and public accessory |
| 459 | ZFD0004 | Mid- & high-end industry model |
| 460 | ZFD0005 | Public item and public accessory |
| 461 | ZFD0301 | Mid- & high-end industry model |
| 462 | ZFD3202 | Mid- & high-end industry model |
| 463 | ZFD3203 | Mid- & high-end industry model |
| 464 | ZFD3204 | Mid- & high-end industry model |
| 465 | ZFD3205 | Mid- & high-end industry model |

**PTX-2352.31**

CONFIDENTIAL BUSINESS INFORMATION, SUBJECT TO PROTECTIVE ORDER     HYT1973-23349621
MSA1120

DMR item code-Product type

| | A | B |
|---|---|---|
| 1 | **Item code** | **Product type** |
| 466 | ZFD3206 | Mid- & high-end industry model |
| 467 | ZFD3207 | Mid- & high-end industry model |
| 468 | ZFD3208 | Mid- & high-end industry model |
| 469 | ZFD3209 | Public item and public accessory |
| 470 | ZFD3210 | Mid- & high-end industry model |
| 471 | ZFD3211 | Mid- & high-end industry model |
| 472 | ZFD3212 | Mid- & high-end industry model |
| 473 | ZFD3213 | Mid- & high-end industry model |
| 474 | ZFD3214 | Mid- & high-end industry model |
| 475 | ZFD3215 | Mid- & high-end industry model |
| 476 | ZFD3216 | Public item and public accessory |
| 477 | ZFD3217 | Mid- & high-end industry model |
| 478 | ZFD3301 | Mid- & high-end industry model |
| 479 | ZFD3302 | Mid- & high-end industry model |
| 480 | ZFD4201 | Mid- & high-end industry model |
| 481 | ZFD5101 | Mid- & high-end industry model |
| 482 | ZFD5102 | Mid- & high-end industry model |
| 483 | ZFM2101 | Mid- & high-end industry model |
| 484 | ZFM2103 | Mid- & high-end industry model |
| 485 | ZFYY001 | Mid- & high-end industry model |
| 486 | ZFYY002 | Mid- & high-end industry model |
| 487 | ZGS0002 | Public item and public accessory |
| 488 | ZHD0001 | Mid- & high-end industry model |
| 489 | ZHD0101 | Mid- & high-end industry model |
| 490 | ZHD0102 | Mid- & high-end industry model |
| 491 | ZHD0103 | Mid- & high-end industry model |
| 492 | ZHD0104 | Mid- & high-end industry model |
| 493 | ZHD0105 | Mid- & high-end industry model |
| 494 | ZHD0106 | Mid- & high-end industry model |
| 495 | ZHD0107 | Mid- & high-end industry model |
| 496 | ZHD0108 | Mid- & high-end industry model |
| 497 | ZHD0109 | Mid- & high-end industry model |
| 498 | ZHD0201 | Mid- & high-end industry model |
| 499 | ZHD0301 | Mid- & high-end industry model |
| 500 | ZHD0601 | Mid- & high-end industry model |
| 501 | ZHD0602 | Mid- & high-end industry model |
| 502 | ZHD1101 | Mid- & high-end industry model |
| 503 | ZHD603 | Mid- & high-end industry model |
| 504 | ZHM0101 | Public item and public accessory |
| 505 | PJ02101 | Public item and public accessory |
| 506 | ZF08101 | Mid- & high-end industry model |

**PTX-2352.32**

CONFIDENTIAL BUSINESS INFORMATION, SUBJECT TO PROTECTIVE ORDER       HYT1973-23349621
MSA1121



**TRANSPERFECT**

City of New York, State of New York, County of New York

I, Artem Furman, hereby certify that the document "HYT1973-23349621 (2)" is to the best of my knowledge and belief, a true and accurate translation from Chinese (Simplified) into English.

Artem Furman

Sworn to before me this
January 15, 2020

Signature, Notary Public

Stamp, Notary Public

**PTX-2352.33**

CONFIDENTIAL BUSINESS INFORMATION, SUBJECT TO PROTECTIVE ORDER        HYT1973-23349621

MSA1122

**CERTIFICATE OF SERVICE**

I hereby certify that on June 11, 2024, a copy of the foregoing separate appendix was filed electronically.  Service of this filing will be made on all ECF-registered counsel by operation of the court's electronic filing system.  Parties may access this filing through the court's system.

*s/* John C. O'Quinn, P.C.
John C. O'Quinn, P.C.
